## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                   :    Chapter 11

                         :

FREEDOM COMMUNICATIONS HOLDINGS, :    Case No. 09-_____ (___)
INC., et al.,                 :

                         :

          Debtors.[1]        :    Joint Administration Pending

------------------------------------------------------------ x

### DECLARATION OF MARK A. MCEACHEN, SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF FREEDOM COMMUNICATIONS HOLDINGS, INC., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Mark A. McEachen, being duly sworn, deposes and says:

1.      I am the Senior Vice President and Chief Financial Officer of Freedom Communications Holdings, Inc., a corporation organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").

2.      I have been employed by the Debtors and served as Senior Vice President and Chief Financial Officer for three months. As such, I am generally familiar with the Debtors' day-to-day operations, financial conditions, business affairs, and books and records. I submit this declaration (the "Declaration") on the Debtors' behalf in conjunction with their petitions and in support of the various motions and applications for orders filed with the Court contemporaneously herewith (collectively, the "First Day Pleadings").

3.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees; my discussions with other

members of the Debtors' management team; or my opinion based upon experience, expertise, and knowledge of the Debtors' operations and financial condition. In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing, or collecting any such documentation and other information.

4. I am over the age of 18 and am competent to testify.

5. If I were called to testify as a witness in this matter, I could and would testify competently as to the veracity of the facts set forth herein.

6. The Declaration is divided into two parts. Part I of this Declaration provides background information about the Debtors, their business operations, and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the Debtors' First Day Pleadings.

## PART I

## <u>BACKGROUND</u>

A.   <u>Chapter 11 Filings</u>

7. On September 1, 2009 (the "Petition Date"), each of the Debtors filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties and will act as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

---

[1]     See Attachment 1 hereto for the names of all Debtors in these jointly-administered cases.

                                                             

B.    Identification of Debtors

8.    The Debtors consist of 50 entities within a corporate family led by parent

company Freedom Communications Holdings, Inc. ("Freedom Holdings"), a Delaware

corporation.  Freedom Holdings is the direct owner of Freedom Communications, Inc.

("Freedom Communications"), also a Delaware corporation.  Freedom Communications is, in

turn, the direct or indirect owner of the other 48 Debtors, which include:

> Freedom Broadcasting, Inc.
> Freedom Broadcasting of Florida, Inc.
> Freedom Broadcasting of Florida Licensee, L.L.C.
> Freedom Broadcasting of Michigan, Inc.
> Freedom Broadcasting of Michigan Licensee, L.L.C.
> Freedom Broadcasting of New York, Inc.
> Freedom Broadcasting of New York Licensee, L.L.C.
> Freedom Broadcasting of Oregon, Inc.
> Freedom Broadcasting of Oregon Licensee, L.L.C.
> Freedom Broadcasting of Southern New England, Inc.
> Freedom Broadcasting of Southern New England Licensee, L.L.C.
> Freedom Broadcasting of Texas, Inc.
> Freedom Broadcasting of Texas, Licensee, L.L.C.
> Freedom Broadcasting of Tennessee, Inc.
> Freedom Broadcasting of Tennessee Licensee, L.L.C.
> Freedom Magazines, Inc.
> Freedom Metro Information, Inc.
> Freedom Newspapers, Inc.
> Orange County Register Communications, Inc.
> OCR Community Publications, Inc.
> OCR Information Marketing, Inc.
> Appeal-Democrat, Inc.
> Florida Freedom Newspapers, Inc.
> Freedom Arizona Information, Inc.
> Freedom Colorado Information, Inc.
> Freedom Eastern North Carolina Communications, Inc.
> Freedom Newspapers of Illinois, Inc.
> Freedom Newspapers of Southwestern Arizona, Inc.
> Freedom Shelby Star, Inc.
> Illinois Freedom Newspapers, Inc.
> Missouri Freedom Newspapers, Inc.
> Odessa American
> The Times-News Publishing Company
> Victor Valley Publishing Company

3

Daily Press
Freedom Newspaper Acquisitions, Inc.
The Clovis News-Journal
Freedom Newspapers of New Mexico L.L.C.
Gaston Gazette LLP
Lima News
Porterville Recorder Company
Seymour Tribune Company
Victorville Publishing Company
Freedom Newspapers
The Creative Spot, L.L.C.
Freedom Interactive Newspapers, Inc.
Freedom Interactive Newspapers of Texas, Inc.
Freedom Services, Inc.

In addition, the corporate family includes an additional six affiliated entities that have not been included in these filings (the "Non-Debtor Affiliates").[2] Attached hereto as <u>Exhibit A</u> are organizational charts depicting the corporate structure of the Debtors.

C.    <u>Nature of Debtors' Business Operations</u>

9.     Together, the Debtors operate a media business in two primary industry segments: newspaper publishing and broadcast television.  In addition, the Debtors operate an interactive business which offers website complements, as well as digital and mobile products, to their newspaper and broadcast properties.  Of the six Non-Debtor Affiliates, five operate as charitable organizations within the communities served by certain of the Debtors' newspapers, and one is a defunct Mexican entity.

10.     The Debtors' operations are headquartered in Orange County, California and extend to 15 states within the United States, including: Arizona, California, Colorado, Florida, Illinois, Indiana, Michigan, Missouri, New Mexico, New York, North Carolina, Ohio, Oregon,

---

[2]    The Non-Debtor Affiliates include:  Gazette Charities (CO), Gazette Charities, Inc. (NC), The Register Charities, Inc., The Register Campership Fund, Lima News Empty Stocking Fund, and Freedom Publicaciones S.A. de C.V.  The Debtors do not hold ownership interests in the five charitable organizations

4

Tennessee, and Texas. In the conduct of their operations, the Debtors utilize the services of in excess of 8,200 employees and independent contractors.

11. The Debtors' newspaper publishing segment produces approximately 90 daily and weekly publications, including 30 daily newspapers, as well as ancillary magazines and other specialty publications. The newspapers include, without limitation, the following, listed by state:

> Arizona: *The Mesa Tribune, Daily News-Sun, The Sun* and *Bajo El Sol*
>
> California: *Appeal-Democrat, Daily Press, El Mojave, Desert Dispatch, Hesperia Star, The Orange County Register, Excelsior, The Porterville Recorder,* and *Noticiero Semanal*
>
> Colorado: *The Gazette*
>
> Florida: *The Times (Apalachicola/Carrabelle), Crestview News Bulletin, The Destin Log, Holmes County Times-Advertiser, The News Herald, Northwest Florida Daily News, Santa Rosa Press Gazette, The Star, The Walton Sun,* and *Washington County News*
>
> Illinois: *Journal-Courier* and *The Telegraph*
>
> Indiana: *The Tribune*
>
> Missouri: *The Sedalia Democrat*
>
> New Mexico: *Clovis News Journal, Portales News-Tribune,* and *Quay County Sun*
>
> North Carolina: *The Daily News, The Free Press, The Jones Post, The Gaston Gazette, The Havelock News, The Star, Sun Journal, The Shopper, Times News,* and *Topsail Advertiser*
>
> Ohio: *The Lima News*
>
> Texas: *The Brownsville Herald, El Nuevo Heraldo, Mid-Valley Town Crier, The Monitor, La Frontera, Odessa American, El Semanario,* and *Valley Morning Star,* and *The Coastal Current Weekly*

12. In addition, the Debtors operate eight television stations within their broadcast television segment, including five CBS affiliates, two ABC affiliates, and one CW affiliate. The television stations include the following, listed by state:

DB02:8677729.1

068715.1001

Florida:  WPEC (CBS, Channel 12)

Michigan:  WLAJ (ABC, Channel 53) and WWMT (CBS, Channel 3)

New York:  WRGB (CBS, Channel 6) and WCWN (CW, Channel 45)

Oregon:  KTVL (CBS, Channel 10)

Tennessee:  WTVC (ABC, Channel 9)

Texas:  KFDM  (CBS, Channel 6)

D.    History

13.    The Debtors were founded in 1935 by libertarian R.C. Hoiles, with the purchase of a newspaper now known as *The Orange County Register* (as defined herein)– currently the Debtors' flagship daily newspaper.  Historical highpoints in the Debtors' subsequent expansion include: in 1946, the acquisition of The Gazette-Telegraph in Colorado Springs, Colorado; during the period from 1981 to 1986, the entry into broadcast television with the acquisition of five stations; and during the period from 1995 to 2000, significant strategic expansions with the acquisition of 15 daily and weekly community newspapers, television stations in West Palm Beach, Florida and Grand Rapids/Lansing, Michigan, and newspapers in Phoenix and Yuma, Arizona and Alton, Illinois.

E.    Ownership

14.    The family of R.C. Hoiles (the "Family") continues to hold a majority stake in the Debtors through an approximately 52% ownership interest in the stock of Freedom Holdings.  Other members of the Family sold their interests through a series of recapitalization transactions completed on May 18, 2004, pursuant to which the remaining stock ownership interest, which has increased from approximately 40% at the time of the recapitalization to approximately 48% at the current time, was acquired by The Blackstone Group, Providence Equity Partners, Inc.,

6

and certain of their respective affiliates (the "Investors").  Freedom Holdings is closely held and its stock interests are not publicly traded.

F.     Directors and Executive Officers

15.     The board of directors of Freedom Holdings consists of 13 seats, with four available for independent directors, four for designees of the Family, four for designees of the Investors, and one for management.  Thomas W. Bassett, a Family designee, serves as Chairman of the Board.

16.     The Debtors' senior management team includes:  Burl Osborne, Interim President and Chief Executive Officer; Mark A. McEachen, Senior Vice President and Chief Financial Officer; Jonathan Segal, Senior Vice President and President of the Newspapers Division; Doreen D. Wade, Senior Vice President and President of the Broadcast Division; Douglas S. Bennett, Senior Vice President and President of the Interactive Division; Rachel L. Sagan, Vice President, General Counsel and Secretary; Marcy E. Bruskin, Vice President, Human Resources; Nancy S. Trillo, Vice President, Enterprise Finance, Controller & Treasurer.

G.     Revenue Sources

17.     Revenue for the Debtors' newspaper publishing segment is derived primarily from advertising (both print and online) and secondarily from paid circulation (including single copy sales and subscription sales), commercial printing, and other product offerings. Advertising revenue consists of three basis categories: retail, classified, and national.  Newspaper revenue tends to follow a distinct and recurring seasonal pattern, with higher advertising revenue in months containing significant events or holidays.  Accordingly, the fourth quarter has historically been the strongest, followed by the second quarter, and the third quarter.  The first quarter has historically been the weakest.  The Debtors' newspapers seek to produce desirable

results for advertisers by targeting readers based on certain geographic and demographic characteristics.

18.    Revenue for the Debtors' broadcast television segment is derived primarily from advertising, with additional sources of revenue from video production services and other activities, including online product sales and retransmission consent fees. Television advertising revenue is generally classified in the following categories: national, local, and political. The revenue stream tends to follow a distinct and recurring bi-annual pattern correlated with the occurrence of political advertising during election years. The fourth quarter is typically the strongest due to holiday retail spending, followed by the second and the third quarters. The first quarter is typically the weakest. The broadcast stations seek to maximize advertising revenue by increasing audiences for local news and syndicated programming. Audience levels are also impacted by the popularity of their affiliated network's programming (CBS, ABC, or CW). There are long-term affiliation agreements in place between the broadcast stations and the networks.

19.    The Debtors anticipate that advertising revenue growth will increasingly come from online advertising. Thus, the Debtors have been committed to building and supporting a portfolio of online products and services that are uniquely tailored to each of their local communities. The Debtors' online activities include websites supporting each of their daily newspapers and television broadcast stations, as well as selected communities of interest, such as high school sports.

H.    Financial Constraints

20.    The advertising environment is influenced by the state of the overall economy, including unemployment rates, inflation, energy prices, consumer interest rates, and the

availability of credit. Historically, advertising revenue has increased in periods of economic growth and declined during national, regional, and local economic downturns. Thus, the Debtors' revenue and operating results since 2008 have been significantly impacted by the ongoing recession. The duration and depth of the recession in markets in which the Debtors operate may further reduce their future revenues, operating results, and cash flows. In addition, competition from internet based advertising alternatives, particularly in the classified employment advertising category, has continued to erode traditional print media sources of revenue. Newsprint prices have also had a significant effect on the Debtors' operating results, as newsprint is their principal raw material. The newsprint industry is highly cyclical, and newsprint prices have historically experienced significant volatility caused by supply and demand imbalances.

I.     Efforts to Address Financial Constraints

21.     In response to declining revenues, the Debtors have been actively engaged in efforts to right-size their cost structure. In their newspaper publishing business, the Debtors have consolidated print facilities and operational functions, created regional hubs, introduced new business models, and outsourced selected distribution, printing, advertising production, and design activities. With respect to the operations of *The Orange County Register*, the Debtors have reduced headcount, cut back on unprofitable circulation, reduced newsprint consumption, streamlined printing, and outsourced distribution functions. In addition, the Debtors have strengthened and reorganized their newspaper sales organization and have added sales hunters to focus on online revenue. In the broadcast arena, the Debtors have focused on sales execution, increase of in-market revenue, operational efficiencies, automation, and headcount reductions. Generally, the Debtors have, among other things, initiated the process of outsourcing the back-

9

office functions in the accounting and finance areas, which is expected to be completed later this year, and have implemented an across-the-board 5% reduction in base pay for employees at all levels, effective as of July 13, 2009.

J.    Credit Agreement Defaults

22.    Notwithstanding their efforts to ameliorate the effects of declining revenues through cost-saving initiatives, the Debtors' financial condition deteriorated to the point of triggering defaults under their primary financial obligation, which is evidenced by the Credit Agreement dated as of May 18, 2004, as amended (the "Credit Agreement"), among Freedom Holdings, Freedom Communications as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A. as administrative agent, and the other agents party thereto.  As of the Petition Date, the indebtedness owing under the Credit Agreement is approximately $770.6 million (excluding accrued and unpaid interest, contingent letter of credit obligations, and related fees).  The obligations under the Credit Agreement are secured by substantially all of the assets of the Debtors pursuant to the terms of the Guarantee and Collateral Agreement dated as of May 18, 2004, as amended (the "Collateral Agreement"), among Freedom Holdings, Freedom Communications, the other Debtors, and JPMorgan Chase Bank, N.A. as collateral agent.

23.    The defaults resulted from the Debtors' failure to satisfy certain financial covenants under the Credit Agreement as of September 30, 2008.   The defaults continued through April 29, 2009, when the Debtors, the lenders, and the agents entered into the Amendment No. 4, Waiver and Agreement (the "April 29 Amendment").  Under the April 29 Amendment, in exchange for fees, an interest rate increase, accelerated amortization payments, revolver repayment and permanent reduction, and entry into control agreements with respect to certain of the Debtors' accounts, the lenders agreed to grant the Debtors a temporary waiver of

the defaults through December 31, 2009, unless earlier terminated. With the waiver termination approaching, during the period immediately prior to the Petition Date, the Debtors faced the prospect of lengthy negotiations with their secured lenders that, even if resulting in an out-of-court restructuring of the obligations under the Credit Agreement, were not certain to remedy all of the issues impacting their financial results.

K.     Contingent Litigation Settlement

24.     Also during the period immediately prior to the Petition Date, the Debtors faced the imminent loss of approximately $28.9 million to a contingent litigation settlement involving the class action claims of certain newspaper carriers for *The Orange County Register*. Those claims arose from a class action lawsuit filed in 2003 against Freedom Communications, Inc. d/b/a The Orange County Register (the "Register") in the Superior Court of California by lead plaintiff Nelson Gonzalez on behalf of certain newspaper carriers who alleged that they were employees rather than independent contractors and thus entitled to wages, overtime, and expenses under certain California labor laws and orders (the "Gonzalez Litigation"). The class as certified contained all persons engaged as home delivery newspaper carriers for *The Orange County Register* during the period from July 7, 1999 through August 22, 2008, approximately 5,000 individuals.

25.     The Debtors denied, and continue to deny, any liability for the claims alleged in the Gonzalez Litigation. Nevertheless, on January 30, 2009, after lengthy and expensive discovery and litigation, but prior to judgment, and without any admission of liability, the Gonzalez Litigation was settled pursuant to the terms of a Stipulation and Agreement of Settlement (Class Action) (the "Settlement Agreement"). Under the Settlement Agreement, the Register agreed to pay up to $22 million for distribution to (a) the class members on a claims-

11

made basis (claims ultimately made and validated were approximately $14.5 million in the aggregate), (b) Rust Consulting, Inc. as claims administrator in the amount of $100,000, and (c) the lead plaintiff and the four other named plaintiffs in the amount of $35,000 each. In addition, the Register agreed to pay up to $2 million in costs and up to $12 million in attorneys fees to class counsel, subject to approval by the Superior Court of California (which approval was granted at such amounts).

26. The Superior Court of California approved the Settlement Agreement on June 25, 2009, pursuant to the terms of its Order Granting Final Approval of Class Action Settlement and Judgment (the "Settlement Approval Order"). By the terms of the Settlement Agreement, the effective date of the settlement was deferred for 61 days after the date of entry of the Settlement Approval Order, which date was August 25, 2009 (the "Effective Settlement Date"). Nevertheless, pending the Effective Settlement Date, the Settlement Agreement required that the settlement be funded into escrow within 15 calendar days after entry of the Settlement Approval Order. Accordingly, the Register entered into an Escrow Agreement dated July 8, 2009, with Wilmington Trust Company ("Wilmington") acting as escrow agent. Pursuant to the terms of the Escrow Agreement, on July 10, 2009 and July 31, 2009, respectively, the Register forwarded funds in the amounts of approximately $14.9 million and $14 million to Wilmington for deposit into an interest-bearing account.

27. Notwithstanding the occurrence of the Effective Settlement Date, the Settlement Agreement clearly provided that the Register's obligations under the Settlement Agreement would not become final and effective until, inter alia, the passage of 20 calendar days after the Effective Settlement Date during which the Register does not become subject to a chapter 11 proceeding. The 20 calendar day period would have ended on September 14, 2009. The Debtors

12

recognized that, if they filed for chapter 11 relief after the funds were disbursed, they would have the right to seek to recover the funds as a preferential transfer, but the process of actually recovering the funds would be time-consuming and expensive. Giving due consideration to the interests of all creditors, the Debtors determined that chapter 11 cases should be commenced before September 14, 2009. As a result, on the Petition Date, the Debtors commenced these chapter 11 cases, thus preventing the Register's obligations from becoming final and effective. Consequently, both by the terms of the Settlement Agreement and the Escrow Agreement, the settlement funds have become property of the chapter 11 estate and, therefore, are subject to immediate return to the Register.

L.      Assets and Liabilities

28.      As of the month ended July 31, 2009, the Debtors had consolidated assets with a book value of approximately $757 million and a fair market value of substantially less than that amount. Their consolidated liabilities, calculated as of July 31, 2009, are approximately $1.077 billion, including the claims under the Credit Agreement in the amount of approximately $770.6 million (excluding accrued and unpaid interest, contingent letter of credit obligations, and related fees). As indicated previously, substantially all of the Debtors' assets have been pledged to secure the Credit Agreement. Other liabilities, in the approximate amount $306.4 million, include, without limitation, trade claims, contract claims, lease claims, nonqualified retirement plan claims, and litigation claims. With the nullification of the settlement of the Gonzalez Litigation, the claims of the Gonzalez plaintiffs are likely to be reasserted. Any such claims would be in addition to the consolidated liabilities of approximately $1.077 billion. The Debtors deny liability for such claims.

13

M.    Use of Chapter 11 Process

29.    The Debtors intend to utilize the tools available to them under chapter 11 to improve their balance sheet and strengthen their businesses for the benefit of creditors, customers, employees, and the communities in which the Debtors operate. Towards that end, the Debtors have entered into a plan support agreement with certain lenders holding a majority of the aggregate amount of claims under the Credit Agreement, which provides the terms upon which the Debtors will seek to restructure their liabilities under a plan of reorganization. In accordance with the schedule agreed to under the plan support agreement, which includes filing a disclosure statement and plan of reorganization within 45 days after the Petition Date, the Debtors intend to move as quickly as possible through the chapter 11 process, optimizing their ability to protect their business operations and maximize the value of their enterprise for the benefit of all parties in interest entitled to share in such value under the Bankruptcy Code.

## PART II

## FACTS IN SUPPORT OF FIRST DAY PLEADINGS

30.    To enable the Debtors to operate effectively and to transition seamlessly into chapter 11, the Debtors have filed the First Day Pleadings, requesting various types of immediate relief. I am familiar with the contents of each of the First Day Pleadings and I believe that the relief sought is critical to stabilizing the Debtors' business operations, preserving value, and facilitating an effective transition into chapter 11. Moreover, absent the immediate ability to make certain essential payments as sought in the First Day Pleadings, I believe the Debtors' estates would suffer immediate and irreparable harm.

14

**A.** **Motion of Debtors for Order Under Fed. R. Bankr. 1015 and Del. Bankr. L.R. 1015-1 Authorizing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")**

31.     The Debtors in these proceedings include Freedom Holdings and 49 of its subsidiaries and affiliates (the "Affiliated Debtors"), which include corporations, limited liability companies, general partnerships, limited partnerships, and limited liability partnerships. Freedom Holdings is the direct or indirect parent or owner of all of the Affiliated Debtors. Freedom Holdings, as the ultimate parent of each Affiliated Debtor, directly or indirectly owns either one hundred (100) percent of the ownership interests in each Affiliated Debtor or in several cases just short of one hundred (100) percent of the ownership interests.

32.     The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect several of the Debtors.  With 50 Debtors, each with its own case docket, the failure to jointly administer these cases would result in numerous duplicative filings for each issue, which would then be served upon separate service lists.  This duplication would be extremely wasteful and would unnecessarily overburden the Clerk of the Court.

33.     Joint administration will save time and money by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in multiple cases.  Moreover, this Court will be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Also, joint administration will ease the burden on the office of the United States Trustee in supervising these bankruptcy cases.  Moreover, joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to use a single general docket for each of the Debtors'

cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates.

34.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights. Each creditor and other party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right.

**B.      Application of Debtors for Order Under 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) and Local Rule 2002-1(f) Approving Agreement with Logan & Company, Inc. and   Appointing Logan & Company, Inc. as Claims, Noticing and Balloting Agent ("Logan Retention Application")**

35.     The Logan Retention Application seeks entry of an order approving the Debtors' agreement with Logan & Company, Inc. ("Logan") and appointing Logan as claims, noticing and balloting agent. Logan is a data processing firm that specializes in chapter 11 administration, consulting, and analysis, including noticing, claims processing, voting, and other administrative tasks in chapter 11 cases. The Debtors wish to engage Logan to, among other things, send out certain designated notices, receive and docket claims, and maintain claims files and a claims and voting register. The Debtors believe that such assistance will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts.

36.     To the best of the Debtors' knowledge, Logan is a "disinterested person" as that term is defined in Bankruptcy Code section 101(14), as modified by Bankruptcy Code section 1107(b). The Logan Agreement (as defined in the Logan Retention Application) outlines the fee arrangements between the Debtors and Logan. Thus far the Debtors have paid Logan a retainer fee of $50,000 to be applied immediately.

16

37. I believe that due to the number of anticipated claimants and parties-in-interest, appointing Logan, an independent third party, to act as Claims, Noticing and Balloting Agent is (a) the most effective and efficient manner by which to give notice and claims and balloting services in these chapter 11 cases and (b) necessary and in the best interest of both the Debtors' estates and their creditors.

**C.    Motion of Debtors for Order Under 11 U.S.C. §§ 105, 362 and 541 Fed. R. Bankr. P. 3001 Establishing Notice And Hearing Procedures for Trading in Equity Interests in Debtors ("<u>Equity Interests Motion</u>")**

38. The Equity Interests Motion seeks the entry of an order establishing notice and hearing procedures that must be satisfied before certain transfers of equity securities in Freedom Communications Holdings, Inc., or of any beneficial interest therein, are deemed effective. The Debtors are incurring net operating losses ("NOLs") in excess of $80 million, that can be carryforwards as valuable tax attributes (the "Tax Attributes"), because these NOLs can be used to offset income generated by transactions completed during the chapter 11 cases. These Tax Attributes could ultimately add up to federal tax savings of $28 million for the Debtors.

39. It is critical to the Debtors that they are able to preserve these Tax Attributes to avoid irreparable harm which could be caused by unrestricted trading in Freedom Holdings' equity securities and claims against the Debtors. The Debtors would therefore be unable to offset taxable income freely with their Tax Attributes. The Debtors believe that if they filed the Equity Interest Motion in accordance with the usual notice procedures set forth in the Bankruptcy Rules, it is likely that a flurry of trading equity of the Debtors could immediately follow. Parties holding such stock might rush to transfer their equity before the restrictions on such trading are imposed by this Court. Such trading would put the Tax Attributes in jeopardy.

DB02:8677729.1

068715.1001

Notably, the Debtors only request this limit for those potential stock trades and claim transfers that pose a risk of an ownership change (as that term is defined in the Equity Interest Motion).

**D.**  **Debtor's Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363, and 364 Fed. R. Banrk. P. 6003 and Del. Bankr. L.R. 2015-2(I) Authorizing Maintenance of Existing Bank Accounts, (II) Authorizing Use of Existing Business Forms, (III) Authorizing Use of Existing Cash Management System, (IV) Authorizing Intercompany Transactions, (V) Granting Superpriority Status to Intercompany Claims, and (VI) Authorizing Continuation of Existing Deposit and Investment Practices (the "<u>Cash Management Motion</u>")**

**(I)**  <u>**Request for Authority to Continue Using the Debtors' Existing Cash Management System**</u>

40.    The Debtors maintain 140 bank accounts (the "Bank Accounts") at 25 various financial institutions across the county. The Schedule of the Bank Accounts is attached as <u>Attachment 2</u> to the Cash Management Motion. These Bank Accounts are administered and managed by personnel in the Debtors' Treasury Department in Irvine, California. The Debtors are currently consolidating these Bank Accounts for greater efficiency and funds from these accounts will be transferred to the main account at JPMorgan Chase Bank, N.A (the "JPM Main Operating Account"). A general overview of the Debtors' proposed post-consolidation banking relationships is included in <u>Attachments 2A, 2B, and 2C</u> to the Cash Management Motion.

41.    The Debtors maintain a complex cash management system (the "Cash Management System") which allows them to collect, transfer and disburse funds in an administratively efficient manner. A summary of the Cash Management System is annexed to the Cash Management Motion as <u>Attachment 1</u>. Funds received (including funds received through wire credit, automated clearinghouse, credit, check and cash) are collected and concentrated in the relevant collection accounts, transferred to the relevant operating accounts and, in turn, and depending upon the method of payment (e.g., wire debit, automated clearinghouse debit, or satisfaction of checks presented) (a) used to satisfy outstanding accounts

payable or (b) transferred to disbursement accounts to be used to satisfy outstanding accounts payable, all as needed to address the Debtors' cash requirements (with any excess cash being deposited in the Freedom Communications, Inc. Investment Account maintained at Wells Capital Management, a subsidiary of Wells Fargo Bank, N.A. (the "Wells Investment Account")).

42.     Substantially all payments and revenues generated by the sale of newspapers, newspaper advertisements and subscriptions, sale of broadcast advertisements and revenue generated from the various websites are collected in the depository accounts as set forth on the attachments hereto. Funds collected in the depository accounts are automatically swept, transferred via Automated Clearing House (ACH), or wired into a main operating account (the "BOA Main Operating Account") that Freedom Communications, Inc. maintains with Bank of America, N.A. ("Bank of America").

43.     Four regional concentration accounts at Wachovia (a Wells Fargo company), Union Bank, N.A., Regions Financial Corp. and International Bancshares Corp. are funded by various depository accounts in Florida, Texas, California, and North Carolina and wired to the BOA Main Operating Account.

44.     Certain depository accounts (the "Standalone Depository Accounts") are maintained at various financial institutions for local operations. The Standalone Depository Accounts collect cash, check, electronic and credit card receipts from newspaper subscriptions, third party vendors such as newspaper carriers, coin operated newspaper machines, sale of advertisement space, and commercial printing operations. Funds from these accounts typically are transferred via wire to the BOA Main Operating Account.

45.     The Debtors maintain accounts to fund various partnership distributions to partners of the Debtor entities that are partnerships. These partnership distributions will only continue upon Court approval, which the Debtors are not seeking at this time.

46.     Funds in the BOA Main Operating Account may be used to fund three employee benefits accounts, including a Vested Employee Benefit Account (VEBA) and seven short term certificates of deposit used to support a self-insured workers' compensation program in the state of Colorado. The VEBA account in turn funds two additional accounts: one for medical claims and one for flexible spending. Moreover, a Bank of America account is maintained for worker's compensation claims and another Bank of America account is maintained as a pass-through to fund the 401(k) program.

47.     The Debtors determine their cash needs and transfer funds between the Wells Investment Account and either the BOA Main Operating Account or the JPM Main Operating Account. The Cash Management System is organized so that wires and transfers from the BOA Main Operating Account and the JPM Main Operating Account occur daily. Funds in the BOA Main Operating Account or JPM Main Operating Account may be transferred by wire debit or swept to satisfy accounts payable in connection with the Debtors' business, including amounts owing to suppliers. Funds in these accounts may be transferred to a disbursement account (the "Disbursement Account") at JPMorgan Chase Bank, N.A. It is the Debtors' intent to discontinue the use of the Bank of America disbursement accounts and utilize the JPMorgan Chase disbursement accounts.

48.     Certain of the Debtors' non-filing affiliates include entities operating as charitable organizations. Bank accounts are maintained on behalf of certain of the charitable entities by Lima News, Orange County Register Communications, Inc., Freedom Colorado Information,

Inc., and Gaston Gazette, LLP. The Debtors periodically collect money from their readers on behalf of the charitable entities and deposit those collections in the applicable charity account. The Debtors believe that the funds in the charity accounts are held in trust for the charitable entities and the causes they support and are not property of the Debtors' estates. The Debtors do not commingle the funds in such charity accounts with the Debtors' own funds.

49. The Wells Investment Account is maintained to hold earnings on excess cash from the Debtors' operations.

50. One of the Debtors maintains two petty cash accounts (the "Petty Cash Accounts"), funded by receipts of that Debtor, at local banks for the newspapers to use for cash, small checks, and sundry items. The Petty Cash Accounts seldom contain more than $2,500 at any one time.

51. The Debtors maintain twelve lockbox accounts (the "Lockbox Accounts") that collect monies from subscribers and advertisers. These Lockbox Accounts consist of: (a) one Lockbox Account at Bank of America, N.A. at the Orange County Register, (b) two Lockbox Accounts at JPMorgan Chase for the Debtors' Mesa newspapers, and (c) one Lockbox Account at TD Banknorth Inc. for Freedom Broadcasting of New York, Inc., (d) one Lockbox Account at First Horizon National Corp. for Freedom Broadcasting of Tennessee, Inc., and (e) seven Lockbox Accounts at The Bank of New York Mellon Corporation for subscriptions for the Debtors' community newspapers. Funds from these accounts are wired or swept into the BOA Main Operating Account or the JPM Main Operating Account.

52. The Debtors disburse their entire principal and interest payment obligations under their prepetition credit agreement, dated May 18, 2004 (the "Prepetition Credit Agreement") through the BOA Main Operating Account. These payments are transmitted on or before the due

DB02:8677729.1

068715.1001

date via wire transfer to JPMorgan Chase, as administrative agent (in such capacity, the "Agent")
under the Prepetition Credit Agreement.

53.     To maximize operating efficiency, Freedom Broadcasting of Oregon, Inc.
("Freedom Oregon") deposits all of its cash in a bank account held by Freedom Broadcasting of
Michigan, Inc. ("Freedom Michigan"). Freedom Michigan maintains that account and oversees
the day-to-day activities of that account. Freedom Michigan can distinguish its own cash from
the cash of Freedom Oregon in the bank account while preparing its daily cash receipts journal,
so there is minimal risk of confusion. The Debtors intend to continue using a single bank
account for Freedom Oregon and Freedom Michigan.

54.     The continued use of the Cash Management System during the pendency of these
chapter 11 cases is essential to the Debtors' business operations and their goal of maximizing
value. Requiring the Debtors to adopt new cash management systems at this early and critical
stage would be expensive, impose needless administrative burdens, and cause undue disruption.
Any such disruption would adversely (and perhaps irreparably) affect the Debtors' ability to
reorganize and/or maximize estate value for the benefit of creditors and other parties in interest.

**(II)     Request for Authority to Maintain Existing Bank Accounts and Business Forms**

55.     In conjunction with the authority to continue to use their Cash Management
System, the Debtors also request in the same manner and with the same account numbers, styles,
and document forms as are currently employed, deposit funds in, and withdraw funds from, the
Bank Accounts by all usual means, including checks, wire transfers, automated clearinghouse
transfers, drafts, electronic fund transfers, or other items presented, issued, or drawn on the Bank
Accounts, pay postpetition ordinary course bank fees in connection with the Bank Accounts,
perform their obligations under the documents and agreements governing the Bank Accounts,

22

and treat the Bank Accounts for all purposes as accounts of the Debtors in their capacities as debtors in possession, and deeming the Bank Accounts to be "DIP Accounts."

56.     If the relief is granted and to protect all interests, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will work closely with the banks at which the Bank Accounts are maintained to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.  However, the Debtors request that no Bank that implements such handling procedures and then honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good faith error made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored post-petition.  The Debtors believe that such flexibility accorded the Banks is necessary to induce the Banks to continue providing cash management services to the Debtors.

57.     In addition, and in the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of these chapter 11 cases, the Debtors request that all Banks be authorized and directed to continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course, and to pay any and all checks, drafts,

DB02:8677729.1

068715.1001

wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts on account of a claim arising on or after the Petition Date.

58.     The Debtors also request that they be authorized to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the Bank Accounts or opening any additional Bank Accounts following the Petition Date (the "New Accounts"), wherever the Debtors deem that such accounts are needed or appropriate, and whether or not the banks in which the accounts are opened are designated depositories in the District of Delaware.  Notwithstanding the foregoing, any New Account that the Debtors open will be (a) with a bank that is organized under the laws of the United States of America or any state therein, and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (b) designated a "Debtor in Possession" account by the relevant bank.  The Debtors also request that the relief sought by the Cash Management Motion extend to any New Accounts that the New Accounts are deemed to be Bank Accounts and are similarly subject to the rights, obligations, and relief granted in the order. The Debtors will provide the United States Trustee with written notice of any New Accounts that are opened.  Finally, the Debtors also request that the relevant banks be authorized to honor the Debtors' requests to open or close (as the case may be) such Bank Account(s).

59.     To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; provided, however, that in the event that the Debtors generate new checks during the pendency of these cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession."  The Debtors also seek authority to use all correspondence and other

DB02:8677729.1                                                                                          068715.1001

business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors' status as debtors in possession.

### (III) <u>Request that the Court Waive Certain Requirements of the U.S. Trustee</u>

60.     The Debtors request that this Court grant a waiver of certain bank account and related requirements of the United States Trustee to the extent that such requirements are inconsistent with the Debtors' existing practices under the Cash Management System. In conjunction with this, Debtors also seek a waiver of the UST Requirement to establish specific DIP Accounts for payroll expenses. Finally, the Debtors seek a waiver of the UST Requirement to establish specific DIP Accounts for tax payments and to deposit to such specific tax accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll.

### (IV) <u>Authorization to Maintain Ordinary Course Intercompany Funding and to Accord Superpriority Status to Intercompany Funds</u>

61.     In connection with the daily operation of the Debtors' business, as funds are moved within the Cash Management System at any given time, there may be intercompany claims owing by one Debtor to another Debtor (collectively, the "Intercompany Transactions"). The Debtors do not transfer funds to their non-filing affiliates under the Cash Management System; however, the Debtors do intend to continue their arrangements with such affiliates in the ordinary course of business. Certain non-Debtor affiliates operate as charitable organizations in conjunction with certain of the Debtor entities that publish community newspapers to support the needs of the communities. The Debtors provide employees and operational support at no cost to the charitable entity, and they contribute to particular funding drives sponsored by the charitable entities from time to time.

62.     The Debtors maintain records of all fund transfers and can ascertain, trace and account for Intercompany Transactions. At the same time, however, if the Intercompany

Transactions were to be discontinued, the Cash Management System and the related administrative controls would be disrupted to the Debtors' detriment.

63. Prior to the Petition Date, the Debtors routinely engaged in Intercompany Transactions prior to the Petition Date. Therefore, they submit that the Intercompany Transactions are within the ordinary course of their business and that Court approval of these transactions is not required pursuant to Bankruptcy Code section 363(c)(1).

64. The Intercompany Transactions reduce the Debtors' administrative costs and facilitate the satisfaction of the Debtors' obligations and are integral to the Debtors' daily operations. Thus, the Debtors submit that continuation of the Intercompany Transactions is an exercise of their sound business judgment and is in the best interests of the Debtors' estates and their creditors.

65. To ensure that each individual Debtor will not fund the operations of another entity at the expense of such Debtor's creditors, the Debtors request that all claims arising from Intercompany Transactions (the "Intercompany Claims") against a Debtor by another Debtor arising after the Petition Date be accorded superpriority status, subject and subordinate only to other valid liens in existence as of the Petition Date or granted pursuant to any cash collateral order.

**(V)     Authorization to Continue Their Deposit and Investment Practices**

66. In the Cash Management Motion, the Debtors request (a) authorization to continue to deposit and invest funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes to the Cash Management System that the Debtors may implement (the "Deposit and Investment Practices") and (b) a waiver of the

investment and deposit requirements of Bankruptcy Code section 345(b) to the extent that such requirements are inconsistent with the Deposit and Investment Practices.

**E.    Motion of Debtors for Order Under U.S.C. §§ 105(a), 506(a), 507(a)(8) and 541 and Fed R. Bankr. P. 6003 Authorizing Payment of Prepetition Taxes and Fees (the "Taxes Motion")**

67.    Prior to the Petition Date, the Debtors incurred obligations to federal, state, and local governments. Although as of the Petition Date the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period were not yet due. Taxes and Fees attributable to the 2008 tax year and to the prepetition portion of the 2009 tax year will not be due until the applicable monthly, quarterly, or annual payment dates -- in some cases immediately and in others not until next year.

68.    The Debtors estimate that as of the Petition Date, their accrued and unpaid liabilities for Taxes and Fees was approximately $3.3 million, including approximately $1 million in sales and use taxes, $2.1 million in real and personal property taxes, $100,000 in franchise taxes, and approximately $100,000 in certain other Taxes and Fees.

69.    Nonpayment or delayed payment of Taxes and Fees may also subject the Debtors to efforts by certain governmental entities, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges either on a postpetition or postconfirmation basis. Moreover, certain of the Taxes and Fees are sales, use, gross receipts, or payroll taxes, which may be considered to be trust funds that are not included in property of the Debtors' estates, and/or taxes as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment. In such events, collection efforts by the governmental entities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring these chapter 11 cases to an expeditious conclusion.

DB02:8677729.1                                                                                        068715.1001

**F.** **Motion of Debtors for Order Under 11 U.S.C. §§ 105(a) and 366(I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment (the "Utilities Motion")**

70.     As of the Petition Date, approximately 240 Utility Companies provide Utility Services to the Debtors at various locations through approximately 1,733 accounts. The Utility Companies service the Debtors' offices throughout the United States. On average, prior to the Petition Date, the Debtors spent approximately $1.3 million each month on utility costs and had a history of timely payment of utility costs. The Debtors are not currently aware of any past due amounts owed to any of the Utility Companies. However, because of the timing of the filings in relationship to the Utility Companies' billing cycles, there may be utility costs that have been invoiced to the Debtors for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtors.

71.     The Utility Services are crucial to the continued operations of the Debtors. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.

72.     The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors will deposit $650,000, equal to approximately 50% of the estimated monthly cost of the Utility Services, into a newly created, segregated, interest-bearing account, within twenty (20) days of the Petition Date (the "Adequate Assurance Deposit"). The Adequate Assurance Deposit would be maintained with a minimum balance equal to 50% of the Debtors' estimated monthly cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other

arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

73.     The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.  If any Utility Company believes that additional assurance is required, they may request such assurance pursuant to the Additional Adequate Assurance Procedures described in the Utilities Motion.

**G.      Motion of Debtors for Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to (I) Maintain Existing Insurance Polices and Pay All Policy Premium and Brokers' Fees Arising Therunder and Pay Insurance Premium Financing Obligations Arising Thereunder or in Connection Therewith (the "Insurance Motion")**

74.     In connection with the operation of their businesses and management of their properties, the Debtors maintain various Insurance Policies, obtained through several third-party insurance carriers (collectively, the "Insurance Carriers").  As shown in Exhibit A to the Insurance Motion, the Insurance Policies include coverage for general liability, auto liability, non-owned aircraft, media, umbrella liability, excess liability, directors' and officers' liability, fiduciary liability, crime and special crime, group personal excess, property, employed lawyers, storage tank liability, foreign package, and workers' compensation.  The third-party claims that are covered by the Insurance Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtors.  The Debtors participate in self-insured programs under the workers' compensation laws of certain of the states in which they operate.  The Debtors seek authorization to honor their obligations under those self-insured programs as part of the Insurance Motion.

DB02:8677729.1                                                                                     068715.1001

75.     Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "Operating Guidelines"), the laws of the various states in which the Debtors operate, and the Debtors' various financial agreements.  Thus, the Debtors submit that they should be authorized to continue to pay premiums, taxes, charges, assessments, fees, and other obligations owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of the Debtors' business.

76.     To the extent that the Insurance Obligations may be attributed to prepetition insurance coverage, the Debtors believe that payment of such obligations is necessary to ensure continued coverage under the Insurance Policies, and to maintain good relationships with the Debtors' insurers.  The Debtors' maintenance of their relationships with their insurers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.

77.     As of the date thereof, the Debtors are current in their premium payments and are not aware of any pending requests for payment of other obligations owed to the Insurance Carriers under the Insurance Policies.  However, requests for payment of amounts attributable to the period prior to the Petition Date may be received from the Insurance Carriers from time to time hereafter, in accordance with the terms of the Insurance Policies.

78.     Marsh Inc. and Alliant Insurance Services serve as the Debtors' insurance agent/broker.  The employment of Marsh and Alliant as the Debtors' insurance agents/brokers has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize savings in the procurement of such policies.

79. Under the current service agreement with Marsh, the Debtors pay Marsh a service fee of $180,000, which is payable in twelve monthly installments of $15,000 starting in April 2009, and it is set to expire in March 31, 2010. As of the Petition Date, the Debtors are current in their installment payment obligations. Additional installments will be due monthly for the remaining term. The Debtors have paid all service fees due and owing to Alliant under current service agreements, so no amounts remain to be paid under those agreements after the Petition Date. The Debtors believe that it is in the best interests of their creditors and estates to continue their business relationship with Marsh and Alliant.

80. The Insurance Policies maintained by the Debtors will all eventually expire under their annual terms, beginning with policies due to expire on December 31, 2009 (workers' compensation), April 1, 2010 (all other policies except property and foreign package), June 19, 2010 (foreign package), and August 1, 2010 (property). The Debtors believe that renewal of these policies or entry into new insurance arrangements is necessary to comply with the United States Trustee Requirements, various state laws, and prudent business practices. Therefore the Debtors request authorization to continue their prepetition practice of renewing the Insurance Policies or entering into new insurance arrangements in the ordinary course of business as the annual terms of the Insurance Policies expire. In addition, the Debtors request authorization to enter into new agreements with Marsh and Alliant to ensure the continuation of the valuation services received from such brokers.

**H.      Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363, 506, 507(a), 553, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Obligations Under, and Continuation of Customer Programs (the "Customer Programs Motion")**

81. Prior to the Petition Date, and in the ordinary course of business, the Debtors engaged in certain practices, in the form of the Customer Programs, to develop and sustain their

31

positive reputations with subscribers, advertisers, and the marketplace generally. The Customer Programs, which are customary in the Debtors' industries, are used to generate goodwill, meet competitive market pressures, and ensure customer satisfaction, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability. A summary of the significant Customer Programs follows.

## I.     ADVERTISING PROGRAMS

82.     The majority of the Debtors' revenue comes from advertising, with the remainder primarily coming from subscriptions and single copy newspaper sales. There are several types of Customer Programs related to the Debtors' advertising services (the "Advertising Programs"), including, as described more fully below, the following: (a) advertising rebates and related discounts or price adjustments (the "Rebate Program"); (b) incentive awards for high-growth advertisers (the "Purchase Rewards Program"); (c) correction of improperly run ads (the "Error Credit Program"); (d) trade agreements with advertisers for the mutual exchange of advertising and other sales and marketing services (the "Trade Program"); (e) barter agreements with program syndicators for the exchange of advertising and programming services (the "Barter Program"); (f) online advertisement programs for the delivery of a guaranteed number of impressions (the "Online Advertisement Program"); (g) online affiliate programs with third-party service providers related to the sale of co-branded inventory owned by the Debtors (the "Online Affiliate Program"); and (h) joint advertising production and delivery arrangements.

### A. Rebate Program

83.     The Debtors offer rebates, allowances, discounts and other price adjustments (collectively, the "Rebates") to incentivize advertisers to purchase large volumes of print, media, and online advertising from the Debtors. These Rebates are custom-negotiated by the Debtors

and the advertisers to fit the specific demands of the advertisers or the needs of a particular vertical segment of the marketplace. The issuance of Rebates is consistent with industry practice and has been done by the Debtors for several years.

84. Typically, the Debtors will accrue Rebates monthly, with such amounts paid in cash or otherwise credited to the advertiser monthly, quarterly or annually, depending on the specific terms of the applicable agreement. As of the Petition Date, the Debtors believe that there is approximately $695,000 of potential liability outstanding in connection with the Rebates. However, in light of the fact that many of these Rebates are granted in the form of additional advertisement space or a credit applied to a particular advertiser's account, the Debtors estimate that the actual cash liability to advertisers with respect to Rebates approximates a mere $69,000.

### B. Purchase Rewards Program

85. As a way to incentivize advertisers to purchase large volumes of print, media, and online advertising, the Debtors offer an annual awards package (the "Purchase Rewards Program") to a group of advertisers who increase their year-over-year purchases by a required amount. The awards typically consist of airfare, hotel, and other travel accommodations. The Purchase Rewards Program is consistent with industry practice and has been run by the Debtors for several years.

86. As of the Petition Date, the Debtors estimate that there may be as much as $500,000 of potential liability outstanding with respect to the Purchase Rewards Program.

### C. Error Credit Program

87. Despite the Debtors' best efforts, given the size of the Debtors' print, media and online advertising business, from time to time advertisements are run with errors or are otherwise not to the advertiser's satisfaction. To the extent such issues occur, under the Error Credit Program, the Debtors will re-run the advertisement at no additional charge. In certain limited

33

circumstances, if an advertising error cannot be corrected by re-running the advertisement, the Debtors will issue a credit to the advertiser's invoice.

88.     As of the Petition Date, the Debtors estimate that there may be as much as $1.25 million of potential liability outstanding with respect to the Error Credit Program. However, because the Debtors' primary obligations associated with the Error Credit Program are to re-run advertisements, or where necessary, to issue a credit to the advertiser's invoice, the Debtors do not believe that there are any cash payments outstanding to their advertisers as of the Petition Date on account of the Error Credit Program.

### D.     Trade Program

89.     The Debtors have entered into agreements with certain advertisers whereby the Debtors exchange advertising space in their newspapers and spot advertising at their broadcast stations in return for services provided to the Debtors by the advertiser (the "Trade Agreements"). Thus, in some instances, instead of receiving a cash payment from the advertiser for the running of a particular advertisement or series of advertisements, or related sales and marketing services, the Debtors receive a service or good from the advertiser. The Trade Agreements are custom-negotiated by the Debtors and the advertisers.

90.     The Trade Agreements provide significant value to both the Debtors and the Debtors' advertisers. The Trade Agreements offer the advertisers additional options and flexibility in making payment to the Debtors, which helps to retain the long-term business of the advertiser. The Debtors enjoy valuable opportunities to promote their newspapers to potential subscribers and customers at no cash expense. As of the Petition Date, the Debtors believe there is approximately $1.275 million of potential liability in connection with the Trade Agreements. However, in light of the fact that the obligations under the Trade Agreements consist of the

34

obligation to provide future advertising services, the Debtors do not believe that there is any potential cash liability with respect to the Trade Agreements.

### E. Barter Programs

91. The Debtors have entered into agreements with certain program syndicators whereby the Debtors exchange spot advertising inventory at their broadcast stations in return for programming services provided to the Debtors by the programmer (the "Barter Agreements"). Thus, in some instances, rather than making a cash payment to the program syndicator for the right to broadcast a particular program or programs, the Debtors receive programming from the program syndicator in return for providing valuable spot advertising inventory that program syndicator can then sell to advertisers. The Barter Agreements are custom-negotiated by the Debtors and the program syndicators.

92. The Barter Agreements provide significant value to both the Debtors and the Debtors' program syndicators. The Barter Agreements offer the program syndicators additional revenue streams, which helps to retain the long-term business of the program syndicators. The Debtors gain valuable programming that helps to attract and retain viewership at no cash expense. As of the Petition Date, the Debtors believe there is approximately $700,000 of potential liability in connection with the Barter Agreements. However, in light of the fact that the obligations under the Barter Agreements consist of the obligation to provide future broadcast spot inventory, the Debtors do not believe that there is any potential cash liability with respect to the Barter Agreements.

### F. Online Advertising Programs

93. The Debtors' business operations include numerous interactive web sites related to their daily newspapers, television stations, and other branded sites targeting specific communities of interest. Among other things, the Debtors' web sites provide online

advertisements on behalf of various businesses (the "Online Advertising Program"). Parties utilizing the Debtors' online advertisement services are generally billed based on the number of times an online advertisement is viewed ("Impressions"). The Debtors often guarantee their advertisers a certain number of Impressions for each advertisement. If the requisite number of Impressions is not achieved, under the Online Advertising Program, an advertiser may generally elect to either pay only for those Impressions that were delivered or to have the Debtors continue the advertisement for an additional period of time at no added cost.

94.     The Debtors generally do not issue cash refunds to their advertisers in connection with the Online Advertising Program. As a result, the Debtors do not believe that there is any cash liability owing to advertisers as of the Petition Date on account of the Online Advertising Program. Instead, the Debtors' obligations related to this program are primarily to provide additional advertising impressions to advertisers until such time that the originally contracted number of Impressions have been delivered.

### G.     Online Affiliate Agreement

95.     In some cases, the Debtors participate in advertising agreements with third-party service providers whereby the Debtors can sell online advertising onto sites that are co-branded between the Debtor and the third-party service provider, but owned by the Debtors. Upon sale of such advertising, the Debtors are obligated to pay a share of the revenue associated with such sale.

96.     The Debtors are also part of an online advertising consortium whereby the Debtors can sell advertising onto the websites owned by another third-party service provider. As part of the agreement, the Debtors are invoiced by the third-party service provider, and are

obligated to pay a percentage of the advertising revenue associated with such sale. As of the Petition Date, the Debtor estimates potential liability totaling $240,000.

97.     The Debtors believe that the ability to continue performing their obligations under these advertising arrangements is an essential component not only to maintaining the satisfaction of their third-party affiliates, but also to generating increased online customer interest, and thus to producing additional revenue for the Debtors' online websites.

### H.     Joint Advertising Arrangements

98.     The Debtors have agreed to participate in a cooperative arrangement with another California newspaper publisher (the "Cooperative Newspaper") for the production and distribution of advertising inserts to certain households in the Orange County area, with a launch date of August 28, 2009. The arrangement is intended to benefit the Debtors' advertising customers by providing efficiencies that reduce costs and enhance package content.

99.     Under the arrangement, wrap and insert advertising, sold separately by each of the Debtors and the Cooperative Newspaper to their respective advertising customers, are combined into a single late week preprint package and delivered to target households in a certain geographic area.

100.     In the context of this joint production and distribution arrangement, each of the Debtors and the Cooperative Newspaper are customers of the other. Each has agreed to pay certain costs to the other. Billing is done weekly in arrears, on a joint basis, with the result that, after offsetting, the party owing the most pays the difference. Given the launch date for the arrangement, prepetition amounts owed by the Debtors to the Cooperative Newspaper, if any, would be de minimis.

## I. Prepayments and Refunds

101.     In certain instances the Debtors receive payments from their customers in advance of providing goods and services (the "Prepayments"). For instance, in the Debtors' publishing businesses, nearly all subscribers prepay for newspaper subscriptions in advance of being provided the newspapers (the "Prepaid Subscriptions"). The Debtors also receive payments from certain advertisers in advance of providing broadcasting or publication advertising slots for such advertisers (the "Prepaid Advertisements"). Additionally, certain customers prepay the Debtors to place customer inserts, such as weekly magazines and other media inserts, into the Debtors' newspapers (the "Prepaid Inserts"). The Debtors generally do not incur actual cash liability on account of the Prepaid Subscriptions, Prepaid Advertisements, and Prepaid Inserts, but instead incur the obligation to deliver the prepaid subscriptions, advertisements, and inserting services. However, in the event a Prepaid Subscription, Prepaid Advertisement, or Prepaid Insert is cancelled by a customer, in certain instances, the Debtors are obligated to return unused prepaid amounts (the "Refunds"). Generally, the Debtors issue Refunds totaling approximately $1.5 million to $3.0 million per year.

102.     Continuing the Debtors' practices with respect to Prepayments and Refunds is essential to the maintenance of the Debtors' ongoing business operations. For example, newspaper subscriptions represent approximately 15% of the Debtors' publishing revenue. If the Debtors were to cease to be able to perform their obligations to their prepaid subscribers, or otherwise be unable to issue Refunds to subscribers who cancel Prepaid Subscriptions, the Debtors' goodwill could be severely undermined, and, consequently, the Debtors could lose subscribers. It is therefore crucial that the Debtors be able either to perform their obligations to deliver Prepaid Subscriptions to their subscribers or to issue such Refunds.

38

103. Similarly, as mentioned above, advertising provides the largest source of the Debtors' revenue. Accordingly, the revenue generated by the Debtors from their advertisers represents a significant portion of the Debtors' total revenue. The Refunds issued to advertisers are comparatively small in contrast to the amount of revenue generated by the advertisers. Any suspension in the Debtors' performance of their obligations on account of Prepaid Advertisements may result in the loss of advertisers and could have devastating effects on the Debtors' ability to generate revenue going forward. Similarly, with respect to Prepaid Inserts, any failure of the Debtors to issue Refunds to customers for unused Prepayments could jeopardize the Debtors' ability to continue doing business with such customers in the future. It is therefore crucial that the Debtors be able either to perform their obligations to run advertisements and distribute inserts that have been prepaid or to issue Refunds to their advertisers.

104. As of the Petition Date, the Debtors believe that they are holding approximately $30 million on account of Prepayments, and that there is approximately $300,000 outstanding in connection with Refunds.

105. Despite the Debtors' best efforts, from time to time in the Debtors' businesses, subscribers, advertisers and other customers are invoiced in error for amounts that they did not actually incur. Such errors include improper invoicing (when the invoice created does not properly reflect the items ordered by a customer), duplicate payment (when a customer makes two payments on account of the same order), mis-pricing (when a customer is charged or pays an incorrect price-either too high or too low for the Debtors' products or services), and various other billing and payment errors (collectively, the "Invoicing Errors"). When a customer pays for the amounts invoiced in error, the Debtors correct the Invoicing Errors through billing adjustments (the "Billing Adjustments"), which typically take the form of credits to a customer's account.

106. Because there is some delay from the time the invoice is first issued to the time the Debtors discover the Invoicing Error, it is difficult to predict with certainty the amount outstanding on account of such errors. However, as of the Petition Date, the Debtors estimate that approximately $500,000 is outstanding in connection with Billing Adjustments. However, the Debtors estimate that their potential cash liability in connection with Billing Adjustments is only approximately $50,000.

## II. Subscriber Discounts

107. Prior to the Petition Date, and in the ordinary course of business, the Debtors offered discounts to customers that subscribe - i.e., purchase for a particular length of time and prepay or pay monthly - to the Debtors' newspapers (the "Subscriber Discount"). The Subscriber Discount averages approximately 35% of the price that the Debtors charge a customer who purchases the newspaper or publication on a single copy basis. The Subscriber Discount provides a key incentive for customers to subscribe to the Debtors' newspapers and is consistent with industry practice. The Debtors estimate that their customers receive approximately $3.9 million per month in Subscriber Discounts, which amount is not a cash payment or reimbursement to the subscribers but rather is the aggregate revenue difference between single copy pricing and subscription pricing.

## J. Delivery Service Program

108. The Debtors provide delivery services for certain non-affiliated newspaper companies (the "Newspaper Companies") in defined geographical areas (the "Delivery Service Program"). These delivery services, which vary among each of the Newspaper Companies, include "home delivery" and "single copy" delivery services. For home delivery service, the Debtors deliver newspapers directly to the Newspaper Companies' subscribers. For single copy

40

delivery services, the Debtors deliver the Newspaper Companies' newspapers to newsstands, stores, or other retail locations.

109.    In some cases the Newspaper Companies may pay the Debtors directly, and in some cases the Debtors may collect from the retailers and remit the money to the Newspaper Companies. The Debtors may also deduct the amount owed to the Debtors from the amount collected before remittance. Actual execution varies from location to location.

110.    As compensation for the delivery services, the Debtors are generally paid a set price per copy delivered and invoice each Newspaper company separately. As of the Petition Date, the Debtors do not have any cash payment obligations to the Newspaper Companies.

### K.    Solicitor Payments

111.    The Debtors contract with various third-party vendors (the "Solicitors") who solicit newspaper subscription sales on behalf of the Debtors. Although the Solicitors' methods vary, it is common for the Solicitors to sign up new subscriptions for the Debtors' various publications by making door-to-door visits to potential subscribers within a predetermined geographic area and/or selling subscriptions or single copies at major events. As consideration for the Solicitors' efforts, the Debtors pay the Solicitors weekly fees in arrears, based on the volume of new subscriptions. As of the Petition Date, the Debtors estimate they owe the Solicitors approximately $70,000 for fees that were earned by the Solicitors prior to the Petition Date (the "Unpaid Solicitor Fees").

112.    The Solicitors provide a vital link between the Debtors and their potential customer base. The Debtors believe that many of the Solicitors would be unlikely to continue to conduct business on behalf of the Debtors, and could disrupt relationships between the Debtors and previously solicited customers, if the Debtors do not pay the Unpaid Solicitor Fees.

DB02:8677729.1                                                                        068715.1001

Credit Card Processing Fees

113.  The Debtors are parties to certain agreements with credit card processors (the "Credit Card Processors") under which the Credit Card Processors accept and process credit card payments made by the Debtors' customers for subscription and advertising purchases, both by phone and online.  The Credit Card Processors deduct a credit card processing fee from the initial charge on the credit card and then remit the balance to the Debtors, subject to certain adjustments, returns and refunds.  The Debtors desire to continue the processing arrangement in the ordinary course, including honoring adjustments, returns, and refunds that may relate to the prepetition period.

114.  Preserving the processing relationship is essential to the Debtors' ability to allow their customers to continue to pay by credit card and thus to the preservation of the customer relationship and the maximization of estate value for all stakeholders.  Losing this ability would impose a significant burden on the Debtors' customers who prefer the option of making their subscription and advertising payments by credit card and would eliminate a major avenue for conducting sales transactions with future customers.

115.  As of the Petition Date, the Debtors estimate they owe approximately $400,000 on account of prepetition Credit Card Processing Fees.

## II.    CUSTOMER CONTEST AND AWARDS PROGRAMS

116.  The Debtors run certain contests and award programs in the ordinary course of business to create interest and induce customers to purchase subscriptions or advertising products from the Debtors, to increase viewership at the Debtors' broadcast stations, or to submit written or photographic content for use on the Debtors' websites (the "Customer Contests").  These Customer Contests often span several months and require customers to enter the contest by a

certain date. Under the terms of the Customer Contests, the Debtors are obligated to pay certain winning customers cash amounts at a date that is one to three months after the contest entry date.

117. As of the Petition Date, the Debtors have a limited number of such Customer Contests in effect. Potential cash payments to contest winners under these ongoing Customer Contests total approximately $150,000.

## III. CUSTOMER SERVICE PROGRAM

118. In order to best serve their customers, the Debtors have engaged the services of certain third-party customer service representatives to address inquiries and issues related to the Debtors' advertising services and publications, including, but not limited to, newspaper subscription issues, delivery issues, billing questions, advertising, customer accounting, online technical issues, and debt collection services (the "Customer Service Providers"). The Customer Service Providers provide their services primarily through outsourced customer call centers.

119. Customer Service Providers generally invoice the Debtors for services rendered in the previous month in an amount based on the volume of calls received. Because the Customer Service Providers generally bill in arrears, the Debtors estimate that, as of the Petition Date, approximately $100,000 is due and owing to the Customer Service Providers

120. The success and ultimate viability of the Debtors' businesses are dependant upon the Debtors' continuing relationships with their advertisers, subscribers, and other customers. The Debtors believe that in order to maintain such relationships and to ensure customer loyalty, the Debtors must satisfy the Customer Obligations. In the competitive industries in which the Debtors operate, failure to honor the Customer Obligations arising from advertising, subscription, delivery, and other relationships that are the same or similar to their competitors is

43

likely to have a material adverse impact on the Debtors' ability to attract new customers and maintain existing ones.

121.    Moreover, the Debtors believe that if they are not authorized to continue the Customer Programs during the pendency of these chapter 11 cases, their valuable business relationships with their customers will be severely jeopardized. Even a short delay by the Debtors in continuing their Customer Programs could cause serious and irreparable harm to the value of the Debtors' estates.

**I.    Debtors' Motion Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541 1107(a) and 1108 and Fed. R. Bankr. P. 6003 for Order (I) Authorizing Payment of Prepetition Employee Compensation, Benefits and Expense Reimbursements and Related Obligations, (II) Confirming Right of Debtors to Continue Employee Programs on Postpetition Basis, (III) Confirming Right of Debtors to Pay Withholding and Payroll Related Taxes, (IV) Authorizing Debtors to Pay and Utilize Independent Contractors, (V) Authorizing the Payment of Any Prepetition Claims Owing to the Administrators Of, Or Third Party Providers Under, Such Plans, Programs and Policies as Necessary to Ensure the Delivery of Compensation, Benefits and Expense Reimbursements and (VI) Directing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations and Prepetition Independent Contractor Obligations (the "Employee Motion")**

122.    The Debtors' currently employ approximately 5,076 employees, of whom approximately 35% (1,775) are salaried employees and approximately 65% (3,301) are hourly employees. Moreover, approximately 82% (4,163) of the employees are full-time and 18% (913) are part-time (i.e., working less than 80 hours bi-weekly). The average annual salary for salaried employees is $56,400 and for hourly employees is $39,500. Approximately 1.5% of the Debtors' hourly employees are covered by collective bargaining agreements (each a "CBA"). In addition, in the Broadcast division, 124 employees are covered under personal services contracts. The Debtors' workforce of employees is augmented by services received from approximately 3,200 independent contractors.

44

123.     If the Debtors fail to pay the Prepetition Employee Obligations and the Prepetition Independent Contractor obligations in the ordinary course, their Employees and Independent Contractors will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on workforce morale and likely would result in unmanageable turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates.  In addition, the Debtors have determined that continuation of the Employee Programs is vital to preserving and rebuilding Employee morale during the pendency of these chapter 11 cases, and to reducing the level of Employee attrition that might otherwise occur.

**Prepetition Employee Compensation**

124.     The Debtors' Employees are paid bi-weekly, one week in arrears, with an average bi-weekly payroll of approximately $8.4 million.  The Debtors' payroll payments are made by ADP through a separate contractual arrangement, which requires the Debtors to fund their obligations to ADP by way of reverse wires from the relevant operating account or disbursement account two days prior to each pay date and one business day prior for payroll taxes.

125.     Further, as of the Petition Date, the Debtors, through ADP, made deductions from Employees' paychecks for payments on behalf of Employees for various federal, state, and local income, FICA, and other taxes, as well as for charitable contributions, garnishments, support payments and tax levies, savings programs, benefit plans, flexible savings accounts, insurance programs, credit unions, union dues, and other similar programs on account of which the Debtors deduct a sum of money from an Employee's paycheck and pay that amount to a third party (collectively, the "Deductions").  The Debtors' average bi-weekly Deductions for Employees aggregate approximately $2.8 million.

45

126.    Although certain Employees were paid for all regular compensation earned through the Petition Date, other Employees are owed certain prepetition amounts. Where Employees are owed prepetition compensation amounts, the applicable Deductions have not yet been taken. Additionally, the Debtors may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions that have been withheld from Employee paychecks. The Debtors estimate that, as of the Petition Date, they are holding Deductions aggregating approximately $2.8 million, which the Debtors seek to pay to third parties in accordance with their prepetition practice.

127.    The Debtors estimate that, as of the Petition Date, accrued but unpaid wages and other compensation, including the Deductions, total approximately $4.2 million (comprised of $2.8 million owed to Employees and $1.4 million attributable to Deductions). After accounting for all Prepetition Employee Obligations, an insubstantial number of Employees – approximately five – may have claims for payment that exceed the $10,950 cap.

128.    As part of their overall compensation, Employees are also entitled to receive a certain number of vacation days each year. Employees earn up to 20 paid vacation days per year, depending upon their length of service with the Debtors. The number of vacation days Employees accrue is based upon length of service. The vacation policies also vary from one Debtor or business unit to another and are based on state-specific requirements. Employees can carry over a certain number of unused vacation days from one year to the next. Upon termination or retirement, Employees receive "cash out" payments of any accrued unused vacation days. This policy is consistent with the laws of most states, which provide that vacation benefits are vested and must be paid upon termination of employment. The Debtors estimate

DB02:8677729.1

068715.1001

that, as of the Petition Date, total accrued but unpaid vacation liability is approximately $8.4 million.

129.    In addition to vacation days, salaried and hourly Employees are provided paid sick leave days. Each Employee is provided up to five sick leave days per year. Unused sick time is accrued and carried over year to year, to a maximum of 400 hours, to be used to bridge short term illness. Some locations provide a critical sick bank for extended leave. These hours are used to provide pay in the event of illness. Accrued and unused sick time is forfeited upon termination. The Debtors do not separately account for unused sick leave.

130.    In addition to vacation or sick leave days, salaried and hourly Employees are provided paid holidays, one paid personal floating holiday, and certain other paid time off (collectively, "Paid Leave") each calendar year, all of which must be used within that year, or lost. Paid Leave may not be cashed out if unused upon termination or retirement, subject to certain exceptions in the state of California. In California, Employees who have not used their one personal paid holiday may be cashed out upon termination or retirement. As of the Petition Date, most Employees will have already used their one personal holiday. The Debtors do not separately account for unused Paid Leave.

131.    In addition to fixed compensation, in the ordinary course of business, the Debtors offer certain Employees, who do not participate in the "MBO Plan" or the "P4P Bonus Plan" described below, commissions for performance based on a percentage of sales or other performance goals (the "Commission Programs"). The Commission Programs are an integral component of compensation for sales and marketing Employees. The Commission Programs provide for (a) a percent of revenue dollars achieved as a commission for acquiring business and (b) flat dollar payment for achieving a specified sales goal typically related to a specific product,

47

number of accounts, or a line of business, for example interactive or online products, ads in special sections, classified advertising, and local search advertising. The Commission Programs vary among the publications and certain Employees are owed payments under the Commission Programs on account of prepetition sales or other prepetition performance. Currently, several ordinary course sales contests and special sales commission programs are underway for which there is a defined dollar payment specifically related to achieving sales criteria for a particular product or new product roll out. Examples include new product roll out (Yahoo), special or local specific section payments, self service advertising conversion, and similar commission initiatives. Commissions are paid through payroll once a month. The Debtors estimate that their total prepetition liability on account of commissions is approximately $1.2 million.

132.    In the ordinary course of business, as an incentive to encourage and reward outstanding performance, the Debtors also offer their Employees the opportunity to earn bonuses under bonus programs, including the MBO Quarterly Bonus Plan (the "MBO Plan"), the P4P Bonus Plan, the Executive Bonus Plan, and other bonus programs (collectively "the Bonus Programs").

133.    Approximately 576 Employees are eligible to receive bonuses under the MBO Plan. In order to be eligible during the specific quarter, the Employee must be employed before the first day of the particular quarter, must work a minimum of 20 hours per week, must not participate in the P4P Bonus Plan or any of the Commission Programs, and must be actively employed at the time of distribution of checks. The MBO Plan is comprised of a financial component (70%) and objective component (30%). The financial component, assessed on a quarterly basis, is a minimum of one-half related to division/region or location normalized EBITDA and the other remaining percentage is division/region or location revenue, depending

on the responsibility of the participant. The objective component, which is based upon the Employee's satisfaction of between three to six quantifiable, position-specific objectives that are provided to the Employee at the beginning the plan year, is assessed and paid on an annual basis after the conclusion of the plan year, but not later than March 15th of the next calendar year. As of the Petition Date, $3.6 million had accrued under the MBO Plan, part of which may be paid, if earned, on a quarterly basis and the remainder assessed and paid after the end of the calendar year.

134.    The P4P Bonus Plan applies to all Employees who are not participating in the MBO Plan or the Commission Programs. Payments under the P4P Bonus Plan are made quarterly if earned. In order to be eligible during the specific quarter, the Employee must be employed before the first day of the particular quarter, must work a minimum of 20 hours per week, and must be actively employed at the time of distribution of checks. Depending on the division, the P4P Bonus Plan may consist of either one or two components. All plans include a financial component, which is 100% normalized EBITDA for the specific location. Plans in place within the Newspaper Division also include an additional departmental quantitative measure, which is determined by each department in each location. As of the Petition Date, $1.2 million was accrued and unpaid under the P4P Bonus Plan. The next scheduled payment date, based on third quarter results, would be in November 2009, within 60 days after the end of the third quarter.

135.    The Executive Bonus Plan is a financial-based plan for 2009, with the measure being total normalized EBITDA. Performance to budget is measured at the end of each quarter, with an annual year-to-date true-up at the end of the fourth quarter. The Executive Bonus Plan, with eight participants, has a target annual value of approximately $1.5 million. The target

49

amount for each participant is 35% to 50% of base salary, depending on position. For 2009, 50% of the bonus amount was paid after the end of the second quarter, and another 25% will be payable at the end of the third quarter. The balance, based on an end of year true-up, will be paid after the conclusion of the plan year, but not later than March 15th of the next calendar year.

136.    Certain Employees at various locations are eligible for participation in and payment under special project/program bonus incentive programs. Currently, several ordinary course projects and product roll outs are underway for which there is a defined bonus incentive specifically related to completion and meeting project performance criteria. Examples include the re-engineering of work through outsourcing, centralizing, regionalizing, or partnerships. The Debtors estimate that the prepetition outstanding liability on account of such project bonus programs is $550,000.

**Prepetition Employee Reimbursements**

137.    The Debtors, in the ordinary course of their business, reimburse Employees for a variety of business related expenses that Employees incur. The Debtors believe that, on average, Employees take four weeks to submit their expense reports. Taking into account this four-week lag period, the Debtors estimate that, as of the Petition Date, their obligation to Employees for accrued, reimbursable expenses (submitted and unsubmitted) aggregate approximately $300,000.

138.    Additionally, in order to maximize the effectiveness of their work-force, the Debtors periodically request that Employees relocate from their current work location to address the Debtors' needs at a different work location. Consistent with the Debtors' ordinary practice, certain costs associated with the relocation are reimbursed by the Debtors. The Debtors directly pay a variety of third-parties who provide these relocation services to the Employees. The Debtors estimate that their total prepetition liability on account of relocation expense reimbursement is approximately $25,000.

50

139.     With the addition of approximately $300,000 in estimated outstanding reimbursable expenses and $25,000 in estimated employee relocation expenses, the total prepetition obligations in respect of reimbursements is estimated at $325,000 as of the Petition Date (the "Reimbursement Obligations").

140.     Prior to the Petition Date, the Debtors offered Employees and their eligible spouses, domestic partners, and dependents various standard employee benefits, including, without limitation, (a) medical, dental, vision, and prescription drug coverage, (b) coverage continuation under COBRA, (c) basic term life and supplemental life insurance, (d) accidental death and dismemberment insurance, (e) long-term disability insurance and benefits programs, (f) pre-tax contribution cafeteria plan and flexible spending accounts, (g) a VEBA trust, (h) retirement, savings, other deferred compensation, and related types of benefits, (i) leased car and automobile assistance programs, employees assistance programs, and business travel accident insurance, (j) workers' compensation, (k) ordinary course severance programs, and (l) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "Employee Benefits"). As of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs, and policies.

141.     The Debtors provide medical and prescription drug insurance to their Employees through three self-insured medical preferred provider plans and one insured HMO, all of which are administered by Anthem Blue Cross.

142.     Employees pay a portion of the premium for their benefits coverage through bi-weekly pre-tax contributions from their paychecks. The Debtors contribute from 0% to 70% of the cost of providing the benefits coverage for Employees and their spouses, domestic partners, and dependents depending on the location, the benefit, and the benefit option elected. The

DB02:8677729.1                                                              068715.1001

Debtors pay approximately $2.3 million per month in medical plan premiums and claims costs. There is additional prepetition exposure for self-funded claims that have accrued but are not yet reported, which is difficult to estimate.

143.    The Debtors also offer eligible Employees (a) dental benefits through two self-insured dental plan options and one insured dental plan and (b) vision benefits through a self-insured plan. The Debtors pay approximately $190,000 per month in claims costs and premiums on account of the dental plans and approximately $43,500 per month for claims costs under the vision plan.

144.    The Debtors provide certain Employees with coverage under an insured Executive Medical Reimbursement Plan (the "EMRP"). This coverage is 100% company paid and is insured by Anthem Blue Cross. The EMRP pays an additional reimbursement over and above the amount reimbursed out of the base medical, dental, or vision plan for procedures covered by the base plans. All participants must elect and pay the employee premium for their base medical, dental, and vision coverage. As of the Petition Date, there are approximately 17 active and inactive Employees covered under the EMRP. The Debtors are billed approximately $941.50 per month per eligible participant or approximately $16,005 per month, which is paid from the Debtors' assets. As of the Petition Date, the accrued, unpaid liability on account of the EMRP Plan was approximately $16,005.

145.    The estimated monthly cost to the Debtors under all medical, prescription, dental and vision plans (including claims, administration, stop-loss insurance, etc.) is approximately $2.55 million, which amount is a reasonable proxy for the Debtors' prepetition obligations under such plans. The Debtors' prepetition exposure would also include self-funded claims that have been incurred but not yet reported.

146. Pre-Tax Contribution Cafeteria Plan, Flexible Spending Accounts, and VEBA Trust. The Debtors maintain a cafeteria plan under section 125 of the Internal Revenue Code under which Employees make contributions under the Debtors' medical, dental, vision, and prescription drug plans through pre-tax compensation deductions. The Debtors also offer their Employees the opportunity to contribute through pre-tax compensation deductions to flexible spending accounts ("FSAs") to be used for healthcare related expenses and dependent care expenses. FSA deductions are made from Employees' paychecks. Those funds are remitted on a bi-weekly basis to Anthem/Blue Cross, which administers and remits reimbursements. Accordingly, as of the Petition Date, the Debtors estimate that they are holding FSA deductions to be remitted to Anthem/Blue Cross of approximately $31,000.

147. The Debtors maintain the VEBA trust, which is a tax-exempt trust under section 501(c)(9) of the Internal Revenue Code. The VEBA trust is used to fund the benefits under the Debtors' self-funded medical, dental, vision, and prescription drug plans. Employee contributions and contributions by the Debtors under the self-funded medical, dental, vision, and prescription drug plans are made to the VEBA trust.

148. The Debtors also provide Employees with basic life insurance and accidental death and dismemberment ("AD&D") insurance in an amount equal to one times their annual salary, up to $150,000. Additionally, certain hourly Employees receive, on average, $15,000 to $150,000 in life insurance pursuant to the terms of their CBA. The Debtors' average monthly expense attributable to all life insurance programs and AD&D insurance is approximately $18,000 per month, which the Debtors owe as of the Petition Date.

149. The Debtors also provide Employees with long-term disability coverage. Employees who work a minimum of 30 hours per week and have been employed for 12 months

are eligible for long-term disability coverage ("LTD") equal to 50% of the Employee's monthly earnings. The average monthly premium for LTD coverage is $37,000, which the Debtors owe as of the Petition Date.

150.    The Debtors provide approximately 55 vice presidents, publishers and general managers and executives with leased cars, 3 car allowances or with Company-owned cars. The Debtors pay approximately $15,000 per month on account of the Automobile Policies, which the Debtors owe as of the Petition Date.

151.    The Debtors offer Employees services to help resolve personal issues, as well as assistance with challenges that may arise in the Employees' lives (the "Employee Assistance Program"). As of the Petition Date, the unpaid obligations on account of the Employee Assistance Program is approximately $5,900.

152.    The Debtors also provide business travel and accident insurance to Employees who are required to travel for business purposes. The annual premium for such insurance is $2,994. There is no estimated outstanding liability due as of the Petition Date.

153.    The Debtors maintain the 401(k) Retirement Savings Plan of Freedom Communications, Inc. (the "Savings Plan") and the Retirement Plan of Freedom Communications, Inc. (the "Retirement Plan") for their Employees.

154.    The Savings Plan is a tax-qualified 401(k) retirement savings plan and is funded through a trust with Fidelity Management Trust Company. Under the Savings Plan, an eligible Employee may contribute a portion of his or her compensation on a pre-tax basis, through voluntary payroll deductions, to the Savings Plan. These contributions are deducted from the

---

pay checks of eligible Employees and contributed by the Debtors to the trust for the Savings Plan.

155.  Also, the Savings Plan provides that the Debtors will make matching contributions to the Savings Plan, based on the contributions by eligible Employees, for payroll periods ending prior to April 1, 2009. The Savings Plan provides that no matching contributions will be made by the Debtors for payroll periods ending on or after April 1, 2009.

156.  Under the Savings Plan, the base matching contribution for the payroll periods ending prior to April 1, 2009 equals 50% of the Employee's pre-tax contributions and applies only to the portion of an Employee's pre-tax contribution that does not exceed 2% of compensation. The Debtors have made the base matching contributions for payroll periods ending prior to April 1, 2009.

157.  The Savings Plan provides for an additional matching contribution for the payroll periods ending before April 1, 2009, based on the earnings before interest, taxes, depreciation and appreciation ("EBITDA") performance of Freedom Communications, Inc. for the 2009 calendar year, relative to the annual budgeted EBITDA for 2009. The matching percentage of the additional matching contribution (if any) will be 25%, 50%, or 75% of an eligible Employee's pre-tax contributions (depending on the EBITDA performance) and will apply only to the portion of the Employee's contributions that exceed 2% of compensation and do not exceed 6% of compensation. The Debtors have accrued $621,475 for the additional matching contribution for payroll periods ending prior to April 1, 2009 that will be made based on the EBITDA performance for 2009. If the Debtors meet the EBITDA performance criteria defined in the Savings Plan, the Debtors will be obligated to make the additional matching contribution

DB02:8677729.1

068715.1001

to the Savings Plan during the first quarter of 2010. The additional matching contribution is estimated to be $0 to $621,475, depending on EBITDA performance for 2009.

158. The Savings Plan also provides for an additional contribution by the Debtors for eligible Employees equal to 3% of the Employee's compensation for the 2009 calendar year. An Employee generally is eligible to receive this contribution if the Employee is credited with at least 1,000 hours of service during a 12-month period. The additional contributions for the 2009 calendar year will be made by the Debtors during the first quarter of 2010. As of July 31, 2009, approximately 4,058 Employees met the eligibility criteria for this additional contribution. As of July 31, 2009, the Debtors accrued approximately $4.0 million for this additional contribution. The Debtors estimate that this additional contribution for 2009 will be approximately $2.5 million.

159. The Retirement Plan is a tax-qualified defined benefit pension plan and is funded through a trust with Bank of New York. Benefit accruals were suspended under the Retirement Plan effective as of December 31, 2008. As of the January 1, 2009, there were approximately 6,631 participants in the Retirement Plan (approximately 3,515 active participants, 1,083 retired participants receiving benefits and 2,033 retired and terminated participants entitled to future benefits). The Debtors are not required to make any minimum funding contributions to the Retirement Plan for 2009.

160. Under the laws of the various states in which they operate, the Debtors are required to maintain workers' compensation policies and programs, or participate in workers' compensation programs administered by state governments, to provide their employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. The Debtors' yearly obligations for their premium-based workers' compensation

policies and the state programs in which they participate is approximately $419,432-for the self-insured programs and approximately $198,725 for the insured programs. The Debtors pay amounts owed on worker's compensation claims on a monthly basis. In addition, the Debtors' obligations include approximately $274,000 per year (paid quarterly at $68,500 per quarter) for services rendered by the third party administrator of their workers' compensation programs.

161. The Debtors have two severance policies in place, one for non-Executive employees who are considered associates (the "Associate Severance Plan") and the other for certain executive Employees (the "Executive Severance Plan"). Under the severance plans, the Debtors provide a severance benefit to the majority of Employees who are involuntarily terminated for reasons that are unrelated to their performance or conduct.

162. Under the Associate Severance Plan, the Debtors provide the severance benefit in the form of salary continuance, based on the associate's years of service. The Associate Severance Plan has a two-tiered structure. Under the first tier, the benefit consists of one week of severance per year of service, with a minimum of four weeks, and COBRA reimbursement for the length of the severance, up to three months. Under the second tier, the severance periods, and corresponding COBRA periods, range from six months to one year. The associates eligible under the second tier have supervisory or managerial roles that they perform under the direction of the Debtors' directors and officers. Under the Executive Severance Plan, seven corporate officers, who are insiders, are eligible for a 12 month severance period, with lump sum payments, and under certain circumstances may be eligible for an 18-month severance period, with lump sum payments.

163. As of the Petition Date, the aggregate cost of accrued but unpaid severance payments owed under the Associate Severance Plan is approximately $2.7 million, which

includes salary, FICA, and healthcare premiums under COBRA benefit continuation. This includes $300,000 in payments due to 72 associates currently collecting severance. In addition, prior to the Petition Date, the Debtors had issued 60-day termination notices, consistent with their WARN Act responsibilities, to approximately 334 associates, providing termination dates that will occur on and within several weeks after the Petition Date. The estimated severance liability for such post-petition terminations is approximately $2.4 million, which includes salary, FICA, COBRA, and healthcare premiums.

164. In the Employee Wages and Benefits Motion the Debtors seek authority to pay such accrued but unpaid severance under the Associate Severance Plan to associates who were terminated prepetition, as well as to those associates who received prepetition notices with postpetition termination dates. The Debtors also seek authorization to continue to provide ordinary course severance benefits under the Associate Severance Plan to applicable associates who may be subject to postpetition terminations during the pendency of these cases. In view of the provisions of Bankruptcy Code section 503(c)(2), the Debtors do not seek authority to make any severance payments under the Executive Severance Plan.

165. As described above, certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of these chapter 11 cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date. The Debtors seek authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued and that are described above. The Debtors estimate that the aggregate amount of such prepetition Employee Benefits is

approximately $7.2 million, not including severance, defined benefits held in trust, vacation or workers' compensation.

166.     The Debtors also request confirmation of their right to continue to perform their obligations with respect to these Employee Benefits on a postpetition basis. The Employee Benefits are an important component of the total compensation offered to the Employees, and are essential to the Debtors' efforts to maintain Employee morale and minimize attrition. The Debtors believe that the expenses associated with the Employee Benefits are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Employee Benefits were discontinued.

167.     Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Employee Benefits and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of these cases. The Debtors do not at this time intend to assume any plan, program, policy or related agreement under Bankruptcy Code section 365(a) and reserve all rejection and termination rights.

Payments to Administrators

168.     With respect to the Employee compensation and benefits described above, the Debtors contract with several vendors to administer and deliver payments or other benefits to their Employees (the "Administrators"). In certain cases, disbursements made in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtors for reimbursement of payments made.

169.     For example, the Debtors, in the ordinary course of business, pay various third-party administrator expenses in connection with three self-funded medical, dental and vision plans and flexible spending account administration, which total approximately $170,000 per

59

month. Further, the Debtors, in the ordinary course of business, contract with a third party to administer the COBRA continuation benefits for terminated Employees, which fees total approximately $2,600 per month. The Debtors may also from time to time incur obligations for actuarial, accounting, trustee, or administrative fees in connection with special projects related to the Savings Plan or the Retirement Plan, when the costs of such projects are not payable out of plan assets.

170. In conjunction with the Debtors' payment of compensation and other benefits, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees. The Debtors believe that the Administrators may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered. A need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees. Accordingly, the Debtors submit that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

171. In the ordinary course of their businesses, the Debtors rely heavily on the services of approximately 3,200 Independent Contractors who are not Employees of the Debtors but who have been retained and have rendered services on behalf of the Debtors, including, without limitation, individual newspaper delivery services, freelance reporters/writers, artists, photographers, technical and administrative support, and temporary and contract labor workers. The overwhelming majority of the Independent Contractors are individual newspaper carriers, but there are also a number of vendors that provide newspaper delivery services for the Debtors. In addition, approximately 400 of the Independent Contractors are freelance reporters/writers.

Without these reporters/writers, the Debtors would not be able to achieve their mission, which is to provide local news in the communities in which they operate. The services of the Independent Contractors cannot be replaced in a cost-effective manner or, in certain circumstances, at all.

172. The compensation and other essential terms and conditions of the relationship of each of the Independent Contractors are typically governed by agreements between the Debtors and the Independent Contractor. Generally, the Independent Contractors utilized by the Debtors are paid through the Debtors' centralized cash management system on a weekly basis. Carriers are paid in arrears based on the number of publications delivered and freelance writers are typically paid by the column inch or per story.

173. Due to the nature of their work, many of the Independent Contractors rely on their weekly paychecks from the Debtors for their livelihood. Thus, any delay or failure in the Debtors' ability to meet their prepetition obligations to the Independent Contractors may cause a great hardship in the lives of the Independent Contractors. In addition, if even one weekly payment is missed, the Debtors believe the Independent Contractors may refuse to continue to do business with the Debtors. In light of the number of Independent Contractors used by the Debtors and the essential nature of the services they provide, it would be impossible for the Debtors to replace numerous Independent Contractors in a timely manner and without significant loss of revenue and customers. In such instance, the Debtors' efforts to reorganize their businesses would be in jeopardy.

174. As of the Petition Date, the Debtors estimate that approximately $2.6 million in Prepetition IC Obligations is outstanding.

175. Prior to the Petition Date, the Debtors paid certain of their Prepetition Employee Obligations and Prepetition IC Obligations with checks that had not been presented for payment

as of the Petition Date. In order to ensure the orderly payment of the Prepetition Employee Obligations and Prepetition IC Obligations, in the Employee Wages and Benefits Motion the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to the Employee Wages and Benefits Motion. To the extent that any such checks are refused payment, the Debtors additionally request authority to issue replacement checks and to reimburse their Employees and Independent Contractors from any loss resulting from the dishonoring.

**J. Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Service Providers (the "Critical Vendors Motion")**

176. The Debtors are engaged in the media business, operating in the newspaper publishing industry and the broadcast television industry, with support from their interactive division. The Debtors' revenues are derived primarily from advertising, and the strength of those revenues is dependent on the size of their newspaper readership and television audience, which in turn is dependent on their ability to deliver their products – newspapers, television programming, and online services. The Debtors believe that payment of the prepetition fixed, liquidated and undisputed claims (the "Critical Vendor Claims") of certain critical suppliers of products and services, with whom the Debtors continue to do business and whose products and services are essential to the Debtors' operations (the "Critical Vendors") that are associated with these various business lines is vital to the Debtors' ability to deliver their products and, thus, to their effort to preserve and maximize value for all stakeholders.

177. Although the Debtors believe that many of their vendors and service providers will continue to do business with them after commencement of these cases, the Debtors

anticipate that certain Critical Vendors will: (a) refuse to deliver products and services (including access to systems or data) without payment of their prepetition claims; (b) refuse to deliver products and services on reasonable price or credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtors; or (c) suffer significant financial hardship, such that the Debtors' non-payment of prepetition claims would destroy a Critical Vendor's business and, therefore, its ability to supply the Debtors with products and services.

178.    Accordingly, in the Critical Vendors Motion, the Debtors seek entry of an order granting them authority to pay Critical Vendor Claims. The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying products and/or services to the Debtors on the same trade terms that, or better trade terms than, such Critical Vendors offered the Debtors immediately prior to the Petition Date or, if more favorable, within the 90 day period prior to the Petition Date, or pursuant to such other trade practices and programs that are favorable to the Debtors. In the Critical Vendors Motion, the Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim and further propose to limit the aggregate amount of payments to be made on account of Critical Vendor Claims to $7 million unless further authorization is obtained from the Court. The Debtors also request in the Critical Vendors Motion that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts, and to honor all fund transfer requests made, in respect of payments made to the Critical Vendors, whether such checks were presented, or fund transfer requests submitted, prior to or after the Petition Date; and that such institutions be authorized to rely on the Debtors' representations as to the

DB02:8677729.1

068715.1001

identification of checks drawn and fund transfer requests made to satisfy their obligations to Critical Vendors.

**Stringent Criteria will be Used to Identify Critical Vendors**

179.    To ensure that the Debtors identify as Critical Vendors only those vendors and service providers that are actually critical to the Debtors' business, and who will refuse to, demand pricing or trade terms that constitute an effective refusal to, or be financially unable to, provide products or services (including access to systems or data) if not paid, certain of the Debtors' employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtors' immediate needs for products and services.

**Types of Goods and Services Giving Rise to Critical Vendor Claims Evidences Necessity for Payment**

180.    Among the types of Critical Vendors identified by the Debtors are certain vendors of the newsprint and other printing-related raw materials, and related purchasing services, that are critical to the Debtor's operations.  Newsprint constitutes the principal raw material used by the Debtors to complete the printing of their various publications.  Historically, the price of newsprint has been volatile.  Furthermore, past consolidation of North American newsprint mills has reduced the number of newsprint suppliers, which has resulted in increases in newsprint prices over the last year.  The Debtors believe that if they fail to pay the Critical Vendor Claims owed to certain of their newsprint suppliers and purchasing service providers on a timely basis, their existing relationships with such suppliers and purchasers will be negatively impacted, resulting in unfavorable newsprint prices for the Debtors in the future.

181.    In addition to newsprint, the Debtors are dependent on several other raw materials. The Debtors' printing process is heavily reliant on a continuous ink supply. The Debtors also must have a sufficient inventory of custom-fit newspaper plates to ensure that ink images can successfully be transferred to newsprint. Also important is a reliable supply of polybags and shrinkwrap to guarantee that the Debtors' newspapers are appropriately assembled for and adequately protected during the delivery process. Furthermore, certain raw materials are customized to fit the Debtors' needs and, as a result, are purchased from a single or limited number of suppliers. Due to the critical nature of the continuous supply of these materials to the production of the Debtors' publications, it is essential to the Debtors' reorganization efforts that the delivery of these raw materials and products continues without any delay or disruption.

182.    Also among potential Critical Vendors are certain third-party commercial printers to whom the Debtors outsource certain of their printing and inserting requirements. Specifically, the Debtors utilize commercial printers to produce certain items that, due to specific formatting requirements and printing specifications, are either inefficiently handled or incapable of being handled by the Debtors' printing presses. These jobs often require unique printing configurations that are not available on the Debtors' printing presses. In order to meet these printing requirements, the Debtors utilize commercial printers with appropriately configured printing presses. In many cases, the delivery of materials printed by the commercial printers in accordance with a specified time line is critical to the Debtors' ability to meet the demands of their advertisers, subscribers and other customers.

183.    In addition, certain Critical Vendors supply services that are essential to the Debtors' maintenance of a competitive position in newspaper or broadcasting and the related advertising industry. Specifically, the Debtors utilize third-party technology to monitor, track,

65

and bill advertisers for all advertisements and commercial time. Any interruption of the Debtors' tracking services would significantly impede the Debtors' ability to run, track, and bill millions of dollars of advertising.

184.	The Debtors also rely on vendors who provide certain proprietary software and on certain specialty equipment manufacturers. In addition, the Debtors depend on certain providers of essential services, ranging from provision of content for their products, to financial and IT support, to shipping and distribution to or from their facilities and to end customers.

185.	Vendors and service of the nature described above fall under the rubric of Critical Vendors. Any refusal by Critical Vendors to provide essential products or perform key services would have immediate and severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of the Debtors' businesses. For even in those instances in which an actual replacement vendor exists, the Debtors have determined that the time and other factors involved in replacing such Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible given the Debtors' efforts to maximize value for their estates and to continue to operate their businesses in the normal course.

186.	The Debtors estimate that there are approximately 80 Critical Vendors. Such Critical Vendors are estimated to account for less than 1% of the total number of vendors and service providers utilized by the Debtors in the ordinary course of their businesses. The aggregate prepetition balances of Critical Vendors are estimated to be approximately $7 million. Of that estimated amount, approximately 55% is attributable to newsprint.

DB02:8677729.1	068715.1001

**K.**  **Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 362, 503(b), 507(a), 546(c), and 546(h) (I) Confirming Administrative Expense Status of Obligations for Goods Received After Petition Date; (II) Authorizing Return of Goods; (III) Approving Procedures for Handling Reclamation Demands; and (IV) Prohibiting Interference with Delivery of Goods (the "Goods Motion")**

187.   For the purpose of obtaining and ensuring timely delivery from their vendors and suppliers (together, the "Vendors") of materials, supplies, goods, products and related items (collectively, the "Goods"), and protecting their rights with respect to certain Goods, the Debtors, through the Goods Motion, seek entry of an order (i) confirming the grant of administrative expense status to obligations for goods received by the Debtors after the commencement of these cases, and the obligation of the Debtors to pay for such goods, (ii) authorizing the Debtors in their discretion to return goods to vendors under Bankruptcy Code section 546(h), (iii) approving procedures for handling reclamation demands, and (iv) prohibiting third parties from interfering with the delivery of goods to the Debtors.

188.   Absent the relief requested in the Goods Motion, the Debtors would be required to expend substantial time and limited resources (a) convincing Vendors of the Debtors' authority to make certain payments; (b) reissuing Outstanding Orders; (c) obtaining authorization to return unnecessary Goods; (d) establishing their right to retain the Goods; (e) contesting or litigating Reclamation Demands; and/or (f) enforcing their rights with respect to Goods in the possession of third parties.

189.   As a result, there would be delay in and/or disruption to the continuous flow of Goods to the Debtors. Any such material delay or disruption would, in turn, cause considerable harm to the Debtors' business operations, thereby imperiling the Debtors' restructuring efforts. Consequently, the relief requested herein is in the best interests of the Debtors, their estates, and their creditors.

**Confirmation of Administrative Status for Goods Delivered Postpetition**

190.    In the ordinary course of the Debtors' business, numerous Vendors honor orders received from the Debtors for a variety of Goods, including, without limitation, raw materials, production supplies, and office supplies. As a result, on a regular basis, large quantities of Goods are delivered to the Debtors' facilities. As of the Petition Date, there were a number of prepetition orders outstanding on the Petition Date ("Outstanding Orders") for Goods yet to be delivered. These Goods are absolutely essential to the sustained operations of the Debtors' businesses and the Debtors' efforts to reorganize.

191.    The Debtors believe that, as a result of the Debtors' filing of their chapter 11 cases, many of the Vendors will be concerned that they will not be paid for Goods delivered on or after the Petition Date, if such delivery or shipment is based on a Outstanding Order. In the absence of an order confirming that postpetition delivery or other performance under an Outstanding Order will give rise to an administrative expense claim that must be paid, many Vendors may decline to ship, or may instruct their shippers not to deliver, Goods destined for the Debtors. Other Vendors will condition postpetition delivery or other performance on the issuance of substitute orders, which would be extremely disruptive to the Debtors' ongoing business operations. Therefore, the Debtors believe that an order confirming that Vendors who deliver Goods to the Debtors on or after the Petition Date are entitled to be paid for such Goods is necessary for the Debtors' smooth transition into chapter 11 and their ability to successfully reorganize.

**Return of Goods**

192.    In the ordinary course of business, the Debtors may receive various Goods that are defective, not up to standards, or otherwise not suitable or necessary for their operations. In some cases, the Debtors may return such Goods to Vendors. In the Goods Motion, the Debtors

request that they be permitted, in their discretion, to return Goods that were delivered prepetition for credit against the prepetition claims of the applicable Vendor, if the Debtors determine that such Goods are of little or no benefit to the Debtors' estates.

193.     The Debtors submit that an order approving returns to Vendors for credit against their prepetition claims, subject to any prior rights ("Prior Rights") of holders of a security interest in such Goods and the limitations imposed by any orders of the Court, is in the best interests of the Debtors' estates. Such relief will enable the Debtors to (a) obtain proper credit for otherwise unusable Goods in a cost-effective manner and without undue financial risk, and (b) effectively manage inventory, thereby enhancing the Debtors' financial performance, the value of the assets of the estates, and the prospects of a successful reorganization.

**Procedures for Resolving Reclamation Claims**

194.     The Debtors believe that many Vendors will attempt to assert their right to reclaim Goods delivered to the Debtors within forty-five (45) days prior to the Petition Date by delivering written reclamation demands ("Reclamation Demands") to the Debtors. Because the Goods are subject to liens in favor of the Debtors' prepetition secured lenders, the Reclamation Demands are subject to Prior Rights that may negate any reclamation rights. Nevertheless, the Debtors desire to preserve the rights of Vendors to seek to establish that their claims for Goods subject to Reclamation Demands have administrative expense status and are entitled to be paid in full under a plan of reorganization.

195.     The procedures described in the Goods Motion will facilitate the continued operation of the Debtors' businesses and should obviate any Vendor's perceived need to initiate legal action to preserve its rights, thereby minimizing potential costs to the Debtors' estates in responding to such litigation. Moreover, the disruption caused by having to administer and analyze reclamation claims during the first few weeks of these bankruptcy cases would seriously

69

distract the Debtors' management and professionals at a critical period in these cases. The Debtors therefore respectfully request that the Court establish the procedures described in the Goods Motion as the sole and exclusive method permitted with respect to the resolution of Reclamation Demands and payment of reclamation claims asserted against the Debtors.

**Confirming Stay of Third Parties**

196.    The Debtors' ability to receive the Goods is critical to the continued operation of the Debtors' business. Thus, in the Goods Motion, the Debtors request that the Court enter an order confirming that Vendors and any other third parties are prohibited from seeking to reclaim or repossess Goods that have already been delivered, or from interfering with the delivery of Goods presently in transit to the Debtors, absent further order of this Court granting relief from the automatic stay. Such relief is both necessary and appropriate under the circumstances and will facilitate uninterrupted operation of the Debtors' business.

**L.     Interim Order (I) Authorizing Use of Prepetition Lenders' Cash Collateral Under 11 U.S.C. § 363, (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 and 363 and (III) Scheduling a Final Hearing Under Bankruptcy Rule 4001(b) (the "Cash Collateral Order")**

197.    In the Cash Collateral Order, the Debtors request (a) authorization to use the cash that is subject to liens and control agreements in favor of the Collateral Agent (as defined below), the Debtors' funds on deposit with the Prepetition Agent or any Prepetition Lender, and all such proceeds of Prepetition Collateral (collectively, "Cash Collateral") and all other Prepetition Collateral, as requested herein; (b) authorization to provide adequate protection as specified herein in favor of the Prepetition Lenders to secure the Prepetition Liens in connection with the Debtors' use of Cash Collateral in which the Prepetition Lenders have an interest, and any diminution in the value of the Prepetition Lenders' interest in the Prepetition Collateral; (c) approval of certain stipulations by the Debtors with respect to the Prepetition Credit Agreement

and related loan documents and the claims, liens and security interests arising therefrom; (d) subject to entry of the Final Order, limiting the Debtors' right to surcharge against collateral under Bankruptcy Code section 506(c); and (e) the scheduling of the Final Hearing to be held within 30 days of the Petition Date to consider entry of the Final Order.

198.    Freedom Communications (the "Borrower") and Freedom Holdings are parties to that certain Credit Agreement, dated as of May 18, 2004 (as amended, supplemented or otherwise modified, the "Prepetition Credit Agreement") with the lenders party from time to time thereto (collectively, the "Prepetition Lenders") and JPMorgan Chase Bank, N.A., as administrative agent for the Prepetition Lenders (in such capacity, the "Prepetition Agent"), pursuant to which the Prepetition Lenders extended term loans and committed to fund loans under a revolving credit facility (including letters of credit) to the Borrower.

199.    The Borrower and certain of the other Debtors (such Debtors other than the Borrower, the "Guarantors") are also party to that certain Guarantee and Collateral Agreement, dated as of May 18, 2004 (as amended, supplemented or otherwise modified, the "Guarantee and Collateral Agreement", and together with the Prepetition Credit Agreement, all other documents executed or delivered in connection therewith, the "Prepetition Loan Documents"). Pursuant to the Guarantee and Collateral Agreement, the Guarantors unconditionally guaranteed the due and punctual payment and performance of the Prepetition Obligations (as defined in the Guarantee and Collateral Agreement). In addition, the Borrower and the Guarantors granted JPMorgan Chase Bank, in its capacity as Collateral Agent (the "Collateral Agent") for the benefit of the Prepetition Agent and the Prepetition Lenders, security interests and liens (the "Prepetition Liens") on substantially all of their assets, including the Cash Collateral (the "Prepetition Collateral").

DB02:8677729.1

068715.1001

200.    Pursuant to that certain Amendment No. 4, Waiver and Agreement, dated as of April 29, 2009 (the "Waiver"), the Borrower and the Guarantors agreed to maintain at least 85% of their aggregate cash and cash equivalents subject to liens and control agreements in favor of the Collateral Agent.

201.    In the Cash Collateral Motion the Debtors request entry of an interim order authorizing the Debtors to use Cash Collateral on an interim basis and entry of the Final Order. For the reasons described herein, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of the Cash Collateral Motion.

202.    The reasons underlying the Debtors' need to use Cash Collateral during the course of these chapter 11 cases are compelling. The Debtors possess insufficient unencumbered cash to fund their day-to-day operating expenses. Accordingly, at this time the Debtors have an immediate need to use Cash Collateral, without which they would be unable to operate their businesses. Indeed, the Debtors have an immediate need to use the Cash Collateral to permit, among other things, the maintenance of business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. Without use of their Cash Collateral, the Debtors will likely be forced to cease operations, lay off their employees and liquidate their assets in a very short timeframe.

203.    The Debtors' use of cash collateral under the terms of the interim order (the "Interim Order") proposed in the Cash Collateral Motion is entirely consensual. Indeed, the Interim Order represents the culmination of arms' length negotiation between the Debtors and the Prepetition Agent, and the Debtors and the Prepetition Agent have agreed to the Interim Order. Furthermore, the Debtors have been informed that the Prepetition Agent and the

Prepetition Lenders will object to the Debtors' use of the Cash Collateral except on the terms of the Interim Order.

## **CONCLUSION**

Accordingly, for the reasons states herein and in each of the First Day Pleadings, the Debtors request that the relief sought in the First Day Pleadings be approved.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: *September 1*, 2009

FREEDOM COMMUNICATIONS HOLDINGS, INC., et al.
Debtors and Debtors in Possession

Mark A. McEachen
Senior Vice President and Chief Financial Officer
Freedom Communications Holdings, Inc.

DB02:8677729.1

068715.1001