# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                                        :     Chapter 11
                                              :
FREEDOM COMMUNICATIONS HOLDINGS, :     Case No. 09-13046 (BLS)
INC., et al.,                                 :
                                              :     Jointly Administered
             Debtors.[1]                      :
                                              :     **Hearing Date: October 5, 2009 at 2:00 p.m. (ET)**
                                              :     **Objection Deadline: September 28, 2009 at 4:00 p.m. (ET)**

------------------------------------------------------------- x

## APPLICATION OF THE DEBTORS FOR ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF DIRKS, VAN ESSEN & MURRAY AS SALE ADVISOR PURSUANT TO 11 U.S.C. §§ 327(A), 328(A) AND 1107, FED. R. BANKR. P. 2014 AND DEL. BANKR. L.R. RULE 2014-1 *NUNC PRO TUNC* TO THE PETITION DATE

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"),

hereby apply to the Court (the "Application") for entry of an order, substantially in the form

attached hereto as Exhibit A, authorizing the Debtors to retain Dirks, Van Essen & Murray

("DV&M") as sale advisor ("Sale Advisor") to assist in the sale of the Phoenix Metropolitan

Area Properties (the "Phoenix Properties") *nunc pro tunc* to September 1, 2009 (the "Petition

Date), pursuant to sections 327(a), 328(a) and 1107 of title 11 of the United States Code (the

"Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Freedom Communications Holdings, Inc. (2814); Freedom Communications, Inc. (0750); Freedom Broadcasting, Inc. (0025); Freedom Broadcasting of Florida, Inc. (6581); Freedom Broadcasting of Florida Licensee, L.L.C. (1198); Freedom Broadcasting of Michigan, Inc. (6110); Freedom Broadcasting of Michigan Licensee, L.L.C. (1122); Freedom Broadcasting of New York, Inc. (6522); Freedom Broadcasting of New York Licensee, L.L.C. (9356); Freedom Broadcasting of Oregon, Inc. (7291); Freedom Broadcasting of Oregon Licensee, L.L.C. (9295); Freedom Broadcasting of Southern New England, Inc. (7274); Freedom Broadcasting of Southern New England Licensee, L.L.C. (1177); Freedom Broadcasting of Texas, Inc. (2093); Freedom Broadcasting of Texas Licensee, L.L.C. (1147); Freedom Broadcasting of Tennessee, Inc. (7961); Freedom Broadcasting of Tennessee Licensee, L.L.C. (9430); Freedom Magazines, Inc. (0328); Freedom Metro Information, Inc. (1604); Freedom Newspapers, Inc. (3240); Orange County Register Communications, Inc. (7980); OCR Community Publications, Inc. (9752); OCR Information Marketing, Inc. (7983); Appeal-Democrat, Inc. (4121); Florida Freedom Newspapers, Inc. (4227); Freedom Arizona Information, Inc. (5796); Freedom Colorado Information, Inc. (7806); Freedom Eastern North Carolina Communications, Inc. (5563); Freedom Newspapers of Illinois, Inc. (2222); Freedom Newspapers of Southwestern Arizona, Inc. (5797); Freedom Shelby Star, Inc. (8425); Illinois Freedom Newspapers, Inc. (8308); Missouri Freedom Newspapers, Inc. (8310); Odessa American (7714); The Times-News Publishing Company (0230); Victor Valley Publishing Company (6082); Daily Press (3610); Freedom Newspaper Acquisitions, Inc. (4322); The Clovis News-Journal (5820); Freedom Newspapers of New Mexico L.L.C. (5360); Gaston Gazette LLP (4885); Lima News (6918); Porterville Recorder Company (7735); Seymour Tribune Company (7550); Victorville Publishing Company (7617); Freedom Newspapers (7766); The Creative Spot, L.L.C. (2420); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Services, Inc. (3125). The address for Freedom Communications Holdings, Inc. and certain other Debtors is 17666 Fitch, Irvine, California 92614.

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). In support of this Application, the Debtors submit the Declaration of Philip W. Murray attached hereto as Exhibit B (the "Murray Declaration") and the Declaration of Mark McEachen (previously filed as Docket No. 2). In further support of this Application, the Debtors respectfully submit as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Application under 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these cases and this Application is proper under 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested herein are Bankruptcy Code sections 327(a), 328(a) and 1107, Bankruptcy Rule 2014(a), and Local Rule 2014-1.

## BACKGROUND

2.      On the Petition Date, the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in these chapter 11 cases. On September 10, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors for these cases (the "Committee").

3.      The Debtors in these cases consist of 50 entities within a corporate family led by parent company Freedom Communications Holdings, Inc. ("Freedom Holdings"). Freedom Holdings is the direct owner of Freedom Communications, Inc. ("Freedom Communications"). Freedom Communications is, in turn, the direct or indirect owner of the other 48 Debtors, as well as six non-Debtor affiliates.

4. Together, the Debtors operate a media business in two primary industry segments: newspaper publishing and broadcast television. In addition, the Debtors operate an interactive business which offers website complements, as well as digital and mobile products, to their newspaper and broadcast properties. Five of the non-Debtor affiliates operate as charitable organizations within the communities served by certain of the Debtors' newspapers, and the other non-Debtor affiliate is an entity organized under the laws of Mexico that has ceased its business operations.

5. The Debtors' operations are headquartered in Orange County, California and extend to 15 states within the United States, utilizing the services of in excess of 8,200 employees and independent contractors. Their newspaper publishing segment produces approximately 90 daily and weekly publications, including 30 daily newspapers, as well as ancillary magazines and other specialty publications. They operate eight television stations within their broadcast television segment, including five CBS affiliates, two ABC affiliates, and one CW affiliate.

6. The Debtors have consolidated liabilities of approximately $1.077 billion (calculated as of the month ended July 31, 2009). Their primary financial obligation arises under a secured credit agreement dated May 18, 2004, as amended, and is in the approximate amount of $770.6 million (excluding contingent letter of credit obligations). The Debtors are either obligors or guarantors, and have pledged substantially all of their assets to secure the indebtedness owing, under the credit agreement. In addition, the Debtors have other liabilities of approximately $306.4 million. Moreover, as described below, the Debtors were obligated under a contingent class action settlement in the amount of approximately $28.9 million. As a result of the commencement of these chapter 11 cases, the settlement terminated, and the Debtors

anticipate that the claimants will assert renewed claims. Any such claims would be in addition to the consolidated liabilities of approximately $1.077 billion.

7.　　The Debtors' financial condition has been deteriorating over the last several years. They have suffered from unprecedented challenges in the economy generally and the media industry specifically that have impacted their primary source of revenue: advertising. Traditionally, advertising revenues decline markedly during national, regional, and local economic downturns, like those experienced since the second half of 2008. For example, retail advertising has decreased with declines in the retail market, and classified advertising has suffered from unemployment and declines in the real estate and auto sectors. Moreover, competition from internet based alternatives, particularly in the classified employment advertising category, has caused significant erosion in traditional print media advertising revenues. In addition, recent high newsprint prices have taken their toll on the Debtors' otherwise reduced revenues.

8.　　As a result of their deteriorating financial condition, as of September 30, 2008, the Debtors had failed to satisfy the financial covenants of their secured credit agreement. The secured lenders issued a notice of default on October 16, 2008. The defaults continued through April 29, 2009, when the lenders agreed, among other things, to grant a temporary waiver of the defaults through December 31, 2009, unless earlier terminated. Thus, prior to the Petition Date, the Debtors faced the prospect of lengthy negotiations with their secured lenders that, even if resulting in an out-of-court restructuring of the obligations under the credit agreement, were not certain to remedy all of the issues impacting their financial results.

9.　　At the same time, the Debtors faced the imminent loss of approximately $28.9 million to a contingent litigation settlement involving the class action claims of certain

newspaper carriers for *The Orange County Register*. As part of the settlement, the Debtors funded an escrow account under the condition that the funds would not be disbursed to the claimants until September 14, 2009, and the funds would be returned to the Debtors in the event of a chapter 11 filing before that date. The Debtors recognized that, if they filed for chapter 11 relief after the funds were disbursed, they would have the right to seek to recover the funds as a preferential transfer, but the process of actually recovering the funds would be time-consuming and expensive.

10. Giving due consideration to the interests of all creditors, the Debtors determined that chapter 11 cases should be commenced before September 14, 2009. As a result, on the Petition Date, the Debtors commenced these chapter 11 cases. The Debtors intend to utilize the tools available to them under chapter 11 to improve their balance sheet and strengthen their businesses for the benefit of creditors, customers, employees, and the communities in which the Debtors operate.

## RELIEF REQUESTED

11. By this Application, the Debtors seek to retain and employ DV&M as their sales advisor in these cases *nunc pro tunc* to the Petition Date to assist in the sale of the Phoenix Properties, under the terms and conditions of the engagement letter that is annexed to the Murray Declaration as Appendix 1 (the "Engagement Letter").

## SERVICES TO BE PROVIDED

12. In connection with these chapter 11 cases, the Debtors have requested court authorization to retain DV&M as sales advisor for the Debtors in connection with the sale of the Phoenix Properties.

13.     The nature and extent of the services that DV&M proposes to render, as may be requested by the Debtors and as may be agreed to by DV&M, include, but are not limited to, the following:

(a)     use its expertise to assess the overall value of the Phoenix Properties;

(b)     develop a strategy for effecting the sale, including but not limited to, solicitation materials and marketing strategies, including Phoenix Properties's key investment attributes and upside potential;

(c)     identify and establish contact with prospective purchasers;

(d)     prepare and distribute solicitations of indicative interest;

(e)     serve as the primary point of contact with potential buyers;

(f)     assist in providing responses to questions, comments and concerns from prospective buyers;

(g)     perform necessary functions to create a competitive bidding environment;

(h)     assist in the evaluation of indicative and binding bids from prospective buyers; and

(i)     assist in negotiating a final transaction value and definitive transaction documents with the selected buyer(s).

14.     DV&M has stated its desire and willingness to act in these chapter 11 cases and to render the necessary professional services as lead sale advisor for the Debtors.

## DV&M'S QUALIFICATIONS

15.     DV&M has informed the Debtors that:

(a)     DV&M is the most active firm in the country specializing exclusively in newspaper mergers and acquisitions. The firm has been involved in hundreds of newspapers transactions in its nearly 30-year history, which in the aggregate total more than $12 billion. DV&M routinely handles more than half of all transactions involving daily newspapers each year, including eight of the thirteen such transactions consummated or announced so far in 2009.

(b)     Since its inception in 1980, DV&M has focused solely on assisting companies in the sale and acquisition of daily newspapers for a variety of purposes. It has thus established itself as the industry's top authority on

transactions and valuations. The firm has successfully closed hundreds of newspaper transactions and has handled many more deals than all other firms combined. Since the mid-1990's, DV&M has been involved in more than half of all daily newspaper transactions, while all other firms combined have accounted for less than 20%.

(c)     Over the years, DV&M has provided services to most of the nation's largest newspaper companies, both public and private, as well as to numerous independent owners and family-owned groups. Thirteen of the fifteen largest newspaper companies in the U.S. have engaged DV&M to assist them in divesting their own daily or non-daily newspapers. Moreover, some of the nation's most prominent independent owners have selected DV&M when contemplating a sale. The Debtors selected DV&M as their sales advisor for the proposed sale of the Phoenix Properties because of DV&M's diverse experience, specialized knowledge, recognized expertise, and reputation as a strategic advisor within the newspaper industry, and because the Debtors believe that DV&M possesses the resources and is well-qualified to provide the services that will be required in connection with the potential sale of the Phoenix Properties.

16.     DV&M's resources, capabilities and experience in advising the Debtors in the sale of the Phoenix Properties are crucial to the Debtors' successful restructuring. An experienced sales advisor such as DV&M fulfills a critical need that complements the services offered by the Debtors' other restructuring professionals. For these reasons, the Debtors require the services of a capable and experienced sales advisor firm such as DV&M.

## COMPENSATION

17.     DV&M intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' chapter 11 cases, subject to the Court's approval and in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, any applicable orders of the Court and consistent with the proposed compensation guidelines set forth in the Engagement Letter (the "Fee Structure").

18.     In summary, the Fee Structure provides for the following compensation to DV&M, subject to Court approval:

(a)    At the time of closing, the Debtors will pay DV&M, a commission (the "Commission") based on the total gross sales price. The Commission will be computed according to the 5-4-3-2-1 formula (that is, the sum of five percent (5%) of the first $1 million of the sale price, four percent (4%) of the second $1 million, three percent (3%) of the third $1 million, two percent (2%) of the fourth $1 million, and one percent (1%) of any amount greater than $4 million).

(b)    The total gross price shall include noncompetition agreements, consulting agreements, payments over time, promissory notes or their equivalents. In the case of payments over time or promissory notes, the full Commission shall be paid at the time of closing on any of the Phoenix Properties assets.

(c)    DV&M will seek reimbursement of all pre-approved reasonable out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of DV&M's counsel and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses.

19.    The Fee Structure is consistent with DV&M's normal and customary billing practices for comparably sized and complex sales, both in and out–of–court, involving the services to be provided in these chapter 11 cases. The Debtors have been informed that the compensation arrangement provided for in the Engagement Letter and generally described above is consistent with and typical of arrangements entered into by DV&M and other sales advisors of comparable standing in connection with the rendering of similar services to clients such as the Debtors. DV&M and the Debtors believe that the foregoing compensation arrangement is both reasonable and market–based.

20.    The Debtors also acknowledge and agree that the Fee Structure has been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of DV&M and its professionals hereunder and in light of the fact that (a) such commitment may foreclose other opportunities for DV&M and (b) the actual time and

commitment required of DV&M and its professionals to perform its services hereunder may vary substantially from week to week and month to month, creating "peak load" issues for DV&M.

21. Notwithstanding the approval of the compensation requested herein, all of DV&M's fees and out-of-pocket expenses in this case will be subject to approval of the Court upon proper application by DV&M in accordance with section 328 of the Bankruptcy Code, the fee and expense guidelines established by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), and any other applicable requirements or orders of the Court; further, the section 328(a) standard of review shall not limit the scope of review and objection, if any, of the U.S. Trustee.

22. The terms and conditions of the Engagement Letter were negotiated by the Debtors and DV&M at arm's length and in good faith. In light of the fact that the Debtors need DV&M's services to successfully reorganize, the Debtors respectfully submit that the terms and conditions of the Engagement Letter are reasonable and in the best interests of the Debtors, their estates and creditors.

<strong>DV&M'S DISINTERESTEDNESS</strong>

23. DV&M has informed the Debtors that, except as qualified in the Murray Declaration, DV&M has no material connection with the Debtors, their creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed by the office of the U.S. Trustee in the Debtors' chapter 11 cases.

24. To the best of the Debtors' knowledge, and as disclosed in the Murray Declaration, (a) DV&M is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code and referenced by section 328(a) of the Bankruptcy Code, and holds no interest adverse to the Debtors or their

estates for the matters for which DV&M is to be retained and (b) DV&M does not hold or represent any interest adverse to the Debtors or their estates.

25.    DV&M has and may in the future be engaged by certain interested parties in matters unrelated to these chapter 11 cases, either individually or as part of an engagement by a committee of creditors or interest holders.  DV&M submits that it holds no adverse interest as to the matters for which it has been employed by the Debtors.  DV&M will periodically review its files during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new relevant facts or relationships are discovered or arise, DV&M will use reasonable efforts to identify such further developments and will file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## BASIS FOR RELIEF

26.    Pursuant to section 327(a) of the Bankruptcy Code, a debtor in possession is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor in possession] in carrying out [its] duties under [the Bankruptcy Code.]" 11 U.S.C. § 327(a).  Section 1107(b) of the Bankruptcy Code modifies section 101(14) (definition of "disinterested person") and section 327(a) of the Bankruptcy Code in chapter 11 cases, by providing "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).

27.    The Debtors seek approval of the Fee Structure and Engagement Letter pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a

retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingency fee basis . . . " 11 U.S.C. § 328(a). The Fee Structure appropriately reflects the nature and scope of services to be provided by DV&M.

28. As recognized by numerous courts, Congress intended in section 328(a) to enable debtors to retain professionals pursuant to specific fee arrangements to be determined at the time of the court's approval of the retention, subject to reversal only if the terms are found to be improvident in light of "developments not capable of being anticipated at the time of fixing such terms and conditions." 11 U.S.C. § 328(a); *see also Donaldson, Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862-3 (5th Cir. 1997) ("If the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment.").

29. Accordingly, section 328 permits the compensation of professionals, including real estate brokers, on terms that reflect the nature of their services and market conditions. The terms of the Engagement Letter and the Commission reflect (i) the nature of the services provided by DV&M and (ii) the fee structure provisions typically utilized by DV&M and other real estate and consulting firms, which do not bill their clients on an hourly basis for services like those to be rendered pursuant to the Engagement Letter and generally are compensated on a transactional basis. The Fee Structure is also consistent with DV&M's normal and customary billing practices. Considering the services that DV&M will provide and the market prices for DV&M's services, the Debtors submit that the Commission is reasonable under the standards set forth in section 328(a) of the Bankruptcy Code and fulfill the requirements of Rule 2014-1 of the

Local Rules. Thus, the Debtors request approval of the Engagement Letter and the Fee Structure pursuant to section 328(a) of the Bankruptcy Code.

## FEE APPLICATIONS

30.    In light of DV&M's fee structure, the Debtors respectfully request that, in lieu of requiring DV&M to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code, a modified procedure (discussed below) be established to compensate DV&M for its services. Requiring DV&M to file periodic fee applications pursuant to sections 330 and 331 of the Bankruptcy Code is unnecessary under the circumstances because DV&M will not be paid until the Phoenix Properties have been sold. Rather than submitting periodic fee applications, the Debtors propose that DV&M's compensation be governed by the following procedure (the "Compensation Procedure"):

The Debtors will request the Court's allowance of DV&M's Commission either (i) as part of a motion, if one is deemed to be necessary under the Bankruptcy Code, requesting the Court's approval of the sale of the Phoenix Properties or (ii) if such Court approval is not required, by filing a notice after consummation of the sale of the Phoenix Properties setting forth the Commission to be paid to DV&M with respect thereto (the "Commission Notice") and serving the Commission Notice on all parties entitled to receive notice in these cases.

- Parties will have ten (10) days after the filing of the Commission Notice to file an objection to any portion of the Commission and serve the objection on the Debtors and DV&M. Any objection to the Commission Notice shall set forth the amount of the Commission to which the party is objecting and the reasons for the objection.

- If no party timely files and serves an objection to the Commission Notice, the Debtors shall be authorized to pay the Commission to DV&M without further notice or authorization from the Court.

- If any party files a timely objection to the Commission Notice, the Debtors shall be authorized to pay, without further notice or authorization from the Court, (i) any portion of the Commission to which any party filing the objection has not objected and (ii) any portion of the Commission to which the Debtors, DV&M, and the objecting party or parties have agreed in writing may be paid. If the Debtors, DV&M, and the objecting party or parties are unable to resolve the objection, the Debtors or DV&M may schedule a hearing for the Court to determine the objection.

31.     The Debtors submit that the proposed Compensation Procedure is practical, affords the Court and other parties in interest an opportunity to review the propriety of the Commission in relation to the proposed sale of the Phoenix Properties, and avoids the administrative burden on the Court of having to review DV&M's fee applications. Accordingly, the Debtors respectfully request that the Court approve the proposed Compensation Procedure.

## NOTICE

32.     Notice of the filing of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the agent for the Debtors' prepetition secured bank group; and (d) all parties who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submits that no further notice is required or needed under the circumstances.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the forms attached hereto as Exhibit A, granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

September 17 , 2009

FREEDOM COMMUNICATIONS
HOLDINGS, INC.

By: _Mark A. McEachen_

Name: Mark A. McEachen

Title:  Senior Vice President and Chief
        Financial Officer