IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| FREEDOM COMMUNICATIONS HOLDINGS, INC., et al.,[1] | : Case No. 09-13046 (BLS) |
| | : (Jointly Administered) |
| | : Related to Docket No. 102 |
| Debtors. | : |
| | : Objections due: November 17, 2009 at 4:00 p.m. (ET) |
| | : Hearing date: November 23, 2009 at 2:00 p.m. (ET) |

**MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER (A) AUTHORIZING ITS INVESTMENT BANKERS, TRENWITH GROUP, LLC, TO SOLICIT ALTERNATIVE PLAN PROPOSALS USING, INTER ALIA, THE DEBTORS' CONFIDENTIAL INFORMATION, AND (B) DIRECTING THE DEBTORS TO PROVIDE COOPERATION IN CONNECTION WITH SUCH EFFORTS**

The Official Committee of Unsecured Creditors (the "Committee") of Freedom Communications Holdings, Inc. ("Freedom Holdings") and its affiliated chapter 11 debtors (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this *Motion of Official Committee of Unsecured Creditors for an Order (A) Authorizing its Investment Bankers, Trenwith Group, LLC, to Solicit Alternative Plan Proposals Using, Inter Alia, the*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification numbers, are: Freedom Communications Holdings, Inc. (2814); Freedom Communications, Inc. (0750); Freedom Broadcasting, Inc. (0025); Freedom Broadcasting of Florida, Inc. (6581); Freedom Broadcasting of Florida Licensee, LLC (1198); Freedom Broadcasting of Michigan, Inc. (6110); Freedom Broadcasting of Michigan Licensee, LLC (1122); Freedom Broadcasting of New York, Inc. (6522); Freedom Broadcasting of New York Licensee, LLC (9356); Freedom Broadcasting of Oregon, Inc. (7291); Freedom Broadcasting of Oregon Licensee, LLC (9295); Freedom Broadcasting of Southern New England, Inc. (7274); Freedom Broadcasting of Southern New England Licensee, LLC (1177); Freedom Broadcasting of Texas, Inc. (2093); Freedom Broadcasting of Texas Licensee, LLC (1147); Freedom Broadcasting of Tennessee, Inc. (7961); Freedom Broadcasting of Tennessee Licensee, LLC (9430); Freedom Magazines, Inc. (0328); Freedom Metro Information, Inc. (1604); Freedom Newspapers, Inc. (3240); Orange County Register Communications, Inc. (7980); OCR Community Publications, Inc. (9752); OCR Information Marketing, Inc. (7983); Appeal-Democrat, Inc. (4121); Florida Freedom Newspapers, Inc. (4227); Freedom Arizona Information, Inc. (5796); Freedom Colorado Information, Inc. (7806); Freedom Eastern North Carolina Communications, Inc. (5563); Freedom Newspapers of Illinois, Inc. (2222); Freedom Newspapers of Southwestern Arizona, Inc. (5797); Freedom Shelby Star, Inc. (8425); Illinois Freedom Newspapers, Inc. (8308); Missouri Freedom Newspapers, Inc. (8310); Odessa American (7714); The Times-News Publishing Company (0230); Victor Valley Publishing Company (6082); Daily Press (3610); Freedom Newspaper Acquisitions, Inc. (4322); The Clovis News-Journal (5820); Freedom Newspapers of New Mexico, LLC (5360); Gaston Gazette LLP (4885); Lima News (6918); Porterville Recorder Company (7735); Seymour Tribune Company (7550); Victorville Publishing Company (7617); Freedom Newspapers (7766); The Creative Spot, LLC (2420); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Services, Inc. (3125). The address for Freedom Communications Holdings, Inc. and certain other Debtors is 17666 Fitch, Irvine, California 92614.

*Debtors' Confidential Information, and (B) Directing the Debtors to Provide Cooperation in Connection with Such Efforts* (the "Motion"), and in support thereof, the Committee respectfully states as follows:

## I.
## PRELIMINARY STATEMENT

1. By this Motion, the Committee seeks authority to conduct a solicitation process intended to seek out higher and better alternative proposals for a plan of reorganization in these Chapter 11 cases. The record of these cases makes clear that having arrived upon a plan of reorganization pre-petition without unsecured creditor input that is to the liking of the Debtors' insiders and secured creditors, the Debtors have abandoned all efforts to seek out any alternative or higher and better plan proposals. Indeed, without the benefit of an order of this Court relieving the Debtors of their fiduciary obligation to maximize the value of these estates and creditors' recoveries by seeking out alternative proposals post-petition, the Debtors are complying with a "no-shop" provision contained in their pre-petition Plan Support Agreement with a group of their Lenders. [Docket No. 19]. As set forth below, the Debtors and their officers and directors cannot contract away their fiduciary duties, nor take it upon themselves to agree to be bound by a no-shop clause without Court approval.

2. Notably, the Debtors filed the Plan Support Agreement on the Petition Date but at no time have they sought Court approval of the no-shop provision, which is clearly not in the ordinary course of business, under section 363(b) of the Bankruptcy Code. The Debtors' unilateral determination to adhere to the no-shop provision without seeking or obtaining Court approval is patently improper, and arguably is grounds for relief far more severe than the relief requested by the Committee in this Motion, which is simply to empower the Committee to

conduct the process of seeking out higher and better plan proposals post-petition – a responsibility that the Debtors have abdicated.

3. Thus, by this Motion, pursuant to sections 105, 107, 362 and 1103(c)(3) of the Bankruptcy Code, the Committee seeks the entry of an Order of this Court that will (a) authorize the Committee to solicit alternative plan proposals for the Debtors using confidential information of the Debtors that will be protected by confidentiality agreements executed with the recipients on prior notice to the Debtors, and (b) direct the Debtors to cooperate with these solicitation efforts by, *inter alia*, providing financial and other information to the Committee and making its management personnel reasonably available to meet with potentially interested parties.

4. Before seeking this relief, the Committee sought the Debtors' agreement to the relief requested herein but after several requests that were met by delaying tactics, in effect that we will have to get back to you, the Committee determined it was necessary to proceed with this Motion, so that the relief is not rendered moot by the passage of time while the Debtors proceed towards confirmation of their recently filed, fatally-flawed Plan. It is clear that having formed an unholy alliance with the Consenting Lenders, the Debtors' board of directors and controlling shareholders have determined to "stand pat" with a Plan that inappropriately provides for distributions to the old equity interests who control the board, while inflicting massive impairment and discrimination on the Debtors' general unsecured creditors. This offense should not go unredressed, and the Committee respectfully submits that the least onerous form of relief, and the one that perhaps best addresses the problem caused by the Debtors' abdication of its responsibilities, is to authorize and empower the Committee to seek out higher and better plan proposals.

## II.
## FACTUAL BACKGROUND

### A. The Chapter 11 Cases

5. On September 1, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), commencing the chapter 11 cases of the Debtors.

6. The Debtors continue to operate and manage their businesses and properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Committee was appointed by the Office of the United States Trustee on September 9, 2009.

### B. The Plan Support Agreement

7. On the Petition Date, the Debtors filed the Plan Support Agreement, a pre-petition agreement between the Debtors and a simple majority of the Lenders, that contemplates the pursuit of a plan of reorganization described in the attached Plan Term Sheet. According to the Plan Term Sheet, that plan would provide for the following classification and treatment of claims against and interests in the Debtors:

    (a) The Lenders, who claim to be owed $770 million secured by substantially all of the Debtors' assets, would receive new notes in the amount of $325 million, cash in excess of $15 million, and substantially all of the New Common Stock in Reorganized Holdings. *See* Plan Term Sheet at 3.

    (b) According to the Plan Term Sheet, holders of "Trade Unsecured Claims" that agree to supply the Debtors on credit terms post-confirmation are to receive payment in full of their claims in cash on the Effective Date. *Id.* at 3-4.

    (c) General Unsecured Claims on the other hand, whose claims were estimated by the Debtors to be as much as $300 million, are to receive a *pro rata* share of $5 million in cash, so long as the class accepts the plan, including its provision of a distribution to Old Equity, as described below.

(d) In violation of the absolute priority rule, under the Plan Term Sheet, Old Equity (who through their ownership control the Board of Directors that approved the Plan Support Agreement) are to receive 2% of the New Common Stock in Reorganized Holdings plus Warrants to purchase 10% of the New Common Stock. *Id.* at 4-5.

(e) Finally, the Plan Term Sheet contemplated that the Plan would contain blanket releases from the Debtors and third parties running to the Debtors' current and former officers and directors and the Lenders and their officers, directors, stockholders, advisors and attorneys. *Id.* at 8.

8. Significant to the instant Motion, the Plan Support Agreement contained a "no-shop" provision which purports (without Court approval) to obligate the debtors in possession "not to directly or indirectly seek, solicit, support or encourage any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, liquidation or restructuring of any of the Debtors that could reasonably be expected to prevent, delay or impede the confirmation and consummation of the Restructuring and the Plan." (Plan Support Agreement, § 4). Although the Plan Support Agreement includes a cosmetic "fiduciary duty" out (*id.*) that would allow the Debtors to accept a better proposal if one came on an unsolicited basis, as confirmed by the Debtors' Chief Financial Officer, Mark McEachen, it would be a breach of the Plan Support Agreement if the Debtors affirmatively solicited any other plan proposals.

9. Indeed, Mr. McEachen candidly testified in earlier hearings in this case that the Debtors have abandoned all efforts to seek any alternative proposal to the Plan.[2]

---

[2] *See* Transcript of hearing held on October 14, 2009 at 97 (Q: "But you can't go out, based on your testimony and understanding, and look for an alternative transaction, correct?" Mark McEachen: "That is correct."), and at 98 (Q: "Is it your understanding that you can't do anything that would in any way delay or interfere with the approval process for the plan that is part of the term sheet attached to the plan support agreement?" Mark McEachen: "It is my understanding we cannot, Your Honor, seek outside nor can we do anything intentionally to delay what was agreed upon.").

Similarly, the Debtors' retained investment Bankers, Houlihan Lokey, have been instructed to stand down.

10. Remarkably, to date, the Debtors have never sought Court approval or authorization to "perform" under the pre-petition no-shop provision by refraining from exercising the pursuit of higher and better alternatives than the flawed Plan they concocted with the Lenders prepetition. Rather, the Debtors have arrogated to themselves the decision that they need do no more as fiduciaries other than to keep their heads down and march towards the goal line of pursuing confirmation of the Plan notwithstanding its patent defects and taint of self-interest.

C. **The Debtors' Joint Plan of Reorganization**

11. Undeterred by the Committee's pleadings in these cases pointing out the numerous patent defects in the Plan, not the least of which is the proposed distribution out of priority to the Old Equity holders that control the board of directors, on October 31, 2009, the Debtors filed their *[First Proposed] Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code, of Freedom Communications Holdings, Inc., et al., Debtors, dated October 31, 2009* [Docket No. 371] (the "Plan") and a related proposed disclosure statement [Docket No. 372]. The Plan generally adheres to the terms and conditions of the Plan Term Sheet, although in some material respects, particularly the advertised payment in full of Trade Unsecured Creditors, the Plan is actually materially worse that the Plan Term Sheet. According to the Plan Term Sheet, all holders of Trade Unsecured Claims were promised payment in full of their claims on the Effective Date if they agreed to provide credit terms to the Reorganized Debtors post-confirmation. However, the Plan provides no such assurance, and instead engages in a

game of "hide the ball," with holders of Trade Unsecured Claims, rendering the advertised promise of full payment illusory.

12. Specifically, the Plan does not separately classify holders of Trade Unsecured Claims and propose payment in full of their claims, as suggested by the Plan Term Sheet. Rather, holders of Trade Unsecured Claims are placed into one of the 43 subclasses of General Unsecured Claims under Class A4 of the Plan along with all other unsecured creditors, who under the Plan are to share pro rata in a pot of $5 million in cash, if Class A4 accepts the Plan. Setting up a purely discretionary vehicle for rescuing creditors from this disfavored treatment, the Plan provides that holders of Trade Unsecured Claims may, at some unspecified point prior to confirmation, be selected by the Debtors in their sole and absolute discretion to better plan treatment upon them, *i.e.*, payment in full, if the holder of the Trade Unsecured Claim agrees to enter into a Post-Emergence Trade Agreement, whose terms are not revealed in the Plan or disclosure statement and if fact will not be revealed until days before the Confirmation Hearing, in the Plan Supplement, presumably after the voting deadline passes. Similarly, the Plan provides that the sum that will be made available to pay Trade Unsecured Claims will only be revealed in the Plan Supplement days before the confirmation hearing.

13. Thus, the advertised treatment is not assured, but is subject to the Debtors' whim and the mechanics for payment are concealed. There is simply no disclosure as to whether or not the Debtors actually will offer payment in full to all or any holders of Trade Unsecured Claims, or the terms which will be demanded of those invited to receive better plan treatment, making the entire approach to the plan treatment of similarly situated creditors discretionary. The Plan thus envisions a program whereby the Debtors will be able to select some creditors for payment in full treatment on the eve of confirmation, even though those

creditors were classified for voting purposes in the same class as other creditors who will remain materially impaired, and because of the lack of disclosure, everyone will be left to guess who will be chosen by the Debtors, in their sole and absolute discretion, for preferred treatment. This flies in the face of the fundamental principle of equality of distribution embodied in the Bankruptcy Code. The Debtors' pernicious Plan also would enable them to gerrymander the vote, as the Debtors have reserved for themselves the ability to "cherry pick" holders of Trade Unsecured Claims who voted against the Plan for full payment after the voting deadline, and thereby eliminate their vote cast to reject the plan.

14. This entire approach is patently wrong, and the Debtors are continuing undeterred to present their flawed Plan for confirmation, to the exclusion of any other plan, since no other plan would provide a distribution to the insiders. While the Committee will address the many defects in the Plan at a later date, and fully reserves its rights in this regard, at this juncture, all that the Committee asks is that it be given a fair opportunity to seek out better plan proposals that are confirmable. The requested relief should be granted if for no other reason than, as shown below, in contravention of their fiduciary duties, the Debtors (under the management of its board of directors who were handpicked by the controlling shareholders) have given up looking for anything beyond the Plan, which proposes to give distributions and releases to these insiders while inflicting massive impairment and rampant discrimination upon creditors to whom they owe their duties.

### III.
### ARGUMENT

#### A. The Debtors' Duty to Maximize the Estate

15. It is beyond peradventure that as a fiduciary, a trustee or a debtor in possession must maximize the value of the bankruptcy estate for the benefit of all creditors. In

*CFTC v. Weintraub*, 471 U.S. 343, 353, 105 S.Ct. 1986 (1985), the United States Supreme Court held that a trustee or debtor in possession owes a fiduciary duty to all creditors and interest holders to maximize the value of the bankruptcy estate. Similarly, the Third Circuit of Appeals, citing *CFTC v. Weintraub*, has held that a debtor in possession has the duty "to maximize the value of the estate, and in so doing is bound to be vigilant and attentive in advancing [the estate's] interests. In sum, it is the trustee's duty to both the debtor and the creditor to realize from the estate all that is possible for distribution among the creditors." *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996).

16. Remarkably, in this case, the Debtors have admittedly ceased all further affirmative efforts to develop any plan of reorganization other than the fatally-flawed Plan. Though the Debtors have engaged an investment banker, the investment banker has been instructed not to seek any alternative plan proposals or higher and better offers. As set forth below, without the benefit of obtaining a court order authorizing this self-imposed limitation on the exercise of its fiduciary duties, the Debtors have been operating under a "no-shop" clause in the pre-petition Plan Support Agreement, which absent such an order is patently improper, and grounds for the relief requested by this Motion.

B. <u>No Shop Clauses Must Be Approved by the Court</u>

17. A corollary to *CFTC v. Weintraub* is that a trustee or debtor in possession must obtain Court approval to deviate from the standard of conduct requiring them to engage in vigilant efforts to maximize the value of the estate. Thus, it has been widely held that "no-shop" clauses such as the one in the Plan Support Agreement, which purport to limit the estate fiduciary's duty to take steps to maximize the value of the estate for the benefit of creditors, are out of the ordinary course and require prior approval by the bankruptcy court.

18. In *In re Bidermann Industries U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997), the bankruptcy court had occasion to address a "no shop" clause in an asset purchase agreement that had restricted the debtor from shopping for a better deal but, like the Plan Support Agreement in this case, allowed the debtor to respond to unsolicited inquiries, denominated as a "window shop" clause. The court concluded that the debtor's adherence to the limitation was inappropriate for a debtor in possession: "This sale process should have followed an intensive effort to drum up the best price obtainable for the creditors. Instead, the process aims to cut off other possible sales. There is some window-dressing, making it look like the sale will be tested, for the so-called "window shop" provision allows the debtors to fulfill their fiduciary obligations by permitting due diligence to occur by others with offers exceeding the claimed value of the A & M/Vestar offer ...." *Id. At 551-553*. And the whole bidding arrangement is designed not to encourage but to stifle bidding." The court concluded that even with the cosmetic out of the "window-shop" clause, the debtor's willing adherence to the no-shop clause in the asset purchase agreement was still improper and set a show cause hearing on the question of whether an examiner with expanded powers should be appointed.

19. The cases are clear that court approval is necessary before a debtor in possession can limit itself from taking actions necessary to fulfill its DIP fiduciary duties, and even where approval has been requested such limitations are highly disfavored. *See, e.g., In re Big Rivers Elec. Corp.*, 233 B.R. 726, 735-36 (Bankr. W.D. Ky. 1998) (No-shop clause in prepetition agreement between Chapter 11 debtor and prospective purchaser of debtor's assets, which purported to bar debtor from negotiating with any other party for the sale, use or transfer of debtor's assets or even from petitioning bankruptcy court to allow negotiations in event that better purchase offer was proposed, was null and void, and would not support breach of contract

claim for debtor's alleged failure to abide by its obligations under no-shop provision, as interfering with debtor's fiduciary obligation to maximize value of bankruptcy estate). These decisions disfavoring no-shop clauses are consistent with applicable Delaware corporate law. *See Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (Del. 1994) ("The No-Shop Provision could not validly define or limit the fiduciary duties of the [corporation's] directors. To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable.").

20. Against the weight of this authority, and despite having the impropriety of lack of court approval pointed out to them frequently, the Debtors' management has not seen fit to seek the approval of this Court to limit the exercise of their fiduciary obligations by complying with the no-shop clause in the Plan Support Agreement. It is clear that in an act of blatant self-interest, the board of directors which is controlled by the controlling shareholders has determined to stick with the agreement they reached with the Lenders that provides for a significant distribution for Old Equity holders who are plainly out of the money and arrogated to themselves the decision to not shop the deal.

C. **If the Debtors Will Not Solicit Higher and Better Proposals, the Committee Should Be Permitted and Enabled to Do So as Contemplated by the Motion**

21. The Committee respectfully submits that the Debtors and their board of directors have no right absent Court approval to adhere to the provisions of the no-shop clause in the pre-petition Plan Support Agreement and that their conduct, including their unwillingness to seek out higher and better offers in favor of a Plan tainted by their self-interest, warrants some

corrective action. The Committee respectfully submits that the relief requested by this Motion is among the least intrusive alternatives.

22.     Some courts would consider the Debtors' conduct as cause for the appointment of a chapter 11 trustee or an examiner with expanded powers. *See In re Bidermann Industries U.S.A., Inc., supra.* Such extraordinary remedies, of course, could have negative consequences to the Debtors' business affairs so the Committee is not seeking such relief at this time.

23.     Another remedy would be the appointment of an examiner to conduct an investigation. In an analogous situation in the Lyondell chapter 11 case, last month Bankruptcy Judge Robert E. Gerber ordered the appointment of an examiner to investigate whether conflicts of interest, as alleged by the official creditors' committee, affected the debtor's selection of insiders, who were also targets of litigation, to backstop a rights offering under a plan.[3] However, the appointment of an examiner in this case would not ameliorate the problem, in that such an appointment would not effect a change on the status quo, which is that the Debtors are not seeking out higher and better offers despite their fiduciary duties.

24.     Another recent, relevant case is *In re Magnachip Semiconductor*, Case No. 09-12008 (PJW) pending before Bankruptcy Judge Peter J. Walsh. There, the debtors in possession filed a joint plan of reorganization with their secured lenders which incorporated a sale of the debtors' assets. The sale was without overbid and on a very tight timetable dictated by milestones in a forbearance agreement with the lenders that allowed them to enforce rights against a certain non-debtor foreign subsidiary if the milestones were not met. The official creditors' committee moved to continue the disclosure statement hearing on the joint plan,

---

[3] A copy of Judge Gerber's order appointing an examiner is annexed hereto as **Exhibit "A."**

arguing that the market had turned around and the debtor should remarket its assets. The Court declined to continue the disclosure statement hearing (and approved the disclosure statement), but terminated exclusivity *sua sponte* (it had not even been requested by the committee) and gave the committee an opportunity to find a plan sponsor and propose a competing plan.[4] The debtor provided due diligence materials to the committee on a cooperative basis to be show to potentially interested third parties. Ultimately, a plan proposed by the official committee with a new plan sponsor was confirmed.

25. In this case, the Committee is not seeking the appointment of a trustee or an examiner, or even, at this time, termination of plan exclusivity.[5] Rather, all the Committee wants is a meaningful opportunity (as in *Magnachip*) to take up the cause of soliciting higher and better plan proposals that the Debtors abandoned, in order to maximize the value of the estates and creditors' recoveries. It is clear that the Debtors and their insiders are content with a plan that improperly gives insiders a distribution, and thus that their abandonment of all efforts to seek out higher and better offers is not only inconsistent with their obligations to the estates and their creditors, but also tainted by self-interest.

26. Accordingly, the Committee proposes to perform the solicitation function on behalf of the estate, much as a Committee would bring derivative claims on behalf of the estate when the Debtors have improperly failed to do so. *Cf. The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery, et al.* 330 F.3d 548 (3rd Cir. 2003) (committee may be authorized to pursue estate claims when the trustee or debtor in possession

---

[4] A complete copy of the transcript of the hearing held on July 30, 2009 is annexed hereto as **Exhibit "B."**

[5] If the Committee's efforts to develop an alternative plan proposal bear fruit, the Committee will come back to the Court with a request to terminate exclusivity, although the case could be made that the Committee's efforts to seek out alternative transactions would be enhanced by a termination of exclusivity since potential purchasers or investors may be reluctant to negotiate plan terms with a party in interest that does not have the right to file a plan once negotiated.

improperly refuses to do so). Here, the Debtors have improperly ceased to perform their obligations as fiduciaries to seek out higher and better offers. Under the circumstances of these cases, the Committee deserves a fair chance to test the market and pursue interested parties who may be willing to sponsor a plan of reorganization that maximizes the value of the estate and the recoveries by all creditors.

27. In order to implement this process, the Committee proposes that the following protocol be adopted and "so ordered" by the Court:

(a) As used herein, the term "Confidential Information" shall have the meaning ascribed to that term in the confidential agreement (the "Confidential Agreement") between the Debtors and the Committee dated as of September 18, 2009.

(b) Notwithstanding any provisions of the Confidentiality Agreement, the Committee shall be authorized and permitted to disseminate Confidential Information to third parties potentially interested in sponsoring a plan of reorganization in these chapter 11 cases, subject to the terms and conditions below.

(c) Before the Committee or its advisors may disseminate Confidential Information to any third parties for the purpose of soliciting a plan proposal, the Committee shall provide the Debtors with two (2) business days' notice of its intention to disseminate such information. In such notice, the Committee shall set forth the identity of the intended recipient and the general categories of information to be supplied to such recipient, together with a copy of a Confidentiality Agreement substantially similar in form to the Committee's Confidentiality Agreement, executed by such recipient.

(d) Unless the Committee receives a written objection from the Debtors to the notice of intention to supply Confidential Information, setting forth the basis for any such objection, the Committee shall be authorized to proceed with the dissemination of such Confidentiality Agreement to interested third parties.

(e) If a written objection is received by the Committee, the Committee and the Debtors shall endeavor in good faith to resolve any disputed issues, failing which the matter shall be presented jointly by the parties to the Court on as expedited a basis as practicable. No Confidential Information shall be provided to a third party

pending resolution of the objection either consensually or by Order of the Court.

(f) The Debtors shall make their management personnel and outside professionals reasonably available to meet with potentially interested third parties.

## CONCLUSION

WHEREFORE, based upon the foregoing, the Committee respectfully requests that the Court enter an Order granting the relief requested in this Motion and such other and further relief as the Court deems just and appropriate.

Dated: November 10, 2009

PACHULSKI STANG ZIEHL & JONES LLP

/s/ B. Grohsgal
---
Robert J. Feinstein (NY Bar No. RF-2836)
Alan J. Kornfeld (CA Bar No. 130063)
Bruce Grohsgal (DE Bar No. 3583)
David A. Abadir (NY Bar No. DA-0741)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: rfeinstein@pszjlaw.com
   akornfeld@pszjlaw.com
   bgrohsgal@pszjlaw.com
   dabadir@pszjlaw.com

[Proposed] Counsel to the Official Committee of Unsecured Creditors for Freedom Communications Holdings, Inc. et al.