# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FREEDOM COMMUNICATIONS HOLDINGS, INC., *et al.*, [1] | ) | Case No. 09-13046 (BLS) |
| | ) | |
| | ) | **Re: Docket No. 371 & 372** |
| Debtor. | ) | |
| | ) | |

Objection Deadline: **December 7, 2009 at 10:00 a.m. (ET)**
Hearing Date: **December 17, 2009 at 2:00 p.m. (ET)**

## COMMITTEE OBJECTION TO DEBTORS' DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION

---

[1] The debtors in these chapter 11 cases ("Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: Freedom Communications Holdings, Inc. (2814); Freedom Communications, Inc. (0750); Freedom Broadcasting, Inc. (0025); Freedom Broadcasting of Florida, Inc. (6581); Freedom Broadcasting of Florida Licensee, LLC (1198); Freedom Broadcasting of Michigan, Inc. (6110); Freedom Broadcasting of Michigan Licensee, LLC (1122); Freedom Broadcasting of New York, Inc. (6522); Freedom Broadcasting of New York Licensee, LLC (9356); Freedom Broadcasting of Oregon, Inc. (7291); Freedom Broadcasting of Oregon Licensee, LLC (9295); Freedom Broadcasting of Southern New England, Inc. (7274); Freedom Broadcasting of Southern New England Licensee, LLC (1177); Freedom Broadcasting of Texas, Inc. (2093); Freedom Broadcasting of Texas Licensee, LLC (1147); Freedom Broadcasting of Tennessee, Inc. (7961); Freedom Broadcasting of Tennessee Licensee, LLC (9430); Freedom Magazines, Inc. (0328); Freedom Metro Information, Inc. (1604); Freedom Newspapers, Inc. (3240); Orange County Register Communications, Inc. (7980); OCR Community Publications, Inc. (9752); OCR Information Marketing, Inc. (7983); Appeal-Democrat, Inc. (4121); Florida Freedom Newspapers, Inc. (4227); Freedom Arizona Information, Inc. (5796); Freedom Colorado Information, Inc. (7806); Freedom Eastern North Carolina Communications, Inc. (5563); Freedom Newspapers of Illinois, Inc. (2222); Freedom Newspapers of Southwestern Arizona, Inc. (5797); Freedom Shelby Star, Inc. (8425); Illinois Freedom Newspapers, Inc. (8308); Missouri Freedom Newspapers, Inc. (8310); Odessa American (7714); The Times-News Publishing Company (0230); Victor Valley Publishing Company (6082); Daily Press (3610); Freedom Newspaper Acquisitions, Inc. (4322); The Clovis News-Journal (5820); Freedom Newspapers of New Mexico, LLC (5360); Gaston Gazette LLP (4885); Lima News (6918); Porterville Recorder Company (7735); Seymour Tribune Company (7550); Victorville Publishing Company (7617); Freedom Newspapers (7766); The Creative Spot, LLC (2420); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Services, Inc. (3125). The address for Freedom Communications Holdings, Inc. and certain other Debtors is 17666 Fitch, Irvine, California 92614.

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 2

Objections ........................................................................................................... 10

A. The Plan Should Not Be Approved Because the Plan is Patently Unconfirmable .......... 10

i.   The Plan Violates the Best Interests of Creditors Test ...................................... 13

ii.  The Plan Violates the Requirement for Providing the "Same" Treatment for All Claims in a Class Due to Its Inclusion of Trade Unsecured Claims in the Class of General Unsecured Claims. ............................................................................................. 16

iii. The Plan Is Not in Good Faith ......................................................................... 17

iv.  The Plan Violates Other Provisions of the Bankruptcy Code ............................ 25

     B.     The Disclosure Statement Is Inadequate ....................................... 28

     C.     Corrections or Additions to the Plan and Disclosure Statement Are Required ..................................................................................... 33

     Reservation Of Rights ..................................................................... 33

     Conclusion ..................................................................................... 35

**Cases**

*Barakat v. Life Ins. Co. (In re Barakat),*
  99 F.3d 1520 (9th Cir.1996) ...................................................................................................20

*Copelin v. Spirco, Inc.,*
  182 F.3d 174 (3d Cir. 1999) ...................................................................................................27

*Everett v. Perez (In re Perez),*
  30 F.3d 1209 (9th Cir. 1994) ..................................................................................................28

*First Fidelity Bank v. McAteer,*
  985 F.2d 114 (3d Cir.1993) .....................................................................................................27

*Folger Adam Security v. DeMatteis/MacGregor JV,*
  209 F.3d 252 (3d Cir. 2000) ...................................................................................................23

*Gilman v. Continental Airlines (In re Continental Airlines),*
  203 F.3d 203 (3d Cir. 2000) ...................................................................................................27

*In re 266 Washington Assoc.,*
  141 B.R. 275 (Bankr. E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y. 1992)...................................10

*In re AOV Indus., Inc.,*
  792 F.2d 1140 (D.C. Cir. 1986)...............................................................................................16

*In re Applegate Prop., Ltd.,*
  133 B.R. 827 (Bankr. W.D. Tex. 1991).....................................................................................28

*In re Armstrong World Industries, Inc.,* 432 F.3d 507, 512 (3rd Cir. 2005). ...............................12

*In re Atlanta West VI,*
  91 B.R. 620 (Bankr. N.D. Ga. 1988) .......................................................................................11

*In re Capital West Investors,*
  186 B.R. 497 (N.D. Cal. 1995).................................................................................................18

*In re Cardinal Congregate I,*
  121 B.R. 760 (Bankr. S.D. Ohio 1990) ...................................................................................29

*In re Civitella,*
  15 B.R. 206 (Bankr. E.D. Pa. 1981) ........................................................................................29

*In re Combustion Engineering, Inc.,*
  391 F.3d 190 (3d Cir. 2004) ...................................................................................................27

*In re Coram Healthcare Corp.,*
  271 B.R. 228 (Bankr. D. Del. 2001)........................................................................................18

*In re Corey,*
  892 F.2d 829 (9th Cir. 1989) ..................................................................................................18

*In re Dakota Rail, Inc.,*
  104 B.R. 138 (Bankr. D. Minn. 1989)......................................................................................29

*In re Exide Technologies,*
  303 B.R. 48 (Bankr. D. Del 2003)......................................................................................17, 27

*In re Felicity Assocs.,*
  197 B.R. 12 (Bankr. D.R.I. 1996).............................................................................................11

*In re Filcas of America, Inc.,*
  147 B.R. 297 (Bankr. D.N.H. 1992) ........................................................................................10

*In re Jersey City Medical Ctr.*,
  817 F.2d 1055 (3d Cir. 1987) ................................................................25
*In re Malek*,
  35 B.R. 443 (Bankr. E.D. Mich. 1983).....................................................29
*In re Market Square Inn, Inc.*,
  163 B.R. 64, 68 (Bankr. W.D. Pa. 1994).................................................10
*In re MCorp Fin., Inc.*,
  137 B.R. 219 (Bankr. S.D. Tex.) ............................................................14
*In re Monroe Well Service, Inc.*,
  80 B.R. 324 (Bankr. E.D. Pa. 1987) .......................................................11
*In re Phoenix Petroleum Co.*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) .....................................................11
*In re United States Brass Corp.*,
  194 B.R. 420 (Bankr. E.D. Tex. 1996).....................................................28
*In re Zenith Electronics Corp.*,
  241 B.R. 92 (Bankr. D. Del.1999)...........................................................27
*Oxford Life Ins. V. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*,
  166 B.R. 892 (BAP 9th Cir.1994) ...........................................................20
*Ryan Operations G.P. v. Santian-Midwest Lumber Co.*,
  81 F.3d 355 (3d Cir. 1996) ....................................................................29
*Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.)*,
  324 F.3d 197 (3d Cir. 2003) ..................................................................18

**Statutes**
11 U.S.C. § 1123(a)(3) ............................................................................20
11 U.S.C. § 1123(a)(4) .......................................................................7, 16
11 U.S.C. § 1123(a)(5)(C)........................................................................25
11 U.S.C. § 1125(a)................................................................................28
11 U.S.C. § 1129(a)(1) ............................................................................25
11 U.S.C. § 1129(a)(3) .......................................................................7, 17
11 U.S.C. § 1129(a)(4) ............................................................................27
11 U.S.C. § 1129(a)(5) ............................................................................26
11 U.S.C. § 1129(a)(7)(A)........................................................................14
11 U.S.C. § 524 ................................................................................7, 27
11 U.S.C. § 524(e)....................................................................................7

**Other Authorities**
*Collier on Bankruptcy*
  ¶ 1129.03[7][b] (15th rev. ed. 2009) ...................................................14
S. Rep. No. 989,
  95th Cong. 2d Sess. 121 (1978)..............................................................28

The Official Committee of Unsecured Creditors (the "Committee") of Freedom Communications Holdings, Inc. ("Freedom") and its affiliated debtors (collectively with Freedom, the "Debtors"), by and through its counsel, respectfully submits this objection (the "Objection") to the adequacy of the *Disclosure Statement With Respect to Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al., Debtors* [Docket No. 372] (the "Disclosure Statement") with respect to the *Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al., Debtors* [Docket No. 371] (the "Plan"). In furtherance of its Objection, the Committee respectfully states as follows:

## Preliminary Statement

1.     The Plan proposed by the Debtors in collusion with the Existing Lenders represents an attempted abuse of the chapter 11 process. The Debtors and the Existing Lenders have stretched the notion of a "gifting" plan to the breaking point, putting forth a plan that inflicts discrimination among equally ranked creditors (payment in full vs. massive impairment), a violation of the absolute priority rule, and clawback clauses and other strategems designed to potentially deprive creditors of the pittances in some cases they have been offered. Under the proposed Plan, the Debtors, at the behest of the Existing Lenders[2] are turning over ownership of the Debtors to the Existing Lenders in partial satisfaction of their claims, while granting the Existing Lenders blanket releases notwithstanding the existence of valuable claims against them

---

[2] Capitalized terms not defined herein are intended to have the meaning ascribed to them in the Plan and Disclosure Statement.

which have been uncovered the Committee in its ongoing investigation[3] that can be asserted for the benefit of all creditors of the estates.[4] Together with the Existing Lenders, the Debtors' current equity holders -- Blackstone, Providence and members of the Hoiles family, are trying to steamroll towards confirmation a grossly inequitable Plan that would selectively impair creditors, primarily present and former employees in respect of pension and litigation claims, while securing a distribution out of priority to the equity holders, in the form of 2% of the Reorganized Debtors' common stock and Warrants to purchase an additional 10% of the stock at a value pegged to the Existing Lenders of 115% of their prepetition debt, and granting gratuitous general releases to the past and present officers and directors, and the Existing Lenders and their officers, directors, agents, professionals, and others, a program that amounts to little more than theft from the impaired creditors by out-of-the-money owners' abusing the process to their own personal advantage:

        2.     The Plan contains many novel and harsh provisions that render it violative of multiple provisions of the Bankruptcy Code, such that incurring the time and expense of transmitting the disclosure statement and soliciting votes would be a futile exercise. Among other things:

> • The Plan embodies a coercive scheme to violate the absolute priority rule to the detriment of general unsecured creditors by conditioning their recoveries on their consent to the making of a distribution of new equity to current equity owners, failing which

---

[3] In light of the fact that Rule 2004 examinations of Company insiders is ongoing, the Committee reserves the right to supplement this Objection prior to the hearing on the Disclosure Statement.

[4] Under the final cash collateral order, the Committee was granted standing over the Debtors and the Existing Lenders' objection, to assert certain of the estate's claims against the Lenders prior to a deadline of December 9, 2009, subject to extension for cause. The Committee reserves its right to assert these claims, which have not been presented to date inasmuch as Rule 2004 examinations being conducted by the Committee have not yet concluded.

if the unsecured creditors reject the Plan, they will forfeit their entire distribution;

- The Plan proposes rampant discrimination among similarly situated creditors and in some cases among creditors who are placed in the same classes under the Plan. In effect, the Plan proposes three different forms of treatment for prepetition unsecured claims. First, there are the General Unsecured Claims against the Debtors, which under the Plan (except for 7 unimpaired Debtors) have been placed into 43 separate subclasses. These subclasses are to share -- in some undisclosed pro rata manner -- in $5 million in cash, unless any of these subclasses object, in which the $5 million is to be reduced by some undisclosed sum. But the Plan provides a second treatment for members of these subclasses who hold Trade Unsecured Claims and thus may be selected for more favorable treatment, i.e., payment in full, by signing a trade support agreement which has not been disclosed. Another unsecured claim addressed by the Plan is the Existing Lenders' alleged deficiency claim, which receives different treatment still from that proposed for General Unsecured Claims and Trade Unsecured Claims;

- The Plan violates the best interest test, in that it robs holders of General Unsecured Claims of even their *pro rata* share of unencumbered avoidance actions and other claims ("Litigation Rights"). The Debtors' liquidation analysis ignores the existence of these valuable claims, depriving such holders of a recovery that would be greater in a chapter 7 liquidation. Adding insult to injury, the Plan proposes that potential avoidance actions against such holders will be retained by the Reorganized Debtors, such that the proceeds of such claims will inure only to the benefit of current equity and the Existing Lenders as the owners of the Reorganized Debtors. Unsecured creditors could thus end up paying more to the estate than the de minimis distribution offered under the Plan;

- And yet the Plan provides for a recovery by the current equity holders, in violation of the absolution priority rule, such that if the Debtors plan to seek confirmation under the cramdown provisions of section 1129(b) of the Bankruptcy Code, they could not succeed, because the Plan, *inter* alia, would fail the "fair and equitable test;"

- The Plan vests the Debtors' assets and business in current equity and Existing Lenders, while, as the same time, proposing to pay nothing or a pittance to holders of General Unsecured Claims;

- The Plan gives the Existing Lenders and current and former officers and directors broad, unjustified releases from the Debtors and from all third parties, which releases would be unavailable if the Cases were dismissed and foreclosure permitted; and

- The Plan affords the Existing Lenders more value than they could achieve using their state court remedies and affords holders of General Unsecured Claims less than they could achieve under state law.

3.      It is evident that the Plan is the product of an unholy alliance formed pre-bankruptcy by the Existing Lenders and the current equity holders and the board of directors they elect, to maximize the Existing Lenders' recoveries to the detriment of general unsecured creditors, in exchange for which the lenders would support a plan that provides for a distribution of new equity to current equity owners while inflicting material impairment and discrimination upon general unsecured creditors. This glaring violation of the absolute priority rule prevents confirmation of the Plan over the unsecured creditors' rejection under the cramdown provisions of section 1129(b) of the Bankruptcy Code because the Plan is anything but fair and equitable. The Plan is nothing more than a scheme to get around the absolute priority rule. Under applicable law, that scheme must fail.

4.      Further, on its face, the Plan fails the *best interests of creditors test* as to the Claims in Class A4 (General Unsecured Claims). The Plan provides not even a penny for sub-Classes of Class A4 that vote against the Plan and an aggregate sum of $5 million or less[5] (the "Unsecured Compensation") for the Class A4 subclasses that vote in favor of the Plan. Yet, general unsecured creditors' *pro rata* share of avoidance and other litigation recoveries –

---

[5] Under the proposed Plan, the Existing Lenders receive the distributions otherwise allocable to sub-Classes of General Unsecured Creditors that vote against the Plan.

including $160 million of avoidance claims against JP Morgan and members of the lender group,

and breach of fiduciary duty and illegal dividend claims against the Debtors' board of directors,

likely will far exceed $5 million, and there are other unencumbered assets as to which the liens

of the Existing Lenders are unperfected or non-existent, including the Debtors' FCC licenses.

5.     In numerous other respects, the Plan fails to meet various other

Bankruptcy Code requirements, including notably that the Plan was not proposed in good faith

and fails to comply with applicable provisions of the Bankruptcy Code due to, among other

things:

- Its various, pernicious, and improper provisions enabling blatant manipulation of the appropriate processes for voting on, objecting to, and obtaining the necessary, impaired consenting Class for, the Plan;

- Its inclusion of a variety of provisions that, taken individually, may seem relatively innocuous, but when taken together, reveal a Plan designed to make illusory even the proffered, paltry distribution of Unsecured Compensation for accepting sub-Classes of General Unsecured Claims;

- Its improper classification and treatment of claims enjoying the same priority, including Trade Unsecured Claims, General Unsecured Claims and the Existing Lenders' deficiency claims;

- Its solicitation of approval by holders of General Unsecured Claims of a Plan that provides a distribution to current equity, without making clear (a) the substantial extent by which some of the projected values for the recovery for current equity would exceed the small distribution offered accepting Classes of Class A4 General Unsecured Claims, (b) some estimate of the value of avoidance recoveries that likely would be available to holders of General Unsecured Claims in a "traditional" chapter 7 liquidation and (c) the estimated value of the Debtors in a value maximizing chapter 7 liquidation, where saleable business segments were operated and sold as going concerns;

- Its *in terrorem* provision, depriving general unsecured creditors of any distribution if they vote to reject the Plan; and

- Its *in terrorem* provision, depriving individual equity holders of their stock and warrant distributions if they object to the Plan or confirmation.

6.      The Plan is also defective on its face because there is no basis whatsoever

for including blanket, gratuitous releases and exculpations of present and former (or soon to be

former) officers, directors, and others who are providing no consideration for such favorable

treatment (other than, perhaps, their willingness to run the Debtors in a manner designed to

benefit only themselves and the Existing Lenders). This purchase of cooperation from the

Debtors violates multiple sections of the Bankruptcy Code (*e.g.*, 11 U.S.C. §§ 524(e), 1123(a)(4)

& 1129(a)(3)), and such gratuitous releases, as well as the releases of the Existing Lenders and

their affiliates, are unjustified and illegal.

7.      The Plan also is patently defective in it failure to afford the *same*

*treatment* to all members of the same Class A4 (General Unsecured Claims). The Plan reserves

to the Debtors the sole and discretionary right to select holders of General Unsecured Claims

who are in Class 4 to become holders of Trade Unsecured Claims and receive different and better

treatment than other members of the same class, even after the voting deadline. The Plan

provides that these Trade Unsecured Creditors, who might at some unspecified point in time be

offered the opportunity to enter into Post-Emergence Trade Agreements (the terms of which

remain undisclosed), are included in Class A4 for voting purposes. Yet, the currently

unidentified holders of Trade Unsecured Claims are to receive some currently unspecified,

enhanced treatment on their past claims, violating the requirement that members of the same

class of creditors receive the same treatment under the Plan and enabling vote manipulation.

8.      As set forth below and in the attached **Exhibit** A, apart from describing a

proposed plan of reorganization that is patently unconfirmable, the Disclosure Statement also

should not be approved because it fails in multiple, material respects to meet the disclosure requirements of section 1125 of the Bankruptcy Code by failing to provide adequate and correct information. While a more detailed list of these failures is set forth below in this document and in **Exhibit A** attached hereto and made a part hereof, the more major and glaring disclosure inadequacies are set forth herein.

9.     Perhaps the most glaring omission is any information by which General Unsecured Creditors, including holders of Trade Unsecured Claims, will see by way of recovery if their subclass accepts the Plan and/or their prospects for getting better treatment as a Trade Unsecured Creditor. Having balkanized the Plan by creating 50 subclasses of General Unsecured Claims, the Debtors provide literally no information on the assets and liabilities of each of the estates, or any basis for allocating the $5 million of cash among 43 of those estates. The Disclosure Statement states that there is no substantive consolidation being effectuated but, without explanation, the Plan creates separate sub-classes for each Debtor for only some Classes and consolidates other Classes for voting for or against the plan, testing whether the Plan meets all the confirmation requirements, and for calculating distributions. The Disclosure Statement has no breakdown of assets and liabilities of the separate Debtors that would allow for any understanding by creditors of the relative solvency or insolvency of each entity or the amounts of distributions projected to be made to creditors as a result.

10.     Nor do the Debtors disclose the amount of cash to be available to pay Trade Unsecured Claims in full, nor the terms of the trade credit agreement such creditors would be expected to sign to escape the plight of their fellow classmates getting pennies on the dollar.

The Disclosure Statement is simply devoid of information from which holders of General Unsecured Claims can discern what is being offered to them.

11.     The first question any holder of a General Unsecured Claim would be expected to ask before voting on the Plan is "how much is the Debtor proposing to pay on my claim?" Yet, the Disclosure Statement, as filed, fails to provide any estimate of potential financial recoveries to holders of Class A4 Claims (General Unsecured Claims against Encumbered Debtors). Without an answer to that question, informed voting by holders of General Unsecured Claims is not possible. Moreover, the Committee needs to see such information with a full twenty-five days to object to the adequacy of the disclosure. Saving this critical information as something to drop in to the Disclosure Statement just before the hearing on approval of the adequacy of disclosure would not afford the Committee sufficient opportunity (a) to review and analyze the proposed disclosure to determine if it, at least, appears to make sense and (b) to validate or investigate any recovery amount or percentage disclosures that appear suspect.

12.     Another major deficiency of the Disclosure Statement is the failure to attach copies of a long list of critically important documents that instead are proposed to be provided in the Plan Supplement days before the Confirmation Hearing and after expiration of the voting deadline. The Debtors also propose not to disclose until filing the Plan Supplement how much money will be set aside to provide for the payment in full of selected Trade Unsecured Claims.

13.     Another critical deficiency is the lack of disclosure with respect to the

Plan's proposed blanket releases and third party releases of the Existing Lenders and the

Debtors' past and present directors and officers. The Disclosure Statement contains no

discussion of potential claims against the officers and directors and Existing Lenders even

though the Debtors are aware that the Committee is actively investigating such potential claims

and made reference to potential claims in prior pleadings filed in this case. There is no

indication in the Disclosure Statement that the Debtors conducted any investigation of the claims

against any of the proposed releases under the Plan, or the results of any such investigation.

14.     Additionally, there are many other deficiencies in disclosure, material

inconsistencies, omissions and errors in the Plan and Disclosure Statement that require correction

as set forth in the chart attached hereto as **Exhibit A** and incorporated herein by reference.

### Objections

**A.    The Disclosure Statement Should Not Be Approved Because the Plan is Patently Unconfirmable[6]**

15.     The Disclosure Statement should not be approved because the Plan is not

capable of being confirmed. *See In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D.

Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is

appropriate to refuse the approval of the disclosure statement.") (citing *In re Filcas of America,

Inc.*, 147 B.R. 297 (Bankr. D.N.H. 1992); *In re 266 Washington Assoc.*, 141 B.R. 275 (Bankr.

E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Monroe Well Service, Inc.*, 80 B.R. 324

---

[6] The Committee reserves the right to present additional confirmation objections if the Debtors are able to obtain approval of the Disclosure Statement.

(Bankr. E.D. Pa. 1987)). "If the disclosure statement describes a plan that is so fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to consider the adequacy of disclosures. Such an exercise of discretion is appropriate because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed." *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (citations omitted). *See also, In re Felicity Assocs.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.'") The primary reason to evaluate confirmability is to "avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the proposed Plan when the plan is unconfirmable on its face. Such an exercise in futility only serves to further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

16.     As summarized below,[7] the Plan is patently unconfirmable and, therefore, the Disclosure Statement should not be approved.

### i.     The Plan Violates the Absolute Priority Rule.

17.     The Debtors' plan includes deemed rejected classes and proposes recoveries that likely will be rejected by holders of General Unsecured Claims, thus invocation

---

[7] In the event that the Disclosure Statement is approved, the Committee reserves the right to make the arguments sets forth herein, as well as any other arguments, in opposition to confirmation of the Plan.

of the cram down provisions will be required. One requirement for cram down is that the plan be

"fair and equitable." 11 U.S.C. § 1129(b). This codifies the 'absolute priority rule:'

> The absolute priority rule is a judicial invention that predated the
> Bankruptcy Code. It arose from the concern that because a debtor
> proposed its own reorganization plan, the plan could be 'too good a deal'
> for that debtor's owners. (Citation Omitted.) . . . . The absolute priority
> rule was later codified as part of the 'fair and equitable' requirement of 11
> U.S.C. § 1129(b). Under the statute, a plan is fair and equitable with
> respect to an impaired, dissenting class of unsecured claims if (1) it pays
> the class's claims in full, or if (2) it does not allow holders of any junior
> claims or interests to receive or retain any property under the plan 'on
> account of' such claims or interests. (Citation Omitted.)

*In re Armstrong World Industries, Inc.*, 432 F.3d 507, 512 (3rd Cir. 2005).

18.     Schemes to skirt the "absolute priority rule" are unlawful. In *Armstrong*,

the debtors proposed that equity get warrants regardless of whether or not the class of general

unsecured claims consented, by providing that upon rejection, the warrants would pass through

another class. In rejecting this scheme, the Third Circuit held:

> The plain language of the statute makes it clear that a plan cannot give
> property to junior claimants over the objection of a more senior class that
> is impaired, but does not indicate that the objecting class must be an
> intervening class. . . . [W]e will apply the plain meaning of the statute.
> Under this reading, the statute would be violated because the Plan would
> give property to Class 12 [equity], which has claims junior to those of
> Class 6 [general unsecured claims].

19.     Other circuit opinions make clear that other schemes, no matter how

clever, to avoid the application of the 'absolute priority rule' also will be rejected. The Second

Circuit Court of Appeals not only refused to affirm a settlement that violated the 'absolute

priority rule' (under which funds in dispute, allegedly owned by secured creditors, would have

been transferred to a litigation trust for holders of junior claims over the objection of a senior

creditor), but also noted the fiduciary obligation of estate parties to honor the priority of creditors in settlements, absent a specific, clearly articulated justification:

> The court must be certain that the parties to a settlement have not employed a settlement as a means to avoid the priority strictures o f the Bankruptcy Code. . . . The Committee has a fiduciary duty to maximize their recovery of the Estate's assets. (Citation omitted.) If in pursuit of that duty, it reaches a settlement that in some way impairs the rule of priorities, it must come before the bankruptcy court with specific and credible grounds to justify that deviation and the court must carefully articulate its reasons for approval of the agreement. That has not happened here.

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 464 (2nd Cir. 2007).

20.     Here, the Debtors have proposed a plan that attempts to terrorize holders of general unsecured claims into consenting to an undeserved gift' to junior equity by threatening the holders of general unsecured claims with loss of even the meager distribution of $5 million in Unsecured Compensation under the Plan, absent their acceptance of the Plan. This effort must fail in this case as it did in *Armstrong*.

### ii.     The Plan Violates the Best Interests of Creditors Test

21.     Section 1129(a)(7) of the Bankruptcy Code sets forth the best interests of creditors test, which requires that "[w]ith respect to each impaired class of claims or interests," "each holder of a claim or interest of such class" has either "accepted the plan" or:

> will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A). The best interests test is based on a hypothetical liquidation. 7

*Collier on Bankruptcy* ¶ 1129.03[7][b] (15th rev. ed. 2009 (hereinafter "Collier")) ("This means

that, absent consent, a creditor or interest holder must receive property that has a present value

equal to that participant's hypothetical chapter 7 distribution....").

      22.    The Plan clearly fails the best interests test because it affords holders of

General Unsecured Claims against the Encumbered Debtors less than the liquidation value of the

Debtor's Assets. The Debtors explain this position by concluding, without analysis, that the

Debtors could have proposed a plan that paid nothing to any other Claim other than that of the

Existing Lenders: "The Consenting Lenders might have insisted that the Debtors propose a plan

of reorganization that provides no recovery whatsoever to any holder of a Claim or Interest in the

Encumbered Debtors other than the Existing Lenders." Disclosure Statement, p. 4.. Not only is

this bare conclusion untrue, but the Debtors' failure to disclose a rational explanation for this

contention makes their bare conclusion meaningless. *See In re MCorp Fin., Inc.*, 137 B.R. 219

(Bankr. S.D. Tex.) (hypothetical liquidation analysis must be based on evidence and not

assumptions in order to meet the best interests of creditors test).

      23.    There clearly are unencumbered assets that would be available to holders

of General Unsecured Claims in a chapter 7 liquidation. For example, the cash collateral order

dated October 15, 2009; at paragraph 10 (b) and (c) makes clear that the Existing Lenders have

no liens on avoidance claims or recoveries and that any priority claims of the Existing Lenders

cannot be satisfied from avoidance recoveries. Besides more typical avoidance claims among

trade creditors, these avoidance claims may include also claims for recovery against the Existing

Lenders of, *inter alia*: approximately $20 million in fees paid in the past year to the Existing

Lenders' Agent and the Existing Lenders and more than $140 million in other avoidable

transfers, recoverable either as insider preferences or as damages due from the Existing Lenders

for the commercial tort of aiding and abetting a breach of fiduciary duty by the Debtors' officers

and directors. There also may be other assets in which the Existing Lenders held no liens.

24.     The Debtors have literally chosen to ignore these potential avoidance and

litigation claims in evaluating what holders of General Unsecured Claims would receive in a

chapter 7 liquidation. Their liquidation analysis expressly states that "the Liquidation Analysis

does not include recoveries resulting from any potential preference claims, fraudulent

conveyance litigation, or other avoidance actions." Disclosure Statement, Exhibit 4, p. 1.

Furthermore, the Debtors' liquidation analysis assumes that in a liquidation all proceeds go to the

Existing Lenders, ignoring the fact that the Lenders have no lien on those claims, or commercial

tort claims such as claims against insiders for breach of fiduciary duties.

25.     The Debtors' Plan does not extinguish avoidance actions. Rather, they are

included within the defined term "Litigation Rights" (Plan § 1.56, p. 8) and these claims, many

of which are intended to effect certain redistributive goals among creditors, are to be retained by

the Debtors after the Effective Date: "[E]ach Debtor or Reorganized Debtor will retain all of

their respective Litigation Rights..." Disclosure Statement §IV.D.8 at p. 62. Under the Plan, the

Debtors are to be owned by current equity and the Existing Lenders and, thus, under the Plan,

those two groups are to be the beneficiaries of any redistributive lawsuits on bankruptcy

avoidance theories. These avoidance claims, which are for the benefit of general unsecured

creditors, would be asserted against creditors who in discriminatory and illegal fashion were denied a fair distribution, such that they might have to pay more money to the Debtors, for the benefit of the new owners, the Existing Lenders and current equity owners, the ultimate in adding insult to injury.

26.     If any sub-Classes of General Unsecured Claims in Class A4 votes against the Plan, that subclass will not get any recovery. Members of such subclasses would fare better in a chapter 7 by receiving their pro rata share of avoidance action recoveries. This renders the Plan clearly unconfirmable, which, perhaps, explains why the Debtors offer no meaningful analysis to show that their Plan satisfies the best interests test.

### iii.     The Plan Violates the Requirement for Providing the "Same" Treatment for All Claims in a Class Due to Its Inclusion of Trade Unsecured Claims in the Class of General Unsecured Claims.

27.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim ... of a particular class, unless the holder of a particular claim ... agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4), *See In re AOV Indus., Inc.,* 792 F.2d 1140, 1151-53 (D.C. Cir. 1986) (unequal treatment where creditors holding different third-party claims required to give same third-party release to obtain additional compensation).

28.     The Plan places in Class A4 (with other General Unsecured Claims) the Trade Unsecured Claims against the Encumbered Debtors for voting purposes. Yet, the holders of Trade Unsecured Claims who are placed within this class, unlike other class members, are made eligible -- at the Debtors' seemingly absolute discretion -- to be paid in full in cash, while other less fortunate holders General Unsecured Claims are left behind, to share on a pro rata basis in a token recovery and only then if their subclass accepts the Plan. This scheme violates

the statutory requirement of not equal treatment of members of the same class under the Plan. It also raises the real possibility that those creditors who believe or are told they will get better treatment will sway Class A4's vote based on treatment not being afforded or offered to all of the holders of Class A4 Claims.[8] It also presents opportunities for gerrymandering of votes, including offering Trade Unsecured Creditors full payment to eliminate votes cast to reject the Plan.

29.     Also, the Plan's treatment for certain classes of priority claims permits the Debtors and claimant to agree to "different" treatment, which could be "more favorable" treatment. This too violates section 1123(a)(4) of the Bankruptcy Code by permitting individual claimants in a class to receive something other than class treatment or "less favorable" treatment. It also violates the confirmation requirements almost certainly applicable here of section 1129(b), which precludes any premium to be afforded to a senior creditor where any junior class rejects the Plan. *In re Exide Technologies*, 303 B.R. 48, 61 (Bankr. D. Del 2003); 7 *Collier* ¶ 1129.04[4][a][ii].

### iv.     The Plan Is Not Proposed in Good Faith

30.     The Bankruptcy Code requires that a plan be proposed in good faith. 11 U.S.C. § 1129(a)(3). "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Coram*

---

[8] If the Trade Unsecured Claims were separately classified, and there were full and timely disclosure of their proposed treatment and the contributions to the reorganization required of their holders, the Committee and other creditors could assess whether any such proposed classification were reasonable and any such proposed treatment discrimination were fair and permissible. *See Mason v. Paradise Irrigation Dist.*, 326 U.S. 536, 66 S.Ct. 290 (1946)(permissible for bondholder who made contributions to reorganization to be paid its 52% dividend all in cash whereas other bondholders were to be paid their 52% dividend in cash and notes).

*Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001). "A good faith determination must be a fact-intensive, case by case inquiry. *Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.)*, 324 F.3d 197, 211 (3d Cir. 2003); *In re Corey*, 892 F.2d 829, 835 (9th Cir. 1989). The objectives of chapter 11 are: (1) to permit successful rehabilitation of the debtor and (2) maximize the value of the bankruptcy estate. *In re Capital West Investors*, 186 B.R. 497, 499 (N.D. Cal. 1995).

31.    The Plan is the product of an unholy alliance between the Existing Lenders and the Debtors and represents a tortured, hopefully unsuccessful, effort to provide the more senior holders of General Unsecured Claims with only a pittance, while affording the junior and out of the money equity valuable releases and an opportunity to own 12% of the Reorganized Debtors, with high, future potential value. The Plan is the chosen means of the Existing Lenders and current equity to this improper end and it includes a number of provisions that reveal its lack of good faith, including the fifteen examples set forth in the following fifteen numbered paragraphs. These measures are discussed extensively in **Exhibit A** and summarized below.

32.    The Plan denies recoveries for creditors and interest holders based on their objection to, or vote against, the Plan and not just based upon a decision to grant or not grant a third-party release. In the context of these cases, these deathtraps make the Plan lack good faith.

33.    The Plan's distribution and related provisions make illusory even the small distribution of Unsecured Compensation claimed to be available to consenting sub-Classes of Class A4 General Unsecured Claims. Absent striking or correcting these provisions, the Plan is

not proposed in good faith. For example, the Plan calls for a two-step distribution to the entitled holders of Class A4 General Unsecured Claims: first, a *pro rata* distribution including Disputed Claims and, after all disputes are resolved, a single, second distribution only for Allowed Claims only once the last litigation on the last Claim is completed. Plan § 8.3, pp. 38-39.

- Requiring that a Disputed Claim, resolved, for example, the week after the first distribution, wait for payment until resolution of the last litigation on the last claim, which could take years, represents bad faith. Worse is that the Plan also proposes that this waiting creditor receive no interest. Plan § 7.2, pp. 34.

- Further, the Plan proposes that claims can be "Disputed" without even filing an objection to them, making this provision even more pernicious. Plan § 1.29(a)(vi), p. 5. Thus, even where there may not even be a basis for disputing the Claim that could pass Rule 11 muster, the claimant could be made to wait until the Cases' conclusion for payment.

- Also, the *de minimis* distribution provision penalizes creditors whose distributions only will exceed the minimum after Disputed Claims are resolved and after some Disputed Claims are disallowed. As written, at minimum, the initial distribution would be lost entirely if due to dilution by unresolved Disputed Claims, it is calculated to be less than $20.

- Moreover, the Plan's *de minimis* distribution provision could be interpreted to provide that where an initial distribution would be under $20, the entire "Claim" of the creditor is forfeit even if the creditor ultimately would be entitled to an aggregate distribution in excess of $20 if the initial distributions were just deferred and recalculated periodically after some Disputed Claims were resolved.

- Another element of bad faith in the distribution provision is that the money not paid due to this *de minimis* distribution limitation is not divided among other creditors, but is retained by the Debtors (to be owned by current equity and the Existing Lenders).

34. The Plan contends Class A3 is an impaired, voting Class, even though the Plan provides four treatment options for Class A 3, of which three represent unimpairment (and the fourth is full payment with interest over 5 years). If it is the Debtors' intention to have Class A3 treated as "impaired" for purposes of Bankruptcy Code section 1129(a)(10), this would be

inappropriate and reflects a Plan not proposed in good faith. The Debtors should advise of their position now. If the Existing Lenders are insiders, as alleged by the Committee, Class A3 would be the only other alleged, impaired, voting non-insider class under the Plan other than Class A4 (General Unsecured Claims) and its sub-Classes. Bankruptcy Code section 1129(a)(10) requires at least one impaired Class to accept the Plan, not counting insider votes. Designating Class A3 as "impaired" *for purposes of Bankruptcy Code section 1129(a)(10)* also make it a "gerrymandered" class. It is well established that classification for such a purpose is improper. *Barakat v. Life Ins. Co. (In re Barakat)*, 99 F.3d 1520, 1526 (9th Cir.1996); *Oxford Life Ins. V. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*, 166 B.R. 892, 898 (BAP 9th Cir.1994). Further, Bankruptcy Code section 1123(a)(3) requires the Plan to specify the treatment of each Class. 11 U.S.C. § 1123(a)(3). This Plan does not specify the Class A3 treatment, but instead provides that the Debtors, not the Plan, will elect the applicable treatment for each Class A3 sub-Class just ten days prior to confirmation.)

35. For good reason, the Debtors list a classification objection as their first listed risk in the risk section of the Disclosure Statement. The Debtors, however, attempt to create a savings clause to say they can fix classification if the Court finds it improper (presumably without any delay in the plan process). The Plan is proposed in bad faith where it includes a blatantly impermissible classification scheme and permits amendment to such scheme without continuing the disclosure hearing to permit a full and fair review and analysis of (and opportunity to object to) any revised plan or disclosure statement.

36.     The Plan affords the Debtors the exclusive right to object to, and settle, claims. Yet, under the Plan, once funds from the Unsecured Compensation are allocated to the Disputed and Allowed Claims in an accepting sub-Class, the Debtors have no interest in the pot of Cash so established. Instead, the disallowance of Claims just increases the *pro rata* recovery for Allowed Claims. The Committee or a successor or other party it designates should be given the authority after the Effective Date to object to, and settle, Claims. The Debtors should be obligated to pay reasonable sums therefor.

37.     The Plan does not require segregation of the portion of the Unsecured Compensation that, initially, will not be paid and will be held for Disputed Claims. The Plan also expressly provides that no interest is payable for the period of delay as to Disputed Claims. Plan § 7.2, p. 34. The amounts for disputed claims should be required to be deposited into an escrow or segregated trust account with the Disbursing Agent and a reasonable estimate of interest actually earned should be payable to the holders of disputed claims after ultimate allowance.

38.     The Plan provides that just five days before the Confirmation Hearing the Debtors can first identify contracts and leases to be assumed. Thus, the Plan permits vote manipulation by enabling the Debtors to include in Class A4 sub-Classes creditors that know they are likely to be paid in full (and also to eliminate rejection votes by assuming a contract after voting). Assumption and rejection schedules to the Plan need to be provided twenty-five days before the date to object to the Disclosure Statement and modifications thereto should require an evidentiary showing that the changed decision has a reasonable basis. (Striking the

votes of creditors with contracts or leases subject to assumption would not be a sufficient remedy; the Debtors could use assumption after voting as a tool to eliminate negative votes on the Plan.)

39. The Plan provides that the Debtors can withhold payment on the undisputed portion of a claim as leverage while disputing another portion of a claim. Plan § 8.2, p. 38. This lacks good faith.

40. The Plan sets a fee claim deadline applicable, *inter alia*, to the Committee professionals, of sixty days after *confirmation* and provides for dissolution of the Committee on *confirmation*. Plan § 11.1, p. 43. The Effective Date (or later) is the earliest appropriate time for dissolution of the Committee and the Effective Date should be the earliest measuring date for filing of a fee request by the Committee professionals. The attempt to prematurely cut off creditor participation and representation lacks good faith.

41. Under the Plan, creditors also can be unfairly denied their distributions due to unreasonable provisions with respect to undeliverable distributions. Creditors are given the obligation to notify the Disbursing Agent of any changes of their address to assure their distribution is deliverable. Plan § 7.6(b), p. 35. Yet, the Disclosure Statement does not advise creditors of the name and address of the Disbursing Agent to whom such notices must be sent and the Plan imposes no obligation to do so on anyone. Additionally, the Disclosure Statement and Plan indicate that undeliverable distributions of Unsecured Compensation are to be dealt with as provided in Plan section 8.3, which doesn't address undeliverable distributions. (Disclosure Statement § IV.B.5, p. 69 and Plan §§ 7.6, 8.3, pp. 35, 38.)

42. The Debtors indicate that they are requesting that all Disputed Claims or Interests be denied the right to vote absent a "Resolution Event." The Plan defines "Disputed" Claims and Interests to include all Claims and Interests as to which the objection deadline (120 days after the Effective Date for General Unsecured Claims) has not expired. Thus, no holder of a General Unsecured Claim can vote absent a "Resolution Event" (*e.g.*, an order is entered or stipulation agreed upon). Absent correction, these provisions together make the Plan lack good faith.

43. Where the distribution for holders of General Unsecured Claims is negligible, the inclusion in the Plan of provisions barring setoff, recoupment, or subrogation against third parties and the Debtors based on a discharged or exculpated Claim (Plan §§ 11.9-11.13, pp. 45-49) is evidence of a lack of good faith. Recoupment and setoff are defenses and the transfer of property free and clear under the Bankruptcy Code does not affect their availability. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 261 (3d Cir. 2000). Providing a paltry distribution to a creditor on its Claim should not become the basis for denying the creditor the right to use that full claim as an offset against a mutual obligation (*e.g.*, prepetition against prepetition or postpetition against postpetition). Moreover, it is never appropriate to preclude recoupment. Recoupment is merely part of the process for the fair calculation of what counter parties to a contract owe each other. As to subrogation, the intention of the Plan's provisions is difficult to discern. If the subrogated party receives the Claim (whether through subrogation or otherwise), even without any reference to "subrogation," the

Plan's injunction language appears to be applicable in that the person is holding "a Claim." The reference to subrogation should be explained.

44.     The Debtors can disenfranchise creditors that vote to reject the Plan simply by objecting to their Claims at any time before confirmation. Creditors thereafter must rush to court, shorten time; and get their Claims allowed for voting before the Voting Deadline, unless the Debtors choose to extend it.

45.     The Plan permits the Debtors to accept or reject faxed or emailed votes in their discretion. This permits vote manipulation because the Debtors could elect to so accept only votes "for" the Plan. (Instead, the Plan could readily condition acceptance of individual electronic ballots on Committee concordance or could set forth functional standards with an ability for Committee (and Court) review.)

46.     The rejection claim bar date of thirty days after confirmation is tied to an event (confirmation) of which there is no reason to believe that the relevant creditors would receive timely notice. On the other hand, if a schedule of rejected contracts were attached to the Disclosure Statement such that "notice" of rejection was provided with the dissemination of the Plan and Disclosure Statement, the lack of clarity as to the later measuring date should not be fatal to fair notice.

47.     In sum, the Plan is rife with provisions that are illegal, or traps for the unwary, all of which supports the conclusion that the Plan was not proposed in good faith.

v.    **The Plan Violates Other Provisions of the Bankruptcy Code**

48.    The Plan must comply with all "applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). It fails in, among others, many respects pointed out in this objection, most notable the five respects set forth below.

49.    First, classification must be, and is not, reasonable. *In re Jersey City Medical Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987). The Plan includes the following consolidated Classes (two of which are voting Classes): Classes A1 (Other Priority Claims), Class A2 (Existing Lender Claims), Class A5 (Intercompany Claims), Class A6 (Subsidiary Interests), Class B1 (Other Priority Claims), Class B4 (Intercompany Claims), and Class B5 (Subsidiary Interests). Section 1123(a)(5)(C) of the Bankruptcy Code, 11 U.S.C. § 1123(a)(5)(C), does permit a merger or consolidation of debtors as part of the treatment of Claims, but the Debtors here expressly state they do not propose substantive consolidation (and reserve the right to eliminate any Debtor from the joint Plan). Instead, the Debtors propose consolidation for classification, for counting votes, and for measuring appropriate distributions. Consolidation only for these purposes is impermissible (and violates Bankruptcy Code section 1122's requirements for reasonable classification, *see infra*). (Absent substantive consolidation, claims against two different, unconsolidated debtors are not substantially similar and cannot be in the same class.) Consistent with this errant approach, the Debtors disclose financial information and provide projections only on a consolidated basis (Exhibits 4, 5 and 6). Information on a debtor-by-debtor basis is not provided.

50.     Second, Bankruptcy Code section 1129(a)(5) requires that the Debtors disclose the identity and affiliations of the post-Effective Date directors and officers and any insiders to be employed and their compensation. 11 U.S.C. § 1129(a)(5). The disclosure that the Existing Lenders will select Directors ten days prior to the Confirmation Hearing does not satisfy Bankruptcy Code section 1129(a)(5)(A)(i) because meaningful disclosure must occur in time for review and consideration thereof and objection thereto.

51.     Third, neither the Plan nor the Disclosure Statement clearly discloses the amounts of compensation payable to senior management, the Board or insiders, as required by Bankruptcy Code section 1129(a)(5), although some of this information appears to be promised to be filed five days prior to the Confirmation Hearing in the Plan Supplement. This compensation information is particularly important to determine the fairness and good faith of the Plan in light of the paucity of the distribution afforded under the Plan to holders General Unsecured Claims. Disclosing starting compensation packages and all promised increases thereto would be a beginning. First providing such information in a Plan Supplement to be filed only one week prior to the Confirmation Hearing affords an impermissibly short time for response.

52.     Fourth, the Plan proposes that all professional fees incurred after confirmation can be paid without Court approval. This violates Bankruptcy Code section 1129(a)(4), which requires that "[a]ny payment... made by the debtor... for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the

case, has been approved by, or is subject to approval of, the court as reasonable." 11 U.S.C. §

1129(a)(4).

        53.    Fifth, as crafted, the Plan's releases and exculpation are improper and not

justified by the indicated facts under well-established principles applicable in this Circuit. *See*

11 U.S.C. § 524; *Gilman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 211

(3d Cir. 2000) (citing *Copelin v. Spirco, Inc.*, 182 F.3d 174, 182 (3d Cir. 1999) (in turn citing

*First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir.1993)); *In re Combustion*

*Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004); *In re Zenith Electronics Corp.*, 241 B.R. 92

(Bankr. D. Del.1999). A compulsory exculpation that benefits the Existing Lenders must fail

where, as here, some holders of General Unsecured Claims get no consideration and others only

receive token consideration. *Exide Technologies*, 303 B.R. at 75. However, in all events, there

is no basis whatsoever and certainly none disclosed for providing a release of the Debtors' or

third-party claims, unrelated to the plan solicitation process, against any officers and directors

not continuing with the Reorganized Debtors after the Effective Date. *Id.* Here, as in

Continental Airlines, the "hallmarks of permissible non-consensual releases-fairness, necessity to

the reorganization, and specific factual findings to support these conclusions-are all absent. . . ."

203 F.3d at 214. The Debtors have failed to include a scintilla of factual evidence or legal

justification for the propriety of such releases and injunction provisions, thereby making the Plan

unconfirmable on its face. Even if these provisions could be corrected, the Committee notes that

it generally disfavors the Plan's Third Party Release and believes the Debtors' release and Plan's

exculpation should be far more narrow.

**B.    The Disclosure Statement Is Inadequate**

54.    Section 1125 of the Bankruptcy Code requires that a disclosure statement contain "adequate information." 11 U.S.C. § 1125(a).  In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991); *see also In re United States Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is not to assure acceptance or rejection of a plan, but to provide enough information to interested persons so they may make an informed choice between two alternatives.").  Significantly, even if more thorough disclosure would not have affected an objecting creditor's vote, that creditor still has standing to object because inadequate disclosure may have induced *other* creditors to approve the plan. *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1217 (9th Cir. 1994).

55.    The information to be provided should include financial projections:

> A plan is necessarily predicated . . . . on factually supported
> expectations as to future course of the business sufficient to meet
> the feasibility standard . . . It may thus be necessary to provide
> estimates or judgments for that purpose. Yet it remains practicable
> to describe, in such detail as may be relevant and needed, the basis
> for the plan and the data on which supporters of the plan rely.

S. Rep. No. 989, 95th Cong. 2d Sess. 121 (1978).

56.    Case law also has recognized the need for detailed disclosure:

> The Debtor should provide the projection of operations subsequent
> to confirmation so that the Court may determine the feasibility of
> the plan. The Debtor is required to make a full, clear, and
> complete disclosure of all underlying assumptions. The Debtor
> must provide sufficient financial information to determine if the
> projections for operations subsequent to confirmation are feasible.
> If the plan assumes an increase in income, the basis for this
> assumption must be set forth.

*In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983); *see also In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) (a disclosure statement "should clearly identify all assumptions made in calculating pro forma information and should set forth those facts supporting all estimates," especially when plan depends on debtor's ability to improve its financial performance); *In re Dakota Rail, Inc.*, 104 B.R. 138, 148-149 (Bankr. D. Minn. 1989) ("A disclosure statement is misleading where it contains glowing opinions or projections, having little or no basis in fact and/or contradicted by known fact"); *In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981) (mere allegations or opinions unsupported by factual information in the disclosure statement do not meet the standard of adequate information).

57. These disclosure requirements are crucial to the effective functioning of the bankruptcy process. *See, e.g., Ryan Operations G.P. v. Santian-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996).

58. The chart attached hereto as **Exhibit A** outlines the myriad areas where the Disclosure Statement fails to provide basic information. Seven examples follow.

59. The Disclosure Statement fails to adequately discuss the negotiations that lead to the Prepetition Plan Support Agreement or the filing of the Plan. Public events are noted. E.g., on April 29, 2009, the Debtors, the lenders, and the agents entered into an Amendment No.

4, Waiver and Agreement (the "April 29 Amendment") whereby, in exchange for fees, an interest rate increase, accelerated amortization payments, revolver repayment and permanent reduction, and entry into control agreements with respect to certain of the Debtors' accounts, the lenders agreed to grant the Debtors a temporary waiver of the defaults through December 31, 2009, unless earlier terminated. Among other requirements of the April 29 Amendment, the obligated Debtors agreed to maintain at least 85% of their aggregate cash and cash equivalents subject to liens and control agreements in favor of the Existing Lender Agent. Yet, while perhaps evident from the facts themselves, no narrative explanation is provided as to (a) reasons for the chapter 11 filing and its timing (the filing was commenced thirty-five days after the non-insider preference period had run as to the April 29 grants of security interests), (b) the extent to which the Existing Lenders dictated the terms of the Plan and the course of other actions by the Debtors, and (c) who negotiated to get a carve out for equity and why.

60.     Although the Debtors inconsistently describe classification of all claims as being either in a single Class or in sub-Classes (see above), the Plan's description of Class A3 and Class A4 (as well as Class B2) as including separate sub-Classes for all purposes requires disclosure of the assets, liabilities, financial information, and liquidation, and reorganization values of each Debtor. Yet, this is not provided.

61.     The Plan intimates that ongoing, unspecified trade vendors will have the opportunity to receive something more than other holders of General Unsecured Claims and become holders of "Trade Unsecured Claims." Creditors are entitled to know if they are among those being offered this opportunity, to what they must agree, and what they would receive.

Moreover, all creditors are entitled to know what other creditors are receiving. The Plan fails, however, to identify the holders of Claims to be offered this opportunity, fails to disclose the terms of the agreement that such holders must sign, fails to specify the treatment they will receive, and fails to indicate the aggregate amount to be set aside for their treatment. The absence of this disclosure also should and may hamper the Court in issuing at confirmation findings that there is an absence of discrimination among Classes, that the Plan is fair and equitable, and that the Plan has been proposed in good faith.

62.     The Plan includes a Debtors' release and a Third Party Release. Disclosure is needed of the claims being released and the reasons for such releases, to demonstrate the reasonableness thereof. The Debtors need to explain their rationale in giving up this value. An analysis is needed of the existing claims and issues (and defenses). Such analysis must be afforded as a necessary prerequisite to a determination by the Court that the Plan and any compromise embodied therein is appropriate. As to the Existing Lenders, if the Debtors are purporting in the Plan to release any claims or causes of action asserted against them in accordance with this Court's cash collateral order, this should be made clearer and the challenges to the Existing Lender Claims should be specified. As well, if so, the full basis for any such compromise of claims should be explained and the beneficiaries of the proceeds identified for inclusion in a best interests analysis. Additionally, the disclosure should include a discussion of the merits of, *inter alia*, the claims against the Existing Lenders for recovery of fees, insider preferences and for aiding and abetting a breach of fiduciary duty by the Debtors' officers and directors (in connection with their permitting the non-insider preference period as to over a

hundred million dollars in potential preferential transfers). The disclosure statement also should discuss the avoidance of unperfected security interests in commercial tort claims and other assets including the assets of Debtor Lima News.

63.     The Disclosure Statement should set forth the dividends paid for each share type of the Debtors for each of the last six years. In light of the potential claims for recovery of dividends and the proposed release of those claims, disclosure of the amount of dividends paid is an important item of information for creditors.

64.     The Plan proposes to reveal for the first time in the Plan Supplement to be filed only one week prior to the Confirmation Hearing a variety of important information: (a) *consideration payable to the Existing Lenders* through the Exit Facility, (b) *whether* the Debtors' *charters and* the limited *voting rights* to be afforded will *comply with chapter 11 requirements*, (c) the amount of *compensation payable to insiders* and management through the New Equity Incentive Plan and other plans and agreements, and (d) the *consideration sought from holders of Trade Unsecured Claims and the pool of funds from which they will be paid.* Creditors need disclosure of such information at least twenty-five days prior to the date to object to any disclosure statement, in accordance with Bankruptcy Rule 2002.

65.     The Exit Facility includes a Term A Facility that includes quarterly principal payments and does not appear to provide for re-amortizing the debt even if a portion of the business is sold (in which case, 100% of the proceeds are to be paid to the lenders while, presumably, the business' overall revenue will decrease due to the sale). At the same time, the financial projections (Ex. 4) indicate that they cover a four-year period, take account of interest

owed under the Exit Facility (without mention of the principal reductions), and "assume" that the

Term A Facility of the Exit Facility is refinanced "during the Projection Period." The Debtors

should clarify whether, absent such refinancing, the Debtors are projected to be able to service

their debt. The Debtors also should disclose the likelihood of achieving such refinancing and the

reasons for any such conclusion. The Debtors further should confirm that the projections do not

assume any sales of any portions of the business during the Projection Period. Otherwise, the

disclosure should address how the Debtors would continue to service the Exit Facilities if a

material part of the business were sold (presumably resulting in lower gross revenues), the net

proceeds therefrom were paid to the lenders, and the quarterly payments due to the lenders were

not reduced.

## C.     Corrections or Additions to the Plan and Disclosure Statement Are Required

66.     Some likely uncontroversial changes or corrections are needed or

requested to the Plan and/or Disclosure Statement as more fully set forth in Exhibit A, including,

by example:

- The Committee requests that the Debtors add to the recipients of confirmation objections for counsel to the Committee, Bruce Grohsgal, Pachulski Stang Ziehl & Jones, LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801).

- The Committee requests that the Debtors correct that the Committee's financial advisor is "BDO Consulting, a division of BDO Seidman, LLP, that the Committee also employed Trenwith Group, LLC as its investment banker, and that all three employment orders were entered November 16, 2009, effective as of earlier dates.

**Reservation Of Rights**

67.     The Committee reserves its right to supplement this Objection.

**Conclusion**

68.     Based on the foregoing and the detailed objections set forth on **Exhibit A**

attached hereto, the Committee respectfully requests that the Court deny approval of the

Disclosure Statement, find that the proposed Plan is patently unconfirmable on its face, and grant

such other and further relief as is just and proper.

Dated:  December 7, 2009                    PACHULSKI STANG ZIEHL & JONES LLP


                                            Robert J. Feinstein (NY Bar No. RF-2836)
                                            Alan J. Kornfeld (CA Bar No. 130063)
                                            Bruce Grohsgal (DE Bar No. 3583)
                                            David A. Abadir (NY Bar No. DA-0741)
                                            919 N. Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, DE  19899-8705 (Courier 19801)
                                            Telephone:  (302) 652-4100
                                            Facsimile:  (302) 652-4400
                                            Email:  rfeinstein@pszjlaw.com
                                                    akornfeld@pszjlaw.com
                                                    bgrohsgal@pszjlaw.com
                                                    dabadir@pszjlaw.com

                                            Counsel to the Official Committee of Unsecured
                                            Creditors for Freedom Communications Holdings,
                                            Inc. et al.