IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Freedom Communications Holdings, | : | |
| Inc., *et al.* | : | |
| | : | |
| | : | Bankruptcy No. 09-13046-BLS |
| | : | |
| Debtor(s), | : | Jointly Administered |

**Hearing Date: December 17, 2009 @ 2:00 p.m.**
**Objection Deadline: December 9, 2009 @ 4:00 p.m.[1]**

**ACTING UNITED STATES TRUSTEE'S OBJECTION TO DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE OF FREEDOM COMMUNICATIONS HOLDINGS, INC. (D.E. 371, 372)**

In support of her Objection to Disclosure Statement with Respect to Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc. (D.E. 371, 372)[2], Roberta A. DeAngelis, Acting United States Trustee (UST) for Region 3, avers:

1.      This Court has jurisdiction to hear the above-captioned Objection.

2.      Pursuant to 28 U.S.C. § 586(a)(3), the UST is charged with supervising the administration of cases under Chapter 11 of the Bankruptcy Code.

3.      Pursuant to 11 U.S.C. § 307, the UST has standing to be heard with regard to the above-captioned Objection.

**STATEMENT OF FACTS**

4.      These cases were commenced on September 1, 2009. The Debtors filed their Chapter 11 Plan of Reorganization ("Plan", D.E. 371) on October 31, 2009, along with an accompanying Disclosure Statement ("Disclosure Statement", D.E. 372). December 17, 2009 has been set as the

---

[1]  Extended for the Office of the United States Trustee to December 9, 2009.

[2]  Terms shall have the same meaning given them in the Motion.

hearing date on a joint hearing to approve the Debtors' Disclosure Statement ("Combined Hearing").

**Summary of Relevant Plan Terms**

5.      The Plan proposes to convert approximately $770 million in secured debt into 98% of equity in the Reorganized Debtor and $325 million of exit financing (Plan 3.2(b); Disclosure Statement at page 44).  General unsecured creditors will receive $5 million allocated into subclasses for each debtor to share on a pro rata basis.  If a sub-class does not vote to accept the plan or affirmatively votes to reject the plan, then the sub-class forfeits its dividend (Plan at 3.2(d); Disclosure Statement at page 46).

9.      The Plan provides that Trade Unsecured Claims have an opportunity to enter into a Post-Emergence Trade Agreement with the Reorganized Debtors.  A Trade Unsecured Claims is defined as a claim for the provision of pre-petition goods or services where the claimant has continued to do business with the Debtors and signs a Post-Emergence Trade Agreement (Plan at 1.102).  The Plan proposes that Trade Unsecured Claims will be paid in full from funds that would otherwise have been distributed to the Existing Lenders (Plan at 5.10; Disclosure Statement at pages 59-61).  The Plan and Disclosure Statement do not disclose the estimated amount of Trade Unsecured Claims that may qualify for payment. The Plan excludes Trade Unsecured Claims from the definition of General Unsecured Claims (Plan at 1.50).  The Disclosure Statement at pages 12 and 47 discloses that Trade Unsecured Claims will nevertheless be entitled to vote as General Unsecured Claims.

10.      Holders of Old Freedom Stock Interests (pre-petition equity), will receive a pro rata distribution of 2% of equity in the Reorganized Debtors and warrants entitling them to purchase more. If the Existing Lenders or General Unsecured Claims do not accept the Plan, then the stock interests are forfeited. If a holder of an Old Freedom Stock Interest objects to the Plan, the holder forfeits distribution (Plan at 3.2(g); Disclosure Statement at page 48).

**Undisclosed Assets**

11.    The Debtors originally filed their Statements of Financial Affairs and Schedules of Assets and Liabilities ("Statements and Schedules") on October 24, 2009. At an adjourned Section 341(a) Meeting of Creditors which took place on November 4, 2009, the Debtors identified numerous media assets not previously disclosed in the Statements and Schedules. Among the assets identified were the following three magazines:

a.    *Coast Magazine* is a monthly publication in Orange County, California. *Coast Magazine* is similar to Philadelphia Magazine. *Coast Magazine* has a circulation of 45,000.

b.    *Preferred Destinations* Magazine is a quarterly travel magazine.

c.    *Coast Kids* is a quarterly magazine. McEachen admitted at the November 4, 2009 Meeting of Creditors that the magazines are not disclosed in the Schedules. The magazines are not identified in the Disclosure Statement. See page 19 of the Disclosure Statement.

12.    Among the assets identified were the cable broadcasting rights to four television stations not previously disclosed:

a.    The Debtor in Case No. 09-13051, Freedom Broadcasting of Michigan, Inc. did not disclose the operations of a CW affiliate for the Kalamazoo, Grand Rapids and Battle Creek, Michigan area (CW7), and a cable affiliate for Lansing, Michigan (CW5).

b.    The Debtor in Case No. 09-13055, Freedom Broadcasting of Oregon, Inc. did not disclose the ownership and operation of the CW affiliate for southern Oregon, CW11.

c.    The Debtor in Case No. 09-13059, Freedom Broadcasting of Texas, Inc. did not disclose the ownership and operation of a cable CW affiliate for Southeast Texas, thecwtv.tv.

13.     The Debtors also identified numerous print media outlets not previously disclosed, including Spanish Language print media outlets and numerous newspapers, journals and other publications.  On November 18, 2009, the Debtors filed amended Statements and Schedules which disclosed additional  publications not previously disclosed in prior pleadings, Statements and Schedules or at the November 4, 2009 Meeting of Creditors.

14.     The Debtors describe themselves as: "...a national privately owned information and entertainment company of print publications, broadcast television stations and interactive businesses." (Disclosure Statement at page 18).  By admission, the Debtors' various media outlets comprise its primary assets.

## SUMMARY OF ARGUMENT

15**.**     The Disclosure Statement fails to satisfy the adequate information standard of Bankruptcy Code Section 1125.  The proposed Disclosure Statement fails to: 1) discuss the Plan Support Agreement ("PSA") which is germane to the Plan; 2) adequately describe the proposed treatment of Trade Unsecured Claims; 3) to comply with Federal Rule of Bankruptcy Procedure 3016; 4) and, the document contains misleading and inaccurate statements.  Furthermore, numerous Plan provisions render the proposed Plan not confirmable on its face, including but not limited to, the impermissible classification of claims, unfair and discriminatory treatment, that the Plan is not fair and equitable, that the Plan violates the absolute priority rule, and that the proposed releases are overbroad.[3]

## ARGUMENT

## I.     The Disclosure Statement is Inadequate

## A.     Relevant  Law

---

[3]  The UST reserves all rights with respect to the assertion of any and all confirmation issues.  The failure of the UST to not raise one or more confirmation issues in this Disclosure Statement objection should not be given any significance.

16.     Section 1125 of the Bankruptcy Code prohibits solicitation of votes on a

reorganization plan prior to court approval of a written disclosure statemen, upon at least twenty-five

days prior notice, which contains "adequate information."  *See* 11 U.S.C. § 1125(b).

17.     "Adequate information" is defined in section 1125 as being

> information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the
> condition of debtor's books and records, that would enable a
> reasonable hypothetical investor typical of holders of claims or
> interests of the relevant class to make an informed judgment about the
> plan, but adequate information need not include such information
> about any other possible or proposed plan.

11 U.S.C. § 1125(a)(1).

18.     "Investor typical of holders of claims or interests of the relevant class" is defined in

section 1125 as being an investor having

> (A) a claim or interest of the relevant class;
> (B) such a relationship with the debtor as the holders of other claims
> or interests of such class generally have; and
> (C) such ability to obtain such information from sources other than
> the disclosure required by this section as holders of claims or interests
> in such class generally have.

11 U.S.C. § 1125(a)(2).

19.     The Disclosure Statement requirement of section 1125 is "crucial to the effective

functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure

cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d

Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank* (*In re Oneida Motor Freight,

Inc.*), 848 F.2d 414 (3d Cir. 1988)).

20.     "Adequate information" under section 1125 is "determined by the facts and

circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97[th] Cong., 2d

Sess. 266 (1977)).  The "adequate information" requirement is designed to help creditors in their

negotiations with Debtors over the plan.  *See Century Glove, Inc. v. First American Bank*, 860 F.2d 94 (3d Cir. 1988).

21.     Section 1129(a)(2) conditions confirmation of a plan upon compliance with applicable Code provisions.  The disclosure requirement of section 1125 is one of those provisions.  *See* 11 U.S.C. § 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d. Cir. 2000).

22.     A Disclosure Statement should not be approved if the plan it describes is unconfirmable on its face, because approving the Disclosure Statement and proceeding to a confirmation hearing would be a fruitless exercise.  *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999); *In re H.K. Porter Co.*, 156 B.R. 16 (W.D. Pa. 1993); *In re Monroe Well Service*, 80 B.R. 324 (Bankr. E.D. Pa. 1987); *John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates*, 987 F. 2d 154 (Cir. 3 1993).  A Disclosure Statement should not be approved if the plan attempts to rewrite the Bankruptcy Code. See, *In re Beyond.com*, 289 Bankr. 138 (Bankr. N.D. CA. 2003).

**B.**     **Disclosure Statement Defects**

**1.**     **Disclaimer**

25.     The Disclosure Statement begins with a three page bold-faced all caps disclaimer, the final paragraph of which reads as follows:

> "THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS Disclosure Statement SOLELY FOR THE PURPOSES OF INFORMING HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS Disclosure Statement MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE EXCEPT AS PROVIDED IN THE PRECEDING SENTENCE, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS.  THIS Disclosure Statement WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL

RESERVATION OF RIGHTS. THIS Disclosure Statement WILL NOT BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER, AND WILL NOT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR THE REORGANIZED DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES LAW OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS."

Most literally, this paragraph serves as notice that the Disclosure Statement may not be used for any purpose. This paragraph is contrary to and inconsistent with the purpose and intent of a Disclosure Statement to provide adequate information to creditors and parties in interest to assist them in making a decision to accept or reject a Plan. For all other parties in interest, including the Court, the Disclosure Statement serves the additional purposes of accurate and truthful representations about the creditor body, the terms of the Plan, facts to demonstrate the plan's feasibility and any other factor relevant to the Plan confirmation process. The statements in a Disclosure Statement are judicial admissions: "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." (*In re Cendant Corporation Securities Litigation*, 109 F. Supp.2d 225, D. N.J. 2000). Creditors and all parties in interest rely upon the contents of a Disclosure Statement in making decisions relevant to a plan and its confirmation. A Disclosure Statement purporting from the onset to disclaim and disavow its contents should not be approved. The Debtors have provided the OUST with a proposed revised disclosure statement. This paragraph, with cursory revisions, remains.

**2.. Plan Support Agreement**

26. The Disclosure Statement makes mention of the PSA in at least two places. At page 2, the document conspicuously states in all caps: "PURSUANT TO A PSA, EXISTING LENDERS HOLDING MORE THAN FIFTY PERCENT (50%) OF THE EXISTING LENDER CLAIMS IN CLASS A2 HAVE AGREED TO SUPPORT THE AND NOT OBJECT TO THE PLAN." At page 36, a number of conclusory statements are made about the PSA, but its pertinent terms are not disclosed. For example, the PSA contains so-called lock-up provisions in favor of the Debtors and in favor of the Existing Lenders. The lock-up provisions should be disclosed. Paragraph 4 of the PSA contains a so-called no shop provision obligating the Debtors to, among other things:

> "...not to seek to implement any transaction or series of transactions that would effect a restructuring on different terms from the Restructuring or propose or support any plan of reorganization or liquidation in the Chapter 11 Cases other than the Plan; (g) not to take any action that is inconsistent with, or that would unreasonably delay or impede approval or confirmation and consummation of the Plan or that is otherwise inconsistent with this Agreement; (h) not to directly or indirectly seek, solicit, support or encourage any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, liquidation or restructuring of any of the Debtors that could reasonably be expected to prevent, delay or impede the confirmation and consummation of theRestructuring and the Plan..."

At a minimum, discussion of the PSA should be expanded to disclose the existence of the "no shop" clause, disclosure that the Debtors are obligated to pursue confirmation of a Plan which complies with the Term Sheet, disclosure that the Plan includes all material elements of the Term Sheet, and finally, that the PSA and Term Sheet were entered into between the parties on September 1, 2009, the filing date of the Petitions herein. Alternatively, the Debtors should include a copy of the PSA and Term Sheet as an Exhibit to the Disclosure Statement. Since the Disclosure Statement provides a website address for a party to request the PSA, the Debtors

acknowledge an interest in the PSA's contents. The UST posits that additional discussion of the

PSA's material terms would be far more adequate than putting parties to the burden of hunting

for the document and then requiring parties to parse through its contents.  The Debtors have

provided the UST with a proposed revised Disclosure Statement that will attach the PSA as an

exhibit.

**3.    Disclosure of Material Assets**.

27.    In the Disclosure Statement at page 19, the Debtors disclose some, but not all, of

their various print and broadcast media outlets.  The Debtors also include the Debtors'

organizational structure, including its media outlets, as an exhibit (*See,* Exhibit 3). purports to

disclose the Debtors' organizational structure, including its media outlets.  However, not all of

the Debtors' media outlets are disclosed in Exhibit 3.  Furthermore, the disclosures contained in

Exhibit 3 are different from those contained on page 19 of the Disclosure Statement. The

disclosures on page 19 and Exhibit 3 need to be reconciled.   The Disclosure Statement should be

amended to correctly disclose each and every print media outlet, each and every broadcast media

outlet, and to identify which of the 50 Debtors in this estate owns a particular  media outlet.

Many of the Debtors own multiple media outlets bearing names other than that of the specific

Debtor.[4]  Given that the various media outlets are, by admission the Debtors' primary assets, they

should be fully and completely disclosed.  Among other things, disclosure of the information in

---

[4]  For example, the Debtor in Case No. 09-13071 is Florida Freedom Newspapers, Inc.  This
Debtor owns and operates at least nine publications: *The Destin Log* in Destin, Florida; the
*Northwest Forida Daily News* in Ft. Walton Beach, Florida; the *News Herald* in Panama City,
Florida; *The Star* in Port. St. Joe, Florida; the *Apalachicola Times* in Apalachicola, Florida; *The
Walton Sun* in Walton County, Florida; the *Santa Rosa Press Gazette* in Santa Rosa, Florida; the
*Crestview News Bulletin* in Crestview, Florida; the *Washington County News* in Chipley, Florida,
and *The Holmes County Times-Advertiser* in Bonifay, Florida.  None of this information is
included in the Disclosure Statement.

this manner will assist creditors in determining which Debtor is the one or ones that owe money to a particular creditors. The UST has been provided with a proposed revised Disclosure Statement in which the Debtors may be attaching the list of media outlets as an exhibit.

**4.    Valuation**

28.    The Disclosure Statement contains reorganization valuation data based solely upon multiples of EBITDA. There is limited disclosure, as noted above, and no separate valuations of the many media outlets as going concerns. There is no explanation in the Disclosure Statement as to why no separate valuation of the individual media outlets has been undertaken although the media outlets are the Debtors' primary assets. Unlike a retail debtor, whose locations are often similar, if not identical, each one of these Debtors' media outlets is unique. Each media outlet therefore has independent going concern value unrelated to the overall corporate EBITDA or a multiple thereof. This is not necessarily a case where the sum of the whole is greater than the sum of the parts.

29.    The Debtors have identified a number of unencumbered Debtors, along with the Debtors' FCC broadcast licenses. There is no discussion in the Disclosure Statement as to why the unencumbered assets have not been independently valued. This has material relevance for at least two reasons. The value of an unencumbered debtor may exceed the direct claims against the Debtor entitling the creditors of such a Debtor to payment in full of their claims. A second reason independent valuations of the unencumbered assets is required is because the Plan proposes to pay general unsecured claims the fixed sum of $5 million. A valuation of the unencumbered assets will disclose whether or not the $5 million sum is an accurate reflection of the unencumbered asset's value and will aid in determining whether or not the best interests test

has been complied with in this case and in a determining that the creditors are being treated in a fair and equitable manner.

**5.    Administrative Claims**

30.    On page 5 of the Disclosure Statement, the Debtors suggest that all administrative claims will be paid in full as required by Section 1129(a)(9) of the Code. However, the discussion on page 5 omits disclosure of Plan provision 11.2 which provides that contingent, disputed, or unliquidated administrative claims will not be paid unless a claim is served on counsel for the Debtors within 45 days of the Effective Date. There is no discussion of how an unknown post-petition personal injury claimant, for example, would know about this case and therefore be in a position to file a claim on or before any administrative claims bar date. The Disclosure Statement at page 5 should discuss this treatment.

**6.    Trade Unsecured Claims**

31.    The Plan provides that a Trade Unsecured Claim is also a General Unsecured Claim entitled to vote in its applicable sub-class (*See* Disclosure Statement at pages 12, 47 and 59). The Plan also provides that General Unsecured Claims will share a $5 million fund and Trade Unsecured Claims compliant with the proposed Post-Emergence Trade Agreement Procedure set forth at Plan Section 5.10 will be paid in full. Trade Unsecured Claims are treated as General Unsecured Claims for voting, but not for distribution.

32.    The Plan (Plan at 5.10) and Disclosure Statement (Disclosure Statement at pages 59-61) make numerous references to the proposed Post-Emergence Trade Agreement but do not attach a copy as an Exhibit. This document is germane to a Trade Unsecured Claimant's decision to accept or reject the plan. However, a claimant will only be able to obtain the document for review from the Logan and Company website (Disclosure Statement at page 60),

or from the Plan Supplement. A Trade Unsecured Claimant is also required to submit a Notice of Desire to Enter into Post-Emergence Trade Agreement ("Notice of Desire") ten days prior to the Confirmation Hearing as a pre-requisite to becoming entitled to enter into a Post-Emergence Trade Agreement (Plan at 5.10(a)(ii). The Disclosure Statement does not propose to include this latter document as an exhibit although it is germane for the protection of a Trade Unsecured Claimant's rights under the Plan. The Disclosure Statement does not indicate if the Notice of Desire will be included in the Plan Supplement.

33. The Debtors' approach requires creditors to hunt for documents germane to the protection of their rights under the Plan, or to await the filing of the Plan Supplement which the Debtors propose to file "...at least five (5) Business Days prior to the date of the commencement of the Confirmation Hearing." (Disclosure Statement at page 61). One self-evident problem with this approach is that the deadline to submit a Notice of Desire, ten days prior to the Confirmation Hearing, is five days before the Debtor proposes to file its Plan Supplement which is the first time the Debtors propose to file either of these documents with the Court. The materials should be included as Exhibits to the Disclosure Statement as they are essential for Trade Unsecured Claims to receive adequate information to exercise their rights under the Plan. The Debtors have provided the UST with a proposed revised Disclosure Statement that will attach the proposed Post-Emergence Trade Agreement as an exhibit. The Notice of Desire is not included in the proposed package of exhibits.

34. This estate is comprised of fifty debtors publishing newspapers located primarily in small towns. The Trade Unsecured Claims are likely to consist of many small and unsophisticated claimants. It is neither realistic, nor fair, nor equitable to require them to hunt for documents germane to the preservation of their rights as creditors. Without including the Notice

of Desire and Post-Emergence Trade Agreement as Exhibits to the Disclosure Statement, potential Trade Unsecured Claims will be deprived of adequate information within the meaning of Section 1125.

35.     In pages 59-61 of the Disclosure Statement, the Debtors purport to summarize the treatment being provided to Trade Unsecured Claims.  The summary is misleading and is provided more as an enticement to vote for the Plan than an accurate reflection of the treatment being provided to these creditors..  First a potential Trade Unsecured Claim must submit a Notice of Desire ten days before the Confirmation Hearing (Plan 5.10(a)(ii)).   The Notices of Desire will then be provided to the Existing Lenders who will consult with the Debtors who will, in their business judgement determine if there remains a need for the goods or services after the Effective Date (Plan 5.10(a)(iii)).  If a claimant is fortunate enough to be selected, only then  will a claimant receive the Post-Emergence Trade Agreement along with a deadline to return the same (Plan 5.10(a)(iv)).  Neither the Plan nor the Disclosure Statement contain this deadline.  After returning a signed Agreement to the Debtors, the Debtors may still determine whether or not to continue using the creditor's goods or services.  The Debtors do not propose  to obligate themselves to execute a Post-Emergence Trade Agreement with a particular claimant until **after** the Effective Date (Plan 5.10(a)(vi) emphasis added).

36.     The provisions affecting Trade Unsecured Claims are written in legalese.  Their full import is not likely to be understood by many of the affected creditors. This section of the Disclosure Statement should be supplemented by a discussion, in plain English, to the effect that a creditor's actions in asserting a position as a Trade Unsecured Claimant and who complies with the Debtor's proposed procedures provides no assurance that a creditor will be paid in full as a

Trade Unsecured Claim by the Debtors who have reserved the right to determine in their discretion after the Effective Date, who will and who will not be paid in full as a Trade Unsecured Claim.  The Debtors have provided the UST with a proposed revised Disclosure Statement that addresses some of these issues.

**7.    Miscellaneous Disclosures**

37.    Page 13 of the Disclosure Statement contains a paragraph of bold faced type in all caps concerning ballot procedures.  One sentence in this paragraph reads: "ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM OR INTEREST BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE."  Federal Rule of Bankruptcy Procedure 3018(c) requires, in part, that: "An acceptance or rejection shall be in writing...be signed by the creditor...".  An unmarked ballot is not entitled to be counted.  The sentence should be stricken from the paragraph as an incorrect statement of the law.  The Debtors have provided the UST with a proposed revised Disclosure Statement that corrects this defect.

38.    Page 16 of the Disclosure Statement sets forth the proposed Third Party Release provision. As per FRBP 3016(c), the text should be in bold, italics or underlined.

39.    Page 32 of the Disclosure Statement contains a paragraph entitled "Consolidated Liabilities".  The paragraph represents that the Debtors have $312.4 million of unsecured claims, including trade accounts, wage and benefit claims of employees, liabilities to subscribers for unearned subscription revenue, pension and retirement liabilities, among others. Towards the end of this paragraph, the Debtors make the following pronouncement in all caps: "MOST OF THE FOREGOING ITEMS ARE NOT CLAIMS FOR BANKRUPTCY PURPOSES."  This sentence is patently wrong.  To the extent any or all of these liabilities were incurred pre-petition, they are

14

all pre-petition liabilities which the Debtors in some way need to account for through their plan. The all caps sentence should be stricken. The UST is informed and believes that the Debtors have agreed to revise this language.

40. Page 59 of the Disclosure Statement discusses Management Incentives and other agreements but omits discussion of compensation that will be received by management should the Plan be confirmed. This information is necessary to evaluate the Debtors' compliance with 11 U.S.C. § 1129(a)(5). The UST is informed and believes that the Debtors have agreed to supplement this provision with additional relevant disclosures.

**C.    The Plan Is Not Confirmable**

**1.    Improper Classification**

41. Section 1123(a)(4) of the Bankruptcy Code requires that a plan: "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The seminal Third Circuit classification case is *John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates*, 987 F. 2d 154 (3d Cir. 1993), where the Third Circuit found that "...the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes..." and held that for a classification scheme to be reasonable, "...it seems clear to us that this determination must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed and treatment of claims under the plan." 987 F.2d 154 at 158, 159 (citations omitted). In *John Hancock*, supra, the Debtor sought to classify the deficiency claim of a lender separate from that of other general unsecured claims, and confirmation was denied.

42. Trade Unsecured Claims are expressly excluded from the Plan definition of

General Unsecured Claims (Plan 1.50). The effect of the Plan is to treat Trade Unsecured Claims as General Unsecured Claims for voting purposes, but not for purposes of distribution. The Debtors will contend that because Trade Unsecured Claims will not be determined until after the Effective Date (see above), then the claims are properly treated as General Unsecured Claims for voting purposes.

43. In essence, the Debtors have created two classes of unsecured claims that will be paid from two different funds, the $5 million fund for General Unsecured Claims and the Trade Unsecured Claim Escrow of an as yet unknown amount. The Debtors should not be permitted to play fast and loose by proposing to treat a significant group of claimants ($16.6 million according to page 32 of the Disclosure Statement) as General Unsecured Creditors for voting purposes, but not for purposes of distribution. Where two groups are being paid different dividends from distinct funds, they are not similarly situated and should be separately classified. The Debtors seek to artificially maintain Trade Unsecured Claims as General Unsecured Claims by proposing to defer the creation of any enforceable obligations on behalf of the Debtors with respect to the Trade Unsecured Claims until after the Effective Date. Additionally, to the extent that the Plan proposes different treatment for Trade Unsecured Claims and other General Unsecured Claims, this violates the principle of equal distribution to similarly situated creditors and is not fair and equitable.

## 2. The Plan Violates the Absolute Priority Rule

44. The absolute priority rule, that senior classes of claims be fully satisfied before distributions may be made to the junior classes or interests retained by equity holders, is at the heart of the Chapter 11 process. Ensuring and maintaining the integrity of the absolute priority rule is required for a court to make a good faith finding or to find that a transaction is fair and

equitable, be the transaction a sale (*In re Abbotts Dairies*, *supra*,  *In re Lionel Corp.*, 722 F.2d

1063 (2d Cir. 1983), *In re Chrysler, LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009), affirmed,  *In re*

*Chrysler, LLC*, 576 F.3d 108, 2009 WL 2382766, 51 Bankr. Ct. Dec. 254 (2d Cir. 2009)), a

settlement (*In re Iridium Operating LLC*, 478 F.3d 452 (2007)), or a plan *(In re Armstrong World*

*Industries, Inc.*, 432 F.3d 507 (3d Cir. 2005)).

45.     In *Armstrong World Industries*, *supra*, the plan provided that a junior class would

receive warrants to purchase new common stock if the class of general unsecured claims

consented to the plan. If the class of general unsecured creditors rejected the plan, then the

warrants would be distributed instead to a class of unsecured asbestos claimants who would

immediately waive distribution of the warrants and gift them to the junior class.  Thus,

irrespective of whether general unsecured claims consented to or rejected the plan, the warrants

to purchase new common stock would still be distributed to the junior class without the

opportunity for any member of the disaffected class to object.  The Third Circuit did not approve:

"Allowing this particular type of transfer would encourage parties to impermissibly sidestep the

carefully crafted strictures of the Bankruptcy Code, and would undermine Congress's intention to

give unsecured creditors bargaining power in this context."  432 F.3d at 514-515.

46.     The absolute priority rule is violated when a junior class of claims or interests

receives a distribution or retains an interest in a debtor on account of the prepetition claim or

interest prior to payment in full of senior classes, absent their consent.  In  *Bank of America  v.*

*203 North LaSallle Street Partners,* 526 U.S. 434 (1999), prepetition equity proposed a plan to

contribute new value into the debtor, limited to the holders of prepetition equity.  Bank of

America contended that the proposed plan violated the absolute priority rule because it was not

being fully paid.  The debtor contended that the new value contributions in exchange for

reorganization equity were not on account of the prepetition equity interests. The Supreme Court

rejected this notion, and ruled in favor of the bank, recognizing: "...the more common

understanding of 'on account of' to mean 'because of'." 526 U.S. at 450. The Court held: "So,

under the commonsense rule that a given phrase is meant to carry a given concept in a single

statute, the better reading of subsection [1129](b)(2)(B)(ii) recognizes that a causal relationship

between holding the prior claim or interest and receiving or retaining property is what activates

the absolute priority rule." 526 U.S. at 451. The Court further observed that since the

opportunity to contribute new value was limited solely to the holders or prepetition equity, this

also evidenced that the reorganization interests were on account of the prepetition interests and

the plan violated the absolute priority rule.

47.     In this case, the Plan proposes to distribute reorganization stock to the holders of

Old Freedom Stock Interests (Plan at 3.2(g)). In page 48 of the Disclosure Statement, the

Debtors represent that the holders of Old Equity will receive 2% of the equity in the Reorganized

Debtors. The Plan also provides that any sub-Class of General Unsecured Claims which does not

vote to accept the Plan forfeits any dividend and will receive no distribution under the Plan (Plan

at 3.2(d)).

48.     It is axiomatic that one may not do indirectly what one may not do directly: "From

time immemorial, courts of law have refused to sanction acts done by indirection, which, if

performed directly, would be barred by law. Courts of Bankruptcy have from the beginning

placed emphasis upon the purpose and effect of a given transaction irrespective of the manner in

which it was accomplished-that is, regardless of whether such transfer was a direct or indirect

transaction." *Steel Structures, Inc. v. Star Manufacturing Company*, 466 F.2d 207 (6th Cir. 1972).

Here, the Plan requires General Unsecured Claims to consent to a violation of the absolute

priority rule or receive no distribution. This proposal is *prima facie* not fair and equitable. It acts to terrorize creditors from exercising their rights because if they do they will receive nothing. Like *Armnstrong, supra,* these Plan provisions are designed to provide a distribution to the junior class of Old Freedom Stock Interests irrespective of the rights of intervening General Unsecured Creditors.

49.     In *In re OCA, Inc.*, 357 B.R. 72 (Bankr. E.D. La. 2006), the court denied confirmation of a  proposed plan in which senior debt, acquiring substantially all equity in the reorganized debtor, provided "Participation Rights" to old equity by extending to holders of old equity the right to acquire up to 15% of the reorganized debtor's equity from the equity distributed to senior debt.  An impaired creditor objected to confirmation claiming that the Participation Rights violated the absolute priority rule.  Analyzing *SPM,* supra, *Mcorp*, supra, *Genesis,* supra, and *Armstrong World Industries,* supra, the *OCA* court found the participation rights proposal violative of the absolute priority rule.  Consistent with the Third Circuit in *Armstrong,* surpa, the court noted: "...the *SPM* decision did not implicate the absolute priority rule because the debtor was in Chapter 7 and not Chapter 11; here, OCA is in Chapter 11 and the absolute priority rule must be applied." 357 B.R. at 85.

50.     The proposed Plan provision effectively eliminates application of the absolute priority rule in this case because it seeks to deprive General Unsecured Creditors of their right to enforce the rule.  The absolute priority rule requires old equity to pay senior classes in full, or reach consensus with senior classes on the terms of a plan permitting old equity to retain an interest in a reorganized debtor.  This is precisely the result the Plan here seeks to circumvent.  In rejecting a plan which sought to re-write various provisions of the Bankruptcy Code, the court stated in the case of *In re Beyond.com*, 289 B.R. 138 (Bankr. N.D. Cal. 2003): "In effect, the plan

affords the reorganized debtor the prerogative to comply selectively with the provisions of the Bankruptcy Code and Rules without judicial supervision."  Solicitation of a plan which proposes to eliminate application of the absolute priority rule by forfeiting distributions  if a creditor class seeks to enforce the rule by rejecting a plan should not be permitted.

51.     In *In re Global Ocean Carriers Limited, et al.*, 251 B.R. 31 (Bankr. D. Del. 2000), the debtor proposed a plan in which an entity controlled by the daughter of the debtor would acquire all the stock in the debtor in exchange for new capital.  In denying confirmation on the basis that the plan violated the absolute priority rule, Judge Walrath stated:

> " In the *La Salle* decision, the Supreme Court concluded that the absolute priority rule was violated where the debtor's plan permitted only its shareholders to invest new capital to obtain all the equity in the company.  The Court was particularly concerned by the fact that the debtor had retained the exclusive right to propose a plan, thereby precluding others (including the objecting creditor) from proposing a plan 'selling' the equity to another." 251 B.R. at 49.

> "Thus, we conclude that the Debtors' Modified Plan violates the absolute priority rule by allowing the existing controlling shareholder to determine, without the benefit of a public auction or competing plans, who will own the equity of Global Ocean and how much they will pay for the privilege.  To avoid this result the Debtors must subject the 'exclusive opportunity' to determine who will own Global Ocean to the market place test."  251 B.R. at 49.

Here, the Old Freedom Equity Interests are not making any contribution to the Plan in exchange for shares in the Reorganized Debtors.  No reasons are disclosed for including the Old Freedom Stock Interests in the Plan to the exclusion of all other classes except the Existing Lenders who will hold 98% of Reorganized Debtors' shares.   No attempt has been made or provided to permit other parties in interest to acquire an interest in the Reorganized Debtors.

## 3.     The Plan is Not Proposed in Good Faith

52.     Bankruptcy Code Section 1129(a)(3) requires, as a condition of confirmation, that "The plan has been proposed in good faith and not by any means forbidden by law."  In *Genesis*

*Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that: "The determination of good faith must be based on the totality of circumstances. [citations omitted]" 266 B.R. at 609. Among the issues for the court to consider is fundamental fairness in dealing with the creditors. The issue of good faith looks to the purposes that would be achieved by the plan. This plan is not proposed in good faith for multiple reasons.

**a.      The Trade Unsecured Claim Escrow is not a Gift**

53.      The alleged "gift" of the Trade Unsecured Claim Escrow is not a gift. It is not a gift because it is a distribution of estate property. Because the funds are property of the estate, they cannot be a gift.

54.      Quite recently, in *Roberts v. Oliver (In re Oliver)*, 414 B.R. 361 (Bankr. E.D. Tenn. 2009), the court reviewed the definition of a gift for bankruptcy purposes:

> "Under both legal and non-legal definitions, a 'gift' is something for which the giver receives nothing in return. *Watson v. Boyajian (In re Watson),* 309 B.R. 652, 662 (1st Cir. BAP 2004); [citations omitted] 'A gift has been judicially defined as a voluntary transfer of property by one to another, without any consideration or compensation therefor"; BLACK'S LAW DICTIONARY 688 (6th ed. 1994) (defining 'gift' as 'a voluntary transfer of property to another made gratuitously and without consideration)." 414 B.R. at 375.

Here, for a Trade Unsecured Claim to receive a distribution from the Trade Unsecured Claim Escrow, the claimant must navigate the many hurdles created at Plan Section 5.10, including the submission of a Notice of Desire and Executing a Post-Emergence Trade Agreement. Yet, even after a claimant completes these tasks, the Debtors are not obligating themselves to enter into these agreements until the Effective Date and can change their mind at any time. Thus, even if a Trade Unsecured Claim follows the procedures to receive a promised payment in full, the "gift"

can be rescinded at any time prior to the Debtor's executing a Post-Emergence Trade Agreement with a particular claimant. This proposal is not a gift. It is an offer to enter into an illusory contract.

**b.      Even if the Trade Account Distribution is a Gift, Distribution is Subject to the Provisions of Chapter 11**

55.      Even if the Trade Account Distribution proposed in the Plan may be considered a gift, distribution of the funds nonetheless remains subject to the provisions of Chapter 11. In *Armstrong World Industries, supra*, the Third Circuit rejected cases such as *In re Mcorp Financial, Inc*., 160 B.R. 941 (S.D. Tex. 1993) and *In re SPM Mfg Corp*, 984 F.2d 1305 (1st Cir. 1993), noting particularly that *In re SPM* was a Chapter 7 case "...which did not trigger 11 U.S.C. § 1129(b)(2)(B)(ii)..." (432 F.3d at 514), stating that these cases: "...do not stand for the proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive. Creditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B)."

56.      The proposed distribution to the Trade Unsecured Claim Escrow is also not in good faith because it discriminates unfairly between Trade Unsecured Claims and all other General Unsecured Claims, as discussed above.

**4.      *In Terrorem* Provisions Chilling Claimants from Exercising Rights are Not in Good Faith**

57.      As noted, Plan provision 3.2(d) contains an *in terrorem* provision intended to prevent classes from exercising their right to reject the Plan, because if a class rejects the Plan, it forfeits any distribution under the Plan. This provision, by itself, renders the Plan not in good faith. Restricting distributions to only those classes who accept a Plan is not in good faith, and is

22

not fair and equitable. Such a provision exists to chill classes from exercising their rights to reject a Plan and enforce the applicable provisions of the Bankruptcy Code, such as the absolute priority rule. Such provisions have no place in a fair and equitable reorganization plan process.

## 5.     Release Issues

58.     Section 11.9 of the Plan provides Debtor releases to a broad universe of individuals, including the Debtors' non-Debtor affiliates, the Debtors' current and former directors, officers, employees, advisors or professionals, the Existing Lenders and their affiliates, and any respective present or former directors, officers, employees, advisors or professionals of any of the foregoing with complete releases not only from the Debtors, but also from "...any Person seeking to exercise the rights of the Estates, including any successor to the Debtors or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code...". The Plan does not provide claimants entitled to vote on the Plan the opportunity to opt out of this release provision, although it would purport to affect their rights.[5]   To the extent that this clause is without respect to whether or not a holder of a claim has voted affirmatively to accept the Plan, or affirmatively consent to the granting of a release, the proposed release of non-debtor parties is inconsistent with *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. De. 1999). In *Zenith*, supra, the Court found that releases of third party claims against non-debtors "...cannot be accomplished without affirmative agreement of the creditor affected." (241 Bankr. 92, 111 (D. Del. 1999)).

59.     The provision proposed by the Debtor fails to comply with *In re Zenith*

---

[5]  The Debtors have provided the UST with a proposed revised Disclosure Statement and Plan which applies the Third Party release provision of 11.9(b) to only those creditors voting on the Plan. There is no such limitation in 11.9(a).

*Electronics Corp.*, 241 B.R. 92 (Bankr. D. De. 1999). In *Zenith*, supra, the Court addressed the issue of releases by the debtor in favor of third parties, and adopted a five part test enunciated in *Master Mortgage Inv. Fund, Inc.*, 168 Bankr. 930 (W.D. Mo. 1994) to determine whether or not to allow a Debtor's release of a third party as part of a plan of reorganization. These factors are:

> "...(1) an identity of interest between the debtor and the third party...; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction." (168 Bankr. at 937)

The enumerated factors must be separately applied to each of the entities the provision purports to affect. Absent such a showing, and appropriate finding by the Court, the provision renders the Plan unconfirmable. Some parties may qualify for the protection afforded by the provision and some may not.

60. In *In re Genesis Health Ventures, Inc.*, supra, examined a similar provision and tested its applicability to each party to be affected by the provision. For example, the attempt in *Genesis*, supra, to release the Debtor's post-petition management, was rejected, the Court stating: "As to the debtor's management personnel here, there is no showing that the individual releasees have made a substantial contribution of assets to the reorganization." (266 Bankr. 591, 606). The Disclosure Statement is devoid of any facts indicating how any proposed person or entity to be released satisfies the *Master Mortgage* standards. Any revised disclosure statement should address this issue.

## CONCLUSION

61.     The Disclosure Statement should not be approved. The Disclosure Statement contains numerous material omissions and misstatements which render it inadequate in its present form.  The Disclosure Statement should not be approved because the Plan is not confirmable in its present form. The Plan impermissibly classifies claims by, among other things, including claims within a class for voting, but not for distribution purposes.  The Plan blatantly violates the absolute priority rule by seeking to effectively prevent the rule from being applied in this case under threat of forfeiture of distributions.

Respectfully submitted,

**ROBERTA A. DeANGELIS,**
**ACTING UNITED STATES TRUSTEE**

Date:  **December 9, 2009**     **BY:** _____/s/_____
                                     David L. Buchbinder, Esquire
                                     Trial Attorney
                                     Office of the United States Trustee
                                     J. Caleb Boggs Federal Building
                                     844 King Street, Suite 2207, Lockbox 35
                                     Wilmington, DE 19801
                                     (302) 573-6491
                                     (302) 573-6497 (Fax)