## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 11** |
| **FREEDOM COMMUNICATIONS HOLDINGS, INC.,** *et al.* | **Case No. 09-13046 (BLS)** |
| Debtors. | **Jointly Administered** |

---

## JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
## OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS

### Dated: January 28, 2010

---

LATHAM & WATKINS LLP
Robert A. Klyman
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:      robert.klyman@lw.com

Rosalie Walker Gray
Michael J. Riela
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:      rosalie.gray@lw.com
           michael.riela@lw.com

Counsel for the Debtors

YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:      mnestor@ycst.com
           kcoyle@ycst.com

Counsel for the Debtors

# TABLE OF CONTENTS

ARTICLE I TERMINOLOGY AND DEFINITIONS ................................................................2
1.1      "Aggregate Existing Lender Share Number" .............................................................2
1.2      "Adequate Protection Obligations" ............................................................................2
1.3      "Administrative Claim" ..............................................................................................2
1.4      "Allowed" ...................................................................................................................2
1.5      "Amended Engagement Agreement" ..........................................................................3
1.6      "Ballot" .......................................................................................................................3
1.7      "Bankruptcy Code" .....................................................................................................3
1.8      "Bankruptcy Court" ....................................................................................................3
1.9      "Bankruptcy Rules" ....................................................................................................3
1.10     "Bar Date(s)" ..............................................................................................................3
1.11     "Broadcast Licensee Companies" ..............................................................................3
1.12     "Broadcast Operating Companies" .............................................................................3
1.13     "Broadcast Stations" ..................................................................................................4
1.14     "Broadcast Trust Agreement" ....................................................................................4
1.15     "Broadcast Trustee" ...................................................................................................4
1.16     "Business Day" ...........................................................................................................4
1.17     "Cash" .........................................................................................................................4
1.18     "Cash Collateral Order" .............................................................................................4
1.19     "Chapter 11 Cases" .....................................................................................................4
1.20     "Claim" .......................................................................................................................4
1.21     "Claims Objection Deadline" .....................................................................................4
1.22     "Class" ........................................................................................................................4
1.23     "Class A2 Beneficial Trust Interests" ........................................................................4
1.24     "Class A4 Beneficial Trust Interests" ........................................................................4
1.25     "Class A4 Claim" ........................................................................................................5
1.26     "Conditions to Stay" ...................................................................................................5
1.27     "Confidentiality and Common Interest Agreement" ..................................................5
1.28     "Confirmation" ...........................................................................................................5
1.29     "Confirmation Date" ...................................................................................................5
1.30     "Confirmation Hearing" .............................................................................................5
1.31     "Confirmation Order" .................................................................................................5
1.32     "Contract/Lease Schedules" .......................................................................................5
1.33     "Coverage Denial" ......................................................................................................5
1.34     "Coverage Statement" ................................................................................................5
1.35     "Creditor" ...................................................................................................................5
1.36     "Creditors' Committee" ..............................................................................................5
1.37     "Cure" .........................................................................................................................5
1.38     "D&O Action" .............................................................................................................6
1.39     "D&O Defendants" ......................................................................................................6
1.40     "D&O Insurance Policies" ..........................................................................................6
1.41     "D&O Insurers" ...........................................................................................................6
1.42     "Debtor(s)" ..................................................................................................................6
1.43     "Defense Expenses" ....................................................................................................6
1.44     "Disbursing Agent" .....................................................................................................6
1.45     "Disclosure Statement" ...............................................................................................6
1.46     "Disputed" ..................................................................................................................6
1.47     "Distribution Date" .....................................................................................................7
1.48     "Distribution Interest" ................................................................................................7
1.49     "Distribution Record Date" ........................................................................................7
1.50     "Duty to Defend" ........................................................................................................7
1.51     "Effective Date" .........................................................................................................7
1.52     "EMRP" ......................................................................................................................7
1.53     "Encumbered Debtor(s)" .............................................................................................7
1.54     "ERISA" ......................................................................................................................7

| 1.55 | "Estate(s)" | 7 |
| 1.56 | "Excess Cash" | 7 |
| 1.57 | "Existing Credit Agreement Documents" | 8 |
| 1.58 | "Existing Lender Agent" | 8 |
| 1.59 | "Existing Lender Fee Claim" | 8 |
| 1.60 | "Existing Lenders" | 8 |
| 1.61 | "Existing Lender Claim" | 8 |
| 1.62 | "Existing Lender Deficiency Claim" | 8 |
| 1.63 | "Existing Lender Secured Claim" | 8 |
| 1.64 | "Existing Lender Shares" | 8 |
| 1.65 | "Existing Lender Warrant Agreement" | 8 |
| 1.66 | "Existing Lender Warrants" | 8 |
| 1.67 | "Exit Facility" | 8 |
| 1.68 | "Exit Financing Share Allocation" | 9 |
| 1.69 | "FCC" | 9 |
| 1.70 | "Final Order" | 9 |
| 1.71 | "First Day Employee Order" | 9 |
| 1.72 | "Freedom Communications" | 9 |
| 1.73 | "Freedom Holdings" | 9 |
| 1.74 | "General Unsecured Claims" | 9 |
| 1.75 | "Gonzalez Class Counsel" | 9 |
| 1.76 | "Gonzalez Litigation Claim" | 9 |
| 1.77 | "Houlihan" | 10 |
| 1.78 | "Impaired" | 10 |
| 1.79 | "Indemnification Obligation" | 10 |
| 1.80 | "Individual Retirement Agreements" | 10 |
| 1.81 | "Insurance Coverage Action" | 10 |
| 1.82 | "Intercompany Claim" | 10 |
| 1.83 | "Intercreditor Agreement" | 10 |
| 1.84 | "Interests" | 10 |
| 1.85 | "Litigation Trust" | 10 |
| 1.86 | "Litigation Trust Agreement" | 10 |
| 1.87 | "Litigation Trust Assets" | 11 |
| 1.88 | "Litigation Trustee" | 11 |
| 1.89 | "LMA" | 11 |
| 1.90 | "LT Beneficiaries" | 11 |
| 1.91 | "Mutual Release Agreement" | 11 |
| 1.92 | "Net Cash Proceeds" | 11 |
| 1.93 | "Net Litigation Proceeds" | 11 |
| 1.94 | "New Board" | 11 |
| 1.95 | "New Common Stock" | 12 |
| 1.96 | "New Equity Incentive Plan" | 12 |
| 1.97 | "New Freedom By-Laws" | 12 |
| 1.98 | "New Freedom Charter" | 12 |
| 1.99 | "New Freedom Governing Documents" | 12 |
| 1.100 | "New Securities" | 12 |
| 1.101 | "New Stockholders Agreement" | 12 |
| 1.102 | "New Subsidiary Governing Documents" | 12 |
| 1.103 | "Non-Qualified DC Plan" | 12 |
| 1.104 | "Non-Qualified EB Plan" | 12 |
| 1.105 | "Non-Qualified Retirement Claim" | 12 |
| 1.106 | "Old Freedom Stock Interests" | 13 |
| 1.107 | "Old Freedom Stock Rights" | 13 |
| 1.108 | "Other Priority Claim" | 13 |
| 1.109 | "Other Secured Claim" | 13 |
| 1.110 | "PBGC" | 13 |
| 1.111 | "Person" | 13 |
| 1.112 | "Petition Date" | 13 |

| | | |
|---|---|---|
| 1.113 | "Plan" | 13 |
| 1.114 | "Plan Supplement" | 13 |
| 1.115 | "Post-Emergence Trade Agreement" | 14 |
| 1.116 | "Primary D&O Insurer" | 14 |
| 1.117 | "Priority Tax Claim" | 14 |
| 1.118 | "Professional" | 14 |
| 1.119 | "Professional Fee Claim" | 14 |
| 1.120 | "Proof of Claim" | 14 |
| 1.121 | "Pro Rata" | 14 |
| 1.122 | "Registration Rights Agreement" | 14 |
| 1.123 | "Reinstated" | 14 |
| 1.124 | "Released Causes of Action" | 15 |
| 1.125 | "Releasing Party" | 15 |
| 1.126 | "Reorganized Broadcast Licensee Companies" | 15 |
| 1.127 | "Reorganized Broadcast Operating Companies" | 15 |
| 1.128 | "Reorganized Debtor(s)" | 15 |
| 1.129 | "Reorganized Freedom Communications" | 15 |
| 1.130 | "Reorganized Freedom Holdings" | 15 |
| 1.131 | "Reorganized Subsidiary Debtor(s)" | 15 |
| 1.132 | "Request for Payment" | 15 |
| 1.133 | "Retained Litigation Rights" | 15 |
| 1.134 | "Retirement Plan" | 15 |
| 1.135 | "Schedules" | 15 |
| 1.136 | "Secured Claim" | 16 |
| 1.137 | "Steering Committee Members" | 16 |
| 1.138 | "Subordinated Claim" | 16 |
| 1.139 | "Subsidiary Debtors" | 16 |
| 1.140 | "Subsidiary Interests" | 17 |
| 1.141 | "Substantial Contribution Claim" | 17 |
| 1.142 | "Tax Items" | 17 |
| 1.143 | "Term A Facility" | 17 |
| 1.144 | "Term A Loan Obligations" | 17 |
| 1.145 | "Term B Facility" | 17 |
| 1.146 | "Term B Loan Obligations" | 17 |
| 1.147 | "Third Party Release" | 17 |
| 1.148 | "Third Party Releasees" | 17 |
| 1.149 | "Tort Claim" | 17 |
| 1.150 | "Trade Unsecured Claim" | 18 |
| 1.151 | "Trade Unsecured Claim Escrow" | 18 |
| 1.152 | "Transferred Cash" | 18 |
| 1.153 | "Transferred Causes of Action" | 18 |
| 1.154 | "Trial Court Disposition" | 18 |
| 1.155 | "Trust Indemnified Parties" | 18 |
| 1.156 | "Unencumbered Debtor(s)" | 18 |
| 1.157 | "Unimpaired" | 18 |
| 1.158 | "Voting Deadline" | 18 |
| | | |
| ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS | | 18 |
| 2.1 | Introduction | 18 |
| 2.2 | Classes of Claims Against and Interests in Encumbered Debtors | 19 |
| 2.3 | Classes of Claims Against and Interests in Unencumbered Debtors | 20 |
| | | |
| ARTICLE III TREATMENT OF CLAIMS AND INTERESTS | | 21 |
| 3.1 | Unclassified Claims | 21 |
| 3.2 | Classes of Claims Against and Interests in Encumbered Debtors | 22 |
| 3.3 | Classes of Claims Against and Interests in Unencumbered Debtors | 27 |
| 3.4 | Reservation of Rights Regarding Claims | 28 |

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ...............................................29
4.1      Impaired Classes of Claims Entitled to Vote ...............................................................29
4.2      Acceptance by an Impaired Class Entitled to Vote .......................................................29
4.3      Presumed Acceptances by Unimpaired Classes and Debtor-Only Classes ...........29
4.4      Classes Deemed to Reject Plan ......................................................................................29
4.5      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.........................29

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN .......................................30
5.1      Continued Corporate Existence.....................................................................................30
5.2      New Governing Documents ............................................................................................30
5.3      Revesting of Assets; Releases of Liens ..........................................................................30
5.4      Cancellation of Prepetition Obligations .......................................................................30
5.5      Exit Funding......................................................................................................................30
5.6      Authorization and Issuance of New Securities.............................................................31
5.7      Directors of Reorganized Debtors..................................................................................32
5.8      Officers of Reorganized Debtors.....................................................................................32
5.9      Indemnification of Reorganized Debtors' Directors, Officers, and Employees......32
5.10     Management Incentive and Other Agreements ............................................................32
5.11     Post-Emergence Trade Agreement Procedure .............................................................33
5.12     Retained Litigation Rights..............................................................................................34
5.13     Effectuating Documents; Further Transactions ...........................................................35
5.14     Exemption From Certain Transfer Taxes .....................................................................35
5.15     Corporate Action..............................................................................................................35
5.16     Interim Trust Control of Subsidiary Interests in Broadcast Licensee Companies....36
5.17     Litigation Trust..................................................................................................................37
5.18     Approval of Compromises and Settlements Embodied in Plan..................................45

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES...............45
6.1      Assumption of Contracts and Leases; Continuing Obligations..................................45
6.2      Cure Rights for Executory Contracts or Unexpired Leases Assumed under Plan....46
6.3      Rejection of Contracts and Leases .................................................................................46
6.4      Rejection Damage Claim Bar Date for Rejections Pursuant to Plan .........................47
6.5      Employee Compensation and Benefit Programs ..........................................................47
6.6      Indemnification Obligations............................................................................................49
6.7      Insurance Rights...............................................................................................................50
6.8      Limited Extension of Time to Assume or Reject ..........................................................51
6.9      Postpetition Contracts and Leases.................................................................................51
6.10     Claims Arising from Assumption or Rejection .............................................................51

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS.........................................51
7.1      Distributions for Claims Allowed as of Effective Date................................................51
7.2      Interest on Claims and Interests ....................................................................................52
7.3      Designation of and Distributions by Disbursing Agent...............................................52
7.4      Means of Cash Payment...................................................................................................53
7.5      Calculation of Distribution Amounts of New Securities .............................................53
7.6      Delivery of Distributions..................................................................................................53
7.7      Application of Distribution Record Date .......................................................................54
7.8      Withholding and Reporting Requirements ...................................................................55
7.9      Setoffs ................................................................................................................................55
7.10     Prepayment........................................................................................................................55
7.11     De Minimis Distributions.................................................................................................56
7.12     No Distribution in Excess of Allowed Amount of Claim .............................................56
7.13     Allocation of Distributions...............................................................................................56

ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND
           UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO..........56
8.1      Prosecution of Objections to Claims .............................................................................56
8.2      Deemed Allowance of Gonzalez Litigation Claims ......................................................57

| 8.3 | Treatment of Disputed Claims Pending Allowance | 57 |
| 8.4 | Allocations and Distributions for Disputed Class A4 Claims | 58 |
| 8.5 | Distributions on Account of Other Disputed Claims Once Allowed | 58 |

ARTICLE IX CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN .... 58
| 9.1 | Conditions to Confirmation | 58 |
| 9.2 | Conditions to Effective Date | 59 |
| 9.3 | Waiver of Conditions | 61 |

ARTICLE X RETENTION OF JURISDICTION ... 61
| 10.1 | Scope of Retention of Jurisdiction | 61 |
| 10.2 | Failure of the Bankruptcy Court to Exercise Jurisdiction | 63 |

ARTICLE XI MISCELLANEOUS PROVISIONS ... 63
| 11.1 | Professional Fee Claims; Expense Reimbursements | 63 |
| 11.2 | Administrative Claims Bar Date | 64 |
| 11.3 | Payment of Statutory Fees | 64 |
| 11.4 | Modifications and Amendments | 64 |
| 11.5 | Severability of Plan Provisions | 65 |
| 11.6 | Successors and Assigns and Binding Effect | 65 |
| 11.7 | Compromises and Settlements | 65 |
| 11.8 | Releases and Satisfaction of Subordination Rights | 65 |
| 11.9 | Releases and Related Matters | 66 |
| 11.10 | Discharge of the Debtors | 68 |
| 11.11 | Injunction | 69 |
| 11.12 | Exculpation and Limitation of Liability | 70 |
| 11.13 | Term of Injunctions or Stays | 70 |
| 11.14 | Revocation, Withdrawal, or Non-Consummation | 71 |
| 11.15 | Plan Supplement | 71 |
| 11.16 | Notices | 71 |
| 11.17 | Dissolution of Creditors' Committee | 72 |
| 11.18 | Computation of Time | 72 |
| 11.19 | Governing Law | 73 |

## EXHIBITS

Exhibit A          Material Terms of Term A Facility

Exhibit B          Material Terms of Term B Facility

Exhibit C          Material Terms of New Common Stock

Exhibit D          Material Terms of Existing Lender Warrants

Exhibit E          Post-Emergence Trade Agreement

# JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
## OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS

## INTRODUCTION

Freedom Communications Holdings, Inc. and certain of its subsidiaries and affiliates, including Freedom Communications, Inc., Freedom Broadcasting, Inc., Freedom Broadcasting of Florida, Inc., Freedom Broadcasting of Florida Licensee, L.L.C., Freedom Broadcasting of Michigan, Inc., Freedom Broadcasting of Michigan Licensee, L.L.C., Freedom Broadcasting of New York, Inc., Freedom Broadcasting of New York Licensee, L.L.C., Freedom Broadcasting of Oregon, Inc., Freedom Broadcasting of Oregon Licensee, L.L.C., Freedom Broadcasting of Southern New England, Inc., Freedom Broadcasting of Southern New England Licensee, L.L.C., Freedom Broadcasting of Texas, Inc., Freedom Broadcasting of Texas, Licensee, L.L.C., Freedom Broadcasting of Tennessee, Inc., Freedom Broadcasting of Tennessee Licensee, L.L.C., Freedom Magazines, Inc., Freedom Metro Information, Inc., Freedom Newspapers, Inc., Orange Country Register Communications, Inc., OCR Community Publications, Inc., OCR Information Marketing, Inc., Appeal-Democrat, Inc., Florida Freedom Newspapers, Inc., Freedom Arizona Information, Inc., Freedom Colorado Information, Inc., Freedom Eastern North Carolina Communications, Inc., Freedom Newspapers of Illinois, Inc., Freedom Newspapers of Southwestern Arizona, Inc., Freedom Shelby Star, Inc., Illinois Freedom Newspapers, Inc., Missouri Freedom Newspapers, Inc., Odessa American, The Times-News Publishing Company, Victor Valley Publishing Company, Daily Press, Freedom Newspaper Acquisitions, Inc., The Clovis News-Journal, Freedom Newspapers of New Mexico L.L.C., Gaston Gazette LLP, Lima News, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, Freedom Newspapers, The Creative Spot, L.L.C., Freedom Interactive Newspapers, Inc., Freedom Interactive Newspapers of Texas, Inc., and Freedom Services, Inc., hereby propose this joint plan of reorganization for the resolution of their outstanding Claims (as defined herein) and Interests (as defined herein).

Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for a discussion of the history, businesses, properties, results of operations, projections for future operations, and risk factors of the Debtors (as defined herein), a summary and analysis of the Plan (as defined herein), and certain related matters, including the New Securities (as defined herein) to be issued under the Plan. The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code (as defined herein).

All holders of Claims who are entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, Rule 3019 of the Bankruptcy Rules (as defined herein), and Article XI of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined in the Plan shall have the meanings ascribed to them in Article I of the Plan. Any capitalized term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the

context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

All documents within the Plan Supplement (as defined herein) and all Exhibits to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.

# ARTICLE I

## TERMINOLOGY AND DEFINITIONS

For purposes of the Plan, (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (c) unless otherwise specified, all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan, (d) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**1.1** **"Aggregate Existing Lender Share Number"** means the sum of (a) the number of Existing Lender Shares and (b) the number of shares of New Common Stock issuable upon exercise of the Existing Lender Warrants issued pursuant to Section 3.2(b), in each case, as of the Effective Date.

**1.2** **"Adequate Protection Obligations"** has the meaning assigned thereto in the Cash Collateral Order. The term includes the Existing Lender Fee Claims.

**1.3** **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, bonuses, or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Fee Claims, (c) Substantial Contribution Claims, (d) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, (e) all Allowed Claims for the value of goods received under Section 503(b)(9) of the Bankruptcy Code, (f) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (g) Cure payments, and (h) to the extent applicable, the portion of the Adequate Protection Obligations that constitute Claims under Section 507(b) of the Bankruptcy Code.

**1.4** **"Allowed"** means, (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim that has been allowed, or adjudicated in favor of the holder

by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become allowed by failure to object pursuant to Section 8.1 of the Plan; (b) when used with respect to a Claim other than an Administrative Claim, such Claim or any portion thereof (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) as to which (x) no Proof of Claim has been filed with the Bankruptcy Court and (y) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (iii) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (x) at the time of the applicable initial Distribution Date, the Reorganized Debtors or the Litigation Trustee, as applicable, have not identified such Claim as being objectionable in whole or part and no objection to the allowance thereof has been filed by the applicable Claims Objection Deadline, or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan; or (c) when used with respect to an Interest, an Interest held in the name, kind, and amount set forth on the records retained by the applicable Debtor.

**1.5** **"Amended Engagement Agreement"** has the meaning set forth in Section 11.1(b) of the Plan.

**1.6** **"Ballot"** means the form of ballot approved by the Bankruptcy Court for use by holders of Claims for purposes of voting to accept or reject the Plan.

**1.7** **"Bankruptcy Code"** means Section 101 *et seq.*, of Title 11 of the United States Code, as now in effect or hereafter amended and applicable to the Chapter 11 Cases.

**1.8** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof.

**1.9** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure.

**1.10** **"Bar Date(s)"** means the date(s) designated by the Bankruptcy Court as the last date(s) for filing Proofs of Claim against the Debtors.

**1.11** **"Broadcast Licensee Companies"** means Freedom Broadcasting of Florida Licensee, L.L.C., Freedom Broadcasting of Michigan Licensee, L.L.C., Freedom Broadcasting of New York Licensee, L.L.C., Freedom Broadcasting of Oregon Licensee, L.L.C., Freedom Broadcasting of Texas Licensee, L.L.C., and Freedom Broadcasting of Tennessee Licensee, L.L.C., each a Debtor herein.

**1.12** **"Broadcast Operating Companies"** means Freedom Broadcasting of Florida, Inc., Freedom Broadcasting of Michigan, Inc., Freedom Broadcasting of New York, Inc., Freedom Broadcasting of Oregon, Inc., Freedom Broadcasting of Texas, Inc., and Freedom Broadcasting of Tennessee, Inc., each a Debtor herein.

**1.13**   **"Broadcast Stations"** means the television stations the FCC licenses of which are held by the Broadcast Licensee Companies or the Reorganized Broadcast Licensee Companies.

**1.14**   **"Broadcast Trust Agreement"** means the Trust Agreement to be entered into by the Broadcast Operating Companies and the Broadcast Trustee, which shall be substantially in the form included in the Plan Supplement and shall have terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors.

**1.15**   **"Broadcast Trustee"** means the trustee under the Broadcast Trust Agreement.

**1.16**   **"Business Day"** means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Rule 9006(a) of the Bankruptcy Rules), on which commercial banks are open for business in New York, New York.

**1.17**   **"Cash"** means legal tender of the United States or equivalents thereof.

**1.18**   **"Cash Collateral Order"** means the Final Order (I) Authorizing Use of Prepetition Lenders' Cash Collateral under 11 U.S.C. § 363 and (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 and 363, which was entered by the Bankruptcy Court on October 15, 2009, as it may be amended through the Effective Date.

**1.19**   **"Chapter 11 Cases"** means the jointly administered Chapter 11 cases of the Debtors.

**1.20**   **"Claim"** means (a) the right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.21**   **"Claims Objection Deadline"** means the last day for filing objections to Claims, including Administrative Claims, shall be the latest of (a) one hundred and twenty (120) days after the Effective Date, (b) sixty (60) days after the applicable Proof of Claim or Request for Payment of an Administrative Claim is filed, and (c) such other date ordered by the Bankruptcy Court upon motion of the Reorganized Debtors or, with respect to Class A4 Claims, the Litigation Trustee, without notice to any party.

**1.22**   **"Class"** means a category of holders of Claims or Interests, as described in Article II of the Plan.

**1.23**   **"Class A2 Beneficial Trust Interests"** means beneficial interests in the Litigation Trust granted to holders of Allowed Existing Lender Claims, which interests shall entitle the holders, in the aggregate, to any Net Litigation Proceeds remaining after the holders of Allowed Class A4 Claims have received, through the Class A4 Beneficial Trust Interests, payment in full of their Allowed Claims plus Distribution Interest.

**1.24**   **"Class A4 Beneficial Trust Interests"** means beneficial interests in the Litigation Trust granted to holders of Allowed Class A4 Claims, which interests shall entitle the holders, in the aggregate, to (a) the Net Cash Proceeds and (b) the Net Litigation Proceeds; *provided, however*,

that in no event shall any such holder of an Allowed Class A4 Claim be entitled to receive payments that exceed the Allowed amount of such holder's Claim plus Distribution Interest.

**1.25** **"Class A4 Claim"** means a General Unsecured Claim against the Encumbered Debtors that is classified and treated in Class A4 of the Plan.

**1.26** **"Conditions to Stay"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.27** **"Confidentiality and Common Interest Agreement"** means the confidentiality and common interest agreement, substantially in the form included in the Plan Supplement, to be entered into between the Reorganized Debtors and the Litigation Trust, governing the use of confidential information or material provided to the Litigation Trust.

**1.28** **"Confirmation"** means approval of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

**1.29** **"Confirmation Date"** means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

**1.30** **"Confirmation Hearing"** means the hearing to consider Confirmation of the Plan under Section 1128 of the Bankruptcy Code.

**1.31** **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming the Plan.

**1.32** **"Contract/Lease Schedules"** means the schedules, in form and substance reasonably acceptable to the Steering Committee Members, as they may be amended prior to the Confirmation Date, which identify the executory contracts and unexpired leases to be assumed under the Plan and set forth any Cure obligation associated with the assumption of such contracts and leases.

**1.33** **"Coverage Denial"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.34** **"Coverage Statement"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.35** **"Creditor"** means any Person who holds a Claim against any of the Debtors.

**1.36** **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed pursuant to Section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases, as reconstituted from time to time.

**1.37** **"Cure"** means (a) with respect to the assumption of an executory contract or unexpired lease pursuant to Section 365(b) of the Bankruptcy Code, (i) the distribution of Cash, or the distribution of such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties under an executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law, or (ii) the taking of such other actions as may be agreed upon by the parties or ordered by the Bankruptcy Court; and (b) to the extent not covered by the foregoing,

with respect to any license granted by the FCC, the payment of any fees or other amounts owed to the FCC.

**1.38** **"D&O Action"** has the meaning set forth in Section 5.17(q) of the Plan.

**1.39** **"D&O Defendants"** means the current or former directors of Freedom Holdings and Freedom Communications and the current interim chief executive officer of Freedom Holdings.

**1.40** **"D&O Insurance Policies"** has the meaning set forth in Section 5.17(p) of the Plan.

**1.41** **"D&O Insurers"** has the meaning set forth in Section 5.17(p) of the Plan.

**1.42** **"Debtor(s)"** means, individually, Freedom Holdings or one of the Subsidiary Debtors, and collectively, Freedom Holdings and the Subsidiary Debtors, including in their capacity as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**1.43** **"Defense Expenses"** has the meaning set forth in Section 6.6(b) of the Plan.

**1.44** **"Disbursing Agent"** means Reorganized Freedom Holdings or any Person designated by Reorganized Freedom Holdings, in its sole discretion, to serve as disbursing agent under the Plan.

**1.45** **"Disclosure Statement"** means the written disclosure statement that relates to the Plan, as amended, supplemented, or modified from time to time, and that is prepared and approved in form and substance satisfactory to the Debtors, the Steering Committee Members, and the Creditors' Committee, and distributed, in accordance with Section 1125 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules or any summary thereof approved by the Bankruptcy Court for distribution to certain Classes or categories of Claims and Interests.

**1.46** **"Disputed"** means (a) with respect to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Claim (i) as to which no Request for Payment or Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed; (ii) as to which a Request for Payment or Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, but as to which an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court has been filed by the applicable Claims Objection Deadline, or which is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (iii) as to which a Request for Payment or Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Request for Payment or Proof of Claim was not timely or properly filed; (iv) for damages based upon the rejection by the Debtors of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed as of the applicable initial Distribution Date; (v) that is disputed in accordance with the provisions of the Plan; or (vi) if not otherwise Allowed, identified by the Reorganized Debtors or the Litigation Trustee, as applicable, at the time of the applicable initial Distribution Date as being objectionable in whole or part and as to which an objection to the allowance thereof has been filed by the applicable Claims Objection Deadline; and (b) with respect to any Interest, an Interest held in a name, kind,

or amount different from the name, kind, and amount set forth on the records retained by the applicable Debtor.

**1.47** **"Distribution Date"** means for any Claim (a) that is an Allowed Claim on the Effective Date, the Effective Date or as soon as practicable thereafter, or (b) that is not an Allowed Claim on the Effective Date, thirty (30) calendar days after the last day of the month during which the Claim becomes an Allowed Claim. As to an Allowed Class A4 Claim entitled to a subsequent distribution, if any, under Section 8.4 of the Plan, such term means the additional date provided in such Section 8.4.

**1.48** **"Distribution Interest"** means interest to accrue on the unpaid amount of an Allowed Class A4 Claim commencing on the Petition Date and continuing to the last date on which distributions are made with respect to Class A4 Beneficial Trust Interests, at the rate in effect on the Effective Date (as though such date was the judgment date), and as computed and accrued, under Section 1961 of Title 28 of the United States Code.

**1.49** **"Distribution Record Date"** means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims, which date shall be (a) in respect of the Existing Lender Secured Claims, the date to be agreed by the Debtors and the Existing Lender Agent, and (b) in respect of all other Claims, the Business Day immediately preceding the Effective Date, at 5:00 p.m. prevailing Eastern time on such Business Day.

**1.50** **"Duty to Defend"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.51** **"Effective Date"** means the Business Day upon which all conditions to the consummation of the Plan as set forth in Section 9.2 of the Plan have been satisfied or waived as provided in Section 9.3 of the Plan, and is the date on which the Plan becomes effective.

**1.52** **"EMRP"** has the meaning set forth in Section 6.5(g) of the Plan.

**1.53** **"Encumbered Debtor(s)"** means, individually or collectively, each Debtor who is not an Unencumbered Debtor or all Debtors who are not Unencumbered Debtors.

**1.54** **"ERISA"** has the meaning set forth in Section 6.5(b) of the Plan.

**1.55** **"Estate(s)"** means, individually, the estate of each Debtor in the Chapter 11 Cases and, collectively, the estates of all Debtors in the Chapter 11 Cases, created pursuant to Section 541 of the Bankruptcy Code.

**1.56** **"Excess Cash"** means the amount of Cash held by the Reorganized Debtors as of the Effective Date that exceeds $15 million, to be distributed to the holders of Allowed Existing Lender Secured Claims on the Effective Date as provided for in Section 3.2(b) of the Plan. For purposes hereof, the amount of Excess Cash to be distributed to holders of Allowed Existing Lender Secured Claims under Section 3.2(b) of the Plan shall be calculated after deducting from the aggregate amount of Cash held by the Reorganized Debtors on the Effective Date (a) the aggregate amount of the Transferred Cash, (b) the aggregate amount of the Trade Unsecured Claim Escrow to be established under Section 5.11 of the Plan, (c) the aggregate amount of the Allowed Claims against the Unencumbered Debtors to be Reinstated under the Plan, (d) the aggregate amount of known and incurred Administrative Claims (whether or not approved by the Bankruptcy Court), Priority Tax Claims, Other Priority Claims, and Other Secured Claims to be

paid under the Plan, and (e) such other amounts as may be agreed to by the Debtors and the Steering Committee Members.

**1.57** **"Existing Credit Agreement Documents"** means (a) that certain Credit Agreement, dated as of May 18, 2004, as amended, among Freedom Holdings, Freedom Communications as borrower, the Existing Lenders and the Existing Lender Agent, (b) that certain Guarantee and Collateral Agreement, dated as of May 18, 2004, as amended, among Freedom Holdings, Freedom Communications, certain of the Subsidiary Debtors as subsidiary loan parties, and JPMorgan Chase Bank, N.A. as collateral agent, and (c) the other "Loan Documents" as defined in the Credit Agreement.

**1.58** **"Existing Lender Agent"** means JPMorgan Chase Bank, N.A. as administrative agent for the Existing Lenders under the Existing Credit Agreement Documents or any duly appointed successor administrative agent.

**1.59** **"Existing Lender Fee Claim"** means any Claim for interest, fees, expenses, costs and other charges of the Existing Lender Agent or any Existing Lender (including of their respective counsel and advisors) that is authorized to be paid under the Cash Collateral Order but which are incurred and unpaid as of the Effective Date.

**1.60** **"Existing Lenders"** means the several lenders from time to time party to the Existing Credit Agreement Documents.

**1.61** **"Existing Lender Claim"** means a Claim arising under the Existing Credit Agreement Documents, including both the component that is an Existing Lender Secured Claim and the component that is an Existing Lender Deficiency Claim.

**1.62** **"Existing Lender Deficiency Claim"** means any Claim arising under the Existing Credit Agreement Documents that is not a Secured Claim.

**1.63** **"Existing Lender Secured Claim"** means any Secured Claim arising under the Existing Credit Agreement Documents.

**1.64** **"Existing Lender Shares"** means one hundred percent (100%) of the shares of New Common Stock, subject to dilution as a result of the Exit Financing Share Allocation, the New Equity Incentive Plan, and the exercise of the Existing Lender Warrants.

**1.65** **"Existing Lender Warrant Agreement"** means the agreement governing the Existing Lender Warrants, to be substantially in the form included in the Plan Supplement, and on terms and conditions reasonably satisfactory to the Steering Committee Members and the Debtors.

**1.66** **"Existing Lender Warrants"** means warrants issued to the Existing Lenders for the purchase of shares of New Common Stock at an exercise price of $0.001 per share, with terms substantially as described on Exhibit D to the Plan.

**1.67** **"Exit Facility"** means a revolving loan facility in an amount of at least $25 million, to be provided under that certain credit agreement (and any related documents, agreements, and instruments) to be entered into by the Reorganized Debtors as of the Effective Date, and having terms and conditions satisfactory in all respects to the Debtors and the Steering Committee Members, and substantially in accordance with the term sheet included in the Plan Supplement.

**1.68** **"Exit Financing Share Allocation"** means an allocation of a number of shares of New Common Stock and/or Existing Lender Warrants in an amount of up to twenty percent (20%) of the Aggregate Existing Lender Share Number, which allocation may be issued to the lender or lenders under the Exit Facility pursuant to Section 5.5 of the Plan.

**1.69** **"FCC"** means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

**1.70** **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any such court, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.71** **"First Day Employee Order"** means the Order (i) Authorizing Payment of Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements, and Related Obligations, (ii) Confirming Right to Continue Employee Programs on Postpetition Basis, (iii) Confirming Right to Pay Withholding and Payroll-Related Taxes, (iv) Authorizing Payment of Prepetition Claims Owing To Administrators of, or Third Party Providers under, Employee Programs, (v) Authorizing Payment of Independent Contractor Obligations, (vi) Directing Banks to Honor Prepetition Checks and Fund Transfers for Payment of Prepetition Employee Obligations and Prepetition Independent Contractor Obligations dated September 2, 2009, as modified and supplemented by the Order Supplementing First Day Employee Order (Docket No. 37) to Approve Certain Bonus and Severance Payments dated December 1, 2009.

**1.72** **"Freedom Communications"** means Freedom Communications, Inc., a Delaware corporation.

**1.73** **"Freedom Holdings"** means Freedom Communications Holdings, Inc., a Delaware corporation.

**1.74** **"General Unsecured Claims"** means a Claim against any of the Debtors that is not an Administrative Claim, an Existing Lender Fee Claim, a Priority Tax Claim, an Other Priority Claim, an Existing Lender Secured Claim, an Other Secured Claim, an Existing Lender Deficiency Claim, a Trade Unsecured Claim, a Non-Qualified Retirement Claim, a Tort Claim, an Intercompany Claim, or a Subordinated Claim.  For the avoidance of doubt, the unsecured Claim of a provider of goods or services shall be considered a General Unsecured Claim until and unless such provider satisfies the requirements for becoming the holder of a Trade Unsecured Claim.

**1.75** **"Gonzalez Class Counsel"** means the lead counsel in the litigation captioned Gonzalez v. Freedom Communications, Inc., Case No. 03CC08756, Superior Court of California, County of Orange.

**1.76** **"Gonzalez Litigation Claim"** means any and all Claims that were asserted in, or could have been asserted in, the litigation captioned Gonzalez v. Freedom Communications, Inc., Case No. 03CC08756, Superior Court of California, County of Orange, or that do or could relate to or did, has or could have arisen as a result of such litigation, including, without limitation, the

Claims of named plaintiffs, class members, counsel and professionals, whether or not such Claims are asserted in Proofs of Claim and, if asserted in Proofs of Claim, whether or not such Proofs of Claim assert priority, secured, or unsecured status, and whether or not such Proofs of Claim are timely or tardily filed. All Gonzalez Litigation Claims are Class A4 Claims.

1.77 **"Houlihan"** means Houlihan Lokey Howard & Zukin Capital, Inc., the investment banking and financial advisory firm retained by the Debtors pursuant to order of the Bankruptcy Court to provide services during the Chapter 11 Cases.

1.78 **"Impaired"** means, with respect to any Claim or Interest, that such Claim or Interest is impaired within the meaning of Section 1124 of the Bankruptcy Code.

1.79 **"Indemnification Obligation"** means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution to a Person arising pursuant to by-laws, articles or certificate of incorporation, contract, or otherwise.

1.80 **"Individual Retirement Agreements"** means (a) the Employment Agreement dated May 30, 1990 with James D. Edwards and the Retirement Agreement dated September 30, 1999 with James N. Rosse and Janice G. Rosse, notwithstanding the rejection of such agreements, but only with respect to retirement and/or deferred compensation benefits under either such agreement, and (b) any other valid, binding, and enforceable similar individual agreement that provides for retirement and/or deferred compensation benefits.

1.81 **"Insurance Coverage Action"** means any action asserting claims for indemnification, reimbursement, contribution or other payment under the D&O Insurance Policies, any action asserting a violation of the implied covenant of good faith and fair dealing, and any related action.

1.82 **"Intercompany Claim"** means any Claim arising prior to the Petition Date against any of the Debtors by another Debtor or by a non-Debtor subsidiary or affiliate of a Debtor.

1.83 **"Intercreditor Agreement"** means an agreement among the lenders (or the administrative or collateral agents on behalf of such lenders) under the Exit Facility, the Term A Facility, and the Term B Facility, governing, among other things, their specific lien rights in the collateral securing each of such facilities, and which shall be substantially in the form to be included in the Plan Supplement, which shall be on terms and conditions reasonably satisfactory to the Debtors and the Steering Committee Members.

1.84 **"Interests"** means the legal, equitable, contractual, or other rights of any Person (a) with respect to Old Freedom Stock Interests, Old Freedom Stock Rights, or Subsidiary Interests, and (b) to acquire or receive any of the foregoing.

1.85 **"Litigation Trust"** means that certain trust created pursuant to the Plan and under the Litigation Trust Agreement, to be administered by the Litigation Trustee, all as more particularly set forth in Section 5.17 of the Plan and the Litigation Trust Agreement.

1.86 **"Litigation Trust Agreement"** means that certain trust agreement substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably satisfactory to the Debtors, the Existing Lender Agent, the Gonzalez Class Counsel, and the Creditors' Committee, which agreement shall govern the Litigation Trust.

**1.87** **"Litigation Trust Assets"** means (a) the Transferred Cash and any interest or earnings thereon, (b) the Transferred Causes of Action, any proceeds therefrom, and any interest or earnings on such proceeds, and (c) subject to Section 5.17(v) of the Plan, any proceeds derived from any Insurance Coverage Action.

**1.88** **"Litigation Trustee"** means the trustee to serve pursuant to Section 5.17 of the Plan and under the Litigation Trust Agreement.

**1.89** **"LMA"** has the meaning set forth in Section 5.16(c) of the Plan.

**1.90** **"LT Beneficiaries"** means the beneficiaries of the Litigation Trust as further defined in Section 5.17 of the Plan.

**1.91** **"Mutual Release Agreement"** means the mutual release agreement to be entered into by each of the Existing Lenders, the Existing Lender Agent, the financial and legal advisors for the Existing Lenders and the Existing Lender Agent, each member of and Professional retained by the Creditors' Committee, each such member's professionals, the Gonzalez Class Counsel and a class representative for themselves and on behalf of the holders of Gonzalez Litigation Claims, and the Debtors for themselves and on behalf of their current and former directors, officers, and Professionals (exclusive of the D&O Defendants).

**1.92** **"Net Cash Proceeds"** means the Transferred Cash <u>less</u> an amount determined adequate by the Litigation Trustee, in its sole discretion, to fund the future costs of the Litigation Trust, including, without limitation, (a) fees and expenses in connection with the prosecution of the Transferred Causes of Action and/or Insurance Coverage Actions against the D&O Insurers and (b) fees and expenses in connection with determining the Allowed amounts of any Disputed Class A4 Claims (including, without limitation, filing objections and litigating such objections to Final Order or otherwise resolving such objections). Only the holders of Class A4 Claims, if and when such Claims become Allowed Claims, shall be entitled to the Net Cash Proceeds as provided for in Section 3.2(d) of the Plan.

**1.93** **"Net Litigation Proceeds"** means the proceeds received by the Litigation Trust from the pursuit of any of the Transferred Causes of Action and any Insurance Coverage Action <u>less</u> (a) the amount of any fees and expenses then incurred by the Litigation Trust in pursuing the Transferred Causes of Action and/or Insurance Coverage Actions against the D&O Insurers, and (b) an amount determined adequate by the Litigation Trustee to fund the future costs of the Litigation Trust, including, without limitation, (i) fees and expenses in connection with the further pursuit of the Transferred Causes of Action and (b) fees and expenses in connection with continuing to determine the Allowed amounts of any Disputed Class A4 Claims (including, without limitation, filing objections and litigating such objections to Final Order or otherwise resolving such objections). Except as otherwise provided in Section 5.17(v) of the Plan, the Net Litigation Proceeds shall be distributed first to the holders of Class A4 Beneficial Trust Interests until such interests have been paid in full and second to the holders of Class A2 Beneficial Trust Interests.

**1.94** **"New Board"** means the board of directors of Reorganized Freedom Holdings to be selected in accordance with the provisions of Section 5.7(a) of the Plan.

**1.95** **"New Common Stock"** means the common shares of Reorganized Freedom Holdings to be issued under Section 5.6 of the Plan as of the Effective Date, consisting of Class A Common Stock and Class B Common Stock, having terms substantially as set forth on Exhibit C to the Plan.

**1.96** **"New Equity Incentive Plan"** means the management equity incentive plan(s) to be adopted by Reorganized Freedom Holdings pursuant to Section 5.10 of the Plan, substantially in the form of such document(s) to be included in the Plan Supplement, which shall have terms and conditions reasonably acceptable to the Debtors and the Existing Lender Agent (in consultation with the Steering Committee Members).

**1.97** **"New Freedom By-Laws"** means the by-laws of Reorganized Freedom Holdings substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably satisfactory to the Steering Committee Members and the Debtors.

**1.98** **"New Freedom Charter"** means the certificate of incorporation of Reorganized Freedom Holdings substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably satisfactory to the Steering Committee Members and the Debtors.

**1.99** **"New Freedom Governing Documents"** means the New Freedom Charter and the New Freedom By-Laws.

**1.100** **"New Securities"** means collectively, the New Common Stock and the Existing Lender Warrants.

**1.101** **"New Stockholders Agreement"** means the agreement governing, and to be deemed to have been executed by, the holders of New Common Stock and Existing Lender Warrants as of the Effective Date, having the terms described on Exhibit C to the Plan and to be substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably acceptable to the Steering Committee Members.

**1.102** **"New Subsidiary Governing Documents"** means the certificates of incorporation, by-laws, articles of organization, operating agreements, partnership agreements, or any other governing document with respect to the Reorganized Subsidiaries, as amended pursuant to the Plan or any document within the Plan Supplement, which shall have terms and conditions reasonably satisfactory to the Steering Committee Members and the Debtors.

**1.103** **"Non-Qualified DC Plan"** means the Freedom Communications, Inc. Non-Qualified Defined Contribution Plan, which is a non-qualified defined contribution retirement plan maintained by Freedom Communications.

**1.104** **"Non-Qualified EB Plan"** means the Freedom Communications, Inc. Excess Benefit Plan, which is a non-qualified defined benefit retirement plan maintained by Freedom Communications.

**1.105** **"Non-Qualified Retirement Claim"** means a Claim against Freedom Communications arising under (a) the Non-Qualified DC Plan, (b) the Non-Qualified EB Plan, and/or (c) the Individual Retirement Agreements.

**1.106  "Old Freedom Stock Interests"** means, collectively, all preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date. The term does not include any stock options or other rights to purchase the stock of Freedom Holdings, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Freedom Holdings prior to the Effective Date.

**1.107  "Old Freedom Stock Rights"** means, collectively, any stock options or other rights to purchase the stock of Freedom Holdings, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Freedom Holdings, and any phantom stock appreciation rights, restricted stock units or any other rights based on the value (or increase in value) of any stock or other equity ownership interests in Freedom Holdings. The term includes, without limitation, any award or rights under the Freedom Holdings 2004 Long-Term Incentive Plan (as amended and restated) and the Freedom Holdings 2008 Restricted Stock Unit Award Plan or any award agreement pursuant thereto. The term does not include any preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date.

**1.108  "Other Priority Claim"** means a Claim against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

**1.109  "Other Secured Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors, other than an Existing Lender Secured Claim.

**1.110  "PBGC"** has the meaning set forth in Section 6.5(b) of the Plan.

**1.111  "Person"** means any individual, firm, partnership, corporation, trust, association, company, limited liability company, joint stock company, joint venture, governmental unit, or other entity or enterprise.

**1.112  "Petition Date"** means September 1, 2009, the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

**1.113  "Plan"** means this joint plan of reorganization under Chapter 11 of the Bankruptcy Code and all exhibits annexed hereto or referenced herein, as the same may be amended, modified, or supplemented from time to time.

**1.114  "Plan Supplement"** means the supplement to the Plan (a) containing the forms of the Term A Facility, the Term B Facility, the Intercreditor Agreement, the New Freedom Charter, the New Freedom By-Laws, the Exit Facility (or term sheet therefor), the New Equity Incentive Plan, the New Stockholders Agreement, the Registration Rights Agreement, the Existing Lender Warrant Agreement, the Broadcast Trust Agreement, the Local Marketing Agreement, the Litigation Trust Agreement, and the Confidentiality and Common Interest Agreement, and (b) including the terms and conditions for an executive incentive plan, severance plan, and other employment arrangements if then agreed to by the Debtors and the Steering Committee Members.

**1.115** **"Post-Emergence Trade Agreement"** means an agreement, substantially in the form included as Exhibit E to the Plan (with such revisions as may be agreed to among the Debtors, the Existing Lender Agent, and the Creditors' Committee), to be entered into pursuant to the procedures set forth in Section 5.11 of the Plan, between the Reorganized Debtors and a provider of goods or services who holds a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date and who has continued to supply such goods or services to the Encumbered Debtors during the Chapter 11 Cases.

**1.116** **"Primary D&O Insurer"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.117** **"Priority Tax Claim"** means a Claim of a governmental unit that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

**1.118** **"Professional"** means any professional employed in the Chapter 11 Cases by order of the Bankruptcy Code pursuant to Sections 327 or 1103 of the Bankruptcy Code and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Section 503(b) of the Bankruptcy Code. The term does not include the Debtors' ordinary course professionals.

**1.119** **"Professional Fee Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered after the Petition Date and prior to and including the Confirmation Date.

**1.120** **"Proof of Claim"** means a proof of claim filed with the Bankruptcy Court in connection with the Chapter 11 Cases.

**1.121** **"Pro Rata"** means, at any time, (a) with respect to any Existing Lender, the proportion that the amount of an Allowed Existing Lender Claim in Class A2 bears to the aggregate amount of all Allowed Existing Lender Claims in Class A2 and (b) with respect to holders of Class A4 Claims, the proportion that an Allowed Class A4 Claim bears to the aggregate amount of all Allowed and Disputed Class A4 Claims.

**1.122** **"Registration Rights Agreement"** means an agreement to be entered into among Reorganized Freedom Holdings and the Existing Lenders having the terms described on Exhibit C to the Plan and to be substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors.

**1.123** **"Reinstated"** means (a) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim or Interest is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, or of a kind that Section 365(b)(2) does not require to be cured, (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default, (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual

provision or such applicable law, (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim or Interest is entitled.

**1.124  "Released Causes of Action"** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that are released, waived, and discharged pursuant to Section 11.9(a) of the Plan or pursuant to any agreement, contract, instrument, release, or document entered into in connection with the Plan.  In no event shall the Released Causes of Action include any Transferred Causes of Action.

**1.125  "Releasing Party"** has the meaning set forth in Section 11.9(b) of the Plan.

**1.126  "Reorganized Broadcast Licensee Companies"** means the Broadcast Licensee Companies on or after the Effective Date.

**1.127  "Reorganized Broadcast Operating Companies"** means the Broadcast Operating Companies on or after the Effective Date.

**1.128  "Reorganized Debtor(s)"** means, individually, any reorganized Debtor or its successor and, collectively, all reorganized Debtors or their successors, on or after the Effective Date.

**1.129  "Reorganized Freedom Communications"** means reorganized Freedom Communications or its successor, on and after the Effective Date.

**1.130  "Reorganized Freedom Holdings"** means reorganized Freedom Holdings or its successor, on and after the Effective Date.

**1.131  "Reorganized Subsidiary Debtor(s)"** means, individually, a reorganized Subsidiary Debtor or its successor and, collectively, all reorganized Subsidiary Debtors or their successors, on or after the Effective Date.

**1.132  "Request for Payment"** means a request for payment of an Administrative Claim filed with the Bankruptcy Court in connection with the Chapter 11 Cases.

**1.133  "Retained Litigation Rights"** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that are property of the Estates, whether arising under the Bankruptcy Code or non-bankruptcy law that are not (a) Released Causes of Action or (b) Transferred Causes of Action.

**1.134  "Retirement Plan"** has the meaning set forth in Section 6.5(b) of the Plan.

**1.135  "Schedules"** means the statements of financial affairs and the schedules of assets, liabilities, and contracts filed in the Bankruptcy Court by the Debtors, as amended or supplemented from time to time in accordance with Rule 1009 of the Bankruptcy Rules or orders of the Bankruptcy Court.

**1.136 "Secured Claim"** means a Claim that is secured by a Lien that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under Section 553 of the Bankruptcy Code; to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to Section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to Section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim.

**1.137 "Steering Committee Members"** means the members of the steering committee representing the Existing Lenders, including JPMorgan Chase Bank, N.A., Bank of New York Mellon, General Electric Capital Corporation, Royal Bank of Scotland PLC, Wachovia Bank, National Association, and any other Existing Lender that may from time to time be a member. Unless otherwise indicated, actions, consents, or agreements of the Steering Committee Members contemplated under the Plan must be unanimous.

**1.138 "Subordinated Claim"** means (a) any Claim against any of the Encumbered Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which shall include any Claim arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of any Interest, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim; (b) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages (but not general or ordinary negligence damages), to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a governmental unit in connection with a tax or other obligation owing to such unit; or (c) any Claim that is tardily filed under Section 501(a) of the Bankruptcy Code, except for any tardily filed Gonzalez Litigation Claim.

**1.139 "Subsidiary Debtors"** means, collectively, Freedom Communications, Freedom Broadcasting, Inc., Freedom Broadcasting of Florida, Inc., Freedom Broadcasting of Florida Licensee, L.L.C., Freedom Broadcasting of Michigan, Inc., Freedom Broadcasting of Michigan Licensee, L.L.C., Freedom Broadcasting of New York, Inc., Freedom Broadcasting of New York Licensee, L.L.C., Freedom Broadcasting of Oregon, Inc., Freedom Broadcasting of Oregon Licensee, L.L.C., Freedom Broadcasting of Southern New England, Inc., Freedom Broadcasting of Southern New England Licensee, L.L.C., Freedom Broadcasting of Texas, Inc., Freedom Broadcasting of Texas, Licensee, L.L.C., Freedom Broadcasting of Tennessee, Inc., Freedom Broadcasting of Tennessee Licensee, L.L.C., Freedom Magazines, Inc., Freedom Metro Information, Inc., Freedom Newspapers, Inc., Orange Country Register Communications, Inc., OCR Community Publications, Inc., OCR Information Marketing, Inc., Appeal-Democrat, Inc., Florida Freedom Newspapers, Inc., Freedom Arizona Information, Inc., Freedom Colorado Information, Inc., Freedom Eastern North Carolina Communications, Inc., Freedom Newspapers of Illinois, Inc., Freedom Newspapers of Southwestern Arizona, Inc., Freedom Shelby Star, Inc., Illinois Freedom Newspapers, Inc., Missouri Freedom Newspapers, Inc., Odessa American, The Times-News Publishing Company, Victor Valley Publishing Company, Daily Press, Freedom

Newspaper Acquisitions, Inc., The Clovis News-Journal, Freedom Newspapers of New Mexico L.L.C., Gaston Gazette LLP, Lima News, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, Freedom Newspapers, The Creative Spot, L.L.C., Freedom Interactive Newspapers, Inc., Freedom Interactive Newspapers of Texas, Inc., and Freedom Services, Inc., each of which is a Debtor.

**1.140** **"Subsidiary Interests"** means, collectively, the issued and outstanding shares of stock, membership units, or partnership interests in the Subsidiary Debtors, as of the Petition Date; as well as any stock options or other rights to purchase the stock, membership units, or partnership interests of any of the Subsidiary Debtors, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors, and any other rights based on the value (or increase in value) of any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors.

**1.141** **"Substantial Contribution Claim"** means a claim for compensation or reimbursement of costs and expenses relating to services rendered in making a substantial contribution in the Chapter 11 Cases pursuant to Section 503(b)(3), (4), or (5) of the Bankruptcy Code.

**1.142** **"Tax Items"** has the meaning set forth in Section 5.17(d) of the Plan.

**1.143** **"Term A Facility"** means a new secured term loan facility in the aggregate principal amount of $225 million, to be entered into by the Reorganized Debtors on the Effective Date, having terms and conditions substantially described on Exhibit A to the Plan, and to be substantially in the form included in the Plan Supplement.

**1.144** **"Term A Loan Obligations"** means the obligations of the Reorganized Debtors under the Term A Facility, to be distributed among the holders of Allowed Existing Lender Secured Claims on the Effective Date, as provided for in Section 3.2(b) of the Plan.

**1.145** **"Term B Facility"** means a new secured term loan facility in the aggregate principal amount of $100 million, to be entered into by the Reorganized Debtors on the Effective Date, having terms and conditions substantially described on Exhibit B to the Plan, and to be substantially in the form included in the Plan Supplement.

**1.146** **"Term B Loan Obligations"** means the obligations of the Reorganized Debtors under the Term B Facility, to be distributed among the holders of Allowed Existing Lender Secured Claims on the Effective Date, as provided for in Section 3.2(b) of the Plan.

**1.147** **"Third Party Release"** means the release provided for in Section 11.9(b) of the Plan.

**1.148** **"Third Party Releasees"** has the meaning set forth in Section 11.9(b) of the Plan.

**1.149** **"Tort Claim"** means, with the exception of any Claim for workers' compensation subject to Section 6.5(c) of the Plan, any tort Claim against the Encumbered Debtors for which coverage exists under the Debtors' insurance policies, including, without limitation, Claims for personal injury, wrongful death, defamation, slander, libel, invasion of privacy, or other tort liability.

**1.150 "Trade Unsecured Claim"** means a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date from, and held by, a provider of goods or services that (a) has continued to supply such goods or services to the Encumbered Debtors during the Chapter 11 Cases and (b) becomes a party to a fully executed Post-Emergence Trade Agreement. The term shall not include (i) any Claim arising from any employee or individual independent contractor relationship between any Debtor and any Person, (ii) any Claim arising from the rejection of an executory contract or unexpired lease, (iii) any Gonzalez Litigation Claim, (iv) any Non-Qualified Retirement Claim, (v) any Tort Claim, or (vi) any Subordinated Claim. For the avoidance of doubt, the term shall not include any Claim against the Unencumbered Debtors, which Claims are being Reinstated under the Plan.

**1.151 "Trade Unsecured Claim Escrow"** means the escrow to be established on the Effective Date to fund payments to holders of Allowed Trade Unsecured Claims in the amount of $5.5 million.

**1.152 "Transferred Cash"** means Cash in the aggregate amount of $14.5 million, to be transferred by the Encumbered Debtors to the Litigation Trust on the Effective Date.

**1.153 "Transferred Causes of Action"** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities of the Estates against the D&O Defendants that arose under applicable law prior to the Petition Date, *subject to the limitations set forth in Section 5.17 of the Plan*.

**1.154 "Trial Court Disposition"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.155 "Trust Indemnified Parties"** has the meaning set forth in Section 5.17(n) of the Plan.

**1.156 "Unencumbered Debtor(s)"** means, individually or collectively, each or all of Freedom Newspapers, Gaston Gazette LLP, Daily Press, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, and The Creative Spot, L.L.C.

**1.157 "Unimpaired"** means, with respect to any Claim, that such Claim is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.158 "Voting Deadline"** means the deadline established by the Bankruptcy Court by which the holders of Claims in Classes that are entitled to vote on the Plan must submit the Ballot indicating such Claim holder's vote on the Plan, in accordance with the procedures set forth in the Disclosure Statement and the instructions provided with the Ballot.

# ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 2.1 Introduction

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such unclassified claims is set forth in Section 3.1 of the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.  A Claim or Interest may be bifurcated and classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

**2.2 Classes of Claims Against and Interests in Encumbered Debtors**

*Class A1:   Other Priority Claims*

Class A1 consists of all Other Priority Claims against the Encumbered Debtors. Class A1 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

*Class A2:   Existing Lender Claims*

Class A2 consists of all Existing Lender Claims.  Class A2 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

*Class A3:  Other Secured Claims*

Class A3 consists of separate sub-Classes, one for each Other Secured Claim against any of the Encumbered Debtors.  Each sub-Class is deemed to be a separate Class with respect to the applicable Encumbered Debtor for all purposes under the Bankruptcy Code, including for voting purposes.

*Class A4:  General Unsecured Claims*

Class A4 consists of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, with the sub-Class for each Encumbered Debtor consisting of the General Unsecured Claims against such Encumbered Debtor.  For example, the sub-Class for Freedom Communications will include all General Unsecured Claims against Freedom Communications, and the sub-Class for Freedom Broadcasting, Inc. will include all General Unsecured Claims against Freedom Broadcasting, Inc.  Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code, including for voting purposes.

*Class A5:  Non-Qualified Retirement Claims*

Class A5 consists of all Non-Qualified Retirement Claims.  Class A5 is a single Class containing Claims against Freedom Communications.

*Class A6:  Intercompany Claims*

Class A6 consists of all Intercompany Claims against the Encumbered Debtors. Class A6 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

*Class A7: Tort Claims*

Class A7 consists of all Tort Claims against the Encumbered Debtors. Class A7 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.

*Class A8: Subordinated Claims*

Class A8 consists of all Subordinated Claims against the Encumbered Debtors. Class A8 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.

*Class A9: Subsidiary Interests*

Class A9 consists of all Subsidiary Interests in the Subsidiary Debtors who are Encumbered Debtors. Class A8 shall be deemed to consist of forty-two (42) separate sub-Classes, one for each of the Encumbered Debtors that are Subsidiary Debtors.

*Class A10: Old Freedom Stock Interests*

Class A10 consists of all Old Freedom Stock Interests.

*Class A11: Old Freedom Stock Rights*

Class A11 consists of all Old Freedom Stock Rights.

**2.3    Classes of Claims Against and Interests in Unencumbered Debtors**

*Class B1: Other Priority Claims*

Class B1 consists of all Other Priority Claims against the Unencumbered Debtors. Class B1 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

*Class B2: Other Secured Claims*

Class B2 consists of separate sub-Classes, one for each Other Secured Claim against any of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Unencumbered Debtor for all purposes under the Bankruptcy Code.

*Class B3: General Unsecured Claims*

General Unsecured Claims against the Unencumbered Debtors are classified in Class B3. Class B3 includes seven (7) separate sub-Classes, each consisting of the General Unsecured Claims against each of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.

*Class B4: Intercompany Claims*

Class B4 consists of all Intercompany Claims against the Unencumbered Debtors. Class B4 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

*Class B5: Subsidiary Interests*

Class B5 consists of all Subsidiary Interests in the Unencumbered Debtors. Class B5 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

# ARTICLE III

# TREATMENT OF CLAIMS AND INTERESTS

**3.1 Unclassified Claims**

(a) **Administrative Claims**

With respect to each Allowed Administrative Claim, except as otherwise provided for herein, and subject to the requirements of Sections 11.1 through 11.2 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different, less favorable treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Existing Lender Agent and the Existing Lenders shall be entitled to retain all payments made by the Debtors during the Chapter 11 Cases in full satisfaction of all Adequate Protection Obligations arising under the Cash Collateral Order, including any portion of the Adequate Protection Obligations that constitute an Administrative Claim under Section 507(b) of the Bankruptcy Code; *provided, however*, that subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, such payments shall be applied in accordance with the Existing Credit Agreement Documents to reduce the principal amount of the Existing Lender Secured Claims. Any Existing Lender Fee Claim that has been incurred and is unpaid as of the Effective Date shall be paid in Cash on or as soon as practicable after the Effective Date, in full satisfaction, settlement, release and discharge of such Claim; *provided, however*, that subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, any such payments shall be deemed to be applied to reduce the principal amount of the Existing Lender Secured Claims in accordance with the Existing Credit Agreement Documents and the Cash Collateral Order. Any replacement or other Liens created under the Cash Collateral Order shall terminate and shall have no further force and effect as of the Effective Date.

(b)     **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, either, with the agreement of the Steering Committee Members, (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different, less favorable treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under Section 511(a) of the Bankruptcy Code), equal to such Allowed Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date.

**3.2     Classes of Claims Against and Interests in Encumbered Debtors**

(a)     **Class A1:  Other Priority Claims Against Encumbered Debtors**

Class A1 is not Impaired.

Class A1 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between an Encumbered Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different, less favorable treatment as to which the applicable Encumbered Debtor and such holder shall have agreed upon in writing.

(b)     **Class A2:  Existing Lender Claims**

Class A2 is Impaired.

The Existing Lender Claims shall be allowed in full in the Chapter 11 Cases, without setoff, subordination, avoidance, reduction, defense, setoff, recharacterization, or counterclaim, in the aggregate principal amount of not less than $770,552,344.03 as of the Petition Date plus $1,933,100.00 in respect of letters of credit issued and outstanding under the Existing Credit Agreement Documents as of the Petition Date.

Each of the Encumbered Debtors are jointly and severally obligated on the Existing Lender Claims.  Accordingly, Class A2 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.  The vote of each holder of an Existing Lender Claim shall be deemed to apply to each of the separate sub-Classes.

Subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, the aggregate amount of all payments made by the Debtors on account of Adequate Protection Obligations shall be deemed applied to reduce the principal amount of the

Existing Lender Secured Claims in accordance with the Existing Credit Agreement Documents and the Cash Collateral Order. In addition, the holders of Existing Lender Secured Claims, in full satisfaction, settlement, release, and discharge of and in exchange for the remaining amount of the Existing Lender Secured Claims, shall receive on the Effective Date their Pro Rata share (except as provided otherwise below) of each of (i) the Term A Loan Obligations, (ii) the Term B Loan Obligations, (iii) the Excess Cash, (iv) the Existing Lender Shares, and (v) the amount of the Trade Unsecured Claim Escrow, which shall be deposited by or on behalf of Existing Lenders into the Trade Unsecured Claim Escrow, and any remaining funds in the Trade Unsecured Claim Escrow after all required payments to holders of Allowed Trade Unsecured Claims have been made in accordance with Section 5.11(c) of the Plan. The entitlement of each holder of Existing Lender Secured Claims to receive its Pro Rata share of the Existing Lender Shares on the Effective Date pursuant to this Section 3.2(b) shall be satisfied by receipt of any combination of shares of New Common Stock and/or Existing Lender Warrants in such proportion to the extent necessary to comply with the Communications Act of 1934 (as amended) and FCC domestic and foreign ownership rules; *provided that* the sum of (i) the number of shares of Existing Lender Shares received by such Existing Lender and (ii) the number of shares of New Common Stock issuable upon the exercise of Existing Lender Warrants issued pursuant to this Section 3.2(b) received by such Existing Lender shall equal such Existing Lender's Pro Rata share of the Aggregate Existing Lender Share Number. In addition, as of the Effective Date, each holder of an Existing Lender Secured Claim shall be deemed to receive a Pro Rata share of the Class A2 Beneficial Trust Interests. The Class A2 Beneficial Trust Interests shall entitle the holders of Existing Lender Secured Claims to receive, after the Effective Date, if and when distributed, their allocated portion of the Net Litigation Proceeds.

The Existing Lenders shall accept the distributions on account of the Existing Lender Secured Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing Credit Agreement Documents, except for indemnification obligations, which shall receive the treatment provided under Section 6.6(c) of the Plan. The holders of Existing Lender Deficiency Claims shall not receive or retain any property under the Plan on account of any Existing Lender Deficiency Claims and all Existing Lender Deficiency Claims shall be deemed waived by the Existing Lenders and discharged as of the Effective Date.

The Existing Lenders shall be deemed to have received the Subsidiary Interests in the Encumbered Debtors and contributed such Subsidiary Interests back to their respective holders.

(c)     **Class A3:  Other Secured Claims Against Encumbered Debtors**

Class A3 is Impaired.

Class A3 consists of separate sub-Classes for each Other Secured Claim against any of the Encumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Encumbered Debtor for all purposes under the Bankruptcy Code, including for voting purposes.

At the option of the Reorganized Debtors, with the agreement of the Steering Committee Members, either (i) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim against an Encumbered Debtor shall be Reinstated as of the

Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; (ii) the holder of an Allowed Other Secured Claim against an Encumbered Debtor shall (A) retain the Liens securing such Allowed Other Secured Claim and (B) receive regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under 26 U.S.C. § 6622 or, if applicable, under Section 511 of the Bankruptcy Code), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date; (iii) the collateral securing such Allowed Other Secured Claim against an Encumbered Debtor shall be surrendered to the holder of such Allowed Other Secured Claim on the Distribution Date; or (iv) the holder of the Allowed Other Secured Claim against an Encumbered Debtor shall be paid in full on the Distribution Date. The treatment applicable to each holder of an Other Secured Claim shall be announced in a filing made with the Bankruptcy Court no later than ten (10) days prior to the Confirmation Hearing.

The Debtors' failure to object to any Other Secured Claim against an Encumbered Debtor in the Chapter 11 Cases shall be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim holder. Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all prepetition Liens on property of any Encumbered Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreement governing such Claim until such Allowed Claim is paid in full. Nothing in this Section 3.2(c) or elsewhere in the Plan shall preclude the Debtors or the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of an Encumbered Debtor or the value of the property that secures any alleged Lien.

(d) **Class A4: General Unsecured Claims Against Encumbered Debtors**

Class A4 is Impaired.

Class A4 consists of separate sub-Classes for each of the Encumbered Debtors, with the sub-Class for each Encumbered Debtor consisting of the General Unsecured Claims against such Encumbered Debtor. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code, including for voting purposes.

As of the Distribution Date, each holder of an Allowed General Unsecured Claim against the Encumbered Debtors shall be deemed to receive a Pro Rata share of the Class A4 Beneficial Trust Interests. The Class A4 Beneficial Trust Interests shall entitle the holders of Allowed General Unsecured Claims to receive (i) on the Distribution Date, the Net Cash Proceeds and (ii) after the Distribution Date, if and when distributed, their allocated portion of the Net Litigation Proceeds. Under no circumstances shall any holder of an Allowed General Unsecured Claim against the Encumbered Debtors receive more than payment in full of such Claim plus Distribution Interest.

(e) **Class A5: Non-Qualified Retirement Claims**

Class A5 is Impaired.

Class A5 is a single Class containing Allowed Non-Qualified Retirement Claims against Freedom Communications.

The treatment of Allowed Non-Qualified Retirement Claims shall be limited to the receipt of benefits as follows:

(i)     All benefit obligations under the Non-Qualified DC Plan shall be reinstated as of the Petition Date on the following modified terms:  (A) the account balances shall be reduced to seventy percent (70%) of the account balances determined as of the Petition Date; (B) no contribution credits shall be credited for the 2009 plan year or any future plan year, and no interest or earnings shall be credited to the reduced account balances on or after the Petition Date; (C) any unpaid benefits relating to the period between the Petition Date and the Effective Date that were due prior to the Effective Date shall be paid in a lump sum to the applicable participant or beneficiary reflecting such reduced account balance (without interest or earnings) on the Effective Date; and (D) any benefits payable on or after the Effective Date shall be paid in accordance with the terms of the applicable Non-Qualified DC Plan (as modified in accordance with the foregoing clauses);

(ii)    All benefit obligations under the Non-Qualified EB Plan shall be reinstated as of the Petition Date on the following modified terms:  (A) the benefits shall be reduced to seventy percent (70%) of the benefits determined as of the Petition Date; (B) any benefit payments that were or are due thereunder on or after October 1, 2009 shall be paid at the rate of seventy percent (70%) of the benefit payment amount otherwise due (determined as of the Petition Date) in the form of payment applicable to such benefit under the Non-Qualified EB Plan (as in effect on the Petition Date); (C) any unpaid benefits relating to the period between October 1, 2009 and the Effective Date that were due prior to the Effective Date shall be paid in a lump sum to the applicable participant or beneficiary reflecting such reduced rate (without interest or earnings) on the Effective Date; and (D) any benefit payments payable on or after the Effective Date shall be paid in accordance with the terms of the applicable Non-Qualified EB Plan (as modified in accordance with the foregoing clauses); and

(iii)   All retirement and/or deferred compensation benefit obligations under the Individual Retirement Agreements shall be incorporated into the Non-Qualified EB Plan and shall be treated in the same manner as benefit obligations under the Non-Qualified EB Plan, as set forth above; *provided, however*, that no such benefit (as reduced as set forth above) shall be increased on or after the Petition Date by any cost of living adjustment or otherwise.

(f)     **Class A6:  Intercompany Claims Against Encumbered Debtors**

Class A6 is Impaired.

Class A6 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

With respect to each Intercompany Claim against any of the Encumbered Debtors, at the election of the Reorganized Debtors, with the consent of the Existing Lender Agent, the Intercompany Claim shall be adjusted, continued, capitalized, either directly or indirectly or in whole or in part as of the Effective Date, or shall be Reinstated on the Effective Date, and no such disposition shall require the consent of the holders of New Common Stock or the consent of any holder of Subsidiary Interests.

(g)    **Class A7:  Tort Claims Against Encumbered Debtors**

Class A7 is Impaired.

Class A7 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.

All holders of Allowed Tort Claims shall have the right to assert such Claims under the Debtors' applicable insurance policies.  Any recovery by such holders on account of such Allowed Claims shall be limited to the coverage that may be available under such insurance policies.  Such holders shall have no rights to any distributions under the Plan.

(h)    **Class A8:  Subordinated Claims Against Encumbered Debtors**

Class A8 is Impaired.

Class A8 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.

The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.  All Subordinated Claims shall be discharged as of the Effective Date.

(i)    **Class A9:  Subsidiary Interests in Encumbered Debtors**

Class A9 is Impaired.

Class A9 shall be deemed to consist of forty-two (42) separate sub-Classes, one for each of the Encumbered Debtors that are Subsidiary Debtors.

On the Effective Date, the Subsidiary Interests in the Encumbered Debtors shall be deemed to have been distributed to the Existing Lenders on account of their Existing Lender Claims and then contributed back by the Existing Lender to the respective holders of the Subsidiary Interests.  The Subsidiary Interests shall thereafter be retained for the benefit of the holders of the New Securities, subject to any applicable restrictions arising under the Exit Facility, the Term A Facility, and the Term B Facility.

Notwithstanding the foregoing, if the Subsidiary Interests in the Reorganized Broadcast Licensee Companies are transferred to the Broadcast Trustee pursuant to the provisions of Section 5.16 of the Plan, such Subsidiary Interests shall be subject to the terms of the Broadcast Trust Agreement until transferred back to the Reorganized Broadcast Operating Companies.  When transferred back, such Subsidiary Interests shall be subject to the provisions in the paragraph above.

(j)    **Class A10:  Old Freedom Stock Interests**

Class A10 is Impaired.

All Old Freedom Stock Interests shall be cancelled as of the Effective Date. The holders of such Old Freedom Stock Interests shall not receive or retain any property under the Plan or otherwise on account thereof.

(k)    **Class A11: Old Freedom Stock Rights**

Class A11 is Impaired.

All Old Freedom Stock Rights shall be cancelled as of the Effective Date. The holders of such Old Freedom Stock Rights shall not receive or retain any property under the Plan or otherwise on account thereof.

**3.3    Classes of Claims Against and Interests in Unencumbered Debtors**

(a)    **Class B1: Other Priority Claims Against Unencumbered Debtors**

Class B1 is not Impaired.

Class B1 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between an Unencumbered Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different, less favorable treatment as to which the applicable Unencumbered Debtor and such holder shall have agreed upon in writing.

(b)    **Class B2: Other Secured Claims Against Unencumbered Debtors**

Class B2 is not Impaired.

Class B2 consists of separate sub-Classes for each Other Secured Claim against any of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Unencumbered Debtor for all purposes under the Bankruptcy Code.

The legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim against an Unencumbered Debtor shall be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code.

The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim holder. Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all prepetition Liens on property of any Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreement governing such Claim until such Allowed Claim is paid in full. Nothing in this Section 3.3(b) or elsewhere in the Plan shall

preclude the Debtors or the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of a Debtor or the value of the property that secures any alleged Lien.

(c)　　**Class B3:　General Unsecured Claims Against Unencumbered Debtors**

Class B3 is not Impaired.

Class B3 consists of separate sub-Classes consisting of the General Unsecured Claims against each of the Unencumbered Debtors.　Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.

The legal, equitable, and contractual rights of each holder of an Allowed General Unsecured Claim against an Unencumbered Debtor shall be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code.　On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and (iii) the date on which such General Unsecured Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Claim, each holder of an Allowed General Unsecured Claim in Class B3 shall receive, in full satisfaction of and in exchange for, such Allowed General Unsecured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Cases not been filed.

(d)　　**Class B4:　Intercompany Claims Against Unencumbered Debtors**

Class B4 is not Impaired.

Class B4 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

With respect to each Intercompany Claim against any of the Unencumbered Debtors, the legal, equitable, and contractual rights of the holder of the Intercompany Claim shall be Reinstated on the Effective Date or, with the consent of the holder, may be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part as of the Effective Date.

(e)　　**Class B5:　Subsidiary Interests in Unencumbered Debtors**

Class B5 is not Impaired.

Class B5 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

The legal, equitable, and contractual rights of each holder of a Subsidiary Interest in any of the Unencumbered Debtors shall be Reinstated on the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code.

**3.4　　Reservation of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan, nothing shall affect the rights, defenses, and counterclaims of the Debtors, the Reorganized Debtors, or the Litigation Trustee,

both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

# ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

### 4.1 Impaired Classes of Claims Entitled to Vote

Holders of Claims in each Impaired Class of Claims are entitled to vote as a Class to accept or reject the Plan, other than Classes that are deemed to reject the Plan. With respect to Claims against the Encumbered Debtors, the votes of holders of Claims in Classes A2, A3 (and each sub-Class thereof), A4 (and each sub-Class thereof), A5, and A7 (and each sub-Class thereof) shall be solicited with respect to the Plan.

### 4.2 Acceptance by an Impaired Class Entitled to Vote

In accordance with Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class or sub-Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class or sub-Class that have timely and properly voted to accept or reject the Plan.

### 4.3 Presumed Acceptances by Unimpaired Classes and Debtor-Only Classes

(a) With respect to Classes of Claims against and Interests in the Encumbered Debtors, Class A1 is Unimpaired under the Plan. With respect to Classes of Claims against and Interests in the Unencumbered Debtors, Classes B1, B2 (and each sub-Class thereof), B3 (and each sub-Class thereof), B4, and B5 are Unimpaired under the Plan. Under Section 1126(f) of the Bankruptcy Code, holders of such Unimpaired Claims and Unimpaired Interests are conclusively presumed to have accepted the Plan, and the votes of such Unimpaired Claim holders and Unimpaired Interest holders shall not be solicited.

(b) The Claims in Class A6 and the Interests in Class A9 are held by certain of the Debtors. Although such Classes are Impaired, because the Debtors are proponents of the Plan, their acceptance of the treatment proposed for such Claims and Interests is presumed. Therefore, their votes shall not be solicited.

### 4.4 Classes Deemed to Reject Plan

Holders of Claims in Class A8 and Interests in Classes A10 and A11 are not entitled to receive or retain any property under the Plan. Under Section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

### 4.5 Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors shall request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter,

amend, or modify the Plan, the Plan Supplement, or any Exhibit to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1     Continued Corporate Existence**

The Reorganized Debtors shall continue to exist after the Effective Date as separate corporate, limited liability, or partnership entities, in accordance with the applicable laws in the respective jurisdictions in which they are organized and pursuant to the New Freedom Governing Documents in the case of Reorganized Freedom Holdings and the New Subsidiary Governing Documents in the case of the respective Reorganized Subsidiaries.

**5.2     New Governing Documents**

The New Freedom Governing Documents and the New Subsidiary Governing Documents shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. The New Freedom Charter and New Freedom By-Laws shall be in substantially the forms of such documents included in the Plan Supplement.

**5.3     Revesting of Assets; Releases of Liens**

Except as otherwise provided herein, the property of each Debtor's Estate, including all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, shall revest in the applicable Debtor on the Effective Date.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  As of the Effective Date, all such property of each Reorganized Debtor shall be free and clear of all Claims and Interests, and all Liens with respect thereto, except as specifically provided in the Plan or the Confirmation Order.

**5.4     Cancellation of Prepetition Obligations**

On the Effective Date, except as otherwise specifically provided for in the Plan, the Existing Credit Agreement Documents and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be canceled and any such indebtedness or obligation of the Debtors shall be discharged.

**5.5     Exit Funding**

(a)     In addition to Cash remaining as of the Effective Date, the Cash necessary to make payments required to be made on the Effective Date and to provide working capital and satisfy other general corporate purposes after the Effective shall be obtained from the Exit Facility.

(b)     With the agreement of the Steering Committee Members, the obligations under the Exit Facility shall be secured by valid, binding, perfected first priority liens on inventory, accounts receivable, and other assets of the Reorganized Debtors, if necessary to obtain a commitment for such Exit Facility.  In the event that the Exit Facility is provided by the Existing

Lender Agent or any Existing Lender, then the Exit Financing Share Allocation may be issued as compensation for such exit lender, as an administrative expense, to the extent necessary to obtain such Exit Facility; *provided that* if any existing Steering Committee Member offers to provide such Exit Facility to the Reorganized Debtors, all other Steering Committee Members shall have the opportunity to participate in such Exit Facility and the Exit Financing Share Allocation on a pro rata basis. Letters of credit under the Existing Credit Agreement Documents outstanding on the Effective Date shall be rolled into, and become letters of credit under, the Exit Facility without any further action by any party.

(c)     The Reorganized Debtors shall be authorized to (a) enter into the Exit Facility, (b) grant any liens and security interests and incur or guaranty the indebtedness as required under the Exit Facility, and (c) issue, execute and deliver all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the Exit Facility and to take all other actions necessary to implement and effectuate borrowings under the Exit Facility. On the Effective Date, the Exit Facility, together with new promissory notes and guarantees, if any, evidencing obligations of the Reorganized Debtors thereunder, and all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective. The new promissory notes issued pursuant to the Exit Facility and all obligations under the Exit Facility and related documents shall be paid as set forth in the Exit Facility and related documents.

**5.6     Authorization and Issuance of New Securities**

(a)     Reorganized Freedom Holdings shall (i) authorize on the Effective Date 21 million shares of New Common Stock; (ii) issue on the Effective Date 7 million shares of New Common Stock (subject to adjustment in respect of shares of New Common Stock issuable upon the exercise of the Existing Lender Warrants), representing 100% of the outstanding shares of New Common Stock as of such date (subject to the Exit Financing Share Allocation, if any); *provided* that the shares of New Common Stock to be distributed under the Plan to holders of Existing Lender Secured Claims pursuant to Section 3.2(b) of the Plan shall be contributed by Reorganized Freedom Holdings to Reorganized Freedom Communications for distribution by Reorganized Freedom Communications to such holders; (iii) reserve for issuance in accordance with the terms of the Plan a number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the antidilution provisions thereof) to satisfy the required distributions of (x) the Existing Lender Warrants and (y) the stock, options, and other awards granted under the New Equity Incentive Plan. In addition, pursuant to Section 5.5(b) of the Plan, the Exit Financing Share Allocation may be issued.

(b)     On the Effective Date, Reorganized Freedom Holdings shall authorize the issuance of the Existing Lender Warrants.

(c)     The New Securities to be issued and distributed pursuant to distributions under the Plan to Classes A2 and pursuant to Sections 5.5(b) and 6.6(b) of the Plan, shall be issued in exchange for or principally in exchange for Allowed Claims and Allowed Interests in such Classes, and for an administrative expense, and shall be exempt from registration under applicable securities laws pursuant to Section 1145 of the Bankruptcy Code.

(d)     Upon the Effective Date (i) each Existing Lender shall be deemed to have executed, without any further action by such party, the New Stockholders Agreement and the Registration Rights Agreement and (ii) each holder of Existing Lender Warrants shall be deemed

to have executed, without any further action by such party, the Existing Lender Warrant Agreement.

**5.7    Directors of Reorganized Debtors**

(a)    The New Board shall be comprised of up to seven (7) directors, initially consisting of (i) six (6) independent and disinterested directors acceptable to the Steering Committee Members and (ii) Reorganized Freedom Holdings' chief executive officer. The designation of directors pursuant to the foregoing clause (i) shall be made at least five (5) days prior to the Voting Deadline and shall be announced in a filing made with the Bankruptcy Court no later than five (5) days prior to the Voting Deadline. The members of the New Board shall continue to serve as such until replaced or removed in accordance with the New Freedom Governing Documents, or until any of such individual's voluntary resignation. Each Steering Committee Member holding in excess of a threshold percentage (to be agreed among the Steering Committee Members) of the Existing Lender Secured Claims shall be entitled to appoint a representative to attend and observe all meetings of the New Board unless such rights would delay or adversely affect the FCC's grant of the long-form application.

(b)    The existing directors of the Subsidiary Debtors shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the New Subsidiary Governing Documents of the respective entity or applicable company policy, or until any of such individual's voluntary resignation; *provided*, *however*, that any such director who is not as of the Effective Date a member of the New Board or a full-time employee of any of the Reorganized Debtors shall be deemed to have resigned as of the Effective Date.

**5.8    Officers of Reorganized Debtors**

(a)    The existing senior officers of Freedom Holdings shall serve initially in the same capacities after the Effective Date for Reorganized Freedom Holdings until replaced or removed in accordance with the New Freedom Governing Documents or company policy, or until any of such individual's voluntary resignation.

(b)    The existing senior officers of the Subsidiary Debtors shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the New Subsidiary Governing Documents of the respective entity or applicable company policy, or until any of them may voluntarily resign.

**5.9    Indemnification of Reorganized Debtors' Directors, Officers, and Employees**

Upon the Effective Date, the New Freedom Governing Documents and the New Subsidiary Governing Documents shall contain customary indemnification provisions for directors, officers, and other key employees (as identified by the chief executive officer of Reorganized Freedom Holdings) serving the Reorganized Debtors, on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors.

**5.10    Management Incentive and Other Agreements**

(a)    On the Effective Date, Reorganized Freedom Holdings shall be authorized and directed to establish and implement the New Equity Incentive Plan, substantially in the form included in the Plan Supplement. The New Equity Incentive Plan shall reserve for issuance pursuant to awards a number of shares of New Common Stock (Class A Common Stock) up to

ten percent (10%) of the total number of shares of New Common Stock (i) issued and outstanding as of the Effective Date (including shares issued pursuant to the Exit Financing Share Allocation, if any) and (ii) issuable upon exercise of the Existing Lender Warrants as of the Effective Date. Members of management, employees, and directors of Reorganized Freedom Holdings and the other Reorganized Debtors shall receive such stock, options, or other awards under the New Equity Incentive Plan as are determined from time to time by the New Board (or an authorized committee thereof). The awards made to such recipients shall be in accordance with the terms of such determinations, subject to such terms as are more specifically described in the New Equity Incentive Plan. As of the Effective Date, pursuant to the Confirmation Order and Section 303 of the Delaware General Corporation Law, the New Equity Incentive Plan shall be deemed adopted by the unanimous action of the New Board and approved by the unanimous action of the stockholders of Reorganized Freedom Holdings (including, without limitation, for purposes of Section 422 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder). The foregoing sentence shall not be deemed to limit the application of Section 303 of the Delaware General Corporation Law to any other corporate action taken pursuant to the Plan. The New Equity Incentive Plan may be amended or modified from time to time by the New Board in accordance with its terms and any such amendment or modification shall not require an amendment of the Plan.

(b) On or after the Effective Date, the Reorganized Debtors may implement an executive incentive plan, severance plan, or other employment agreements for their senior management team and other key employees either (i) having terms and conditions agreed to by the Debtors and the Steering Committee Members and set forth in the Plan Supplement if agreed to prior to the filing thereof or presented at the Confirmation Hearing if agreed to prior to the commencement thereof or (ii) having terms and conditions determined by the New Board or by the then-serving chief executive officer of Reorganized Freedom Holdings or such other person as may be authorized by the New Board.

**5.11    Post-Emergence Trade Agreement Procedure**

(a) Any provider of goods or services who holds a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date may be afforded the opportunity to enter into a Post-Emergence Trade Agreement, in accordance with the following procedure:

(i) The Encumbered Debtors shall make available to all providers of goods or services, at www.loganandco.com and as an attachment to the Disclosure Statement, a Notice of Desire to Enter into Post-Emergence Trade Agreement, in which each provider shall certify that (A) it holds a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date, (B) it has continued to supply such goods or services to the Encumbered Debtors during the Chapter 11 Cases, and (C) it is willing to enter into and comply with the terms of the Post-Emergence Trade Agreement. A form Post-Emergence Trade Agreement is included as Exhibit E to the Plan.

(ii) The deadline for returning a completed Notice of Desire to Enter into Post-Emergence Trade Agreement shall be five (5) days prior to the Voting Deadline.

(iii) The Encumbered Debtors shall provide copies of the returned Notices of Desire to Enter into Post-Emergence Trade Agreement to the Existing Lender Agent.

(iv)     The Encumbered Debtors shall determine, in their business judgment, if the Reorganized Debtors will have a continuing need for the goods or services of the provider after the Effective Date, and shall so advise the Existing Lender Agent.

(v)     If, as determined by the Encumbered Debtors in their business judgment, the Reorganized Debtors will have a continuing need for the goods or services of the provider after the Effective Date, then the Encumbered Debtors shall deliver to the provider a form Post-Emergence Trade Agreement that contains the terms and conditions for the applicable provider, with a deadline for executing and returning the agreement, and shall provide a copy to the Existing Lender Agent and the Creditors' Committee (subject to the existing confidentiality protocol).

(vi)     As to each provider who timely returns an executed Post-Emergence Trade Agreement, and who has continued to supply such goods or services to the Encumbered Debtors through the Confirmation Date, the Encumbered Debtors shall execute the Post-Emergence Trade Agreement and return a copy to the provider of goods or services as soon as practicable between the Confirmation Date and the Effective Date.  The Encumbered Debtors shall provide a copy of each executed Post-Emergence Trade Agreement to the Existing Lender Agent and the Creditors' Committee (subject to the existing confidentiality protocol).

(b)     On the Effective Date, the Trade Unsecured Claim Escrow shall be established, into which the Encumbered Debtors shall deposit funds in the amount of $5.5 million.  The funds in the Trade Unsecured Claim Escrow shall be funds that otherwise would have been distributed to the Existing Lenders as Excess Cash under the Plan, and that, as of the Effective Date and subject to the terms of this section, shall constitute property of the Existing Lenders.  The Existing Lenders shall be deemed to have authorized the Reorganized Debtors to access funds in the Trade Unsecured Claim Escrow to make payments to holders of Allowed Trade Unsecured Claims pursuant to the terms of each such holder's Post-Emergence Trade Agreement.

(c)     Under the terms of the Post-Emergence Trade Agreement, as soon as reasonably practicable after the latest of (i) the Effective Date and (ii) the date on which such Trade Unsecured Claim becomes an Allowed Trade Unsecured Claim, each holder of an Allowed Trade Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Trade Unsecured Claim, Cash from the Trade Unsecured Claim Escrow equal to the amount or such portion of the Allowed Trade Unsecured Claim as the parties may agree.  In the event of an agreement to pay a portion of any Allowed Trade Unsecured Claim, the remaining portion shall be waived and shall not participate as a General Unsecured Claim under the Plan.  By executing a Post-Emergence Trade Agreement, the Reorganized Debtors shall not become obligated to pay any Trade Unsecured Claim or portion thereof that is not an Allowed Claim.

(d)     The Debtors shall be obligated to use the full amount of the Trade Unsecured Claim Escrow to satisfy Allowed Trade Unsecured Claims.

## 5.12     Retained Litigation Rights

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan (including the Mutual Release Agreement), in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, each Debtor or Reorganized Debtor shall retain all of

their respective Retained Litigation Rights that such Debtor or Reorganized Debtor may hold against any Person. Each Debtor or Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Retained Litigation Rights. Each Debtor or Reorganized Debtor or their respective successor(s) may pursue such Retained Litigation Rights as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan. For the avoidance of doubt, Retained Litigation Rights are exclusive of, and do not include, Transferred Causes of Action or Insurance Coverage Actions.

## 5.13 Effectuating Documents; Further Transactions

The chief executive officer, the president, the chief financial officer, the general counsel or any other appropriate officer of Freedom Holdings, or any applicable Debtor, or any of the Reorganized Debtors, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of Freedom Holdings, or any applicable Debtor, or any of the Reorganized Debtors, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

## 5.14 Exemption From Certain Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Liens granted by the Debtors to secure the Exit Facility, the Term A Facility, and the Term B Facility, shall not be taxed under any law imposing a stamp tax or other similar tax. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

## 5.15 Corporate Action

On the Effective Date, the adoption and filing of the New Freedom Governing Documents, the appointment of the New Board, the adoption of the New Equity Incentive Plan, and all actions contemplated or necessary to implement the transactions described in the Plan shall be authorized and approved in all respects pursuant to the Plan. All matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the board of directors of the Reorganized Debtors are authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations or consents except for express consents required under the Plan. Without limiting the foregoing, the New Equity Incentive Plan shall be deemed to have been unanimously approved by the stockholders of Reorganized Freedom Holdings pursuant to Section 303 of the Delaware General Corporation Law.

**5.16    Interim Trust Control of Subsidiary Interests in Broadcast Licensee Companies**

(a)    The Debtors, with the agreement of the Existing Lender Agent (in consultation with the Steering Committee Members), shall designate the Person to serve as the Broadcast Trustee under the Plan, and shall file a written notice of such designation at least five (5) days prior to the Voting Deadline.

(b)    Prior to the Effective Date, each of the Broadcast Operating Companies shall enter into the Broadcast Trust Agreement with the Broadcast Trustee.  The Broadcast Trust Agreement shall provide that, *inter alia*, (i) on the Effective Date, all of the Subsidiary Interests in each of the Reorganized Broadcast Licensee Companies shall be issued to the Broadcast Trustee to be held in trust pursuant to the terms of the Broadcast Trust Agreement and subject to the continued supervision of the Bankruptcy Court if and only to the extent necessary for the FCC to grant the "short-form" applications referred to in subsection (d) of this Section 5.16; (ii) the beneficiaries of the trust shall be the Reorganized Broadcast Operating Companies, which shall continue to own all of the assets of the Broadcast Stations other than the Subsidiary Interests in the Reorganized Broadcast Licensee Companies, which own the FCC licenses; and (iii) following the Effective Date, and subject to the consent of the FCC, each of the Reorganized Broadcast Operating Companies shall have the right to acquire from the Broadcast Trustee all of the Subsidiary Interests in its respective Reorganized Broadcast Licensee Company as set forth in the Broadcast Trust Agreement.

(c)    Contemporaneously with the execution and delivery of the Broadcast Trust Agreement, the Broadcast Operating Companies shall enter into one or more Local Marketing Agreement(s) with the Broadcast Trustee (each an "LMA"), which LMAs shall become effective with respect to the Reorganized Broadcast Operating Companies and the Reorganized Licensee Companies as of the Effective Date and shall provide for the brokerage by the Reorganized Broadcast Operating Companies of all or substantially all of the programming and advertising time on the Broadcast Stations.  The effectiveness of the Broadcast Trust Agreement shall be conditioned upon the execution and delivery of the LMAs, and the effectiveness of the LMAs shall be conditioned upon the execution and delivery of the Broadcast Trust Agreement.  As consideration for the right to broker time on the Broadcast Stations, the Reorganized Broadcast Operating Companies shall reimburse the Reorganized Broadcast Licensee Companies for the costs and expenses incurred in connection with the operation of the Broadcast Stations, and shall pay the Broadcast Trustee an LMA fee to be agreed upon by the parties to the Broadcast Trust Agreement.

(d)    Following execution and delivery of the Broadcast Trust Agreement and the LMAs, each of the Broadcast Licensee Companies and the Broadcast Trustee shall file the appropriate applications with the FCC to request the FCC's consent to the transfer of control of the Broadcast Licensee Companies from the Broadcast Operating Companies (as debtors in possession) to the Broadcast Trustee using "short form" procedures.  The grant of such applications by the FCC without conditions that would prevent implementation of the structure contemplated herein shall be a condition to such implementation.

(e)    Assuming such grant by the FCC, on and as of the Effective Date, all of the Subsidiary Interests of the Reorganized Broadcast Licensee Companies shall be issued to the Broadcast Trustee, and the Reorganized Broadcast Operating Companies shall commence to broker all or substantially all of the programming and advertising time on each of the Broadcast Stations pursuant to the LMAs.

(f)     Following the Effective Date, the parties shall file applications seeking "long-form" FCC consent to transfer control of the Reorganized Broadcast Licensee Companies from the Broadcast Trustee to the Reorganized Broadcast Operating Companies.

(g)     If the Debtors, in consultation with the Existing Lender Agent, determine that: (i) the FCC is unlikely in a timely fashion to consent to a transfer of control of the Broadcast Licensee Companies from the Broadcast Operating Companies (as debtors in possession) to the Broadcast Trustee using "short-form" procedures, (ii) the FCC would be likely to impose conditions which would make it impracticable for the parties to implement the interim trust structure contemplated in this Section 5.16, or (iii) the parties are unable to reach agreement on the Broadcast Trust Agreement or LMAs, or for any other reason the interim trust structure is unlikely to be able to be implemented in a timely fashion and in a manner that would achieve its goals, then in place of that structure, subject to obtaining the consent of the Steering Committee Members (which consent shall not be unreasonably withheld), and as soon as practicable, the Debtors and the other appropriate parties shall file suitable "long-form" applications with the FCC requesting FCC consent to the transfer of control of the Broadcast Licensee Companies to the Reorganized Broadcast Operating Companies in order to effectuate the transactions contemplated by the Plan.

## 5.17    Litigation Trust

(a)     On the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purposes of (i) administering the Litigation Trust Assets, (ii) resolving all Claims to be treated as Class A4 Claims, and (iii) making all distributions as provided for under the Plan to the holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests (the "LT Beneficiaries") as provided for under the Plan.  The Litigation Trust is intended to qualify as a liquidation trust pursuant to United States Treasury Regulation Section 301.7701-4(d).  Except as expressly provided in Section 5.17(l), none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the Litigation Trust.

(b)     The holders of Class A4 Beneficial Trust Interests shall be limited to holders of Claims listed on Schedule F of the Debtors' Schedules as of the date hereof and Claims asserted in Proofs of Claim or Requests for Payment that are, or through the claims objection process become, Allowed Class A4 Claims.

(c)     On the Effective Date, in accordance with Section 1141 of the Bankruptcy Code, all of the Litigation Trust Assets, as well as the rights and powers of the Estates applicable to the Litigation Trust Assets, shall automatically vest in the Litigation Trust, free and clear of all Claims and Interests for the benefit of the LT Beneficiaries.  In connection with the vesting and transfer of the Litigation Trust Assets, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written or oral and including but not limited to all electronic information) relating to the Litigation Trust Assets and objections to the Class A4 Claims shall vest in the Litigation Trust.  The Debtors, the Reorganized Debtors, and the Litigation Trustee are authorized and required to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.

(d)     The transfer of the Litigation Trust Assets to the Litigation Trust shall be made for the benefit and on behalf of the LT Beneficiaries.  The Litigation Trust Assets comprising the Litigation Trust shall be treated for federal income tax purposes as being transferred by the Debtors to the LT Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and

then by the LT Beneficiaries to the Litigation Trust. For federal income tax purposes, the holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests shall be treated as the grantors and deemed owners of the Litigation Trust. The Litigation Trustee shall file federal income tax returns for the Litigation Trust as a grantor trust under IRC Section 671 and Treasury Income Tax Regulation Section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss deductions and credits ("Tax Items"). The holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests shall report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. Upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the applicable Estates' rights, title and interest in the Litigation Trust Assets and the Debtors shall have no further interest in or with respect to the Litigation Trust Assets.

(e)    As soon as practicable after the Effective Date, (i) the Litigation Trustee shall determine the fair market value of the Litigation Trust Assets as of the Effective Date, based on his good faith determination, and (ii) the Litigation Trust shall establish appropriate means to apprise the LT Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Litigation Trust, and the LT Beneficiaries) for all federal income tax purposes.

(f)    The Litigation Trust, acting through the Litigation Trustee, shall be authorized to exercise and perform the rights, powers, and duties held by the Estate with respect to the Litigation Trust Assets, including, without limitation, the authority under Section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy or insolvency trustee or examiner, or a receiver for the Creditors' Committee, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Transferred Causes of Action.

(g)    The Gonzalez Class Counsel, in the exercise of its absolute discretion, shall designate the Person that shall be appointed by the Bankruptcy Court in the Confirmation Order to serve as the Litigation Trustee, and shall file a written notice of such designation at least five (5) days prior to the Voting Deadline; *provided, however*, that in no event shall the Litigation Trustee be (i) a member of the Creditors' Committee or an advisor to or affiliate of any such member or (ii) a LT Beneficiary or an advisor to or affiliate of any such LT Beneficiary.

(h)    The responsibilities of the Litigation Trustee shall include, but shall not be limited to: (i) prosecuting through judgment and/or settling the Transferred Causes of Action and any defense asserted by the Litigation Trust in connection with any counterclaim or cross claim asserted by the D&O Defendants against the Litigation Trust in the D&O Action, and compelling the prosecution and/or settlement of the Insurance Coverage Actions against any D&O Insurer; (ii) facilitating the prosecution and/or settlement of objections to, and estimations of, Class A4 Claims; (iii) calculating and implementing all distributions required under the Plan to be made from the Litigation Trust Assets; (iv) filing all required tax returns, and paying taxes and all other obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (v) otherwise administering the Litigation Trust; (vi) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Existing Lender Agent and Reorganized Debtors only), and providing annual reports to the LT Beneficiaries, reflecting expenditures, receipts, and distributions; (vii) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Existing Lender Agent and Reorganized Debtors only), and providing annual reports to the LT Beneficiaries, with respect to the prosecution and resolution of the Transferred

Causes of Action and the objections to the Class A4 Claims; and (viii) such other responsibilities as may be vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee shall maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to LT Beneficiaries contemplated or effectuated under the Plan.

(i)      The powers and authority of the Litigation Trustee, without any further approval from the Bankruptcy Court, shall include, without limitation, the power, with sole authority and discretion: (i) to invest the Litigation Trust Assets, and withdraw funds of the Litigation Trust, make distributions, incur obligations for reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash, and pay taxes and other obligations owed by the Litigation Trust from funds held by the Litigation Trustee in accordance with the Plan; (ii) to engage professionals and service providers to assist the Litigation Trustee with respect to his responsibilities, including, but not limited to, any professionals employed by the Creditors' Committee; (iii) to evaluate and determine strategy with respect to the Transferred Causes of Action, the Insurance Coverage Actions, and the objections to Class A4 Claims, and to prosecute, compromise, transfer, release, abandon and/or settle the Transferred Causes of Action and the objections to Class A4 Claims on behalf of the Litigation Trust and to compel the D&O Defendants, at the expense of the Litigation Trust, to do the same with respect to Insurance Coverage Actions against the D&O Insurers; (iv) to liquidate any remaining Litigation Trust Assets, and provide for the distributions therefrom in accordance with the provisions of the Plan; (v) to otherwise administer the Litigation Trust; (vi) to interpret the provisions of the Plan relating to the Litigation Trust in the Litigation Trustee's reasonable discretion; and (vii) to exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee, on behalf of the Litigation Trust, shall have discretion to pursue, not pursue, and/or settle any and all Transferred Causes of Action and objections to Class A4 Claims as he determines to be in the best interests of the Litigation Trust, and the Litigation Trustee shall have no liability whatsoever for the outcome of that decision, except in the event that there is a Final Order determining that the Litigation Trustee committed fraud, self-dealing, intentional misrepresentation, or willful misconduct. In connection with the administration of the Litigation Trust, the Litigation Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of the provisions of the Plan relating to the Litigation Trust, within the bounds of the Plan and applicable law.

(j)      The Litigation Trustee may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist him in fulfilling his obligations under the Plan, and on whatever fee arrangement he deems appropriate, including, without limitation, contingency fee arrangements. The Litigation Trustee may, but is not required to, employ professionals that were previously employed by the Creditors' Committee. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. All such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Assets. The Reorganized Debtors shall have no liability therefor, except for the payment of up to $200,000 provided for in Section 5.17(l).

(k)     In addition to reimbursement for actual out-of-pocket expenses incurred by the Litigation Trustee, the Litigation Trustee shall be entitled to receive reasonable compensation for services rendered on behalf of the Litigation Trust on terms to be set forth in the Litigation Trust Agreement.  All such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Assets.  The Reorganized Debtors shall have no liability therefor.

(l)     From time to time after the Effective Date, no later than thirty (30) days after receipt of an invoice from the Litigation Trust, the Reorganized Debtors shall reimburse the Litigation Trust for reasonable fees and expenses up to, and not exceeding, an aggregate amount of $200,000 incurred in prosecution and/or settlement of objections to, and estimations of, Class A4 Claims.

(m)     The Litigation Trustee or any successor Litigation Trustee appointed pursuant to the Plan may be removed as Litigation Trustee for cause by order of the Bankruptcy Court upon motion of any holder of a Class A2 Beneficial Trust Interest or Class A4 Beneficial Trust Interest; *provided, however*, that any holder of a Class A2 Beneficial Trust Interest may seek to remove the Litigation Trustee without cause after all holders of Class A4 Beneficial Trust Interests have been paid in full by the Litigation Trustee.  For purposes of this provision, cause shall mean fraud, self-dealing, intentional misrepresentation, or willful misconduct.  In additional, the Litigation Trustee may resign with thirty (30) days' notice served on the LT Beneficiaries and filed with the Bankruptcy Court.  In the event that the Litigation Trustee is removed, resigns, or otherwise ceases to serve as Litigation Trustee, the Gonzalez Class Counsel shall appoint a successor Litigation Trustee.  Any successor Litigation Trustee shall be subject to the same qualifications and shall have the same rights, powers, duties, and discretion, and otherwise be in the same position, as the originally named Litigation Trustee.  References herein to the Litigation Trustee shall be deemed to refer to the successor Litigation Trustee acting hereunder.

(n)     From and after the Effective Date, the Litigation Trustee, his firm, company, partners, officers, directors, employees, professionals, representatives, successors, and assigns (collectively, the "<u>Trust Indemnified Parties</u>" and each a "<u>Trust Indemnified Party</u>") shall be, and hereby are, indemnified by the Litigation Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Trust Indemnified Party's good faith exercise of what such Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Trust Indemnified Party reasonably understands to be its duties conferred by the Litigation Trust Agreement, the Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the Transferred Causes of Action or objections to the Class A4 Claims, on and after the Effective Date.  The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to (i) the Litigation Trust Agreement or the Plan; (ii) the services to be rendered pursuant to the Litigation Trust Agreement or the Plan; (iii) any document or information, whether verbal or written, referred to herein or supplied to the Litigation Trustee; or (iv) proceedings by or on behalf of any creditor.  The Litigation Trust shall, on demand, advance or pay promptly out of the Litigation Trust Assets, on behalf of each Trust Indemnified Party, reasonable attorneys' fees

and other expenses and disbursements to which such Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; *provided, however*, that any Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Trust Indemnified Party. In any matter covered by the first two sentences of this subsection, any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Litigation Trustee, at the Litigation Trust's expense, subject to the foregoing terms and conditions.

(o)     To effectively investigate, prosecute, compromise, and/or settle the Transferred Causes of Action, the Insurance Coverage Actions, and the objections to Class A4 Claims on behalf of the Litigation Trust, the Litigation Trustee and its counsel and representatives must have access to all documents and information relating to the Litigation Trust Assets and the objections to the Class A4 Claims and be able to exchange such information with the Reorganized Debtors on a confidential basis and in common interest without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Given the Litigation Trust's position as successor to the Litigation Trust Assets, sharing such information between the Reorganized Debtors and the Litigation Trustee and their counsel shall not waive or limit any applicable privilege or exemption from disclosure or discovery related to such information. Accordingly, on the Effective Date, the Reorganized Debtors and the Litigation Trustee shall enter into the Confidentiality and Common Interest Agreement providing for, inter alia, the Reorganized Debtors to provide reasonable access to, and the Litigation Trust shall have the right to secure, at its own expense, copies of, all of the Debtors' and Reorganized Debtors' records and information relating to the Litigation Trust Assets and objections to Class A4 Claims, including, without limitation, all electronic records or documents. The Litigation Trustee shall also have full and complete access to, and the right to copy at the expense of the Litigation Trust, all reports, documents, memoranda and other work product of the Debtors and the Creditors' Committee and their respective professionals and advisors related to the Litigation Trust Assets and objections to Class A4 Claims. From and after the Effective Date, the Reorganized Debtors and their officers, employees, agents, and professionals shall provide reasonable cooperation during normal business hours in responding to information requests of the Litigation Trustee regarding the Litigation Trust Assets and objections to Class A4 Claims. For a period of five years after the Effective Date, or the date of termination provided in this Section 5.17 if earlier, the Reorganized Debtors shall preserve all records and documents (including all electronic records or documents) related to the Transferred Causes of Action or, if any Transferred Cause of Action has been asserted in a pending action, then until such later time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved; *provided, however*, that nothing herein shall or shall be deemed to expand the scope of documents available, and/or require production of work product, to the Litigation Trust, that would not otherwise have been available to the Debtors or be available to the Reorganized Debtors. To the extent that the Reorganized Debtors incur out of pocket costs and expenses for travel accommodations, electronic discovery and other forensic investigation and analysis or courier and mail service in performing their obligations under this Section 5.17 or in otherwise supporting the Litigation Trust to the extent such support is required by the Litigation Trust Agreement or is otherwise requested and provided under the Confidentiality and Common Interest Agreement, the Litigation Trust shall be required to reimburse the Reorganized Debtors for such actual costs and expenses within 15 days of receipt of a written invoice;

*provided, however*, that if such costs and expenses are third party costs and expenses, the Reorganized Debtors may require that such costs and expenses be incurred directly, and be paid in advance, by the Litigation Trust; *provided further, howeve*r, that the Reorganized Debtors shall not incur any such out of pocket cost or expense reasonably estimated to be in excess of $50 without the prior written consent of the Litigation Trust.

(p)      The Litigation Trust shall not (i) execute upon any assets of the D&O Defendants or (ii) record any judgment against the D&O Defendants; *provided*, *however*, that the Litigation Trust shall be entitled to recover any judgment, settlement, or other proceeds arising from or related to the Transferred Causes of Action only from the Debtors' director and officer insurance policies (the "D&O Insurance Policies") and other damages, if any, from the Debtors' director and officer insurance companies (the "D&O Insurers") related to any Insurance Coverage Action (subject to the allocation set forth in Section 5.17(v)); *provided*, *further*, that there shall be no limitation on a D&O Defendant's liability in the event that the subject director or chief executive officer (i) intentionally impairs or impedes insurance coverage, (ii) intentionally attempts to cause or causes the delay of any insurance coverage or the payment thereof, or (iii) is not entitled to insurance coverage on account of his or her failure to make a timely claim under the applicable policies or failure to cooperate with the insurers.

(q)      The D&O Defendants shall cooperate fully in good faith with the D&O Insurers in defense of any Transferred Cause of Action in which any D&O Defendant is a defendant (any such action, a "D&O Action") brought by the Litigation Trust.  In further cooperation with the D&O Insurers in defense of any action brought by the Litigation Trust, the D&O Defendants agree to either (i) accept counsel appointed by the Primary D&O Insurer(s), (ii) retain counsel that will accept the standard, usual, and customary rates paid by the Primary D&O Insurer(s), or (iii) if the D&O Defendants wish to retain other counsel, bear responsibility to pay any excess amounts over and above those standard, usual, and customary rates.  To the extent the D&O Insurers refuse to reimburse or advance the D&O Defendants for the defense of, or deny their duty to defend, any claims alleged by the Litigation Trust in a D&O Action, the D&O Defendants shall be liable and responsible for their own defense of the Transferred Causes of Action except as otherwise provided in Section 5.17(t), Section 5.17(v), and Section 6.6(a) of the Plan.

(r)      The D&O Defendants (i) shall defend any Insurance Coverage Action initiated by the Debtors' D&O Insurers, including if such Insurance Coverage Action is initiated as a counter or cross claim against the D&O Defendants and (ii) shall file any Insurance Coverage Action as deemed appropriate by the Litigation Trust against the Debtors' D&O Insurers.

(s)      In connection with any Insurance Coverage Action, the Litigation Trust shall (i) have the right to select capable and competent counsel with experience in insurance coverage and/or related litigation matters, as applicable, to represent the D&O Defendants; (ii) have the right to control the commencement, prosecution, disposition, settlement, or other resolution of the Insurance Coverage Action and (iii) be responsible for all costs and attorney's fees incurred by the D&O Defendants in connection with the prosecution or defense of such actions by counsel selected by the Litigation Trust.  Additionally, the D&O Defendants shall cooperate fully and in good faith with the Litigation Trust in pursuing or defending any Insurance Coverage Action, if necessary, and as applicable.  Subject to the applicable cooperation clauses in the D&O Insurance Policies, the D&O Defendants further agree to waive any and all actual or potential conflicts of interest so as to allow the D&O Defendants to be represented by one law

firm in each of (i) any and all Insurance Coverage Actions and (ii) any and all D&O Actions; and shall execute any necessary waivers or other documents reflecting such agreement upon request; *provided, however*, that such waiver shall not be required to the extent not permitted or authorized under applicable law or the applicable D&O Insurance Policies or as to which the D&O Insurers assert that such waiver shall either vitiate coverage or constitute a failure to cooperate under the D&O Insurance Policies.

(t)     Upon service of the complaint in a D&O Action, the D&O Defendants shall immediately tender their defense to the primary D&O Insurer(s) or such other D&O Insurer(s) which, pursuant to the applicable D&O Insurance Policies, becomes obligated to defend the D&O Defendants in the D&O Action or to advance or reimburse the D&O Defendants their costs and expenses incurred in defending the D&O Action (the "Primary D&O Insurer") and shall give notice of such complaint to the other D&O Insurers.  The Litigation Trust will not prosecute any D&O Action until the earlier of (i) the D&O Insurers providing a written statement (the "Coverage Statement") to the D&O Defendants as to whether they will reimburse or advance the D&O Defendants for the defense of, or defend, the D&O Action or (ii) 30 days following the date on which the D&O Defendants tender their defense to the D&O Insurers. Once a Coverage Statement is issued, (x) if the Coverage Statement states that the D&O Insurers will reimburse or advance the D&O Defendants for 90 percent or more of the costs and expenses of defending the D&O Action, or that the Primary D&O Insurer will assume a duty to defend the D&O Action, even if such statement indicates that reimbursement, advancement or defense by the D&O Insurers is subject to a reservation of rights, then the Litigation Trust may proceed with prosecution of the D&O Action and (y) if the Coverage Statement states that the D&O Insurers will reimburse or advance the D&O Defendants for less than 90 percent of the costs and expenses of defending the D&O Action (a "Coverage Denial"), the Litigation Trust will stay the D&O Action as to all causes of action for which such advancement or reimbursement was denied until the earlier of a summary adjudication by a trial court pursuant to subparagraphs (i)-(iii) below or a settlement in an Insurance Coverage Action on the issue of the D&O Insurers' obligations to reimburse or advance the D&O Defendants for the defense of, or the Primary D&O Insurer's obligation to defend, the D&O Action (the "Duty to Defend Issue"), subject to the following conditions (the "Conditions to Stay"):

(i)     Pursuant to the terms and provisions in Section 5.17(s) of the Plan, the Litigation Trust authorizes and the D&O Defendants (through counsel) file an Insurance Coverage Action against the D&O Insurers within 30 days of receipt by the D&O Defendants of a Coverage Denial;

(ii)     the D&O Defendants authorize counsel to file a motion for summary judgment or adjudication on the Duty to Defend Issue within 60 days of the filing of the Insurance Coverage Action. Such counsel shall be authorized to set the motion for summary judgment or adjudication for the earliest possible hearing date, pursuant to minimum statutory notice requirements, and on the earliest court date available for the trial court; and

(iii)     the D&O Defendants do not authorize counsel to, and do not on their own, stipulate or agree to continue the hearing or any other litigation deadlines related to the motion for summary judgment or adjudication.

In the event of a Coverage Denial, so long as the D&O Defendants comply with the Conditions to Stay, the stay of any D&O Action as to causes of action for which advancement or reimbursement was denied will remain in effect until settlement or summary adjudication on the

Duty to Defend Issue or, if the trial court denies summary adjudication on the ground that further proceedings are necessary to resolve the Duty to Defend Issue, until a subsequent order or judgment from the trial court on the Duty to Defend Issue (such settlement, summary adjudication or subsequent order or judgment, a "Trial Court Disposition"); *provided, however*, that if the Trial Court Disposition concludes that the D&O Insurers are obligated to reimburse or advance the D&O Defendants for less than ten percent of the costs and expenses of defending the D&O Action, or that the Primary D&O Insurer does not have an obligation to defend the D&O Action, then the D&O Action shall be stayed pending appeal of the Trial Court Disposition on the Duty to Defend Issue and shall not be terminated until a court of competent jurisdiction issues a final non-appealable judgment (or if the parties reach a settlement) obligating the D&O Insurers to reimburse or advance the D&O Defendants for the defense of, or obligating the Primary D&O Insurer to defend, one or more of the claims alleged by the Litigation Trust. If the Litigation Trust and any D&O Insurer reach a settlement that provides that such D&O Insurer has no obligation to reimburse or advance the D&O Defendants for the defense of, or to defend, one or more (but not all) claims alleged by the Litigation Trust, such settled claims shall be dismissed by the Litigation Trust. For the avoidance of doubt, in the event of a Coverage Denial, the Litigation Trust may proceed with a D&O Action prior to a Trial Court Disposition only if the Litigation Trust dismisses or stays those claims for which the D&O Insurers have denied coverage.

If any D&O Defendant fails to comply with any of the above Conditions to Stay, the stay of the action against the D&O Defendants will be lifted.

The Litigation Trust shall not, directly or indirectly, direct, encourage or otherwise cause counsel selected to represent any of the D&O Defendants in connection with the Insurance Coverage Action to fail to comply with any of the deadlines described above as a Condition to Stay; *provided, however*, that the Litigation Trust may also, in its sole discretion, stipulate to extend the stay of the action against the D&O Defendants beyond the dates set forth above for any reason.

The Litigation Trust shall provide written notice of any Trial Court Disposition to Reorganized Freedom Holdings. In the event any Trial Court Disposition determines that the D&O Insurers have no obligation to reimburse or advance the D&O Defendants for the defense of, or that the Primary D&O Insurer has no obligation to defend, one or more claims alleged by the Litigation Trust, the Litigation Trust shall advise Reorganized Freedom Holdings in such written notice as to whether the Litigation Trust will appeal such Trial Court Disposition.

(u) The duties, responsibilities, and powers of the Litigation Trustee shall terminate in accordance with the terms of the Litigation Trust Agreement after all of the Litigation Trust Assets have been liquidated and after all distributions have been made to the LT Beneficiaries.

(v) The proceeds from any Insurance Coverage Action, whether by settlement, judgment or otherwise, shall be applied (i) first, to reimburse the Litigation Trust for any costs, expenses or attorney's fees incurred by the Litigation Trust in prosecuting such Insurance Coverage Action, (ii) next, to reimburse the D&O Defendants for any costs, expenses and attorney's fees advanced or reimbursed on behalf of the D&O Defendants in defense of any D&O Action (other than amounts to be paid by the D&O Defendants pursuant to Section 5.17(q)(iii)), subject to the requirements of Section 6.6, and (iii) finally, the balance of any such

proceeds shall be delivered to and shall be the sole property of the Litigation Trust to be distributed to the LT Beneficiaries in accordance with the terms of the Plan.

**5.18    Approval of Compromises and Settlements Embodied in Plan**

The terms of the Plan represent compromises and settlements of certain issues among the Debtors, the Existing Lender Agent (in consultation with the Steering Committee Members), and the Creditors' Committee.  To the extent necessary, the Plan is deemed to be a motion for approval of the compromises and settlements and the Confirmation Order shall contain findings supporting and conclusions approving the compromises and settlements as fair and equitable and within the bounds of reasonableness.

# ARTICLE VI

# TREATMENT OF EXECUTORY CONTRACTS
# AND UNEXPIRED LEASES

**6.1    Assumption of Contracts and Leases; Continuing Obligations**

(a)    On the Effective Date, in addition to all executory contracts and unexpired leases that have been previously assumed by the Debtors by order of the Bankruptcy Court, all executory contracts and unexpired leases of the Debtors listed on the Contract/Lease Schedules are hereby deemed assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  On or before the day that is ten (10) days before the Voting Deadline, the Debtors (after consultation with the Steering Committee Members) shall file the Contract/Lease Schedules; *provided, however*, that the Debtors reserve the right to amend the Contract/Lease Schedules at any time prior to the Effective Date.  The Debtors shall provide notice of any amendments to the Contract/Lease Schedules to the parties to the executory contracts and unexpired leases affected thereby and to the Creditors' Committee.

(b)    To the extent applicable, all executory contracts or unexpired leases of Reorganized Debtors assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

(c)    Each executory contract and unexpired lease assumed pursuant to Article VI of the Plan (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

(d)    In the event that any license granted to the Debtors by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtors, such license shall be deemed to be assumed pursuant to Section 365 of the Bankruptcy Code under the Plan; *provided, however,* that the assumption of the licenses issued by the FCC shall be subject to compliance with the rules and regulations of the FCC.

(e)    Continuing obligations of third parties to the Debtors under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or

prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, shall continue and shall be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtors or by order of Bankruptcy Court. The deemed rejection provided by Section 6.3 of the Plan shall not apply to any such continuing obligations.

(f) To the extent any insurance policy under which the insurer has a continuing obligation to pay the Debtors or a third party on behalf of the Debtors is held by the Bankruptcy Court to be an executory contract and is not otherwise assumed upon motion by a Final Order, such insurance policy shall be treated as though it is an executory contract that is assumed pursuant to Section 365 of the Bankruptcy Code under the Plan. Any and all Claims (including Cure) arising under or related to any insurance policies or related insurance agreements that are assumed by the Debtors prior to or as of the Effective Date: (i) shall not be discharged; (ii) shall be Allowed Administrative Claims; and (iii) shall be paid in full in the ordinary course of business of the Reorganized Debtors as set forth in Section 3.1(a) of the Plan.

## 6.2 Cure Rights for Executory Contracts or Unexpired Leases Assumed under Plan

Any monetary Cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the later of (a) the Effective Date (or as soon as practicable thereafter), (b) as due in the ordinary course of business or (c) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree. In the event of a dispute regarding: (i) the amount of any Cure payments, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. The Debtors shall list Cure amounts for executory contracts and unexpired leases on the Contract/Lease Schedules. **The failure of any non-Debtor party to an executory contract or unexpired lease to file and serve an objection to the Cure amount listed on the Contract/Lease Schedules for such party's contract or lease by the deadline set forth on the Contract/Lease Schedules shall be deemed consent to such Cure amount**; *provided*, *however*, that prior to entry of a Final Order approving the assumption of an executory contract or unexpired lease, the Debtors shall be authorized to reject any executory contract or unexpired lease to the extent the Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by the Bankruptcy Court renders assumption of such executory contract or unexpired lease unfavorable to the Estates.

## 6.3 Rejection of Contracts and Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have rejected each prepetition executory contract and unexpired lease to which it is a party unless such contract or lease (i) is listed on the Contract/Lease Schedules as of the Confirmation Date, (ii) was previously assumed or rejected upon motion by a Final Order, (iii) previously expired or terminated pursuant to its own terms, or

(iv) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the rejection of the prepetition executory contracts and unexpired leases described above, as of the Effective Date.

**6.4    Rejection Damage Claim Bar Date for Rejections Pursuant to Plan**

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the claims agent and served upon counsel to the Reorganized Debtors and the Litigation Trustee within thirty (30) days after entry of the Confirmation Order. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a Proof of Claim filed by earlier applicable bar dates, or shall be otherwise Allowed, and if not shall be barred and unenforceable unless otherwise ordered by the Bankruptcy Court.

**6.5    Employee Compensation and Benefit Programs**

(a)    Except to the extent (i) otherwise provided for in the Plan (including, without limitation, otherwise provided in subparagraphs (d) and (f) of this Section 6.5 and in Section 6.6 of the Plan), (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation, benefit, and expense reimbursement programs, plans, policies, and agreements of the Debtors in effect during the pendency of the Chapter 11 Cases, including all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all benefits subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Cases, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan; *provided, however*, that the foregoing provision shall not apply to unpaid compensation and severance Claims that were not authorized to be paid under the First Day Employee Order, which unpaid Claims shall be treated as Other Priority Claims or General Unsecured Claims, as may be applicable.  Except as expressly provided in the Plan, nothing contained herein shall be deemed to modify the existing terms of any such employee compensation, benefit, and expense reimbursement program, plan, policy, or agreement, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

(b)    Subject to the rights of the Debtors and the Reorganized Debtors to terminate or amend as provided for in Section 6.5(a) of the Plan, the Debtors shall continue after the Effective Date the Retirement Plan of Freedom Communications, Inc. (the "Retirement Plan"), the qualified defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461, maintained by the Debtors.  As part of the continuation of the Retirement Plan, subject to any such termination or amendment, the Reorganized Debtors shall meet the minimum funding standards under ERISA and the Internal Revenue Code, pay all insurance premiums owed to the Pension Benefit Guaranty Corporation (the "PBGC"), and administer and operate the Retirement Plan in accordance with its terms and ERISA.  Nothing in the Plan is intended to release or discharge

any statutory liability or obligation of the Debtors or the Reorganized Debtors with respect to the PBGC or the Retirement Plan. Neither the PBGC nor the Retirement Plan shall be enjoined or precluded from enforcing such liability as a result of the Plan.

(c)     In accordance with the authority provided by the First Day Employee Order, the Debtors shall, in the ordinary course of business, pay all valid prepetition claims, assessments and premiums arising under their workers' compensation program.

(d)     The Non-Qualified DC Plan, the Non-Qualified EB Plan, and the Individual Retirement Agreements shall be treated as set forth in Section 3.2(e) of the Plan. To the extent the Non-Qualified DC Plan, Non-Qualified EB Plan, or any of the Individual Retirement Agreements are considered to be executory contracts, such Non-Qualified DC Plan, Non-Qualified EB Plan, or the Individual Retirement Agreements, shall be deemed to be assumed as modified by the Plan pursuant to Section 365 of the Bankruptcy Code under the Plan. Any Claims under the Non-Qualified DC Plan, Non-Qualified EB Plan, and the Individual Retirement Agreements shall be treated as Non-Qualified Retirement Claims.

(e)     The Debtors' prepetition collective bargaining agreements shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

(f)     As of the Effective Date, any and all stock based incentive plans or stock ownership plans of the Debtors entered into before the Effective Date (including, without limitation, the Freedom Holdings 2004 Long-Term Incentive Plan (as amended and restated) and the Freedom Holdings 2008 Restricted Stock Unit Award Plan), or other agreements or documents giving rise to Old Freedom Stock Rights, shall be terminated. To the extent such plans, agreements, or documents are considered to be executory contracts, such plans, agreements, or documents shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan.

(g)     To the extent that a retired employee of the Debtors, or a spouse or surviving spouse of such a retired employee, was provided health benefits as of the Petition Date under the Debtors' self-funded group health plan for active employees of the Debtors, and the health insurance policy maintained under the Debtors' Executive Medical Reimbursement Plan (the "EMRP") pursuant to any prepetition agreement with the Debtors, the Reorganized Debtors shall continue to provide health benefits to such retired employees, spouses, and surviving spouses, notwithstanding the rejection of any such prepetition agreement, to the extent that the Reorganized Debtors continue to provide health benefits under the Reorganized Debtors' group health plan, the EMRP, or by other means to their active employees as a whole on or after the Effective Date. The continued health benefits provided to the retired employees, spouses, and surviving spouses shall be subject to any applicable laws. On and after the Effective Date, such retired employees, spouses, and surviving spouses shall have no greater or lesser rights to health benefits than the rights of the active employees as a whole participating in the Reorganized Debtors' group health plan or the EMRP or receiving health benefits on any other basis, including by contract; *provided, however*, that any such retired employee, spouse, or surviving spouse shall not be treated as having lesser rights by reason of receiving primary coverage under Medicare and secondary coverage under the Debtors' group health plan, EMRP, or other health benefits plan. Nothing herein shall restrict or limit the rights of the Reorganized Debtors to modify or terminate the Reorganized Debtors' group health plan, the EMRP, or any other health

benefits plan or agreement of the Reorganized Debtors at any time in anyway for active employees, and the rights of the Reorganized Debtors to so modify or terminate the Debtors' group health plan, the EMRP, or any other health benefits plan or agreement of the Reorganized Debtors on or after the Effective Date shall be reserved. If the Reorganized Debtors' group health plan or the EMRP, or any other health benefits plan or agreement of the Reorganized Debtors, or any benefits provided thereunder, are modified or terminated as to active employees of the Reorganized Debtors, the benefits provided to such retired employees, spouses, and surviving spouses shall be similarly modified or terminated, and the Reorganized Debtors shall have no obligation to provide such retired employees, spouses, or surviving spouses with any health benefits that are eliminated or decreased as a result of any such modification or termination; *provided, however*, that if such health plan or the EMRP (or any successor plan that is equivalent to or superior to the health plan or the EMRP being provided to active employees of the Reorganized Debtors as of the Effective Date) is being provided to any active employees of the Reorganized Debtors, then such health plan or the EMRP as in effect on the Effective Date shall continue to be provided to such retired employees, spouses or surviving spouses. In no event shall any retired employee, spouse, or surviving spouse be entitled on or after the Effective Date to any rights or benefits that exceed the rights or benefits provided to such retired employee, spouse, or surviving spouse under the applicable prepetition agreement and, to the extent provided under such prepetition agreement, such retired employee, spouse, or surviving spouse shall be required to maintain Medicare coverage at his or her expense as a condition to receiving health benefits from the Reorganized Debtors on and after the Effective Date. Any and all Claims of the retired employees, spouses, and surviving spouses for health benefits pursuant to any prepetition agreement shall be deemed satisfied in full by the provisions of this subsection.

**6.6    Indemnification Obligations**

(a)    All Indemnification Obligations owed to any person who is a director, officer, or employee of the Debtors serving immediately prior to the Effective Date, other than any such director, officer, or employee that is a D&O Defendant (with respect to any Transferred Cause of Action only), shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order); *provided, however*, that in no event shall any Reorganized Debtor be required to indemnify any such director, officer, or employee to a greater extent than is provided under the charter, bylaws, or similar governing document of such Debtor in effect as of immediately prior to the Effective Date or permitted under the Delaware General Corporation Law (or other applicable law governing indemnities for such Debtor). All Indemnification Obligations owed to any person who was a former director, officer, or employee of the Debtors immediately prior to the Effective Date shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order).

(b)    All Indemnification Obligations owed to any of the D&O Defendants with respect to an Insurance Coverage Action or Transferred Causes of Action only shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order); *provided, however*, that if, and to the extent that (i) the D&O Insurers do not reimburse or advance all or a portion of the costs, expenses, or attorney's fees incurred by

the D&O Defendants in defense of a D&O Action, and such D&O Action proceeds in accordance with the terms of Section 5.17 or (ii) the D&O Insurers advance on behalf of the D&O Defendants any of the costs, expenses, or attorney's fees incurred by the D&O Defendants in defense of the D&O Action subject to a reservation of rights, and a court of competent jurisdiction subsequently determines that the D&O Defendants must reimburse the D&O Insurers for all or a portion of the advancement or prior reimbursement of such costs, expenses and attorney's fees, then Reorganized Freedom Holdings shall reimburse the D&O Defendants from and, where applicable, advance on behalf of the D&O Defendants, such reasonable costs, expenses, and attorney's fees incurred by the D&O Defendants and not reimbursed by the D&O Insurers in defense of the D&O Action (the "Defense Expenses"), *provided further, however*, that Reorganized Freedom Holdings shall not advance Defense Expenses to a D&O Defendant unless such D&O Defendant, pursuant to applicable law, shall deliver to Reorganized Freedom Holdings an undertaking, by or on behalf of such D&O Defendant, to repay all amounts so advanced if it shall ultimately be determined that such person is not entitled to be indemnified against such Defense Expenses pursuant to this Section 6.6(b), *provided further, however*, that in the event it is later determined, by agreement, settlement, judgment, or otherwise, that the D&O Defendants were entitled to reimbursement of such Defense Expenses by the D&O Insurers, the D&O Defendants shall hold in trust and forthwith turn over any proceeds from an Insurance Coverage Action first to repay Reorganized Freedom Holdings for Defense Expenses advanced or reimbursed by Reorganized Freedom Holdings. In no event shall the reimbursement or advancement of Defense Expenses by Reorganized Freedom Holdings under this subsection exceed $500,000 in the aggregate. Notwithstanding the foregoing, in no event shall Reorganized Freedom Holdings reimburse or advance the D&O Defendants to a greater extent than is provided under the Amended and Restated Certificate of Incorporation of Freedom Holdings or permitted under the Delaware General Corporation Law. Any reimbursement or advancement of Defense Expenses by Reorganized Freedom Holdings shall be allocated pro rata among the D&O Defendants based on each D&O Defendant's proportionate share of the Defense Expenses. In no event shall the Litigation Trust be responsible for reimbursement of any Defense Expenses.

(c)     Notwithstanding anything to the contrary contained herein, all Indemnification Obligations arising under the Existing Credit Agreement Documents in favor of the Existing Lender Agent, the Existing Lenders, and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Reorganized Debtors after the Effective Date.

**6.7     Insurance Rights**

Notwithstanding anything to the contrary in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening), nothing in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights of the Debtors' insurers, if any, in any respect. The rights of the Debtors' insurers shall be determined under their respective insurance policies and any related agreements with the Debtors, as applicable, subject, however, to the rights, if any, of the Debtors to assume or reject any such policy or agreement and the consequences of such assumption or rejection under Section 365 of the Bankruptcy Code.

**6.8    Limited Extension of Time to Assume or Reject**

(a)    Notwithstanding anything set forth in Article VI of the Plan, and except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor), in the event of a dispute as to whether a contract is executory or a lease is unexpired, Debtors' right to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed rejection provided for in Section 6.3 of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

(b)    Except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor), in the event the Debtors or the Reorganized Debtors become aware after the Confirmation Date of the existence of an executory contract or unexpired lease that was not included in the Contract/Lease Schedules, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Debtors or the Reorganized Debtors become aware of the existence of such contract or lease. The deemed rejection provided for in Section 6.3 of the Plan shall not apply to any such contract or lease unless a motion to assume or reject is not filed within such (30) day period.

**6.9    Postpetition Contracts and Leases**

The Debtors shall not be required to assume or reject any contract or lease entered into by the Debtors after the Petition Date. Any such contract or lease shall continue in effect in accordance with its terms after the Effective Date, unless the Debtor has obtained a Final Order of the Bankruptcy Court approving rejection of such contract and lease.

**6.10    Claims Arising from Assumption or Rejection**

All Allowed Claims arising from the assumption of any executory contract or unexpired lease shall be treated as Administrative Claims pursuant to Section 3.1(a) of the Plan; all Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as General Unsecured Claims pursuant to Section 3.2(d) or Section 3.3(c) of the Plan, depending on the Debtor against which each such Claim is held; and all other Allowed Claims relating to an executory contract or unexpired lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

# ARTICLE VII

# PROVISIONS GOVERNING DISTRIBUTIONS

**7.1    Distributions for Claims Allowed as of Effective Date**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date. Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to Section 8.4 of the Plan. The Reorganized Debtors shall have the right, in their

discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant; *provided, however*, that any such acceleration with respect to payments to be made from the Litigation Trust shall be made by the Litigation Trustee pursuant to the terms of the Litigation Trust Agreement.

## 7.2     Interest on Claims and Interests

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Interest shall not accrue or be paid upon any Disputed Claim or Disputed Interest in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim or Disputed Interest becomes an Allowed Claim or Disputed Interest.

## 7.3     Designation of and Distributions by Disbursing Agent

(a)     The Debtors shall, in their sole discretion, designate the Person to serve as the Disbursing Agent under the Plan, and shall file a written notice of such designation at least five (5) days prior to the Voting Deadline.

(b)     Unless otherwise provided herein, the Disbursing Agent shall make all distributions required to be made on the respective Distribution Date under the Plan, except that (i) payments made to holders of Existing Lender Claims and General Unsecured Claims from the Litigation Trust shall be made by the Litigation Trustee in accordance with the Litigation Trust Agreement and (ii) payments made to holders of Trade Unsecured Claims under the terms of each such holder's Post-Emergence Trade Agreement shall be made by the Reorganized Debtors from the Trade Unsecured Claim Escrow.

(c)     If the Disbursing Agent is an independent third party designated by the Debtors to serve in such capacity, such Disbursing Agent shall receive from the Debtors or the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services, on any agreed terms. No Disbursing Agent shall be required to give any bond, surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

(d)     If the Disbursing Agent is an independent third party, the Litigation Trustee and such third party may agree separately that such third party shall also make distributions on behalf of the Litigation Trustee from the Litigation Trust. In that event, the Litigation Trustee shall be responsible to pay such third party reasonable compensation for distribution services rendered to the Litigation Trust and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services, on any agreed terms. Any requirement for a bond, surety or other security for the performance of distribution services shall be subject to the agreement of such third party and the Litigation Trustee. In no event shall the Reorganized Debtors have any liability for the cost any bond, surety or other security or any liability or responsibility for any actions or inactions of the third party while acting on behalf of the Litigation Trustee.

**7.4    Means of Cash Payment**

Cash payments made pursuant to the Plan shall be in U.S. funds, by check or wire transfer or by such other commercially reasonable means as may be agreed to by the payor and the payee.

**7.5    Calculation of Distribution Amounts of New Securities**

No fractional shares of New Common Stock or Existing Lender Warrants shall be issued or distributed under the Plan.  Each Person entitled to receive New Common Stock or Existing Lender Warrants shall receive the total number of whole shares of New Common Stock and/or Existing Lender Warrants to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of New Common Stock or Existing Lender Warrants, the actual distribution of shares of such stock or warrants shall be rounded to the next higher or lower whole number as follows:  (a) fractions one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number.  Notwithstanding the foregoing, whenever rounding to the next lower whole number would result in such Person receiving no New Common Stock or no Existing Lender Warrants, such Person shall receive one (1) share of New Common Stock or one (1) Existing Lender Warrant, as the case may be.  If two or more Persons are entitled to equal fractional entitlements and the aggregate amount of New Common Stock or Existing Lender Warrants that would otherwise be issued to such Persons with respect to such fractional entitlements as a result of such rounding exceeds the number of whole shares and/or warrants which remain to be allocated, the Disbursing Agent shall allocate the remaining whole shares and/or warrants to such holders by random lot or such other impartial method as the Disbursing Agent deems fair.  Upon the allocation of all of the whole shares and/or warrants authorized under the Plan, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect.  The Disbursing Agent shall have the right to carry forward to subsequent distributions any applicable credits or debits arising from the rounding described in this paragraph.

**7.6    Delivery of Distributions**

(a)    Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or the Litigation Trustee, as applicable, (i) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtors, the claims agent, the Disbursing Agent, and the Litigation Trustee have been notified of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Debtors, the claims agent, the Disbursing Agent, and the Litigation Trustee after the date of any related Proof of Claim, (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and a written notice of a change of address has not been received by the Debtors, the claims agent, the Disbursing Agent, and the Litigation Trustee, or (iv) in the case of an Existing Lender Claim, at the addresses provided by the Existing Lenders.  To the extent that addresses are required to effect distributions to Existing Lenders, no distributions shall be made to any Existing Lender who fails to provide the Existing Lender Agent and the Debtors with written instructions as to the address at which such Existing Lender desires to receive distributions under the Plan, until such written instructions are provided.

(b)     If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent or the Litigation Trustee, as applicable, is notified by the Debtors, the claims agent, or such holder of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  If any distribution is made by check and such check is not returned but remains uncashed for six (6) months after the date of such check, the Disbursing Agent or the Litigation Trustee, as applicable, may cancel and void such check, and the distribution with respect thereto shall be deemed undeliverable.  If any holder is requested to provide a taxpayer identification number or to otherwise satisfy any tax withholding requirements with respect to a distribution and such holder fails to do within six (6) months of the date of such request, such holder's distribution shall be deemed undeliverable.

(c)     With respect to distributions to be made by the Disbursing Agent, unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of returned or otherwise undeliverable or unclaimed distributions made by the Disbursing Agent on behalf of the Reorganized Debtors shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (a) on or before the first (1st) anniversary of the Effective Date or (b) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property shall revert to the Reorganized Debtors free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  In the event of a timely claim for any returned or otherwise undeliverable or unclaimed distribution, the Reorganized Debtors shall deliver the applicable distribution amount or property to the Disbursing Agent for distribution pursuant to the Plan.  Nothing contained in the Plan shall require any Debtor, any Reorganized Debtor, or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(d)     With respect to distributions to be made by the Litigation Trustee, amounts in respect of returned or otherwise undeliverable or unclaimed distributions shall be retained in the Litigation Trust until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (a) on or before the first (1st) anniversary of the Effective Date or (b) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property shall revert to the Litigation Trust free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Nothing contained in the Plan shall require any Debtor, any Reorganized Debtor, or the Litigation Trustee to attempt to locate any holder of an Allowed Claim.

## 7.7     Application of Distribution Record Date

(a)     **Existing Lender Claims**

At the close of business on the Distribution Record Date, the register maintained by the Existing Lender Agent shall be closed and there shall be no further changes in the listed holders of the Existing Lender Claims for purposes of distributions under the Plan. The Reorganized Debtors, the Disbursing Agent, the Existing Lender Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Existing Lender Claims occurring after the Distribution Record Date and shall be entitled instead

to recognize and deal for all purposes hereunder with only those record holders stated on the register as of the close of business on the Distribution Record Date.

(b)     **Other Claims**

At the close of business on the Distribution Record Date, the claims register maintained by the claims agent shall be closed and there shall be no further changes in the listed holders of the Claims.  The Reorganized Debtors, the Disbursing Agent, the Litigation Trustee, the claims agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims register as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

**7.8     Withholding and Reporting Requirements**

In connection with the Plan and all distributions hereunder, the Disbursing Agent or the Litigation Trustee, as applicable, shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding, payment, and reporting requirements. The Disbursing Agent or the Litigation Trustee, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent or the Litigation Trustee, as applicable, for the payment and satisfaction of such withholding tax obligations in connection with such distribution.  Any cash or other property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Section 7.6 of the Plan.

**7.9     Setoffs**

The Reorganized Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder; *provided further*, *however*, that all of the Debtors' rights to setoff are waived as to any Existing Lender.

**7.10     Prepayment**

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Reorganized Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; *provided*, *however,* that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

**7.11     De Minimis Distributions**

Neither the Reorganized Debtors, the Disbursing Agent, nor the Litigation Trustee shall have any obligation to make a Cash distribution with respect to any Claim (other than a Claim held by an Existing Lender) if the amount of the distribution is less than $20.00.  The Claim of any holder (other than an Existing Lender) whose distribution is in an amount less than $20.00 shall be discharged, and such holder shall be forever barred from asserting such Claim against the Reorganized Debtors or their respective property; *provided, however*, that if the Claim is a Class A4 Claim, (a) it shall be included, regardless of amount, in all allocations made to determine distribution entitlements and (b) it shall not be discharged until all subsequent distributions under Sections 1.47 and 8.4 of the Plan have been made, although any such subsequent distribution shall be subject to the first sentence of this Section 7.11.  Except with respect to distributions from the Litigation Trust, any Cash not distributed as a result of this provision shall be the property of the Reorganized Debtors, free of any restrictions, and any such Cash held by the Disbursing Agent shall be returned to the Reorganized Debtors following the Distribution Date that would have applied to any such distribution.  For distributions from the Litigation Trust, any Cash not distributed as a result of this provision shall be the property of the Litigation Trust.

**7.12     No Distribution in Excess of Allowed Amount of Claim**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Plan).

**7.13     Allocation of Distributions**

All distributions received under the Plan by holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

**ARTICLE VIII**

**PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO**

**8.1     Prosecution of Objections to Claims**

(a)     **Objections to Claims**

All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline.  If an objection has not been filed to a Proof of Claim or Request for Payment by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim, or Request for Payment, relates shall be treated as an Allowed Claim if such Claim has not been allowed earlier.  The Reorganized Debtors or, with respect to Class A4 Claims only, the Litigation Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether such Debtor or the Litigation Trustee has previously

objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors or the Litigation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

Nothing in the Plan shall, or shall be construed to, limit, alter, impair, or release any objection or counterclaim to any Proof of Claim filed by a D&O Defendant.

(b)     **Authority to Prosecute Objections**

After the Effective Date, except with respect to Class A4 Claims, only the Reorganized Debtors shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims. The Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

With respect to Class A4 Claims, only the Litigation Trustee shall have the authority to file objections to such General Unsecured Claims and to settle, compromise, withdraw, or litigate to judgment objections to such Claims. The Litigation Trustee may settle or compromise any Disputed Class A4 Claim without approval of the Bankruptcy Court.

Nothing herein shall limit the contractual rights and obligations of any party, including any insurer, with respect to any Claim, under (i) an assumed agreement, including any assumed insurance policy, or (ii) any non-executory agreement, including a non-executory insurance policy, as to which such party has continuing obligations pursuant to Section 6.1(e) of the Plan or applicable law.

## 8.2     Deemed Allowance of Gonzalez Litigation Claims

The Gonzalez Litigation Claims shall be deemed to be Allowed Class A4 Claims in the aggregate amount of $29.5 million. In no event shall the Litigation Trust have any liability to the holders of Gonzalez Litigation Claims for any amount that exceeds the distribution entitlement applicable to an Allowed Class A4 Claim in the aggregate amount of $29.5 million and the Reorganized Debtors shall have no liability whatsoever to the holders of Gonzalez Litigation Claims.

## 8.3     Treatment of Disputed Claims Pending Allowance

Notwithstanding any other provisions of the Plan, no payments or distributions shall be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim; *provided, however*, that the Reorganized Debtors or, with respect to Class A4 Claims only, the Litigation Trustee, as applicable, may elect to withhold distributions on the portion of a Claim that is not Disputed until the portion of the Claim that is Disputed is resolved by Final Order.

**8.4     Allocations and Distributions for Disputed Class A4 Claims**

As soon as practicable prior to the initial Distribution Date applicable to Class A4 Claims, the Litigation Trustee shall determine the Pro Rata allocation of Class A4 Beneficial Trust Interests for holders of (a) Allowed General Unsecured Claims based upon their Allowed Claim amounts and (b) Disputed General Unsecured Claims based upon their Proof of Claims amounts or such other allocation amounts as may be agreed by such holders or ordered by the Bankruptcy Court.  Any distributable amounts relating to the Pro Rata allocation for the holder of a Disputed General Unsecured Claim shall be available for distribution to such holder, but only in an amount reflecting the Pro Rata share attributable to the actual amount of such holder's Allowed Claim, on the Distribution Date following entry of a Final Order resolving such Claim, and otherwise shall be treated in accordance with the terms of the Litigation Trust Agreement.

**8.5     Distributions on Account of Other Disputed Claims Once Allowed**

The Disbursing Agent shall, on the applicable Distribution Dates, make distributions on account of any Disputed Claim that has become an Allowed Claim (not including any Disputed Class A4 Claims, which shall be subject to Section 8.4 of the Plan).  Such distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.  Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

## ARTICLE IX

## CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**9.1     Conditions to Confirmation**

The following are conditions precedent to Confirmation, each of which must be satisfied or waived in accordance with Section 9.3 of the Plan:

(a)     the Disclosure Statement shall have been in form and substance reasonably satisfactory to the Debtors, the Steering Committee Members, and the Creditors' Committee, and an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court;

(b)     the Debtors shall have obtained a written commitment for the Exit Facility on terms and conditions that (i) are reasonably acceptable to the Steering Committee Members and the Debtors; and (ii) support the Debtors' demonstration that (x) the Plan is feasible; and (y) the Reorganized Debtors will have the ability to satisfy their obligations to pay current interest and principal under the Term A Facility and the Term B Facility;

(c)     the proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Steering Committee Members, and the Creditors' Committee, and shall, among other things:

(i)     provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into,

implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

        (ii)     approve the Exit Facility;

        (iii)     authorize the issuance of the New Securities; and

        (iv)     provide that the amount of Houlihan's "Phase II Deferred Fees" (as referred to in Section 11.1(b) of the Plan) shall not exceed $4 million.

## 9.2    Conditions to Effective Date

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 9.3 of the Plan:

        (a)     the Confirmation Order shall have been entered on or before March 19, 2010;

        (b)     the Confirmation Order shall not then be stayed, vacated, or reversed, or shall not have been amended without the agreement of the Debtors, the Steering Committee Members, and, as to terms and provisions materially affecting holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee;

        (c)     the Confirmation Order shall not then be subject to a pending appeal, and the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending;

        (d)     the New Freedom Charter, the New Freedom By-Laws, the Exit Facility, the New Equity Incentive Plan, the Term A Facility, the Term B Facility, the Intercreditor Agreement, the New Stockholders Agreement, the Registration Rights Agreement, and the Existing Lender Warrant Agreement shall be in form and substance reasonably acceptable to the Debtors and the Steering Committee Members, and, to the extent any of such documents contemplates execution by one or more persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived in accordance with their respective terms;

        (e)     the Litigation Trust Agreement shall be in form and substance reasonably acceptable to the Debtors, the Existing Lender Agent, the Gonzalez Class Counsel, and the Creditors' Committee, and, to the extent such document contemplates execution by one or more persons, such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of such document shall have been satisfied or waived in accordance with its terms;

        (f)     there shall not have been any material adverse change (as measured against the information provided to the Existing Lender Agent and/or its advisors prior to the Petition Date) in the status of any claims against the Debtors on account of (i) pension funding liability, (ii) tax liability, and (iii) environmental liability; *provided that*, with respect to (i) and (ii), there shall not be a material adverse change if the Steering Committee Members and the Debtors are able to negotiate a mutually satisfactory response to such change, subject to any requirements of the Bankruptcy Code, within 15 business days of its discovery;

(g)     the Debtors shall have Cash on hand as of the Effective Date of at least $15 million;

(h)     the Exit Facility (i) shall be on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors; (ii) shall be in full force and effect upon closing, and (iii) shall provide for the extension of credit thereunder to be available upon closing;

(i)     all conditions precedent to the closing of the Exit Facility, the Term A Facility, and the Term B Facility as set on Exhibit A hereto shall have been satisfied or waived, as applicable;

(j)     all material governmental, regulatory, and third party approvals, waivers, or consents in connection with the Plan (including any required approvals or waivers by the FCC), if any, shall have been obtained and shall remain in full force and effect, and there shall exist no third party claim, action, suit, investigation, litigation, request for reconsideration, or proceeding pending in any court or before any arbitrator or governmental instrumentality, which would if successfully pursued prohibit the transactions contemplated by the Plan;

(k)     all motions necessary to effect the withdrawal and dismissal, with prejudice, by the Existing Lender Agent, any of the Existing Lenders, the Creditors' Committee, any member of the Creditors' Committee, or any holder of a Gonzalez Litigation Claim, of any litigation, discovery, appeals, or motions that seek or would have the effect of hindering, delaying, or objecting to the consummation of the Plan, shall have been filed by the applicable party, which motions shall be without condition other than the occurrence of the Effective Date;

(l)     the Mutual Release Agreement shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of such document shall have been satisfied or waived in accordance with its terms;

(m)     the Superior Court of California, County of Orange, presiding over the Gonzalez Litigation Claims, shall have approved the Mutual Release Agreement to the extent it relates to a release granted by the Gonzalez Class Counsel and a class representative on behalf of the holders of the Gonzalez Litigation Claims of each of the Existing Lenders, the Existing Lender Agent, the financial and legal advisors for the Existing Lenders and the Existing Lender Agent, each member of and Professional retained by the Creditors' Committee, each such member's professionals, and the Debtors for themselves and on behalf of their current and former directors, officers, and Professionals (exclusive of the D&O Defendants), as described in the Mutual Release Agreement;

(n)     the Debtors have provided a representation and warranty in a form and substance reasonably satisfactory to the Creditors' Committee that, as of the Confirmation Date, there are no claims that have been made or are pending against the D&O Insurance Policies, except for the notice of claim submitted by the Debtors on behalf of their directors and officers in connection with the examinations under Rule 2004 of the Bankruptcy Rules undertaken by the Creditors' Committee;

(o)     the Debtors have entered into Post-Emergence Trade Agreements evidencing that they have satisfied the requirement of Section 5.11(d) of the Plan; and

(p)     all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

**9.3     Waiver of Conditions**

With the exception of the conditions contained in Section 9.1(a), 9.2(a), and 9.2(b) of the Plan, each of the conditions set forth in Section 9.1 and Section 9.2 of the Plan may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing, *provided, however*, that any such waiver shall not be effective without the consent of the Steering Committee Members, which consent shall not be unreasonably withheld; *provided further, however*, that any such waiver with respect to Section 9.1(c), 9.2(e), and 9.2(n) of the Plan shall not be effective without the additional consent of the Creditors' Committee, which consent shall not be unreasonably withheld; and *provided further, however*, that with respect Section 9.2(c) or 9.2(k) of the Plan, if the particular matter to be waived materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, such waiver shall not be effective without the additional consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

## ARTICLE X

## RETENTION OF JURISDICTION

**10.1     Scope of Retention of Jurisdiction**

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including the resolution of any Request for Payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)     hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided, however,* that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)     hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)     effectuate performance of and payments under the provisions of the Plan;

(e)     hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, the Retained Litigation Rights, or the Transferred Causes of Action;

(f)     enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(g)     hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(h)     hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, *provided*, *however*, that any dispute arising under or in connection with the Exit Facility, Term A Facility, the Term B Facility, and the New Securities shall be determined in accordance with the governing law designated by the applicable document;

(i)     consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(k)     enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(l)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(m)     except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

(n)     hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(p)     hear and determine all matters arising under the Broadcast Trust Agreement or relating to the Broadcast Trustee, including, without limitation, with respect to any continuing supervision that may be required under Section 5.16(b) of the Plan;

(q)     hear and determine all matters arising under the Litigation Trust Agreement or relating to the Litigation Trustee;

(r)     hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(s)     enter one or more final decrees closing some or all of the Chapter 11 Cases.

**10.2    Failure of the Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.1 of the Plan, the provisions of this Article X shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

**11.1    Professional Fee Claims; Expense Reimbursements**

(a)    All final applications seeking allowance and payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code and Substantial Contribution Claims under Section 503(b)(3), (4), or (5) of the Bankruptcy Code must be filed and served on the Reorganized Debtors, their counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such applications must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

(b)    In connection with the Professional Fee Claim of Houlihan, the Debtors, the Creditors' Committee, and Houlihan have settled all issues relating to the "Phase II Monthly Fees" and the "Phase II Deferred Fee," as such terms are defined in that certain First Amendment dated May 6, 2009 to that certain Engagement Agreement dated March 13, 2009 (the "Amended Engagement Agreement") as described in this paragraph. The Debtors (including the Litigation Trust), the Creditors' Committee, and the Steering Committee Members each agree that they have no objection to the final award of Phase II Monthly Fees in the amount set forth in the Amended Engagement Agreement and the Phase II Deferred Fee in the amount of $4 million. The Debtors further agree that the Phase II Monthly Fees and Phase II Deferred Fee as described in the preceding sentence are reasonable under the standards set forth in Sections 328(a) and 330(a) of the Bankruptcy Code. The Debtors and the Existing Lender Agent further each agree that they will oppose any objection raised by a party in interest to Houlihan's final fee application. Additionally, both Houlihan and the Creditors' Committee also have agreed that upon confirmation of this Plan, each party will dismiss with prejudice its appeal and cross-appeal, respectively, in the United States District Court for the District of Delaware regarding the Order Authorizing the Employment and Retention of Houlihan Lokey Howard & Zukin Capital, Inc. as Investment Bankers and Financial Advisors Pursuant to 11 U.S.C. §§ 327(a), 330, and 1107 and Fed. R. Bankr. P. 2014(a) and Del. Bankr. L.R. 2014-1, Nunc Pro Tunc to the Petition Date.  The Debtors (including the Litigation Trust), the Creditors' Committee, and the Existing Lender Agent each recognize that Houlihan intends to file a final fee application for the Phase II Monthly Fees in the amount set forth in the Amended Engagement Agreement and the Phase II Deferred Fee in the amount of $4 million in time to be heard at the Confirmation Hearing.  Such parties have no objection to the consideration of such final fee application at the Confirmation Hearing and, as a result, the Bankruptcy Court has agreed to hear such final fee application at that time.  Any other fees and all expense reimbursements provided for under the Amended

Engagement Agreement shall be subject to the final application process described in Section 11.1(a) of the Plan.

(c)     Each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay reasonable professional fees and expenses in connection with services rendered to it after the Effective Date.

## 11.2    Administrative Claims Bar Date

All Requests for Payment of an Administrative Claim (other than as set forth in Sections 3.1(a) and 11.1 and this Section 11.2 of the Plan) must be filed with the Bankruptcy Court and served on counsel for the Debtors or Reorganized Debtors no later than forty-five (45) days after the Effective Date.  The Debtors shall provide supplemental notice of such filing deadline by mail with respect to known claimants and by publication with respect to unknown claimants.  Unless the Debtors or Reorganized Debtors object to an Administrative Claim by the applicable Claims Objection Deadline, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that the Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  Notwithstanding the foregoing, (a) no Request for Payment need be filed with respect to an undisputed postpetition obligation which was paid or is payable by any of the Debtors in the ordinary course of business; *provided, however*, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; (b) no Request for Payment need be filed with respect to Cure owing under an executory contract or unexpired lease if (i) the amount of Cure is fixed or proposed to be fixed by the Confirmation Order or other order of the Bankruptcy Court either pursuant to the Plan or pursuant to a motion to assume and fix the amount of Cure filed by the Debtors and (ii) a timely objection asserting an increased amount of Cure has been filed by the non-Debtor party to the subject contract or lease; and (c) no Request for Payment need be filed with respect to fees payable pursuant to Section 1930 of Title 28 of the United States Code.

## 11.3    Payment of Statutory Fees

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date shall be paid by the Reorganized Debtors.  The obligation of the Reorganized Debtors to pay such fees as to any one of their cases shall continue only until such case is closed, dismissed, or converted.

## 11.4    Modifications and Amendments

The Debtors may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date, *provided*, *however*, that any such alteration, amendment, or modification shall not be effective without the consent of the Steering Committee Members and, if such alteration, amendment, or modification materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors

may, with the agreement of the Steering Committee Members and, if the provision at issue materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided*, *however,* that prior notice of such proceedings shall be served to the extent required by the Bankruptcy Rules or order of the Bankruptcy Court.

## 11.5    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor, with the agreement of the Steering Committee Members and, if such term or provision materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Each of the Debtors reserves the right to sever itself from the Plan, in which event the Plan shall continue as to all other non-severing Debtors.

## 11.6    Successors and Assigns and Binding Effect

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such entity, including, but not limited to, the Reorganized Debtors and all other parties in interest in the Chapter 11 Cases.

## 11.7    Compromises and Settlements

From and after the Effective Date, the Reorganized Debtors may compromise and settle various Claims against them and/or Retained Litigation Rights and other claims that they may have against other Persons without any further approval by the Bankruptcy Court; *provided, however*, that the foregoing shall not apply to any Transferred Causes of Action or Disputed Class A4 Claims, which shall be compromised and settled only in accordance with the terms of the Litigation Trust Agreement and the Plan.  Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them and Retained Litigation Rights or other claims that they may have against other Persons, with the exception of the Transferred Causes of Action and Disputed Class A4 Claims.

## 11.8    Releases and Satisfaction of Subordination Rights

All Claims against the Debtors and all rights and claims between or among the holders of Claims relating in any manner whatsoever to any alleged subordination rights shall be deemed satisfied by the distributions under, described in, contemplated by, and/or implemented in

Sections 3.1, 3.2, 3.3, and 3.4 of the Plan. Distributions under, described in, contemplated by, and/or implemented by the Plan to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any alleged subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**11.9    Releases and Related Matters**

    (a)    **Debtor Releases**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Estates, including the Litigation Trustee on behalf of the Litigation Trust acting in the capacity of a bankruptcy or insolvency trustee or examiner, or a receiver for the Creditors' Committee, and any other successor to the Debtors or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, whether pursuing a derivative cause of action or otherwise, shall be deemed to forever release, waive, and discharge:**

**(i)    all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors, against (A) any of the other Debtors and any of the Debtors' non-Debtor affiliates, (B) except with respect to the Transferred Causes of Action against the D&O Defendants, the Debtors' current and former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, and (C) the Existing Lenders, the Existing Lender Agent, and any of their respective current or former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (but solely in their respective capacities as such); *provided, however,* that nothing in this Section 11.9(a) shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any of their employees that is based upon an alleged breach of a confidentiality, noncompete, or (as to non-officer employees only) any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors; and *provided further, however*, that nothing in this Section 11.9(a) shall operate as a release of intercompany obligations between any of the Debtors or between any of the Debtors and their non-Debtor subsidiaries unless otherwise provided for in the Plan; and**

(ii)     all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities arising under (and solely arising under) Chapter 5 of the Bankruptcy Code against any provider of goods or services to the Debtors.

In no event shall any Transferred Cause of Action be subject to the foregoing release, waiver, and discharge.

(b)     **Third Party Releases**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of any Claim that votes to accept the Plan (each a "<u>Releasing Party</u>") shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, against (i) the Debtors' current and former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (exclusive of the D&O Defendants) and (ii) the Existing Lenders, the Existing Lender Agent, and any of their respective current or former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (but solely in their respective capacities as such) (the Persons identified in clauses (i) and (ii) collectively, the "<u>Third Party Releasees</u>"), in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

Each of the Third Party Releasees shall be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), taking place on or prior to the Effective Date against each Releasing Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date. For the avoidance of doubt and notwithstanding anything herein to the contrary, any release provided under this Section 11.9(b) by any Existing Lender shall not affect any right, claim, remedy, or cause of action such lender or its affiliates may have related to any equipment leases.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is (i) in exchange for the good and valuable consideration provided by the Third Party Releasees, representing good faith settlement and compromise of the claims released herein; (ii) in the best interests of the Debtors and

all holders of Claims and Interests; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any claim released by the Releasing Parties against any of the Third Party Releasees or their respective properties.

(c)        **Mutual Agreed Releases**

On the Effective Date, each of the Existing Lenders, the Existing Lender Agent, the financial and legal advisors for the Existing Lenders and the Existing Lender Agent, each member of and Professional retained by the Creditors' Committee, each such member's professionals, the Gonzalez Class Counsel and a class representative for themselves and on behalf of the holders of Gonzalez Litigation Claims, and the Debtors for themselves and on behalf of their current and former directors, officers, and Professionals (exclusive of the D&O Defendants) shall enter into and execute the Mutual Release Agreement, pursuant to which each executing party thereto releases all other executing parties thereto from all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, held by each such executing party against all other executing parties in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

For the avoidance of doubt and notwithstanding anything herein to the contrary, any release provided under the Mutual Release Agreement by any Existing Lender shall not affect any right, claim, remedy, or cause of action such lender or its affiliates may have related to any equipment leases.

(d)        **Waiver of Statutory Limitations on Releases**

THE LAWS OF SOME STATES (FOR EXAMPLE, CALIFORNIA CIVIL CODE §1542) PROVIDE, IN WORDS OR SUBSTANCE THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS DECISION TO RELEASE. THE RELEASING PARTIES IN EACH OF SECTIONS 11.9(a), (b), AND (c) OF THE PLAN ARE DEEMED TO HAVE WAIVED ANY RIGHTS THEY MAY HAVE UNDER SUCH STATE LAWS AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.

**11.10  Discharge of the Debtors**

(a)        Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Interests of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan

on account of such Claims; and upon the Effective Date, except as otherwise provided herein or in the Confirmation Order, (i) the Debtors, and each of them, shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (C) the holder of a Claim based upon such debt accepted the Plan, and (ii) all Interests shall be terminated.

(b)     As of the Effective Date, except as provided in the Plan or in the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, causes of action, liabilities, or Interests relating to the Debtors based upon any act, omission, transaction, or other activity of any nature that occurred prior to the Confirmation Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

(c)     The discharge of the Debtors pursuant to the Plan is not intended to limit in any way the Debtors' insurance coverage or to deprive any third party of any rights to such coverage that may otherwise exist.

**11.11  Injunction**

(a)     **Except as provided in the Plan or in the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner or in any place any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance in any manner or in any place; or (iv) commencing or continuing any action, in each such case in any manner or in any place or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

(b)     **As of the Effective Date, all Persons that have held, currently hold, or may hold, a claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Section 11.9 of the Plan or is subject to exculpation pursuant to Section 11.12 of the Plan are permanently enjoined from taking any of the following actions on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner or in any place any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any**

Lien or encumbrance in any manner or in any place; or (iv) commencing or continuing any action, in each such case in any manner or in any place or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(c)    Without limiting the effect of the foregoing upon any person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 11.11.

## 11.12    Exculpation and Limitation of Liability

(a)    **None of (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Existing Lenders, (iv) the Existing Lender Agent, (v) the Creditors' Committee, or (vi) any of the respective current or former members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates of the foregoing (but solely in their respective capacities as such), shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct, or willful violation of federal or state securities laws or the Internal Revenue Code (in each case as determined by a Final Order), and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

(b)    **Notwithstanding any other provision of the Plan, no holder of a Claim or an Interest, no other party in interest, none of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, and none of their respective successors or assigns, shall have any right of action against (i) any Debtor, (ii) any Reorganized Debtor, (iii) any of the Existing Lenders, (iv) the Existing Lender Agent, (v) the Creditors' Committee, or (vi) any of the respective current or former members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates of the foregoing (but solely in their respective capacities as such), for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code (in each case as determined by a Final Order).**

## 11.13    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or

otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

## 11.14   Revocation, Withdrawal, or Non-Consummation

(a)     The Debtors reserve the right to revoke or withdraw the Plan as to all Debtors at any time prior to the Confirmation Date and to file subsequent plans of reorganization for all Debtors.  If the Debtors revoke or withdraw the Plan in its entirety, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

(b)     The Debtors reserve the right, with the agreement of each of the Steering Committee Members and the Creditors' Committee, to revoke or withdraw the Plan as to any one or more (but not all) Debtors at any time prior to the Confirmation Date and to file subsequent plans of reorganization for any one or more Debtors as to which the Plan is withdrawn or revoked.  A revocation or withdrawal of the Plan as to any one or more (but not all) Debtors shall not affect the Plan as it relates to the other non-revoking or non-withdrawing Debtors.

## 11.15   Plan Supplement

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court at least five (5) days prior to the Voting Deadline.  Upon such filing, all documents included in the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours or may be accessed online at www.deb.uscourts.gov (cm/ecf) or www.loganandco.com. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors in accordance with Section 11.16 of the Plan.

## 11.16   Notices

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor or a Reorganized Debtor under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Rachel Sagan
Vice President and General Counsel
FREEDOM COMMUNICATIONS HOLDINGS, INC.
17666 Fitch
Irvine, California 92614
Telephone: 949-798-3535
Facsimile:  949-789-3524

with copies to:

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: 213-485-1234
Facsimile: 213-891-8763

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: 212-906-1200
Facsimile: 212-751-4864

Michael R. Nestor
Kara Hammond Coyle
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:302-571-6600
Facsimile: 302-571-1253

## 11.17   Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and its members shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases.  The Professionals retained by the Creditors' Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered after the Effective Date, except as may be necessary to file applications pursuant to Section 11.1(a) of the Plan.

## 11.18   Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

## 11.19   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof; *provided, however*, that any and all provisions relating to or dealing with the Transferred Causes of Action and/or the Insurance Coverage Actions shall be governed by and interpreted under the laws of the State of California; *provided further, however*, that nothing herein shall affect the choice of law applicable to the Transferred Causes of Action.

[space intentionally left blank]

Dated: January 28, 2010

Freedom Communications Holdings, Inc.
(for itself and on behalf of the Subsidiary Debtors)

By: _____

Mark A. McEachen
Senior Vice President and Chief Financial Officer

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:     302-571-6600
Facsimile:     302-571-1253
Email:         mnestor@ycst.com
               kcoyle@ycst.com

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:     213-485-1234
Facsimile:     213-891-8763
Email:         robert.klyman@lw.com

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:     212-906-1200
Facsimile:     212-751-4864
Email:         rosalie.gray@lw.com
               michael.riela@lw.com

Co-Counsel for Debtors and Debtors in Possession

# EXHIBIT A

## TO

## JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
## OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS

## Material Terms of Term A Facility

| | |
|---|---|
| **Principal Amount and Type:** | A term loan facility (the "Term A Facility") in an aggregate principal amount of $225 million representing a conversion of a portion of the Existing Lender Secured Claims into the Term A Loans as of the Closing Date. |
| **Borrower:** | Reorganized Freedom Communications (the "Borrower") |
| **Guarantors:** | Reorganized Freedom Holdings and each of the Borrower's direct and indirect existing and future subsidiaries (collectively, the "Guarantors"; the Borrower and the Guarantors, collectively, the "Loan Parties"). |
| **Administrative Agent:** | JPMorgan Chase Bank, N.A. (in such capacity, the "Term A Administrative Agent"). |
| **Collateral Agent:** | JPMorgan Chase Bank, N.A. |
| **Lenders:** | Holders of Secured Lender Claims as of the Closing Date (collectively, the "Term A Lenders"). |
| **Interest Rates and Fees:** | *Interest Rate*: <br><br> The Borrower may elect that the Term A Loans bear interest at a rate per annum equal to: (i) the Alternate Base Rate plus the Applicable Margin; or (ii) the Adjusted LIBO Rate plus the Applicable Margin. <br><br> As used herein: <br><br> "***ABR Loans***" means Term A Loans bearing interest based upon the Alternate Base Rate. <br><br> "***Adjusted LIBO Rate***" means, for any Eurodollar Loan for an interest period selected by the Borrower equal to one, two, three or six months, a rate per annum determined by the Term A Administrative Agent to be equal to the quotient of the LIBO Rate for such loan for such interest period divided by 1 minus the statutory reserve rate for such loan for such interest period; *provided that*, for purposes of the Term A Facility, the Adjusted LIBO Rate for any interest period shall in no event be less than 3.50% per annum. <br><br> "***Alternate Base Rate***" means, with respect to any ABR Loan, for any |

day, the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month interest period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; *provided that*, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time on such day; and provided further that the Alternate Base Rate shall in no event at any time be less than 4.50% per annum. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

"*Applicable Margin*" means (a) with respect to ABR Loans, 5.00% per annum and (b) with respect to Eurodollar Loans, 6.00% per annum.

"*Eurodollar Loans*" means Term A Loans bearing interest based upon the LIBO Rate.

"*Federal Funds Effective Rate*" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding business day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a business day, the average of the quotations for such day for such transactions received by the Term A Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*LIBO Rate*" means, with respect to any Eurodollar Loan for any interest period therefor, the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time, two London business days prior to the commencement of such interest period, as the rate for dollar deposits with a maturity comparable to such interest period.

"*Prime Rate*" means the rate of interest per annum publicly announced from time to time by the Term A Administrative Agent (or other designated bank) as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

***Interest Payment Date***:

On the last day of each relevant interest period and, in the case of any

| | |
|---|---|
| | interest period longer than three months, on each successive date three months after the first day of such interest period. |
| | ***Default Rate***: |
| | At any time upon the occurrence and during the continuation of any event of default under the Term A Facility, all outstanding Term A Loans shall bear interest at 2% above the Term A Interest Rate. Without limiting the foregoing, overdue interest, fees and other amounts under the Term A Loan shall bear interest at 2% above the Term A Interest Rate. |
| | ***Rate Basis***: |
| | All per annum rates shall be calculated on the basis of a year of 360 days, except that interest based on the Prime Rate shall be calculated on the basis of a year of 365/366 days, as applicable. |
| | ***Agency Fee***: |
| | An administrative agency fee payable to the Term A Administrative Agent in such amount and at such times as shall be agreed in writing between the Borrower and the Term A Administrative Agent. |
| **Maturity:** | Four years after the Effective Date |
| **Optional Prepayments:** | Term A Loans may be prepaid by the Borrower without premium or penalty (but subject to payment of break funding costs, if any, as described below) in minimum amounts to be agreed in the Term A Loan Documents (as defined below). |
| **Mandatory Prepayments:** | The following amounts shall be applied to prepay the Term A Loans: |
| | (a) 100% of the net proceeds of any sale or other disposition of assets (including as a result of casualty or condemnation) by Holdings, the Borrower or any of its subsidiaries (subject to certain customary exceptions (including reinvestment rights) and minimum thresholds to be agreed); |
| | (b) 100% of the net proceeds of any debt incurrence by the Borrower or any of its subsidiaries after the Closing Date (subject to certain customary exceptions to be agreed); |
| | (c) 50% of Free Cash Flow (to be defined in a manner to be agreed upon by the Debtors and the Steering Committee Members) for any fiscal year of the Borrower (commencing with the fiscal year ending on or nearest to December 31, 2010, and which will be defined to include tax refunds and other extraordinary receipts received during such fiscal year); and |

| | |
|---|---|
| | (d) other amounts subject to customary mandatory prepayment provisions, including, but not limited to, net proceeds of equity issuances, tax refunds and extraordinary receipts.<br><br>Each such mandatory prepayment of principal of the Term A Loans shall be applied to reduce scheduled payments of principal due after the date of such prepayment in the inverse order of maturity. Amounts prepaid in respect of Term A Loans may not be reborrowed. |
| **Collateral:** | The obligations of the Loan Parties in respect of the Term A Facility shall be secured by (i) a first priority, perfected security interest in all assets of the Loan Parties, whether consisting of real property, personal, tangible or intangible property, including all of the capital stock of the Borrower's subsidiaries (other than the Exit Facility Collateral), except for those assets as to which the Term A Administrative Agent shall determine in its sole discretion that the costs of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby and other customary exclusions acceptable to the Term A Administrative Agent (the "<u>Term A Collateral</u>") and (ii) a second priority, perfected security interest in all of the Exit Facility Collateral, if applicable. In the case of the assets of, and the ownership interests in, the Reorganized Broadcast Licensee Companies, the grant of such security interests shall be limited to the extent required by law, and shall occur following "long-form" consent of the FCC to the transfer of control of the Reorganized Broadcast Licensee Companies to Reorganized Freedom Holdings, unless the grant of such security interests as of the Effective Date shall be permitted under applicable law or approved by the FCC; *provided, however*, that a first priority, perfected security interest in the beneficial interests held by the Reorganized Broadcast Operating Companies in the trust formed under the Broadcast Trust Agreement shall be granted as security for the obligations of the Loan Parties in respect of the Term A Facility as of the Effective Date.<br><br>The liens securing the Term A Loans will be subject to and governed by an intercreditor agreement between the Term A Lenders and the Term B Lenders (the "<u>Intercreditor Agreement</u>"), on terms acceptable to the Steering Committee Members. |
| **Amortization:** | The Borrower shall make quarterly amortization payments of $3.75 million per quarter, paid in arrears, totaling $15 million annually beginning the first quarter following the first anniversary of the Effective Date and continuing quarterly thereafter. |
| **Closing Date Conditions Precedent:** | The occurrence of the Closing Date with respect to the Term A Facility, the Term B Facility, and the Exit Facility (the "<u>Facilities</u>") is subject to the satisfaction or written waiver of conditions by the Steering Committee Members that are customary, necessary or |

appropriate for the loans of this type, including, without limitation, the following:

(a) The Loan Parties shall have executed and delivered reasonably satisfactory definitive financing documentation with respect to the Facilities, including credit agreements, security documents, intercreditor agreements and other legal documentation mutually satisfactory to the Steering Committee Members, which shall reflect the terms and conditions set forth in Exhibit A and Exhibit B.

(b) All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Borrower and its subsidiaries (including shareholder approvals, if any) shall have been obtained and shall be in full force and effect.

(c) The respective New Agent under each Facility shall have received such closing documents thereunder as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, insurance certificates, loss payable and additional insured endorsements, opinions of counsel, organizational documents, title insurance policies, collateral releases (which releases may be effected by the Confirmation Order), consents, landlord/mortgagee/bailee waivers, financing statements and consignment or similar filings, all in form and substance reasonably acceptable to the Steering Committee Members.

(d) The Debtors shall have cash on hand of at least $15 million.

(e) The corporate and capital structure (including the terms of debt other than the Facilities) of the Borrower and its subsidiaries shall be acceptable to the Steering Committee Members, which condition shall be deemed satisfied if the corporate and capital structure of the Borrower and its subsidiaries is consistent with the Term Sheet.

(f) There shall not have been any material adverse change (as measured against the information provided to the Agent and/or its advisors prior to the Petition Date) in the status of any claims against the Debtors on account of (i) pension funding liability, (ii) tax liability and (iii) environmental liability; *provided that,* with respect to (i) and (ii), there shall not be a material adverse change if the Steering Committee Members and the Debtors are able to negotiate a mutually satisfactory response to such change, subject to any requirements of the Bankruptcy Code, within 15 business days of its discovery.

(g) With respect to each of the Facilities, the execution, delivery, and performance by the Borrower of such facility, the borrowing of the loans thereunder and the use of proceeds thereof shall be in compliance with applicable law, including but not limited to

| | |
|---|---|
| | compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System.

(h) Liens creating security interests in the Collateral of the requisite priority shall have been perfected.

(i) All fees required to be paid, and all expenses for which invoices have been presented, shall have been paid on or before the Closing Date.

(j) The Borrower shall have issued New Common Stock to the Secured Lenders as contemplated in the Plan.

(k) Satisfaction of all conditions precedent to the Effective Date as set forth in the Plan. |
| **Documentation:** | The credit documentation for the Term A Facility (the "Term A Loan Documents") shall contain representations and warranties, covenants and events of default relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and other terms deemed appropriate by the Term A Lenders as set forth below. |
| **Representations:** | The credit documentation for the Term A Facility (the "Term A Loan Documents") shall contain representations and warranties relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following: financial statements; absence of undisclosed liabilities; no material adverse change; existence and standing, authorization and validity; compliance with law; corporate power and authority; enforceability of Term A Loan Documents; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; no burdensome restrictions; taxes; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; labor matters; accuracy of disclosure; perfection and priority of security interests under the Term A Loan Documents; and enforceability of guarantees by the Guarantors under the Term A Loan Documents. |
| **Affirmative Covenants:** | The Term A Loan Documents shall contain affirmative covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following: delivery of monthly, quarterly and annual financial statements (in each case, within a time period to be agreed); quarterly compliance certificates and annual projections; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws; maintenance of property and insurance; maintenance of books and records; right of the Term A |

| | |
|---|---|
| | Lenders and the Term A Administrative Agent to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; casualty and condemnation; use of proceeds; and further assurances (including with respect to security interests in after-acquired property). |
| **Financial Covenants:** | The Term A Loan Documents shall contain financial covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following:  (i) Minimum EBITDA, (ii) maximum capital expenditures, (iii) a minimum fixed charge coverage ratio and (iv) a maximum leverage ratio.  Covenant levels to be negotiated to provide flexibility reasonably acceptable to the Steering Committee Members and the Debtors for the first 18 months after the Effective Date. |
| **Negative Covenants:** | The Term A Loan Documents shall contain negative covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following:  limitations on: indebtedness (including guarantee obligations and preferred stock of subsidiaries); liens; mergers, consolidations, liquidations and dissolutions; sales of assets; payment of restricted payments (including dividends and other payments in respect of capital stock); investments (including acquisitions), loans and advances; sale and leaseback transactions; swap agreements; optional payments and modifications of subordinated debt and certain other debt to be determined; transactions with affiliates; changes in fiscal year; negative pledge clauses and other restrictive agreements; and amendment of material documents. |
| **Events of Default:** | The Term A Loan Documents shall contain events of default relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following:  nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of representations and warranties; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default to occurrence of a default (whether or not resulting in acceleration) under any other agreement governing indebtedness, in excess of an amount to be agreed upon, of the Borrower or any of its subsidiaries; bankruptcy events; certain ERISA events; material judgments; any of the Term A Loan Documents shall cease to be in full force and effect or any Loan Party shall so assert; any security interests created by the security documents shall cease to be enforceable and of the same priority purported to be created thereby; and a change of control (the definition of which is to be |

| | |
|---|---|
| | agreed). |
| **Voting:** | Amendments, waivers and consents with respect to the Term A Loan Documents shall require the approval of Term A Lenders holding not less than a majority of the aggregate amount of the Term A Loans, except that the consent of each Term A Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of amortization or final maturity of any Term A Loan, (ii) reductions in the principal of any Term A Loan or the rate of interest or any fee or extensions of any due date thereof, (iii) modifications to any of the voting percentages, (iv) modifications to the pro rata sharing requirements of the Term A Loan Documents, (v) assignment by any Loan Party of its rights under the Term A Loan Documents and (vi) release of all or substantially all of the Guarantors, and release of all or substantially all of the Collateral, except as permitted in the Term A Loan Documents. |
| **Assignments and Participations:** | The Term A Lenders shall be permitted to assign all or a portion of their Term A Loans with the consent, not to be unreasonably withheld, of the Term A Administrative Agent, unless the assignee is a Term A Lender, an affiliate of a Term A Lender or an approved fund. In the case of partial assignments (other than to another Term A Lender, an affiliate of a Term A Lender or an approved fund, the minimum assignment amount shall be $5 million, unless otherwise agreed by the Term A Administrative Agent. The Term A Lenders shall also be permitted to sell participations in their loans. Participants shall have the same benefits as the Term A Lenders with respect to yield protection and increased cost provisions. Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of the Term A Lender from which it purchased its participation would be required. Pledges of loans in accordance with applicable law shall be permitted without restriction. Each Term A Lender may disclose information to prospective participants and assignees. The Term A Administrative Agent will be entitled to a processing fee of $3,500 from the assignor or the assignee in connection with any assignment. |
| **Yield Protection:** | The Term A Loan Documents shall contain customary provisions (a) protecting the Term A Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Term A Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a loan on a day other than the last day of an interest period with respect thereto. |
| **Expenses and Indemnification:** | The Borrower shall pay (a) all reasonable out-of-pocket expenses of the Term A Administrative Agent associated with the preparation, execution, delivery and administration of the Term A Loan |

| | |
|---|---|
| | Documents and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel), (b) all out-of-pocket expenses of the Term A Administrative Agent and the Term A Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Term A Loan Documents and (c) fees and expenses associated with collateral monitoring, collateral reviews and appraisals (including field examination fees plus out-of-pocket expenses), environmental reviews and fees and expenses of other advisors and professionals engaged by the Term A Administrative Agent.<br><br>The Term A Administrative Agent and the Term A Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent found in a Final Order to have resulted from the gross negligence or willful misconduct of the indemnified party). |
| **Governing Law and Forum:** | State of New York. |
| **Counsel to Term A Administrative Agent:** | Cravath, Swaine & Moore LLP. |

**JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE**
**OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS**

**<u>Material Terms of Term B Facility</u>**

| | |
|---|---|
| **Principal Amount and Type:** | A term loan facility (the "<u>Term B Facility</u>") in an aggregate principal amount of $100 million, representing a conversion of a portion of the Secured Lender Claims into the Term B Loans as of the Closing Date. |
| **Borrowers:** | The Borrower. |
| **Guarantors:** | The Guarantors. |
| **Administrative Agent** | An entity to be determined (in such capacity, the "<u>Term B Administrative Agent</u>"). |
| **Collateral Agent:** | To be determined. |
| **Lenders:** | Holders of Secured Lender Claims as of the Closing Date (collectively, the "<u>Term B Lenders</u>"). |
| **Interest Rates and Fees:** | ***<u>Interest Rate</u>***: <br><br> The Term B Loan shall bear interest at a fixed rate of 14.00% per annum (the "<u>Term B Interest Rate</u>"). <br><br> ***<u>Interest Payment Dates</u>***: <br><br> Interest payments shall be made quarterly in arrears. Interest shall be paid in cash or, if cash on hand and availability under the Revolving Credit Facility, pro forma for a quarterly cash election interest payment under the Term B Loan, are less than $40 million in the aggregate (the "<u>Availability</u>"), the Borrower shall have the option to add such interest to the principal amount of the Term B Loan (a "<u>PIK Election</u>"), in each case, quarterly in arrears. Principal added pursuant to a PIK Election will bear interest at 14%. <br><br> For purposes of determining whether the Borrower can make a PIK Election in respect of the first quarterly interest payment in each fiscal year, the Availability shall be calculated as of the date of such first quarterly interest payment after giving effect to the amount of the mandatory prepayment to be made by the Borrower in respect of Free Cash Flow for the prior fiscal year if such payment has not been previously made. |

| | |
|---|---|
| | ***Default Rate***:<br><br>At any time upon the occurrence and during the continuation of any event of default under the Term B Facility, all outstanding Term B Loans shall bear interest at 2% above the Term B Interest Rate. Without limiting the foregoing, overdue interest, fees and other amounts under the Term B Facility shall bear interest at 2% above the Term B Interest Rate.<br><br>***Rate Basis***:<br><br>Interest payments will be calculated on the basis of a 360-day year of twelve 30-day months.<br><br>***Agency Fee***:<br><br>An administrative agency fee payable to the Term B Administrative Agent in such amount and at such times as shall be agreed in writing between the Borrower and the Term B Administrative Agent. |
| **Maturity:** | Five years after the Effective Date. |
| **Optional Prepayments:** | Subject to the prior indefeasible payment in full of the Term A Loans, the Term B Loans may be prepaid by the Borrower without premium or penalty in minimum amounts to be agreed in the Term B Loan Documents. |
| **Mandatory Prepayments:** | Subject to the prior indefeasible payment in full in cash of the Term A Loans, the following amounts shall be applied to prepay the Term B Loans:<br><br>(a) 100% of the net proceeds of any sale or other disposition of assets (including as a result of casualty or condemnation) by the Borrower or any of its subsidiaries (subject to certain customary exceptions (including reinvestment rights) and minimum thresholds to be agreed) or receipt of tax refunds or other extraordinary receipts;<br><br>(b) 100% of the net proceeds of any debt incurrence by the Borrower or any of its subsidiaries after the Closing Date (subject to certain customary exceptions to be agreed);<br><br>(c) 50% of Free Cash Flow (to be defined in a manner to be agreed upon by the Debtors and the Steering Committee Members) for any fiscal year of the Borrower (commencing with the fiscal year ending on or nearest to December 31, 2010); and<br><br>(d) other amounts subject to customary mandatory prepayment provisions, including, but not limited to, net proceeds of equity issuances, tax refunds and extraordinary receipts. |

| | |
|---|---|
| | Each such mandatory prepayment shall be applied ratably to the Term B Loans. Amounts prepaid in respect of Term B Loans may not be reborrowed. |
| **Collateral:** | The obligations of the Loan Parties in respect of the Term B Facility shall be secured by (i) a second priority, perfected security interest in the Term A Collateral, and (ii) a third priority, perfected security interest in all of the Exit Facility Collateral, if applicable.  In the case of the assets of, and the ownership interests in, the Reorganized Broadcast Licensee Companies, the grant of such security interests shall be limited to the extent required by law, and shall occur following "long-form" consent of the FCC to the transfer of control of the Reorganized Broadcast Licensee Companies to Reorganized Freedom Holdings, unless the grant of such security interests as of the Effective Date shall be permitted under applicable law or approved by the FCC.<br><br>The liens securing the Term B Loans will be subject to and governed by the Intercreditor Agreement. |
| **Amortization:** | N/A |
| **Closing Date Conditions Precedent:** | Same as for the Term A Facility. |
| **Documentation:** | The credit documentation for the Term B Facility (the "<u>Term B Loan Documents</u>") shall contain representations and warranties, covenants and events of default relating to the Borrower and its subsidiaries customary for financings of this type and other terms deemed appropriate by the Term B Lenders as set forth below. |
| **Representations:** | Substantially the same as for the Term A Loan. |
| **Affirmative Covenants:** | Substantially the same as for the Term A Loan. |
| **Financial Covenants:** | The Term B Loan Documents shall contain financial covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following:   (a Minimum EBITDA, (b) maximum capital expenditures, (c) a minimum fixed charge coverage ratio, and (d) a maximum leverage ratio (each with greater headroom than the corresponding covenant levels contained in the Term A Facility).  Covenant levels to be negotiated to provide flexibility reasonably acceptable to the Steering Committee Members and the Debtors for the first 18 months after the Effective Date. |
| **Negative Covenants:** | To be based substantially upon the negative covenants in the Term A Facility (but with less restrictive baskets and thresholds to be agreed). |

| | |
|---|---|
| **Events of Default:** | To be based substantially upon the events of default in the Term A Facility (but with less restrictive grace periods and thresholds to be agreed). |
| **Voting:** | Substantially the same as for the Term A Facility. |
| **Assignments and Participations:** | Substantially the same as for the Term A Facility. |
| **Yield Protection:** | Substantially the same as for the Term A Facility. |
| **Expenses and Indemnification:** | Substantially the same as for the Term A Facility. |
| **Governing Law and Forum:** | State of New York. |

# EXHIBIT C

## TO

## JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
### OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS

### Material Terms of New Common Stock

| | |
|---|---|
| **Issue:** | Common stock, $0.001 par value. |
| **Issuer:** | Reorganized Freedom Holdings. |
| **Authorized Shares:** | 21 million shares of New Common Stock. |
| **Initial Issuance:** | 7 million shares of New Common Stock, subject to adjustment for the Existing Lender Warrants and the Exit Financing Share Allocation, if any. |
| **Classes:** | The New Common Stock shall consist of (i) a class of full voting common stock (the "Class A Common Stock") and (ii) a separate class of limited-voting common stock (the "Class B Common Stock"). |
| | Subject to compliance with the Communications Act of 1934 (as amended) and the ownership rules, regulations, and/or policies of the FCC, each holder of an Existing Lender Secured Claim shall take its New Common Stock in the form of either Class A Common Stock, Class B Common Stock, and/or Existing Lender Warrants. |
| **Conversion Rights:** | Each share of Class B Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Class A Common Stock, and each share of Class A Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Class B Common Stock; *provided that*, at all times, there must be outstanding at least one share of Class A Common Stock; *provided further* that the New Common Stock will not be convertible if any such conversion would result in a violation of any ownership restrictions imposed by the Communications Act of 1934 (as amended) or the ownership rules, regulations, and/or policies of the FCC. |
| **Economic Rights:** | The economic rights of the Class A Common Stock and Class B Common Stock shall be identical. |
| **Class A Voting Rights** | The holders of the Class A Common Stock will be entitled to one vote for each share of Class A Common Stock held by such holder of record on the books of Reorganized Freedom Holdings for all matters |

| | |
|---|---|
| | on which stockholders of Reorganized Freedom Holdings are entitled to vote. |
| **Class B Voting Rights and Limitations:** | The Class B Common Stock will not be entitled to general voting rights, but will be entitled to vote on an "as converted" basis (together with the holders of the Class A Common Stock, voting as a single class) on certain non-ordinary course transactions, including (a) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking pari passu with or senior to the New Common Stock as to dividends or liquidation preference, including additional New Common Stock; (b) any amendment to Reorganized Freedom Holdings' certificate of incorporation or by-laws; (c) any amendment to any shareholders or comparable agreement; (d) any sale, lease or other disposition of all or substantially all of the assets of Reorganized Freedom Holdings through one or more transactions; (e) any recapitalization, reorganization, consolidation or merger of Reorganized Freedom Holdings; (f) to the extent that holders of Class A Common Stock have the right to vote thereon, any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Freedom Holdings, except as may be provided for under the New Equity Incentive Plan or any other management incentive plan; and (g) to the extent that holders of Class A Common Stock have the right to vote thereon, any redemption, purchase or other acquisition by Reorganized Freedom Holdings of any of its capital stock (except for purchases from employees upon termination of employment).

The Class B Common Stock will be entitled to a separate class vote on any amendment or modification of any rights or privileges of the Class B Common Stock that does not equally affect the Class A Common Stock. In any liquidation, dissolution or winding up of Reorganized Freedom Holdings, all assets will be distributed to holders of the New Common Stock on a pro rata basis. |
| **Initial Board of Directors:** | The New Board shall be comprised of up to seven (7) directors, initially consisting of (i) six (6) independent and disinterested directors acceptable to the Steering Committee Members and (ii) Freedom Holdings' chief executive officer. Successor directors shall be appointed and/or elected in accordance with the New Freedom Governing Documents. Each Steering Committee Member holding more than a threshold percentage (to be agreed upon among the Steering Committee Members) of the Existing Lender Secured Claims shall have the right to appoint one representative to attend and observe all board meetings. |
| **New Stockholders Agreement:** | Each holder of New Common Stock shall be deemed to enter into the New Stockholders Agreement, which agreement shall be on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors, and which, without limitation, shall provide for (i) |

| | |
|---|---|
| | customary "drag along" and "tag along" rights, (ii) obligations for holders of the New Common Stock to provide such information as Reorganized Freedom Holdings reasonably may require to ensure compliance with the Communications Act of 1934 (as amended) and the rules, regulations, and/or policies of the FCC, (iii) information rights, including the right of prospective purchasers of the New Common Stock or Existing Lender Warrants to obtain non-public information upon execution of a confidentiality agreement, and (iv) certain preemptive rights. |
| **Transfer Restrictions:** | The Class A Common Stock and the Class B Common Stock may be transferred to the extent set forth in the New Stockholders Agreement; *provided that* (i) any transfer that would require the prior consent of the FCC will not occur until such consent shall have been granted and (ii) no transfer shall be permitted that would result in a violation of any ownership restrictions imposed by the Communications Act of 1934 (as amended), or the ownership rules, regulations, and/or policies of the FCC. The New Board shall have the power to ensure compliance with Section 310(b) of the Communications Act of 1934 (as amended) and the FCC's ownership rules, including the power to decline to allow the transfer of shares and the power to redeem shares.<br><br>In addition, the New Stockholders Agreement shall provide for a moratorium on trading New Common Stock and Existing Lender Warrants until FCC approval of the "long-form" applications. |
| **Registration Rights Agreement:** | On the Effective Date, Reorganized Freedom Holdings and the Secured Lenders shall enter into a Registration Rights Agreement on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors, which, without limitation, shall provide for (a) "piggyback" registration rights for the New Common Stock (with customary exceptions, including Reorganized Holding's initial public offering) and (b) following the initial public offering of Reorganized Freedom Holdings, if any, for those holders of New Common Stock that cannot sell freely under Rule 144 of the Securities Act of 1933, as amended, S-3 or "short-form" demand registration rights for the New Common Stock (with customary limitations). |

**EXHIBIT D**

**TO**

**JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS**

**Material Terms of Existing Lender Warrants**

| | |
|---|---|
| **Securities to be Issued:** | Reorganized Freedom Holdings will issue the Existing Lender Warrants to the Existing Lenders pursuant to Section 3.2(b) of the Plan. Subject to the restrictions on exercise set forth below, each Existing Lender Warrant will entitle its holder to purchase one share of either Class A Common Stock or Class B Common Stock, at the election of the holder, at the Exercise Price (as defined below). |
| **Exercise:** | The Existing Lender Warrants shall be exercisable immediately after issuance and until the Expiration Date (as defined below); *provided that* the Existing Lender Warrants shall not be exercised without the consent of Reorganized Freedom Holdings, which consent shall not be withheld unless such exercise would result in violation of any ownership restrictions imposed by the Communications Act of 1934 (as amended) or the ownership rules, regulations, and/or policies of the FCC.  No Existing Lender Warrant shall be exercisable after the Expiration Date.  Each holder of Existing Lender Warrants shall provide to Reorganized Freedom Holdings such information as Reorganized Freedom Holdings may require in order to determine whether such a violation may occur. |
| **Exercise Price:** | The exercise price (the "Exercise Price") shall be $0.001 per share of New Common Stock. |
| **Cashless Exercise:** | If the New Common Stock is listed on a national securities exchange (as such term is defined in the U.S. Securities and Exchange Act of 1934), in lieu of paying the Exercise Price, a holder of Existing Lender Warrants shall have the option (the "Cashless Exercise Option") to receive, upon exercise of the Existing Lender Warrants, shares of New Common Stock with a market value equal to the difference between (i) the market value of the shares of New Common Stock that would have been issuable upon exercise of the Existing Lender Warrants for cash and (ii) the aggregate Exercise Price. |
| **Term:** | The thirtieth anniversary of the Effective Date (the "Expiration Date"). |
| **Anti-Dilution**: | Proportional anti-dilution adjustments in the event of subdivisions, splits, combinations and reverse splits. |
| **Distributions**: | Any distributions made to the holders of New Common Stock (other |

| | than distributions of New Common Stock) will be made pro rata to holders of Existing Lender Warrants based upon their respective ownership of New Common Stock on an as-exercised basis, *provided that* no such distribution shall be made to either holders of Existing Lender Warrants or holders of New Common Stock if (x) an FCC ruling prohibits such distribution, or (y) such distribution is reasonably likely to cause (i) a violation of any ownership restriction imposed under the Communications Act of 1934 (as amended) or the ownership rules, regulations, and/or policies of the FCC or (ii) any such holder of Existing Lender Warrants to be deemed to hold an attributable interest in Reorganized Freedom Holdings.  If Reorganized Freedom Holdings shall make a distribution to the holders of New Common Stock in shares of New Common Stock, Reorganized Freedom Holdings shall make a corresponding distribution of Existing Lender Warrants pro rata to holders of Existing Lender Warrants based upon their respective ownership of New Common Stock on an as-exercised basis. |
| | All distributions shall be paid to holders of Existing Lender Warrants and holders of New Common Stock concurrently. |
| **Merger or Consolidation**: | Except as provided in the next sentence, upon a merger or a consolidation of Reorganized Freedom Holdings, each Existing Lender Warrant will be exercisable solely into the right to receive the kind and amount of consideration to which such holder would have been entitled as a result of such merger or consolidation had the Existing Lender Warrant been exercised immediately prior thereto. In the event of a merger or a consolidation of Reorganized Freedom Holdings in which the only consideration payable to holders of New Common Stock is cash, each holder of an Existing Lender Warrant shall be entitled to receive solely the cash consideration to which such holder would have been entitled as a result of such merger or consolidation, less the Exercise Price, had the Existing Lender Warrant been exercised immediately prior thereto. |
| | In the event of a merger or a consolidation of Reorganized Freedom Holdings, if the holders of New Common Stock have the right to receive more than a single type of consideration based on any form of stockholder election, then the holders of the Existing Lender Warrants shall have the right to make a corresponding election as to the type of consideration that they are entitled to receive. |
| **Registration Rights**: | Upon exercise of the Existing Lender Warrants, holders will be entitled to registration rights in respect of shares of New Common Stock to the extent provided for in the Registration Rights Agreement. |
| **Stockholders' Agreement**: | On the Effective Date, each holder of Existing Lender Warrants shall be deemed to have entered into the Stockholders' Agreement, and will be subject to the provisions thereof, including the transfer restrictions and tag-along and drag-along rights described therein. |
| **Voting Rights:** | None. |

**JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS**

<u>**FORM OF POST-EMERGENCE TRADE AGREEMENT**</u>

[*THIS IS A FORM DOCUMENT PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE DEBTORS RESERVE THE RIGHT TO MODIFY THE FORM WITH THE CONSENT OF
THE EXISTING LENDER AGENT AND THE CREDITORS' COMMITTEE.  ONLY FINAL
AGREEMENTS PRINTED ON THE DEBTORS' FORMAL LETTERHEAD WILL BE
OPERATIVE.  THE DEBTORS WILL DELIVER FINAL AGREEMENTS TO SELECTED
PROVIDERS OF GOODS AND/OR SERVICES PURSUANT TO THE PROCEDURES AND ON
THE TIMEFRAME SET FORTH IN THE PLAN*]

**POST-EMERGENCE TRADE AGREEMENT**

This Agreement is made and entered into by and between [NAME OF FREEDOM
ENTITY or ENTITIES] (together "Customer") and [NAME OF PROVIDER] ("Vendor").

**Whereas**, on September 1, 2009 (the "Petition Date"), Freedom Communications
Holdings, Inc., together with certain of its affiliates, including Customer (collectively, the
"Debtors"), filed voluntary petitions (the "Bankruptcy Cases") under chapter 11 of title 11 of the
United States Code in the United States Bankruptcy Court for the District of Delaware (the
"Bankruptcy Court");

**Whereas**, Vendor (i) holds a claim or claims against Customer arising from Customer's
receipt of goods and/or services in the ordinary course of business prior to the Petition Date (any
such claim or claims, together, the "Prepetition Claim"), (ii) has continued to supply goods
and/or services to Customer during the Chapter 11 Cases on substantially the same terms or
better than the terms under which Vendor provided goods and/or services to Customer
immediately prior to, or within 90 days of, the Petition Date, and (iii) is willing to enter into and
comply with the terms of this Agreement;

**Whereas**, Section 5.11 of the Joint Plan of Reorganization Under Chapter 11, Title 11,
United States Code of Freedom Communications Holdings, Inc., Et al., Debtors (the "Plan")
contains procedures (the "Post-Emergence Trade Credit Procedures") whereby certain vendors of
the Debtors will have their prepetition claims paid, in whole or part as may be agreed, in
exchange for agreeing to maintain preexisting trade terms after the Debtors' emergence from
bankruptcy;

**Whereas**, Vendor has reviewed the Plan and is familiar with the Post-Emergence Trade
Credit Procedures; and

**Whereas**, Customer desires to obtain goods and/or services from Vendor and Vendor desires to provide goods and/or services to Customer on the terms and conditions set forth herein;

**Now**, **therefore**, for good and valuable consideration received, Customer and Vendor agree as follows:

1.	Capitalized terms contained herein but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

2.	This Agreement shall be effective and binding upon each party hereto on the Effective Date of the Plan.

3.	As soon as reasonably practicable after the later of (a) the Effective Date and (b) the date on which the Prepetition Claim becomes Allowed, Customer (or its affiliate) shall pay Vendor the amount of its Allowed Prepetition Claim. Such amount shall either be the amount set forth on Exhibit A or the amount to be determined by Final Order. The payment when made shall constitute full satisfaction, settlement, release, and discharge of the Prepetition Claim.

4.	As of the Agreement Date, and in exchange for the good and valuable consideration received hereunder, Vendor agrees to immediately release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan, against (i) the Existing Lenders and any of their respective affiliates, (ii) the Existing Lender Agent and any of its affiliates, and (iii) any of the respective present or former directors, officers, employees, advisors, or professionals of any of the foregoing (but solely in their respective capacities as such).

5.	Vendor shall continue from and after the Agreement Date to provide to Customer the goods and/or services described on Exhibit A on the terms (the "Trade Terms") set forth on Exhibit A.

6.	Customer shall pay Vendor for such goods and/or services on the terms set forth on Exhibit A.

7.	Customer and Vendor agree that the Trade Terms are substantially the same or better than the terms (the "Prepetition Trade Terms") under which Vendor provided goods and/or services to Customer immediately prior to, or within 90 days of, the Petition Date. The Prepetition Trade Terms shall be determined by reference to either performance immediately before the Petition Date or the 90-day period prior to the Petition Date, whichever such terms are more favorable to Customer.

8.	In the event Customer fails to make payment by the due date specified on Exhibit A, Vendor shall provide written notice to Customer that if such failure is not cured within ten

(10) days of Customer's receipt of such written notice, then Customer shall be in breach of this Agreement.

9. In the event of a breach of this Agreement resulting from nonpayment as provided in paragraph 8, Vendor shall have the immediate right to terminate its performance under this Agreement. Customer shall have no liability to Vendor for goods and/or services not provided by Vendor to Customer or for any lost profit or other damages as a result of such termination.

10. This Agreement shall continue for the term set forth on Exhibit A, unless terminated pursuant to paragraph 9. In addition, Customer may terminate this Agreement at any time and for any reason by providing thirty (30) days written notice of termination to Vendor, delivered by email, facsimile or overnight mail.

11. Neither Customer nor Vendor shall have any liability to the other for any obligation arising from and after the date of a termination pursuant to paragraph 9 or 10 of this Agreement.

12. If Vendor fails to perform under this Agreement, Vendor shall be obligated to return to Customer the amount paid pursuant to paragraph 3. In addition, Customer shall have all rights available under law or equity to enforce this Agreement or to recover any damages occasioned by Vendor's failure to perform.

13. Vendor agrees that Customer may assign its rights and obligations under this Agreement at any time to any affiliate or third party.

14. This Agreement together with Exhibit A forms the entire agreement between Customer and Vendor as to the subject matter hereto and supersedes all prior communications between the parties as to the subject matter hereof.

15. Neither this Agreement nor Exhibit A shall be modified except by a writing signed by both Customer and Vendor.

16. This Agreement shall be governed by the laws of the State of California.

17. This Agreement may be executed in counterparts. Signatures delivered by pdf email or by facsimile shall have the same force and effect and original signatures.

| [NAME OF FREEDOM ENTITY] | [NAME OF PROVIDER] |
|---|---|
| By:_____ | By:_____ |
|    Name:_____ |    Name:_____ |
|    Title:_____ |    Title:_____ |
| Dated: _____(the Agreement Date) | Dated: _____ |
| Address:_____ | Address:_____ |
| _____ | _____ |
| _____ | _____ |
| Telephone:_____+_____ | Telephone:_____ |
| Facsimile:_____ | Facsimile:_____ |
| Email:_____ | Email:_____ |

**EXHIBIT A**
**TO POST-EMERGENCE TRADE AGREEMENT**


**NAME OF PROVIDER:**


**AMOUNT OF ALLOWED CLAIM TO BE PAID**
**(indicate amount if agreed or indicate that amount will be determined by Final Order):**


**DESCRIPTION OF GOODS/SERVICES:**


**TRADE TERMS:**


**TERM OF AGREEMENT:**


**OTHER AGREEMENTS:**


**Initials:**

_____    _____
Customer    Vendor