# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **FREEDOM COMMUNICATIONS HOLDINGS, INC.,** *et al.* | Case No. 09-13046 (BLS) |
| **Debtors.** | Jointly Administered |

---

## DISCLOSURE STATEMENT WITH RESPECT TO
## JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
## OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS

### Dated: January 28, 2010

---

LATHAM & WATKINS LLP
Robert A. Klyman
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email: robert.klyman@lw.com

Rosalie Walker Gray
Michael J. Riela
885 Third Avenue
New York, New York 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: rosalie.gray@lw.com
      michael.riela@lw.com

Counsel for the Debtors

YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mnestor@ycst.com
      kcoyle@ycst.com

Counsel for the Debtors

# DISCLAIMER

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT (DEFINED BELOW) AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS. FURTHERMORE, ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO BE ACCURATE, UNLESS OTHERWISE SPECIFIED HEREIN THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN ACCOUNTING FIRM. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN, THIS DISCLOSURE STATEMENT, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, OR THE FINANCIAL INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN, UNLESS SO SPECIFIED. ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OCCUR.

THIS DISCLOSURE STATEMENT CONTAINS CERTAIN PROJECTED FINANCIAL INFORMATION RELATING TO THE REORGANIZED DEBTORS, AS WELL AS CERTAIN OTHER STATEMENTS THAT CONSTITUTE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE FEDERAL PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH PROJECTIONS AND STATEMENTS ARE BASED ON CERTAIN ESTIMATES AND ASSUMPTIONS MADE BY, AND ON INFORMATION AVAILABLE TO, THE DEBTORS. WHEN USED IN THIS DOCUMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "EXPECT," "INTEND," "PLAN," "PROJECT," "FORECAST," "MAY," "PREDICT,"

"TARGET," "POTENTIAL," "PROPOSED," "CONTEMPLATED," "SHALL," "SHOULD," "COULD," "WILL," "WOULD" AND SIMILAR EXPRESSIONS, AS THEY RELATE TO THE DEBTORS, THE REORGANIZED DEBTORS AND THEIR MANAGEMENT, ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THE DEBTORS INTEND FOR SUCH FORWARD-LOOKING STATEMENTS TO BE COVERED BY THE SAFE HARBOR PROVISIONS FOR FORWARD-LOOKING STATEMENTS CONTAINED IN THE FEDERAL PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995, AND THE DEBTORS SET FORTH THIS STATEMENT AND THE RISK FACTORS CONTAINED HEREIN TO COMPLY WITH SUCH SAFE HARBOR PROVISIONS. SUCH PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS REFLECT THE CURRENT VIEWS OF THE DEBTORS AND ARE SUBJECT TO CERTAIN RISKS, UNCERTAINTIES AND ASSUMPTIONS. MANY FACTORS COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS OF THE DEBTORS AND THE REORGANIZED DEBTORS TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS THAT MAY BE EXPRESSED OR IMPLIED BY SUCH PROJECTED FINANCIAL INFORMATION AND FORWARD-LOOKING STATEMENTS, INCLUDING, BUT NOT LIMITED TO, THE RISKS DISCUSSED IN THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" AND RISKS, UNCERTAINTIES AND OTHER FACTORS DISCUSSED FROM TIME TO TIME IN FILINGS MADE BY CERTAIN OF THE DEBTORS WITH THE SEC AND OTHER REGULATORY AUTHORITIES. SHOULD ONE OR MORE OF THESE RISKS OR UNCERTAINTIES MATERIALIZE, OR SHOULD ASSUMPTIONS UNDERLYING THE PROJECTED FINANCIAL INFORMATION OR OTHER FORWARD-LOOKING STATEMENTS PROVE INCORRECT, ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE DESCRIBED HEREIN AS ANTICIPATED, BELIEVED, ESTIMATED OR EXPECTED. THE DEBTORS DO NOT INTEND, AND DO NOT ASSUME ANY DUTY OR OBLIGATION, TO UPDATE OR REVISE THESE FORWARD-LOOKING STATEMENTS, WHETHER AS THE RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS OTHERWISE REQUIRED BY LAW.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF INFORMING HOLDERS

OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. EXCEPT AS PROVIDED IN THE PRECEDING SENTENCE, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN PROCEEDINGS BEFORE THE BANKRUPTCY COURT RELATING TO APPROVAL OF THIS DISCLOSURE STATEMENT AND TO CONFIRMATION OF THE PLAN.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION ...................................................................................................1
    A.      Overview.................................................................................................................1
    B.      Summary of the Plan...............................................................................................3
    C.      Voting; Holders of Claims Entitled to Vote .......................................................13
    D.      Special Notice of Third Party Release Resulting from Vote to Accept Plan.........17
    E.      The Confirmation Hearing ....................................................................................17
          1.      Time and Place of the Confirmation Hearing ...........................................18
          2.      Objections to the Plan ...............................................................................18
ARTICLE II. GENERAL INFORMATION REGARDING THE DEBTORS...........................18
    A.      Formation and History of the Debtors ..................................................................18
    B.      The Debtors' Business Operations.........................................................................19
    C.      Corporate Governance of the Debtors ..................................................................22
          1.      Board of Directors of Freedom Holdings ..................................................22
          2.      Senior Management of Freedom Holdings .................................................24
          3.      Directors and Officers of Subsidiary Debtors...........................................26
    D.      Employees .............................................................................................................26
          1.      Compensation and Benefits .......................................................................26
          2.      Labor Matters............................................................................................27
          3.      Pension Plan Matters.................................................................................28
          4.      Executive Compensation ...........................................................................28
    E.      Competitive Factors Affecting the Debtors' Businesses .......................................28
    F.      Regulatory Factors Affecting the Debtors' Businesses ........................................30
          1.      General......................................................................................................30
          2.      Station Licenses ........................................................................................30
           3.      Programming and Operations ....................................................................30
           4.      Digital Television......................................................................................31
           5.      Cable and Satellite Transmission of Local Television Signals..................32
           6.      Ownership Rules........................................................................................32
           7.      Local Television Ownership ......................................................................33
           8.      Cross-Media Limits ..................................................................................33
           9.      Alien Ownership Limits.............................................................................34
           10.    National Television Station Ownership Cap...............................................34
           11.    Additional Regulations..............................................................................34
    G.      Prepetition Indebtedness and Capital Structure of the Debtors ............................34
          1.      Consolidated Liabilities ............................................................................34
          2.      Secured Indebtedness................................................................................35
           3.      Interests ....................................................................................................36
          4.      General Financial Information ...................................................................37
ARTICLE III. THE CHAPTER 11 CASES ...............................................................................37
    A.      Events Leading to the Filing of the Chapter 11 Cases..........................................37
    B.      Plan Support Agreement .......................................................................................40
    C.      Stockholder Consents............................................................................................41
    D.      Significant Developments in the Chapter 11 Cases..............................................41
          1.      "First Day" Orders ....................................................................................41

|  | 2. | Retention of Professionals and Other Agents | 42 |
|  | 3. | Appointment of the Official Committee of Unsecured Creditors | 43 |
|  | 4. | Additional Proceedings with Respect to Cash Collateral Order | 43 |
|  | 5. | Additional Proceedings with Respect to Employee Order | 44 |
|  | 6. | Rejection/Assumption of Executory Contracts and Unexpired Leases | 45 |
|  | 7. | Sales of Assets | 45 |
|  | 8. | Trenwith's Authorization to Solicit Alternative Plan Proposals | 46 |
|  | 9. | Gonzalez Claimants' Motion to Appoint an Examiner | 46 |
|  | 10. | Claims Process | 46 |

ARTICLE IV. SUMMARY OF THE PLAN ...........................................................47

A. Overview of Chapter 11 .................................................................48
B. Classification of Claims and Interests..........................................49
  1. Introduction ...........................................................................49
  2. Classification..........................................................................49
  3. Treatment of Claims Against and Interests in Encumbered Debtors.........50
  4. Treatment of Claims Against and Interests in Unencumbered Debtors ....60
C. Treatment of Unclassified Claims. ................................................63
  1. Summary ...............................................................................63
  2. Treatment of Administrative Claims ....................................63
  3. Administrative Claims Bar Date ..........................................64
  4. Deadline for Professional Fee Claims..................................65
  5. Settlement Relating to Houlihan's Professional Fee Claim....65
  6. Priority Tax Claims...............................................................65
D. Means for Implementation of the Plan........................................67
  1. Continued Corporate Existence ...........................................67
  2. Exit Funding..........................................................................67
  3. Authorization and Issuance of New Securities ....................68
  4. Directors and Officers of Reorganized Debtors....................70
  5. Post-Emergence Trade Agreements with Holders of Trade Unsecured Claims ...........73
  6. Interim Broadcast Trust Arrangement .................................75
  7. Litigation Trust .....................................................................77
  8. Plan Supplement, Effectuating Documents, and Further Transactions .....85
  9. Exemption from Transfer Taxes ...........................................86
  10. Retained Litigation Rights ....................................................87
  11. Approval of Compromises and Settlements Embodied in Plan................87
E. Treatment of Executory Contracts and Unexpired Leases ..........88
  1. Assumption of Executory Contracts and Unexpired Leases....88
  2. Cure of Defaults for Assumed Contracts and Leases ................89
  3. Rejection of Executory Contracts and Unexpired Leases.........89
  4. Rejection Damage Claim Bar Date for Rejections Pursuant to Plan .........90
  5. Employee Compensation and Benefit Programs ..................90
  6. Indemnification Obligations ................................................93
  7. Insurance Rights....................................................................94
  8. Limited Extension of Time to Assume or Reject..................94
F. Provisions Regarding Distributions .............................................95
  1. Allowance Requirement........................................................95
  2. Distributions for Claims Allowed as of the Effective Date .....95

| | 3. | Disbursing Agent | 95 |
|---|---|---|---|
| | 4. | Delivery of Distributions | 96 |
| | 5. | Undeliverable Distributions | 97 |
| | 6. | Distributions to Holders as of the Distribution Record Date | 97 |
| | 7. | De Minimis Distributions | 98 |
| | 8. | Fractional Securities; Fractional Dollars | 98 |
| | 9. | Withholding Taxes | 99 |
| G. | | Procedures for Treating and Resolving Disputed Claims | 99 |
| | 1. | Objections to Claims | 99 |
| | 2. | Deemed Allowance of Gonzalez Litigation Claims | 100 |
| | 3. | No Distributions Pending Allowance | 101 |
| | 4. | Distributions after Allowance | 101 |
| | 5. | Allocations and Distributions for Disputed Class A4 Claims | 101 |
| H. | | Conditions Precedent to Confirmation and the Effective Date of the Plan | 101 |
| | 1. | Conditions to Confirmation | 101 |
| | 2. | Conditions to the Effective Date | 102 |
| | 3. | Waiver of Conditions | 104 |
| I. | | Effect of the Plan | 104 |
| | 1. | Revesting of the Debtors' Assets | 104 |
| | 2. | Discharge of Claims and Termination of Interests | 105 |
| | 3. | Release by Debtors of Certain Parties | 105 |
| | 4. | Release by Holders of Claims | 107 |
| | 5. | Mutual Agreed Release | 109 |
| | 6. | Waiver of Statutory Limitation on Releases | 109 |
| | 7. | Exculpation | 109 |
| | 8. | Injunction | 110 |
| J. | | Retention of Jurisdiction after Confirmation and Effective Date | 111 |
| K. | | Miscellaneous Provisions of the Plan | 113 |
| | 1. | Post-Confirmation Date Retention of Professionals | 113 |
| | 2. | Dissolution of Creditors' Committee | 113 |
| | 3. | Confirmation of Plans for Separate Debtors | 113 |
| | 4. | Modifications and Amendments | 113 |
| | 5. | Severability of Plan Provisions | 113 |
| | 6. | Revocation, Withdrawal or Non-Consummation | 114 |
| | 7. | Term of Injunctions or Stays | 114 |
| | 8. | Service of Documents | 114 |
| | 9. | Governing Law | 115 |
| L. | | Additional Plan Provisions | 116 |
| ARTICLE V. REQUIREMENTS FOR CRAMDOWN OF THE PLAN | | | 116 |
| ARTICLE VI. FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST | | | 117 |
| A. | | Feasibility of the Plan | 117 |
| B. | | Best Interests of Creditors Test | 118 |
| C. | | Reorganized Value Analysis | 119 |
| ARTICLE VII. CERTAIN RISK FACTORS TO CONSIDER | | | 120 |
| A. | | Certain Bankruptcy Law Considerations | 120 |
| B. | | Risk Factors Associated with the Business | 124 |
| C. | | Factors Affecting the Reorganized Debtors | 130 |
| D. | | Factors Affecting the Value of Securities to be Issued under the Plan | 132 |

E.       Accuracy of Information; Disclaimer ...................................................................133

ARTICLE VIII. CERTAIN SECURITIES LAW MATTERS .................................................134

    A.       Issuance of New Common Stock and Existing Lender Warrants........................134

    B.       New Stockholders Agreement .............................................................................134

    C.       Transferability of New Common Stock................................................................134

ARTICLE IX. MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES ...................135

    A.       Introduction.........................................................................................................135

    B.       U.S. Federal Income Tax Consequences to the Debtors....................................136

            1.       Cancellation of Indebtedness and Reduction of Attributes.....................137

            2.       Section 382 Limitation on NOLs............................................................138

            3.       Alternative Minimum Tax .......................................................................139

    C.       U.S. Federal Income Tax Treatment of the Litigation Trust ..............................140

    D.       U.S. Federal Income Tax Consequences to Holders of Certain Claims ..............141

            1.       Allocation of Payments Between Principal and Interest.........................141

            2.       Holders of Existing Lender Secured Claims...........................................141

            3.       Holders of Other Secured Claims Against Encumbered Debtors............146

            4.       Holders of General Unsecured Claims Against Encumbered Debtors ....147

            5.       Holders of Non-Qualified Retirement Claims ........................................148

            6.       Holders of Tort Claims ...........................................................................148

            7.       Information Reporting and Backup Withholding ....................................148

ARTICLE X. RECOMMENDATION .......................................................................................149

## Exhibits

**Annexed as Exhibits to this Disclosure Statement are copies of the following documents:**

- **Joint Plan of Reorganization (Exhibit 1)**

- **Disclosure Statement Order (Exhibit 2)**

- **Plan Support Agreement and Stockholder Consents (Exhibit 3)**

- **Filed and Scheduled Claims as of December 11, 2009 by Debtor and Plan Class (Exhibit 4)**

- **Prepetition Organizational Chart (Exhibit 5)**

- **Debtor Specific Information Chart (Exhibit 6)**

- **Historical Executive Compensation Information (Exhibit 7)**

- **Notice of Desire to Enter into Post-Emergence Trade Agreement (Exhibit 8)**

- **Reorganized Debtors' Projected Financial Information (Exhibit 9)**

- **Liquidation Analysis (Exhibit 10)**

- **Reorganized Value Analysis (Exhibit 11)**

- **Estimated Class A4 Claim Recovery Analysis (Exhibit 12)**

# ARTICLE I.
## INTRODUCTION

### A.    Overview

The Debtors and debtors in possession in the above-captioned Chapter 11 Cases include Freedom Communications Holdings, Inc. ("Freedom Holdings") and its direct and indirect subsidiaries, all as set forth below (collectively, the "Debtors"):

| | |
|---|---|
| Freedom Communications Holdings, Inc. | Freedom Arizona Information, Inc. |
| Freedom Communications, Inc. | Freedom Colorado Information, Inc. |
| Freedom Broadcasting, Inc. | Freedom Eastern North Carolina Communications, Inc. |
| Freedom Broadcasting of Florida, Inc. | Freedom Newspapers of Illinois, Inc. |
| Freedom Broadcasting of Florida Licensee, L.L.C. | Freedom Newspapers of Southwestern Arizona, Inc. |
| Freedom Broadcasting of Michigan, Inc. | Freedom Shelby Star, Inc. |
| Freedom Broadcasting of Michigan Licensee, L.L.C. | Illinois Freedom Newspapers, Inc. |
| Freedom Broadcasting of New York, Inc. | Missouri Freedom Newspapers, Inc. |
| Freedom Broadcasting of New York Licensee, L.L.C. | Odessa American |
| Freedom Broadcasting of Oregon, Inc. | The Times-News Publishing Company |
| Freedom Broadcasting of Oregon Licensee, L.L.C. | Victor Valley Publishing Company |
| Freedom Broadcasting of Southern New England, Inc. | Daily Press |
| Freedom Broadcasting of Southern New England Licensee, L.L.C. | Freedom Newspaper Acquisitions, Inc. |
| | The Clovis News-Journal |
| Freedom Broadcasting of Texas, Inc. | Freedom Newspapers of New Mexico L.L.C. |
| Freedom Broadcasting of Texas Licensee, L.L.C. | Gaston Gazette LLP |
| Freedom Broadcasting of Tennessee, Inc. | Lima News |
| Freedom Broadcasting of Tennessee Licensee, L.L.C. | Porterville Recorder Company |
| Freedom Magazines, Inc. | Seymour Tribune Company |
| Freedom Metro Information, Inc. | Victorville Publishing Company |
| Freedom Newspapers, Inc. | Freedom Newspapers |
| Orange County Register Communications, Inc. | The Creative Spot, L.L.C. |
| OCR Community Publications, Inc. | Freedom Interactive Newspapers, Inc. |
| OCR Information Marketing, Inc. | Freedom Interactive Newspapers of Texas, Inc. |
| Appeal-Democrat, Inc. | Freedom Services, Inc. |
| Florida Freedom Newspapers, Inc. | |

The Debtors hereby submit, pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this Disclosure Statement with Respect to Joint Plan of Reorganization under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al., Debtors (the "Disclosure Statement") in connection with the Debtors' solicitation of votes with respect to Joint Plan of Reorganization under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al., Debtors, dated as of January 28, 2010 (the "Plan").  A copy of the Plan is attached hereto as Exhibit 1.  All capitalized terms used but not defined in the Disclosure Statement will have the respective meanings ascribed to such terms in the Plan, unless otherwise noted.  In the event of any inconsistency between the Disclosure Statement and the Plan, the terms of the Plan will govern and such inconsistency will be resolved in favor of the Plan.

The purpose of this Disclosure Statement is to set forth information: (i) regarding the history of the Debtors and their businesses; (ii) describing the Reorganization Cases; (iii) concerning the Plan and alternatives to the Plan; (iv) advising the holders of Claims and Interests of their rights under the Plan; and (v) assisting the holders of Claims entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan.

On January 22, 2010, after notice and a hearing, the Bankruptcy Court entered an order: (i) approving this Disclosure Statement (the "Disclosure Statement Order") as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Debtors to make an informed judgment as to whether to accept or reject the Plan; and (ii) authorizing the Debtors to use this Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan. The Disclosure Statement Order establishes **March 1, 2010, at 4:00 p.m. (Eastern Time)**, as the deadline for the return of Ballots accepting or rejecting the Plan (the "Voting Deadline"). The Disclosure Statement Order is attached hereto as Exhibit 2.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement and the Exhibits hereto, including the Plan and the Disclosure Statement Order, as well as the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.

The Plan represents a consensus negotiated among the Debtors, the Existing Lender Agent (in consultation with the Steering Committee Members) on behalf of the holders of Existing Lender Claims, and the Creditors' Committee on behalf of the holders of General Unsecured Claims, Non-Qualified Retirement Claims, Tort Claims, and Trade Unsecured Claims. The Steering Committee Members are Existing Lenders that currently include JPMorgan Chase Bank, N.A., Bank of New York Mellon, General Electric Capital Corporation, Royal Bank of Scotland PLC, and Wachovia Bank, National Association. The members of the Creditors' Committee are Pension Benefit Guaranty Corporation, Nelson Gonzalez (the lead plaintiff for the Gonzalez Litigation Claims), Telerep LLC, Pitman Co., and Alan J. Bell.

**THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES A2, A3, A4, A5, AND A7 VOTE TO ACCEPT THE PLAN, AS THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO SUCH HOLDERS.**

**THE CREDITORS' COMMITTEE RECOMMENDS THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASS A4, NON-QUALIFIED RETIREMENT CLAIMS IN CLASS A5, AND TORT CLAIMS IN CLASS A7 VOTE TO ACCEPT THE PLAN.**

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED EXHIBITS AND ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

Additional copies of this Disclosure Statement (including the Exhibits hereto) are available upon request made in writing to Logan & Company, Inc., Attention: Freedom Communications, 546 Valley Road, Upper Montclair, New Jersey 07043, telephone: (973) 509-3190, or can be accessed online at www.deb.uscourts.gov (cm/ecf) or www.loganandco.com.

In addition, a Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement for the holders of Claims that are entitled to vote to accept or reject the Plan. If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Logan & Company, Inc., Attention: Freedom Communications, in writing at 546 Valley Road, Upper Montclair, New Jersey 07043, or by telephone at (973) 509-3190.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the other Exhibits attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification and treatment of Claims and Interests.

**B.     Summary of the Plan**

As indicated above, the Plan represents a consensus reached by the Debtors, the Existing Lender Agent (in consultation with the Steering Committee Members), and the Creditors' Committee.  The consensus is based upon a compromise of a host of issues in dispute among such parties, as more particularly described below.  The Plan provides for the Debtors to be reorganized under Chapter 11 and to emerge as a continuing business operation for the benefit of their customers, vendors, employees, and communities, supported by a restructured balance sheet and new exit financing.  All of the parties to the consensus believe that the Plan represents the best means currently available for the Debtors' emergence from Chapter 11.

The structure of the Plan recognizes the rights of the Existing Lenders under the Existing Credit Agreement Documents.  Most of the fifty (50) Debtors are either obligors or guarantors, and have pledged substantially all of their assets to secure their obligations, under the Existing Credit Agreement Documents (the "Encumbered Debtors").  Seven (7) of the Encumbered Debtors are guarantors who have granted a lien on their assets under the Existing Credit Agreement, but their primary assets, consisting of FCC licenses, are not subject to that lien.  Nevertheless, as explained in the paragraph below, the value of the FCC licenses flows to the Existing Lenders.  Another seven (7) of the Debtors are not obligors or guarantors, and have not pledged any assets, under the Existing Credit Agreement Documents (the "Unencumbered Debtors").

Among the issues compromised by the Plan was the extent of the Existing Lenders' rights as secured creditors and whether any unencumbered value was available for unsecured creditors of the Encumbered Debtors.  On the one hand, it has been asserted that (a) the substantial majority of the Debtors' assets are owned by the Encumbered Debtors, and thus the substantial majority of the Debtors' assets have been pledged to secure the obligations to the Existing Lenders under the Existing Credit Agreement Documents; (b) the value of the assets pledged by the Encumbered Debtors is substantially less than the aggregate amount owed to the Existing Lenders, leaving the Existing Lenders with a significant unsecured deficiency claim; and (c) as a consequence, there is no value available for distribution to unsecured creditors of the

Encumbered Debtors. On the other hand, it has been asserted that certain of the Encumbered Debtors have unencumbered assets that could be used to fund distributions to the unsecured creditors of those Debtors in excess of amounts originally proposed, and that certain potential causes of action existed against the Existing Lenders. That position was countered by the argument that priority creditors have prior rights over unsecured creditors to any unencumbered value, as well as the fact that the amount of the Existing Lenders' unsecured deficiency claims against every Encumbered Debtor would eclipse all unsecured claims against the particular Encumbered Debtor, leaving de minimis recoveries, if any, for unsecured creditors, and that the potential causes of action against the Existing Lenders lacked merit.

As to the seven (7) Encumbered Debtors who are guarantors, but whose FCC licenses are not subject to their pledge of assets under the Existing Credit Agreement Documents – Freedom Broadcasting of Florida Licensee, L.L.C., Freedom Broadcasting of Michigan Licensee, L.L.C., Freedom Broadcasting of New York Licensee, L.L.C., Freedom Broadcasting of Oregon Licensee, L.L.C., Freedom Broadcasting of Southern New England Licensee, L.L.C., Freedom Broadcasting of Texas Licensee, L.L.C., and Freedom Broadcasting of Tennessee Licensee, L.L.C. – the obligations of such Debtors are believed to be limited to their guarantee obligations to the Existing Lenders and fees or other amounts owing to the FCC (which constitute Cure obligations and thus will be paid as Administrative Claims under the Plan), and thus the value of their assets in excess of their obligations flows to their Interest holders. Those Interest holders are themselves obligated under the Existing Credit Agreement Documents and have pledged their Interests to secure their obligations. Thus, if such pledges are valid, the Existing Lenders would assert a right to any value in the assets of these Encumbered Debtors in excess of the amount of their obligations.

The seven (7) Unencumbered Debtors – Freedom Newspapers, Gaston Gazette LLP, Daily Press, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, and The Creative Spot, L.L.C. – are either operating entities that generate sufficient cash flow to support payment of their obligations or are inactive entities that have no known obligations.

The Plan treats Claims against and Interests in the Encumbered Debtors differently than it treats Claims against and Interests in the Unencumbered Debtors.

A brief summary of the Classes established under the Plan, the treatment of each Class, and the voting rights of each Class is set forth in the table below. A complete description of the treatment of each Class is set forth in Article III of the Plan and Article IV of this Disclosure Statement. Parties should refer to those sections for a complete description of the proposed treatment for each Class.

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| **Administrative Claims**<br><br>Estimated Allowed Claims (anticipated accrued and unpaid Claims as of the Effective Date; exclusive of (i) ordinary course operational costs and (ii) fees and expenses in connection with obtaining the Exit Facility):<br><br>Approximately $16.9 million (including estimated unpaid Professional Fee Claims, Claims under Section 503(b)(9), and Cure payments)<br><br>Note that the estimated amount of Cure payments includes certain amounts that are also included in the estimated $39.0 million in Class A4 General Unsecured Claims and the estimated $1.5 million in Class B3 General Unsecured Claims. If the executory contract or unexpired lease of any holder of a General Unsecured Claim is assumed, the amount of such holder's Claim that is included within the estimates for General Unsecured Claims will become Cure payments and will be treated as Administrative Claims. | An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, bonuses, or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Claims, (c) Substantial Contribution Claims, (d) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, (e) all Allowed Claims for the value of goods received under Section 503(b)(9) of the Bankruptcy Code, (f) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (g) Cure payments, and (h) to the extent applicable, the portion of the Adequate Protection Obligations that constitute Claims under Section 507(b) of the Bankruptcy Code.<br><br>With respect to each Allowed Administrative Claim, except as otherwise provided for in the Plan, and subject to the requirements of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different, less favorable treatment as to which the applicable Debtor and such holder will have agreed upon in writing; *provided, however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.<br><br>The Existing Lender Agent and the Existing Lenders will be entitled to retain all payments made by the Debtors during the Chapter 11 Cases in full satisfaction of all Adequate Protection Obligations arising under the Cash Collateral Order, including any portion of the Adequate Protection Obligations that constitute an Administrative Claim under Section 507(b) of the Bankruptcy Code; *provided, however*, that subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, such payments will be applied in accordance with the Existing Credit Agreement Documents to reduce the principal amount of the Existing Lender Secured Claims. Any Existing Lender Fee Claim that has been incurred and is unpaid as of the Effective Date will be paid in Cash on or as soon as practicable after the Effective Date in full satisfaction, settlement, release and discharge of such Claim *provided, however*, that subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, any such payments will be deemed to be applied to reduce the principal amount of the Existing Lender Secured Claims in accordance with the Existing Credit Agreement Documents and the Cash Collateral Order. Any replacement or other Liens created under the Cash Collateral Order will terminate and will have no further force and effect as of the Effective Date.<br><br>SECTION 11.2 OF THE PLAN IMPOSES A DEADLINE OF FORTY-FIVE (45) DAYS AFTER THE EFFECTIVE DATE FOR THE FILING OF REQUESTS FOR PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS.<br><br>Administrative Claims are not classified and are treated as required by the |

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| | Bankruptcy Code.  The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Priority Tax Claims**<br><br>Estimated Allowed Claims:<br><br>Approximately $0.00 as scheduled and unpaid<br><br>But note that approximately $29.7 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as of December 11, 2009 against all Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.  The amount includes a protective Proof of Claim in the approximate amount of $29 million filed by the Internal Revenue Service pending required review of a 2008 carryback refund made to the Debtors.<br><br>*(Priority Tax Claims have been paid since the Petition Date, and will continue to be paid when due, pursuant to order of the Bankruptcy Court.)* | A Priority Tax Claim is a Claim of a governmental unit that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.<br><br>Each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, either, with the agreement of the Steering Committee Members, (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different, less favorable treatment as to which the applicable Debtor and such holder will have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under Section 511 of the Bankruptcy Code), equal to such Allowed Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date.<br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code.  The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class A1:   Other Priority Claims Against Encumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $35,000 as scheduled and unpaid<br><br>But note that approximately $1.7 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as of December 11, 2009 against all Encumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.<br><br>See <u>Exhibit 4</u> for scheduled and filed Claim information for each Encumbered Debtor (subject to the disclaimers thereon).<br><br>*(Certain Other Priority Claims against the Encumbered Debtors have been paid since the Petition Date pursuant to order of the Bankruptcy Court.)*<br><br>**Class B1:   Other Priority Claims Against Unencumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $3,600 as scheduled and unpaid<br><br>But note that approximately $4,150 in fixed amount has been asserted on an aggregate basis in | An Other Priority Claim is a Claim against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different, less favorable treatment as to which the applicable Debtor and such holder will have agreed upon in writing.<br><br>Class A1, containing Other Priority Claims against the Encumbered Debtors, and Class B1, containing Other Priority Claims against the Unencumbered Debtors, are not Impaired.  The holders of such Claims are, therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| Proofs of Claim filed as of December 11, 2009 against all Unencumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.<br><br>See <u>Exhibit 4</u> for scheduled and filed Claim information for each Unencumbered Debtor (subject to the disclaimers thereon).<br><br>*(Certain Other Priority Claims against the Unencumbered Debtors have been paid since the Petition Date pursuant to order of the Bankruptcy Court.)* | |
| **Class A2:   Existing Lender Claims**<br><br>Allowed Claims:<br><br>Approximately $772 million as scheduled<br><br>(Consisting of not less than $770,552,344.03 in aggregate principal amount as of the Petition Date, plus $1,933,100.00 in respect of letters of credit issued and outstanding under the Existing Credit Agreement Documents as of the Petition Date) | "Existing Lender Claim" means any Claim arising under (a) that certain Credit Agreement, dated as of May 18, 2004, as amended, among Freedom Holdings, Freedom Communications as borrower, the Existing Lenders and the Existing Lender Agent, (b) that certain Guarantee and Collateral Agreement, dated as of May 18, 2004, as amended, among Freedom Holdings, Freedom Communications, certain of the Subsidiary Debtors as subsidiary loan parties, and JPMorgan Chase Bank, N.A. as collateral agent, and (c) the other "Loan Documents" as defined in the Credit Agreement.<br><br>Subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, the aggregate amount of all payments made by the Debtors on account of Adequate Protection Obligations will be deemed applied to reduce the principal amount of the Existing Lender Secured Claims in accordance with the Existing Credit Agreement Documents and the Cash Collateral Order.  In addition, the holders of Existing Lender Secured Claims, in full satisfaction, settlement, release, and discharge of and in exchange for the remaining amount of the Existing Lender Secured Claims, will receive on the Effective Date their Pro Rata share (except as provided otherwise below) of each of (i) the Term A Loan Obligations, (ii) the Term B Loan Obligations, (iii) the Excess Cash, (iv) the Existing Lender Shares, and (v) the amount of the Trade Unsecured Claim Escrow, which will be deposited by or on behalf of Existing Lenders into the Trade Unsecured Claim Escrow, and any remaining funds in the Trade Unsecured Claim Escrow after all required payments to holders of Allowed Trade Unsecured Claims have been made in accordance with Section 5.11(c) of the Plan.  The entitlement of each holder of Existing Lender Secured Claims to receive its Pro Rata share of the Existing Lender Shares on the Effective Date pursuant to Section 3.2(b) of the Plan will be satisfied by receipt of any combination of shares of New Common Stock and/or Existing Lender Warrants in such proportion to the extent necessary to comply with the Communications Act of 1934 (as amended) and FCC domestic and foreign ownership rules; *provided that* the sum of (i) the number of shares of Existing Lender Shares received by such Existing Lender and (ii) the number of shares of New Common Stock issuable upon the exercise of Existing Lender Warrants issued pursuant to Section 3.2(b) of the Plan received by such Existing Lender will equal such Existing Lender's Pro Rata share of the Aggregate Existing Lender Share Number.  In addition, as of the Effective Date, each holder of an Existing Lender Secured Claim will be deemed to receive a Pro Rata share of the Class A2 Beneficial Trust Interests.  The Class A2 Beneficial Trust Interests will entitle the holders of Existing Lender Secured Claims to receive, after the Effective Date, if and when distributed, their allocated portion of the Net Litigation Proceeds.<br><br>The Existing Lenders will accept the distributions on account of the |

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| | Existing Lender Secured Claims, in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing Credit Agreement Documents, except for indemnification obligations, which will receive the treatment provided under Section 6.6(c) of the Plan. The holders of Existing Lender Deficiency Claims will not receive or retain any property under the Plan on account of any Existing Lender Deficiency Claims and all Existing Lender Deficiency Claims will be deemed waived by the Existing Lenders and discharged as of the Effective Date.<br><br>The Existing Lenders will be deemed to have received the Subsidiary Interests in the Encumbered Debtors and contributed such Subsidiary Interests back to their respective holders.<br><br>Class A2, containing Existing Lender Claims, is Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Each of the Encumbered Debtors are jointly and severally obligated on the Existing Lender Claims. Accordingly, Class A2 will be deemed to consist of forty-three (43) separate sub-Classes for each of the Encumbered Debtors. The vote of each holder of an Existing Lender Claim will be deemed to apply to each of the separate sub-Classes.<br><br>Estimated Percentage Recovery: 55.1% to 67.8% |
| **Class A3:  Other Secured Claims against Encumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $0.00 as scheduled<br><br>But note that approximately $8.1 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as of December 11, 2009 against all Encumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.<br><br>See <u>Exhibit 4</u> for scheduled and filed Claim information for each Encumbered Debtor (subject to the disclaimers thereon).<br><br>**Class B2:  Other Secured Claims against Unencumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $0.00 as scheduled<br><br>But note that approximately $4,300 in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as of December 11, 2009 against all Unencumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.<br><br>See <u>Exhibit 4</u> for scheduled and filed Claim information for each Unencumbered Debtor (subject to the disclaimers thereon). | An Other Secured Claim is a Secured Claim arising prior to the Petition Date against any of the Debtors, other than an Existing Lender Secured Claim.<br><br><u>Class A3, Other Secured Claims against Encumbered Debtors</u>:<br><br>At the option of the Reorganized Debtors, with the agreement of the Steering Committee Members, either (i) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim against an Encumbered Debtor will be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; (ii) the holder of an Allowed Other Secured Claim against an Encumbered Debtor will (A) retain the Liens securing such Allowed Other Secured Claim and (B) receive regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under 26 U.S.C. § 6622 or, if applicable, under Section 511 of the Bankruptcy Code), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date; (iii) the collateral securing such Allowed Other Secured Claim against an Encumbered Debtor will be surrendered to the holder of such Allowed Other Secured Claim on the Distribution Date; or (iv) the holder of the Allowed Other Secured Claim against an Encumbered Debtor will be paid in full. The treatment applicable to each holder of an Other Secured Claim will be announced in a filing made with the Bankruptcy Court no later than ten (10) days prior to the Confirmation Hearing.<br><br>Because certain of the treatment options are Impaired, and the treatment options have not yet been determined for each holder, Class A3 is considered to be Impaired for voting purposes. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Class A3 consists of separate sub-Classes for each Other Secured Claim against any of the Encumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Encumbered Debtor for all purposes under the Bankruptcy Code, including for voting purposes. |

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| | Estimated Percentage Recovery: 100% |
| | <u>Class B2, Other Secured Claims against Unencumbered Debtors</u>: |
| | The legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim against an Unencumbered Debtor will be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code. |
| | Class B2 is not Impaired. The holders of such Claims are, therefore, not entitled to vote on the Plan. |
| | Estimated Percentage Recovery: 100% |
| **Class A4: General Unsecured Claims against Encumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $39.0 million (including an agreed amount of $29.5 million for the Gonzalez Litigation Claims, solely for purposes of the Plan and conditioned on confirmation and effectiveness of the Plan).<br><br>But note that approximately $260.6 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as of December 11, 2009 against all Encumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection. Such amount includes two class Proofs of Claim filed with respect to the Gonzalez Litigation Claims in the amount of $102.7 million each. The Debtors believe that the aggregate amount ultimately Allowed will be closer to the amount listed above under Estimated Allowed Claims, but no assurances can be provided.<br><br>See <u>Exhibit 4</u> for scheduled and filed Claim information for each Encumbered Debtor (subject to the disclaimers thereon). The amount of scheduled Claims on <u>Exhibit 4</u> is different from the $39.0 million estimate above for several reasons, as detailed on <u>Exhibit 4</u>.<br><br>**Class B3: General Unsecured Claims against Unencumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $1.5 million<br><br>Approximately $587,000 in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as of December 11, 2009 against all Unencumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection. Certain claimants may have filed their Proofs of Claim against the wrong Debtor (possibly against an Encumbered Debtor), in which case their Claim amounts are | A General Unsecured Claim is a Claim against any of the Debtors that is <u>not</u> an Administrative Claim, an Existing Lender Fee Claim, a Priority Tax Claim, an Other Priority Claim, an Existing Lender Secured Claim, an Other Secured Claim, an Existing Lender Deficiency Claim, a Trade Unsecured Claim, a Non-Qualified Retirement Claim, a Tort Claim, an Intercompany Claim, or a Subordinated Claim. For the avoidance of doubt, the unsecured Claim of a provider of goods or services will be considered a General Unsecured Claim until and unless such provider satisfies the requirements for becoming the holder of a Trade Unsecured Claim.<br><br>Class A4, General Unsecured Claims against Encumbered Debtors:<br><br>As of the Distribution Date, each holder of an Allowed General Unsecured Claim against the Encumbered Debtors (also referred to as a Class A4 Claim) will be deemed to receive a Pro Rata share of the Class A4 Beneficial Trust Interests. The Class A4 Beneficial Trust Interests will entitle the holders of Allowed General Unsecured Claims to receive (i) on the Distribution Date, the Net Cash Proceeds and (ii) after the Distribution Date, if and when distributed, their allocated portion of the Net Litigation Proceeds. Under no circumstances will any holder of an Allowed General Unsecured Claim against the Encumbered Debtors receive more than payment in full of such Allowed Claim plus Distribution Interest.<br><br>Class A4 consists of 43 separate sub-Classes for each of the Encumbered Debtors, with the sub-Class for each Encumbered Debtor consisting of the General Unsecured Claims against such Encumbered Debtor. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code, including for voting purposes.<br><br>Class A4, containing General Unsecured Claims against the Encumbered Debtors, is Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan, by separate sub-Class.<br><br>Estimated Percentage Recovery: 37.2% to 100% (see <u>Exhibit 12</u> for recovery analysis prepared by the Creditors' Committee)<br><br>Class B3, General Unsecured Claims against Unencumbered Debtors:<br><br>The legal, equitable, and contractual rights of each holder of an Allowed General Unsecured Claim against an Unencumbered Debtor will be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code. On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and (iii) the date on which such General Unsecured Claim becomes payable pursuant to any agreement between a Debtor and the |

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| not included here. The Debtors believe that the aggregate amount ultimately Allowed will be closer to the amount listed above under Estimated Allowed Claims, but no assurances can be provided.<br><br>See Exhibit 4 for scheduled and filed Claim information for each Unencumbered Debtor (subject to the disclaimers thereon). | holder of such Claim, each holder of an Allowed General Unsecured Claim in Class B3 will receive, in full satisfaction of and in exchange for, such Allowed General Unsecured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Cases not been filed.<br><br>Class B3 is not Impaired. The holders of such Claims are, therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class A5:  Non-Qualified Retirement Claims against Encumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $17.8 million<br><br>See Exhibit 4 for scheduled and filed Claim information for each Encumbered Debtor. | A Non-Qualified Retirement Claim is a Claim against Freedom Communications arising under (a) the Non-Qualified DC Plan, (b) the Non-Qualified EB Plan, or (c) the Individual Retirement Agreements.<br><br>The treatment of Allowed Non-Qualified Retirement Claims will be limited to the receipt of benefits as follows:<br><br>(i) All benefit obligations under the Non-Qualified DC Plan will be reinstated as of the Petition Date on the following modified terms:  (A) the account balances will be reduced to 70% of the account balances determined as of the Petition Date; (B) no contribution credits will be credited for the 2009 plan year or any future plan year, and no interest or earnings will be credited to the reduced account balances on or after the Petition Date; (C) any unpaid benefits relating to the period between the Petition Date and the Effective Date that were due prior to the Effective Date will be paid in a lump sum to the applicable participant or beneficiary reflecting such reduced account balance (without interest or earnings) on the Effective Date; and (D) any benefits payable on or after the Effective Date will be paid in accordance with the terms of the applicable Non-Qualified DC Plan (as modified in accordance with the foregoing clauses);<br><br>(ii) All benefit obligations under the Non-Qualified EB Plan will be reinstated as of the Petition Date on the following modified terms:  (A) the benefits will be reduced to 70% of the benefits determined as of the Petition Date; (B) any benefit payments that were or are due thereunder on or after October 1, 2009 will be paid at the rate of 70% of the benefit payment amount otherwise due (determined as of the Petition Date) in the form of payment applicable to such benefit under the Non-Qualified EB Plan (as in effect on the Petition Date); (C) any unpaid benefits relating to the period between October 1, 2009 and the Effective Date that were due prior to the Effective Date will be paid in a lump sum to the applicable participant or beneficiary reflecting such reduced rate (without interest or earnings) on the Effective Date; and (D) any benefit payments payable on or after the Effective Date will be paid in accordance with the terms of the applicable Non-Qualified EB Plan (as modified in accordance with the foregoing clauses); and<br><br>(iii) All retirement and/or deferred compensation benefit obligations under the Individual Retirement Agreements will be incorporated into the Non-Qualified EB Plan and will be treated in the same manner as benefit obligations under the Non-Qualified EB Plan, as set forth above; provided, however, that no such benefit (as reduced as set forth above) will be increased on or after the Petition Date by any cost of living adjustment or otherwise.<br><br>Class A5, containing Non-Qualified Retirement Claims, is Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery:  70% |

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| **Class A6:  Intercompany Claims against Encumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $4.8 billion<br><br>See Exhibit 4 for scheduled and filed Claim information for each Encumbered Debtor.<br><br>**Class B4:  Intercompany Claims against Unencumbered Debtors**<br><br>Estimated Allowed Claims:<br><br>Approximately $215 million<br><br>See Exhibit 4 for scheduled and filed Claim information for each Unencumbered Debtor. | An Intercompany Claim is a Claim arising prior to the Petition Date against any of the Debtors by another Debtor or by a non-Debtor subsidiary or affiliate of a Debtor.<br><br>Class A6, Intercompany Claims against Encumbered Debtors:<br><br>With respect to each Intercompany Claim against any of the Encumbered Debtors, at the election of the Reorganized Debtors, with the consent of the Existing Lender Agent, the Intercompany Claim will be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part as of the Effective Date, or may be Reinstated on the Effective Date, and no such disposition will require the consent of the holders of New Common Stock or the consent of any holder of Subsidiary Interests.<br><br>Class A6, containing Intercompany Claims, is Impaired.<br><br>Estimated Percentage Recovery: Subject to election; no payment contemplated.<br><br>Class B4, Intercompany Claims against Unencumbered Debtors:<br><br>With respect to each Intercompany Claim against any of the Unencumbered Debtors, the legal, equitable, and contractual rights of the holder of the Intercompany Claim will be Reinstated on the Effective Date, or, with the consent of the holder, may be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part as of the Effective Date.<br><br>Class B4 is not Impaired.<br><br>Estimated Percentage Recovery: 100% |
| **Class A7:  Tort Claims**<br><br>Estimated Allowed Claims:<br><br>$0.00 (the Debtors dispute all liability on such Claims)<br><br>But note that approximately $12.1 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as of December 11, 2009 against all Encumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.<br><br>See Exhibit 4 for scheduled and filed Claim information for each Encumbered Debtor (subject to the disclaimers thereon). | A Tort Claim is any tort Claim against the Encumbered Debtors for which coverage exists under the Debtors' insurance policies, including, without limitation, Claims for personal injury, wrongful death, defamation, slander, libel, invasion of privacy, or other tort liability, but not including any Claim for workers' compensation that is subject to Section 6.5(c) of the Plan.<br><br>The Plan provides that holders of Allowed Tort Claims will have the right to assert such Claims under the Debtors' applicable insurance policies.  Any recovery by such holders on account of such Allowed Claims will be limited to the coverage that may be available under such insurance policies.  Such holders will have no rights to any distributions under the Plan.<br><br>Class A7 is Impaired.  The holders of such Claims are, therefore, entitled to vote on the Plan, by separate sub-Class as applicable.<br><br>Estimated Percentage Recovery:  Subject to insurance coverage. |
| **Class A8:  Subordinated Claims**<br><br>Estimated Allowed Claims:<br><br>To be determined<br><br>As of January 12, 2010, approximately $440,260 in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed *after* December 11, 2009 against all Encumbered Debtors (not | A Subordinated Claim is (a) any Claim against any of the Encumbered Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which will include any Claim arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of any Interest, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim; (b) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages (but not general or ordinary negligence damages), to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such |

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| including unliquidated and contingent Claims).<br><br>See Exhibit 4 for scheduled and filed Claim information for each Encumbered Debtor (subject to the disclaimers thereon). | Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a governmental unit in connection with a tax or other obligation owing to such unit; or (c) any Claim that is tardily filed under Section 501(a) of the Bankruptcy Code, except for any tardily filed Gonzalez Litigation Claim.<br><br>The holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims. All Subordinated Claims will be discharged as of the Effective Date.<br><br>Class A8 is Impaired and no distribution will be made to such Class. The holders of such Claims are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |
| **Class A9: Subsidiary Interests in Encumbered Debtors**<br><br>**Class B5: Subsidiary Interests in Unencumbered Debtors** | Subsidiary Interests are, collectively, the issued and outstanding shares of stock, membership units, or partnership interests in the Subsidiary Debtors, as of the Petition Date; as well as any stock options or other rights to purchase the stock, membership units, or partnership interests of any of the Subsidiary Debtors, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors, and any other rights based on the value (or increase in value) of any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors.<br><br>Class A9, Subsidiary Interests in Encumbered Debtors:<br><br>On the Effective Date, the Subsidiary Interests in the Encumbered Debtors will be deemed to have been distributed to the Existing Lenders on account of their Existing Lender Claims and then contributed back by the Existing Lender to the respective holders of the Subsidiary Interests. The Subsidiary Interests will thereafter be retained for the benefit of the holders of the New Securities, subject to any applicable restrictions arising under the Exit Facility, the Term A Facility, and the Term B Facility. The Subsidiary Interests in the Reorganized Broadcast Licensee Companies will be subject to the provisions of Section 5.16 of the Plan.<br><br>Class A9 is Impaired.<br><br>Estimated Percentage Recovery: 0%<br><br>Class B5, Subsidiary Interests in Unencumbered Debtors:<br><br>The legal, equitable, and contractual rights of each holder of a Subsidiary Interest in any of the Unencumbered Debtors will be Reinstated on the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code.<br><br>Class B5 is not Impaired.<br><br>Estimated Percentage Recovery: 100% |

| Description of Claims | Summary of Treatment under Plan |
|---|---|
| **Class A10: Old Freedom Stock Interests** | Old Freedom Stock Interests are, collectively, all preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date. The term does not include any stock options or other rights to purchase the stock of Freedom Holdings, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Freedom Holdings prior to the Effective Date.<br><br>All Old Freedom Stock Interests will be cancelled as of the Effective Date. The holders of such Old Freedom Stock Interests will not receive or retain any property under the Plan or otherwise on account thereof.<br><br>Class A10, containing Old Freedom Stock Interests, is Impaired and no distribution will be made to such Class. The holders of such Interests are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |
| **Class A11: Old Freedom Stock Rights** | Old Freedom Stock Rights means, collectively, any stock options or other rights to purchase the stock of Freedom Holdings, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Freedom Holdings, and any phantom stock appreciation rights, restricted stock units or any other rights based on the value (or increase in value) of any stock or other equity ownership interests in Freedom Holdings. The term includes, without limitation, any award or rights under the Freedom Holdings 2004 Long-Term Incentive Plan (as amended and restated) and the Freedom Holdings 2008 Restricted Stock Unit Award Plan or any award agreement pursuant thereto. The term does not include any preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date.<br><br>All Old Freedom Stock Rights will be cancelled as of the Effective Date. The holders of such Old Freedom Stock Rights will not receive or retain any property under the Plan or otherwise on account thereof.<br><br>Class A11, containing Old Freedom Stock Rights, is Impaired and no distribution will be made to such Class. The holders of such Interests are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |

## C.    Voting; Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or interests in classes of claims or interests that are impaired and that are not deemed to have rejected a plan of reorganization are entitled to vote to accept or reject such proposed plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan. Classes of claims or interests under a chapter 11 plan in which the holders of claims or interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan. In addition, classes of claims or interests in which the holders of claims or interests will not receive or retain any

property on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

With respect to the Plan, a Claim or Interest must be "Allowed" for purposes of voting in order for such creditor to have the right to vote. Generally, for voting purposes a Claim or Interest is deemed "Allowed" absent an objection to the Claim or Interest if (i) a Proof of Claim was timely filed, or (ii) if no Proof of Claim was filed, the Claim or Interest is identified in the Debtors' Schedules as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim or Interest is specified in the Schedules, in which case the Claim or Interest will be deemed Allowed for the specified amount. In either case, when an objection to a Claim or Interest is filed, the holder of such Claim or Interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or deems the Claim or Interest to be Allowed for voting purposes.

In connection with the Plan, therefore:

- Claims in Classes A2, A3, A4, A5, and A7 (and each sub-Class of such Classes) are Impaired and the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in Classes A2, A3, A4, A5, and A7 are entitled to vote to accept or reject the Plan;

- Claims in Classes A1, B1, B2, B3, and B4 and Interests in Class B5 are not Impaired. As a result, holders of Claims in that Class are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan;

- Claims in Class A8 and Interests in Classes A10 and A11 are Impaired and the holders of such Claims and Interests will not receive any distribution on account of such Claims and Interests. As a result, the holders of Claims and Interests in those Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan; and

- Claims in Class A6 and Interests in Class A9 are Impaired, but because the holders of such Claims and Interests are Debtors, who are proponents and thus supporters of the Plan, their votes will not be solicited.

**Providers of goods or services to the Encumbered Debtors who may later become holders of Trade Unsecured Claims pursuant to the procedures in the Plan will be holders of General Unsecured Claims at the time of voting. Such holders, if otherwise eligible to vote, will vote as holders of General Unsecured Claims in Class A4.**

The Bankruptcy Code defines "acceptance" of a plan by (a) a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan and (b) a class of interests as acceptance by holders in the class that hold at least two-thirds of the number of interests that cast ballots for acceptance or rejection of the plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of Section 1129(b) of the Bankruptcy Code are met. In view of the deemed rejection of the Plan by Classes A8, A10, and A11, the Debtors will request

confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code as to such Classes, as well as with respect to any Class of Claims or Interests entitled to vote on the Plan that rejects the Plan. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept the plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement, the Exhibits attached hereto, the documents incorporated herein by reference, the Plan and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan. Please complete, execute and return your Ballot(s) to the Debtors' claims and voting agent (the "Voting Agent") at the address below:

> Logan & Company, Inc.
> Attention: Freedom Communications
> 546 Valley Road
> Upper Montclair, New Jersey 07043

**BALLOTS MUST BE COMPLETED AND RECEIVED NO LATER THAN THE VOTING DEADLINE OF 4:00 P.M. (EASTERN TIME) ON MARCH 1, 2010. ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON WILL NOT BE COUNTED. ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. ANY BALLOT THAT IS RECEIVED BY TELECOPIER, FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE COUNTED. IF A HOLDER OF A CLAIM SHOULD CAST MORE THAN ONE BALLOT VOTING THE SAME CLAIM PRIOR TO THE VOTING DEADLINE, ONLY THE LAST-DATED TIMELY BALLOT RECEIVED BY THE BALLOTING AGENT WILL BE COUNTED.**

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has fixed **5:00 p.m. (Eastern Time) on January 21, 2010 or, for holders of Existing Lender Claims only, 5:00 p.m. (Eastern Time) on January 22, 2010** (the "Voting Record Date"), as the time and date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept or reject the Plan. Accordingly, only holders of record of Claims as of the Voting Record Date that are entitled to vote on the Plan, will receive a Ballot and may vote on the Plan.

If you did not receive a Ballot and believe that you are entitled to vote on the Plan, you must either (a) obtain a Ballot pursuant to the instructions set forth above and timely submit such Ballot by the Voting Deadline, or (b) file a Motion pursuant to Rule 3018 of the Bankruptcy Rules with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by **February 22, 2010, at 4:00 p.m. (Eastern Time)**, or you will not be entitled to vote to accept or reject the Plan.

THE DEBTORS, THE REORGANIZED DEBTORS, AND THE LITIGATION TRUSTEE, AS APPLICABLE, IN ALL EVENTS RESERVE THE RIGHT THROUGH THE CLAIM RECONCILIATION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN, EVEN IF THE HOLDER OF SUCH CLAIM VOTED TO ACCEPT OR REJECT THE PLAN.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of Impaired Claims has accepted the Plan. The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Class entitled to vote.

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

**HOLDERS OF CLAIMS VOTING TO ACCEPT THE PLAN WILL BE DEEMED TO HAVE GRANTED THE THIRD PARTY RELEASE PROVIDED FOR IN SECTION 11.9(b) OF THE PLAN AND DESCRIBED BELOW. HOLDERS WHO DO NOT DESIRE TO GRANT THE THIRD PARTY RELEASE SHOULD GOVERN THEMSELVES ACCORDINGLY.**

The Debtors have proposed that the Bankruptcy Court approve procedures regarding temporary allowance of certain Claims for voting purposes only. Specifically, the Debtors have requested that any holder of an Other Secured Claim in Class A3, a General Unsecured Claim in Class A4, a Non-Qualified Retirement Plan Claim in Class A5, or a Tort Claim in Class A7 whose Claim is (a) asserted as wholly unliquidated or wholly contingent in a timely Proof of Claim, (b) asserted in an untimely Proof of Claim that has not been allowed by the Court as timely on or before the Voting Record Date, (c) asserted in a Proof of Claim as to which an objection to the entirety of the Claim is pending as of the Voting Record Date, (d) asserted in a single Proof of Claim against multiple Debtors (unless authorized by order of the Bankruptcy Court), or (e) listed in the schedules of liabilities as contingent, unliquidated or disputed or as zero or unknown in amount, and not asserted in a timely Proof of Claim in a manner other than as wholly unliquidated or wholly contingent (collectively, the "Disputed Claimants") not be permitted to vote on the Plan unless they file a motion seeking to be allowed to vote on the Plan pursuant to Bankruptcy Rule 3018(a) (a "Rule 3018 Motion"). All Disputed Claimants will receive a copy of the Notice of Non-Voting Status and Temporary Allowance Procedures with Respect to Claims Held by Disputed Claimants (the "Notice of Disputed Claim Status") in lieu of a Ballot. The Notice of Disputed Claim Status will inform the Disputed Claimants that if they wish to dispute their status as a Disputed Claimant and to seek the right to vote on the Plan, they must: (a) request temporary allowance of their claim for voting purposes on or before February 22, 2010 at 4:00 p.m. (Eastern Time), by filing a Rule 3018 Motion with the Bankruptcy Court; (b) request a provisional ballot from the Voting Agent (Logan & Company, Inc., 546 Valley Road, Upper Montclair, New Jersey 07043, Telephone: (973) 509-3190), and (c) on or before March 1, 2010, at 4:00 p.m. (Eastern Time), complete and return the provisional ballot according to the instructions contained on the ballot. If and to the extent that the Debtors and each such Disputed Claimant are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline, then the Debtors will request that the Bankruptcy Court determine, at a hearing

to be held in advance of the Confirmation Hearing, whether the provisional ballot should be counted as a vote on the Plan.

The Debtors reserve the right to object to any Proof of Claim after the Voting Record Date. With respect to any such objection, the Debtors may request, on notice, that any vote cast by the holder of the subject claim not be counted in determining whether the requirements of Section 1126(c) of the Bankruptcy Code have been met. In the absence of any such request, the holder of the subject claim will be entitled to vote or receive notice, as applicable under the Disclosure Statement Order, in accordance with its Proof of Claim.

Nothing in the solicitation procedures affects the right of the Debtors, the Reorganized Debtors, or the Litigation Trustee to object to any Proof of Claim on any ground or for any purpose prior to the applicable Claims Objection Deadline established by the Plan.

**D. Special Notice of Third Party Release Resulting from Vote to Accept Plan**

**THE PLAN PROVIDES THAT EACH HOLDER OF ANY CLAIM THAT VOTES TO ACCEPT THE PLAN (EACH A "<u>RELEASING PARTY</u>") SHALL BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER, AGAINST (I) THE DEBTORS' CURRENT AND FORMER DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, ATTORNEYS, PROFESSIONALS, AGENTS, PARTNERS, STOCKHOLDERS, OR AFFILIATES (EXCLUSIVE OF THE D&O DEFENDANTS) AND (II) THE EXISTING LENDERS, THE EXISTING LENDER AGENT, AND ANY OF THEIR RESPECTIVE CURRENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, ATTORNEYS, PROFESSIONALS, AGENTS, PARTNERS, STOCKHOLDERS, OR AFFILIATES (BUT SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH) (THE PERSONS IDENTIFIED IN CLAUSES (I) AND (II) COLLECTIVELY, THE "<u>THIRD PARTY RELEASEES</u>"), IN CONNECTION WITH OR RELATED TO THE DEBTORS, THE REORGANIZED DEBTORS, THE CHAPTER 11 CASES, THE ESTATES, THE CONDUCT OF THE DEBTORS' BUSINESS, OR THE PLAN (OTHER THAN THE RIGHTS UNDER THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREUNDER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE.**

Parties who do not desire to grant the Third Party Release should govern themselves accordingly.

**E. The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

1. **Time and Place of the Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Pursuant to Section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing to commence on **March 9, 2010, at 10:00 a.m. (Eastern Time)**, before the Honorable Brendan Linehan Shannon, of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801. A notice setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

2. **Objections to the Plan**

Any objection to confirmation of the Plan must be in writing; must comply with the Bankruptcy Code, Bankruptcy Rules, and the Local Rules of the Bankruptcy Court; and must be filed with the United States Bankruptcy Court for the District of Delaware, and served upon the following parties, so as to be received no later than **March 1, 2010, at 4:00 p.m. (Eastern Time)**: (a) Robert A. Klyman, Latham & Watkins LLP, 355 South Grand Avenue, Los Angeles, California 90071-1560 (counsel for the Debtors); (b) Rosalie Walker Gray and Michael J. Riela, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (counsel for the Debtors), (c) Michael R. Nestor. and Kara Hammond Coyle, Young Conaway Stargatt & Taylor LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, (counsel for the Debtors), (d) Robert H. Trust, Cravath, Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, NY 10019-7475 (counsel for the Existing Lender Agent), (e) Richard W. Riley and William Schrag, Duane Morris LLP, 1100 North Market Street, Suite 1200, Wilmington, DE 19801 (counsel for Existing Lender Agent), (f) Robert J. Feinstein, Pachulski Stang Ziehl & Jones, LLP, 780 Third Avenue, 36th Floor, New York, NY 10017-2024 (counsel for the Creditors' Committee), (g) Bruce Grohsgal, Pachulski Stang Ziehl & Jones, LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705, and (h) David L. Buchbinder, Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801.

FOR THE REASONS SET FORTH BELOW, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT TO "ACCEPT" THE PLAN.

## ARTICLE II.
## GENERAL INFORMATION REGARDING THE DEBTORS

A. **Formation and History of the Debtors**

Freedom Holdings owns 100% of Freedom Communications, Inc. ("<u>Freedom Communications</u>") and has no significant separate operations.

Freedom Communications, headquartered in Irvine, Calif., is a national privately owned information and entertainment company of print publications, broadcast television stations and interactive businesses. Its portfolio includes 30 daily newspapers (including *The Orange County Register),* weekly newspapers, magazines and other specialty publications, with news, information and entertainment websites to complement its media properties. Freedom's newspaper publications have a combined circulation of nearly one million subscribers. The broadcast stations – five CBS network affiliates, two ABC network affiliates and one CW affiliate – reach more than 3 million households across the country. The Debtors operate an interactive business which offers website complements, as well as digital and mobile products, to their newspaper and broadcast properties.

The Debtors were founded in 1935 by libertarian R.C. Hoiles, with the purchase of a newspaper now known as *The Orange County Register.* Historical highpoints in the Debtors' subsequent expansion include: in 1946, the acquisition of The Gazette-Telegraph in Colorado Springs, Colorado; during the period from 1981 to 1986, the entry into broadcast television with the acquisition of five stations; and during the period from 1995 to 2000, significant strategic expansions with the acquisition of 15 daily and weekly community newspapers, television stations in West Palm Beach, Florida and Grand Rapids/Lansing, Michigan, and newspapers in Phoenix and Yuma, Arizona and Alton, Illinois.

The family of R.C. Hoiles (the "Family") continues to hold a majority stake in the Debtors through an approximately 52% ownership interest in the stock of Freedom Holdings. Other members of the Family sold their interests through a series of recapitalization transactions completed on May 18, 2004, pursuant to which the remaining stock ownership interest, which has increased from approximately 40% at the time of the recapitalization to approximately 48% at the current time, was acquired by The Blackstone Group, Providence Equity Partners, Inc., and certain of their respective affiliates. Freedom Holdings is closely held and its stock interests are not publicly traded.

Recapitalization transactions involving the Debtors were completed on May 18, 2004. The recapitalization provided Family stockholders with an opportunity to obtain liquidity for some or all of their shares and also facilitated a means for Family stockholders to continue with an ongoing ownership interest if they so elected. New debt (approximately $900 million from the Existing Lenders) was obtained to refinance existing indebtedness and finance other general corporate purposes. In addition, new equity funding (approximately $467 million from The Blackstone Group and Providence Equity Partners, Inc.) was obtained. Proceeds were also used to repurchase shares from those stockholders seeking liquidity. Stockholders were entitled to elect to receive, in exchange for their stock, net cash per share of $212.71 or shares of recapitalized Freedom.

The organizational chart showing the ownership interests and relationships among the Debtors is attached hereto as Exhibit 5. Additional information specific to each of the Debtors is included in the chart attached hereto as Exhibit 6.

## B.    The Debtors' Business Operations

The Debtors are in the media business operating in two industry segments: newspaper publishing and broadcast television. The newspaper segment consists of two operating divisions:

Orange County Register Communications and the Community Newspapers Division. In late 2007, the Debtors realigned their two newspaper operating divisions, combining the divisions into one newspaper group. Each of the Debtors' business segments relies on advertising as their primary source of revenue.

The Debtors' newspaper publishing segment produces approximately 90 daily and weekly publications, including 30 daily newspapers, as well as ancillary magazines and other specialty publications. The publications of each Debtor involved in the newspaper publishing segment are identified on Exhibit 6. As of the Petition Date, the publications included, without limitation (see Exhibit 6 for the complete listing), the following newspapers, listed by state:

| | |
|---|---|
| Arizona: | *The East Valley Tribune*, *Daily News-Sun*, *The Sun* and *Bajo El Sol* |
| California: | *Appeal-Democrat*, *Daily Press*, *El Mojave*, *Desert Dispatch*, *Hesperia Star*, *The Orange County Register*, *Excelsior*, *The Porterville Recorder*, and *Noticiero Semanal* |
| Colorado: | *The Gazette* |
| Florida: | *The Times (Apalachicola/Carrabelle)*, *Crestview News Bulletin*, *The Destin Log*, *Holmes County Times-Advertiser*, *The News Herald*, *Northwest Florida Daily News*, *Santa Rosa Press Gazette*, *The Star*, *The Walton Sun*, and *Washington County News* |
| Illinois: | *Journal-Courier and The Telegraph* |
| Indiana: | *The Tribune* |
| Missouri: | *The Sedalia Democrat* |
| New Mexico: | *Clovis News Journal*, *Portales News-Tribune*, and *Quay County Sun* |
| North Carolina: | *The Daily News*, *The Free Press, The Jones Post*, *The Gaston Gazette*, *The Havelock News*, *The Star*, *Sun Journal*, *The Shopper*, *Times News*, and *Topsail Advertiser* |
| Ohio: | *The Lima News* |
| Texas: | *The Brownsville Herald*, *El Nuevo Heraldo*, *Mid-Valley Town Crier*, *The Monitor*, *Odessa American*, *El Semanario*, *Valley Morning Star, The Coastal Current Weekly,* and *La Frontera* (discontinued after the Petition Date) |

Revenue for the Debtors' newspaper publishing segment is derived primarily from advertising (both print and online) and secondarily from paid circulation (including single copy sales and subscription sales), commercial printing, and other product offerings. Advertising revenue consists of three basic categories: retail, classified, and national. Newspaper revenue tends to follow a distinct and recurring seasonal pattern, with higher advertising revenue in months containing significant events or holidays. Accordingly, the fourth quarter has historically been the strongest, followed by the second quarter, and the third quarter. The first quarter has

historically been the weakest. The Debtors' newspapers seek to produce desirable results for advertisers by targeting readers based on certain geographic and demographic characteristics.

In addition, the Debtors operate eight television stations within their broadcast television segment, including five CBS affiliates, two ABC affiliates, and one CW affiliate. Each of the stations uses its digital spectrum to broadcast two channels. The Debtors involved in the broadcast television segment are identified on Exhibit 6. The television stations, with each of their respective networks and the channels carried thereon, are as follows, listed by state:

Florida:            WPEC (CBS, Channel 12) (Mi Pueblo, Channel 12.2)

Michigan:       WLAJ (ABC, Channel 53) (CW, Channel 51.2)
                        WWMT (CBS, Channel 3) (CW, Channel 3.2)

New York:     WRGB (CBS, Channel 6) (This TV, Channel 6.2)
                        WCWN (CW, Channel 45) (Universal Sports, Channel 6.2)

Oregon:         KTVL (CBS, Channel 10) (CW, Channel 10.2)

Tennessee:     WTVC (ABC, Channel 9) (This TV, Channel 9.2)

Texas:           KFDM  (CBS, Channel 6) (CW, Channel 6.2)

Revenue for the Debtors' broadcast television segment is derived primarily from advertising, with additional sources of revenue from video production services and other activities, including online product sales and retransmission consent fees. Television advertising revenue is generally classified in the following categories: national, local, and political. The revenue stream tends to follow a distinct and recurring bi-annual pattern correlated with the occurrence of political advertising during election years. The fourth quarter is typically the strongest due to holiday retail spending, followed by the second and the third quarters. The first quarter is typically the weakest. The broadcast stations seek to maximize advertising revenue by increasing audiences for local news and syndicated programming. Audience levels are also impacted by the popularity of their affiliated network's programming (CBS, ABC, or CW). There are long-term affiliation agreements in place between the broadcast stations and the networks.

The Debtors anticipate that any future advertising revenue growth will increasingly come from online advertising. Thus, through their interactive business, the Debtors have been committed to building and supporting a portfolio of online products and services that are uniquely tailored to each of their local communities. The Debtors' online activities include websites supporting each of their daily newspapers and television broadcast stations, as well as selected communities of interest, such as high school sports.

For further information regarding the Debtors' business operations, see the audited consolidated financial statements for Freedom Holdings for the periods ended December 31, 2007 and December 31, 2008 posted at www.loganandco.com.

### C. Corporate Governance of the Debtors

#### 1. Board of Directors of Freedom Holdings

The members of the board of directors (the "<u>Board</u>") of Freedom Holdings are as follows:

**Thomas W. Bassett**.  Chairman of the Board.  Mr. Bassett is a Manager in the tax department of BKD, LLP.  He is an attorney and CPA with a Juris Doctorate and Master of Business Administration degree from Washington University in St. Louis.  Prior to working at BKD, Mr. Bassett was a Manager in the federal tax practice of KPMG LLP.  Mr. Bassett served on the Board from 1993 through 1998.  He has served on the Board's Retirement Benefits Investment Committee, continuing from 1998 to 2003, and various committees of the Board.

**William F. Baker**.  Dr. Baker is Executive in Residence at the Columbia Business School and serves as President Emeritus of WNET/Channel 13 (the PBS station in New York City) having previously served as President and Chief Executive Officer of WNET/Channel 13 from 1987 to 2007.  Prior to joining WNET, Dr. Baker served a dual role as President of Westinghouse Television, Inc. (from 1979) and Chairman of Group W Satellite Communications (from 1981).  Since beginning his broadcasting career while in college, Dr. Baker has held a variety of programming and general management positions in radio and television in Cleveland, Baltimore, Los Angeles and New York and has been honored with seven Emmy Awards.  Dr. Baker serves on the Board of Directors of Grey Island Systems; Summit Media Holdings; and Rodale, Inc., a privately held family publishing company.  Dr. Baker is a Professor at Fordham University, NY.  He received his Bachelor of Arts, Master of Business Administration and Ph.D. degrees from Case Western Reserve University.

**Raymond C. H. Bryan**.  Mr. Bryan served as the former Business Manager for the Executive Intelligence Division at Freedom Technology Media Group, and has been a director since 2000.  Mr. Bryan is the grandson of the late Harry Hoiles, a son of Freedom founder R.C. Hoiles.  He has held various positions within Freedom in the Sales and Finance departments.  Mr. Bryan is a graduate of Skidmore College and received his Master of Business Administration degree from Fordham University.

**Jill A. Greenthal**.  Jill A. Greenthal is a Senior Advisor in the Private Equity Group of The Blackstone Group. Prior to September 2007, Ms. Greenthal was a Senior Managing Director in the Corporate and Mergers and Acquisitions Advisory Group of The Blackstone Group. She is based in Boston. Before joining Blackstone in 2003, Ms. Greenthal was Co-Head of the Global Media Group, Co-Head of the Boston Office and a member of the Executive Board of Investment Banking at Credit Suisse First Boston (now known as Credit Suisse).  Ms. Greenthal was also Co-Head of the Boston office of Donaldson, Lufkin and Jenrette, before its acquisition by Credit Suisse. Prior to joining Donaldson, Lufkin and Jenrette, she was Head of the Media Group at Lehman Brothers. Ms. Greenthal has advised and financed media companies for over 20 years, having worked in all sectors of the business. As a Senior Advisor to Blackstone's Private Equity group, Ms Greenthal works closely with the global media and technology teams to assist in investments in those sectors. Ms. Greenthal graduated as a member of The Academy from Simmons College and received an MBA from Harvard Business School. Ms. Greenthal is on the Board of Directors of Akamai Technologies, Orbitz Worldwide, The Weather Channel and Universal Orlando. Ms. Greenthal is also a member of the Women's Executive Council of

Dana-Farber Cancer Institute and is a Trustee of The James Beard Foundation and Simmons College.

**Robin J. Hardie**.  Ms. Hardie has held various positions within Freedom at the National Advertising Sales Office in Colorado Springs, KFDM-TV in Beaumont, Texas, and The Gazette in Colorado Springs.  She also has worked at the Arizona Daily Star, The Thousand Oaks News Chronicle, The Sacramento Bee, and The San Antonio Light.  Ms. Hardie is currently serving on the board of directors of coloradosprings.com, the Cheyenne Mountain Zoo, Goodwill Industries of Colorado Springs and the Colorado Springs Fine Arts Center.  She has a Bachelor of Arts degree in Journalism from the University of Southern California.

**Burl Osborne**.  Mr. Osborne is interim President and Chief Executive Officer of Freedom Holdings and Freedom Communications.  He formerly held several positions in the Belo Corporation:  President, Publishing Division from 1995 to 2001; Director from 1987 to 2002; and Publisher from 1986 to 2001 of The Dallas Morning News Co., with which he became associated in 1980.  In connection with The Associated Press, Mr. Osborne served as Chairman of the Board from 2002 to 2007, Director from 1993 to 2007 and as a member of the Executive Committee.  Mr. Osborne also has served as Director and Past Chairman of Southern Newspaper Publishers Association and Director of Newspaper Association of America.  Currently, he serves as director of the Committee to Protect Journalists; director of GateHouse Media, Inc.; and director of J.C. Penney Company, Inc.  Mr. Osborne earned a Bachelor of Arts degree from Marshall University in Huntington, West Virginia and a Master of Business Administration degree from Long Island University.  He also participated in the Advanced Management Program at the Harvard Business School.

**Chris Philibbosian**.  Mr. Philibbosian is President of SAAK Management, an advisory firm focused on actively assisting a limited group of stockholders and CEOs of privately held firms in managing, protecting and growing their businesses on an ongoing basis.  Prior to forming SAAK Management, Mr. Philibbosian was with The Greenspun Corporation for over 10 years, serving most recently as President and COO. The Greenspun Corporation is responsible for managing the financial interests of the Greenspun family which is focused on operating and investing in public and private businesses primarily in the media, communication, travel, real estate and gaming industries. In addition, Mr. Philibbosian has held real estate investment and management consulting positions with Westfield Corporation and Ernst & Young/Kenneth Leventhal & Co. He holds a Bachelor of Science degree in Business Administration and a Masters of Accounting degree, both from the University of Southern California.

**James J. Spanfeller**.  Mr. Spanfeller is the President and Chief Executive Officer of the Spanfeller Group, a content-based web media company.  He most recently served as President and Chief Executive Officer of Forbes.com.  Prior to joining Forbes.com, Mr. Spanfeller was President of the Consumer Magazine Group of Ziff Davis Media, Inc.  He also served as Publisher of Inc. magazine and held senior positions at Playboy Enterprises Publishing Group and Newsweek.  Mr. Spanfeller serves on several boards including:  the board of directors of Viewpoint Corporation, Chairman of the Interactive Advertising Bureau (IAB) Executive Committee, and is Treasurer for the Online Publishers Association (OPA).  He also served on the Magazine Publishers Association board from 1999-2000.  He holds a Bachelor's degree in English Literature from Union College.

**David M. Tolley.** Mr. Tolley is a Senior Managing Director in the Private Equity group of The Blackstone Group. Since joining Blackstone in 2000, Mr. Tolley has focused on Blackstone's investment activities in the communications and media sectors. Before joining Blackstone, Mr. Tolley was a Vice President in the Global Communications Group at Morgan Stanley & Co., where he was responsible for sourcing and executing financing and advisory assignments for a broad array of public and private communications companies. Mr. Tolley holds a Bachelor of Arts degree from the University of Michigan and a Master of Business Administration degree from Columbia Business School. He currently serves as a director of Cumulus Media, Inc.

**Gregory J. Wallace.** Mr. Wallace was the founder of Digital Cranium, an online DVD retailer. From 1998 to 2001, he was the Major Accounts and Entertainment Sales Manager at *The Daily Breeze* in Torrance, CA, and he also held several positions at *The Orange County Register* from 1992 to 1996. From 1989 to 1991, Mr. Wallace held various positions within Freedom, including Classified Advertising Sales Manager at the *Odessa American* and at *The News Herald* in Panama City, FL. Mr. Wallace has a Bachelor of Arts Degree from the University of Colorado and received his Master of Business Administration degree from Pepperdine University.

## 2. Senior Management of Freedom Holdings

The following table sets forth certain information regarding the executive officers of Freedom Holdings:

| Name | Title |
|------|-------|
| Burl Osborne | Interim President and Chief Executive Officer |
| Mark A. McEachen | Senior Vice President and Chief Financial Officer |
| Jonathan Segal | President, Freedom Newspapers Division |
| Doreen D. Wade | President, Freedom Broadcasting Division |
| Douglas S. Bennett | President, Freedom Interactive Division |
| Rachel L. Sagan | Vice President, General Counsel and Secretary |
| Nancy S. Trillo | Vice President, Enterprise Finance, Controller and Treasurer |
| Marcy E. Bruskin | Vice President, Human Resources and Organizational Development |

**Burl Osborne**. Mr. Osborne is interim President and Chief Executive Officer of Freedom Holdings and Freedom Communications. Mr. Osborne's biographical information is included in the Board of Directors discussion above.

**Mark A. McEachen**. Mark McEachen is Senior Vice President and Chief Financial Officer. Prior to joining Freedom, Mr. McEachen was CFO of Fabrik, Inc., a manufacturer of external hard drives and digital content management software. Prior to that, he was interim CEO and then Chief Operating Officer/Chief Financial Officer of BridgeCo, Inc. Mr. McEachen has also held lead positions at International Rectifier Corp, Excite@Home, Transamerica and Chrysler. Mr. McEachen holds a master's degree and a bachelor's degree in commerce from the University of Windsor, Ontario. He also holds a bachelor's degree in economics from the University of Western Ontario, London.

**Jonathan Segal**.  Jonathan Segal is President of the Newspaper Division.  Mr. Segal had been President of the Community Newspapers division since 1999.  During his career at Freedom, he has served as President of the Eastern Community Newspapers division, Senior Publisher of Freedom's North Carolina newspapers and served as Publisher of The Gaston Gazette and New Bern Sun Journal.  He was also Editor of the Free Press in Kinston, N.C.  He is a graduate of the University of Texas with an honors degree in Journalism.

**Doreen D. Wade**.  Doreen Wade has been President of the Broadcasting Division since 2002.  Prior to assuming her current role, she served as the Vice President and General manager of the television station WPEC (West Palm Beach, FL) and she managed two of the company's other television stations: WLNE (Providence, RI) and WRGB (Albany, NY).  Ms. Wade has almost thirty years of experience in broadcast sales and station management.  Her career with Freedom spans more than twenty years.

**Douglas S. Bennett**.  Doug Bennett is President of the Interactive Division.  He has been with the Company since 2006.  Mr. Bennett's experience spans publishing, media, entertainment, and technology.  Prior to joining Freedom, Bennett served as President and Chief Financial Officer for National Lampoon.  Prior to that he was Chief Operating Officer at iUniverse, Inc., a digital publishing company that provides technology for multiple distribution methods of content such as ebooks and print-on demand deliveries.  His other positions included: Chief Executive Officer and President of EoExchange, Inc. and President at Macmillan Publishing.  Bennett holds a Bachelor's degree in Business Administration and Economics from Coe College in Cedar Rapids, Iowa.

**Rachel L. Sagan**.  Rachel Sagan is Vice President, General Counsel and Secretary.  From 2002-2003, she served as Acting General Counsel and was promoted to Vice President, General Counsel in 2003.  She joined Freedom in January 2001 as Associate General Counsel.  Prior to joining Freedom, Ms. Sagan served as an associate at the law firm, Gibson, Dunn & Crutcher, specializing in the areas of corporate law, mergers and acquisitions, and commercial transactions.  She also practiced at the law firm, Hancock, Rothert and Bunshoft, specializing in litigation.  Ms. Sagan earned her law degree from the University of Michigan School of Law and her Bachelor of Arts degree from Duke University, where she graduated magna cum laude and Phi Beta Kappa.

**Nancy S. Trillo**.  Nancy Trillo is Vice President of Enterprise Finance, Controller and Treasurer.  Prior to joining Freedom in 2000, Ms. Trillo was Senior Director, Corporate Accounting for Fluor Corp. (1996-2000); Corporate Controller and Chief Accounting Officer for BW/IP International, Inc., (now Flowserve Corp.) (1989-1996); and Senior Manager for Price Waterhouse (1977-1989).  Ms. Trillo is a licensed Certified Public Accountant in the State of California and received her Master of Business Administration and Bachelor of Science degrees from the University of California at Los Angeles.

**Marcy E. Bruskin**.  Marcy Bruskin is Vice President of Human Resources and Organizational Development.  Prior to joining Freedom in June 2002, she was Vice President of Human Resources at AmerisourceBergen Corporation, a $35 billion-dollar pharmaceutical distributor.  Her experience includes: organizational development, associate relations, training and development, recruiting, quality performance measurement, compensation and benefits, relocation and government compliance.  She has also worked in the Human Resource departments of Washington National Insurance Co. in Evanston, Ill., Rand McNally & Co., in

Skokie, Ill. and Thorek Hospital & Medical Center in Chicago.  She holds a Master's degree in Industrial Psychology from Fairleigh Dickinson University and a Bachelor's degree in Math and Psychology from New York University.

The Plan provides that the existing senior officers of Freedom Holdings will serve initially in the same capacities after the Effective Date for Reorganized Freedom Holdings until replaced or removed in accordance with the New Freedom Governing Documents, or until any of such individual's voluntary resignation.  The Debtors assume that the New Freedom Governing Documents will authorize the New Board or the Chief Executive Officer to make any change in the senior officer ranks that it determines appropriate.

### 3.    Directors and Officers of Subsidiary Debtors

The directors and officers for Freedom Communications are identical to the directors and officers of Freedom Holdings, as identified above.  The directors and officers of the other Subsidiary Debtors are identified on <u>Exhibit 6</u>.

Under the Plan, with certain exceptions, the existing directors of the Subsidiary Debtors will continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the New Subsidiary Governing Documents of the respective entity, or until any of such individual's voluntary resignation.  As to the exceptions, any such director who is not as of the Effective Date a member of the New Board or a full-time employee of any of the Reorganized Debtors will be deemed to have resigned as of the Effective Date.  Likewise, the existing senior officers of the Subsidiary Debtors will continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the New Subsidiary Governing Documents of the respective entity, or until any of such individual's voluntary resignation.

## D.    Employees

The Debtors' workforce consists of approximately 5,100 employees, of whom approximately 35% are salaried employees and approximately 65% are hourly employees. Moreover, approximately 82% of the employees are full-time and 18% are part-time.  The average annual salary for salaried employees is $56,400 and for hourly employees is $39,500. Approximately 1.5% of the Debtors' hourly employees are covered by collective bargaining agreements.  In addition, in the Broadcast division, approximately 125 employees are covered under personal services contracts.  The Debtors' workforce of employees is augmented by services received from approximately 3,200 independent contractors.

### 1.    Compensation and Benefits

The Debtors have historically provided a competitive compensation and benefit package to their employees, consistent with their belief that the success of their business is dependent to a significant extent on the efforts and abilities of their employees.

The compensation and benefit package consists of various plans, programs, policies and agreements that may provide for (a) wages, salaries, commissions, bonuses, holiday and vacation pay, sick leave pay, and other accrued compensation; (b) reimbursement of business, travel, and

other reimbursable expenses; and (c) benefits, with coverage as applicable for eligible spouses, domestic partners, and dependents, in the form of medical, dental, vision, and prescription drug coverage, coverage continuation under COBRA, basic term life and supplemental life insurance, accidental death and dismemberment insurance, long-term disability insurance and benefit programs, pre-tax contribution cafeteria plan and flexible spending accounts, a voluntary employees beneficiary association trust, retirement, savings, other deferred compensation, and related types of benefits, leased car and automobile assistance programs, employees assistance programs, business travel accident insurance, workers' compensation coverage, severance protections, and miscellaneous other benefits provided to the employees in the ordinary course of business.

Information about each of these programs is included in the Motion of Debtors for Order under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 (i) Authorizing Payment of Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements, and Related Obligations, (ii) Confirming Right to Continue Employee Programs on Postpetition Basis, (iii) Confirming Right to Pay Withholding and Payroll-Related Taxes, (iv) Authorizing Payment of Prepetition Claims Owing To Administrators of, or Third Party Providers under, Employee Programs, (v) Authorizing Payment of Independent Contractor Obligations, (vi) Directing Banks to Honor Prepetition Checks and Fund Transfers for Payment of Prepetition Employee Obligations and Prepetition Independent Contractor Obligations dated September 1, 2009, and the supplement thereto dated September 17, 2009, both on file with the Bankruptcy Court.

### 2. Labor Matters

The Debtors currently have three collective bargaining agreements – two active and one in negotiations. Freedom Broadcasting of New York, Inc. (WRGB) currently has two union arrangements. The first agreement is with the National Association of Broadcast Employees and Technicians (NABET), Communication Workers of America (CWA) and the AFL-CIO. The Debtors have negotiated a new agreement and are awaiting approval by the unions' national organization. The proposed agreement spans the years 2009-2011. The second agreement is with the Schenectady Local American Federation of Television and Radio Artists (AFTRA) and the AFL-CIO. The Schenectady agreement expired in 2006. The Debtors are in active negotiations. Third, Freedom Broadcasting of Texas, Inc. (KFDM) has a contract with Local Union #2286, International Brotherhood of Electrical Workers (IBEW). The IBEW contract runs through 2010.

The Debtors' relationship with the unions has historically been good. The Debtors have been able to successfully negotiate needed concessions in their most recent agreements. Although all of the Debtors' newspaper locations remain non-union, the Debtors continue to monitor labor developments in all locations. The highest risk regarding labor developments is the Debtors' larger market locations.

Traditionally, any issues that are identified by the Debtors as related to employment law, labor relations and wage and hour violations are investigated and rectified quickly. The Debtors implemented an Ethics Hotline providing another option for their employees to escalate any issues creating dissatisfaction in the workplace. This has enabled the Debtors to investigate and address issues and to minimize risk.

### 3. Pension Plan Matters

The Debtors maintain the Retirement Plan of Freedom Communications, Inc. (the "Retirement Plan") as a tax-qualified defined benefit pension plan subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Retirement Plan is funded through a trust with Bank of New York. Benefit accruals were suspended under the Retirement Plan effective as of December 31, 2008. As of the January 1, 2009, there were approximately 6,631 participants in the Retirement Plan (approximately 3,515 active participants, 1,083 retired participants receiving benefits, and 2,033 retired and terminated participants entitled to future benefits). The Debtors were not required to make any minimum funding contributions to the Retirement Plan for 2009.

The Debtors are jointly and severally liable to the Pension Benefit Guaranty Corporation ("PBGC") for unfunded benefit liabilities, as defined in 29 U.S.C. § 1301(a)(18), if the Retirement Plan terminates. Prior to termination, the Debtors are jointly and severally liable for the contributions necessary to satisfy ERISA's minimum funding standards. See 29 U.S.C. §§ 1082; 26 U.S.C. §412. The Debtors are also jointly and severally liable for PBGC premiums, and interest, and penalties, if any, imposed by ERISA for plans covered by Title IV of ERISA. See 29 U.S.C. § 1307(a), (b), (e); 29 C.F.R. § 4007.12(a).

The Debtors intend to continue the Retirement Plan, fund the plan in accordance with the minimum funding standards under the Internal Revenue Code of 1986, as amended ("IRC"), pay all required PBGC insurance premiums, and continue to administer and operate the Retirement Plan in accordance with the terms of the Retirement Plan and provisions of ERISA. However, the Debtors reserve the right to amend or terminate the Retirement Plan in accordance with its terms and ERISA.

### 4. Executive Compensation

The Debtors have historically provided what they have intended to be a competitive compensation package to their senior management team, consistent with their belief that the success of their businesses is dependent to a significant extent upon the efforts and abilities of such key personnel. Attached as Exhibit 7 to this Disclosure Statement is historical compensation information for those individuals who were members of the Debtors' senior management team during 2009 (not including restructuring consultants who served in management positions).

The Debtors assume that the compensation to be provided to their senior management team after the Effective Date will be substantially similar to amounts currently paid, as shown on Exhibit 7, but the decision as to compensation will be made by the New Board or by the Chief Executive Officer as to executives who do not report directly to the New Board. The New Board or the Chief Executive Officer, as applicable, would have the discretion to increase or decrease compensation, as it and the particular executive determine appropriate.

### E. Competitive Factors Affecting the Debtors' Businesses

A substantial majority of the Debtors' revenues are generated from the sale of local, regional and national advertising. Advertisers generally reduce their advertising spending during economic downturns. The worldwide economy is currently undergoing unprecedented turmoil

amid stock market volatility, tightening credit markets, inflation and deflation concerns, decreased consumer confidence, reduced corporate profits and capital spending, adverse business conditions, and increased liquidity concerns and business insolvencies. This turmoil and uncertainty about future economic conditions has and could continue to negatively impact the Debtors' advertisers and cause them to postpone their advertising decision-making or decrease their advertising spending.

The Debtors' ability to generate advertising revenues is and will continue to be affected by financial market conditions, consumer confidence, advertiser challenges and changes in the national and sometimes international economy, as well as by regional economic conditions in each of the markets in which our stations operate. The Debtors have a significant concentration of assets in California and Florida, which makes the economic condition of these regions of particular consequence to their financial condition and results of operations. The level of advertising spending, which is affected by broad economic trends, affects the broadcast industry in general and the revenues of individual broadcast television stations in particular. Advertisers have purchased less advertising time from the Debtors' stations recently, due to the current decline in the national economy and in regional economies. This is particularly the case with respect to automotive advertising.

The Debtors' advertising revenues depend upon a variety of other factors specific to the communities that they serve. Changes in those factors have and could in the future negatively affect advertising revenues. These factors include, among others, the size and demographic characteristics of the local population, the concentration of retail stores and other businesses, the level of online connectivity, and local economic conditions in general.

The Debtors' television businesses operate in highly competitive markets. The television stations compete for audiences and advertising revenue with newspapers and other broadcast and cable television stations, as well as with other media such as magazines, telephone and/or wireless companies, satellite television and the Internet. Some of the Debtors' current and potential competitors may have greater financial, marketing, programming and broadcasting resources than we do and the ability to distribute more targeted advertising. Cable companies and others have developed national advertising networks in recent years that increase the competition for national advertising.

The Debtors' television stations compete for audiences and advertising revenues primarily on the basis of programming content and advertising rates. Advertising rates are set based upon a variety of factors, including a program's popularity among the advertiser's target audience, the number of advertisers competing for the available time, the size and demographic make-up of the market served and the availability of alternative advertising in the market. Changes in market demographics, the entry of competitive stations into our markets, the transition to new methods for measuring audiences, the introduction of competitive local news or other programming by cable, satellite, Internet, telephone or wireless providers, or the adoption of competitive offerings by existing and new providers could result in lower ratings and adversely affect the Debtors' financial condition and results of operations.

With the continued development of alternative forms of media, particularly those based on the Internet, the Debtors' businesses face increased competition. Alternative media sources also affect their ability to generate circulation revenues and television audience. This competition

could make it difficult for the Debtors to grow or maintain their broadcasting, print advertising and circulation revenues, which the Debtors believe will challenge them to expand the contributions of their online and other digital businesses.

## F.    Regulatory Factors Affecting the Debtors' Businesses

### 1.    General

The Debtors' publishing and broadcasting operations are subject to government regulation.  Changing regulations, particularly Federal Communications Commission under the Communications Act of 1934, as amended, regulations which affect the Debtors' television stations, may result in increased costs and adversely impact our future profitability.  Among other things, the Communications Act empowers the FCC to (1) issue, renew, revoke and modify station licenses; (2) regulate stations' technical operations and equipment, as well as the content of their broadcasts; and (3) impose sanctions for violations of the Communications Act or FCC regulations.  The Communications Act and the FCC's regulations prohibit the assignment of a broadcast license or the transfer of control of a broadcast licensee without prior FCC approval, and also place certain limits on the direct or indirect ownership of FCC licensees by certain persons and entities.

### 2.    Station Licenses

The FCC grants television station licenses for terms of up to eight years, and licenses may be renewed upon application to the FCC for additional eight-year terms.  License renewal applications may be challenged by interested parties.  The FCC has authority to renew broadcast licenses, to not renew them, or to renew them with conditions, including renewal for less than a full license term.  Under the FCC's rules, a licensee may continue to operate pending review of a timely filed renewal application.  The following stations owned by the Debtors are operating past their stated license expiration dates under that rule:  WCWN, Schenectady, NY, WRGB, Schenectady, NY, WTVC, Chattanooga, TN, WLAJ, Lansing, MI, WWMT, Kalamazoo, MI, KFDM, Beaumont, TX, and KTVL, Medford, OR.  The license expiration date for WPEC, West Palm Beach, Florida, is February 1, 2013.

The Debtors have been informally advised by the FCC that it has placed a hold on the processing of those of the Debtors' renewal applications which are still pending due to complaints filed with the FCC alleging that programming aired on those stations violated Federal law and FCC rules regarding the broadcast of indecent or obscene programming.  The Debtors understand that numerous television stations in the United States have similar holds on their license renewal applications.  The Debtors cannot predict when the FCC will act on their pending license renewal applications; however, the stations are permitted to continue to operate under their expired licenses pending action on their renewal applications.

### 3.    Programming and Operations

Rules and policies of the FCC and other federal agencies regulate certain programming practices and other areas affecting the business and operations of broadcast stations.

The Children's Television Act of 1990 limits the amount and nature of commercial matter in children's television programs and requires stations to provide a minimum amount of

children's educational programming per week on their video programming streams. The FCC also restricts commercialization of children's programming, including certain promotions of other programs and displays of Web site addresses during children's programming.

The FCC has adopted new public file and public interest reporting requirements on broadcasters that must be approved by the Office of Management and Budget (OMB) before they become effective, which has not yet occurred. Pursuant to these new requirements, stations with Web sites will be obligated to make certain portions of their public inspection files available online and broadcast notifications on how to access the public file. Stations also will be required to file quarterly a new, standardized form that will track various types and quantities of local programming. The form will require, among other things, information about programming related to local civic affairs, local electoral affairs, public service announcements, and independently-produced programming. The new standardized form will significantly increase recordkeeping requirements for television broadcasters. Several station owners and other interested parties have asked the FCC to reconsider the new reporting requirements and have sought to postpone their implementation. In addition, the order imposing the new rules is currently on appeal in the U.S. Court of Appeals for the District of Columbia Circuit.

In December 2007, the FCC initiated a proceeding in which it (i) tentatively concluded that broadcast licensees should be required to have regular meetings with permanent local advisory boards to ascertain the needs and interests of communities, (ii) tentatively adopted specific renewal application processing guidelines that would require broadcasters to air a minimum amount of local programming, and (iii) sought comment on a variety of other issues concerning localism, including potential changes to the main studio rule, network affiliation rules, and sponsorship identification rules. The FCC has not yet issued a final order on the matter. The Debtors cannot predict whether the FCC will adopt some or all of these proposals.

The FCC's Equal Employment Opportunity rules impose upon broadcasters job information dissemination, recruitment, documentation and reporting requirements. Broadcasters are subject to random audits to ensure compliance with the Equal Employment Opportunity rules and could be sanctioned for noncompliance.

The FCC has increased its enforcement efforts regarding broadcast indecency and profanity over the past several years. In June 2006, the statutory maximum fine for the broadcast of indecent material increased from $32,500 to $325,000 per incident. Several judicial appeals of FCC indecency enforcement actions are currently pending, and their outcomes could affect future FCC policies in this area.

As indicated above, FCC licenses for seven of the Debtors' eight full-power television stations have expired without renewal, although the stations may continue to operate pending action on their license renewal applications before the FCC.

### 4.    Digital Television

Under federal law, full-power broadcast television stations were required to cease analog service and convert to digital transmissions by June 12, 2009. All full-power television stations licensed to the Debtors were broadcasting digitally, and terminated analog broadcasts, by the June 12, 2009 deadline. Spectrum formerly used by broadcasters, including the Debtors, for analog service, was surrendered to the government at the end of the DTV transition.

Broadcasters may either provide a single DTV signal or "multicast" several DTV program streams. Broadcasters also may use some of their digital spectrum to provide non-broadcast "ancillary" services (i.e., subscription video, data transfer or audio signals), provided broadcasters pay the government a fee of 5% of gross revenues received from such services. Under the FCC's rules relating to must-carry rights of digital broadcasters, which apply to cable and certain satellite carriers, including direct broadcast satellite ("DBS") systems, a station asserting must-carry rights is entitled to carriage of only a single programming stream and other "program related" content, even if the station multicasts. In November 2007, the FCC decided that after the transition, cable operators must ensure that all analog cable subscribers will continue to be able to receive the signals of stations electing must-carry status. Cable operators can choose either to deliver the signal in digital format for digital customers and "down convert" the signal to analog format for analog customers, or to deliver the signal in digital format to all subscribers but ensure that all subscribers with analog sets have set-top boxes that will convert the digital signal to analog format.

### 5. Cable and Satellite Transmission of Local Television Signals

Under FCC regulations, cable systems must make available a specified portion of their channel capacity to the carriage of the signals of local television stations. Television stations may elect between "must-carry rights" or a right to restrict or prevent cable systems from carrying the station's signal without the station's permission (retransmission consent). Stations must make this election once every three years, and did so most recently on October 1, 2008. All broadcast stations that made carriage decisions on October 1, 2008, will be bound by their decisions through the 2009-2011 cycle. Satellite carriers, including DBS operators, are subject to similar carriage rules. A television station may elect mandatory carriage rights on any satellite carrier which carries at least one local signal in that station's market, or alternatively, may elect retransmission consent. Such elections with respect to satellite carriers must be made on the same time cycle as carriage elections for cable systems.

### 6. Ownership Rules

The FCC's ownership rules affect the number, type and location of broadcast and newspaper properties that the Debtors or certain investors in Debtors may hold or acquire. The rules now in effect limit the common ownership, operation, or control of television stations serving the same area; television and radio stations serving the same area; and television stations and daily newspapers serving the same area; as well as the aggregate national audience of commonly-owned television stations. The FCC's rules also define the types of positions and interests that are considered "attributable" for purposes of the ownership limits, and thus also apply to certain of the Debtors' officers, directors, and investors. In general, officers, directors, and 5% or greater shareholders of the Debtors are deemed to hold attributable interests in the Debtors and their media interests.

In September 2003, the FCC relaxed many of its ownership restrictions. However, on June 24, 2004, the United States Court of Appeals for the Third Circuit rejected many of the FCC's 2003 rule changes. The court remanded the rules to the FCC for further proceedings and extended a stay on the implementation of the new rules. In December 2007, the FCC adopted a Report and Order that left most of the FCC's pre-2003 ownership restrictions in place, but made modifications to the newspaper/broadcast cross-ownership restriction. A number of parties

appealed the FCC's order, and those appeals were consolidated in the Third Circuit in November 2008 and remain pending.

### 7. Local Television Ownership

Under the FCC's current local television ownership rules, absent a waiver, one entity may own two commercial television stations in a Designated Market Area (DMA) if no more than one of those stations is ranked among the top four stations in the DMA and eight independently owned, full-power stations will remain in the DMA.

The Debtors own stations WRGB and WCWN, both in the Albany-Schenectady-Troy, New York DMA, pursuant to a waiver granted by the FCC on the basis that WCWN, when acquired by the Debtors in 2006, was failing financially, that no out-of-market buyer for the station was available, and that public interest benefits would result from the Debtors' ownership of the station. The transfer of control of WRGB and WCWN as contemplated by the Plan would require that a new waiver be granted by the FCC. The Debtors are aware of only one instance in which a request for a new failing station waiver, to follow a prior waiver with respect to the same station, was acted on by the FCC. While the FCC granted a new waiver in that case, certain portions of the waiver request were confidential and therefore are unavailable to be used as guidance in assessing the likelihood that the Debtors would be able to obtain a new waiver. The Debtors believe that under current conditions, including the deterioration of the financial performance of the broadcast television industry and the market for the sale of television stations generally since the initial waiver was granted, a good case can be made for the grant of a new waiver. However, there can be no assurance that such a waiver will be able to be obtained.

### 8. Cross-Media Limits

The newspaper/broadcast cross-ownership rule generally prohibits one entity from owning both a commercial broadcast station and a daily newspaper in the same community.

The radio/television cross-ownership rule allows a party to own one or two TV stations and a varying number of radio stations within a single market. The FCC's December 2007 decision leaves the newspaper/broadcast and radio/television cross-ownership prohibitions in place, but provides that the FCC will evaluate newly proposed newspaper/broadcast combinations under a non-exhaustive list of four public interest factors. The FCC will apply a presumption that the combination is in the public interest if it is located in a top 20 DMA and involves the combination of a newspaper and only one television station or radio station. If the combination involves a television station, the presumption will apply only where the station is not among the top 4 in the DMA and at least eight independently owned and operated newspapers and/or full-power commercial television stations remain in the DMA. All other combinations will be presumed not in the public interest. That negative presumption can be reversed if the combination will result in a new local news source that provides at least seven hours of local news programming or if the property being acquired has failed or is failing.

To the extent any person who acquires an attributable interest in the Debtors pursuant to the Plan holds an attributable interest in other broadcast media or daily newspapers in the same markets as the Debtors' media outlets, such acquisition may violate the FCC's local television ownership and/or cross-media limits.

### 9. Alien Ownership Limits

The Communications Act prohibits ownership of, or the power to vote, more than 20% of the equity of a broadcast licensee, and more than 25% of the equity of a company directly or indirectly controlling a licensee, from being held by aliens, foreign governments or their representatives, or corporations formed under the laws of foreign countries. The acquisition of equity interests in the Debtors pursuant to the Plan by persons or entities which are aliens, foreign governments or their representatives, or corporations formed under the laws of a foreign country, where such interests in the aggregate exceed such limits, would violate the Communications Act absent a waiver from the FCC. Existing Lenders who are formed under the laws of foreign countries would own more than 25% of the Reorganized Freedom Holdings absent the distribution of the Existing Lender Warrants.

### 10. National Television Station Ownership Cap

A person or entity is prohibited from having attributable interests in television stations that reach in excess of 39% of U.S. households.

### 11. Additional Regulations

The foregoing does not purport to be a complete summary of the Communications Act, other applicable statutes or the FCC's rules, regulations, and/or policies. Proposals for additional or revised regulations and requirements are pending before, and are considered by, Congress and federal regulatory agencies from time to time. The Debtors cannot predict the effect of existing and proposed federal legislation, regulations and policies on their businesses. Also, several of the foregoing matters (e.g., the media ownership rules and the new reporting rules) are now, or may become, the subject of litigation and the Debtors cannot predict the outcome of any such litigation or the effect on their respective businesses.

### G. Prepetition Indebtedness and Capital Structure of the Debtors

### 1. Consolidated Liabilities

The Debtors have consolidated accounting liabilities of approximately $1.083 billion (calculated as of the month ended August 31, 2009). Their primary financial obligation arises under a secured credit agreement dated May 18, 2004, as amended, and is in the aggregate approximate amount of $772 million (the "Credit Agreement"). In addition, the Debtors accounted on their books for other liabilities or accruals of approximately $312.4 million. The $312.4 million is comprised of the following: trade accounts payable of approximately $16.6 million, accrued salaries, wages and employee benefits of approximately $41.7 million, unearned subscription revenue of approximately $17.8 million, accrued pension and other retirement related liabilities of approximately $103.1 million, deferred income taxes of approximately $90.2 million, and other miscellaneous liabilities of approximately $43.0 million.

Only a portion of the foregoing $312.4 million in liabilities or accruals will constitute General Unsecured Claims, Non-Qualified Retirement Claims, Tort Claims, and Subordinated Claims under the Plan. The Debtors have estimated that Allowed General Unsecured Claims and Allowed Non-Qualified Retirement Claims are expected to be in the approximate amount of $58.3 million (consisting of $39.0 million for Class A4, $17.8 million for Class A5, and $1.5

million for Class B3), exclusive of contingent, unliquidated, or disputed Claims that may ultimately become Allowed Claims. The estimated $39.0 million for Class A4 **does not include** (a) approximately $5.5 million attributable to potential Trade Unsecured Claims that are proposed to be paid from the Trade Unsecured Claim Escrow and (b) approximately $300,000 attributable to utilities holding deposits, who may be treated as holders of Other Secured Claims. In addition, the $39.0 million **includes** potential escheatment liability of approximately $400,000 and estimated rejection damage claims of $4.5 million.

The $39.0 million includes $29.5 million for the Gonzalez Litigation Claims. Prior to the Petition Date, the Debtors were obligated under a contingent class action settlement in the amount of approximately $28.9 million. As a result of the commencement of the Chapter 11 Cases, the settlement terminated, and the Gonzalez Class Counsel filed class Proofs of Claim asserting Claims of approximating $102.7 million each against two different Debtors. A copy of those Proofs of Claim may be obtained at www.loganandco.com. Although the Debtors have disputed all liability on such Claims, as part of the Plan, the Debtors, the Steering Committee Members, the Creditors' Committee and the Gonzalez Class Counsel have agreed that the Gonzalez Litigation Claims will be allowed as Class A4 General Unsecured Claims in the aggregate amount of $29.5 million. Such agreement relates only to the Plan. If the Plan is not confirmed or does not become effective in accordance with its terms, the Gonzalez Litigation Claims will revert to their disputed status, and the Debtors may seek to disallow in their entireties all Proofs of Claim that assert Gonzalez Litigation Claims.

### 2. Secured Indebtedness

The primary obligations in the Chapter 11 Cases arise under the senior secured credit facilities provided under the Existing Credit Agreement Documents, which include (a) the Credit Agreement, (b) that certain Guarantee and Collateral Agreement, as amended, supplemented or otherwise modified from time to time, among Freedom Holdings, Freedom Communications, certain of the Subsidiary Debtors as subsidiary loan parties (the Freedom parties are referred to in the Plan as the Encumbered Debtors), and JPMorgan Chase Bank, N.A. as collateral agent, and (c) the other "Loan Documents" as defined in the Credit Agreement.

The Debtors defaulted under the Credit Agreement as of September 30, 2008, and the defaults continued through April 29, 2009, when the Debtors negotiated a waiver with their lender group that would have been effective through December 31, 2009, if it had not otherwise been terminated or superseded by that date.

As of the Petition Date, the senior secured credit facilities consisted of a revolving credit facility and term loans (the "Term Loan Facility"), which facility included a $228 million tranche A term loan and a $300 million tranche A-1 term loan. The senior credit facilities also included a subfacility for swingline borrowings and a sublimit for letters of credit. As of the Petition Date, approximately $245 million was outstanding under the revolving credit facility, including outstanding letters of credit.

The tranche A term loan and the revolving credit facility had maturity dates of May 1, 2011. The tranche A-1 term loan had a maturity date of December 31, 2012. The Term Loan Facility was subject to repayment based on a predetermined amortization schedule. Borrowings under the revolving credit facility and the Term Loan Facility bear interest at the bank's reference rate plus a margin of 2.25% per annum. Commitment fees on the unused portion of the

revolving credit facility are 0.5% per annum and are payable monthly. At the Petition Date, the bank reference rate was 3.25% per annum, and the weighted-average interest rate for outstanding bank borrowings was 5.5% per annum.

As is typical of secured loan agreements, the Debtors were obligated under the senior secured credit facilities to pay the professional fees and expenses of the Existing Lender Agent, and in certain situations, the Existing Lenders. During the one year preceding the Petition Date, the Debtors' books and records show such payments to be in the aggregate amount of approximately $2.3 million.

### 3. Interests

Freedom Holdings is the ultimate parent entity of the other Debtors. As stated previously, the Family continues to hold approximately 52% of the stock ownership interests in Freedom Holdings. Other members of the Family sold their interests through a series of recapitalization transactions completed on May 18, 2004, pursuant to which the remaining stock ownership interest, which has increased from approximately 40% at the time of the recapitalization to approximately 48% at the current time, was acquired by The Blackstone Group, Providence Equity Partners, Inc., and certain of their respective affiliates (the "Investors"). Freedom Holdings is closely held and its stock interests are not publicly traded.

Freedom Holdings has two series of preferred stock: Series A Senior Preferred and Series A Junior Preferred, all par value $0.01. The Board of Directors is authorized to issue up to 100,000 shares each of Series A Senior and Series A Junior preferred stock with such rights, privileges, preferences, and restrictions as may be determined by the Board of Directors. Preferred stockholders are not entitled to voting privileges except as may be determined under certain circumstances. Under Freedom Holdings' certificate of incorporation, shares of Series A Junior Preferred stock are mandatorily redeemable in 10 years from date of issuance.

As of the Petition Date, Freedom Holdings had issued 9,075 shares of Series A Senior Preferred stock to Series A stockholders (the Family) and 7,896 shares of Series A Junior Preferred stock to Series B and C stockholders (the Investors). Such preferred shares accrete interest from date of issuance at 7% per annum, compounded quarterly. The Series A Senior Preferred shares are classified as equity and included in stockholders' deficiency in the consolidated balance sheet. The aggregate accretion associated with these shares totaled $425,000 as of the Petition Date and has been reflected as a reduction to retained earnings. The Series A Junior Preferred shares are classified as a liability and included in long-term liabilities in the consolidated balance sheet. The aggregate accretion associated with these shares totaled $366,000 as of the Petition Date and has been reflected as interest expense. The total liability for Series A Junior Preferred shares as of the Petition Date was $8.3 million.

Freedom Holdings has four series of common stock: Series A, Series B, Series C, and Series D, all par value $0.001. Holders of Series A and Series B common stock are entitled to one vote for each share held. Series A and Series B common stock entitles its holders to vote in all matters requiring a vote of the stockholders; Series C and Series D common stock carry no voting rights, except as may be required pursuant to law. Series A, Series B, and Series C common stock were entitled to quarterly dividend rights as provided under Freedom Holdings' certificate of incorporation. Cash dividends have been paid in recent years as follows:

2009: no cash dividends paid
2008: $0.55 per share of Series A, B and C shares (approximately $3.3 million)
2007: $2.20 per share of Series A, B and C shares (approximately $13.1 million)
2006: $2.20 per share of Series A, B and C shares (approximately $12.7 million)
2005: $2.20 per share of Series A, B and C shares (approximately $12.4 million)

Beginning in the second quarter of 2008, Freedom Holdings issued preferred stock in lieu of cash for quarterly dividends. In addition, Series B and Series C common stock were entitled to a mandatory quarterly stock dividend, to be issued in Series C common stock, as provided under Freedom Holdings' certificate of incorporation. For each quarter between the recapitalization date and the Petition Date, each share of Series B and Series C common stock received 0.15 shares of Series C Common Stock. For the period January 1, 2009 through the Petition Date, Freedom Holdings issued stock dividends totaling 88,062 in Series C common shares; such shares had no value at issuance. There was no Series D common stock issued or outstanding as of the Petition Date.

### 4. General Financial Information

Each of the Debtors filed statements of financial affairs and schedules of assets and liabilities with the Bankruptcy Court on October 24, 2009, certain of which were amended on November 3, 2009. On November 18 or 19, 2009, each of the Debtors filed amended and restated statements of financial affairs and amended and restated schedules of assets and liabilities, which superseded all prior statements and schedules. These documents provide information about, *inter alia*, the Debtors' income and operations, certain payments during specified periods prior to the Petition Date, real and personal property assets, secured, priority and unsecured claims, and executory contracts and unexpired leases. The amended and restated statements and schedules are available online at www.deb.uscourts.gov (cm/ecf) or www.loganandco.com.

## ARTICLE III.
## THE CHAPTER 11 CASES

### A. Events Leading to the Filing of the Chapter 11 Cases

In recent years, the newspaper industry and the Debtors have battled declining readership and circulation, declining advertising revenues due to alternative choices for advertisers, ongoing margin pressure and an ongoing free cash flow decline as print media pricing adapts to a more digitally-oriented and highly-competitive marketplace. The recent global recession has placed an even greater burden on an already distressed industry, leading to unprecedented industry-wide revenue declines. The slumping retail market has reduced demand for retail advertising, and the rise in the national unemployment rate, coupled with the decline in the real estate and auto sectors has led to a significant decline in classified advertising.

With the increased competition from other forms of media and slumping advertising revenues, the downward pressure on newspaper earnings will likely remain intense in the near-term. Further, many media companies, such as the Debtors, have debt loads that are not sustainable in the current economic environment.

The advertising revenue on which the media industry relies is currently being driven down by macroeconomic trends, including, but not limited to, the current housing downturn, declining automotive sales, the retail sector slowdown, a slow labor market and a shift in advertising dollars to online media. Due to structural changes in the advertising business and the reduced consumer spending in the current market, industry-wide retail advertising performance has been significantly negatively impacted from 2007 through the Petition Date.

In addition to the industry-wide decline in retail advertising sales, weakness in the real estate and auto markets and a soft labor demand have created a significant downturn in classified advertising revenue. Also, in recent years, Internet sites devoted to recruitment, automobile and real estate have become significant competitors of the Debtors' newspapers and websites.

In addition, increased competition from other forms of media has led to newspaper industry-wide decreases in circulation volume and revenues. The ability to obtain new subscribers was also adversely affected by changes to telemarketing regulations ("do not call" legislation) in 2004. Telemarketing historically had been the largest single source of new subscribers for the newspaper industry. The Debtors have been, and are likely to continue to be, affected by the industry-wide decline in circulation.

The Debtors' revenue decline was $111 million, or 13%, during the year ended December 31, 2008 as compared to the year ended December 31, 2007. Advertising and circulation revenue were down $110 million and $7 million, respectively. During this same time period, operating cash flow decreased from $150 million to $34 million, or 77%. Similar trends continued into fiscal year 2009. The Debtors' revenue declined $115 million, or 23%, during the eight months ended August 31, 2009 as compared to the same period in 2008. Advertising and circulation revenue were down another $99 million and $6 million, respectively. Operating cash flow during the same time period, decreased $42 million, or 76%, to $13 million.

In response to declining revenues, the Debtors have been actively engaged in efforts to right-size their cost structure. In their newspaper publishing business, the Debtors have consolidated print facilities and operational functions, created regional hubs, introduced new business models, and outsourced selected distribution, printing, advertising production, and design activities. Additionally, the Debtors' newspapers have reduced headcount, cut back on unprofitable circulation, reduced newsprint consumption and streamlined printing. The Debtors have strengthened and reorganized their newspaper sales organization and have added sales hunters to focus on online revenue. In the broadcast arena, the Debtors have focused on sales execution, increase of in-market revenue, operational efficiencies, automation, and headcount reductions. Generally, the Debtors have, among other things, initiated the process of outsourcing the back-office functions in the accounting and finance areas, which is expected to be completed later this year, and have implemented an across-the-board mandatory one-week unpaid leave, during the second quarter of 2009, plus a 5% reduction in base pay for employees at all levels, effective as of July 13, 2009.

Notwithstanding their efforts to ameliorate the effects of declining revenues through cost-saving initiatives, the Debtors' financial condition deteriorated to the point of triggering defaults under their Credit Agreement. The defaults resulted from the Debtors' failure to satisfy certain financial covenants under the Credit Agreement as of September 30, 2008. The defaults continued through April 29, 2009, when the Debtors, the Existing Lenders, and the Existing Lender Agent entered into that certain Amendment No. 4, Waiver and Agreement (the "April 29

Amendment"). Under the April 29 Amendment, in exchange for a payment of interest, fees, and other amounts in the aggregate amount of approximately $19 million, an interest rate increase, accelerated amortization payments, revolver repayment and permanent reduction, and entry into control agreements with respect to certain of the Debtors' accounts, the Existing Lenders agreed to grant the Debtors a temporary waiver of the defaults through December 31, 2009, unless earlier terminated in accordance with its terms. As the waiver termination approached, the Debtors faced the prospect of lengthy negotiations with their secured lenders that, even if resulting in an out-of-court restructuring of the obligations under the Credit Agreement, were not certain to remedy all of the issues impacting their financial results.

Also during the period immediately prior to the Petition Date, the Debtors faced the imminent payment loss of approximately $28.9 million pursuant to a contingent litigation settlement involving the class action claims of certain newspaper carriers for *The Orange County Register*. Those claims arose from a class action lawsuit filed in 2003 against Freedom Communications, Inc. d/b/a The Orange County Register (the "Register") in the Superior Court of California by lead plaintiff Nelson Gonzalez on behalf of certain newspaper carriers who alleged that they were employees rather than independent contractors and thus entitled to wages, overtime, and expenses under certain California labor laws and orders (the "Gonzalez Litigation"). The class as certified contained all persons engaged as home delivery newspaper carriers for *The Register* during the period from July 7, 1999 through August 22, 2008, approximately 5,000 individuals.

The Debtors denied (and, but for the compromises contained in the Plan, continue to deny) any liability for the claims alleged in the Gonzalez Litigation (as more specifically defined in the Plan, the "Gonzalez Litigation Claims"). Nevertheless, on January 30, 2009, after lengthy and expensive discovery and litigation, but prior to judgment, and without any admission of liability, the Gonzalez Litigation was settled pursuant to the terms of a Stipulation and Agreement of Settlement (Class Action) (the "Settlement Agreement"). Under the Settlement Agreement, the Register agreed to pay up to $22 million for distribution to (a) the individual class members on a claims-made basis (claims ultimately made and validated were approximately $14.5 million in the aggregate), (b) Rust Consulting, Inc. as claims administrator in the amount of $100,000, and (c) the lead plaintiff and the four other named plaintiffs in the amount of $35,000 each. In addition, the Register agreed to pay up to $2 million in costs and up to $12 million in attorneys fees to class counsel, subject to approval by the Superior Court of California (which approval was granted at such amounts).

The Superior Court of California approved the Settlement Agreement on June 25, 2009, pursuant to the terms of its Order Granting Final Approval of Class Action Settlement and Judgment (the "Settlement Approval Order"). By the terms of the Settlement Agreement, the effective date of the settlement was deferred for 61 days after the date of entry of the Settlement Approval Order, which date was August 25, 2009 (the "Effective Settlement Date"). Nevertheless, pending the Effective Settlement Date, the Settlement Agreement required that the settlement be funded into escrow within 15 calendar days after entry of the Settlement Approval Order. Accordingly, the Register entered into an Escrow Agreement dated July 8, 2009, with Wilmington Trust Company ("Wilmington") acting as escrow agent. Pursuant to the terms of the Escrow Agreement, on July 10, 2009 and July 31, 2009, respectively, the Register forwarded funds in the amounts of approximately $14.9 million and $14 million to Wilmington for deposit into an interest-bearing account.

Notwithstanding the occurrence of the Effective Settlement Date, the Settlement Agreement clearly provided that the Register's obligations under the Settlement Agreement would not become final and effective until, inter alia, the passage of 20 calendar days after the Effective Settlement Date during which the Register does not become subject to a chapter 11 proceeding. The 20 calendar day period would have ended on September 14, 2009. The Debtors recognized that, if they filed for chapter 11 relief after the funds were disbursed, they would have the right to seek to recover the funds as a preferential transfer, but the process of actually recovering the funds would be uncertain, time-consuming and expensive. Giving due consideration to the interests of all creditors, the Debtors determined that chapter 11 cases should be commenced before September 14, 2009. As a result, on the Petition Date, the Debtors commenced these chapter 11 cases, thus preventing the Register's obligations from becoming final and effective. Consequently, both by the terms of the Settlement Agreement and the Escrow Agreement, the settlement funds have become property of the chapter 11 estate. Pursuant to a notice delivered to the Escrow Agent on September 1, 2009, the settlement funds have been returned to the Debtors.

The Gonzalez Claimants have alleged that if the settlement is no longer effective and enforceable in the amount of approximately $29 million, then they have class claims in the aggregate amount of approximately $102.7 million each against two different Debtors. Further information concerning the alleged claims of the Gonzalez Claimants may be found in their class Proofs of Claim, filed as claim numbers 2444 and 2445 and available at www.loganandco.com. As indicated previously, however, as part of the compromises embodied in the Plan, the Debtors, the Steering Committee Members, the Creditors' Committee, and the Gonzalez Class Counsel have agreed that all Gonzalez Litigation Claims (including, without limitation, the foregoing described class claims) will be allowed in the aggregate amount of $29.5 million and will receive the treatment provided for Class A4 Claims under the Plan. This agreement is only effective in the context of the Plan. If the Plan is not confirmed or does not become effective in accordance with its terms, the Gonzalez Litigation Claims will revert to their disputed status, and the Debtors may seek to disallow in their entireties all Proofs of Claim that assert Gonzalez Litigation Claims.

**B.      Plan Support Agreement**

Prior to the commencement of the Chapter 11 Cases, the Debtors and the Steering Committee Members executed the Plan Support Agreement, which set forth the terms of a consensual restructuring. In connection therewith, the Debtors agreed to pay the Existing Lender Agent a work fee of $2 million to review and evaluate restructuring proposals and alternatives, structure and negotiate a restructuring transaction, and provide related administrative services; and an arrangement fee of $1 million to use commercially reasonable best efforts to arrange the requisite consent of the Existing Lenders to a restructuring transaction.

The Debtors intend to utilize the tools available to them under chapter 11 to improve their balance sheet and strengthen their businesses for the benefit of creditors, customers, employees, and the communities in which the Debtors operate. Towards that end, the Plan Support Agreement provided the general terms upon which the Debtors would seek to restructure their liabilities, which terms, with certain modifications and compromises now embodied in the Plan, are substantially reflected in the Plan. The Plan Support Agreement included deadlines by which the various milestones in the plan process had to be accomplished. The Debtors met the first

deadline by initially filing the Disclosure Statement on October 31, 2009. However, when the hearing to consider the Disclosure Statement could not be held in time for approval to occur by the second deadline of November 30, 2009 (the hearing was set for December 17, 2009 and then continued first to January 13, 2010, and then from time to time until January 21, 2010), a technical default occurred and the Plan Support Agreement terminated as of November 30, 2009. Notwithstanding the termination, the Steering Committee Members remain supportive of the Debtors' restructuring efforts as now embodied in the Plan. The Debtors remain committed to moving as quickly as possible through the chapter 11 process, optimizing their ability to protect their business operations and maximize the value of their enterprise for the benefit of all parties in interest entitled to share in such value under the Bankruptcy Code. The Plan Support Agreement is attached hereto as <u>Exhibit 3</u>. In the event of any discrepancy between the restructuring terms contained in the Plan Support Agreement and those contained in the Plan, the Plan is controlling in all respects.

### C. Stockholder Consents

Pursuant to Freedom Holdings' certificate of incorporation, to commence the Chapter 11 Cases, the Debtors required not only the approval of the Board of Directors, but also the consent of the Series A stockholders (the Family, acting through an authorized committee) and the Series B stockholders (the Investors). The Debtors obtained those consents prior to the Petition Date. As part of those consents, the Family and the Investors agreed to support a restructuring on terms substantially consistent with those set forth in the Plan Support Agreement. That agreement was subject to the same milestones as the Plan Support Agreement. Copies of the two stockholder consents are included in <u>Exhibit 3</u>. The Plan deviates from the terms contained in the Plan Support Agreement with respect to the treatment of Old Freedom Stock Interests, which are no longer entitled to any distribution under the Plan.

### D. Significant Developments in the Chapter 11 Cases

#### 1. "First Day" Orders

On the Petition Date, the Debtors filed "first day" motions with the Bankruptcy Court seeking relief to aid in the efficient administration of the Chapter 11 Cases and to facilitate the Debtors' transition to debtor in possession status. These motions and applications were granted at the "first day" hearing held on September 2, 2009. Among other things, the Bankruptcy Court's orders authorized the Debtors to:

- procedurally consolidate and jointly administer their Chapter 11 cases;

- operate their consolidated cash management system during the Chapter 11 cases in substantially the same manner as it was operated prior to the commencement of the Chapter 11 cases;

- utilize cash collateral on an interim basis;

- pay and honor certain prepetition employee salaries, wages, and benefits, and reimburse certain prepetition employee business expenses;

- pay prepetition certain sales, payroll, and use taxes owed by the Debtors;

- pay and honor certain prepetition obligations to customers;

- pay prepetition claims of certain critical vendors and service providers;

- pay prepetition insurance obligations;

- pay certain prepetition tax obligations; and

- provide a deposit as adequate assurance of payment for postpetition utility service invoices.

### 2. Retention of Professionals and Other Agents

The Debtors received Bankruptcy Court permission to retain a panel of professionals, managers and agents to assist the Debtors in their reorganizations, including: Latham & Watkins, LLP and Young Conaway Stargatt & Taylor LLP as co-counsel to the Debtors; Houlihan Lokey ("Houlihan") as the Debtors' financial advisor and investment banker; AP Services LLP as the Debtors' restructuring managers; Logan & Company as claims, noticing and balloting/voting agent; Sitrick and Company, Inc. as the Debtors' corporate communications consultants; Deloitte & Touche LLP as the Debtors' auditors and accounting advisors; PriceWaterhouseCoopers LLP as the Debtors' tax services provider; Dirks, Van Essen & Murray as sales advisor in connection with the sale of newspaper properties in the Phoenix, Arizona metropolitan area; Professional Real Estate Services as real estate broker with respect to certain real property leases and owned real estate; Titan Broadcast Management LLC as consultant with respect to certain broadcast segment initiatives; and Bond & Pecaro, Inc. to provide certain audit and fresh start valuation services. Pursuant to interim payment procedures approved by the Bankruptcy Court, the professionals subject to such procedures may receive fee and expense payments on a monthly basis, subject to the filing of monthly fee applications, quarterly fee applications, and final fee applications. The retention or other orders applicable to other professionals, managers, and agents may prescribe alternative payment procedures.

By order dated November 13, 2009, the Bankruptcy Court approved the Debtors' retention of Houlihan, nunc pro tunc to the Petition Date after a contested hearing in which the Creditors' Committee had objected to Houlihan's retention. In its objection, the Creditors' Committee urged the Bankruptcy Court to deny the Debtors' application to retain Houlihan, asserting that the proposed fee arrangement with Houlihan (consisting of a fixed monthly fee of $200,000, a transaction fee of $6 million, plus the reimbursement of out-of-pocket expenses) was excessive and that Houlihan was not a "disinterested person," as defined in the Bankruptcy Code. In response to the Creditors' Committee's objection, the Debtors and Houlihan asserted that the proposed fee arrangement was reasonable and consistent with the market for compensation of restructuring financial advisors of Houlihan's caliber, and that Houlihan indeed was a "disinterested person." Following negotiations with the Debtors and the Existing Lender Agent, Houlihan agreed to apply a certain portion of its monthly fees to its transaction fee, agreed to reduce its transaction fee from $6 million to $5 million (as further reduced to $4 million pursuant to the Plan), and agreed to assist the Debtors with negotiating the terms of an exit financing facility. In its November 13, 2009 order approving the Debtors' retention of Houlihan, the Bankruptcy Court found that Houlihan was a "disinterested person" and ruled that Houlihan's compensation and reimbursement of expenses would be reviewed pursuant to the standards set forth in Section 330 of the Bankruptcy Code (and not Section 328 of the Bankruptcy Code). The Debtors and Houlihan appealed that portion of the Bankruptcy Court's order that provided that Houlihan's compensation and reimbursement of expenses would be reviewed pursuant to the standards set forth in Section 330 of the Bankruptcy Code, while the Creditors' Committee

appealed that portion of the Bankruptcy Court's order that found that Houlihan was a "disinterested person." As of the date hereof, the appeals are pending but have been abated pending the occurrence of the Effective Date, based on the compromise embodied in the Plan. Upon the Effective Date, the appeal and cross-appeal will be dismissed with prejudice.

The Debtors also obtained authorization to retain and pay "ordinary course professionals," subject to the submission of retention affidavits by each professional, monthly payment caps applicable to each professional, and quarterly payment reporting by the Debtors.

### 3. Appointment of the Official Committee of Unsecured Creditors

On September 9, 2009, the United States Trustee appointed the Creditors' Committee pursuant to Section 1102(a) of the Bankruptcy Code. The members of the Creditors' Committee that were appointed were: Pension Benefit Guaranty Corporation, Nelson Gonzalez (the lead plaintiff for the Gonzalez Claimants), Telerep LLC, Pitman Co., and Alan J. Bell (a former President and Chief Executive Officer of the Debtors). By orders entered on November 16, 2009, the Creditors' Committee was authorized to retain Pachulski Stang Ziehl & Jones, LLP as counsel to the Creditors' Committee, BDO Seidman, LLP as financial advisors to the Creditors' Committee, and Trenwith Group, LLC ("Trenwith") as investment banker to the Creditors' Committee. The fees and expenses of the Committee's professionals are payable by the Debtors, subject to the same interim payment procedures applicable to the Debtors' professionals. Certain approved out-of-pocket expenses incurred by members of the Committee are also payable by the Debtors.

### 4. Additional Proceedings with Respect to Cash Collateral Order

As mentioned above, the "first day" orders included an interim order authorizing the Debtors to use the cash collateral of the Existing Lenders, subject to, among other things, budgeting, financial reporting, and the grant of adequate protection. The hearing to consider entry of a final order, originally scheduled for October 5, 2009, was continued and held on October 14, 2009. In advance of that hearing, objections were filed by the Creditors' Committee and the Gonzalez Claimants. Following argument by the parties, the Bankruptcy Court overruled certain of the objections and sustained others. The final cash collateral order, referred to in the Plan as the Cash Collateral Order, was entered by the Bankruptcy Court on October 15, 2009.

Subsequently, within the appeal period, the Gonzalez Claimants filed a notice of appeal to the United States District Court for the District of Delaware, challenging the adequate protection provision requiring payments of contractual interest and fees (the "Payment Provision"), and sought a limited stay of the Payment Provision pending the outcome of the appeal. The Bankruptcy Court held a hearing on the Gonzalez Claimants' request for a stay of the Payment Provision pending the outcome of the appeal, and the Bankruptcy Court denied that request by order dated November 12, 2009. By memorandum order dated December 4, 2009, the United States District Court for the District of Delaware also denied the Gonzalez Claimants' request to stay the Payment Provision pending appeal. The Gonzalez Claimants appealed the District Court's order to the United States Court of Appeals for the Third Circuit. As of the date hereof, the Third Circuit has not yet ruled on the appeal. As part of the agreements reached with respect to the consensual terms of the Plan, the appeal of the Cash Collateral Order has been

abated pending the occurrence of the Effective Date, and will be withdrawn with prejudice at that time.

Pursuant to the Payment Provision, as of January 8, 2010, the Debtors had made adequate protection payments to the Existing Lenders approximately as follows:

| | |
|---|---|
| Interest: | $18,229,368 |
| Letter of Credit Fees: | $     28,943 |
| Unused Line Fees | $            40 |
| Other Prepetition Amounts: | $     528,611 |
| Postpetition Professionals Fees and Expenses: | $  1,537,880 |

The Cash Collateral Order contains plan process milestones that constitute events of termination if not satisfied. Pursuant to stipulations filed with the Bankruptcy Court, the Existing Lender Agent, acting at the direction of holders of the requisite majority of Existing Lender Claims, agreed to extend the termination deadline relating to approval of the Disclosure Statement first to December 21, 2009, then from time to time until January 25, 2010, and the termination deadline relating to confirmation of the Plan first to February 19, 2010 and then to March 15, 2010. Additional extensions of these or other termination deadlines or waivers of any other termination events in the Cash Collateral Order will be subject to the agreement of the Existing Lender Agent as directed by the requisite holders.

### 5.    Additional Proceedings with Respect to Employee Order

The "first day" orders included an order authorizing the Debtors to pay and honor certain prepetition employee salaries, wages, and benefits, and reimburse certain prepetition employee business expenses. The order deferred the requested approval of ordinary course bonus programs and severance payments for presumed insiders under the associate severance plan pending a subsequent hearing initially scheduled for October 5, 2009, which was continued and held on October 16, 2009. (The Debtors did not seek authorization to pay severance under the executive severance plan applicable to the Debtors' senior management team.) In advance of that hearing, the Creditors' Committee filed an objection to the payment of bonuses and severance amounts. That objection was substantially overruled as a result of the testimony and arguments presented at the hearing. With the exception of certain bonus amounts for the Debtors' Senior Vice President and Chief Financial Officer, which were presented for approval by separate motion, the Bankruptcy Court approved the Debtors' bonus programs. As to severance, the Bankruptcy Court reconfirmed the authorization of the Debtors to pay severance under the associate severance plan to employees terminated postpetition, held that the presumption of insider status had been rebutted for all but six employees under the associate severance plan, and authorized payment of severance for insiders under the associate severance plan up to the amount permitted by Section 503(c)(2) of the Bankruptcy Code. Although the Debtors had been previously authorized to pay severance to non-insider employees terminated prepetition, the Bankruptcy Court indicated that, as to amounts remaining to be paid, such authorization, if challenged, may be reconsidered. When the Creditors' Committee indicated that it would challenge such authorization, the Debtors discontinued further payments of prepetition severance. Eight former employees were affected by such discontinuance and will have Claims that will be treated under the Plan.

On November 3, 2009, the Debtors filed a motion to assume an amended employment agreement with their Senior Vice President and Chief Financial Officer, Mark A. McEachen, or alternatively to approve certain incentive payments to Mr. McEachen as stand-alone programs. Under the amended employment agreement, three $100,000 bonus targets were deleted and replaced with clear and objective metrics for two incentive payments: (a) $250,000 payable upon confirmation of a plan of reorganization and (b) an additional $50,000 payable upon confirmation of a plan of reorganization that provides a distribution to General Unsecured Creditors. At a hearing held on November 23, 2009, the Bankruptcy Court overruled objections from the Creditors' Committee and the U.S. Trustee and authorized the Debtors to make the payments under the amended agreement.

### 6.    Rejection/Assumption of Executory Contracts and Unexpired Leases

As part of the review of their ongoing businesses, the Debtors have assessed their executory contracts and unexpired leases to identify those contracts that were no longer beneficial and those that remain valuable to the Debtors' business operations.

As of the date hereof, the Debtors have filed two motions, which in the aggregate sought to reject 197 contracts and leases. The Debtors have sought to reject 57 additional contracts and leases pursuant to notice procedures approved by the Bankruptcy Court. For a variety of reasons, the rejected contracts and leases were no longer advantageous to the Debtors' businesses. The Debtors anticipate seeking additional rejections pursuant to the notice procedures or separate motion, if necessary, prior to the Effective Date. The terms of the Plan itself provide for rejections of certain types of contracts and leases.

The Debtors will assume contracts and leases either pursuant to separate motions to be filed prior to the Effective Date or pursuant to the provisions of the Plan. To date, the Debtors have filed motions and obtained orders from the Bankruptcy Court approving the assumption of a distribution agreement with Los Angeles Times Communications LLC and, in conjunction therewith, the assumption and assignment of five real property leases to Los Angeles Times Communications LLC, the assumption of a distribution agreement with Parade Publications, Inc., and the assumption of workers' compensation insurance policies obtained from Chartis. The Debtors anticipate filing additional assumption motions during the remaining pendency of the Chapter 11 Cases. In addition, the Debtors intend to utilize the assumption process contemplated in the Plan's provision for Contract/Lease Schedules. Contracts and leases that are not assumed will be deemed rejected under the Plan.

### 7.    Sales of Assets

The Debtors are seeking to sell their newspaper properties in the Phoenix, Arizona metropolitan area. On October 5, 2009, the Bankruptcy Court authorized the Debtors to retain the firm of Dirks, Van Essen & Murray to act as their sales advisor in connection with the proposed sale. On November 23, 2009, Freedom Arizona Information, Inc. entered into a letter of intent with Thirteen Street Media Inc. for the sale of all the assets used primarily in the operation of the East Valley Tribune, other than certain real estate, computer equipment, cash and other assets, subject to approval of the Bankruptcy Court. That letter of intent has been superseded by a new letter of intent with Thirteen Street Media Inc. for the sale of all the assets used primarily in the operation of the East Valley Tribune, the Mesa Tribune, the Gilbert Tribune, the Chandler Tribune, the Queen Creek Tribune, the Daily News-Sun, the Ahwatukee Foothill

News, and the Arizona Interactive Media Group, other than certain excluded assets, subject to approval of the Bankruptcy Court. Prior to the acceptance of the original letter of intent, the Debtors had announced a plan to wind down operations of the East Valley Tribune and its associated websites at the end of the year. As part of that plan, on November 1, 2009, the Debtors had delivered a WARN act notice to the employees of the East Valley Tribune. As of the date hereof, the wind down plan has been superseded by the proposed sale to Thirteen Street Media Inc.

### 8. Trenwith's Authorization to Solicit Alternative Plan Proposals

On November 10, 2009, the Creditors' Committee filed a motion for an order of the Bankruptcy Court that would (a) authorize its investment banker, Trenwith, to solicit third party proposals that may serve as an alternative to the Plan and (b) direct the Debtors to cooperate with Trenwith's efforts. The Debtors objected to that motion on several grounds, including their belief that, given the amount of their secured debt and the value of their assets, there is unlikely to be a better alternative than the Plan, and their concern that the process will further drain already-stretched resources and could cause additional disruption for employees and in the marketplace. After a hearing held on December 2, 2009, the Bankruptcy Court granted that motion by order entered on December 4, 2009.

### 9. Gonzalez Claimants' Motion to Appoint an Examiner

On November 25, 2009, the Gonzalez Claimants filed a motion for an order appointing an examiner to investigate the Debtors' estates' causes of action that are to be released under the Plan. On November 30, 2009, the Creditors' Committee filed a statement in response to the motion, stating that "an examiner's investigative efforts would be redundant of the Committee's ongoing investigation of claims against the Debtors' insiders and lenders…." On December 10, 2009, the Debtors and the Existing Lender Agent filed objections to the motion, arguing that the appointment of an examiner is not required under the Bankruptcy Code, and that the appointment of an examiner was not warranted under the facts and circumstances of these bankruptcy cases. As part of the agreements reached with respect to the consensual terms of the Plan, the motion has been continued pending the occurrence of the Effective Date, and will be withdrawn with prejudice at that time.

### 10. Claims Process

Pursuant to an order of the Bankruptcy Court, the general bar date for filing Proofs of Claim against the Debtors was December 11, 2009. Notice of the general bar date was mailed to all known creditors on November 6, 2009. In addition, prior to November 20, 2009, the Debtors published notice of the general bar date in *The New York Times* (national edition), *The Orange County Register*, each local daily newspaper owned and operated by the Debtors, and newspapers serving the Debtors' broadcast markets. As of December 11, 2009, approximately 3,400 Proofs of Claim were filed, alleging aggregate fixed liability of $1.094 billion plus additional undeterminable and unknown amounts of unliquidated and contingent liability. See Exhibit 4 for information as to the aggregate fixed amount of liability asserted against each of the Debtors, by Class. Some of the alleged liability is duplicative, as certain parties filed Proofs of Claim against multiple Debtors for the same liability (for example, class Proofs of Claim relating to the Gonzalez Litigation were filed in the approximate amount of $102.7 million each against two different Debtors). The Debtors will review all Proofs of Claim and reserve the right to

object to any Proofs of Claim that are filed in amounts, priorities, or other bases that vary from the Debtors' books and records. For example, the Debtors dispute all liability for the Gonzalez Litigation Claims and, but for the compromise embodied in the Plan, would challenge all Proofs of Claim filed with respect thereto.

Each of the Debtors filed schedules of liabilities with the Bankruptcy Court on October 24, 2009, certain of which were amended on November 3, 2009. On November 18 or 19, 2009, each of the Debtors filed amended and restated schedules of liabilities, which superseded all prior schedules. The schedules of liabilities are based on the Debtors' books and records and reflect the amount of liabilities believed to be owed by the Debtors as of the Petition Date (with certain exceptions note therein). See Exhibit 4 for a summary of unpaid prepetition liabilities of each of the Debtors, by Class, based on the Debtors' amended schedules of liabilities. Please note that the scheduled Claim information on Exhibit 4 does not include contingent, unliquidated, or disputed Claims (including, without limitation, the Gonzalez Litigation Claims, which have been alleged to be in the aggregate amount of approximately $102.7 million each against two different Debtors) or rejection damage Claims (which the Debtors estimate to be in the aggregate amount of $4.5 million). As to Class A4 General Unsecured Claims, please also note that the scheduled Claim information on Exhibit 4 is different from the $39.0 million estimate otherwise provided by the Debtors, because the $39.0 million **excludes** the following amounts that are included in the scheduled amount on Exhibit 4: (a) approximately $3.5 million for critical vendors paid under the applicable first day order, (b) approximately $5.5 million attributable to potential Trade Unsecured Claims that are proposed to be paid from the Trade Unsecured Claim Escrow, and (c) approximately $300,000 attributable to utilities holding deposits, who may be treated as holders of Other Secured Claims. In addition, the $39.0 million **includes** (a) an agreed amount of $29.5 million for the Gonzalez Litigation Claims (only for purposes of the compromises embodied in the Plan), (b) potential escheatment liability of approximately $400,000, and (c) estimated rejection damage claims of $4.5 million that are not included in the scheduled Claim information on Exhibit 4.

## ARTICLE IV.
## SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO INCLUDED IN THE PLAN SUPPLEMENT AND DEFINITIONS TO THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS

UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING DISTRIBUTIONS UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER DOCUMENT REFERRED TO THEREIN, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its holders of claims and interests. Chapter 11 also strives to promote equality of treatment of similarly situated holders of claims and similarly situated holders of interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all the legal and equitable interests of a debtor as of the petition date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any holder of claims against or interests in the debtor, whether or not such holders of claims or interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization will classify the debtor's holders of claims and interests. Pursuant to Section 1122 of the Bankruptcy Code, each class of claims against and interests in a debtor must contain claims or interests, whichever is applicable, that are substantially similar to the other claims or interests in such class. Further, a chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are Unimpaired and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes with claims or interests which are receiving a distribution under the plan but which are not Unimpaired will be solicited to vote to accept or reject the plan.

In compliance with the requirements of Section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each class. Further, the Debtors believe that the Plan is in compliance with the requirements of Section 1122

of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan (and after consultation with the Existing Lenders), to make such reasonable modifications to the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The foregoing language, indicating that the Debtors may seek to modify classifications to overcome classification challenges, is disclosure only. It does not commit the Debtors to seek any such modification and it does not require the Bankruptcy Court to permit any such modification. If the Debtors do seek to modify any classifications, any party in interest is free to oppose the modification at that time. The Bankruptcy Court will then determine whether the modification should be permitted.

## B. Classification of Claims and Interests

### 1. Introduction

The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtors for all purposes of the Plan. A Claim or Interest will be deemed classified in a particular Class or sub-Class only to the extent the Claim or Interest qualifies within the description of that Class or sub-Class and will be deemed classified in a different Class or sub-Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class or sub-Class. A Claim or Interest in a particular Class or sub-Class is entitled to the treatment provided for such Class or sub-Class only to the extent that such Claim or Interest is Allowed and has not been paid or otherwise settled prior to the Effective Date. The treatment with respect to each Class or sub-Class of Claims and Interests provided for in the Plan will be in full and complete satisfaction, release and discharge of such Claims and Interests.

### 2. Classification

For purposes of classification, voting, and treatment under the Plan, Claims against each of the Debtors are classified or deemed classified in a single Class or sub-Class. The Debtors do not believe that such classification or treatment adversely impacts upon the rights of any Holder of a Claim. The Debtors do not intend to effect a substantive consolidation of any of the Debtors or their respective Estates. Rather, the separate corporate existence of each of the Debtors is preserved under the Plan.

Except as otherwise provided in the Plan, nothing under the Plan is intended to or will affect the Debtors' or Reorganized Debtors' rights and defenses in respect of any Claim that is "unimpaired" under the Plan, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupment against such Unimpaired Claims.

The classification of Claims against and Interests in the Encumbered Debtors under the Plan is as follows:

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| A1 | Other Priority Claims | No | No; deemed to accept |
| A2 | Existing Lender Claims | Yes | Yes |
| A3 | Other Secured Claims | Yes | Yes |
| A4 | General Unsecured Claims | Yes | Yes |
| A5 | Non-Qualified Retirement Claims | Yes | Yes |
| A6 | Intercompany Claims | Yes | Held by Debtors; not voting |
| A7 | Tort Claims | Yes | Yes |
| A8 | Subordinated Claims | Yes | No; deemed to reject |
| A9 | Subsidiary Interests | Yes | Held by Debtors; not voting |
| A10 | Old Freedom Stock Interests | Yes | No; deemed to reject |
| A11 | Old Freedom Stock Rights | Yes | No; deemed to reject |

The classification of Claims against and Interests in the Unencumbered Debtors under the Plan is as follows:

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| B1 | Other Priority Claims | No | No; deemed to accept |
| B2 | Other Secured Claims | No | No; deemed to accept |
| B3 | General Unsecured Claims | No | No; deemed to accept |
| B4 | Intercompany Claims | No | No; deemed to accept |
| B5 | Subsidiary Interests | No | No; deemed to accept |

### 3. Treatment of Claims Against and Interests in Encumbered Debtors

The Encumbered Debtors consist of all the Debtors except Freedom Newspapers, Gaston Gazette LLP, Daily Press, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, and The Creative Spot, L.L.C. The Classes of Claims against and Interests in the Encumbered Debtors, as well as their treatment and an analysis of whether they are impaired or unimpaired, are described in more detail as follows:

### (a) Class A1 – Other Priority Claims Against Encumbered Debtors.

The Plan defines Other Priority Claims as any Claim against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

The Plan provides that on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between an Encumbered Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different, less favorable treatment as to which the applicable Encumbered Debtor and such holder will have agreed upon in writing.

This treatment satisfies the requirements of Section 1129(a)(9)(B) of the Bankruptcy Code.

Class A1 will be deemed to consist of forty-three (43) separate sub-Classes for each of the Encumbered Debtors. Class A1 is Unimpaired. The holders of Other Priority Claims are, therefore, not entitled to vote on the Plan.

The Encumbered Debtors estimate that they have outstanding Other Priority Claims of approximately $35,000. But note that approximately $1.7 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed against the Encumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.

### (b) Class A2 – Existing Lender Claims.

The Plan defines Existing Lender Claims as any Claim arising under the Existing Credit Agreement Documents, which include (i) that certain Credit Agreement, dated as of May 18, 2004, as amended, among Freedom Holdings, Freedom Communications as borrower, the Existing Lenders and the Existing Lender Agent, (ii) that certain Guarantee and Collateral Agreement, dated as of May 18, 2004, as amended, among Freedom Holdings, Freedom Communications, certain of the Subsidiary Debtors as subsidiary loan parties, and JPMorgan Chase Bank, N.A. as collateral agent, and (iii) the other "Loan Documents" as defined in the Credit Agreement. Existing Lender Claims include both the Existing Lender Secured Claims and the Existing Lender Deficiency Claims.

The Plan provides for the Existing Lender Claims to be allowed in full in the Chapter 11 Cases, without setoff, subordination, avoidance, reduction, defense, setoff, recharacterization, or counterclaim, in the approximate aggregate amount of $772 million (specifically, the aggregate principal amount of not less than $770,552,344.03 as of the Petition Date, plus $1,933,100.00 in respect of letters of credit issued and outstanding as of the Petition Date).

Subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, the aggregate amount of all payments made by the Debtors on account of Adequate Protection Obligations will be deemed applied to reduce the principal amount of the Existing Lender Secured Claims in accordance with the Existing Credit Agreement Documents and the Cash Collateral Order. In addition, the holders of Existing Lender Secured Claims, in full satisfaction, settlement, release, and discharge of and in exchange for the remaining amount of the Existing Lender Secured Claims, will receive on the Distribution Date:

- their Pro Rata share of the Term A Loan Obligations, which are the obligations of the Reorganized Debtors under the Term A Facility, which is a new first-priority secured term loan facility in the aggregate principal amount of $225 million, to be entered into by the Reorganized Debtors on the Effective Date, and having terms substantially described on Exhibit A to the Plan;

- their Pro Rata share of the Term B Loan Obligations, which are the obligations of the Reorganized Debtors under the Term B Facility, which is a new second-priority secured term loan facility in the aggregate principal amount of $100

million, to be entered into by the Reorganized Debtors on the Effective Date, and having terms substantially described on Exhibit B to the Plan;

- their Pro Rata share of the Excess Cash, which is the amount of Cash held by the Reorganized Debtors on the Effective Date that exceeds $15 million (calculated after deducting from the aggregate amount of Cash held by the Reorganized Debtors on the Effective Date (i) the aggregate amount of the Transferred Cash, (ii) the aggregate amount of the Trade Unsecured Claim Escrow to be established under Section 5.11 of the Plan, (iii) the aggregate amount of the Allowed Claims against the Unencumbered Debtors to be Reinstated under the Plan, (iv) the aggregate amount of known and incurred Administrative Claims (whether or not approved by the Bankruptcy Court), Priority Tax Claims, Other Priority Claims, and Other Secured Claims to be paid under the Plan, and (v) such other amounts as may be agreed to by the Debtors and the Steering Committee Members); which Excess Cash is currently projected to be in the approximate amount of $15 million, but is subject to the actual amount of the identified deductions;

- subject to compliance with FCC domestic and foreign ownership rules, the Existing Lender Shares, which are 100% of the shares of New Common Stock, subject to dilution as a result of the Exit Financing Share Allocation, the New Equity Incentive Plan, and the exercise of the Existing Lender Warrants, which New Common Stock will be in the form of either Class A Common Stock or Class B Common Stock, and which will be subject to certain FCC related transfer restrictions, among others, under the New Stockholders Agreement;

- subject to compliance with FCC domestic and foreign ownership rules, the Existing Lender Warrants issued pursuant to Section 3.2(b) of the Plan, which will have an exercise price of $0.001 per share and other terms as described on Exhibit D to the Plan, and which will be subject to certain FCC related transfer restrictions, among others, under the New Stockholders Agreement;

- their Pro Rata share of the amount of the Trade Unsecured Claim Escrow, which will be deposited by or on behalf of Existing Lenders into the Trade Unsecured Claim Escrow, and any remaining funds in the Trade Unsecured Claim Escrow after all required payments to holders of Allowed Trade Unsecured Claims have been made in accordance with the Plan; and

- their Pro Rata share of the Class A2 Beneficial Trust Interests, which will entitle them to receive, in the aggregate, any Net Litigation Proceeds remaining after the holders of Allowed Class A4 Claims have received, through the Class A4 Beneficial Trust Interests, payment in full of their Allowed Claims plus Distribution Interest.

The distributions provided for the Existing Lender Secured Claims are in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing Credit Agreement Documents, except for indemnification obligations, which shall receive the treatment provided under Section 6.6(c) of the Plan. The holders of Existing Lender Deficiency Claims will not receive or retain any property under the Plan on account of any Existing Lender Deficiency Claims and all Existing Lender Deficiency Claims will be deemed waived by the Existing Lenders and discharged as of the Effective Date.

The Existing Lenders will be deemed to have received the Subsidiary Interests in the Encumbered Debtors and contributed such Subsidiary Interests back to their respective holders.

**Class A2 is Impaired. The holders of Allowed Existing Lender Claims are, therefore, entitled to vote on the Plan. Each of the Encumbered Debtors are jointly and severally obligated on the Existing Lender Claims. Accordingly, Class A2 will be deemed to consist of forty-three (43) separate sub-Classes for each of the Encumbered Debtors. The vote of each holder of an Existing Lender Claim on a single ballot will be deemed to apply to each of the separate sub-Classes.**

### (c) Class A3 – Other Secured Claims Against Encumbered Debtors.

The Plan defines Other Secured Claims as any Secured Claim arising prior to the Petition Date against any of the Debtors, other than an Existing Lender Secured Claim. A Secured Claim is a Claim that is secured by a Lien that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under Section 553 of the Bankruptcy Code; to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to Section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to Section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim.

The Plan provides that, at the option of the Reorganized Debtors, with the agreement of the Steering Committee Members, either (i) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim against an Encumbered Debtor will be Reinstated as of the Effective Date in accordance with the provisions of 11 U.S.C. § 1124(2); (ii) the holder of an Allowed Other Secured Claim against an Encumbered Debtor will (A) retain the Liens securing such Allowed Other Secured Claim and (B) receive regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under 26 U.S.C. § 6622 or, if applicable, under Section 511 of the Bankruptcy Code), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date; (iii) the collateral securing such Allowed Other Secured Claim against an Encumbered Debtor will be surrendered to the holder of such Allowed Other Secured Claim; or (iv) the holder of the Allowed Other Secured Claim against an Encumbered Debtor will be paid in full on the Distribution Date. The treatment applicable to each holder of an Other Secured Claim will be announced in a filing made with the Bankruptcy Court no later than ten (10) days prior to the Confirmation Hearing.

**Class A3 and each sub-class thereof is considered to be Impaired for voting purposes, even though the treatment options available under (i) and (iv) above are not Impaired treatments. Because the treatment option applicable to Claim will not have been announced when the voting commences, each holder of an Allowed Other Secured Claim is entitled to vote on the Plan. However, if the treatment option announced for a particular Claim is not an Impaired option, any vote cast by the holder of such Claim may be disregarded.**

**The Encumbered Debtors did not schedule any Claims as Other Secured Claims, but note that approximately $8.1 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed against the Encumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.**

(d) **Class A4 – General Unsecured Claims Against Encumbered Debtors.**

The Plan defines General Unsecured Claims as any Claim against any of the Debtors that is not an Administrative Claim, an Existing Lender Fee Claim, a Priority Tax Claim, an Other Priority Claim, an Existing Lender Secured Claim, an Other Secured Claim, an Existing Lender Deficiency Claim, a Trade Unsecured Claim, a Non-Qualified Retirement Claim, a Tort Claim, an Intercompany Claim, or a Subordinated Claim. For the avoidance of doubt, the unsecured Claim against the Encumbered Debtors of a provider of goods or services will be considered a General Unsecured Claim until and unless such provider satisfies the requirements for becoming the holder of a Trade Unsecured Claim. (For information on the treatment of Trade Unsecured Claims, see IV.D.5. below, entitled Post-Emergence Trade Agreements with Holders of Trade Unsecured Claims.) General Unsecured Claims against the Encumbered Debtors are also referred to as Class A4 Claims.

As negotiated with the Creditors' Committee, the Plan creates a Litigation Trust that will be funded with Transferred Cash and Transferred Causes of Action. Transferred Cash is defined to mean Cash in the aggregate amount of $14.5 million to be transferred by the Encumbered Debtors to the Litigation Trust on the Effective Date. Transferred Causes of Action are defined to mean all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities of the Estates against the D&O Defendants that arose under applicable law prior to the Petition Date, subject to the limitations set forth in Section 5.17 of the Plan. (See IV.D.7. below, entitled Litigation Trust, for further information about such limitations.) The D&O Defendants are the current or former directors of Freedom Holdings and Freedom Communications and the current interim chief executive officer of Freedom Holdings. The Litigation Trust will be charged with pursuing the Transferred Causes of Action with the objective of producing recoveries for holders of Allowed Class A4 Claims.

The Litigation Trust will be the sole source of recovery for such holders, through Class A4 Beneficial Trust Interests. As described below, a portion of the Transferred Cash will be initially distributed, but the remainder will be used to fund the litigation. If the Transferred Causes of Action are determined to be without merit or are otherwise not successfully pursued, there may be no recovery over and above the amount of Transferred Cash initially distributed.

The Plan specifically provides that, as of the Distribution Date, each holder of an Allowed Class A4 Claim will be deemed to receive a Pro Rata share of the Class A4 Beneficial Trust Interests. Class A4 Beneficial Trust Interests are beneficial interests in the Litigation Trust that entitle the holders, in the aggregate, to the following:

- on the Distribution Date, a Pro Rata share of the Net Cash Proceeds, which consist of Cash in the aggregate amount of $14.5 million, less an amount determined adequate by the Litigation Trustee, in its sole discretion, to fund the future costs of the Litigation Trust, including, without limitation, (a) fees and expenses in connection with the prosecution of the Transferred Causes of Action

and/or Insurance Coverage Actions and/or related actions against the insurance companies and (b) fees and expenses in connection with determining the Allowed amounts of any Disputed Class A4 Claims in Class A4 (including, without limitation, filing objections and litigating such objections to Final Order or otherwise resolving such objections); and

- after the Distribution Date, if and when distributed, a Pro Rata share of the Net Litigation Proceeds, which will consist of the proceeds received by the Litigation Trust from the pursuit of any of the Transferred Causes of Action less (a) the amount of any fees and expenses then incurred by the Litigation Trust in pursuing the Transferred Causes of Action and/or Insurance Coverage Actions and/or related actions against the insurance companies and (b) an amount determined adequate by the Litigation Trustee to fund the future costs of the Litigation Trust, including, without limitation, (i) fees and expenses in connection with the further pursuit of the Transferred Causes of Action and (ii) fees and expenses in connection with continuing to determine the Allowed amounts of any Disputed Class A4 Claims (including, without limitation, filing objections and litigating such objections to Final Order or otherwise resolving such objections).

Under no circumstances will any holder of an Allowed Class A4 Claim be entitled to receive more than payment in full of such holder's Allowed Claim, plus Distribution Interest. As used in the Plan, the term Distribution Interest means interest to accrue on the unpaid amount of an Allowed Class A4 Claim commencing on the Petition Date and continuing to the last date on which distributions are made with respect to Class A4 Beneficial Trust Interests, at the rate in effect on the Effective Date (as though such date was the judgment date), and as computed and accrued, under Section 1961 of Title 28 of the United States Code.

**Class A4 consists of 43 separate sub-Classes for each of the Encumbered Debtors, with the sub-Class for each Encumbered Debtor consisting of the General Unsecured Claims against such Encumbered Debtor. For example, the sub-Class for Freedom Communications will include all General Unsecured Claims against Freedom Communications, and the sub-Class for Freedom Broadcasting, Inc. will include all General Unsecured Claims against Freedom Broadcasting, Inc. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code, including for voting purposes.**

**Class A4 is Impaired. The holders of Allowed General Unsecured Claims in Class A4 are, therefore, entitled to vote on the Plan.**

**Providers of goods or services who may later become holders of Trade Unsecured Claims pursuant to the procedures in the Plan will be holders of General Unsecured Claims at the time of voting and, thus, will vote as holders of General Unsecured Claims in Class A4. For information on the treatment of Trade Unsecured Claims, see IV.D.5. below, entitled Post-Emergence Trade Agreements with Holders of Trade Unsecured Claims.**

**The Encumbered Debtors estimate that they will have Allowed General Unsecured Claims in the aggregate amount of approximately $39.0 million, exclusive of any contingent, unliquidated, or disputed Claims that may ultimately become Allowed Claims, but including an agreed amount of $29.5 million for the Gonzalez Litigation Claims. No**

assurances can be made that the aggregate amount of Allowed General Unsecured Claims will not exceed such estimate. Approximately $260.6 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as unsecured against all Encumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection. The $260.6 million includes two class Proofs of Claim filed for the Gonzalez Claimants in the amount of $102.7 million each ($205.4 million in the aggregate). Those Proofs of Claim will be superseded by the agreement in the Plan to allow the Gonzalez Litigation Claims in the aggregate amount of $29.5 million.

Set forth at <u>Exhibit 12</u> is a chart, prepared by the Creditors' Committee, that provides an estimated range of recovery for holders of Allowed Class A4 claims depending upon the amount of Class A4 Claims that are ultimately Allowed, and the total recovery from the Transferred Causes of Action. As indicated on <u>Exhibit 12</u>, the range is from 37.2% to 100%, depending upon recoveries from prosecution of the Transferred Causes of Action by the Litigation Trust and the amount of Class A4 Claims that are ultimately Allowed. Recoveries are inherently difficult to value and the assumptions made on <u>Exhibit 12</u> regarding levels of recovery from litigation are for illustration purposes only. Actual recoveries on the Transferred Causes of Action may differ materially from the estimated amounts.

(e)     Class A5 – Non-Qualified Retirement Plan Claims Against Freedom Communications.

The Plan defines Non-Qualified Retirement Plan Claims as Claims against Freedom Communications arising under (i) the Non-Qualified DC Plan, (ii) the Non-Qualified EB Plan, and/or (iii) the Individual Retirement Agreements.

The Non-Qualified DC Plan is the Freedom Communications, Inc. Non-Qualified Defined Contribution Plan, which is a non-qualified defined contribution retirement plan maintained by Freedom Communications. The Non-Qualified EB Plan is the Freedom Communications, Inc. Excess Benefit Plan, which is a non-qualified defined benefit retirement plan maintained by Freedom Communications. The Individual Retirement Agreements include (i) the Employment Agreement dated May 30, 1990 with James D. Edwards and the Retirement Agreement dated September 30, 1999 with James N. Rosse and Janice G. Rosse, notwithstanding the rejection of such agreements, but only with respect to retirement and/or deferred compensation benefits under either such agreement, and (ii) any other valid, binding, and enforceable similar individual agreement that provides for retirement and/or deferred compensation benefits.

Class A5 is a single Class against Freedom Communications.

The treatment of Allowed Non-Qualified Retirement Claims will be limited to the receipt of benefits as follows:

- All benefit obligations under the Non-Qualified DC Plan will be reinstated as of the Petition Date on the following modified terms: (A) the account balances will be reduced to 70% of the account balances determined as of the Petition Date; (B) no contribution credits will be credited for the 2009 plan year or any future plan year, and no interest or earnings will be credited to the reduced account balances

on or after the Petition Date; (C) any unpaid benefits relating to the period between the Petition Date and the Effective Date that were due prior to the Effective Date will be paid in a lump sum to the applicable participant or beneficiary reflecting such reduced account balance (without interest or earnings) on the Effective Date; and (D) any benefits payable on or after the Effective Date will be paid in accordance with the terms of the applicable Non-Qualified DC Plan (as modified in accordance with the foregoing clauses);

- All benefit obligations under the Non-Qualified EB Plan will be reinstated as of the Petition Date on the following modified terms: (A) the benefits will be reduced to 70% of the benefits determined as of the Petition Date; (B) any benefit payments that were or are due thereunder on or after October 1, 2009 will be paid at the rate of 70% of the benefit payment amount otherwise due (determined as of the Petition Date) in the form of payment applicable to such benefit under the Non-Qualified EB Plan (as in effect on the Petition Date); (C) any unpaid benefits relating to the period between October 1, 2009 and the Effective Date that were due prior to the Effective Date will be paid in a lump sum to the applicable participant or beneficiary reflecting such reduced rate (without interest or earnings) on the Effective Date; and (D) any benefit payments payable on or after the Effective Date will be paid in accordance with the terms of the applicable Non-Qualified EB Plan (as modified in accordance with the foregoing clauses); and

- All retirement and/or deferred compensation benefit obligations under the Individual Retirement Agreements will be incorporated into the Non-Qualified EB Plan and will be treated in the same manner as benefit obligations under the Non-Qualified EB Plan, as set forth above; *provided, however*, that no such benefit (as reduced as set forth above) will be increased on or after the Petition Date by any cost of living adjustment or otherwise.

**Class A5 is Impaired. The holders of Allowed Non-Qualified Retirement Claims are, therefore, entitled to vote on the Plan.**

**Freedom Communications estimates that there will be Allowed Non-Qualified Retirement Claims in the aggregate amount of approximately $17.8 million.**

**(f)     Class A6 – Intercompany Claims Against Encumbered Debtors.**

The Plan defines Intercompany Claims as any Claim arising prior to the Petition Date against any of the Debtors by another Debtor or by a non-Debtor subsidiary or affiliate of a Debtor.

The Plan provides that, with respect to each Intercompany Claim against the Encumbered Debtors, at the election of the Reorganized Debtors, with the consent of the Existing Lender Agent, the Intercompany Claim will be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part as of the Effective Date, or will be Reinstated on the Effective Date, and no such disposition will require the consent of the holders of New Common Stock or the consent of any holder of Subsidiary Interests.

**Class A6 is Impaired but because the holders of such Claims are Debtors, who are proponents and thus supporters of the Plan, their votes will not be solicited. Class A6 will**

be deemed to consist of forty-three (43) separate sub-Classes for each of the Encumbered Debtors.

### (g) Class A7 – Tort Claims Against Encumbered Debtors.

The Plan defines a Tort Claim as any tort Claim against the Encumbered Debtors for which coverage exists under the Debtors' insurance policies, including, without limitation, Claims for personal injury, wrongful death, defamation, slander, libel, invasion of privacy, or other tort liability, but excluding any Claim for workers' compensation subject to Section 6.5(c) of the Plan.

The Plan provides that all holders of Allowed Tort Claims will have the right to assert such Claims under the Debtors' applicable insurance policies. Any recovery by such holders on account of such Allowed Claims will be limited to the coverage that may be available under such insurance policies. Such holders will have no rights to any distributions under the Plan.

**Class A7 is Impaired. The holders of Allowed Tort Claims are, therefore, entitled to vote on the Plan. Class A7 is deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.**

**The Debtors dispute all liability on the Tort Claims. Nevertheless, approximately $12.1 million in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed as of December 11, 2009 against all Encumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.**

### (h) Class A8 – Subordinated Claims Against Encumbered Debtors.

The Plan defines Subordinated Claims as (i) any Claim against any of the Encumbered Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which will include any Claim arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of any Interest, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim; (ii) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages (but not general or ordinary negligence damages), to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a governmental unit in connection with a tax or other obligation owing to such unit; or (iii) any Claim that is tardily filed under Section 501(a) of the Bankruptcy Code, except for any tardily filed Gonzalez Litigation Claim.

The holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims. All Subordinated Claims will be discharged as of the Effective Date.

Subordinated Claims include, without limitation, tardily filed Claims. Approximately $440,260 in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed

between December 12, 2009 and January 12, 2010 against all Encumbered Debtors (not including unliquidated and contingent Claims).

**Class A8 is Impaired and will receive no distribution under the Plan. The holders of such Claims are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.**

### (i)     Class A9 – Subsidiary Interests in Encumbered Debtors.

The Plan defines Subsidiary Interests as the issued and outstanding shares of stock, membership units, or partnership interests in the Subsidiary Debtors, as of the Petition Date; as well as any stock options or other rights to purchase the stock, membership units, or partnership interests of any of the Subsidiary Debtors, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors, and any other rights based on the value (or increase in value) of any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors.

The Subsidiary Interests in the Encumbered Debtors are subject to Liens in favor of the Existing Lenders. In recognition of that fact, and to preserve the corporate structure of Freedom Holdings for the benefit of the Existing Lenders, on the Effective Date, the Subsidiary Interests will be deemed to have been distributed to the Existing Lenders on account of their Existing Lender Claims and then contributed back by the Existing Lender to the respective holders of the Subsidiary Interests. The Subsidiary Interests will thereafter be retained for the benefit of the holders of the New Securities, subject to any applicable restrictions arising under the Exit Facility, the Term A Facility, and the Term B Facility.

Notwithstanding the foregoing, if the Subsidiary Interests in the Reorganized Broadcast Licensee Companies are transferred to the Broadcast Trustee pursuant to the provisions of Section 5.16 of the Plan, such Subsidiary Interests will be subject to the terms of the Broadcast Trust Agreement until transferred back to the Reorganized Broadcast Operating Companies. When transferred back, such Subsidiary Interests will be subject to the provisions described in the paragraph above.

**Class A9 is Impaired but because the holders of such Interests are Debtors, who are proponents and thus supporters of the Plan, their votes will not be solicited. Class A9 will be deemed to consist of forty-two (42) separate sub-Classes for each of the Encumbered Debtors that are Subsidiary Debtors.**

### (j)     Class A10 – Old Freedom Holdings Stock Interests.

The Plan defines Old Freedom Holdings Stock Interests as all preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date. The Old Freedom Holdings Stock Interests are owned by the Family and the Investors.

Under the Plan all Old Freedom Stock Interests will be cancelled as of the Effective Date. The holders of such Old Freedom Stock Interests will not receive or retain any property under the Plan or otherwise on account thereof.

**Class A10 is Impaired and will receive no distribution under the Plan. The holders of such rights are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.**

        **(k)**        **Class A11 – Old Freedom Holdings Stock Rights**.

The Plan defines Old Freedom Holdings Stock Rights as any stock options or other rights to purchase the stock of Freedom Holdings, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Freedom Holdings, and any phantom stock appreciation rights, restricted stock units or any other rights based on the value (or increase in value) of any stock or other equity ownership interests in Freedom Holdings. The term includes, without limitation, any award or rights under the Freedom Holdings 2004 Long-Term Incentive Plan (as amended and restated) and the Freedom Holdings 2008 Restricted Stock Unit Award Plan or any award agreement pursuant thereto. The term does not include any preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date.

Under the Plan, all Old Freedom Stock Rights will be cancelled as of the Effective Date. The holders of such Old Freedom Stock Rights will not receive or retain any property under the Plan or otherwise on account thereof.

**Class A11 is Impaired and will receive no distribution under the Plan. The holders of such rights are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.**

        **4.**        **Treatment of Claims Against and Interests in Unencumbered Debtors**

The Unencumbered Debtors consist of Freedom Newspapers, Gaston Gazette LLP, Daily Press, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, and The Creative Spot, L.L.C. The Classes of Claims against and Interests in the Unencumbered Debtors, as well as their treatment and an analysis of whether they are impaired or unimpaired, are described in more detail as follows:

        **(a)**        **Class B1 – Other Priority Claims Against Unencumbered Debtors.**

The Plan defines Other Priority Claims as any Claim against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

The Plan provides that on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between an Unencumbered Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different, less

favorable treatment as to which the applicable Unencumbered Debtor and such holder will have agreed upon in writing.

**This treatment satisfies the requirements of Section 1129(a)(9)(B) of the Bankruptcy Code.**

**Class B1 will be deemed to consist of seven (7) separate sub-Classes for each of the Unencumbered Debtors. Class B1 is not Impaired. The holders of Other Priority Claims are, therefore, not entitled to vote on the Plan.**

**The Unencumbered Debtors estimate that they have outstanding Other Priority Claims in the approximate amount of $3,600. However, approximately $4,150 in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed against the Unencumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.**

(b)  **Class B2 – Other Secured Claims Against Unencumbered Debtors.**

The Plan defines Other Secured Claims as any Secured Claim arising prior to the Petition Date against any of the Debtors, other than an Existing Lender Secured Claim. A Secured Claim is a Claim that is secured by a Lien that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under Section 553 of the Bankruptcy Code; to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to Section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to Section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim.

The Plan provides that the legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim against an Unencumbered Debtor will be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code.

**Class B2 consists of separate sub-Classes for each Other Secured Claim against any of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Unencumbered Debtor for all purposes under the Bankruptcy Code. Class B2 is not Impaired. The holders of Other Secured Claims are, therefore, not entitled to vote on the Plan.**

**The Unencumbered Debtors did not schedule any Claims as Other Secured Claims. However, approximately $4,300 in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed against the Unencumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection.**

(c)  **Class B3 – General Unsecured Claims Against Unencumbered Debtors.**

The Plan defines General Unsecured Claims as any Claim against any of the Debtors that is not an Administrative Claim, an Existing Lender Fee Claim, a Priority Tax Claim, an Other

Priority Claim, an Existing Lender Secured Claim, an Other Secured Claim, an Existing Lender Deficiency Claim, a Trade Unsecured Claim, a Non-Qualified Retirement Claim, a Tort Claim, an Intercompany Claim, or a Subordinated Claim.

The Plan provides that the legal, equitable, and contractual rights of each holder of an Allowed General Unsecured Claim against an Unencumbered Debtor will be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code. On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and (iii) the date on which such General Unsecured Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Claim, each holder of an Allowed General Unsecured Claim in Class B3 will receive, in full satisfaction of and in exchange for, such Allowed General Unsecured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Cases not been filed.

**Class B3 consists of separate sub-Classes consisting of the General Unsecured Claims against each of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code. Class B3 is not Impaired. The holders of Allowed General Unsecured Claims are, therefore, not entitled to vote on the Plan.**

**The Unencumbered Debtors estimate that they have Allowed General Unsecured Claims in the aggregate amount of approximately $1.5 million. Approximately $587,000 in fixed amount has been asserted on an aggregate basis in Proofs of Claim filed against the Unencumbered Debtors (not including unliquidated and contingent Claims), all subject to review and possible objection. Certain claimants may have filed their Proofs of Claim against the wrong Debtor (possibly against an Encumbered Debtor), in which case their Claim amounts are not included in the filed amount of $587,000.**

(d)     **Class B4 – Intercompany Claims Against Unencumbered Debtors.**

The Plan defines Intercompany Claims as any Claim arising prior to the Petition Date against any of the Debtors by another Debtor or by a non-Debtor subsidiary or affiliate of a Debtor.

The Plan provides that the legal, equitable, and contractual rights of each holder of an Intercompany Claims against the Unencumbered Debtors will be Reinstated on the Effective Date or, with the consent of the holder, may be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part as of the Effective Date.

**Class B4 is be deemed to consist of seven (7) separate sub-Classes for each of the Unencumbered Debtors. Class B4 is not Impaired. The holders of Intercompany Claims in Class B4 are, therefore, not entitled to vote on the Plan.**

(e)     **Class B5 – Subsidiary Interests in Unencumbered Debtors.**

The Plan defines Subsidiary Interests as the issued and outstanding shares of stock, membership units, or partnership interests in the Subsidiary Debtors, as of the Petition Date; as well as any stock options or other rights to purchase the stock, membership units, or partnership

interests of any of the Subsidiary Debtors, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors, and any other rights based on the value (or increase in value) of any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors.

The Plan provides that the legal, equitable, and contractual rights of each holder of a Subsidiary Interest in any of the Unencumbered Debtors will be Reinstated on the Effective in accordance with the provisions of Section 1124(2) of the Bankruptcy Code.

**Class B5 will be deemed to consist of seven (7) separate sub-Classes for each of the Unencumbered Debtors. Class B5 is not Impaired. The holders of Subsidiary Interests in Class B5 are, therefore, not entitled to vote on the Plan.**

C. **Treatment of Unclassified Claims.**

1. **Summary**

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving distributions under, the Plan.

2. **Treatment of Administrative Claims**

The Plan defines Administrative Claims as any Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, bonuses, or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Fee Claims, (c) Substantial Contribution Claims, (d) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, (e) all Allowed Claims for the value of goods received under Section 503(b)(9) of the Bankruptcy Code, (f) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (g) Cure payments, and (h) to the extent applicable, the portion of the Adequate Protection Obligations that constitute Claims under Section 507(b) of the Bankruptcy Code.

The Plan provides that with respect to each Allowed Administrative Claim, except as otherwise provided in the Plan, and subject to the requirements of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different, less favorable treatment as to which the applicable Debtor and such holder will have agreed upon in writing; *provided, however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the

Chapter 11 Cases will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Existing Lender Agent and the Existing Lenders will be entitled to retain all payments made by the Debtors during the Chapter 11 Cases in full satisfaction of all Adequate Protection Obligations arising under the Cash Collateral Order, including any portion of the Adequate Protection Obligations that constitute an Administrative Claim under Section 507(b) of the Bankruptcy Code; *provided, however*, that subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, such payments will be applied in accordance with the Existing Credit Agreement Documents to reduce the principal amount of the Existing Lender Secured Claims. Any Existing Lender Fee Claim that has been incurred and is unpaid as of the Effective Date will be paid in Cash on or as soon as practicable after the Effective Date in full satisfaction, settlement, release and discharge of such Claim; *provided, however*, that subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, any such payments will be deemed to be applied to reduce the principal amount of the Existing Lender Secured Claims in accordance with the Existing Credit Agreement Documents and the Cash Collateral Order. Any replacement or other Liens created under the Cash Collateral Order will terminate and will have no further force and effect as of the Effective Date.

**This treatment satisfies the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.**

### 3. Administrative Claims Bar Date

All Requests for Payment of an Administrative Claim (except as otherwise provided in the Plan) must be filed with the Bankruptcy Court and served on counsel for the Debtors or the Reorganized Debtors no later than forty-five (45) days after the Effective Date. The Debtors intend to provide further notice of such deadline to all known parties in interest following the entry of the Confirmation Order and will publish notice with respect to unknown parties. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Claims Objection Deadline, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors object to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim.

Notwithstanding the foregoing, (a) no Request for Payment need be filed with respect to an undisputed postpetition obligation which was paid or is payable by any of the Debtor in the ordinary course of business; *provided, however*, that in no event will a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; (b) no Request for Payment need be filed with respect to Cure owing under an executory contract or unexpired lease if (i) the amount of Cure is fixed or proposed to be fixed by the Confirmation Order or other order of the Bankruptcy Court either pursuant to the Plan or pursuant to a motion to assume and fix the amount of Cure filed by the Debtors and (ii) a timely objection asserting an increased amount of Cure has been filed by the non-Debtor party to the subject contract or lease; and (c) no Request for Payment

need be filed with respect to fees payable pursuant to Section 1930 of Title 28 of the United States Code.

### 4. Deadline for Professional Fee Claims

All final applications seeking allowance and payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code and Substantial Contribution Claims under Section 503(b)(3), (4), or (5) of the Bankruptcy Code must be filed and served on the Reorganized Debtors, their counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

### 5. Settlement Relating to Houlihan's Professional Fee Claim

In connection with the Professional Fee Claim of Houlihan, the Debtors, the Creditors' Committee, and Houlihan have settled all issues relating to the "Phase II Monthly Fees" and the "Phase II Deferred Fee," as such terms are defined in that certain First Amendment dated May 6, 2009 to that certain Engagement Agreement dated March 13, 2009 (the "Amended Engagement Agreement") as described in this paragraph. The Debtors (including the Litigation Trust), the Creditors' Committee, and the Steering Committee Members each agree that they have no objection to the final award of Phase II Monthly Fees in the amount set forth in the Amended Engagement Agreement and the Phase II Deferred Fee in the amount of $4 million. The Debtors further agree that the Phase II Monthly Fees and Phase II Deferred Fee as described in the preceding sentence are reasonable under the standards set forth in Sections 328(a) and 330(a) of the Bankruptcy Code. The Debtors and the Existing Lender Agent further each agree that they will oppose any objection raised by a party in interest to Houlihan's final fee application. Additionally, both Houlihan and the Creditors' Committee also have agreed that upon confirmation of this Plan, each party will dismiss with prejudice its appeal and cross-appeal, respectively, in the United States District Court for the District of Delaware regarding the Order Authorizing the Employment and Retention of Houlihan Lokey Howard & Zukin Capital, Inc. as Investment Bankers and Financial Advisors Pursuant to 11 U.S.C. §§ 327(a), 330, and 1107 and Fed. R. Bankr. P. 2014(a) and Del. Bankr. L.R. 2014-1, Nunc Pro Tunc to the Petition Date. The Debtors (including the Litigation Trust), the Creditors' Committee, and the Existing Lender Agent each recognize that Houlihan intends to file a final fee application for the Phase II Monthly Fees in the amount set forth in the Amended Engagement Agreement and the Phase II Deferred Fee in the amount of $4 million in time to be heard at the Confirmation Hearing. Such parties have no objection to the consideration of such final fee application at the Confirmation Hearing and, as a result, the Bankruptcy Court has agreed to hear such final fee application at that time. Any other fees and all expense reimbursements provided for under the Amended Engagement Agreement will be subject to the final application process described in Section 11.1(a) of the Plan.

### 6. Priority Tax Claims

The Plan defines Priority Tax Claims as any Claim of a governmental unit that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Claims for the following types

of taxes have priority status: (a) a tax on or measured by income or gross receipts for a taxable year ending on or before the date of the filing of the petition, (i) for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition; (ii) assessed within 240 days before the date of the filing of the petition, exclusive of (I) any time during which an offer in compromise with respect to that tax was pending or in effect during that 240-day period, plus 30 days; and (II) any time during which a stay of proceedings against collections was in effect in a prior case under this title during that 240-day period, plus 90 days; (iii) other than a tax of a kind specified in section 523 (a)(1)(B) or 523 (a)(1)(C) of this title, not assessed before, but assessable, under applicable law or by agreement, after, the commencement of the case; (b) a property tax incurred before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition; (c) a tax required to be collected or withheld and for which the debtor is liable in whatever capacity; (d) an employment tax on a wage, salary, or commission of a kind specified in Section 507(a)(4) earned from the debtor before the date of the filing of the petition, whether or not actually paid before such date, for which a return is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; (e) an excise tax on (i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or (ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition; (f) a customs duty arising out of the importation of merchandise (i) entered for consumption within one year before the date of the filing of the petition; (ii) covered by an entry liquidated or reliquidated within one year before the date of the filing of the petition; or (iii) entered for consumption within four years before the date of the filing of the petition but unliquidated on such date, if the Secretary of the Treasury certifies that failure to liquidate such entry was due to an investigation pending on such date into assessment of antidumping or countervailing duties or fraud, or if information needed for the proper appraisement or classification of such merchandise was not available to the appropriate customs officer before such date; or (g) a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss.

Under the Plan, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, either, with the agreement of the Steering Committee Members, (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different, less favorable treatment as to which the applicable Debtor and such holder will have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under Section 511 of the Bankruptcy Code), equal to such Allowed Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date.

**This treatment satisfies the requirements of Section 1129(a)(9)(C) of the Bankruptcy Code.**

## D. Means for Implementation of the Plan

### 1. Continued Corporate Existence

The Reorganized Debtors will continue to exist after the Effective Date as separate corporate, limited liability, partnership entities, in accordance with the applicable laws in the respective jurisdictions in which they are organized and pursuant to the New Freedom Governing Documents in the case of Reorganized Freedom Holdings and the New Subsidiary Governing Documents in the case of the respective Reorganized Subsidiaries.

The New Freedom Governing Documents and the New Subsidiary Governing Documents will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. Such amendments will include a prohibition against the issuance of non-voting securities and other provisions as necessary to satisfy Section 1126(a)(6) of the Bankruptcy Code. As set forth on Exhibit C to the Plan, the Class B Common Stock is intended to be limited voting stock. The New Freedom Charter and New Freedom By-Laws will be in substantially the forms of such documents included in the Plan Supplement.

### 2. Exit Funding

The Exit Facility is a proposed revolving loan facility in an amount of at least $25 million, to be provided under that certain credit agreement (and any related documents, agreements, and instruments) to be entered into by the Reorganized Debtors as of the Effective Date, and having terms and conditions satisfactory in all respects to the Debtors and the Steering Committee Members, and substantially in accordance with the term sheet included in the Plan Supplement.

In addition to Cash remaining as of the Effective Date, the Cash necessary to make payments required to be made on the Effective Date and to provide working capital and satisfy other general corporate purposes after the Effective will be obtained from the Exit Facility.

With the agreement of the Steering Committee Members, the obligations under the Exit Facility will be secured by valid, binding, perfected first priority liens on inventory, accounts receivable, and other assets of the Reorganized Debtors, if necessary to obtain a commitment for such Exit Facility. In the event that the Exit Facility is provided by the Existing Lender Agent or any Existing Lender, then the Exit Financing Share Allocation may be issued as compensation for such exit lender, as an administrative expense, to the extent necessary to obtain such Exit Facility; *provided that* if any existing Steering Committee Member offers to provide such Exit Facility to the Reorganized Debtors, all other Steering Committee Members will have the opportunity to participate in such Exit Facility and the Exit Financing Share Allocation on a pro rata basis. Letters of credit under the Existing Credit Agreement Documents outstanding on the Effective Date will be rolled into, and become letters of credit under, the Exit Facility without any further action by any party.

The Exit Financing Share Allocation to the lenders who provide the Exit Facility will be exempt from registration under the U.S. Securities Act of 1933, as amended (the "Securities Act"), by virtue of (a) Section 1145 of the Bankruptcy Code, to the extent such lenders are comprised of Existing Lenders, and (b) Section 4(2) of the Securities Act or Regulation D thereunder as a transaction by an issuer not involving a public offering.

The Reorganized Debtors will be authorized to (a) enter into the Exit Facility, (b) grant any liens and security interests and incur or guaranty the indebtedness as required under the Exit Facility, and (c) issue, execute and deliver all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the Exit Facility and to take all other actions necessary to implement and effectuate borrowings under the Exit Facility. On the Effective Date, the Exit Facility, together with new promissory notes and guarantees, if any, evidencing obligations of the Reorganized Debtors thereunder, and all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, will become effective. The new promissory notes issued pursuant to the Exit Facility and all obligations under the Exit Facility and related documents will be paid as set forth in the Exit Facility and related documents.

### 3. Authorization and Issuance of New Securities

The New Securities under the Plan consist of (i) New Common Stock, meaning common shares of Reorganized Freedom Holdings with terms substantially as set forth on Exhibit C to the Plan and (ii) the Existing Lender Warrants, meaning warrants to purchase shares of New Common Stock with terms substantially as set forth on Exhibit D to the Plan.

On the Effective Date, Reorganized Freedom Holdings will issue the New Common Stock and the Existing Lender Warrants in accordance with the provisions of the Plan. The issuance of New Common Stock and the Existing Lender Warrants and the distributions thereof will be exempt from registration under applicable securities laws pursuant to Section 1145(a) of the Bankruptcy Code.

The New Common Stock will consist of (i) a class of full voting common stock (the "Class A Common Stock") and (ii) a separate class of limited-voting common stock (the "Class B Common Stock"). Subject to compliance with the Communications Act of 1934 (as amended) and the ownership rules, regulations, and/or policies of the FCC, each Secured Lender will have the option to choose to take its New Common Stock in the form of Class A Common Stock or Class B Common Stock. In addition, each Secured Lender may instead take Existing Lender Warrants in lieu of any portion of its New Common Stock.

Subject to compliance with the Communications Act of 1934 (as amended) and the ownership rules, regulations, and/or policies of the FCC, each share of Class B Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Class A Common Stock, and each share of Class A Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Class B Common Stock; *provided that*, at all times, there must be outstanding at least one share of Class A Common Stock; provided further that the New Common Stock will not be convertible if any such conversion would result in a violation of any ownership restrictions imposed by the Communications Act of 1934 (as amended) or the ownership rules, regulations, and/or policies of the FCC.

The economic rights of the Class A Common Stock and Class B Common Stock will be identical. The holders of the Class A Common Stock will be entitled to one vote for each share of Class A Common Stock held by such holder of record on the books of Reorganized Freedom Holdings for all matters on which stockholders of Reorganized Freedom Holdings are entitled to vote. The Class B Common Stock will not be entitled to general voting rights, but will be entitled to vote on an "as converted" basis (together with the holders of the Class A Common

Stock, voting as a single class) on certain non-ordinary course transactions, including (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking pari passu with or senior to the New Common Stock as to dividends or liquidation preference, including additional New Common Stock; (ii) any amendment to Reorganized Holding's certificate of incorporation or by-laws; (iii) any amendment to any shareholders or comparable agreement; (iv) any sale, lease or other disposition of all or substantially all of the assets of Reorganized Holdings through one or a series of transactions; (v) any recapitalization, reorganization, consolidation or merger of Reorganized Holdings; (vi) to the extent that holders of Class A Common Stock have the right to vote thereon, any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Holdings, except as may be provided for under the New Equity Incentive Plan or any other management incentive plan; and (vii) to the extent that holders of Class A Common Stock have the right to vote thereon, any redemption, purchase or other acquisition by Reorganized Holdings of any of its capital stock (except for purchases from employees upon termination of employment). The Class B Common Stock will be entitled to a separate class vote on any amendment or modification of any rights or privileges of the Class B Common Stock that does not equally affect the Class A Common Stock. In any liquidation, dissolution or winding up of the Reorganized Company, all assets will be distributed to holders of the New Common Stock on a pro rata basis.

Reorganized Freedom Holdings will (i) authorize on the Effective Date 21 million shares of New Common Stock; (ii) issue on the Effective Date 7 million shares of New Common Stock (subject to adjustment in respect of shares of New Common Stock issuable upon the exercise of the Existing Lender Warrants), representing 100% of the outstanding shares of New Common Stock as of such date (subject to the Exit Financing Share Allocation, if any); *provided* that the shares of New Common Stock to be distributed under the Plan to holders of Existing Lender Secured Claims pursuant to the Plan will be contributed by Reorganized Freedom Holdings to Reorganized Freedom Communications for distribution by Reorganized Freedom Communications to such holders; (iii) reserve for issuance in accordance with the terms of the Plan a number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the antidilution provisions thereof) to satisfy the required distributions of (A) the Existing Lender Warrants, (B) the stock, options, and other awards granted under the New Equity Incentive Plan, and (C) if applicable, the Exit Financing Share Allocation. The purpose of the contribution of the New Common Stock to Reorganized Freedom Communications described in clause (ii) of the foregoing sentence is to provide greater certainty regarding the U.S. federal income tax treatment of the exchange by holders of Existing Lender Secured Claims of such Claims in part for such New Common Stock. It is intended that such exchange would be treated as occurring by means of a direct transfer of such Claims by the holders to Reorganized Freedom Communications, which prior to the Effective Date was the borrower under the Existing Credit Agreement Documents giving rise to such Claims, in exchange for the direct transfer of the New Common Stock by Reorganized Freedom Communications to such holders.

In the event that the Exit Facility is provided by the Existing Lender Agent or any Existing Lender, then the Exit Financing Share Allocation (a number of shares in an amount of up to 20% of the Aggregate Existing Lender Share Number) will be set aside as compensation for such exit lender or lenders, as an administrative expense, to the extent necessary to obtain such Exit Facility; *provided that* if any existing Steering Committee Member offers to provide

such Exit Facility to the Reorganized Debtors, all other Steering Committee Members will have the opportunity to participate in such Exit Facility and the Exit Financing Share Allocation on a pro rata basis.

Upon the Effective Date (i) each Existing Lender will be deemed to have executed, without any further action by such party, the New Stockholders Agreement and the Registration Rights Agreement and (ii) each holder of Existing Lender Warrants will be deemed to have executed, without any further action by such party, the Existing Lender Warrant Agreement.

The New Stockholders Agreement will provide, among other things, for (i) customary "drag along" and "tag along" rights, (ii) obligations for holders of the New Common Stock to provide such information as Reorganized Freedom Holdings reasonably may require to ensure compliance with the Communications Act of 1934 (as amended) and the rules, regulations, and/or policies of the FCC, (iii) information rights, including the right of prospective purchasers of the New Common Stock or Existing Lender Warrants to obtain non-public information upon execution of a confidentiality agreement, and (iv) certain preemptive rights. In addition, the New Stockholders Agreement will provide for a moratorium on trading the Existing Lender Shares, any shares of New Common Stock issued pursuant to the Exit Financing Share Allocation, and the Existing Lender Warrants until the FCC grants approval of the "long-form" applications.

The Registration Rights Agreement will provide, among other things, for (a) "piggyback" registration rights for the New Common Stock (with customary exceptions, including Reorganized Holding's initial public offering) and (b) following the initial public offering of Reorganized Holdings, if any, for those holders of New Common Stock that cannot sell freely under Rule 144 of the Securities Act of 1933, as amended, S-3 or "short-form" demand registration rights for the New Common Stock (with customary limitations).

Upon emergence, Reorganized Freedom Holdings will not be a "public" company subject to the reporting requirements of the Exchange Act. There is no current intention that it will become a public company in the future, although that decision will be made as appropriate by the New Board. It is expected that the New Stockholders Agreement will include transfer and trading restrictions intended to limit the number of record holders of New Common Stock such that Reorganized Freedom Holdings would not be subject to reporting requirements under the Exchange Act. In addition, the New Stockholders Agreement will provide for restrictions as necessary to ensure compliance with the Communications Act of 1934 (as amended) and the FCC's ownership rules, regulations, and/or policies.

The foregoing may be modified by the Debtors, with the agreement of the Steering Committee Members, at any time, subject to any applicable limitations on modification that may exist under Section 1127 of the Bankruptcy Code. Certain of the terms described above may instead or also be included in the New Freedom Governing Documents.

### 4. Directors and Officers of Reorganized Debtors

#### (a) Reorganized Freedom Holdings

The New Board will be comprised of up to seven (7) directors, initially consisting of (i) six (6) independent and disinterested directors acceptable to the Steering Committee Members

and (ii) Reorganized Freedom Holdings' chief executive officer. The designation of directors pursuant to the foregoing clause (i) will be made at least five (5) days prior to the Voting Deadline and will be announced in a filing made with the Bankruptcy Court no later than five (5) days prior to the Voting Deadline. The members of the New Board will continue to serve as such until replaced or removed in accordance with the New Freedom Governing Documents. Each Steering Committee Member holding in excess of a threshold percentage (to be agreed among the Steering Committee Members) of the Existing Lender Secured Claims will be entitled to appoint a representative to attend and observe all meetings of the New Board unless such rights would delay or adversely affect the FCC's grant of the long-form application.

The existing senior officers of Freedom Holdings are expected to serve initially in the same capacities after the Effective Date for Reorganized Freedom Holdings until replaced or removed in accordance with the New Freedom Governing Documents or company policy, or until any of such individual's voluntary resignation. The officers as of the date hereof are identified above and on <u>Exhibit 6</u>.

The New Freedom Governing Documents will be included in the Plan Supplement. Upon a review of such documents, parties in interest may verify that the director and officer replacement or removal provisions are consistent with the interests of creditors and equity security holders and with public policy and, thus, are in compliance with the requirement of Section 1123(a)(7) of the Bankruptcy Code.

### (b)      Reorganized Subsidiary Debtors

Except as to Freedom Communications, which shares the same board of directors as Freedom Holdings, the existing directors of the Subsidiary Debtors are expected to continue serving in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the New Subsidiary Governing Documents of the respective entity or applicable company policy, or until any of such individual's voluntary resignation. As to Freedom Communications, only directors who are as of the Effective Date members of the New Board or full-time employees of any of the Reorganized Debtors will continue to serve, and all other directors will be deemed to have resigned as of the Effective Date. The directors as of the date hereof are identified on <u>Exhibit 6</u>.

The existing senior officers of the Subsidiary Debtors are expected to continue serving in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the New Subsidiary Governing Documents of the respective entity or applicable company policy, or until any of such individual's voluntary resignation. The officers as of the date hereof are identified on <u>Exhibit 6</u>.

The Debtors do not currently anticipate any change in the director and officer replacement or removal provisions of the existing governing documents, which provisions the Debtors believe are standard and in compliance with the requirement of Section 1123(a)(7) of the Bankruptcy Code that such provisions be consistent with the interests of creditors and equity security holders and with public policy.

**(c)      Indemnification of Directors, Officers, and Employees**

The Plan requires that upon the Effective Date, the New Freedom Governing Documents and the New Subsidiary Governing Documents will contain customary indemnification provisions for directors, officers, and other key employees (as identified by the chief executive officer of Reorganized Freedom Holdings) on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors.

**(d)      Management Incentive and Other Agreements**

On the Effective Date, Reorganized Freedom Holdings will be authorized and directed to establish and implement the New Equity Incentive Plan, substantially in the form included in the Plan Supplement, which will have terms and conditions reasonably acceptable to the Debtors and the Existing Lender Agent (in consultation with the Steering Committee Members). The New Equity Incentive Plan will reserve for issuance pursuant to awards a number of shares of New Common Stock (in the form of Class A Common Stock) up to 10% of the total number of shares of New Common Stock (i) issued and outstanding as of the Effective Date (including shares issued pursuant to the Exit Financing Share Allocation, if any) and (ii) issuable upon exercise of the Existing Lender Warrants as of the Effective Date.

The Debtors do not currently know how much of such 10% will actually be issued in the aggregate or to any single recipient, as all such decisions will be made by the New Board after the Effective Date. As the amount and timing of any issuance are uncertain, it is not possible to predict the ultimate value of the issuance. However, based on the valuation attached as Exhibit 11, 1% of the common equity is estimated to be worth $0.9 - $1.9 million, although, as described therein, this is not necessarily representative of the actual trading value of the equity reserve under the New Equity Incentive Plan.

As provided for in the Plan, members of management, employees, and directors of Reorganized Freedom Holdings and the other Reorganized Debtors will receive stock, options, or other awards under the New Equity Incentive Plan only as determined from time to time by the New Board (or an authorized committee thereof). The awards made to such recipients will be in accordance with the terms of such determinations, subject to such terms as are more specifically described in the New Equity Incentive Plan. As of the Effective Date, pursuant to the Confirmation Order and Section 303 of the Delaware General Corporation Law, the New Equity Incentive Plan will be deemed adopted by the unanimous action of the New Board and approved by the unanimous action of the stockholders of Reorganized Freedom Holdings (including, without limitation, for purposes of Section 422 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder). The foregoing sentence will not be deemed to limit the application of Section 303 of the Delaware General Corporation Law to any other corporate action taken pursuant to the Plan. The New Equity Incentive Plan may be amended or modified from time to time by the New Board in accordance with its terms and any such amendment or modification will not require an amendment of the Plan.

In addition, the Plan contemplates that the Reorganized Debtors may implement an executive incentive plan, severance plan, or other employment agreements for their senior management team and other key employees either (i) having terms and conditions agreed to by the Debtors and the Steering Committee Members and set forth in the Plan Supplement if agreed to prior to the filing thereof or presented at the Confirmation Hearing if agreed to prior to the

commencement thereof or (ii) having terms and conditions determined by the New Board or, as to any member of the management team who does not report to the New Board, as determined by the then-serving Chief Executive Officer of Reorganized Freedom Holdings or such other person as may be authorized by the New Board.  As of the date hereof there is no understanding between the Debtors and the Steering Committee Members as to any executive incentive plan, severance plan, or other employment agreement.

**5.  Post-Emergence Trade Agreements with Holders of Trade Unsecured Claims**

The Steering Committee Members have agreed to provide a mechanism for the Encumbered Debtors' continuing providers of goods and services, who are important business partners to the Encumbered Debtors, to provide value to the Reorganized Debtors by maintaining preexisting trade credit terms, in consideration of which the prepetition Claims of such providers may be paid in full or in such lesser amount as the parties may agree.  The mechanism does not apply to the Unencumbered Debtors because all prepetition Claims against such Debtors will be Reinstated under the Plan.

If the provisions of the Plan are approved by the Bankruptcy Court, then to qualify, a provider of goods or services must be the holder of an Allowed Trade Unsecured Claim.  The Plan defines a Trade Unsecured Claim as a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date from, and held by, a provider of goods or services that (a) has continued to supply such goods or services to the Encumbered Debtors during the Chapter 11 Cases and (b) becomes a party to a fully executed Post-Emergence Trade Agreement.  The term Trade Unsecured Claim does not include (i) any Claim arising from any employee or individual independent contractor relationship between any Debtor and any Person, (ii) any Claim arising from the rejection of an executory contract or unexpired lease, (iii) any Gonzalez Litigation Claim, (iv) any Non-Qualified Retirement Claim, (v) any Tort Claim, or (vi) any Subordinated Claim.  The term also excludes any Claim against the Unencumbered Debtors, which Claims are being Reinstated under the Plan.

Under the Plan, any provider of goods or services who holds a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date may be afforded the opportunity to enter into a Post-Emergence Trade Agreement, in accordance with the following procedure:

- The Encumbered Debtors will make available to all providers of goods or services, at www.loganandco.com, a Notice of Desire to Enter into Post-Emergence Trade Agreement, in which each provider will certify that (A) it holds a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date, (B) it has continued to supply such goods or services to the Encumbered Debtors during the Chapter 11 Cases, and (C) it is willing to enter into and comply with the terms of the Post-Emergence Trade Agreement.  A copy of the Notice of Desire to Enter into Post-Emergence Trade Agreement is attached to this Disclosure Statement as <u>Exhibit 8</u>.

- The deadline for returning a completed Notice of Desire to Enter into Post-Emergence Trade Agreement will be five (5) days before the Voting Deadline. **Please note that a provider who timely returns a Notice of Desire to Enter**

**into Post-Emergence Trade Agreement, and makes accurate certifications as required therein, will not automatically become the holder of a Trade Unsecured Claim. First, the provider must continue to supply goods or services through the Effective Date. Second, as set forth in the Plan and as described in the two bullet points below, the Encumbered Debtors must decide that they have a continuing need for the goods or services of the provider after the Effective Date. If the Debtors do not have a continuing need for the goods or services, they will not enter into a Post-Emergence Trade Agreement and, as a result, the provider will not become the holder of a Trade Unsecured Claim but will instead remain the holder of a General Unsecured Claim. In deciding whether to vote to accept or reject the Plan, all holders of Claims who may be eligible to become holders of Trade Unsecured Claims should assume the possibility that they ultimately may not satisfy the eligibility requirements.**

- The Encumbered Debtors will provide copies of the returned Notices of Desire to Enter into Post-Emergence Trade Agreement to the Existing Lender Agent.

- The Encumbered Debtors will determine, in their business judgment, if the Reorganized Debtors will have a continuing need for the goods or services of the provider after the Effective Date, and will so advise the Existing Lender Agent.

- If, as determined by the Encumbered Debtors in their business judgment, the Reorganized Debtors will have a continuing need for the goods or services of the provider after the Effective Date, then the Encumbered Debtors will deliver to the provider a form Post-Emergence Trade Agreement that contains the proposed terms and conditions for the provider, with a deadline for executing and returning the agreement, and will provide a copy to the Existing Lender Agent and the Creditors' Committee (subject to the existing confidentiality protocol).

- As to each provider who timely returns an executed Post-Emergence Trade Agreement, and who has continued to supply such goods or services to the Encumbered Debtors through the Confirmation Date, the Encumbered Debtors will execute the Post-Emergence Trade Agreement and return a copy to the provider of goods or services as soon as practicable between the Confirmation Date and the Effective Date. The Encumbered Debtors shall provide a copy of each executed Post-Emergence Trade Agreement to the Existing Lender Agent and the Creditors' Committee (subject to the existing confidentiality protocol).

On the Effective Date, the Trade Unsecured Claim Escrow will be established, into which the Encumbered Debtors will deposit funds in the amount of $5.5 million. The funds in the Trade Unsecured Claim Escrow will be funds that otherwise would have been distributed to the Existing Lenders as Excess Cash under the Plan, and that, as of the Effective Date and subject to the terms of this section, will constitute property of the Existing Lenders. The Existing Lenders will be deemed to have authorized the Reorganized Debtors to access funds in the Trade Unsecured Claim Escrow to make payments to holders of Allowed Trade Unsecured Claims pursuant to the terms of each such holder's Post-Emergence Trade Agreement. **The amount of the Trade Unsecured Claim Escrow may be less than the amount that would be required to pay all Claims of participating providers in full, and thus the Debtors may seek the**

**agreement of certain providers to accept less than payment in full as a condition to entering into a Post-Emergence Trade Agreement. In deciding whether to vote to accept or reject the Plan, all holders of Claims who may be eligible to become holders of Trade Unsecured Claims should assume the possibility that their Claims may not be paid in full.**

Under the terms of the Post-Emergence Trade Agreement, as soon as reasonably practicable after the latest of (i) the Effective Date and (ii) the date on which such Trade Unsecured Claim becomes an Allowed Trade Unsecured Claim, each holder of an Allowed Trade Unsecured Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Trade Unsecured Claim, Cash from the Trade Unsecured Claim Escrow equal to the amount or such portion of the Allowed Trade Unsecured Claim as the parties may agree. In the event of an agreement to pay a portion of any Allowed Trade Unsecured Claim, the remaining portion will be waived and will not participate as a General Unsecured Claim under the Plan. Claims of provider of goods or services that may become Trade Unsecured Claims are subject to the same objection and allowance process as all other Claims, as only Allowed Claims will be entitled to payment. By executing a Post-Emergence Trade Agreement, the Reorganized Debtors will not become obligated to pay any Trade Unsecured Claim or portion thereof that is not an Allowed Claim.

The Debtors will be obligated to use the full amount of the Trade Unsecured Claim Escrow, $5.5 million, to satisfy Allowed Trade Unsecured Claims.

A form Post-Emergence Trade Agreement is attached to the Plan as Exhibit E. It will also be available at www.loganandco.com.

**Providers of goods or services who may become holders of Trade Unsecured Claims pursuant to the procedures in the Plan will be holders of General Unsecured Claims in Class A4 at the time of voting and, thus, will vote as holders of General Unsecured Claims in Class A4.**

### 6.   Interim Broadcast Trust Arrangement

The prior consent of the FCC will be required for the transfer of control of the Subsidiary Debtors which hold FCC licenses (the "Broadcast Licensee Companies"), which transfer would result from implementation of the Plan and the issuance of the New Common Stock. The consent process can either take the so-called "long-form" path or an interim so-called "short-form" path followed by the later long-form.

When consent is applied for through the long-form process before the FCC, the applications for consent would be placed on public notice by the FCC and would be subject to a 30-day period during which third parties could file petitions to deny the applications. Obtaining FCC consent through such a long-form process would require at least approximately 45 days, and is likely to require considerably longer.

On the other hand, if FCC consent were sought through the short-form process before the FCC, there would be no requirement that the applications be placed on public notice for a 30-day period, and no petitions to deny could be filed against the applications, although third parties could file informal objections to the applications. Such a short-form process is used by the FCC

to grant consent to the transfer of control of FCC licensees where the change in control is not regarded as substantial by the FCC. A short-form consent process could be completed in a considerably shorter period of time than a long-form process. Obtaining FCC consent through a short-form process, as opposed to a long-form process, should enable the Effective Date to occur, and the Debtors to exit bankruptcy, at an earlier time.

The Debtors contemplate a plan in which a trust (the "Trust") will be established pursuant to a trust agreement (the "Broadcast Trust Agreement") with a trustee (the "Broadcast Trustee"), the identity of which is to be determined. The Debtors will seek the consent of the FCC, using short-form procedures, to the transfer of control of the Broadcast Licensee Companies to the Trust. On the Effective Date, the ownership interests in each of the Reorganized Licensee Companies will be issued to the Trust to be held in trust pursuant to the terms of the Broadcast Trust Agreement, of which the Subsidiary Debtors which hold direct ownership interests in the Broadcast Licensee Companies (the "Broadcast Operating Companies") will be the beneficiaries.

The Broadcast Licensee Companies are: Freedom Broadcasting of Florida Licensee, L.L.C., Freedom Broadcasting of Michigan Licensee, L.L.C., Freedom Broadcasting of New York Licensee, L.L.C., Freedom Broadcasting of Oregon Licensee, L.L.C., Freedom Broadcasting of Texas Licensee, L.L.C., and Freedom Broadcasting of Tennessee Licensee, L.L.C. The Reorganized Broadcast Licensee Companies are the Broadcast Licensee Companies from and after the Effective Date. The Broadcast Operating Companies are: Freedom Broadcasting of Florida, Inc., Freedom Broadcasting of Michigan, Inc., Freedom Broadcasting of New York, Inc., Freedom Broadcasting of Oregon, Inc., Freedom Broadcasting of Texas, Inc., and Freedom Broadcasting of Tennessee, Inc. The Reorganized Broadcast Operating Companies are the Broadcast Operating Companies from and after the Effective Date.

The Broadcast Trust Agreement will provide that the Trust and its assets, which will consist of the ownership interests in the Reorganized Broadcast Licensee Companies, will remain subject to the supervision of the Bankruptcy Court if and only to the extent necessary for the FCC to grant the "short-form" applications. The Broadcast Trust Agreement will further provide that, following receipt of required FCC consent, which would need to be obtained through long-form procedures, the Reorganized Broadcast Operating Companies will have the right to acquire from the Trust the ownership interests of the Reorganized Broadcast Licensee Companies.

In addition, the Broadcast Operating Companies and the Broadcast Trustee will enter into one or more Local Marketing Agreement(s) (each, an "LMA"), effective as of the Effective Date, which will provide that the Reorganized Broadcast Operating Companies will operate the Debtors' television broadcast stations, subject to the review, oversight and control of the Broadcast Trustee to the extent required under Federal communications laws and the rules of the FCC. Under the LMA, the Reorganized Broadcast Operating Companies will pay to the Broadcast Trustee amounts sufficient to pay the costs of FCC-required employees at each station, governmental fees and taxes, other direct costs of the Reorganized Broadcast Licensee Companies, and the amounts due to the Broadcast Trustee under the Trust. The Reorganized Broadcast Operating Companies will have the right to receive all income from the operation of the stations. The LMAs will remain in effect until the ownership interests in the Reorganized Broadcast Licensee Companies have been acquired by the Reorganized Broadcast Operating Companies.

On the Effective Date, the Existing Lender Shares (Class A Common Stock and Class B Common Stock) and Existing Lender Warrants will be issued to the Existing Lenders and, if applicable, shares of New Common Stock and Existing Lender Warrants may be issued to any recipient of an Exit Financing Share Allocation, in amounts that comply with FCC domestic and foreign ownership rules. The New Stockholders Agreement will provide for a moratorium on trading the Existing Lender Shares, any shares of New Common Stock issued pursuant to the Exit Financing Share Allocation, and the Existing Lender Warrants until FCC approval of the long-form application.

While the Debtors believe that the FCC would grant its consent to the transfer of control of the Broadcast Licensee Companies to the Trust using short-form procedures, provided that the Trust and the Reorganized Broadcast Licensee Companies remain under the supervision of the Bankruptcy Court, there can be no assurance that this would be the case. In addition, there can be no assurance that the relevant parties will be able to reach agreement on the Broadcast Trust Agreement and LMAs, or that other required steps to implement the short-form structure contemplated above can be completed. If that structure cannot be implemented, or cannot be approved by the FCC using short-form procedures, the transfer of control of the Broadcast Licensee Companies contemplated by the Plan will require the consent of the FCC using long-form procedures. The FCC is likely to take several months or longer before acting on applications for such consent using long-form procedures, which will delay the occurrence of the Effective Date.

If the FCC grants its consent to the transfer of control of the Broadcast Licensee Companies to the Trust using short-form procedures, such transfer will occur on the Effective Date. After the Effective Date, the parties will apply for long-form consent, which would allow the transfer of control from the Trust back to Reorganized Broadcast Operating Companies. After grant of the long-form consent and the closing of that transaction, the moratorium on trading the Existing Lender Shares, any shares of New Common Stock issued pursuant to the Exit Financing Share Allocation, and the Existing Lender Warrants will be lifted, subject to a limitation that the Existing Lender Shares and any shares of New Common Stock issued pursuant to the Exit Financing Share Allocation cannot be exchanged or transferred and the Existing Lender Warrants cannot be exercised if the results were to place Reorganized Freedom Holdings in violation of FCC ownership limits. In addition, after the grant of the long-form consent, the Reorganized Broadcasting Licensee Companies will grant liens, to the extent permitted by law, to secure the Term A Loan Obligations, the Term B Loan Obligations, and the Exit Facility.

## 7. Litigation Trust

As negotiated with the Creditors' Committee, the Plan creates a Litigation Trust that will be funded with Transferred Cash and Transferred Causes of Action. Transferred Cash is defined to mean Cash in the aggregate amount of $14.5 million to be transferred by the Encumbered Debtors to the Litigation Trust on the Effective Date. Transferred Causes of Action are defined to mean all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities of the Estates against the D&O Defendants that arose under applicable law prior to the Petition Date, subject to the limitations set forth in Section 5.17 of the Plan. The D&O Defendants are the current or former directors of Freedom Holdings and Freedom Communications and the current interim chief executive officer of Freedom Holdings.

On the Effective Date, the Litigation Trust will be established pursuant to the Litigation Trust Agreement for the purposes of (i) administering the Litigation Trust Assets, (ii) resolving all Claims to be treated as Class A4 Claims, and (iii) making all distributions as provided for under the Plan to the holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests (the "LT Beneficiaries") as provided for under the Plan. The Litigation Trust is intended to qualify as a liquidation trust pursuant to United States Treasury Regulation Section 301.7701-4(d). Except as expressly provided in Section 5.17(l), none of the Debtors or the Reorganized Debtors will have any liability for any cost or expense of the Litigation Trust.

The holders of Class A4 Beneficial Trust Interests will be limited to holders of Claims listed on Schedule F of the Debtors' Schedules as of the date hereof and Claims asserted in Proofs of Claim or Requests for Payment that are, or through the claims objection process become, Allowed Class A4 Claims.

On the Effective Date, in accordance with Section 1141 of the Bankruptcy Code, all of the Litigation Trust Assets, as well as the rights and powers of the Estates applicable to the Litigation Trust Assets, will automatically vest in the Litigation Trust, free and clear of all Claims and Interests for the benefit of the LT Beneficiaries. In connection with the vesting and transfer of the Litigation Trust Assets, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written or oral and including but not limited to all electronic information) relating to the Litigation Trust Assets and objections to the Class A4 Claims will vest in the Litigation Trust. The Debtors, the Reorganized Debtors, and the Litigation Trustee are authorized and required to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.

The transfer of the Litigation Trust Assets to the Litigation Trust will be made for the benefit and on behalf of the LT Beneficiaries. The Litigation Trust Assets comprising the Litigation Trust will be treated for federal income tax purposes as being transferred by the Debtors to the LT Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the LT Beneficiaries to the Litigation Trust. For federal income tax purposes, the holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests will be treated as the grantors and deemed owners of the Litigation Trust. The Litigation Trustee will file federal income tax returns for the Litigation Trust as a grantor trust under IRC Section 671 and Treasury Income Tax Regulation Section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss deductions and credits ("Tax Items"). The holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. Upon the transfer of the Litigation Trust Assets, the Litigation Trust will succeed to all of the applicable Estates' rights, title and interest in the Litigation Trust Assets and the Debtors will have no further interest in or with respect to the Litigation Trust Assets.

As soon as practicable after the Effective Date, (i) the Litigation Trustee will determine the fair market value of the Litigation Trust Assets as of the Effective Date, based on his good faith determination, and (ii) the Litigation Trustee will establish appropriate means to apprise the LT Beneficiaries of such valuation. The valuation will be used consistently by all parties (including, without limitation, the Debtors, the Litigation Trust, and the LT Beneficiaries) for all federal income tax purposes.

The Litigation Trust, acting through the Litigation Trustee, will be authorized to exercise and perform the rights, powers, and duties held by the Estate with respect to the Litigation Trust Assets, including, without limitation, the authority under Section 1123(b)(3) of the Bankruptcy Code, and will be deemed to be acting in the capacity of a bankruptcy or insolvency trustee or examiner, or a receiver for the Creditors' Committee, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Transferred Causes of Action.

The Gonzalez Class Counsel, in the exercise of its absolute discretion, will designate the Person that will be appointed by the Bankruptcy Court in the Confirmation Order to serve as the Litigation Trustee, and will file a written notice of such designation at least five (5) days prior to the Voting Deadline; *provided, however*, that in no event will the Litigation Trustee be (i) a member of the Creditors' Committee or an advisor to or affiliate of any such member or (ii) a LT Beneficiary or an advisor to or affiliate of any such LT Beneficiary.

The responsibilities of the Litigation Trustee will include, but will not be limited to: (i) prosecuting through judgment and/or settling the Transferred Causes of Action and any defense asserted by the Litigation Trust in connection with any counterclaim or cross claim asserted by the D&O Defendants against the Litigation Trust in the D&O Action, and compelling the prosecution and/or settlement of the Insurance Coverage Actions against any D&O Insurer; (ii) facilitating the prosecution and/or settlement of objections to, and estimations of, Class A4 Claims; (iii) calculating and implementing all distributions required under the Plan to be made from the Litigation Trust Assets; (iv) filing all required tax returns, and paying taxes and all other obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (v) otherwise administering the Litigation Trust; (vi) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Existing Lender Agent and Reorganized Debtors only), and providing annual reports to the LT Beneficiaries, reflecting expenditures, receipts, and distributions; (vii) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Existing Lender Agent and Reorganized Debtors only), and providing annual reports to the LT Beneficiaries, with respect to the prosecution and resolution of the Transferred Causes of Action and the objections to the Class A4 Claims; and (viii) such other responsibilities as may be vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee will maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to LT Beneficiaries contemplated or effectuated under the Plan.

The powers and authority of the Litigation Trustee, without any further approval from the Bankruptcy Court, will include, without limitation, the power, with sole authority and discretion: (i) to invest the Litigation Trust Assets, and withdraw funds of the Litigation Trust, make distributions, incur obligations for reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash, and pay taxes and other obligations owed by the Litigation Trust from funds held by the Litigation Trustee in accordance with the Plan; (ii) to engage professionals and service providers to assist the Litigation Trustee with respect to his responsibilities, including, but not limited to, any professionals employed by the Creditors' Committee; (iii) to evaluate and determine strategy with respect to the Transferred Causes of Action, the Insurance Coverage Actions, and the objections to Class A4 Claims, and to prosecute, compromise, transfer, release, abandon and/or settle the Transferred Causes of Action and the

objections to Class A4 Claims on behalf of the Litigation Trust and to compel the D&O Defendants, at the expense of the Litigation Trust, to do the same with respect to Insurance Coverage Actions against the D&O Insurers; (iv) to liquidate any remaining Litigation Trust Assets, and provide for the distributions therefrom in accordance with the provisions of the Plan; (v) to otherwise administer the Litigation Trust; (vi) to interpret the provisions of the Plan relating to the Litigation Trust in the Litigation Trustee's reasonable discretion; and (vii) to exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee, on behalf of the Litigation Trust, will have discretion to pursue, not pursue, and/or settle any and all Transferred Causes of Action and objections to Class A4 Claims as he determines to be in the best interests of the Litigation Trust, and the Litigation Trustee will have no liability whatsoever for the outcome of that decision, except in the event that there is a Final Order determining that the Litigation Trustee committed fraud, self-dealing, intentional misrepresentation, or willful misconduct. In connection with the administration of the Litigation Trust, the Litigation Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of the provisions of the Plan relating to the Litigation Trust, within the bounds of the Plan and applicable law.

The Litigation Trustee may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist him in fulfilling his obligations under the Plan, and on whatever fee arrangement he deems appropriate, including, without limitation, contingency fee arrangements. The Litigation Trustee may, but is not required to, employ professionals that were previously employed by the Creditors' Committee. Professionals engaged by the Litigation Trustee will not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. All such compensation and reimbursement will be paid from the Litigation Trust with Litigation Trust Assets. The Reorganized Debtors will have no liability therefor, except for the payment of up to $200,000 provided for in Section 5.17(l).

In addition to reimbursement for actual out-of-pocket expenses incurred by the Litigation Trustee, the Litigation Trustee will be entitled to receive reasonable compensation for services rendered on behalf of the Litigation Trust on terms to be set forth in the Litigation Trust Agreement. All such compensation and reimbursement will be paid from the Litigation Trust with Litigation Trust Assets. The Reorganized Debtors will have no liability therefor.

From time to time after the Effective Date, no later than thirty (30) days after receipt of an invoice from the Litigation Trust, the Reorganized Debtors will reimburse the Litigation Trust for reasonable fees and expenses up to, and not exceeding, an aggregate amount of $200,000 incurred in prosecution and/or settlement of objections to, and estimations of, Class A4 Claims.

The Litigation Trustee or any successor Litigation Trustee appointed pursuant to the Plan may be removed as Litigation Trustee for cause by order of the Bankruptcy Court upon motion of any holder of a Class A2 Beneficial Trust Interest or Class A4 Beneficial Trust Interest; *provided, however*, that any holder of a Class A2 Beneficial Trust Interest may seek to remove the Litigation Trustee without cause after all holders of Class A4 Beneficial Trust Interests have been paid in full by the Litigation Trustee. For purposes of this provision, cause will mean fraud, self-dealing, intentional misrepresentation, or willful misconduct. In additional, the Litigation Trustee may resign with thirty (30) days' notice served on the LT Beneficiaries and filed with the

Bankruptcy Court. In the event that the Litigation Trustee is removed, resigns, or otherwise ceases to serve as Litigation Trustee, the Gonzalez Class Counsel will appoint a successor Litigation Trustee. Any successor Litigation Trustee will be subject to the same qualifications and will have the same rights, powers, duties, and discretion, and otherwise be in the same position, as the originally named Litigation Trustee. References herein to the Litigation Trustee will be deemed to refer to the successor Litigation Trustee acting hereunder.

From and after the Effective Date, the Litigation Trustee, his firm, company, partners, officers, directors, employees, professionals, representatives, successors, and assigns (collectively, the "Trust Indemnified Parties" and each a "Trust Indemnified Party") will be, and hereby are, indemnified by the Litigation Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Trust Indemnified Party's good faith exercise of what such Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Trust Indemnified Party reasonably understands to be its duties conferred by the Litigation Trust Agreement, the Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the Transferred Causes of Action or objections to the Class A4 Claims, on and after the Effective Date. The foregoing indemnification will also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to (i) the Litigation Trust Agreement or the Plan; (ii) the services to be rendered pursuant to the Litigation Trust Agreement or the Plan; (iii) any document or information, whether verbal or written, referred to herein or supplied to the Litigation Trustee; or (iv) proceedings by or on behalf of any creditor. The Litigation Trust will, on demand, advance or pay promptly out of the Litigation Trust Assets, on behalf of each Trust Indemnified Party, reasonable attorneys' fees and other expenses and disbursements to which such Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; *provided, however*, that any Trust Indemnified Party receiving any such advance will execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Trust Indemnified Party. In any matter covered by the first two sentences of this subsection, any person entitled to indemnification will have the right to employ such person's own separate counsel reasonably acceptable to the Litigation Trustee, at the Litigation Trust's expense, subject to the foregoing terms and conditions.

To effectively investigate, prosecute, compromise, and/or settle the Transferred Causes of Action, the Insurance Coverage Actions, and the objections to Class A4 Claims on behalf of the Litigation Trust, the Litigation Trustee and its counsel and representatives must have access to all documents and information relating to the Litigation Trust Assets and the objections to the Class A4 Claims and be able to exchange such information with the Reorganized Debtors on a confidential basis and in common interest without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Given the Litigation Trust's position as successor to the Litigation Trust Assets, sharing such information between the Reorganized Debtors and the Litigation Trustee and their counsel will not waive or limit any applicable privilege or exemption from disclosure or discovery related to such information. Accordingly,

on the Effective Date, the Reorganized Debtors and the Litigation Trustee will enter into the Confidentiality and Common Interest Agreement providing for, inter alia, the Reorganized Debtors to provide reasonable access to, and the Litigation Trust will have the right to secure, at its own expense, copies of, all of the Debtors' and Reorganized Debtors' records and information relating to the Litigation Trust Assets and objections to Class A4 Claims, including, without limitation, all electronic records or documents. The Litigation Trustee will also have full and complete access to, and the right to copy at the expense of the Litigation Trust, all reports, documents, memoranda and other work product of the Debtors and the Creditors' Committee and their respective professionals and advisors related to the Litigation Trust Assets and objections to Class A4 Claims. From and after the Effective Date, the Reorganized Debtors and their officers, employees, agents, and professionals will provide reasonable cooperation during normal business hours in responding to information requests of the Litigation Trustee regarding the Litigation Trust Assets and objections to Class A4 Claims. For a period of five years after the Effective Date, or the date of termination provided in Section 5.17 of the Plan if earlier, the Reorganized Debtors will preserve all records and documents (including all electronic records or documents) related to the Transferred Causes of Action or, if any Transferred Cause of Action has been asserted in a pending action, then until such later time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved; *provided, however*, that nothing herein will or will be deemed to expand the scope of documents available, and/or require production of work product, to the Litigation Trust, that would not otherwise have been available to the Debtors or be available to the Reorganized Debtors. To the extent that the Reorganized Debtors incur out of pocket costs and expenses for travel accommodations, electronic discovery and other forensic investigation and analysis or courier and mail service in performing their obligations under Section 5.17 of the Plan or in otherwise supporting the Litigation Trust to the extent such support is required by the Litigation Trust Agreement or is otherwise requested and provided under the Confidentiality and Common Interest Agreement, the Litigation Trust will be required to reimburse the Reorganized Debtors for such actual costs and expenses within 15 days of receipt of a written invoice; *provided, however*, that if such costs and expenses are third party costs and expenses, the Reorganized Debtors may require that such costs and expenses be incurred directly, and be paid in advance, by the Litigation Trust; *provided further, howeve*r, that the Reorganized Debtors will not incur any such out of pocket cost or expense reasonably estimated to be in excess of $50 without the prior written consent of the Litigation Trust.

The Litigation Trust will not (i) execute upon any assets of the D&O Defendants or (ii) record any judgment against the D&O Defendants; *provided*, *however*, that the Litigation Trust will be entitled to recover any judgment, settlement, or other proceeds arising from or related to the Transferred Causes of Action only from the Debtors' director and officer insurance policies (the "D&O Insurance Policies") and other damages, if any, from the Debtors' director and officer insurance companies (the "D&O Insurers") related to any Insurance Coverage Action (subject to the allocation set forth in Section 5.17(v)); *provided*, *further*, that there will be no limitation on a D&O Defendant's liability in the event that the subject director or chief executive officer (i) intentionally impairs or impedes insurance coverage, (ii) intentionally attempts to cause or causes the delay of any insurance coverage or the payment thereof, or (iii) is not entitled to insurance coverage on account of his or her failure to make a timely claim under the applicable policies or failure to cooperate with the insurers.

The D&O Defendants will cooperate fully in good faith with the D&O Insurers in defense of any Transferred Cause of Action in which any D&O Defendant is a defendant (any such action, a "D&O Action") brought by the Litigation Trust. In further cooperation with the D&O Insurers in defense of any action brought by the Litigation Trust, the D&O Defendants agree to either (i) accept counsel appointed by the Primary D&O Insurer(s), (ii) retain counsel that will accept the standard, usual, and customary rates paid by the Primary D&O Insurer(s), or (iii) if the D&O Defendants wish to retain other counsel, bear responsibility to pay any excess amounts over and above those standard, usual, and customary rates. To the extent the D&O Insurers refuse to reimburse or advance the D&O Defendants for the defense of, or deny their duty to defend, any claims alleged by the Litigation Trust in a D&O Action, the D&O Defendants will be liable and responsible for their own defense of the Transferred Causes of Action except as otherwise provided in Section 5.17(t), Section 5.17(v), and Section 6.6(a) of the Plan.

The D&O Defendants (i) will defend any Insurance Coverage Action initiated by the Debtors' D&O Insurers, including if such Insurance Coverage Action is initiated as a counter or cross claim against the D&O Defendants and (ii) will file any Insurance Coverage Action as deemed appropriate by the Litigation Trust against the Debtors' D&O Insurers.

In connection with any Insurance Coverage Action, the Litigation Trust will (i) have the right to select capable and competent counsel with experience in insurance coverage and/or related litigation matters, as applicable, to represent the D&O Defendants; (ii) have the right to control the commencement, prosecution, disposition, settlement, or other resolution of the Insurance Coverage Action and (iii) be responsible for all costs and attorney's fees incurred by the D&O Defendants in connection with the prosecution or defense of such actions by counsel selected by the Litigation Trust. Additionally, the D&O Defendants will cooperate fully and in good faith with the Litigation Trust in pursuing or defending any Insurance Coverage Action, if necessary, and as applicable. Subject to the applicable cooperation clauses in the D&O Insurance Policies, the D&O Defendants further agree to waive any and all actual or potential conflicts of interest so as to allow the D&O Defendants to be represented by one law firm in each of (i) any and all Insurance Coverage Actions and (ii) any and all D&O Actions; and will execute any necessary waivers or other documents reflecting such agreement upon request; *provided, however*, that such waiver will not be required to the extent not permitted or authorized under applicable law or the applicable D&O Insurance Policies or as to which the D&O Insurers assert that such waiver will either vitiate coverage or constitute a failure to cooperate under the D&O Insurance Policies.

Upon service of the complaint in a D&O Action, the D&O Defendants will immediately tender their defense to the primary D&O Insurer(s) or such other D&O Insurer(s) which, pursuant to the applicable D&O Insurance Policies, becomes obligated to defend the D&O Defendants in the D&O Action or to advance or reimburse the D&O Defendants their costs and expenses incurred in defending the D&O Action (the "Primary D&O Insurer") and will give notice of such complaint to the other D&O Insurers. The Litigation Trust will not prosecute any D&O Action until the earlier of (i) the D&O Insurers providing a written statement (the "Coverage Statement") to the D&O Defendants as to whether they will reimburse or advance the D&O Defendants for the defense of, or defend, the D&O Action or (ii) 30 days following the date on which the D&O Defendants tender their defense to the D&O Insurers. Once a Coverage Statement is issued, (x) if the Coverage Statement states that the D&O Insurers will reimburse or advance the D&O Defendants for 90% or more of the costs and expenses of defending the D&O

Action, or that the Primary D&O Insurer will assume a duty to defend the D&O Action, even if such statement indicates that reimbursement, advancement or defense by the D&O Insurers is subject to a reservation of rights, then the Litigation Trust may proceed with prosecution of the D&O Action and (y) if the Coverage Statement states that the D&O Insurers will reimburse or advance the D&O Defendants for less than 90% of the costs and expenses of defending the D&O Action (a "Coverage Denial"), the Litigation Trust will stay the D&O Action as to all causes of action for which such advancement or reimbursement was denied until the earlier of a summary adjudication by a trial court pursuant to the three points below or a settlement in an Insurance Coverage Action on the issue of the D&O Insurers' obligations to reimburse or advance the D&O Defendants for the defense of, or the Primary D&O Insurer's obligation to defend, the D&O Action (the "Duty to Defend Issue"), subject to the following conditions (the "Conditions to Stay"):

- Pursuant to the terms and provisions in Section 5.17(s) of the Plan, the Litigation Trust authorizes and the D&O Defendants (through counsel) file an Insurance Coverage Action against the D&O Insurers within 30 days of receipt by the D&O Defendants of a Coverage Denial;

- the D&O Defendants authorize counsel to file a motion for summary judgment or adjudication on the Duty to Defend Issue within 60 days of the filing of the Insurance Coverage Action. Such counsel will be authorized to set the motion for summary judgment or adjudication for the earliest possible hearing date, pursuant to minimum statutory notice requirements, and on the earliest court date available for the trial court; and

- the D&O Defendants do not authorize counsel to, and do not on their own, stipulate or agree to continue the hearing or any other litigation deadlines related to the motion for summary judgment or adjudication.

In the event of a Coverage Denial, so long as the D&O Defendants comply with the Conditions to Stay, the stay of any D&O Action as to causes of action for which advancement or reimbursement was denied will remain in effect until settlement or summary adjudication on the Duty to Defend Issue or, if the trial court denies summary adjudication on the ground that further proceedings are necessary to resolve the Duty to Defend Issue, until a subsequent order or judgment from the trial court on the Duty to Defend Issue (such settlement, summary adjudication or subsequent order or judgment, a "Trial Court Disposition"); *provided, however*, that if the Trial Court Disposition concludes that the D&O Insurers are obligated to reimburse or advance the D&O Defendants for less than 10% of the costs and expenses of defending the D&O Action, or that the Primary D&O Insurer does not have an obligation to defend the D&O Action, then the D&O Action will be stayed pending appeal of the Trial Court Disposition on the Duty to Defend Issue and will not be terminated until a court of competent jurisdiction issues a final non-appealable judgment (or if the parties reach a settlement) obligating the D&O Insurers to reimburse or advance the D&O Defendants for the defense of, or obligating the Primary D&O Insurer to defend, one or more of the claims alleged by the Litigation Trust. If the Litigation Trust and any D&O Insurer reach a settlement that provides that such D&O Insurer has no obligation to reimburse or advance the D&O Defendants for the defense of, or to defend, one or more (but not all) claims alleged by the Litigation Trust, such settled claims will be dismissed by the Litigation Trust. For the avoidance of doubt, in the event of a Coverage Denial, the Litigation Trust may proceed with a D&O Action prior to a Trial Court Disposition only if the

Litigation Trust dismisses or stays those claims for which the D&O Insurers have denied coverage. If any D&O Defendant fails to comply with any of the above Conditions to Stay, the stay of the action against the D&O Defendants will be lifted. The Litigation Trust will not, directly or indirectly, direct, encourage or otherwise cause counsel selected to represent any of the D&O Defendants in connection with the Insurance Coverage Action to fail to comply with any of the deadlines described above as a Condition to Stay; *provided, however*, that the Litigation Trust may also, in its sole discretion, stipulate to extend the stay of the action against the D&O Defendants beyond the dates set forth above for any reason. The Litigation Trust will provide written notice of any Trial Court Disposition to Reorganized Freedom Holdings. In the event any Trial Court Disposition determines that the D&O Insurers have no obligation to reimburse or advance the D&O Defendants for the defense of, or that the Primary D&O Insurer has no obligation to defend, one or more claims alleged by the Litigation Trust, the Litigation Trust will advise Reorganized Freedom Holdings in such written notice as to whether the Litigation Trust will appeal such Trial Court Disposition.

The duties, responsibilities, and powers of the Litigation Trustee will terminate in accordance with the terms of the Litigation Trust Agreement after all of the Litigation Trust Assets have been liquidated and after all distributions have been made to the LT Beneficiaries.

The proceeds from any Insurance Coverage Action, whether by settlement, judgment or otherwise, will be applied (i) first, to reimburse the Litigation Trust for any costs, expenses or attorney's fees incurred by the Litigation Trust in prosecuting such Insurance Coverage Action, (ii) next, to reimburse the D&O Defendants for any costs, expenses and attorney's fees advanced or reimbursed on behalf of the D&O Defendants in defense of any D&O Action (other than amounts to be paid by the D&O Defendants pursuant to Section 5.17(q)(iii)), subject to the requirements of Section 6.6, and (iii) finally, the balance of any such proceeds will be delivered to and will be the sole property of the Litigation Trust to be distributed to the LT Beneficiaries in accordance with the terms of the Plan.

## 8. Plan Supplement, Effectuating Documents, and Further Transactions

The primary documents pursuant to which the Plan will be implemented will be included in the Plan Supplement, including:

- the Term A Facility,
- the Term B Facility,
- the Intercreditor Agreement,
- the New Freedom Charter,
- the New Freedom By-Laws,
- the Exit Facility (or term sheet therefor),
- the New Equity Incentive Plan,
- the New Stockholders Agreement,
- the Registration Rights Agreement,
- the Existing Lender Warrant Agreement,
- the Broadcast Trust Agreement,
- the Local Marketing Agreement,
- the Litigation Trust Agreement, and
- the Confidentiality and Common Interest Agreement.

In addition, the Plan Supplement will include the terms and conditions for an executive incentive plan, severance plan, or other employment agreements for their senior management team and key employees if then agreed to by the Debtors and the Steering Committee Members.

The Plan Supplement will be filed with the Clerk of the Bankruptcy Court at least five (5) days prior to the Voting Deadline. Upon such filing, all documents included in the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours or may be accessed online at www.deb.uscourts.gov (cm/ecf) or www.loganandco.com.

The chief executive officer, the president, the chief financial officer, the general counsel or any other appropriate officer of Freedom Holdings, or any applicable Debtor, or any of the Reorganized Debtors, as the case may be, will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of Freedom Holdings, or any applicable Debtor, or any of the Reorganized Debtors, as the case may be, will be authorized to certify or attest to any of the foregoing actions.

On the Effective Date, the adoption and filing of the New Freedom Governing Documents, the appointment of the New Board, the adoption of the New Equity Incentive Plan, and all actions contemplated or necessary to implement the transactions described in the Plan will be authorized and approved in all respects pursuant to the Plan. All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the board of directors of the Reorganized Debtors are authorized and directed to issue execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations or consents except for express consents required under the Plan. Without limiting the foregoing, the New Equity Incentive Plan will be deemed to have been unanimously approved by the stockholders of Reorganized Freedom Holdings pursuant to Section 303 of the Delaware General Corporation Law.

## 9.    Exemption from Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Liens granted by the Debtors to secure the Exit Facility, the Term A Facility, and the Term B Facility, will not be taxed under any law imposing a stamp tax or other similar tax. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

## 10.  Retained Litigation Rights

Retained Litigation Rights are defined in the Plan as all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that are property of the Estates, whether arising under the Bankruptcy Code or non-bankruptcy law that are not (a) Released Causes of Action or (b) Transferred Causes of Action.  Released Causes of Action are all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that are released, waived, and discharged pursuant to Section 11.9(a) of the Plan or pursuant to any agreement, contract, instrument, release, or document entered into in connection with the Plan (including the Mutual Release Agreement).  Transferred Causes of Action are all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities of the Estates against the D&O Defendants that arose under applicable law prior to the Petition Date, subject to the limitations set forth in Section 5.17 of the Plan.

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, each Debtor or Reorganized Debtor will retain all of their respective Retained Litigation Rights that such Debtor or Reorganized Debtor may hold against any Person.  Each Debtor or Reorganized Debtor will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Retained Litigation Rights.  Each Debtor or Reorganized Debtor or their respective successor(s) may pursue such Retained Litigation Rights as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan.

## 11.  Approval of Compromises and Settlements Embodied in Plan

The terms of the Plan represent compromises and settlements of certain issues among the Debtors, the Existing Lender Agent (in consultation with the Steering Committee Members), the Creditors' Committee, and the Gonzalez Class Counsel (for themselves and on behalf of the holders of the Gonzalez Litigation Claims), including, without limitation, the following: (a) allegations against the Existing Lenders of aiding and abetting a breach of fiduciary duty, avoidance and recovery of $160 million in alleged wrongful prepetition transfers (as insiders of the Debtors), and avoidance as a fraudulent transfer of the liens granted to the Existing Lenders as part of the recapitalization that occurred in 2004; (b) objections by the Creditors Committee and the Gonzalez Plaintiffs to the fees sought by Houlihan for its services as financial advisor to the Debtors; and (c) disputes over the merits and amount of the Gonzalez Litigation Claims.

In addition, the provisions of the Plan relating to the Litigation Trust provide an agreed means for addressing the allegations against the Debtors' directors and officers of breach of fiduciary duty.

To the extent necessary, the Plan is deemed to be a motion for approval of the compromises and settlements.  The Debtors believe that the compromises and settlements are fair and equitable and within the bounds of reasonableness, and will so demonstrate at the Confirmation Hearing.

E.     **Treatment of Executory Contracts and Unexpired Leases**

1.     **Assumption of Executory Contracts and Unexpired Leases.**

The Debtors may file motions seeking to assume executory contracts and unexpired leases.  In addition, pursuant to the procedure outlined in the Plan, the Debtors may use the Contract/Lease Schedules to assume contracts and leases.  The Contract/Lease Schedules are schedules that  identify the executory contracts and unexpired leases to be assumed under the Plan and set forth any Cure obligation associated with the assumption of such contracts and leases.

As provided for in the Plan, on the Effective Date, in addition to all executory contracts and unexpired leases that have been previously assumed by the Debtors by order of the Bankruptcy Court, all executory contracts and unexpired leases of the Debtors listed on the Contract/Lease Schedules will be deemed assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  On or before the day that is ten (10) days before the Voting Deadline, the Debtors will file the Contract/Lease Schedules; *provided, however*, that the Debtors reserve the right to amend the Contract/Lease Schedules at any time prior to the Effective Date.  The Debtors will provide notice of any amendments to the Contract/Lease Schedules to the parties to the executory contracts and unexpired leases affected thereby and to the Creditors' Committee.

To the extent applicable, all executory contracts or unexpired leases of Reorganized Debtors assumed pursuant to the Plan will be deemed modified such that the transactions contemplated by the Plan will not be a "change of control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease will be deemed satisfied by the Confirmation of the Plan.

Each executory contract and unexpired lease assumed pursuant to the Plan (or pursuant to other Bankruptcy Court order) will remain in full force and effect and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

 In the event that any license granted to the Debtors by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtors, such license will be deemed to be assumed pursuant to Section 365 of the Bankruptcy Code under the Plan; *provided, however*, that the assumption of the licenses issued by the FCC will be subject to compliance with the rules and regulations of the FCC.

Continuing obligations of third parties to the Debtors under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, will continue and will be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically

terminated by the Debtors or by order of Bankruptcy Court. The deemed rejection provided by the Plan will not apply to any such continuing obligations.

To the extent any insurance policy under which the insurer has a continuing obligation to pay the Debtors or a third party on behalf of the Debtors is held by the Bankruptcy Court to be an executory contract and is not otherwise assumed upon motion by a Final Order, such insurance policy will be treated as though it is an executory contract that is assumed pursuant to Section 365 of the Bankruptcy Code under the Plan. Any and all Claims (including Cure) arising under or related to any insurance policies or related insurance agreements that are assumed by the Debtors prior to or as of the Effective Date: (i) will not be discharged; (ii) will be Allowed Administrative Claims; and (iii) will be paid in full in the ordinary course of business of the Reorganized Debtors as set forth in the Plan.

## 2. Cure of Defaults for Assumed Contracts and Leases

Any monetary Cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the later of (a) the Effective Date (or as soon as practicable thereafter), (b) as due in the ordinary course of business or (c) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree. In the event of a dispute regarding: (i) the amount of any Cure payments, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

The Debtors will list Cure amounts for executory contracts and unexpired leases on the Contract/Lease Schedules. The failure of any non-Debtor party to an executory contract or unexpired lease to file and serve an objection to the Cure amount listed on the Contract/Lease Schedules for such party's contract or lease by the deadline set forth on the Contract/Lease Schedules will be deemed consent to such Cure amount; *provided, however*, that prior to entry of a Final Order approving the assumption of an executory contract or unexpired lease, the Debtors will be authorized to reject any executory contract or unexpired lease to the extent the Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by the Bankruptcy Court renders assumption of such executory contract or unexpired lease unfavorable to the Estates.

## 3. Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor will be deemed to have rejected each prepetition executory contract and unexpired lease to which it is a party unless such contract or lease (i) is listed on the Contract/Lease Schedules as of the Confirmation Date, (ii) was previously assumed or rejected upon motion by a Final Order, (iii) previously expired or terminated pursuant to its own terms, or (iv) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of

the Bankruptcy Code approving the rejection of the prepetition executory contracts and unexpired leases described above, as of the Effective Date.

### 4. Rejection Damage Claim Bar Date for Rejections Pursuant to Plan

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim will be forever barred and will not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the claims agent and served upon counsel to the Reorganized Debtors and the Litigation Trustee within thirty (30) days after entry of the Confirmation Order. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease must be evidenced by a Proof of Claim filed by earlier applicable bar dates, or otherwise Allowed, and if not will be barred and unenforceable unless otherwise ordered by the Bankruptcy Court.

The Debtors intend to provide notice of the entry of the Confirmation Order, which will include notice of the rejection damage claim bar date, to all parties in interest, including all known counterparties to their executory contracts and unexpired leases.

### 5. Employee Compensation and Benefit Programs

#### (a) Continuing Programs

Except to the extent (i) otherwise provided for in the Plan (including, without limitation, otherwise provided in subparagraphs (d) and (f) of Section 6.5 of the Plan and in Section 6.6 of the Plan), (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation, benefit, and expense reimbursement programs, plans, policies, and agreements of the Debtors in effect during the pendency of the Chapter 11 Cases, including all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all benefits subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Cases, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan. However, the Plan specifically excepts from the foregoing the unpaid compensation and severance Claims that were not authorized to be paid under the First Day Employee Order. There is one such unpaid compensation Claim, which was not authorized to be paid under the First Day Employee Order to the extent it exceeded $10,950, and which will be treated as a General Unsecured Claim.  In addition, there are eight unpaid severance Claims, two of which are held by former employees who received no severance benefits after the Petition Date, and six of which are held by former employees who received partial payments after the Petition Date based on authorization that was initially granted by the Bankruptcy Court and then discontinued by the Debtors to avoid a challenge by the Creditors' Committee.  The unpaid severance Claims may be treated as Other Priority Claims or as General Unsecured Claims, to the extent applicable. Except as expressly provided in the Plan, nothing contained in the Plan will be deemed to modify the existing terms of any such employee compensation, benefit, and expense reimbursement program, plan, policy, or agreement, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

With certain exceptions, the Debtors intend to continue to offer their employees the full-range of compensation, benefit, and expense reimbursement programs offered prior to the Petition Date. The Debtors believe that all such programs are standard within the business community and necessary to remain competitive within their industry and communities. The success of the Debtors' restructuring is dependent upon the continuing dedication and support of their workforce.

### (b)    Qualified Pension Plan

Subject to the rights of the Debtors and the Reorganized Debtors to terminate or amend as provided for in the Plan, the Debtors will continue after the Effective Date the Retirement Plan, the qualified defined benefit pension plan covered by Title IV of ERISA, maintained by the Debtors. As part of the continuation of the Retirement Plan, subject to any such termination or amendment, the Reorganized Debtors will meet the minimum funding standards under ERISA and the Internal Revenue Code, pay all insurance premiums owed to the PBGC, and administer and operate the Retirement Plan in accordance with its terms and ERISA. Nothing in the Plan is intended to release or discharge any statutory liability or obligation of the Debtors or the Reorganized Debtors with respect to the PBGC or the Retirement Plan. Neither the PBGC nor the Retirement Plan will be enjoined or precluded from enforcing such liability as a result of the Plan.

### (c)    Workers' Compensation Benefits

In accordance with the authority provided by the First Day Employee Order, the Debtors will, in the ordinary course of business, pay all valid prepetition claims, assessments and premiums arising under their workers' compensation program.

### (d)    Non-Qualified Retirement Plans

The Non-Qualified DC Plan, the Non-Qualified EB Plan, and the Individual Retirement Agreements will be treated as set forth in Section 3.2(e) of the Plan. To the extent the Non-Qualified DC Plan, Non-Qualified EB Plan, or any of the Individual Retirement Agreements are considered to be executory contracts, such Non-Qualified DC Plan, Non-Qualified EB Plan, or the Individual Retirement Agreements, will be deemed to be assumed as modified by the Plan pursuant to Section 365 of the Bankruptcy Code under the Plan. Any Claims under the Non-Qualified DC Plan, Non-Qualified EB Plan, and the Individual Retirement Agreements will be treated as Non-Qualified Retirement Claims.

### (e)    Collective Bargaining Agreements

The Debtors' prepetition collective bargaining agreements will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

### (f)    Stock-Based Plans

As of the Effective Date, any and all stock based incentive plans or stock ownership plans of the Debtors entered into before the Effective Date (including, without limitation, the Freedom Holdings 2004 Long-Term Incentive Plan (as amended and restated) and the Freedom Holdings 2008 Restricted Stock Unit Award Plan), or other agreements or documents giving rise to Old

Freedom Stock Rights, will be terminated. To the extent such plans, agreements, or documents are considered to be executory contracts, such plans, agreements, or documents will be deemed to be, and will be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan.

### (g) Health Benefits for Certain Retired Employees

To the extent that a retired employee of the Debtors, or a spouse or surviving spouse of such a retired employee, was provided health benefits as of the Petition Date under the Debtors' self-funded group health plan for active employees of the Debtors, and the health insurance policy maintained under the Debtors' Executive Medical Reimbursement Plan (the "EMRP") pursuant to any prepetition agreement with the Debtors, the Reorganized Debtors will continue to provide health benefits to such retired employees, spouses, and surviving spouses, notwithstanding the rejection of any such prepetition agreement, to the extent that the Reorganized Debtors continue to provide health benefits under the Reorganized Debtors' group health plan, the EMRP, or by other means to their active employees as a whole on or after the Effective Date. The continued health benefits provided to the retired employees, spouses, and surviving spouses will be subject to any applicable laws. On and after the Effective Date, such retired employees, spouses, and surviving spouses will have no greater or lesser rights to health benefits than the rights of the active employees as a whole participating in the Reorganized Debtors' group health plan or the EMRP or receiving health benefits on any other basis, including by contract; *provided, however*, that any such retired employee, spouse, or surviving spouse will not be treated as having lesser rights by reason of receiving primary coverage under Medicare and secondary coverage under the Debtors' group health plan, EMRP, or other health benefits plan. Nothing herein will restrict or limit the rights of the Reorganized Debtors to modify or terminate the Reorganized Debtors' group health plan, the EMRP, or any other health benefits plan or agreement of the Reorganized Debtors at any time in anyway for active employees, and the rights of the Reorganized Debtors to so modify or terminate the Debtors' group health plan, the EMRP, or any other health benefits plan or agreement of the Reorganized Debtors on or after the Effective Date will be reserved. If the Reorganized Debtors' group health plan or the EMRP, or any other health benefits plan or agreement of the Reorganized Debtors, or any benefits provided thereunder, are modified or terminated as to active employees of the Reorganized Debtors, the benefits provided to such retired employees, spouses, and surviving spouses will be similarly modified or terminated, and the Reorganized Debtors will have no obligation to provide such retired employees, spouses, or surviving spouses with any health benefits that are eliminated or decreased as a result of any such modification or termination; *provided, however*, that if such health plan or the EMRP (or any successor plan that is equivalent to or superior to the health plan or the EMRP being provided to active employees of the Reorganized Debtors as of the Effective Date) is being provided to any active employees of the Reorganized Debtors, then such health plan or the EMRP as in effect on the Effective Date will continue to be provided to such retired employees, spouses or surviving spouses. In no event will any retired employee, spouse, or surviving spouse be entitled on or after the Effective Date to any rights or benefits that exceed the rights or benefits provided to such retired employee, spouse, or surviving spouse under the applicable prepetition agreement and, to the extent provided under such prepetition agreement, such retired employee, spouse, or surviving spouse will be required to maintain Medicare coverage at his or her expense as a condition to receiving health benefits from the Reorganized Debtors on and after the Effective Date. Any and all

Claims of the retired employees, spouses, and surviving spouses for health benefits pursuant to any prepetition agreement will be deemed satisfied in full by the provisions of this subsection.

**6. Indemnification Obligations**

Indemnification Obligations include any obligation of any of the Debtors to indemnify, reimburse, or provide contribution to a Person arising pursuant to by-laws, articles or certificate of incorporation, contract, or otherwise.

The Plan provides that all Indemnification Obligations owed to any person who was a director, officer, or employee of the Debtors serving immediately prior to the Effective Date, other than any such director, officer, or employee that is a D&O Defendant (with respect to any Transferred Cause of Action only), will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order). In no event, however, will any Reorganized Debtor be required to indemnify any such director, officer, or employee to a greater extent than is provided under the charter, bylaws, or similar governing document of such Debtor in effect as of immediately prior to the Effective Date or permitted under the Delaware General Corporation Law (or other applicable law governing indemnities for such Debtor).

All Indemnification Obligations owed to any person who was a former director, officer, or employee of the Debtors immediately prior to the Effective Date will be deemed to be, and will be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order).

All Indemnification Obligations owed to any of the D&O Defendants with respect to an Insurance Coverage Action or Transferred Causes of Action only will be deemed to be, and will be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order); *provided, however*, that if, and to the extent that (i) the D&O Insurers do not reimburse or advance all or a portion of the costs, expenses, or attorney's fees incurred by the D&O Defendants in defense of a D&O Action, and such D&O Action proceeds in accordance with the terms of Section 5.17 or (ii) the D&O Insurers advance on behalf of the D&O Defendants any of the costs, expenses, or attorney's fees incurred by the D&O Defendants in defense of the D&O Action subject to a reservation of rights, and a court of competent jurisdiction subsequently determines that the D&O Defendants must reimburse the D&O Insurers for all or a portion of the advancement or prior reimbursement of such costs, expenses and attorney's fees, then Reorganized Freedom Holdings will reimburse the D&O Defendants from and, where applicable, advance on behalf of the D&O Defendants, such reasonable costs, expenses, and attorney's fees incurred by the D&O Defendants and not reimbursed by the D&O Insurers in defense of the D&O Action (the "<u>Defense Expenses</u>"); *provided further, however*, that Reorganized Freedom Holdings will not advance Defense Expenses to a D&O Defendant unless such D&O Defendant, pursuant to applicable law, will deliver to Reorganized Freedom Holdings an undertaking, by or on behalf of such D&O Defendant, to repay all amounts so advanced if it will ultimately be determined that such person is not entitled to be indemnified against such Defense Expenses pursuant to the Plan; *provided further, however*, that in the event

it is later determined, by agreement, settlement, judgment, or otherwise, that the D&O Defendants were entitled to reimbursement of such Defense Expenses by the D&O Insurers, the D&O Defendants will hold in trust and forthwith turn over any proceeds from an Insurance Coverage Action first to repay Reorganized Freedom Holdings for Defense Expenses advanced or reimbursed by Reorganized Freedom Holdings. In no event will the reimbursement or advancement of Defense Expenses by Reorganized Freedom Holdings under this paragraph (a) exceed $500,000 in the aggregate. Notwithstanding the foregoing, in no event will Reorganized Freedom Holdings reimburse or advance the D&O Defendants to a greater extent than is provided under the Amended and Restated Certificate of Incorporation of Freedom Holdings or permitted under the Delaware General Corporation Law. Any reimbursement or advancement of Defense Expenses by Reorganized Freedom Holdings will be allocated pro rata among the D&O Defendants based on each D&O Defendant's proportionate share of the Defense Expenses. In no event will the Litigation Trust be responsible for reimbursement of any Defense Expenses.

All Indemnification Obligations arising under the Existing Credit Agreement Documents in favor of the Existing Lender Agent, the Existing Lenders, and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, will survive, remain in full force and effect, and be enforceable against the Reorganized Debtors after the Effective Date.

### 7. Insurance Rights

Notwithstanding anything to the contrary in the Plan or the Plan Supplement, nothing in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening) will in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights of the Debtors' insurers, if any, in any respect. The rights of the Debtors' insurers will be determined under their respective insurance policies and any related agreements with the Debtors, as applicable, subject, however, to the rights, if any, of the Debtors to assume or reject any such policy or agreement and the consequences of such assumption or rejection under Section 365 of the Bankruptcy Code.

### 8. Limited Extension of Time to Assume or Reject

Notwithstanding anything set forth in the Plan, and except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor), in the event of a dispute as to whether a contract is executory or a lease is unexpired, Debtors' right to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed rejection provided for in the Plan will not apply to any such contract or lease, and any such contract or lease will be assumed or rejected only upon motion of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

Except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor), in the event the Debtors or the Reorganized Debtors become aware after the Confirmation Date of the existence of an executory contract or unexpired lease that was not included in the Contract/Lease Schedules, the right of the Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after the date on which the Debtors or the Reorganized

Debtors become aware of the existence of such contract or lease. The deemed rejection provided for in the Plan will not apply to any such contract or lease unless a motion to assume or reject is not filed within such (30) day period.

## F. Provisions Regarding Distributions

### 1. Allowance Requirement

Only holders of Allowed Claims and Interests are entitled to receive distributions under the Plan.

An Allowed Administration Claim is an Administrative Claim that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become allowed by failure to object pursuant to the Plan.

As to all other types of Claims, an Allowed Claim is a Claim (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) as to which (x) no Proof of Claim has been filed with the Bankruptcy Court and (y) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (iii) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (x) at the time of the applicable initial Distribution Date, the Reorganized Debtors or the Litigation Trustee, as applicable, have not identified such Claim as being objectionable in whole or part and no objection to the allowance thereof has been filed by the applicable Claims Objection Deadline, or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan

An Allowed Interest is an Interest held in the name, kind, and amount set forth on the stock records retained by the applicable Debtor.

### 2. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims as of the applicable Distribution Date will be made on or as soon as practicable after the applicable Distribution Date. Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date will be made pursuant to the Plan. The Reorganized Debtors will have the right, in their discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant, except that any such acceleration with respect to payments to be made from the Litigation Trust will be made only with the consent of the Litigation Trustee.

### 3. Disbursing Agent

The Debtors will, in their sole discretion, designate the Person to serve as the Disbursing Agent under the Plan, and will file a written notice of such designation at least five (5) days before the Voting Deadline. Reorganized Freedom Holdings may elect to serve as the Disbursing

Agent in lieu of an independent third party. Unless otherwise provided in the Plan, the Disbursing Agent will make all distributions required to be made on the respective Distribution Date under the Plan, except that payments made to holders of Existing Lender Claims and General Unsecured Claims from the Litigation Trust will be made by the Litigation Trustee and payments made to holders of Trade Unsecured Claims under the terms of each such holder's Post-Emergence Trade Agreement will be made by the Reorganized Debtors from the Trade Unsecured Claim Escrow. If the Disbursing Agent is an independent third party designated by the Debtors to serve in such capacity, such Disbursing Agent will receive from the Debtors or the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services, on any agreed terms. No Disbursing Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

If the Disbursing Agent is an independent third party, the Litigation Trustee and such third party may agree separately that such third party will also make distributions on behalf of the Litigation Trustee from the Litigation Trust. In that event, the Litigation Trustee will be responsible to pay such third party reasonable compensation for distribution services rendered to the Litigation Trust and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services, on any agreed terms. Any requirement for a bond, surety or other security for the performance of distribution services will be subject to the agreement of such third party and the Litigation Trustee. In no event will the Reorganized Debtors have any liability for the cost any bond, surety or other security or any liability or responsibility for any actions or inactions of the third party while acting on behalf of the Litigation Trustee.

## 4. Delivery of Distributions

Distributions to holders of Allowed Claims will be made by the Disbursing Agent or the Litigation Trustee, as applicable, (a) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtors, the claims agent, the Disbursing Agent, and the Litigation Trustee have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtors, the claims agent, the Disbursing Agent, and the Litigation Trustee after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and a written notice of a change of address has not been received by the Debtors, the claims agent, the Disbursing Agent, or the Litigation Trustee, or (d) in the case of an Existing Lender Claim, at the addresses provided by the Existing Lenders.

TO THE EXTENT THAT ADDRESSES ARE REQUIRED TO EFFECT DISTRIBUTIONS TO THE EXISTING LENDERS, EACH EXISTING LENDER IS RESPONSIBLE FOR PROVIDING TO THE EXISTING LENDER AGENT AND TO THE DEBTORS AND THE LITIGATION TRUSTEE WRITTEN INSTRUCTIONS AS TO THE ADDRESS AT WHICH SUCH LENDER DESIRES TO RECEIVE PLAN DISTRIBUTIONS. DISTRIBUTIONS WILL BE HELD PENDING RECEIPT OF SUCH WRITTEN INSTRUCTIONS.

### 5. Undeliverable Distributions

If any holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the Disbursing Agent or the Litigation Trustee, as applicable, is notified by the Debtors, the claims agent, or such holder of such holder's then current address, at which time all missed distributions will be made to such holder without interest. If any distribution is made by check and such check is not returned but remains uncashed for six (6) months after the date of such check, the Disbursing Agent or the Litigation Trustee, as applicable, may cancel and void such check, and the distribution with respect thereto will be deemed undeliverable. If any holder is requested to provide a taxpayer identification number or to otherwise satisfy any tax withholding requirements with respect to a distribution and such holder fails to do within six (6) months of the date of such request, such holder's distribution will be deemed undeliverable.

With respect to distributions to be made by the Disbursing Agent, unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of returned or otherwise undeliverable or unclaimed distributions made by the Disbursing Agent will be returned to the Reorganized Debtors until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (a) on or before the first (1st) anniversary of the Effective Date or (b) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property will revert to the Reorganized Debtors free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. In the event of a timely claim for any returned or otherwise undeliverable or unclaimed distribution, the Reorganized Debtors will deliver the applicable distribution amount or property to the Disbursing Agent for distribution pursuant to the Plan. Nothing contained in the Plan will require any Debtor, any Reorganized Debtor, or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

With respect to distributions to be made by the Litigation Trustee, amounts in respect of returned or otherwise undeliverable or unclaimed distributions will be retained in the Litigation Trust until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (a) on or before the first (1st) anniversary of the Effective Date or (b) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property will revert to the Litigation Trust free of the claims of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan will require any Debtor, any Reorganized Debtor, or the Litigation Trustee to attempt to locate any holder of an Allowed Claim.

### 6. Distributions to Holders as of the Distribution Record Date

The Distribution Record Date is the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims. For holders of Existing Lender Claims, the Distribution Record Date is the date to be agreed by the Debtors and the Existing Lender Agent. For holders of all other Claims, the Distribution Record Date is the Business Day immediately preceding the Effective Date, at 5:00 p.m. (Eastern Time) on such Business Day.

As to Existing Lender Claims, at the close of business on the Distribution Record Date, the register maintained by the Existing Lender Agent will be closed and there will be no further changes in the listed holders of the Existing Lender Claims for purposes of distributions under the Plan. As to all other Claims, at the close of business on the Distribution Record Date, the claims register maintained by the claims agent will be closed and there will be no further changes in the listed holders of the Claims. Only holders of Claims as of the Distribution Record Date will be recognized and dealt with for distribution and all other purposes under the Plan.

### 7. De Minimis Distributions

None of the Reorganized Debtors, the Disbursing Agent, or the Litigation Trustee will have any obligation to make a Cash distribution with respect to any Claim (other than a Claim held by an Existing Lender) if the amount of the distribution is less than $20.00. The Claim of any holder (other than an Existing Lender) whose distribution is in an amount less than $20.00 will be discharged, and such holder will be forever barred from asserting such Claim against the Reorganized Debtors or their respective property; *provided, however*, that if the Claim is a Class A4 Claim, (a) it will be included, regardless of amount, in all allocations made to determine distribution entitlements and (b) it will not be discharged until all subsequent distributions under the Plan have been made, although any such subsequent distribution will be subject to the $20.00 limitation above. Except with respect to distributions from the Litigation Trust, any Cash not distributed as a result of this provision will be the property of the Reorganized Debtors, free of any restrictions, and any such Cash held by the Disbursing Agent will be returned to the Reorganized Debtors following the Distribution Date that would have applied to any such distribution. For distributions from the Litigation Trust, any Cash not distributed as a result of this provision will be the property of the Litigation Trust.

### 8. Fractional Securities; Fractional Dollars

No fractional shares of New Common Stock or Existing Lender Warrants will be issued or distributed under the Plan. Each Person entitled to receive New Common Stock or Existing Lender Warrants will receive the total number of whole shares of New Common Stock and/or Existing Lender Warrants to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of New Common Stock or Existing Lender Warrants, the actual distribution of shares of such stock or warrants will be rounded to the next higher or lower whole number as follows: (a) fractions one-half (½) or greater will be rounded to the next higher whole number and (b) fractions of less than one-half (½) will be rounded to the next lower whole number. Notwithstanding the foregoing, whenever rounding to the next lower whole number would result in such Person receiving no New Common Stock or no Existing Lender Warrants, such Person will receive one (1) share of New Common Stock or one (1) Existing Lender Warrant, as the case may be. If two or more Persons are entitled to equal fractional entitlements and the aggregate amount of New Common Stock or Existing Lender Warrants that would otherwise be issued to such Persons with respect to such fractional entitlements as a result of such rounding exceeds the number of whole shares or warrants which remain to be allocated, the Disbursing Agent will allocate the remaining whole shares or warrants to such holders by random lot or such other impartial method as the Disbursing Agent deems fair. Upon the allocation of all of the whole shares or warrants authorized under the Plan, all remaining fractional portions of the entitlements will be cancelled and will be of no further force and effect. The Disbursing Agent will have the right to carry

forward to subsequent distributions any applicable credits or debits arising from the rounding described in this paragraph.

## 9. Withholding Taxes

In connection with the Plan and all distributions hereunder, the Disbursing Agent or the Litigation Trustee, as applicable, will, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder will be subject to any such withholding, payment, and reporting requirements. The Disbursing Agent or the Litigation Trustee, as applicable, will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution will be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations in connection with such distribution. The Disbursing Agent or the Litigation Trustee, as applicable, will provide advance notice to any holder whose distribution will be held unless such arrangements are made. Any cash or other property to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to the Plan.

## G. Procedures for Treating and Resolving Disputed Claims

### 1. Objections to Claims

All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline. The Claims Objection Deadline is defined as the last day for filing objections to Claims, including Administrative Claims, which will be the latest of (a) one hundred and twenty (120) days after the Effective Date, (b) sixty (60) days after the applicable Proof of Claim or request for payment of an Administrative Claim is filed, and (c) such other date ordered by the Bankruptcy Court upon motion of the Reorganized Debtors, or with respect to Class A4 Claims, the Litigation Trustee, without notice to any party.

If an objection has not been filed to a Proof of Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. The Reorganized Debtors or, with respect to Class A4 Claims, the Litigation Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors or the Litigation Trustee, as

applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

Nothing in the Plan limits, alters, impairs, or releases any objection or counterclaim to any Proof of Claim filed by a D&O Defendant.

After the Effective Date, except with respect to Class A4 Claims, the Plan provides that only the Reorganized Debtors will have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims. The Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. With respect to Class A4 Claims, only the Litigation Trustee will have the authority to file objections to such General Unsecured Claims and to settle, compromise, withdraw, or litigate to judgment objections to such Claims. The Litigation Trustee may settle or compromise any Disputed Class A4 Claim without approval of the Bankruptcy Court.

This provision of the Plan is intended to specify who, as between the Reorganized Debtors, the Litigation Trustee, the Creditors' Committee, the Existing Lenders, or any other party in the Chapter 11 Cases, will have responsibility to conduct the continuing claims process after the Effective Date. It is not intended to limit the contractual rights and obligations of any party, including any insurer, with respect to any Claim, under (i) an assumed agreement, including any assumed insurance policy, or (ii) any non-executory agreement, including a non-executory insurance policy, as to which such party has continuing obligations pursuant to the Plan or applicable law.

## 2. Deemed Allowance of Gonzalez Litigation Claims

As defined in the Plan, the term Gonzalez Litigation Claims includes any and all Claims that were asserted in, or could have been asserted in, the litigation captioned <u>Gonzalez v. Freedom Communications, Inc.</u>, Case No. 03CC08756, Superior Court of California, County of Orange, or that do or could relate to or did, has or could have arisen as a result of such litigation, including, without limitation, the Claims of named plaintiffs, class members, counsel and professionals, whether or not such Claims are asserted in Proofs of Claim and, if asserted in Proofs of Claim, whether or not such Proofs of Claim assert priority, secured, or unsecured status, and whether or not such Proofs of Claim are timely or tardily filed. All Gonzalez Litigation Claims are Class A4 Claims.

The Plan provides that the Gonzalez Litigation Claims will be deemed to be Allowed Class A4 Claims in the aggregate amount of $29.5 million. In no event will the Litigation Trust have any liability to the holders of Gonzalez Litigation Claims for any amount that exceeds the distribution entitlement applicable to an Allowed Class A4 Claim in the aggregate amount of $29.5 million and the Reorganized Debtors will have no liability whatsoever to the holders of Gonzalez Litigation Claims. It will be the responsibility of the Litigation Trust to deal with all Proofs of Claim filed by holders of Gonzalez Litigation Claims to conform them to the aggregate Allowed amount of $29.5 million.

### 3. No Distributions Pending Allowance

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim; *provided, however*, that the Reorganized Debtors or, with respect to General Unsecured Claims against Encumbered Debtors only, the Litigation Trustee, as applicable, may elect to withhold distributions on the portion of a Claim that is not Disputed until the portion of the Claim that is Disputed is resolved by Final Order.

### 4. Distributions after Allowance

The Disbursing Agent will, on the applicable Distribution Dates, make distributions on account of any Disputed Claim that has become an Allowed Claim (not including any Disputed Class A4 Claim, which will be subject to the provisions below). Such distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Such distributions will be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

For holders of Claims that are not Allowed Claims on the Effective Date, the Distribution Date for each such Claim, once Allowed, will be thirty (30) calendar days after the last day of the month during which each such Claim becomes an Allowed Claim.

### 5. Allocations and Distributions for Disputed Class A4 Claims

As soon as practicable prior to the initial Distribution Date applicable to Class A4 Claims, the Litigation Trustee will determine the Pro Rata allocation of Class A4 Beneficial Trust Interests for holders of (a) Allowed General Unsecured Claims based upon their Allowed Claim amounts and (b) Disputed General Unsecured Claims based upon their Proof of Claims amounts or such other allocation amounts as may be agreed by such holders or ordered by the Bankruptcy Court. Any distributable amounts relating to the Pro Rata allocation for the holder of a Disputed General Unsecured Claim will be available for distribution to such holder, but only in an amount reflecting the Pro Rata share attributable to the actual amount of such holder's Allowed Claim, on the Distribution Date following entry of a Final Order resolving such Claim, and otherwise will be treated in accordance with the terms of the Litigation Trust Agreement.

## H. Conditions Precedent to Confirmation and the Effective Date of the Plan

### 1. Conditions to Confirmation

The following are conditions precedent to Confirmation, each of which must be satisfied or waived in accordance with the Plan:

- the Disclosure Statement will have been in form and substance reasonably satisfactory to the Debtors, the Steering Committee Members, and the Creditors' Committee, and an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code will have been entered by the Bankruptcy Court;

- the Debtors will have obtained a written commitment for the Exit Facility on terms and conditions that (i) are reasonably acceptable to the Steering Committee Members and the Debtors; and (ii) support the Debtors' demonstration that (x) the Plan is feasible; and (y) the Reorganized Debtors will have the ability to satisfy their obligations to pay current interest and principal under the Term A Facility and the Term B Facility; and

- the proposed Confirmation Order will be in form and substance reasonably satisfactory to the Debtors, the Steering Committee Members, and the Creditors' Committee, and will, among other things: (i) provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan; (ii) approve the Exit Facility; (iii) authorize the issuance of the New Securities; and (iv) provide that the amount of Houlihan's "Phase II Deferred Fees" (as referred to in Section 11.1(b) of the Plan) will not exceed $4 million.

## 2. Conditions to the Effective Date

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with the Plan:

- the Confirmation Order will have been entered on or before March 19, 2010;

- the Confirmation Order will not then be stayed, vacated, or reversed, or will not have been amended without the agreement of the Debtors, the Steering Committee Members, and, as to terms and provisions materially affecting holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee;

- the Confirmation Order will not then be subject to a pending appeal, and the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending;

- the New Freedom Charter, the New Freedom By-Laws, the Exit Facility, the New Equity Incentive Plan, the Term A Facility, the Term B Facility, the Intercreditor Agreement, the New Stockholders Agreement, the Registration Rights Agreement, and the Existing Lender Warrant Agreement will be in form and substance reasonably acceptable to the Debtors and the Steering Committee Members, and, to the extent any of such documents contemplates execution by one or more persons, any such document will have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each

such document will have been satisfied or waived in accordance with their respective terms;

- the Litigation Trust Agreement will be in form and substance reasonably acceptable to the Debtors, the Steering Committee Members, the Gonzalez Class Counsel, and the Creditors' Committee, and, to the extent such document contemplates execution by one or more persons, such document will have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of such document will have been satisfied or waived in accordance with its terms;

- there will not have been any material adverse change (as measured against the information provided to the Existing Lender Agent and/or its advisors prior to the Petition Date) in the status of any claims against the Debtors on account of (i) pension funding liability, (ii) tax liability, and (iii) environmental liability; *provided that*, with respect to (i) and (ii), there will not be a material adverse change if the Steering Committee Members and the Debtors are able to negotiate a mutually satisfactory response to such change, subject to any requirements of the Bankruptcy Code, within 15 business days of its discovery;

- the Debtors will have Cash on hand as of the Effective Date of at least $15 million;

- the Exit Facility (i) will be on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors; (ii) will be in full force and effect upon closing, and (iii) will provide for the extension of credit thereunder to be available upon closing;

- all conditions precedent to the closing of the Exit Facility, the Term A Facility, and the Term B Facility as set forth on Exhibit A to the Plan will have been satisfied or waived, as applicable;

- all material governmental, regulatory, and third party approvals, waivers, or consents in connection with the Plan (including any required approvals or waivers by the FCC), if any, will have been obtained and will remain in full force and effect, and there will exist no third party claim, action, suit, investigation, litigation, request for reconsideration, or proceeding pending in any court or before any arbitrator or governmental instrumentality, which would if successfully pursued prohibit the transactions contemplated by the Plan;

- all motions necessary to effect the withdrawal and dismissal, with prejudice, by the Existing Lender Agent, any of the Existing Lenders, the Creditors' Committee, any member of the Creditors' Committee, or any holder of a Gonzalez Litigation Claim, of any litigation, discovery, appeals, or motions that seek or would have the effect of hindering, delaying, or objecting to the consummation of the Plan, will have been filed by the applicable party, which motions shall be without condition other than the occurrence of the Effective Date;

- the Mutual Release Agreement shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of such document shall have been satisfied or waived in accordance with its terms;

- the Superior Court of California, County of Orange, presiding over the Gonzalez Litigation Claims, shall have approved the Mutual Release Agreement to the extent it relates to a release granted by the holders of the Gonzalez Litigation Claims of each of the Existing Lenders, the Existing Lender Agent, the financial and legal advisors for the Existing Lenders and the Existing Lender Agent, each member of and Professional retained by the Creditors' Committee, each such member's professionals, and the Debtors for themselves and on behalf of current and former directors, officers, and Professionals (exclusive of the D&O Defendants), as described in the Mutual Release Agreement;

- the Debtors shall have provided a representation and warranty in a form and substance reasonably satisfactory to the Creditors' Committee that, as of the Confirmation Date, there are no claims that have been made or are pending against the Debtors' director and officer insurance policies, except for the notice of claim submitted by the Debtors on behalf of their directors and officers in connection with the examinations under Rule 2004 of the Bankruptcy Rules undertaken by the Creditors' Committee;

- the Debtors have entered into Post-Emergence Trade Agreements evidencing that they have satisfied the requirement of Section 5.11(d) of the Plan; and

- all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

### 3. Waiver of Conditions

With certain exceptions identified in the Plan, relating to the entry of the order approving the Disclosure Statement, the entry of the Confirmation Order, and the continuing effectiveness of the Confirmation Order, each of the conditions may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing. The exceptions are as follows:  (a) any such waiver shall not be effective without the consent of the Steering Committee Members, which consent shall not be unreasonably withheld; (b) any such waiver with respect to Section 9.1(c), 9.2(e), and 9.2(n) of the Plan shall not be effective without the additional consent of the Creditors' Committee, which consent shall not be unreasonably withheld; and (c) with respect Section 9.2(c) or 9.2(k) of the Plan, if the particular matter to be waived materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, such waiver shall not be effective without the additional consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

## I. Effect of the Plan

### 1. Revesting of the Debtors' Assets

Except as otherwise provided in the Plan, the property of each Debtor's Estate, including all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, will revest in the applicable Debtor on the Effective Date.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  As of the Effective Date, all such property of each Reorganized Debtor will

be free and clear of all Claims and Interests, and all Liens with respect thereto, except as specifically provided in the Plan or the Confirmation Order.

### 2. Discharge of Claims and Termination of Interests

Except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Interests of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims; and upon the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, (i) the Debtors, and each of them, will be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (C) the holder of a Claim based upon such debt accepted the Plan, and (ii) all Interests will be terminated.

As of the Effective Date, except as provided in the Plan or in the Confirmation Order, all Persons will be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, causes of action, liabilities, or Interests relating to the Debtors based upon any act, omission, transaction, or other activity of any nature that occurred prior to the Confirmation Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

The discharge of the Debtors pursuant to the Plan is not intended to limit in any way the Debtors' insurance coverage or to deprive any third party of any rights to such coverage that may otherwise exist.

### 3. Release by Debtors of Certain Parties

The Plan contains the following language regarding releases of claims by the Debtors and their Estates:

> **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Estates, including the Litigation Trustee on behalf of the Litigation Trust acting in the capacity of a bankruptcy or insolvency trustee or examiner, or a receiver for the Creditors' Committee, and any other successor to the Debtors or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, whether pursuing a derivative cause of action or otherwise, shall be deemed to forever release, waive, and discharge:**

(i)     all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors, against (A) any of the other Debtors and any of the Debtors' non-Debtor affiliates, (B) except with respect to the Transferred Causes of Action against the D&O Defendants, the Debtors' current and former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, and (C) the Existing Lenders, the Existing Lender Agent, and any of their respective current or former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (but solely in their respective capacities as such); *provided, however,* that nothing in Section 11.9(a) of the Plan shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any of their employees that is based upon an alleged breach of a confidentiality, noncompete, or (as to non-officer employees only) any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors; and *provided further, however*, that nothing in Section 11.9(a) shall operate as a release of intercompany obligations between any of the Debtors or between any of the Debtors and their non-Debtor subsidiaries unless otherwise provided for in the Plan; and

(ii)     all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities arising under (and solely arising under) Chapter 5 of the Bankruptcy Code against any provider of goods or services to the Debtors.

In no event shall any Transferred Cause of Action be subject to the foregoing release, waiver, and discharge.

The Debtors do not believe that any valid potential actions exist against the released parties with regard to the foregoing released claims. The Debtors have not pursued any valid potential actions against the released parties arising from such transactions or any other transactions. Additionally, the Debtors believe that litigation over the validity of any theoretically potential claims against the released parties based upon the foregoing released claims would require a significant expenditure of the Debtors' time and resources and could unnecessarily impair the Debtors' businesses and the administration of the Chapter 11 Cases.

Nevertheless, the Creditors' Committee has asserted in various motions and objections filed in these Chapter 11 Cases that potential actions exist, including: (i) claims against the

Debtors' directors and officers for breach of fiduciary duty arising from, among other things, prepetition negotiations with the Existing Lenders over a lapse of an alleged preference claim against such lenders, payments of prepetition fees to such lenders, and the formulation of the Plan Support Agreement which the Creditors' Committee asserts represents an improper alliance between the board of directors and the Existing Lenders at the expense of holders of General Unsecured Claims; and (ii) claims against the Existing Lenders for aiding and abetting a breach of fiduciary duty, avoidance and recovery of $160 million in alleged wrongful prepetition transfers (as insiders of the Debtors), and avoidance as a fraudulent transfer of the liens granted to the Existing Lenders as part of the recapitalization that occurred in 2004.

The Debtors believe that the foregoing assertions are wholly without merit because, among other things:

- The Debtors' directors and officers worked to achieve a consensual restructure to maximize the value of these estates for all stakeholders.

- Because the enterprise value of these estates is hundreds of millions of dollars less than the amount owed to the Existing Lenders, the Debtors believe that holders of General Unsecured Claims against the Encumbered Debtors are entitled to no recovery. However, the Debtors negotiated for the best possible return to out of the money stakeholders and believe that they fulfilled their fiduciary duties.

- The Debtors believe that the 2004 recapitalization occurred at a time when the Debtors were solvent and did not render the Debtors insolvent.

- The Existing Lenders were not insiders of the Debtors.

Nevertheless, the Plan provides the Creditors' Committee with the opportunity to pursue certain of the alleged causes of action, specifically those described as the Transferred Causes of Action, through the Litigation Trust. The Transferred Causes of Action include all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities of the Estates against the D&O Defendants – the current or former directors of Freedom Holdings and Freedom Communications and the current interim chief executive officer of Freedom Holdings – that arose under applicable law prior to the Petition Date, including, without limitation, any alleged causes of action based upon the D&O Defendants' alleged failure to file timely the bankruptcy cases to protect the rights of creditors and/or entering into transactions to preserve the interests of equity at the expense of creditors, but all subject to the limitations set forth in Section 5.17 of the Plan. There is no guarantee that the pursuit of any of the Transferred Causes of Action will produce any recovery for the beneficiaries of the Litigation Trust, who are primarily the holders of Class A4 Claims. Allegations made by the Creditors' Committee against the Existing Lenders are compromised by the terms of the Plan, and the Existing Lenders are released under the Plan.

### 4. Release by Holders of Claims

The Plan contains the following language regarding releases of claims by holders of Claims:

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of any Claim that votes to accept the Plan**

(each a "<u>Releasing Party</u>") shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, against (i) the Debtors' current and former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (exclusive of the D&O Defendants) and (ii) the Existing Lenders, the Existing Lender Agent, and any of their respective current or former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (but solely in their respective capacities as such) (the Persons identified in clauses (i) and (ii) collectively, the "<u>Third Party Releasees</u>"), in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

Each of the Third Party Releasees shall be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), taking place on or prior to the Effective Date against each Releasing Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date. For the avoidance of doubt and notwithstanding anything herein to the contrary, any release provided under Section 11.9(b) of the Plan by any Existing Lender shall not affect any right, claim, remedy, or cause of action such lender or its affiliates may have related to any equipment leases.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is (i) in exchange for the good and valuable consideration provided by the Third Party Releasees, representing good faith settlement and compromise of the claims released herein; (ii) in the best interests of the Debtors and all holders of Claims and Interests; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any claim released by the Releasing Parties against any of the Third Party Releasees or their respective properties.

The Debtors believe the releases set forth in the Plan are reasonable and appropriate given the extraordinary facts and circumstances of these cases. The releases are voluntary and are supported by the consideration provided under the Plan.

## 5. Mutual Agreed Release

The Plan provides for certain parties to enter into a Mutual Release Agreement. The parties include the Existing Lenders, the Existing Lender Agent, the financial and legal advisors for the Existing Lenders and the Existing Lender Agent, each member of and Professional retained by the Creditors' Committee, each such member's professionals, the Gonzalez Class Counsel and a class representative for themselves and on behalf of the holders of Gonzalez Litigation Claims, and the Debtors for themselves and on behalf of their current and former directors, officers, and Professionals (exclusive of the D&O Defendants). As a result of entering into the Mutual Release Agreement, the parties will release each other from all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, held by each against all the others in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

For the avoidance of doubt and notwithstanding anything in the Plan to the contrary, any release provided under the Mutual Release Agreement by any Existing Lender will not affect any right, claim, remedy, or cause of action such lender or its affiliates may have related to any equipment leases.

## 6. Waiver of Statutory Limitation on Releases

**THE LAWS OF SOME STATES (FOR EXAMPLE, CALIFORNIA CIVIL CODE §1542) PROVIDE, IN WORDS OR SUBSTANCE THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS DECISION TO RELEASE. THE RELEASING PARTIES IN EACH OF SECTIONS 11.9(a), (b), AND (c) OF THE PLAN ARE DEEMED TO HAVE WAIVED ANY RIGHTS THEY MAY HAVE UNDER SUCH STATE LAWS AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.**

## 7. Exculpation

The Plan provides standard exculpations for key parties involved in the Debtors' restructuring efforts under Chapter 11. Specifically, the Plan provides that none of (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Existing Lenders, (iv) the Existing Lender Agent, (v) the Creditors' Committee, or (vi) any of the respective current or former members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates of the foregoing (but solely in their respective capacities as such), will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their

respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct, or willful violation of federal or state securities laws or the Internal Revenue Code (in each case as determined by a Final Order), and in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of the Plan, no holder of a Claim or an Interest, no other party in interest, none of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, and none of their respective successors or assigns, will have any right of action against (i) any Debtor, (ii) any Reorganized Debtor, (iii) any of the Existing Lenders, (iv) the Existing Lender Agent, (v) the Creditors' Committee, or (vi) any of the respective current or former members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates of the foregoing (but solely in their respective capacities as such), for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code (in each case as determined by a Final Order).

8. **Injunction**

**Except as provided in the Plan or in the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner or in any place any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance in any manner or in any place; or (iv) commencing or continuing any action, in each such case in any manner or in any place or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

**As of the Effective Date, all Persons that have held, currently hold, or may hold, a claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Section 11.9 of the Plan or is subject to exculpation pursuant to Section 11.12 of the Plan are permanently enjoined from taking any of the following actions on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing,**

attaching, collecting, or recovering in any manner or in any place any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance in any manner or in any place; or (iv) commencing or continuing any action, in each such case in any manner or in any place or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Without limiting the effect of the foregoing upon any person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in the Plan.

## J.    Retention of Jurisdiction after Confirmation and Effective Date

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

- hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

- effectuate performance of and payments under the provisions of the Plan;

- hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, the Retained Litigation Rights, or the Transferred Causes of Action;

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

- hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, *provided, however*, that any dispute arising under or in connection with the Exit Facility, Term A Facility, the Term B Facility, and the New Securities will be determined in accordance with the governing law designated by the applicable document;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

- enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

- except as otherwise limited in the Plan, recover all assets of the Debtors and property of the Estates, wherever located;

- hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

- hear and determine all matters arising under the Broadcast Trust Agreement or relating to the Broadcast Trustee, including, without limitation, with respect to any continuing supervision that may be required under the Plan;

- hear and determine all matters arising under the Litigation Trust Agreement or relating to the Litigation Trustee;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

- enter one or more final decrees closing some or all of the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth above, the provisions of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## K.    Miscellaneous Provisions of the Plan

### 1.    Post-Confirmation Date Retention of Professionals

Upon the Confirmation Date, any requirement that professionals comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

### 2.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee will dissolve and its members will be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases.  The Professionals retained by the Creditors' Committee and the members thereof will not be entitled to compensation or reimbursement of expenses for any services rendered after the Effective Date, except as may be necessary to file final applications as prescribed by the Plan.

### 3.    Confirmation of Plans for Separate Debtors

In the event the Debtors are unable to confirm the Plan with respect to all Debtors, the Debtors reserve the right, unilaterally and unconditionally, to proceed with the Plan with respect to any Debtor for which the confirmation requirements of the Bankruptcy Code are met.

### 4.    Modifications and Amendments

The Debtors may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date, *provided*, *however*, that any such alteration, amendment, or modification will not be effective without the consent of the Steering Committee Members and, if such alteration, amendment, or modification materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, with the agreement of the Steering Committee Members and, if the provision at issue materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided*, *however,* that prior notice of such proceedings will be served to the extent required by the Bankruptcy Rules or order of the Bankruptcy Court.

### 5.    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor,

with the agreement of the Steering Committee Members and, if such term or provision materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Each of the Debtors reserves the right to sever itself from the Plan, in which event the Plan will continue as to all other non-severing Debtors.

### 6.   Revocation, Withdrawal or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan as to all Debtors at any time prior to the Confirmation Date and to file subsequent plans of reorganization for all Debtors. If the Debtors revoke or withdraw the Plan in its entirety, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

The Debtors reserve the right, with the agreement of each of the Steering Committee Members and the Creditors' Committee, to revoke or withdraw the Plan as to any one or more (but not all) Debtors at any time prior to the Confirmation Date and to file subsequent plans of reorganization for any one or more Debtors as to which the Plan is withdrawn or revoked. A revocation or withdrawal of the Plan as to any one or more (but not all) Debtors will not affect the Plan as it relates to the other non-revoking or non-withdrawing Debtors.

### 7.   Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), will remain in full force and effect until the Effective Date.

### 8.   Service of Documents

Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

Rachel Sagan
Vice President and General Counsel
FREEDOM COMMUNICATIONS HOLDINGS, INC.
17666 Fitch
Irvine, California 92614
Telephone: 949-798-3535
Facsimile: 949-789-3524

with copies to:

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: 213-485-1234
Facsimile:    213-891-8763

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: 212-906-1200
Facsimile:    212-751-4864

Michael R. Nestor
Kara Hammond Coyle
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:    302-571-6600
Facsimile:    302-571-1253

### 9.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware will govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of each Debtor will govern corporate governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof; *provided, however*, that any and all provisions relating to or dealing with the Transferred Causes of Action and/or the Insurance Coverage Actions will be governed by and interpreted under the laws of the State of California; *provided further, however*, that nothing in the Plan will affect the choice of law applicable to the Transferred Causes of Action.

**L.     Additional Plan Provisions**

THE FOREGOING SUMMARY OF THE PLAN CONTAINED IN THE DISCLOSURE STATEMENT IS INTENDED TO HIGHLIGHT ONLY CERTAIN PROVISIONS OF THE PLAN. IT IS NOT INTENDED TO COVER EVERY PROVISION OF THE PLAN AND IT IS NOT A SUBSTITUTE FOR A COMPLETE REVIEW OF THE PLAN ITSELF.  THE SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PROVISIONS OF THE PLAN ITSELF, WHICH PROVISIONS CONTROL IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARY.

## ARTICLE V.
## REQUIREMENTS FOR CRAMDOWN OF THE PLAN

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all Impaired Classes.  To confirm the Plan without the requisite number of acceptances of each Impaired Class, the Bankruptcy Court must find that at least one Impaired Class has accepted the Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable, to any Impaired Class that does not accept the Plan. Accordingly, if any Impaired Class votes to reject or is deemed to reject the Plan, the Debtors will seek to confirm the Plan under the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.

The Debtors believe the Plan does not discriminate unfairly with respect to the Claims in Class A8 and the Interests in Classes A10 and A11, which are deemed to reject the Plan.  Such Classes are not entitled to payment under Bankruptcy Code principles, including the absolute priority rule, until all other creditors have been paid in full.  Because all holders of Claims in Class A8 and Interests in Classes A10 and A11, respectively, are similarly treated, there is no unfair discrimination with respect to such holders of Claims and Interests.

Under Section 1129(b)(2)(B) of the Bankruptcy Code, a plan is fair and equitable as to a class of claims that rejects the plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.  The Debtors believe that the Plan satisfies the fair and equitable requirements of Section 1129(b) of the Bankruptcy Code with respect to holders of Claims in Class A8 because no holders of junior Claims or Interests will receive distributions under the Plan.

Under Section 1129(b)(2)(C) of the Bankruptcy Code, a plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.  The Debtors believe that they will meet the "fair and equitable" requirements of Section 1129(b) of the Bankruptcy Code with respect to holders of Interests in that no holders of junior Claims or Interests will receive distributions under the Plan.

The Debtors also believe that they will satisfy the requirements of Section 1129(b) of the Bankruptcy Code with respect to any Impaired Class of Claims that is entitled to vote on the Plan and votes to reject the Plan. There is no unfair discrimination with respect to any of the voting Classes.

As to Class A2, containing Existing Lender Claims, the Plan reflects consensual terms supported by the Steering Committee Members, and the Debtors believe that such Class will accept the Plan by the requisite majorities. As to Class A3 and the sub-classes thereof containing Other Secured Claims, the treatment options provided in the Plan satisfy the requirements of Section 1129(b)(2)(A), which are that a plan provides: (a) that the holders of secured claims retain the liens in the property securing such claims to the extent of the allowed amount of such claims, and that the holders of such claims receive on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of a value, as of the effective date of the plan, of at least the value of such holders' interest in the estate's interest in such property, (b) for the sale of any property subject to the liens securing such claims, free and clear of such liens, with the liens attaching the proceeds of such sale, and such liened proceeds being treated either pursuant to (a) or (c), or (c) for the realization by such holders of the indubitable equivalent of such claims. In the event that any sub-class in Class A3 votes to reject the Plan, the Plan can be crammed down over that rejection.

As to Class A4, containing General Unsecured Claims against the Encumbered Debtors, Class A5, containing Non-Qualified Retirement Claims against Freedom Communications, and Class A7 containing Tort Claims, the Plan satisfies the requirements of Section 1129(b)(2)(B), which are that the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

## ARTICLE VI.
## FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST

### A. Feasibility of the Plan

The Bankruptcy Code requires that, for the Plan to be confirmed, the Debtors must demonstrate that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. The Debtors believe that the Debtors and/or Reorganized Debtors, as applicable, will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors have prepared pro forma Financial Projections for fiscal years 2010 through 2014 (the "Projections"), as set forth in Exhibit 9 to this Disclosure Statement. The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations, including the Exit Facility, the Term A Facility, and the Term B Facility, to make all payments required to be made pursuant to the Plan, and to fund their restructured operations. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. The Debtors caution that they are making no representations, and no representations can be made, as to the accuracy of the Projections or as to the Reorganized Debtors' ability to achieve the

projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the Debtors or Reorganized Debtors' control. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different than those assumed or may be unanticipated and may adversely affect the Reorganized Debtors' financial results. Therefore the actual results may vary from the Projections, and the variations may be material and adverse.

**HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE RISK FACTORS INCLUDED IN ARTICLE VII OF THIS DISCLOSURE STATEMENT AS THEY MAY AFFECT THE FINANCIAL FEASIBILITY OF THE PLAN.**

**B.     Best Interests of Creditors Test**

To be confirmed, the Plan must pass the "best interests of creditors" test incorporated in Section 1129(a)(7) of the Bankruptcy Code. The test applies to holders of Claims and Interests that are <u>both</u> (i) in Impaired Classes under the Plan, and (ii) do not vote to accept the Plan. Section 1129(a)(7) of the Bankruptcy Code requires that such holders receive or retain an amount under the Plan not less than the amount that such holders would receive or retain if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code.

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Secured creditors generally are paid first from the sales proceeds of properties securing their liens. If any assets are remaining in the bankruptcy estates after the satisfaction of secured creditors' claims from their collateral, administrative expense claims generally are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, holders of interests receive the balance that remains, if any, after all creditors are paid.

The Debtors believe that the Plan meets the "best interests of creditors" test of Section 1129(a)(7) of the Bankruptcy Code because members of each Impaired Class of sub-Class will receive a more valuable distribution under the Plan than they would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow the realization of more value for the Debtors' assets. Moreover, creditors such as the Debtors' employees will retain their jobs and most likely make few if any other claims against the Estates. Lastly, in the event of liquidation, the aggregate amount of unsecured claims would increase significantly, and such claims would be subordinated to priority claims that would be created. For example, employees will file claims for wages and other benefits, some of which would be entitled to priority. The resulting increase in both general unsecured and priority claims would decrease percentage recoveries to unsecured creditors of the Debtors. Attached as <u>Exhibit 10</u> to the Disclosure Statement is a hypothetical liquidation analysis (the "<u>Liquidation Analysis</u>") that shows the hypothetical distribution creditors would receive in the event the Plan is not confirmed and the Chapter 11 Cases are converted to Chapter 7 liquidations.

The Liquidation Analysis is presented on a consolidated basis. The Debtors do not believe it is necessary to show a separate analysis for any of the Debtors. As to the Unencumbered Debtors, all Claims are being paid in full under the Plan. Thus, the "best interest of creditors" test is clearly satisfied. As to the Encumbered Debtors, to the extent there is any unencumbered value at any Debtor, that value will first be allocated to that Debtor's Administrative Claims, Priority Tax Claims, and Other Priority Claims. The Debtors' Administrative Claims in a liquidation would also include substantial adequate protection claims pursuant to the protections provided to the Existing Lenders under the Cash Collateral Order. Any remaining value – which is likely zero – will be shared among that Debtor's unsecured creditors, which will include significant unsecured deficiency Claims held by the Existing Lenders. Those deficiency Claims on a pro rata basis will be substantially larger than all other unsecured Claims and, thus, will be entitled to the substantial majority of any recovery. If any party in interest is able to prove at the Confirmation Hearing that there is unencumbered value at any Debtor that would produce a higher recovery in a liquidation scenario for unsecured creditors than is afforded by the Plan, the Bankruptcy Court may determine not to confirm the Plan as to that Debtor.

## C.    Reorganized Value Analysis

THE VALUATION INFORMATION SET FORTH IN THIS SECTION REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS. THE ESTIMATED VALUE SET FORTH IN THIS SECTION DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH VALUE MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN THE ESTIMATE SET FORTH IN THIS SECTION. ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH THE NEW COMMON STOCK OR OTHER SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE REORGANIZATION AND TRANSACTIONS SET FORTH IN THE PLAN, WHICH PRICES MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN INDICATED BY THIS VALUATION.

The Debtors have been advised by Houlihan, their financial advisor, with respect to the total enterprise value of the Reorganized Debtors on a going-concern basis. Houlihan undertook this valuation analysis (the "Reorganized Value Analysis"), based in part on information provided by the Debtors, for the purpose of determining value available for distribution to holders of Allowed Claims and Interests pursuant to the Plan and to analyze the relative recoveries to such holders thereunder.

Attached as Exhibit 11 to this Disclosure Statement is Houlihan's Reorganized Value Analysis. As set forth in the Reorganized Value Analysis, solely for purposes of the Plan, the estimated range of reorganization value of the Reorganized Debtors was assumed to be $400.0 million to $500.0 million as of June 30, 2010. Houlihan's estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF JUNE 30, 2010, REFLECTS WORK PERFORMED BY HOULIHAN ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO HOULIHAN AS OF OCTOBER 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN'S CONCLUSIONS, HOULIHAN DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the reorganization value of the Reorganized Debtors of between $400.0 million and $500.0 million less assumed total net debt of $310.0 million, Houlihan has estimated the range of equity value for the Reorganized Debtors between approximately $90.0 million and $190.0 million.

The foregoing estimate of the reorganization value of the Reorganized Debtors is based on a number of assumptions, including a successful implementation of the Debtors' business plan, the achievement of the forecasts reflected in the Projections, the restructuring of existing secured credit facilities in the form of the Term A Facility and the Term B Facility, access to the Exit Facility, the continuing leadership of the existing management team, market conditions as of October 2009 continuing through the assumed Effective Date of June 2010 or as assumed in the Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

## ARTICLE VII.
## CERTAIN RISK FACTORS TO CONSIDER

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, holders of Claims or Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

### A.     Certain Bankruptcy Law Considerations

*Parties in Interest May Object To Debtors' Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Encumbered Debtors created eleven classes (with sub-classes where appropriate) of Claims and Interests and the Unencumbered Debtors created five classes (with sub-classes where appropriate) of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests in each such class (or sub-class).

*A Delay in Plan Confirmation May Disrupt the Debtors' Operations*

A prolonged confirmation process could adversely affect the Debtors' relationships with their customers, suppliers, and employees, which, in turn, could adversely affect the Debtors' competitive position, financial condition, and results of operations. Such developments could, in turn, adversely affect the price of the New Common Stock, and the value of assets available to satisfy holders of Allowed Claims or Interests.

*The Debtors May Not be Able to Secure Confirmation of the Plan*

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or interest holder might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization, and the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all administrative expense claims and costs associated with any such Chapter 7 case. The Debtors believe that neither holders of unsecured Claims nor Interests would receive any distribution under either a liquidation pursuant to Chapter 7 or Chapter 11.

Confirmation of the Plan is also subject to certain conditions as described in Article IV, Section H hereof. If the Plan is not confirmed, it is unclear whether a restructuring of the Debtors could be implemented and what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests. If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case holders of Claims and Interests would receive substantially less favorable treatment than they would receive under the Plan.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

*Risk of Non-Occurrence of the Effective Date*

Various conditions precedent must be satisfied before the Effective Date of the Plan can occur. Although the Debtors believe that the Effective Date may occur within 330 days after the Confirmation Date, there can be no assurance that the Effective Date will occur or as to the actual timing of the Effective Date.

*Risk of Post-Effective Date Default*

At the Confirmation Hearing, the Court will be required to make a judicial determination that the Plan is feasible, but that determination does not serve as any guarantee that there will not be any post-Effective Date defaults. The Debtors believe that the cash flow generated from operations and post-Effective Date borrowing will be sufficient to meet the Reorganized Debtors' operating requirements, their obligations under the Exit Facility, and other post-Effective Date obligations under the Plan.

*Amount or Classification of a Claim May be Subject to Objection*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

*Estimated Claim Amounts by Class May not be Accurate*

There can be no assurance that the estimated Claim amounts assumed for the purposes of preparing the Plan are correct. The actual amount of Allowed Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated for the purpose of preparing the Plan. Depending on the outcome of claims objections, the estimated recovery percentages provided in this Disclosure Statement may be different than the actual recovery percentages that are realized under the Plan.

*Validity of Votes Cast to Accept Plan not Affected by Contingencies*

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims and Interests. The occurrence of any and all such contingencies which could affect distributions available to holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

*Possible Limitations on Contract or Lease Rights and Protections*

Certain parties to executory contracts or unexpired leases may assert that their contracts or leases are subject to Section 365(c) of the Bankruptcy Code and, thus, may not be assumed or assigned absent the consent of such parties. An executory contract or unexpired lease may be subject to Section 365(c) if applicable law excuses the non-debtor party from accepting performance from or rendering performance to an entity other than the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties. In addition, a contract to make a loan or extend other debt financing or financial accommodations may be subject to Section 365(c). In addition, pursuant to Section 365(e)(2) of the Bankruptcy Code, contracts or leases of a type subject to Section 365(c) may not be protected from termination or modification. If a party to a contract or lease successfully asserts the applicability of Section 365(c) and Section 365(e)(2), the Debtors may lose the benefit of such contract or lease, which loss may be significant depending upon the contract or lease at issue.

*Steering Committee Members or Creditors' Committee may Decline to Grant Consents*

Various provisions of the Plan require the agreement or consent of the Existing Lender Agent, the Steering Committee Members, or the Creditors' Committee. In some cases, if the parties act unreasonably, the absence of agreement or consent may be an impediment to satisfying the conditions precedent to the Effective Date of the Plan, and thus the occurrence of the Effective Date may be delayed or may not be achievable without intervention from the Bankruptcy Court.

*Recoveries for Holders of Class A4 Claims are Dependent, in Part, on Recoveries from Litigation*

The holders of Allowed Class A4 Claims will receive only Class A4 Beneficial Trust Interests. The value of the Class A4 Beneficial Trust Interests is derived from the transfer of $14.5 million in cash and the Transferred Causes of Action. The Litigation Trust will be charged with pursuing the Transferred Causes of Action with the objective of producing recoveries for holders of Allowed Class A4 Claims. Although the Plan contemplates an initial distribution from Transferred Cash, the Litigation Trust will retain a portion of the Transferred Cash to fund litigation with respect to the Transferred Causes of Action. If the prosecution of the Transferred Causes of Action is unsuccessful in whole or in part, recoveries by holders of Allowed Class A4 Claims will be adversely affected. Moreover, if the D&O Insurers were to be successful in declining coverage for the Transferred Causes of Action, recoveries by holders of Allowed Class A4 Claims will be adversely affected. Ultimately, given the inherent uncertainties in litigation, there can be no assurance that the Litigation Trust will realize any recoveries on account of the Transferred Causes of Action, such that there may be no recovery over and above the amount of Transferred Cash initially distributed.

## B.    Risk Factors Associated with the Business

*Impact of the U.S. Economy*

The Debtors' business is vulnerable to the U.S. economy and the varying economic and business cycles of their customers.

*Incurrence of Significant Losses In Recent Years*

Although the restructuring providing under the Plan will improve the Debtors' balance sheet, there can be no assurance that the Reorganized Debtors will be, or of the extent to which they will be, profitable.

*Reliance on Key Personnel*

The Debtors' success and future prospects depend on the continued contributions of their senior management and other key employees.  The Debtors current financial position makes it difficult for them to retain key employees.  There can be no assurances that the Debtors would be able to find qualified replacements for these individuals if their services were no longer available. The loss of services of members of the senior management team, in particular, and other key employees could have a material adverse effect on the Debtors' business, financial condition and results of operations.

*Loss of Key Customers*

If some of the Debtors' existing customers ceased doing business with the Debtors, or if the Debtors were unable to generate new customers, they could experience an adverse impact on their business, financial condition and results of operations.  The Debtors cannot be certain that any given customer in any given year will continue to use the Debtors' services in subsequent years.  There is significant risk in concentrating their sales with these customers, including but not limited to, potential customer insolvency, cessation of business, work stoppage, or other adverse circumstances.

*Digital Media Challenges*

The Debtors have placed an emphasis on building their digital/online businesses.  Failure to succeed in this undertaking would adversely affect their future business growth and profitability. The Debtors seek to increase their online revenues through a number of digital media initiatives, including developing digital products internally and entering into strategic partnerships with existing online businesses. While the Debtors have invested in successful internet ventures to capture some of the advertising dollars that have migrated online, retaining the Debtors' historical share of advertising revenues remains a challenge and there can be no assurances that the Debtors' digital media initiatives will be successful or result in significant online revenue growth.

*Advertising  and Circulation Dependencies*

The Debtors' advertising revenues and, to a lesser extent, circulation revenues, are dependent on a variety of factors specific to the communities that the Debtors' publications and

television stations serve. These factors include, among other things, the size and demographic characteristics of the local population, local economic conditions in general, and the related retail segments and labor markets in particular, as well as local weather conditions. Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable systems and networks, satellite television and radio, websites, magazines, direct marketing and solo and shared mail programs, affects, and may continue to affect, the Debtors' ability to retain advertising clients and raise rates in the future.

The advertising revenue on which the media industry is reliant is currently being driven by macroeconomic trends, including, but not limited to, the current housing downturn, declining automotive sales, a declining job market, the retail sector slowdown and a shift in advertising dollars to online media. Due to structural changes in the advertising business, and other factors including the reduced consumer spending in the current market and the tight labor market, industry-wide retail and classified advertising performance is expected to be significantly negatively impacted in 2009.

*Labor Unrest*

If the Reorganized Debtors experience labor unrest, their ability to produce and deliver their products could be impaired. The results of future labor negotiations could harm the Reorganized Debtors' operating results. As of October 1, 2009, approximately 1.5% of full-time and part-time employees were represented by unions. Most of the Debtors' union-represented employees are currently working under labor agreements, which expire at various times. In addition, if some or all of the Reorganized Debtors' non-union employees were to become union-represented, the Reorganized Debtors could experience an adverse impact on their business, financial condition and results of operations.

*Retirement Plan Funding Obligations*

The Debtors expect to continue to maintain the Retirement Plan, as described above. The Reorganized Debtors will have an obligation to continue making contributions necessary to fund the Retirement Plan. These funding obligations will vary from year to year and may be affected by various factors that will be primarily outside of the Reorganized Debtors' control, including the performance of the investments of the Retirement Plan, interest rates, and IRS funding rules. The funding obligations may result in significant costs to the Reorganized Debtors, which could have a material adverse effect on their financial condition and results of operations.

*Privacy Laws*

Recent public concern over methods of information gathering has led to the enactment of legislation in certain jurisdictions that restricts the collection and use of information. The Reorganized Debtors' publishing business relies in part on telemarketing and online sales, which are affected by recent ''do not call'' and "spam e-mail" legislation at both the federal and state levels. Further legislation, industry regulations, the issuance of judicial interpretations or a change in customs relating to the collection, management, aggregation and use of consumer information could materially increase the cost of collecting that data, or limit the Reorganized Debtors' ability to provide that information to their customers or otherwise utilize telemarketing or online sales and could adversely affect the Reorganized Debtors' results of operations.

*Cost of Newsprint*

The basic raw material for newspapers and shoppers is newsprint. The Debtors' newsprint consumption related to their publications totaled approximately $33.7 million in 2009 through the Petition Date, which was approximately 10% of total revenue of their newspaper operations. The Reorganized Debtors are unable to predict whether any price increase will take place or the amount or timing of any increase. The Reorganized Debtors inability to obtain an adequate supply of newsprint in the future or significant increases in newsprint costs could have a material adverse effect on their financial condition and results of operations.

*Publishing Industry Competition*

The Debtors' newspaper business is concentrated primarily in small metropolitan and suburban areas in the United States. Revenues in the newspaper industry primarily consist of advertising and paid circulation. Competition for advertising expenditures and paid circulation comes from local, regional and national newspapers, shopping guides, television, radio, direct mail, on-line services and other forms of communication and advertising media. Competition for newspaper advertising expenditures is based largely upon advertiser results, readership, advertising rates, demographics and circulation levels, while competition for circulation and readership is based largely upon the content of the newspaper, its price and the effectiveness of its distribution. The Debtors have many competitors for advertising revenue that are larger and have greater financial and distribution resources than the Debtors. Circulation revenue and the ability to achieve price increases for print products are affected by competition from other publications and other forms of media available in various markets, declining consumer spending on discretionary items like newspapers, decreasing amounts of free time and declining frequency of regular newspaper buying among young people. The Reorganized Debtors' may incur increasing costs trying to compete for advertising expenditures and paid circulation. If the Reorganized Debtors' are not able to compete effectively for advertising expenditures and paid circulation, their revenue may decline and their financial condition and results of operations may be adversely affected.

*Variability of Television Revenues*

The Debtors' television stations compete for audiences and advertising revenues primarily on the basis of programming content and advertising rates. Advertising rates are set based upon a variety of factors, including a program's popularity among the advertiser's target audience, the number of advertisers competing for the available time, the size and demographic make-up of the market served and the availability of alternative advertising in the market. The Reorganized Debtors' ability to maintain market share and competitive advertising rates depends in part on audience acceptance of their network, syndicated and local programming. Changes in market demographics, the entry of competitive stations into the Reorganized Debtors' markets, the transition to Local People Meters and other methods for measuring audiences, the introduction of competitive local news or other programming by cable, satellite, Internet, telephone or wireless providers, or the adoption of competitive offerings by existing and new providers could result in lower ratings and adversely affect the Reorganized Debtors' financial condition and results of operations.

The Debtors' revenues and results of operations are subject to seasonal, cyclical and other fluctuations that they expect to continue in future periods. In particular, the Debtors typically

experience fluctuations in their revenues between even and odd numbered years. During elections for various state and national offices, which are primarily in even numbered years, advertising revenues tend to increase based on the demand for political advertising in their markets. Advertising revenues in odd numbered years tend to be less than in even numbered years due to the lack of demand for political advertising in the Debtors' markets.

*New Media Technologies*

The television broadcasting industry is subject to rapid technological change, evolving industry standards and the emergence of new media technologies and services. The Reorganized Debtors may not have the resources to acquire new technologies or to introduce new services that will compete effectively with these new technologies. Competition arising from new technologies or new services may have a negative effect on the television broadcasting industry or on the Reorganized Debtors.

Advances in technology may increase competition for viewers and advertisers, which could possibly have a material adverse effect on the Reorganized Debtors' operating results. For example, digital video recorders, which permit consumers to digitally record multiple hours of video programming, allow those viewers to play back that programming without watching commercial advertisement, which could reduce the willingness of advertisers to spend money on television advertising. Moreover, the development of new and additional video distribution systems can increase competition for broadcasting stations like ours by bringing into the local television market broadcasting signals and programming not otherwise available to the stations' audiences. Video compression techniques, now in use with direct broadcast satellite and cable television systems, permit greater numbers of channels to be carried within existing bandwidth and have the potential to provide vastly expanded programming to highly targeted audiences. Reduction in the cost of creating additional channel capacity could lower entry barriers for new channels and may alter the competitive dynamics for advertising expenditures.

*Effect of Loss or Modification of Network Affiliation Agreements*

The non-renewal, termination or modification of the network affiliation agreements for the Debtors' television stations could have a material adverse effect on the Debtors' business. The Debtor has five stations affiliated with the CBS network, two affiliated with the ABC network, and one affiliated with the CW network. In addition, the Debtors have four stations that multicast CW network programming in addition to the programming of their primary affiliated network. Each of the affiliation agreements has a stated expiration date. In the process of renewing an affiliation agreement, a network may seek changes in the economics of its agreement, including the elimination of cash compensation to the stations and/or the imposition of cash payments to the network, that could adversely affect the stations. Consequently, the Debtors' network affiliation agreements may not all remain in place on existing terms and conditions, and each network may not continue to provide programming or compensation to affiliates on the same terms as are currently in place. In the event of a loss of network programming, the Debtor would have to find alternative sources of programming, which may be less attractive, and more expensive, and may yield lower advertising revenues.

In recent years, networks have streamed their programming on the Internet and other distribution platforms. These and other practices by the networks tend to dilute the exclusivity

and value of network programming originally broadcast by local stations and could adversely affect the Debtors' business.

*Effect of any Inability to Secure or Maintain Carriage of Television Signals*

The ability of Debtors' television stations to generate advertising revenue is directly correlated with the number of viewers who watch those stations. Carriage of the signals of those stations on cable television, DBS, or other multichannel video distribution systems, in turn, increases the number of potential viewers. Pursuant to FCC rules, local television stations must elect every three years to either (i) require cable and/or DBS operators to carry the stations' signals, or (ii) enter into retransmission consent negotiations for carriage. Currently, the Debtors have retransmission consent agreements with the major cable operators in each of their markets and with both DBS operators, although in some cases such agreements are interim extensions of existing agreements effective while new agreements are being negotiated. If those retransmission consent agreements are terminated or not renewed, or if the signals of the Debtors' stations are distributed on less favorable terms than its competitors, the Debtors' ability to compete effectively may be adversely affected.

*Effect of Regulatory Changes*

The Debtors' television business is subject to extensive and changing federal regulation. Changes in current regulations or the adoption of new laws and policies could affect the Debtors' strategy, increase competition and operating costs, and adversely affect the Debtors' financial condition and operations. Among other things, the Communications Act and FCC rules and policies govern the term, renewal and transfer of the Debtors' television broadcasting licenses and limit certain concentration of media control and ownership of multiple television stations, including ownership by foreign persons and entities. Relaxation of ownership restrictions may provide a competitive advantage to those with greater financial and other resources than the Debtors. Federal law also regulates indecency on television broadcasting, political advertising availability and rates, and the amount of children's programming and advertising in children's programming.

In June 2009, the television industry transitioned from analog to digital broadcasting. Digital broadcasts are available only to those viewers who receive the broadcasts via cable or satellite delivered television systems, or who use over-the-air antennas and digital receivers or converter equipment to receive digital signals. Viewers who received analog signals over the air, and have not acquired digital receivers or converter equipment, are not able to view the programming currently broadcast on the Debtors' television stations. Because the coverage of digital broadcasting stations may not replicate the coverage of analog stations, certain former viewers of the Debtors' analog broadcast signals now may not be able to receive the digital signals.

The delivery of the signals of certain television broadcast stations (including the Debtors' stations) to viewers is subject to the terms of certain statutory copyright licenses under federal law. Certain provisions of those federal laws expire at the end of 2009, and pending legislation may alter the terms of those laws. If Congress were to pass legislation materially changing the existing regulatory scheme, or to adopt new legislation in place of existing law, the Debtors and other local broadcasters and viewers could be adversely affected.

*Effect of Regulatory Ownership Restrictions*

The FCC limits the number of commercial television stations an entity may own in a Designated Market Area ("DMA"). The Debtors own stations WRGB and WCWN, both in the Albany-Schenectady-Troy, New York DMA, pursuant to a waiver granted by the FCC on the basis that WCWN, when acquired by one of the Debtors in 2006, was failing financially, that no out-of-market buyer for the station was available, and that public interest benefits would result from the Debtors' ownership of the station. The transfer of control of WRGB and WCWN as contemplated by the Plan would require that a new waiver be granted by the FCC, and there can be no assurance that such a waiver will be able to be obtained.

In addition, to the extent any persons or entities which acquire "attributable" interests in the Debtors pursuant to the Plan hold "attributable" interests in other broadcast media or daily newspapers in the same markets as the Debtors' media outlets, such acquisition may violate the FCC's rules. Moreover, the direct or indirect acquisition of equity interests in the Debtors, either pursuant to the Plan or afterward, by, aliens, foreign governments or their representatives, or by corporations formed under the laws of a foreign country, may not in the aggregate exceed limits established for foreign voting and non-voting equity ownership in FCC licensees under the Communications Act. Violation of any of these restrictions on ownership could subject the Debtors and their investors to FCC enforcement action or delay in approval of the FCC application.

*Effect of Inability to Renew FCC Licenses*

The Debtors' television business depends upon maintaining their broadcast licenses, which are issued by the FCC. Broadcast licenses are generally granted for eight-year terms, and may be renewed upon application to the FCC for additional eight-year terms. Broadcast license renewal applications may be challenged by interested parties. The FCC has authority to renew broadcast licenses, to not renew them, or to renew them with conditions, including renewal for less than a full license term.

The main broadcast station licenses for seven of the Debtors' eight stations have expired but they are allowed to continue to operate during the pendency of their renewal applications. The license for the eighth station will expire in 2013. The FCC has informally advised the Debtors that action on the pending renewal applications for those seven stations has been delayed due to indecency complaints filed against those stations. Although the Debtors ultimately expect to renew all such licenses, there can be no assurance that the pending renewal applications, or renewal applications filed in the future, will be granted, or will be granted without significant adverse conditions or without enforcement action regarding violations of FCC rules, including with respect to alleged indecency violations. A failure to renew a license for a station would preclude the Debtors from operating that station. Because the FCC generally will not permit the transfer of control of an FCC license for which a renewal application is pending, the transfer of control, pursuant to the Plan, of those stations for which renewal applications remain pending will require that the Debtors enter into a tolling agreement with the FCC. Under such an agreement, the FCC would agree to renew the licenses, and the Debtors would agree to remain subject to FCC enforcement action for such alleged indecency violations following the license renewal. Although the FCC routinely enters into tolling agreements with licensees, there can be

no assurance that such a tolling agreement can be reached with the FCC in this or any other particular case.

## C.    Factors Affecting the Reorganized Debtors

*Capital Requirements*

The business of the Reorganized Debtors is expected to have certain capital expenditure needs. While the Debtors' Projections assume that operations and post-Effective Date borrowings will generate sufficient funds to meet capital expenditure needs for the foreseeable future, the Reorganized Debtors' ability to gain access to additional capital, if needed, cannot be assured, particularly in view of competitive factors and industry conditions.

*Variances from Projections*

The fundamental premise of the Plan is the de-leveraging of the Debtors and the implementation and realization of the Debtors' business plan, as reflected in the Projections contained in this Disclosure Statement. The Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize. Such assumptions include, among other items, assumptions concerning the general economy, the ability to make necessary capital expenditures, the ability to maintain market strength, the ability to refinance certain facilities, consumer preferences and the ability to increase gross margins and control future operating expenses. The Debtors believe that the assumptions underlying the Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the Projections necessarily will vary from the projected results and such variations may be material and adverse.

*Debt Covenants that may Restrict Reorganized Debtors' Financial and Operating Flexibility*

The Exit Facility, the Term A Facility, and the Term B Facility can be expected to contain covenants, including potential restrictions on:

- indebtedness (including guarantee obligations and preferred stock of subsidiaries);
- liens;
- mergers, consolidations, liquidations and dissolutions;
- sales of assets;
- payment of restricted payments (including dividends and other payments in respect of capital stock);
- investments (including acquisitions), loans and advances;
- sale and leaseback transactions;
- swap agreements;
- optional payments and modifications of subordinated debt and certain other debt;
- transactions with affiliates;
- changes in fiscal year;
- negative pledge clauses and other restrictive agreements; and
- amendment of material documents.

The terms of any such these covenants have not yet been negotiated.

*Litigation and Claims*

From time to time, the Debtors are subject to claims or litigation incidental to their business. The Debtors were party to a various prepetition litigation including a class action lawsuit asserting failure to pay to newspaper carriers proper wages, overtime, and expenses under certain California labor laws and wage orders. During the class action trial, the parties negotiated and reached a settlement of the lawsuit. That settlement and other litigation matters have been nullified through the Chapter 11 process. As a result, those claims or similar claims may be reasserted against the Debtors.

*Future Business Performance*

The Debtors' future business performance is subject to business, economic, legislative, and competitive risks and uncertainties. Such uncertainties and other factors include approval by the Bankruptcy Court of the Plan and potential objections of third parties. Uncertainties also include, but are not limited to: (i) general economic and political conditions and the cyclicality of the newspaper, television, and interactive media industry; (ii) competitive conditions in the newspaper, television, and interactive media industry; (iii) the Debtors' ability to implement cost reductions, efficiencies and other improvements in their businesses; (iv) the Debtors' ability to fund capital expenditure requirements needed to maintain competitive position; (v) the effect of U.S. governmental policies and regulations related to the Debtors' businesses; (vi) compliance with environmental, health and safety laws and regulations; (vii) changes in relationships with large customers; (viii) business-related difficulties of the Debtors' customers; and (ix) the effects of the Chapter 11 process on the Debtors' ability to attract and retain key management personnel.

*Assumptions Regarding Value of Debtors' Assets*

It has been assumed in the preparation of the Plan that the value of the Debtors' assets described in the Reorganized Value Analysis generally approximates the fair value thereof, except for specific adjustments discussed in the notes thereto. For financial reporting purposes, the fair value of the assets of the Debtors (including deferred tax assets) must be determined as of the Effective Date. Although such valuation is not presently expected to result in values that are materially different than the values assumed in the preparation of the Plan, there can be no assurance with respect thereto.

*Leverage, Liquidity, and Capital Requirements*

In addition to Cash generated by operations, the Reorganized Debtors' principal source of liquidity following their emergence from bankruptcy will be the Exit Facility. After the Effective Date of the Plan, the Reorganized Debtors will face liquidity requirements, including working capital requirements and repayment of the Reorganized Debtors' obligations under the Exit Facility. While the Debtors believe that they will have adequate liquidity to meet requirements following the Effective Date of the Plan, no assurances can be made in this regard. Furthermore, the ability of the Reorganized Debtors to gain access to additional capital if needed, whether through equity offerings or debt financing, cannot be assured. Any inability of the Reorganized Debtors to service their indebtedness, obtain additional financing, as needed, or

comply with the financial covenants contained in the debt instruments issued pursuant to the Plan could have a material adverse effect on the Reorganized Debtors.

**D.     Factors Affecting the Value of Securities to be Issued under the Plan**

*Achievement of Projected Financial Results*

The Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that they have assumed in projecting future business prospects. If the Reorganized Debtors do not achieve these projected revenue or cash flow levels, they may lack sufficient liquidity to continue operating as planned after the Effective Date. The Projections represent the Debtors' view based on current known facts and hypothetical assumptions about the Reorganized Debtors' future operations. However, the Projections set forth herein do not guarantee the Reorganized Debtors' future financial performance.

*Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures*

To the extent the Reorganized Debtors are unable to meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may be unable to service their debt obligations as they come due or to meet the Reorganized Debtors' operational needs. Such a failure may preclude the Reorganized Debtors from developing or enhancing their products and services, taking advantage of future opportunities, growing their business or responding to competitive pressures.

*There May be No Market for any of the New Securities*

As described in more detail in Article VIII of this Disclosure Statement, each of the New Securities to be issued under the Plan has not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, and subject to the provisions of the New Stockholders Agreement restricting the trade of New Common Stock and Existing Lender Warrants, each of the New Securities may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws.

The valuation of the Reorganized Debtors could be adversely impacted over time if the Reorganized Debtors' business plan does not meet expectations or if factors beyond the Reorganized Debtors' control materialize.

Each of the shares of New Common Stock and the Existing Lender Warrants are a new issuance of Freedom securities with no established trading market. The New Common Stock and the Existing Lender Warrants will not be listed for trading on any national securities exchange, automated quotation service or over-the-counter trading markets, and it is unlikely that an active trading market will develop or be sustained for the New Common Stock and the Existing Lender Warrants. If no active trading market develops, stockholders may not be able to resell their shares of New Common Stock and the Existing Lender Warrants at their fair market value or at all.

*New Common Stock and Existing Lender Warrants May be Subject to Restrictions Resulting from New Stockholders Agreement*

The shares of New Common Stock and the Existing Lender Warrants will be subject to the terms and restrictions of the New Stockholders Agreement which will contain certain terms and restrictions that may adversely affect the rights of holders of New Common Stock and the Existing Lender Warrants and could adversely affect the price, value and liquidity of the New Common Stock and the Existing Lender Warrants. All holders of Claims receiving New Common Stock and the Existing Lender Warrants under the Plan, by acceptance of such newly issued shares or warrants, will be bound by the terms of the New Stockholders Agreement to the maximum extent permitted by applicable law, including the Bankruptcy Code.

## E.     Accuracy of Information; Disclaimer

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Debtors may subsequently update the information in this Disclosure Statement, but they have no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the pro forma and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Exhibits hereto, the documents incorporated by reference herein, the Plan or any Exhibits thereto.

Although the Debtors have used their reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, much of the financial information contained in the Disclosure Statement came from parties other than the Debtors, and some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and attached hereto is complete and without inaccuracies.

**THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN**

**THE FORWARD LOOKING STATEMENTS AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

## ARTICLE VIII.
## CERTAIN SECURITIES LAW MATTERS

**A.     Issuance of New Common Stock and Existing Lender Warrants**

Section 1145(a)(l) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claims or interests and partly for cash or property.  Except as noted below, the Debtors believe that the offer and sale of the New Common Stock and the distribution of the Existing Lender Warrants under the Plan to holders satisfies the requirements of Section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

**B.     New Stockholders Agreement**

The Plan provides for each holder of New Common Stock to be deemed to enter into the New Stockholders Agreement on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors.  The New Stockholders Agreement may provide for, among other things, (i) customary "drag along" and "tag along" rights, (ii) obligations for holders of the New Common  Stock to provide such information as Reorganized Freedom Holdings reasonably may require to ensure compliance with the Communications Act of 1934 (as amended) and the rules, regulations, and/or policies of the FCC, (iii) information rights, including the right of prospective purchasers of the New Common Stock or Existing Lender Warrants to obtain non-public information upon execution of a confidentiality agreement, and (iv) certain preemptive rights.  In addition, the New Stockholders Agreement will impose restrictions on transfer as necessary to ensure compliance with the Communications Action of 1934 (as amended) and the rules, regulations, and/or policies of the FCC.  The New Stockholders Agreement will be included in the Plan Supplement.

**C.     Transferability of New Common Stock**

Apart from any provisions in the New Stockholders Agreement preventing transferability of the New Common Stock, such stock may be freely transferred by most recipients following initial issuance under the Plan provided that such transfer complies with federal and state securities laws.  Shares issued in respect of the Exit Financing Share Allocation pursuant to Section 4(2) of the Securities Act or Regulation D thereunder will be "restricted securities" that may be transferred only after registration under the Securities Act or pursuant to an exemption therefrom, unless otherwise exempt from registration under Section 1145 of the Bankruptcy Code.  The Debtors make no representation concerning the right of any person to trade in the New Common Stock, the Existing Lender Warrants, or other securities. The Debtors recommend that potential recipients of the New Common Stock, the Existing Lender Warrants, or other

securities consult their own counsel concerning whether they may freely trade New Common Stock, the Existing Lender Warrants, or any other securities without compliance with the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, or any other federal or state securities laws.

# ARTICLE IX.
## MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

### A.    Introduction

The following summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan as they relate to the Debtors and to beneficial owners of Claims (each a "Holder") entitled to vote on the Plan. This summary is intended for general information purposes only, is not a complete analysis of all potential U.S. federal income tax consequences that may be relevant to any particular Holder and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published rulings and administrative pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly with retroactive effect, resulting in U.S. federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion assumes that Holders have held Claims as "capital assets" within the meaning of Section 1221 of the Tax Code (generally, property held for investment) and will hold, as applicable, the Term A Obligations, the Term B Obligations (together with the Term A Obligations, the "New Term Obligations"), the New Common Stock and the Existing Lender Warrants (together with the New Common Stock, the "New Equity") as capital assets. In addition, this discussion assumes the Claims and the New Term Obligations constitute debt for U.S. federal tax purposes.

This summary assumes any distributions to Holders of General Unsecured Claims against the Encumbered Debtors (Class A4), any payments made from the Trade Unsecured Claim Escrow to holders of Allowed Trade Unsecured Claims and any benefit payments made to Holders of Non-Qualified Retirement Claims (Class A5) will for U.S. federal income tax purposes be regarded as having been distributed to such Holders directly from the Debtors in respect of such Claims, and not as having been transferred to such Holders by the Holders of Existing Lender Secured Claims.

This summary does not apply to Holders that are not U.S. persons for U.S. federal income tax purposes. Moreover, this summary does not address all of the U.S. federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances or to Holders otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions,

insurance companies, pass through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies and Holders that received Claims in connection with the performance of services).

Holders should consult their tax advisors regarding the U.S. federal income tax consequences of the consummation of the Plan and the ownership and disposition of the New Term Obligations and the New Equity received pursuant to the Plan, as well as any tax consequences arising under any state, local or foreign tax laws, or any other U.S. federal tax laws.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE DISCUSSION BELOW.**

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### B.    U.S. Federal Income Tax Consequences to the Debtors

Many of the Debtors are members of a consolidated group of corporations for U.S. federal income tax purposes, of which Freedom Holdings is the common parent (the "group"). For the taxable year ended December 31, 2008, the group reported on its U.S. federal income tax return approximately $93 million of consolidated net operating losses ("NOLs"), of which approximately $9 million of such NOLs were carried forward. The group expects to report additional NOLs in its taxable years ended December 31, 2009 and December 31, 2010. Any such NOLs, however, are subject to audit and possible challenge by the IRS and thus may ultimately vary from any specific amounts claimed. In any event, as described below, as a result of the application of section 108(b) of the Tax Code, the Debtors believe that all of their NOLs (and certain other losses, credits and carryforwards, if any) will be effectively eliminated after consummation of the Plan.

## 1. Cancellation of Indebtedness and Reduction of Attributes

The discharge of a debt obligation for an amount less than the remaining amount due on the obligation (as determined for U.S. federal income tax purposes) generally will give rise to cancellation of indebtedness ("COD") income that must be included in the debtor's taxable income, subject to certain exceptions. In particular, under Section 108 of the Tax Code, COD income will not be included in a debtor's income if the discharge of the debt obligation occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "Bankruptcy Exception"). The Debtors expect the consummation of the Plan will produce a significant amount of COD income. Because the cancellation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the court in such case and the cancellation of the Claims will be pursuant to the Plan, the Debtors will not be required to include any COD income realized as a result of the implementation of the Plan in taxable income under the Bankruptcy Exception.

Under the Tax Code, a debtor that excludes COD income from taxable income under the Bankruptcy Exception generally must reduce certain tax attributes by a corresponding amount. Attributes subject to reduction include consolidated attributes (such as NOLs, NOL carryforwards and certain other losses, credits and carryforwards) attributable to the debtor, attributes that arose in separate return limitation years of the debtor and the debtor's tax basis in its assets (including stock of subsidiaries). A debtor's tax basis in its assets generally may not be reduced below the amount of its liabilities remaining immediately after the discharge of indebtedness. If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member. NOLs for the taxable year of the discharge and then NOL carryforwards to such year generally are the first attributes subject to reduction. However, a debtor may elect under Section 108(b)(5) of the Tax Code (the "Section 108(b)(5) Election") to reduce its basis in its depreciable property first. If the debtor is a member of a consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property. If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply. The Debtors have not yet determined whether they will make the Section 108(b)(5) Election. The Debtors expect that attribute reduction required by reason of COD income produced pursuant to consummation of the Plan will effectively eliminate NOL carryforwards otherwise available to the group. However, the precise effect of the attribute reduction rules on all of the tax attributes of the Debtors is uncertain because, among other things, it will depend on the amount of COD income realized by the Debtors.

Under newly enacted Section 108(i) of the Tax Code, the Debtors can, in certain circumstances, elect to defer rather than exclude COD income from taxable income. Deferred COD income under this rule would be included in the Debtors' taxable income ratably over the five taxable-year period starting in 2014. This election is irrevocable. Under this deferral regime, the Debtors would not be required to reduce any of its tax attributes but would have taxable COD income in future years. The Debtors do not expect to make this election.

## 2. Section 382 Limitation on NOLs

Section 382 of the Tax Code generally imposes an annual limitation on the use of NOLs (and certain other tax attributes) if a corporation or a consolidated group with NOLs (a "<u>loss corporation</u>") undergoes an "ownership change." In general, an ownership change occurs if the percentage of the value of the loss corporation's stock (including the parent corporation in a consolidated group) owned by one or more direct or indirect "five-percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five-percent shareholders at any time during the applicable testing period. The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent ownership change of the corporation. The Debtors expect the consummation of the Plan will result in an ownership change on the Effective Date.

In general, the amount of the annual limitation on a loss corporation's use of its pre-ownership change NOLs (and certain other tax attributes) is equal to the product of the long-term tax-exempt rate (as published by the IRS for the month in which the ownership change occurs, which rate is 4.14% for January 2010) and the value of the loss corporation's outstanding stock immediately before the ownership change.

Unless a debtor corporation in a bankruptcy case elects otherwise, however, a special exception under Section 382(l)(5) of the Tax Code will prevent application of the annual limitation provided at least 50% of the stock of the debtor (or stock of a controlling corporation if that corporation is also in bankruptcy) is owned by the shareholders and "old and cold" creditors of the debtor immediately following the reorganization and as a result of being shareholders or creditors immediately before such reorganization (the "<u>Section 382(l)(5) Exception</u>"). Under this rule, NOL carryforwards would be subject to a one-time reduction for any deductions with respect to debt converted into stock in the bankruptcy reorganization relating to interest paid or accrued during the three taxable years preceding the year in which the ownership change occurs and the portion of the taxable year preceding and including the effective date of the bankruptcy reorganization. A second ownership change within two years following the first ownership change would eliminate the debtor's ability to utilize any pre-ownership change NOLs for any taxable year ending after the second ownership change.

An "old and cold" creditor is a creditor that has held the debt of the debtor for at least eighteen months prior to the date of the filing of the case or that has held "ordinary course indebtedness" at all times it has been outstanding. However, any debt owned immediately before an ownership change by a creditor that does not become a direct or indirect five-percent shareholder of the reorganized debtor generally will be treated as always having been owned by such creditor, except in the case of any creditor whose participation in formulating the plan of reorganization makes evident to the debtor that such creditor has not owned the debt for the requisite period. Because it is uncertain whether a sufficient number of the holders of the Existing Lender Secured Claims as of the Effective Date will satisfy the holding requirements to be considered as "old and cold" creditors, it is unclear whether the Debtors will be eligible to utilize the Section 382(l)(5) Exception. Even if the Debtors were eligible to utilize the Section 382(l)(5) Exception, however, application of the exception would require the Debtors to significantly reduce their NOLs (if any NOLs would otherwise be available taking into account the attribute reduction rules described above) because of interest deductions taken by Debtors with respect to the Existing Lender Secured Claims.

A debtor may elect not to apply Section 382(l)(5) of the Tax Code to an ownership change that otherwise satisfies its requirements. This election must be made on the debtor's U.S. federal income tax return for the taxable year in which the ownership change occurs.

If a debtor elects not to apply, or does not satisfy the requirements of, Section 382(l)(5) of the Tax Code, Section 382(l)(6) of the Tax Code will apply. Section 382(l)(6) of the Tax Code requires no reduction of the debtor corporation's pre-ownership change NOLs as required by Section 382(l)(5) of the Tax Code but imposes an annual limitation on a loss corporation's use of its pre-ownership change NOLs (and certain other tax attributes), although relief is provided in the form of an increased annual limitation. Specifically, Section 382(l)(6) of the Tax Code provides that the value of the loss corporation's outstanding stock for purposes of computing the annual limitation will be increased to reflect the cancellation of indebtedness in the bankruptcy case (but the value of such stock as adjusted may not exceed the value of the debtor's gross assets immediately before the ownership change (subject to certain adjustments)). The foregoing rules regarding the annual limitation in the event Section 382(l)(6) of the Tax Code applies are subject to modifications. First, if the Debtors have a net unrealized built-in gain ("NUBIG") at the time of the ownership change (subject to a *de minimis* threshold), the amount of such built-in gain recognized during the five-year period following the ownership change will increase the amount of the taxable income that may be offset by pre-ownership change losses. Second, if the Debtors have a net unrealized built-in loss ("NUBIL") at the time of the ownership change (subject to a *de minimis* threshold), certain built-in losses recognized during the five-year period following the ownership change will generally be subject to the annual limitation in the same manner as pre-change losses. Whether the Debtors are in a NUBIG or NUBIL position will depend in part on the fair market value of the Debtors' assets immediately before the ownership change date. This value cannot be known with certainty until the Effective Date.

The Debtors do not expect to benefit from pre-ownership change NOL carryforwards following the consummation of the Plan because of the attribute reduction required in connection with the COD income produced pursuant to the consummation of the Plan. In addition, as described above, a Debtor will be required to reduce its tax basis in its assets (but not below the amount of its liabilities remaining immediately after the consummation of the Plan) to the extent its COD income (including as a result of the application of the look-through rules) exceeds the amount of NOLs and any other losses, credits and carryovers so reduced (subject to certain modifications).

### 3. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% tax rate to the extent such tax exceeds the corporation's regular U.S. federal income tax for the taxable year. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. For example, a corporation is generally not allowed to offset more than 90% of its taxable income for AMT purposes by available NOL carryforwards (as computed for AMT purposes). Accordingly, for tax periods after the Effective Date, the Reorganized Debtors may have to pay AMT regardless of whether they generate non-AMT NOLs or have sufficient non-AMT NOL carryforwards to offset regular taxable income for such periods.

In addition, if a corporation (or consolidated group) undergoes an ownership change within the meaning of Section 382 of the Tax Code and is in a NUBIL position (as determined

for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the ownership change date.

Subject to certain limitations, any AMT that a corporation pays will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

## C. U.S. Federal Income Tax Treatment of the Litigation Trust

It is intended that the Litigation Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. In Revenue Procedure 94-45, 1994-2 C.B. 6 84 ("Rev. Proc. 94-45"), the IRS set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Rev. Proc. 94-45, the Litigation Trust Agreement will require all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Litigation Trust Assets to the Litigation Trust as (i) a transfer of the Litigation Trust Assets to the LT Beneficiaries, which transfer should be taxable to each LT Beneficiary in its taxable year that includes the Effective Date as discussed below under "D. U.S. Federal Income Tax Consequences to Holders of Certain Claims," followed by (ii) a transfer of the Litigation Trust Assets by such LT Beneficiaries to the Litigation Trust, with the LT Beneficiaries being treated as the grantors and owners of the Litigation Trust.

The Plan generally provides that the LT Beneficiaries must value the Litigation Trust Assets consistently with the values determined by the Litigation Trustee for all U.S. federal income tax purposes. As soon as practicable after the Effective Date, the Litigation Trustee will determine the fair market value of the Litigation Trust Assets, based upon his good faith determination, and will establish appropriate means to apprise the LT Beneficiaries of such valuation. The valuation will be used consistently by all parties (including, without limitation, the Debtors, the Litigation Trust and the LT Beneficiaries) for all U.S. federal income tax purposes.

Consistent with the treatment of the Litigation Trust as a grantor trust, the Litigation Trust Agreement will require each LT Beneficiary to report on its U.S. federal income tax return its allocable share of the Litigation Trust's income. Therefore, an LT Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Litigation Trust whether or not the Litigation Trust has made any distributions to such LT Beneficiary. The character of items of income, gain, deduction and credit to any LT Beneficiary and the ability of such LT Beneficiary to benefit from any deduction or losses may depend on the particular situation of such LT Beneficiary.

In general, a distribution of Litigation Trust Assets from the Litigation Trust to an LT Beneficiary may not be taxable to such LT Beneficiary because such LT Beneficiary is already regarded for U.S. federal income tax purposes as owning its allocable share of such assets. Holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Litigation Trust.

The Litigation Trustee will file with the IRS tax returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and will also send to each LT Beneficiary a separate statement setting forth such LT Beneficiary's share of items of the Litigation Trust's income, gain, loss, deduction or credit. Each such LT Beneficiary will be required to report such items on its U.S. federal income tax return.

This discussion assumes the Litigation Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Litigation Trust and the LT Beneficiaries could differ materially from those discussed herein (including the possible imposition of an entity-level tax on all income of the Litigation Trust).

## D. U.S. Federal Income Tax Consequences to Holders of Certain Claims

The U.S. federal income tax consequences of the transactions contemplated by the Plan to Holders (including the character, timing and amount of income, gain or loss recognized) will depend significantly on such Holder's individual circumstances. Therefore, Holders should consult their tax advisors to determine the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes Holders have not taken bad debt deductions with respect to Claims (or any portion thereof) in the current or any prior year.

### 1. Allocation of Payments Between Principal and Interest

To the extent any Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position, and the Plan provides, that, for U.S. federal income tax purposes, such distribution should be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. The IRS, however, may take a contrary position and therefore no assurance can be made in this regard. If, contrary to the Debtors' intended position, such a distribution were treated as being allocated first to accrued but unpaid interest (or if the consideration received by any Holder exceeds the principal amount of the Claim surrendered in exchange therefor), a Holder of such a Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder otherwise realizes a loss as a result of the Plan.

### 2. Holders of Existing Lender Secured Claims

#### (a) Exchange of Existing Lender Secured Claims for New Term Obligations, New Common Stock, Existing Lender Warrants, Cash, and Class A2 Beneficial Trust Interests

The U.S. federal income tax consequences of the Plan to Holders of Existing Lender Secured Claims in Class A2 depend, in part, on whether such Claims constitute "securities" for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a security depends on an overall evaluation of the nature of the debt, with the term of the obligation usually regarded as one of the

most significant factors.  In general, debt obligations issued with a term of five years or less have generally not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities.  Another factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer.  Generally, the more senior the debt obligation, the less likely it is to be a security.

Although the matter is not free from doubt, the Debtors intend to take the position the Existing Lender Secured Claims and the New Term Obligations do not constitute securities for U.S. federal income tax purposes. Under this position, a Holder of Existing Lender Secured Claims should, except as described in the next sentence and as discussed below under "(e) Class A2 Beneficial Trust Interests," generally recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (1) the sum of the issue price of any New Term Obligations and the fair market value of any New Common Stock, Existing Lender Warrants and such Holder's share of the Litigation Trust Assets transferred to the Litigation Trust on the Effective Date, in each case determined as of the Effective Date, and the amount of Cash received in respect of an Existing Lender Secured Claim and (2) the Holder's adjusted tax basis in the Existing Lender Secured Claim. A Holder should, however, recognize ordinary income to the extent it receives (or is deemed to receive) New Term Obligations, New Common Stock, Existing Lender Warrants, Litigation Trust Assets or Cash in respect of accrued interest or accrued market discount that have not already been included in income under the Holder's method of accounting (as described above under "Allocation of Payments Between Principal and Interest"). Conversely, a Holder would generally recognize a loss to the extent any accrued interest or accrued market discount was previously included under such Holder's method of accounting and is not paid (or deemed paid) in full. A Holder's aggregate tax basis in any New Term Obligation, New Common Stock, Existing Lender Warrant or Litigation Trust Asset received (or deemed received) in respect of an Existing Lender Secured Claim on the Effective Date should generally be equal to the issue price of such New Term Obligation or the fair market value of such New Common Stock, Existing Lender Warrant or Litigation Trust Asset (in each case, as of the Effective Date). The holding period for any New Term Obligation, New Common Stock, Existing Lender Warrant or Litigation Trust Asset received (or deemed received) pursuant to the Plan should begin on the day after the Effective Date.

The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the "original issue discount" rules at any time during the sixty-day period ending thirty days after the issue date.  If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (*i.e.*, interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest.  If the new debt instrument is publicly traded, its issue price generally will be its fair market value on the issue date.  If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument on the exchange date less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium or readily available from dealers, broker or traders.  At this time, the Debtors cannot predict whether the Existing Lender Secured Claims or the New Term Obligations will be publicly traded during the relevant period.

If, contrary to the Debtors' intended position, the Existing Lender Secured Claims were treated as "securities" and the exchange of Existing Lender Secured Claims were treated as occurring pursuant to a "reorganization," then the tax consequences to Holders of Existing Lender Secured Claims could differ materially from those described above, including that Holders of Existing Lender Secured Claims would recognize gain, but not loss, in connection with the exchange to the extent required under applicable rules governing reorganizations.

Holders of Existing Lender Secured Claims should consult their tax advisors regarding the possibility the transaction will be treated as a "reorganization" and the character of any gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Holder, whether such Claims have been held for more than one year, whether such Claims have bond premium or market discount and whether and to what extent the Holder previously claimed a bad debt deduction with respect to such Claims. Holders should also consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses, and as to whether any resulting gain recognition may be deferred under the installment method until principal is repaid on the New Term Obligations. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### (b)     New Term Obligations

*Interest and Original Issue Discount*.   A New Term Obligation generally would be treated as issued with "original issue discount" ("OID") if the principal amount of the New Term Obligation plus all scheduled interest payments thereon, other than payments of "qualified stated interest," exceeds the "issue price" of the New Term Obligation by more than a *de minimis* amount. The issue price of the New Term Obligations will be determined as discussed above under "Exchange of Existing Lender Secured Claims for New Term Obligations, New Common Stock, Existing Lender Warrants, Cash and Class A2 Beneficial Trust Interests." Generally, "qualified stated interest" is stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate.

The amount of OID includible in gross income annually by a Holder of the New Term Obligation will be the sum of the daily portions of OID with respect to the New Term Obligation for each day during the taxable year (or portion thereof) during which the Holder holds the New Term Obligation.   The daily portion is determined by allocating to each day of any accrual period a *pro rata* portion of the OID that accrued during the period.   The accrual period of the New Term Obligation may be of any length and may vary in length over the term of the New Term Obligation, provided each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or last day of an accrual period. The amount of OID allocable to any accrual period will be an amount equal to the product of the New Term Obligation's adjusted issue price at the beginning of the accrual period and its yield to maturity, less any qualified stated interest allocable to the accrual period (determined on a constant yield method, compounded at the close of each accrual period and properly adjusted for the length of the accrual period). The adjusted issue price of the New Term Obligation at the beginning of any accrual period will be the issue price of the New Term Obligation *plus* the aggregate amount of accrued OID for all prior accrual periods *minus* any payments previously made on the New Term Obligation other than payments of qualified stated interest. Under these rules, a Holder will have to include an increasingly greater amount of OID in income in each successive accrual period.

A Holder's tax basis in the New Term Obligation will be increased by the amount of OID included in the Holder's gross income and will be decreased by the amount of any payments received by the Holder with respect to the New Term Obligation other than payments of qualified stated interest.

Payments of stated interest on the Term A Obligations will constitute payments of qualified stated interest and generally will be taxable to Holders as ordinary income at the time the payments are received or accrued, in accordance with the Holder's method of tax accounting. Whether the Term A Obligations are issued with OID will depend on the issue price of the Term A Obligations.

Because interest on the Term B Obligations will not be unconditionally payable in cash currently on an annual basis, none of the interest on the Term B Obligations will be qualified stated interest. Accordingly, the Term B Obligations should be issued with OID, in which case a Holder of a Term B Obligation will, as described above, be required to include OID in gross income annually on a constant yield basis in advance of the receipt of cash attributable to that income, regardless of the Holder's regular method of tax accounting. However, a Holder generally will not be required to include separately in income cash payments received on the Term B Obligations to the extent the payments constitute payments of previously accrued OID.

*Amortizable Bond Premium.* To the extent a Holder's initial tax basis in a New Term Obligation is greater than the sum of all amounts payable on the New Term Obligation, other than payments of qualified stated interest, the Holder generally will be considered to have acquired the New Term Obligation with amortizable bond premium (and the New Term Obligation would not have any OID). Generally, a holder that acquires a debt obligation at a premium may elect to amortize bond premium from the acquisition date to the debt's maturity date under a constant yield method. Once made, this election applies to all debt obligations held or subsequently acquired by the holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. The amount amortized in any taxable year generally is treated as an offset to payments of qualified stated interest on the related debt obligation.

*Sale, Retirement or Other Taxable Disposition.* A Holder of a New Term Obligation will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the New Term Obligation equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest and OID which generally will be taxable as ordinary income) and the Holder's adjusted tax basis in such New Term Obligation. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the Holder has held the New Term Obligation for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

*CPDI Rules.* The Debtors intend to treat the Term A Obligations as subject to the Treasury Regulations governing "variable rate debt instruments" (the "VRDI Rules"). If, however, the Term A Obligations are not subject to the VRDI Rules, the rules governing "contingent payment debt instruments" (the "CPDI Rules") may apply to the Term A Obligations. If the CPDI Rules apply to the Term A Obligations, the tax consequences of owning and disposing of the Term A Obligations may be materially different than those described above,

including with respect to the character, timing, and amount of income, gain, or loss recognized. This discussion generally assumes the CPDI Rules will not apply to the Term A Obligations, but there can be no assurance in this regard. Holders are urged to consult their own tax advisors with respect to the appropriate treatment of the Term A Obligations.

### (c) New Common Stock

In general, distributions on the New Common Stock will be treated first as a dividend to the extent of the issuer's current and accumulated earnings and profits (as determined for U.S. federal income tax purposes), and then as a tax-free return of capital to the extent of the Holder's tax basis, with any excess treated as capital gain from the sale or exchange of the stock. In the case of a corporation (provided that certain holding period requirements are met), any dividend generally should be eligible for the dividends received deduction provided by Section 243(a)(1) of the Tax Code. In addition, if a dividend distribution constitutes an "extraordinary dividend," the benefit of the dividends received deduction to a corporate Holder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions in Section 1059 of the Tax Code.

Upon a subsequent sale or other taxable disposition of New Common Stock, a Holder will generally recognize capital gain or loss equal to the difference between the amount realized upon the disposition and the Holder's adjusted tax basis in such New Common Stock. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

Under certain circumstances, holders of New Common Stock could be treated as having received a constructive distribution. For example, if no appropriate adjustment is made to the number of shares of New Common Stock for which an Existing Lender Warrant may be exercised or to the exercise price of the Existing Lender Warrants which has the effect of increasing the proportionate interest of holders of New Common Stock in Reorganized Freedom Holdings' equity, a constructive distribution may result that could be taxable to the holders of New Common Stock.

### (d) Existing Lender Warrants

A Holder of an Existing Lender Warrant generally will not recognize gain or loss upon exercise. The Holder's tax basis in the New Common Stock received upon exercise of an Existing Lender Warrant will be equal to the sum of the Holder's tax basis in the Existing Lender Warrant and the exercise price. The Debtors intend to take the position the Existing Lender Warrants constitute stock of Reorganized Freedom Holdings for U.S. federal income tax purposes consistent with general U.S. federal income tax principles (even though the Existing Lender Warrants may not constitute capital stock for purposes of other federal laws). Assuming such position is correct, the Holder's holding period in the New Common Stock received upon exercise would include the Holder's holding period in the Existing Lender Warrant, and any distributions on the Existing Lender Warrants would generally be treated for U.S. federal income tax purposes in the same manner as distributions on the New Common Stock, as discussed above under "(c) New Common Stock." If the Debtors' position were not correct, then the Holder would generally commence a new holding period with respect to the New Common Stock

received on the date of exercise, and the treatment of distributions on the Existing Lender Warrants in such case is unclear.

Upon the lapse, sale or other taxable disposition of an Existing Lender Warrant, the Holder will generally recognize capital gain or loss equal to the difference between the amount realized (zero in the case of a lapse) and such Holder's adjusted tax basis in such Existing Lender Warrant. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

Under certain circumstances, holders of Existing Lender Warrants could be treated as having received a constructive distribution. For example, if an adjustment is made to the number of shares of New Common Stock for which an Existing Lender Warrant may be exercised or to the exercise price of the Existing Lender Warrants which has the effect of increasing the proportionate interest of holders of Existing Lender Warrants in Reorganized Freedom Holdings' equity, a constructive distribution may result that could be taxable to the holders of Existing Lender Warrants.

(e)       <b>Class A2 Beneficial Trust Interests</b>

In addition to recognizing gain or loss on the Effective Date in respect of its share of the Litigation Trust Assets as described above under "(a) Exchange of Existing Lender Secured Claims for New Term Obligations, New Common Stock, Existing Lender Warrants, Cash and Class A2 Beneficial Trust Interests," a Holder of an Existing Lender Secured Claim should generally recognize its allocable share of income, gain, loss and deductions recognized by the Litigation Trust on an annual basis, as described above in "C. U.S. Federal Income Tax Treatment of the Litigation Trust."

Because such Holder's ultimate amount realized with respect to the Litigation Trust Assets will not be determinable on the Effective Date due to, among other things, the inability on the Effective Date to ascertain the ultimate value of the Litigation Trust Assets, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of assets ultimately received by such Holder from the Litigation Trust is greater or less than the amount used in initially determining gain or loss in accordance with the procedures described above.

It is possible the IRS may assert that any loss should not be recognizable until the Litigation Trustee makes its final distribution of the assets of the Litigation Trust. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Litigation Trust.

3.       <b>Holders of Other Secured Claims Against Encumbered Debtors</b>

The tax consequences to Holders of Other Secured Claims against the Encumbered Debtors in Class A3 will depend on the character of the Other Secured Claim and the consideration paid, if any, with respect to such Other Secured Claim. Holders of Other Secured Claims should consult their tax advisors regarding the consequences of the potential treatment alternatives described in the Plan.

### 4.    Holders of General Unsecured Claims Against Encumbered Debtors

Holders of General Unsecured Claims against the Encumbered Debtors in Class A4 should be treated as receiving from the Debtors their respective shares of the Litigation Trust Assets transferred to the Litigation Trust on the Effective Date, and simultaneously transferring such assets to the Litigation Trust.  Accordingly, a Holder of such a General Unsecured Claim should generally recognize gain or loss for U.S. federal income tax purposes on the Effective Date in an amount equal to the difference between (1) the fair market value of such Holder's share of the Litigation Trust Assets transferred to the Litigation Trust on the Effective Date, and (2) the Holder's adjusted tax basis in the General Unsecured Claim. A Holder should, however, recognize ordinary income to the extent it is deemed to receive such Litigation Trust Assets in respect of accrued interest or accrued market discount that has not already been included in income (as described above under "Allocation of Payments Between Principal and Interest"). Conversely, a Holder would generally recognize a loss to the extent any accrued interest or accrued market discount was previously included in income and is not paid (or deemed paid) in full. Additionally, such Holder should generally recognize its allocable share of income, gain, loss and deductions recognized by the Litigation Trust on an annual basis, as described above in "C.  U.S. Federal Income Tax Treatment of the Litigation Trust."

Because such Holder's ultimate amount realized with respect to the Litigation Trust Assets will not be determinable on the Effective Date due to, among other things, the inability on the Effective Date to ascertain the ultimate value of the Litigation Trust Assets, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of assets ultimately received by such Holder from the Litigation Trust is greater or less than the amount used in initially determining gain or loss in accordance with the procedures described above.

It is possible the IRS may assert that any loss should not be recognizable until the Litigation Trustee makes its final distribution of the assets of the Litigation Trust.  Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Litigation Trust.

Holders of General Unsecured Claims against the Encumbered Debtors should consult their tax advisors regarding the character of any gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Holder, whether such Claims have been held for more than one year, whether such Claims have bond premium or market discount whether and to what extent the Holder previously claimed a bad debt deduction with respect to such Claims, and the nature and origin of such Claims. Holders should also consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

Holders that may become holders of Allowed Trade Unsecured Claims should consult their tax advisors as to the consequences of payments, if any, made to them from the Trade Unsecured Claim Escrow.  The foregoing discussion does not take into account the possibility of such payments.

### 5. Holders of Non-Qualified Retirement Claims

The tax consequences to Holders of Non-Qualified Retirement Claims in Class A5 will depend on the particular circumstances of the Holder. Holders of Non-Qualified Retirement Claims should consult their tax advisors regarding the consequences of the Plan.

### 6. Holders of Tort Claims

The tax consequences to Holders of Tort Claims against the Encumbered Debtors in Class A7 will depend on, among other things, the particular circumstances of the Holder and the nature and origin of the Tort Claim. Holders of Tort Claims should consult their tax advisors regarding the consequences of the Plan.

### 7. Information Reporting and Backup Withholding

The Debtors or their paying agent may be obligated to furnish information to the IRS regarding the consideration received by Holders pursuant to the Plan. In addition, the Debtors generally will be required to report annually to the IRS, with respect to each Holder, the amount of interest (including any OID) paid or accrued on the New Term Obligations and dividends paid (or deemed paid) on the New Equity and the amount of any tax withheld from payment thereof. Certain Holders (including corporations) generally are not subject to information reporting.

Holders may be subject to backup withholding on the consideration received pursuant to the Plan. Backup withholding may also apply to interest paid or accrued on the New Term Obligations and dividends paid on the New Equity and to proceeds received upon sale or other disposition of the New Term Obligations and the New Equity. Certain Holders (including corporations) generally are not subject to backup withholding. A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Debtors or their paying agent its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their U.S. federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

[space intentionally left blank]

# ARTICLE X.
## RECOMMENDATION

Based on the foregoing analysis of the Debtors, the Debtors' remaining assets, and the Plan, the Debtors believe that the best interests of all parties would be served through confirmation of the Plan. **ACCORDINGLY, THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO "ACCEPT" THE PLAN.**

Dated:  January 28, 2010

Freedom Communications Holdings, Inc.
(for itself and on behalf of the Subsidiary Debtors)

By: _Mark A. McEachen_

Mark A. McEachen
Senior Vice President and Chief Financial Officer

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:302-571-6600
Facsimile: 302-571-1253
Email:        mnestor@ycst.com
                   kcoyle@ycst.com

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:      213-485-1234
Facsimile: 213-891-8763
Email:        robert.klyman@lw.com

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:      212-906-1200
Facsimile: 212-751-4864
Email:        rosalie.gray@lw.com
                   michael.riela@lw.com

Co-Counsel for Debtors and Debtors in Possession

**Exhibit 1**

**Joint Plan of Reorganization**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **FREEDOM COMMUNICATIONS HOLDINGS, INC.,** *et al.* | **Case No. 09-13046 (BLS)** |
| Debtors. | **Jointly Administered** |

---

## JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
### OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS

### Dated: January 28, 2010

---

LATHAM & WATKINS LLP
Robert A. Klyman
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:        robert.klyman@lw.com

Rosalie Walker Gray
Michael J. Riela
885 Third Avenue
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:        rosalie.gray@lw.com
                michael.riela@lw.com

Counsel for the Debtors

YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:        mnestor@ycst.com
                kcoyle@ycst.com

Counsel for the Debtors

# TABLE OF CONTENTS

ARTICLE I TERMINOLOGY AND DEFINITIONS................................................................2
1.1 "Aggregate Existing Lender Share Number"...............................................................2
1.2 "Adequate Protection Obligations"..............................................................................2
1.3 "Administrative Claim"................................................................................................2
1.4 "Allowed"....................................................................................................................2
1.5 "Amended Engagement Agreement"...........................................................................3
1.6 "Ballot".......................................................................................................................3
1.7 "Bankruptcy Code"......................................................................................................3
1.8 "Bankruptcy Court".....................................................................................................3
1.9 "Bankruptcy Rules".....................................................................................................3
1.10 "Bar Date(s)".............................................................................................................3
1.11 "Broadcast Licensee Companies"..............................................................................3
1.12 "Broadcast Operating Companies".............................................................................3
1.13 "Broadcast Stations"..................................................................................................4
1.14 "Broadcast Trust Agreement"....................................................................................4
1.15 "Broadcast Trustee"...................................................................................................4
1.16 "Business Day"..........................................................................................................4
1.17 "Cash"........................................................................................................................4
1.18 "Cash Collateral Order".............................................................................................4
1.19 "Chapter 11 Cases"....................................................................................................4
1.20 "Claim".......................................................................................................................4
1.21 "Claims Objection Deadline".....................................................................................4
1.22 "Class".......................................................................................................................4
1.23 "Class A2 Beneficial Trust Interests".........................................................................4
1.24 "Class A4 Beneficial Trust Interests".........................................................................4
1.25 "Class A4 Claim".......................................................................................................5
1.26 "Conditions to Stay"..................................................................................................5
1.27 "Confidentiality and Common Interest Agreement"...................................................5
1.28 "Confirmation"..........................................................................................................5
1.29 "Confirmation Date"..................................................................................................5
1.30 "Confirmation Hearing".............................................................................................5
1.31 "Confirmation Order".................................................................................................5
1.32 "Contract/Lease Schedules".......................................................................................5
1.33 "Coverage Denial"......................................................................................................5
1.34 "Coverage Statement".................................................................................................5
1.35 "Creditor"...................................................................................................................5
1.36 "Creditors' Committee"..............................................................................................5
1.37 "Cure".........................................................................................................................5
1.38 "D&O Action"............................................................................................................6
1.39 "D&O Defendants".....................................................................................................6
1.40 "D&O Insurance Policies"..........................................................................................6
1.41 "D&O Insurers"..........................................................................................................6
1.42 "Debtor(s)".................................................................................................................6
1.43 "Defense Expenses"....................................................................................................6
1.44 "Disbursing Agent".....................................................................................................6
1.45 "Disclosure Statement"...............................................................................................6
1.46 "Disputed"..................................................................................................................6
1.47 "Distribution Date".....................................................................................................7
1.48 "Distribution Interest".................................................................................................7
1.49 "Distribution Record Date".........................................................................................7
1.50 "Duty to Defend".......................................................................................................7
1.51 "Effective Date".........................................................................................................7
1.52 "EMRP"......................................................................................................................7
1.53 "Encumbered Debtor(s)".............................................................................................7
1.54 "ERISA"......................................................................................................................7

1.55    "Estate(s)" ...........................................................................................................7

1.56    "Excess Cash" .....................................................................................................7

1.57    "Existing Credit Agreement Documents" .........................................................8

1.58    "Existing Lender Agent" ....................................................................................8

1.59    "Existing Lender Fee Claim" .............................................................................8

1.60    "Existing Lenders" .............................................................................................8

1.61    "Existing Lender Claim" ....................................................................................8

1.62    "Existing Lender Deficiency Claim" ..................................................................8

1.63    "Existing Lender Secured Claim" ......................................................................8

1.64    "Existing Lender Shares" ...................................................................................8

1.65    "Existing Lender Warrant Agreement" ..............................................................8

1.66    "Existing Lender Warrants" ...............................................................................8

1.67    "Exit Facility" ....................................................................................................8

1.68    "Exit Financing Share Allocation" ....................................................................9

1.69    "FCC" .................................................................................................................9

1.70    "Final Order" ......................................................................................................9

1.71    "First Day Employee Order" ..............................................................................9

1.72    "Freedom Communications" ..............................................................................9

1.73    "Freedom Holdings" ..........................................................................................9

1.74    "General Unsecured Claims" ..............................................................................9

1.75    "Gonzalez Class Counsel" .................................................................................9

1.76    "Gonzalez Litigation Claim" ..............................................................................9

1.77    "Houlihan" ........................................................................................................10

1.78    "Impaired" ........................................................................................................10

1.79    "Indemnification Obligation" ...........................................................................10

1.80    "Individual Retirement Agreements" ...............................................................10

1.81    "Insurance Coverage Action" ...........................................................................10

1.82    "Intercompany Claim" ......................................................................................10

1.83    "Intercreditor Agreement" ................................................................................10

1.84    "Interests" .........................................................................................................10

1.85    "Litigation Trust" .............................................................................................10

1.86    "Litigation Trust Agreement" ..........................................................................10

1.87    "Litigation Trust Assets" .................................................................................11

1.88    "Litigation Trustee" .........................................................................................11

1.89    "LMA" ..............................................................................................................11

1.90    "LT Beneficiaries" ...........................................................................................11

1.91    "Mutual Release Agreement" ...........................................................................11

1.92    "Net Cash Proceeds" ........................................................................................11

1.93    "Net Litigation Proceeds" ................................................................................11

1.94    "New Board" .....................................................................................................11

1.95    "New Common Stock" ......................................................................................12

1.96    "New Equity Incentive Plan" ...........................................................................12

1.97    "New Freedom By-Laws" .................................................................................12

1.98    "New Freedom Charter" ...................................................................................12

1.99    "New Freedom Governing Documents" ...........................................................12

1.100   "New Securities" ..............................................................................................12

1.101   "New Stockholders Agreement" .......................................................................12

1.102   "New Subsidiary Governing Documents" .........................................................12

1.103   "Non-Qualified DC Plan" .................................................................................12

1.104   "Non-Qualified EB Plan" .................................................................................12

1.105   "Non-Qualified Retirement Claim" ..................................................................12

1.106   "Old Freedom Stock Interests" ........................................................................13

1.107   "Old Freedom Stock Rights" ...........................................................................13

1.108   "Other Priority Claim" .....................................................................................13

1.109   "Other Secured Claim" .....................................................................................13

1.110   "PBGC" ............................................................................................................13

1.111   "Person" ............................................................................................................13

1.112   "Petition Date" .................................................................................................13

| | | |
|---|---|---|
| 1.113 | "Plan" | 13 |
| 1.114 | "Plan Supplement" | 13 |
| 1.115 | "Post-Emergence Trade Agreement" | 14 |
| 1.116 | "Primary D&O Insurer" | 14 |
| 1.117 | "Priority Tax Claim" | 14 |
| 1.118 | "Professional" | 14 |
| 1.119 | "Professional Fee Claim" | 14 |
| 1.120 | "Proof of Claim" | 14 |
| 1.121 | "Pro Rata" | 14 |
| 1.122 | "Registration Rights Agreement" | 14 |
| 1.123 | "Reinstated" | 14 |
| 1.124 | "Released Causes of Action" | 15 |
| 1.125 | "Releasing Party" | 15 |
| 1.126 | "Reorganized Broadcast Licensee Companies" | 15 |
| 1.127 | "Reorganized Broadcast Operating Companies" | 15 |
| 1.128 | "Reorganized Debtor(s)" | 15 |
| 1.129 | "Reorganized Freedom Communications" | 15 |
| 1.130 | "Reorganized Freedom Holdings" | 15 |
| 1.131 | "Reorganized Subsidiary Debtor(s)" | 15 |
| 1.132 | "Request for Payment" | 15 |
| 1.133 | "Retained Litigation Rights" | 15 |
| 1.134 | "Retirement Plan" | 15 |
| 1.135 | "Schedules" | 15 |
| 1.136 | "Secured Claim" | 16 |
| 1.137 | "Steering Committee Members" | 16 |
| 1.138 | "Subordinated Claim" | 16 |
| 1.139 | "Subsidiary Debtors" | 16 |
| 1.140 | "Subsidiary Interests" | 17 |
| 1.141 | "Substantial Contribution Claim" | 17 |
| 1.142 | "Tax Items" | 17 |
| 1.143 | "Term A Facility" | 17 |
| 1.144 | "Term A Loan Obligations" | 17 |
| 1.145 | "Term B Facility" | 17 |
| 1.146 | "Term B Loan Obligations" | 17 |
| 1.147 | "Third Party Release" | 17 |
| 1.148 | "Third Party Releasees" | 17 |
| 1.149 | "Tort Claim" | 17 |
| 1.150 | "Trade Unsecured Claim" | 18 |
| 1.151 | "Trade Unsecured Claim Escrow" | 18 |
| 1.152 | "Transferred Cash" | 18 |
| 1.153 | "Transferred Causes of Action" | 18 |
| 1.154 | "Trial Court Disposition" | 18 |
| 1.155 | "Trust Indemnified Parties" | 18 |
| 1.156 | "Unencumbered Debtor(s)" | 18 |
| 1.157 | "Unimpaired" | 18 |
| 1.158 | "Voting Deadline" | 18 |
| | | |
| ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS | | 18 |
| 2.1 | Introduction | 18 |
| 2.2 | Classes of Claims Against and Interests in Encumbered Debtors | 19 |
| 2.3 | Classes of Claims Against and Interests in Unencumbered Debtors | 20 |
| | | |
| ARTICLE III TREATMENT OF CLAIMS AND INTERESTS | | 21 |
| 3.1 | Unclassified Claims | 21 |
| 3.2 | Classes of Claims Against and Interests in Encumbered Debtors | 22 |
| 3.3 | Classes of Claims Against and Interests in Unencumbered Debtors | 27 |
| 3.4 | Reservation of Rights Regarding Claims | 28 |

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ...............................................29
4.1        Impaired Classes of Claims Entitled to Vote ..........................................................29
4.2        Acceptance by an Impaired Class Entitled to Vote ................................................29
4.3        Presumed Acceptances by Unimpaired Classes and Debtor-Only Classes ............29
4.4        Classes Deemed to Reject Plan ..............................................................................29
4.5        Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code......................29

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN .............................................30
5.1        Continued Corporate Existence................................................................................30
5.2        New Governing Documents .....................................................................................30
5.3        Revesting of Assets; Releases of Liens ...................................................................30
5.4        Cancellation of Prepetition Obligations ..................................................................30
5.5        Exit Funding.............................................................................................................30
5.6        Authorization and Issuance of New Securities.........................................................31
5.7        Directors of Reorganized Debtors............................................................................32
5.8        Officers of Reorganized Debtors..............................................................................32
5.9        Indemnification of Reorganized Debtors' Directors, Officers, and Employees.......32
5.10       Management Incentive and Other Agreements ........................................................32
5.11       Post-Emergence Trade Agreement Procedure..........................................................33
5.12       Retained Litigation Rights.......................................................................................34
5.13       Effectuating Documents; Further Transactions .......................................................35
5.14       Exemption From Certain Transfer Taxes .................................................................35
5.15       Corporate Action......................................................................................................35
5.16       Interim Trust Control of Subsidiary Interests in Broadcast Licensee Companies....36
5.17       Litigation Trust.........................................................................................................37
5.18       Approval of Compromises and Settlements Embodied in Plan................................45

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES...............45
6.1        Assumption of Contracts and Leases; Continuing Obligations................................45
6.2        Cure Rights for Executory Contracts or Unexpired Leases Assumed under Plan....46
6.3        Rejection of Contracts and Leases ...........................................................................46
6.4        Rejection Damage Claim Bar Date for Rejections Pursuant to Plan ........................47
6.5        Employee Compensation and Benefit Programs ......................................................47
6.6        Indemnification Obligations.....................................................................................49
6.7        Insurance Rights.......................................................................................................50
6.8        Limited Extension of Time to Assume or Reject .....................................................51
6.9        Postpetition Contracts and Leases ...........................................................................51
6.10       Claims Arising from Assumption or Rejection ........................................................51

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS....................................................51
7.1        Distributions for Claims Allowed as of Effective Date............................................51
7.2        Interest on Claims and Interests ..............................................................................52
7.3        Designation of and Distributions by Disbursing Agent............................................52
7.4        Means of Cash Payment...........................................................................................53
7.5        Calculation of Distribution Amounts of New Securities ..........................................53
7.6        Delivery of Distributions..........................................................................................53
7.7        Application of Distribution Record Date ..................................................................54
7.8        Withholding and Reporting Requirements ...............................................................55
7.9        Setoffs ......................................................................................................................55
7.10       Prepayment...............................................................................................................55
7.11       De Minimis Distributions.........................................................................................56
7.12       No Distribution in Excess of Allowed Amount of Claim .........................................56
7.13       Allocation of Distributions.......................................................................................56

ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND
           UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO..........56
8.1        Prosecution of Objections to Claims .......................................................................56
8.2        Deemed Allowance of Gonzalez Litigation Claims .................................................57

8.3      Treatment of Disputed Claims Pending Allowance ........................................................57
8.4      Allocations and Distributions for Disputed Class A4 Claims ...............................................58
8.5      Distributions on Account of Other Disputed Claims Once Allowed .....................................58

ARTICLE IX CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN............58
9.1      Conditions to Confirmation.........................................................................................58
9.2      Conditions to Effective Date .......................................................................................59
9.3      Waiver of Conditions ................................................................................................61

ARTICLE X RETENTION OF JURISDICTION ...................................................................61
10.1      Scope of Retention of Jurisdiction ...............................................................................61
10.2      Failure of the Bankruptcy Court to Exercise Jurisdiction ..................................................63

ARTICLE XI MISCELLANEOUS PROVISIONS...................................................................63
11.1      Professional Fee Claims; Expense Reimbursements..........................................................63
11.2      Administrative Claims Bar Date ...................................................................................64
11.3      Payment of Statutory Fees..........................................................................................64
11.4      Modifications and Amendments ...................................................................................64
11.5      Severability of Plan Provisions ....................................................................................65
11.6      Successors and Assigns and Binding Effect.....................................................................65
11.7      Compromises and Settlements .....................................................................................65
11.8      Releases and Satisfaction of Subordination Rights ...........................................................65
11.9      Releases and Related Matters.......................................................................................66
11.10      Discharge of the Debtors............................................................................................68
11.11      Injunction ..............................................................................................................69
11.12      Exculpation and Limitation of Liability .........................................................................70
11.13      Term of Injunctions or Stays .......................................................................................70
11.14      Revocation, Withdrawal, or Non-Consummation .............................................................71
11.15      Plan Supplement ......................................................................................................71
11.16      Notices ..................................................................................................................71
11.17      Dissolution of Creditors' Committee .............................................................................72
11.18      Computation of Time ................................................................................................72
11.19      Governing Law........................................................................................................73

## EXHIBITS

| | |
|---|---|
| Exhibit A | Material Terms of Term A Facility |
| Exhibit B | Material Terms of Term B Facility |
| Exhibit C | Material Terms of New Common Stock |
| Exhibit D | Material Terms of Existing Lender Warrants |
| Exhibit E | Post-Emergence Trade Agreement |

# JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
## OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS

## INTRODUCTION

Freedom Communications Holdings, Inc. and certain of its subsidiaries and affiliates, including Freedom Communications, Inc., Freedom Broadcasting, Inc., Freedom Broadcasting of Florida, Inc., Freedom Broadcasting of Florida Licensee, L.L.C., Freedom Broadcasting of Michigan, Inc., Freedom Broadcasting of Michigan Licensee, L.L.C., Freedom Broadcasting of New York, Inc., Freedom Broadcasting of New York Licensee, L.L.C., Freedom Broadcasting of Oregon, Inc., Freedom Broadcasting of Oregon Licensee, L.L.C., Freedom Broadcasting of Southern New England, Inc., Freedom Broadcasting of Southern New England Licensee, L.L.C., Freedom Broadcasting of Texas, Inc., Freedom Broadcasting of Texas, Licensee, L.L.C., Freedom Broadcasting of Tennessee, Inc., Freedom Broadcasting of Tennessee Licensee, L.L.C., Freedom Magazines, Inc., Freedom Metro Information, Inc., Freedom Newspapers, Inc., Orange Country Register Communications, Inc., OCR Community Publications, Inc., OCR Information Marketing, Inc., Appeal-Democrat, Inc., Florida Freedom Newspapers, Inc., Freedom Arizona Information, Inc., Freedom Colorado Information, Inc., Freedom Eastern North Carolina Communications, Inc., Freedom Newspapers of Illinois, Inc., Freedom Newspapers of Southwestern Arizona, Inc., Freedom Shelby Star, Inc., Illinois Freedom Newspapers, Inc., Missouri Freedom Newspapers, Inc., Odessa American, The Times-News Publishing Company, Victor Valley Publishing Company, Daily Press, Freedom Newspaper Acquisitions, Inc., The Clovis News-Journal, Freedom Newspapers of New Mexico L.L.C., Gaston Gazette LLP, Lima News, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, Freedom Newspapers, The Creative Spot, L.L.C., Freedom Interactive Newspapers, Inc., Freedom Interactive Newspapers of Texas, Inc., and Freedom Services, Inc., hereby propose this joint plan of reorganization for the resolution of their outstanding Claims (as defined herein) and Interests (as defined herein).

Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for a discussion of the history, businesses, properties, results of operations, projections for future operations, and risk factors of the Debtors (as defined herein), a summary and analysis of the Plan (as defined herein), and certain related matters, including the New Securities (as defined herein) to be issued under the Plan. The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code (as defined herein).

All holders of Claims who are entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, Rule 3019 of the Bankruptcy Rules (as defined herein), and Article XI of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined in the Plan shall have the meanings ascribed to them in Article I of the Plan. Any capitalized term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the

context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

All documents within the Plan Supplement (as defined herein) and all Exhibits to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.

# ARTICLE I

## TERMINOLOGY AND DEFINITIONS

For purposes of the Plan, (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (c) unless otherwise specified, all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan, (d) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**1.1** **"Aggregate Existing Lender Share Number"** means the sum of (a) the number of Existing Lender Shares and (b) the number of shares of New Common Stock issuable upon exercise of the Existing Lender Warrants issued pursuant to Section 3.2(b), in each case, as of the Effective Date.

**1.2** **"Adequate Protection Obligations"** has the meaning assigned thereto in the Cash Collateral Order. The term includes the Existing Lender Fee Claims.

**1.3** **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, bonuses, or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Fee Claims, (c) Substantial Contribution Claims, (d) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, (e) all Allowed Claims for the value of goods received under Section 503(b)(9) of the Bankruptcy Code, (f) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (g) Cure payments, and (h) to the extent applicable, the portion of the Adequate Protection Obligations that constitute Claims under Section 507(b) of the Bankruptcy Code.

**1.4** **"Allowed"** means, (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim that has been allowed, or adjudicated in favor of the holder

by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become allowed by failure to object pursuant to Section 8.1 of the Plan; (b) when used with respect to a Claim other than an Administrative Claim, such Claim or any portion thereof (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) as to which (x) no Proof of Claim has been filed with the Bankruptcy Court and (y) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (iii) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (x) at the time of the applicable initial Distribution Date, the Reorganized Debtors or the Litigation Trustee, as applicable, have not identified such Claim as being objectionable in whole or part and no objection to the allowance thereof has been filed by the applicable Claims Objection Deadline, or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan; or (c) when used with respect to an Interest, an Interest held in the name, kind, and amount set forth on the records retained by the applicable Debtor.

**1.5** **"Amended Engagement Agreement"** has the meaning set forth in Section 11.1(b) of the Plan.

**1.6** **"Ballot"** means the form of ballot approved by the Bankruptcy Court for use by holders of Claims for purposes of voting to accept or reject the Plan.

**1.7** **"Bankruptcy Code"** means Section 101 *et seq.*, of Title 11 of the United States Code, as now in effect or hereafter amended and applicable to the Chapter 11 Cases.

**1.8** **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof.

**1.9** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure.

**1.10** **"Bar Date(s)"** means the date(s) designated by the Bankruptcy Court as the last date(s) for filing Proofs of Claim against the Debtors.

**1.11** **"Broadcast Licensee Companies"** means Freedom Broadcasting of Florida Licensee, L.L.C., Freedom Broadcasting of Michigan Licensee, L.L.C., Freedom Broadcasting of New York Licensee, L.L.C., Freedom Broadcasting of Oregon Licensee, L.L.C., Freedom Broadcasting of Texas Licensee, L.L.C., and Freedom Broadcasting of Tennessee Licensee, L.L.C., each a Debtor herein.

**1.12** **"Broadcast Operating Companies"** means Freedom Broadcasting of Florida, Inc., Freedom Broadcasting of Michigan, Inc., Freedom Broadcasting of New York, Inc., Freedom Broadcasting of Oregon, Inc., Freedom Broadcasting of Texas, Inc., and Freedom Broadcasting of Tennessee, Inc., each a Debtor herein.

**1.13** **"Broadcast Stations"** means the television stations the FCC licenses of which are held by the Broadcast Licensee Companies or the Reorganized Broadcast Licensee Companies.

**1.14** **"Broadcast Trust Agreement"** means the Trust Agreement to be entered into by the Broadcast Operating Companies and the Broadcast Trustee, which shall be substantially in the form included in the Plan Supplement and shall have terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors.

**1.15** **"Broadcast Trustee"** means the trustee under the Broadcast Trust Agreement.

**1.16** **"Business Day"** means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Rule 9006(a) of the Bankruptcy Rules), on which commercial banks are open for business in New York, New York.

**1.17** **"Cash"** means legal tender of the United States or equivalents thereof.

**1.18** **"Cash Collateral Order"** means the Final Order (I) Authorizing Use of Prepetition Lenders' Cash Collateral under 11 U.S.C. § 363 and (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 and 363, which was entered by the Bankruptcy Court on October 15, 2009, as it may be amended through the Effective Date.

**1.19** **"Chapter 11 Cases"** means the jointly administered Chapter 11 cases of the Debtors.

**1.20** **"Claim"** means (a) the right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.21** **"Claims Objection Deadline"** means the last day for filing objections to Claims, including Administrative Claims, shall be the latest of (a) one hundred and twenty (120) days after the Effective Date, (b) sixty (60) days after the applicable Proof of Claim or Request for Payment of an Administrative Claim is filed, and (c) such other date ordered by the Bankruptcy Court upon motion of the Reorganized Debtors or, with respect to Class A4 Claims, the Litigation Trustee, without notice to any party.

**1.22** **"Class"** means a category of holders of Claims or Interests, as described in Article II of the Plan.

**1.23** **"Class A2 Beneficial Trust Interests"** means beneficial interests in the Litigation Trust granted to holders of Allowed Existing Lender Claims, which interests shall entitle the holders, in the aggregate, to any Net Litigation Proceeds remaining after the holders of Allowed Class A4 Claims have received, through the Class A4 Beneficial Trust Interests, payment in full of their Allowed Claims plus Distribution Interest.

**1.24** **"Class A4 Beneficial Trust Interests"** means beneficial interests in the Litigation Trust granted to holders of Allowed Class A4 Claims, which interests shall entitle the holders, in the aggregate, to (a) the Net Cash Proceeds and (b) the Net Litigation Proceeds; *provided, however,*

that in no event shall any such holder of an Allowed Class A4 Claim be entitled to receive payments that exceed the Allowed amount of such holder's Claim plus Distribution Interest.

**1.25** **"Class A4 Claim"** means a General Unsecured Claim against the Encumbered Debtors that is classified and treated in Class A4 of the Plan.

**1.26** **"Conditions to Stay"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.27** **"Confidentiality and Common Interest Agreement"** means the confidentiality and common interest agreement, substantially in the form included in the Plan Supplement, to be entered into between the Reorganized Debtors and the Litigation Trust, governing the use of confidential information or material provided to the Litigation Trust.

**1.28** **"Confirmation"** means approval of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

**1.29** **"Confirmation Date"** means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

**1.30** **"Confirmation Hearing"** means the hearing to consider Confirmation of the Plan under Section 1128 of the Bankruptcy Code.

**1.31** **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming the Plan.

**1.32** **"Contract/Lease Schedules"** means the schedules, in form and substance reasonably acceptable to the Steering Committee Members, as they may be amended prior to the Confirmation Date, which identify the executory contracts and unexpired leases to be assumed under the Plan and set forth any Cure obligation associated with the assumption of such contracts and leases.

**1.33** **"Coverage Denial"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.34** **"Coverage Statement"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.35** **"Creditor"** means any Person who holds a Claim against any of the Debtors.

**1.36** **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed pursuant to Section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases, as reconstituted from time to time.

**1.37** **"Cure"** means (a) with respect to the assumption of an executory contract or unexpired lease pursuant to Section 365(b) of the Bankruptcy Code, (i) the distribution of Cash, or the distribution of such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties under an executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law, or (ii) the taking of such other actions as may be agreed upon by the parties or ordered by the Bankruptcy Court; and (b) to the extent not covered by the foregoing,

with respect to any license granted by the FCC, the payment of any fees or other amounts owed to the FCC.

**1.38    "D&O Action"** has the meaning set forth in Section 5.17(q) of the Plan.

**1.39    "D&O Defendants"** means the current or former directors of Freedom Holdings and Freedom Communications and the current interim chief executive officer of Freedom Holdings.

**1.40    "D&O Insurance Policies"** has the meaning set forth in Section 5.17(p) of the Plan.

**1.41    "D&O Insurers"** has the meaning set forth in Section 5.17(p) of the Plan.

**1.42    "Debtor(s)"** means, individually, Freedom Holdings or one of the Subsidiary Debtors, and collectively, Freedom Holdings and the Subsidiary Debtors, including in their capacity as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**1.43    "Defense Expenses"** has the meaning set forth in Section 6.6(b) of the Plan.

**1.44    "Disbursing Agent"** means Reorganized Freedom Holdings or any Person designated by Reorganized Freedom Holdings, in its sole discretion, to serve as disbursing agent under the Plan.

**1.45    "Disclosure Statement"** means the written disclosure statement that relates to the Plan, as amended, supplemented, or modified from time to time, and that is prepared and approved in form and substance satisfactory to the Debtors, the Steering Committee Members, and the Creditors' Committee, and distributed, in accordance with Section 1125 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules or any summary thereof approved by the Bankruptcy Court for distribution to certain Classes or categories of Claims and Interests.

**1.46    "Disputed"** means (a) with respect to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Claim (i) as to which no Request for Payment or Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed; (ii) as to which a Request for Payment or Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, but as to which an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court has been filed by the applicable Claims Objection Deadline, or which is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (iii) as to which a Request for Payment or Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Request for Payment or Proof of Claim was not timely or properly filed; (iv) for damages based upon the rejection by the Debtors of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed as of the applicable initial Distribution Date; (v) that is disputed in accordance with the provisions of the Plan; or (vi) if not otherwise Allowed, identified by the Reorganized Debtors or the Litigation Trustee, as applicable, at the time of the applicable initial Distribution Date as being objectionable in whole or part and as to which an objection to the allowance thereof has been filed by the applicable Claims Objection Deadline; and (b) with respect to any Interest, an Interest held in a name, kind,

or amount different from the name, kind, and amount set forth on the records retained by the applicable Debtor.

**1.47** **"Distribution Date"** means for any Claim (a) that is an Allowed Claim on the Effective Date, the Effective Date or as soon as practicable thereafter, or (b) that is not an Allowed Claim on the Effective Date, thirty (30) calendar days after the last day of the month during which the Claim becomes an Allowed Claim. As to an Allowed Class A4 Claim entitled to a subsequent distribution, if any, under Section 8.4 of the Plan, such term means the additional date provided in such Section 8.4.

**1.48** **"Distribution Interest"** means interest to accrue on the unpaid amount of an Allowed Class A4 Claim commencing on the Petition Date and continuing to the last date on which distributions are made with respect to Class A4 Beneficial Trust Interests, at the rate in effect on the Effective Date (as though such date was the judgment date), and as computed and accrued, under Section 1961 of Title 28 of the United States Code.

**1.49** **"Distribution Record Date"** means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims, which date shall be (a) in respect of the Existing Lender Secured Claims, the date to be agreed by the Debtors and the Existing Lender Agent, and (b) in respect of all other Claims, the Business Day immediately preceding the Effective Date, at 5:00 p.m. prevailing Eastern time on such Business Day.

**1.50** **"Duty to Defend"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.51** **"Effective Date"** means the Business Day upon which all conditions to the consummation of the Plan as set forth in Section 9.2 of the Plan have been satisfied or waived as provided in Section 9.3 of the Plan, and is the date on which the Plan becomes effective.

**1.52** **"EMRP"** has the meaning set forth in Section 6.5(g) of the Plan.

**1.53** **"Encumbered Debtor(s)"** means, individually or collectively, each Debtor who is not an Unencumbered Debtor or all Debtors who are not Unencumbered Debtors.

**1.54** **"ERISA"** has the meaning set forth in Section 6.5(b) of the Plan.

**1.55** **"Estate(s)"** means, individually, the estate of each Debtor in the Chapter 11 Cases and, collectively, the estates of all Debtors in the Chapter 11 Cases, created pursuant to Section 541 of the Bankruptcy Code.

**1.56** **"Excess Cash"** means the amount of Cash held by the Reorganized Debtors as of the Effective Date that exceeds $15 million, to be distributed to the holders of Allowed Existing Lender Secured Claims on the Effective Date as provided for in Section 3.2(b) of the Plan. For purposes hereof, the amount of Excess Cash to be distributed to holders of Allowed Existing Lender Secured Claims under Section 3.2(b) of the Plan shall be calculated after deducting from the aggregate amount of Cash held by the Reorganized Debtors on the Effective Date (a) the aggregate amount of the Transferred Cash, (b) the aggregate amount of the Trade Unsecured Claim Escrow to be established under Section 5.11 of the Plan, (c) the aggregate amount of the Allowed Claims against the Unencumbered Debtors to be Reinstated under the Plan, (d) the aggregate amount of known and incurred Administrative Claims (whether or not approved by the Bankruptcy Court), Priority Tax Claims, Other Priority Claims, and Other Secured Claims to be

paid under the Plan, and (e) such other amounts as may be agreed to by the Debtors and the Steering Committee Members.

**1.57** **"Existing Credit Agreement Documents"** means (a) that certain Credit Agreement, dated as of May 18, 2004, as amended, among Freedom Holdings, Freedom Communications as borrower, the Existing Lenders and the Existing Lender Agent, (b) that certain Guarantee and Collateral Agreement, dated as of May 18, 2004, as amended, among Freedom Holdings, Freedom Communications, certain of the Subsidiary Debtors as subsidiary loan parties, and JPMorgan Chase Bank, N.A. as collateral agent, and (c) the other "Loan Documents" as defined in the Credit Agreement.

**1.58** **"Existing Lender Agent"** means JPMorgan Chase Bank, N.A. as administrative agent for the Existing Lenders under the Existing Credit Agreement Documents or any duly appointed successor administrative agent.

**1.59** **"Existing Lender Fee Claim"** means any Claim for interest, fees, expenses, costs and other charges of the Existing Lender Agent or any Existing Lender (including of their respective counsel and advisors) that is authorized to be paid under the Cash Collateral Order but which are incurred and unpaid as of the Effective Date.

**1.60** **"Existing Lenders"** means the several lenders from time to time party to the Existing Credit Agreement Documents.

**1.61** **"Existing Lender Claim"** means a Claim arising under the Existing Credit Agreement Documents, including both the component that is an Existing Lender Secured Claim and the component that is an Existing Lender Deficiency Claim.

**1.62** **"Existing Lender Deficiency Claim"** means any Claim arising under the Existing Credit Agreement Documents that is not a Secured Claim.

**1.63** **"Existing Lender Secured Claim"** means any Secured Claim arising under the Existing Credit Agreement Documents.

**1.64** **"Existing Lender Shares"** means one hundred percent (100%) of the shares of New Common Stock, subject to dilution as a result of the Exit Financing Share Allocation, the New Equity Incentive Plan, and the exercise of the Existing Lender Warrants.

**1.65** **"Existing Lender Warrant Agreement"** means the agreement governing the Existing Lender Warrants, to be substantially in the form included in the Plan Supplement, and on terms and conditions reasonably satisfactory to the Steering Committee Members and the Debtors.

**1.66** **"Existing Lender Warrants"** means warrants issued to the Existing Lenders for the purchase of shares of New Common Stock at an exercise price of $0.001 per share, with terms substantially as described on Exhibit D to the Plan.

**1.67** **"Exit Facility"** means a revolving loan facility in an amount of at least $25 million, to be provided under that certain credit agreement (and any related documents, agreements, and instruments) to be entered into by the Reorganized Debtors as of the Effective Date, and having terms and conditions satisfactory in all respects to the Debtors and the Steering Committee Members, and substantially in accordance with the term sheet included in the Plan Supplement.

**1.68** **"Exit Financing Share Allocation"** means an allocation of a number of shares of New Common Stock and/or Existing Lender Warrants in an amount of up to twenty percent (20%) of the Aggregate Existing Lender Share Number, which allocation may be issued to the lender or lenders under the Exit Facility pursuant to Section 5.5 of the Plan.

**1.69** **"FCC"** means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

**1.70** **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any such court, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.71** **"First Day Employee Order"** means the Order (i) Authorizing Payment of Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements, and Related Obligations, (ii) Confirming Right to Continue Employee Programs on Postpetition Basis, (iii) Confirming Right to Pay Withholding and Payroll-Related Taxes, (iv) Authorizing Payment of Prepetition Claims Owing To Administrators of, or Third Party Providers under, Employee Programs, (v) Authorizing Payment of Independent Contractor Obligations, (vi) Directing Banks to Honor Prepetition Checks and Fund Transfers for Payment of Prepetition Employee Obligations and Prepetition Independent Contractor Obligations dated September 2, 2009, as modified and supplemented by the Order Supplementing First Day Employee Order (Docket No. 37) to Approve Certain Bonus and Severance Payments dated December 1, 2009.

**1.72** **"Freedom Communications"** means Freedom Communications, Inc., a Delaware corporation.

**1.73** **"Freedom Holdings"** means Freedom Communications Holdings, Inc., a Delaware corporation.

**1.74** **"General Unsecured Claims"** means a Claim against any of the Debtors that is <u>not</u> an Administrative Claim, an Existing Lender Fee Claim, a Priority Tax Claim, an Other Priority Claim, an Existing Lender Secured Claim, an Other Secured Claim, an Existing Lender Deficiency Claim, a Trade Unsecured Claim, a Non-Qualified Retirement Claim, a Tort Claim, an Intercompany Claim, or a Subordinated Claim. For the avoidance of doubt, the unsecured Claim of a provider of goods or services shall be considered a General Unsecured Claim until and unless such provider satisfies the requirements for becoming the holder of a Trade Unsecured Claim.

**1.75** **"Gonzalez Class Counsel"** means the lead counsel in the litigation captioned <u>Gonzalez v. Freedom Communications, Inc.</u>, Case No. 03CC08756, Superior Court of California, County of Orange.

**1.76** **"Gonzalez Litigation Claim"** means any and all Claims that were asserted in, or could have been asserted in, the litigation captioned <u>Gonzalez v. Freedom Communications, Inc.</u>, Case No. 03CC08756, Superior Court of California, County of Orange, or that do or could relate to or did, has or could have arisen as a result of such litigation, including, without limitation, the

Claims of named plaintiffs, class members, counsel and professionals, whether or not such Claims are asserted in Proofs of Claim and, if asserted in Proofs of Claim, whether or not such Proofs of Claim assert priority, secured, or unsecured status, and whether or not such Proofs of Claim are timely or tardily filed. All Gonzalez Litigation Claims are Class A4 Claims.

1.77 **"Houlihan"** means Houlihan Lokey Howard & Zukin Capital, Inc., the investment banking and financial advisory firm retained by the Debtors pursuant to order of the Bankruptcy Court to provide services during the Chapter 11 Cases.

1.78 **"Impaired"** means, with respect to any Claim or Interest, that such Claim or Interest is impaired within the meaning of Section 1124 of the Bankruptcy Code.

1.79 **"Indemnification Obligation"** means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution to a Person arising pursuant to by-laws, articles or certificate of incorporation, contract, or otherwise.

1.80 **"Individual Retirement Agreements"** means (a) the Employment Agreement dated May 30, 1990 with James D. Edwards and the Retirement Agreement dated September 30, 1999 with James N. Rosse and Janice G. Rosse, notwithstanding the rejection of such agreements, but only with respect to retirement and/or deferred compensation benefits under either such agreement, and (b) any other valid, binding, and enforceable similar individual agreement that provides for retirement and/or deferred compensation benefits.

1.81 **"Insurance Coverage Action"** means any action asserting claims for indemnification, reimbursement, contribution or other payment under the D&O Insurance Policies, any action asserting a violation of the implied covenant of good faith and fair dealing, and any related action.

1.82 **"Intercompany Claim"** means any Claim arising prior to the Petition Date against any of the Debtors by another Debtor or by a non-Debtor subsidiary or affiliate of a Debtor.

1.83 **"Intercreditor Agreement"** means an agreement among the lenders (or the administrative or collateral agents on behalf of such lenders) under the Exit Facility, the Term A Facility, and the Term B Facility, governing, among other things, their specific lien rights in the collateral securing each of such facilities, and which shall be substantially in the form to be included in the Plan Supplement, which shall be on terms and conditions reasonably satisfactory to the Debtors and the Steering Committee Members.

1.84 **"Interests"** means the legal, equitable, contractual, or other rights of any Person (a) with respect to Old Freedom Stock Interests, Old Freedom Stock Rights, or Subsidiary Interests, and (b) to acquire or receive any of the foregoing.

1.85 **"Litigation Trust"** means that certain trust created pursuant to the Plan and under the Litigation Trust Agreement, to be administered by the Litigation Trustee, all as more particularly set forth in Section 5.17 of the Plan and the Litigation Trust Agreement.

1.86 **"Litigation Trust Agreement"** means that certain trust agreement substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably satisfactory to the Debtors, the Existing Lender Agent, the Gonzalez Class Counsel, and the Creditors' Committee, which agreement shall govern the Litigation Trust.

**1.87** **"Litigation Trust Assets"** means (a) the Transferred Cash and any interest or earnings thereon, (b) the Transferred Causes of Action, any proceeds therefrom, and any interest or earnings on such proceeds, and (c) subject to Section 5.17(v) of the Plan, any proceeds derived from any Insurance Coverage Action.

**1.88** **"Litigation Trustee"** means the trustee to serve pursuant to Section 5.17 of the Plan and under the Litigation Trust Agreement.

**1.89** **"LMA"** has the meaning set forth in Section 5.16(c) of the Plan.

**1.90** **"LT Beneficiaries"** means the beneficiaries of the Litigation Trust as further defined in Section 5.17 of the Plan.

**1.91** **"Mutual Release Agreement"** means the mutual release agreement to be entered into by each of the Existing Lenders, the Existing Lender Agent, the financial and legal advisors for the Existing Lenders and the Existing Lender Agent, each member of and Professional retained by the Creditors' Committee, each such member's professionals, the Gonzalez Class Counsel and a class representative for themselves and on behalf of the holders of Gonzalez Litigation Claims, and the Debtors for themselves and on behalf of their current and former directors, officers, and Professionals (exclusive of the D&O Defendants).

**1.92** **"Net Cash Proceeds"** means the Transferred Cash <u>less</u> an amount determined adequate by the Litigation Trustee, in its sole discretion, to fund the future costs of the Litigation Trust, including, without limitation, (a) fees and expenses in connection with the prosecution of the Transferred Causes of Action and/or Insurance Coverage Actions against the D&O Insurers and (b) fees and expenses in connection with determining the Allowed amounts of any Disputed Class A4 Claims (including, without limitation, filing objections and litigating such objections to Final Order or otherwise resolving such objections). Only the holders of Class A4 Claims, if and when such Claims become Allowed Claims, shall be entitled to the Net Cash Proceeds as provided for in Section 3.2(d) of the Plan.

**1.93** **"Net Litigation Proceeds"** means the proceeds received by the Litigation Trust from the pursuit of any of the Transferred Causes of Action and any Insurance Coverage Action <u>less</u> (a) the amount of any fees and expenses then incurred by the Litigation Trust in pursuing the Transferred Causes of Action and/or Insurance Coverage Actions against the D&O Insurers, and (b) an amount determined adequate by the Litigation Trustee to fund the future costs of the Litigation Trust, including, without limitation, (i) fees and expenses in connection with the further pursuit of the Transferred Causes of Action and (b) fees and expenses in connection with continuing to determine the Allowed amounts of any Disputed Class A4 Claims (including, without limitation, filing objections and litigating such objections to Final Order or otherwise resolving such objections). Except as otherwise provided in Section 5.17(v) of the Plan, the Net Litigation Proceeds shall be distributed first to the holders of Class A4 Beneficial Trust Interests until such interests have been paid in full and second to the holders of Class A2 Beneficial Trust Interests.

**1.94** **"New Board"** means the board of directors of Reorganized Freedom Holdings to be selected in accordance with the provisions of Section 5.7(a) of the Plan.

**1.95** **"New Common Stock"** means the common shares of Reorganized Freedom Holdings to be issued under Section 5.6 of the Plan as of the Effective Date, consisting of Class A Common Stock and Class B Common Stock, having terms substantially as set forth on Exhibit C to the Plan.

**1.96** **"New Equity Incentive Plan"** means the management equity incentive plan(s) to be adopted by Reorganized Freedom Holdings pursuant to Section 5.10 of the Plan, substantially in the form of such document(s) to be included in the Plan Supplement, which shall have terms and conditions reasonably acceptable to the Debtors and the Existing Lender Agent (in consultation with the Steering Committee Members).

**1.97** **"New Freedom By-Laws"** means the by-laws of Reorganized Freedom Holdings substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably satisfactory to the Steering Committee Members and the Debtors.

**1.98** **"New Freedom Charter"** means the certificate of incorporation of Reorganized Freedom Holdings substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably satisfactory to the Steering Committee Members and the Debtors.

**1.99** **"New Freedom Governing Documents"** means the New Freedom Charter and the New Freedom By-Laws.

**1.100** **"New Securities"** means collectively, the New Common Stock and the Existing Lender Warrants.

**1.101** **"New Stockholders Agreement"** means the agreement governing, and to be deemed to have been executed by, the holders of New Common Stock and Existing Lender Warrants as of the Effective Date, having the terms described on Exhibit C to the Plan and to be substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably acceptable to the Steering Committee Members.

**1.102** **"New Subsidiary Governing Documents"** means the certificates of incorporation, by-laws, articles of organization, operating agreements, partnership agreements, or any other governing document with respect to the Reorganized Subsidiaries, as amended pursuant to the Plan or any document within the Plan Supplement, which shall have terms and conditions reasonably satisfactory to the Steering Committee Members and the Debtors.

**1.103** **"Non-Qualified DC Plan"** means the Freedom Communications, Inc. Non-Qualified Defined Contribution Plan, which is a non-qualified defined contribution retirement plan maintained by Freedom Communications.

**1.104** **"Non-Qualified EB Plan"** means the Freedom Communications, Inc. Excess Benefit Plan, which is a non-qualified defined benefit retirement plan maintained by Freedom Communications.

**1.105** **"Non-Qualified Retirement Claim"** means a Claim against Freedom Communications arising under (a) the Non-Qualified DC Plan, (b) the Non-Qualified EB Plan, and/or (c) the Individual Retirement Agreements.

**1.106 "Old Freedom Stock Interests"** means, collectively, all preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date. The term does not include any stock options or other rights to purchase the stock of Freedom Holdings, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Freedom Holdings prior to the Effective Date.

**1.107 "Old Freedom Stock Rights"** means, collectively, any stock options or other rights to purchase the stock of Freedom Holdings, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Freedom Holdings, and any phantom stock appreciation rights, restricted stock units or any other rights based on the value (or increase in value) of any stock or other equity ownership interests in Freedom Holdings. The term includes, without limitation, any award or rights under the Freedom Holdings 2004 Long-Term Incentive Plan (as amended and restated) and the Freedom Holdings 2008 Restricted Stock Unit Award Plan or any award agreement pursuant thereto. The term does not include any preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date.

**1.108 "Other Priority Claim"** means a Claim against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

**1.109 "Other Secured Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors, other than an Existing Lender Secured Claim.

**1.110 "PBGC"** has the meaning set forth in Section 6.5(b) of the Plan.

**1.111 "Person"** means any individual, firm, partnership, corporation, trust, association, company, limited liability company, joint stock company, joint venture, governmental unit, or other entity or enterprise.

**1.112 "Petition Date"** means September 1, 2009, the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

**1.113 "Plan"** means this joint plan of reorganization under Chapter 11 of the Bankruptcy Code and all exhibits annexed hereto or referenced herein, as the same may be amended, modified, or supplemented from time to time.

**1.114 "Plan Supplement"** means the supplement to the Plan (a) containing the forms of the Term A Facility, the Term B Facility, the Intercreditor Agreement, the New Freedom Charter, the New Freedom By-Laws, the Exit Facility (or term sheet therefor), the New Equity Incentive Plan, the New Stockholders Agreement, the Registration Rights Agreement, the Existing Lender Warrant Agreement, the Broadcast Trust Agreement, the Local Marketing Agreement, the Litigation Trust Agreement, and the Confidentiality and Common Interest Agreement, and (b) including the terms and conditions for an executive incentive plan, severance plan, and other employment arrangements if then agreed to by the Debtors and the Steering Committee Members.

**1.115 "Post-Emergence Trade Agreement"** means an agreement, substantially in the form included as Exhibit E to the Plan (with such revisions as may be agreed to among the Debtors, the Existing Lender Agent, and the Creditors' Committee), to be entered into pursuant to the procedures set forth in Section 5.11 of the Plan, between the Reorganized Debtors and a provider of goods or services who holds a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date and who has continued to supply such goods or services to the Encumbered Debtors during the Chapter 11 Cases.

**1.116 "Primary D&O Insurer"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.117 "Priority Tax Claim"** means a Claim of a governmental unit that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

**1.118 "Professional"** means any professional employed in the Chapter 11 Cases by order of the Bankruptcy Code pursuant to Sections 327 or 1103 of the Bankruptcy Code and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Section 503(b) of the Bankruptcy Code. The term does not include the Debtors' ordinary course professionals.

**1.119 "Professional Fee Claim"** means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered after the Petition Date and prior to and including the Confirmation Date.

**1.120 "Proof of Claim"** means a proof of claim filed with the Bankruptcy Court in connection with the Chapter 11 Cases.

**1.121 "Pro Rata"** means, at any time, (a) with respect to any Existing Lender, the proportion that the amount of an Allowed Existing Lender Claim in Class A2 bears to the aggregate amount of all Allowed Existing Lender Claims in Class A2 and (b) with respect to holders of Class A4 Claims, the proportion that an Allowed Class A4 Claim bears to the aggregate amount of all Allowed and Disputed Class A4 Claims.

**1.122 "Registration Rights Agreement"** means an agreement to be entered into among Reorganized Freedom Holdings and the Existing Lenders having the terms described on Exhibit C to the Plan and to be substantially in the form included in the Plan Supplement, which shall have terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors.

**1.123 "Reinstated"** means (a) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim or Interest is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, or of a kind that Section 365(b)(2) does not require to be cured, (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default, (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual

provision or such applicable law, (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim or Interest is entitled.

**1.124 "Released Causes of Action"** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that are released, waived, and discharged pursuant to Section 11.9(a) of the Plan or pursuant to any agreement, contract, instrument, release, or document entered into in connection with the Plan. In no event shall the Released Causes of Action include any Transferred Causes of Action.

**1.125 "Releasing Party"** has the meaning set forth in Section 11.9(b) of the Plan.

**1.126 "Reorganized Broadcast Licensee Companies"** means the Broadcast Licensee Companies on or after the Effective Date.

**1.127 "Reorganized Broadcast Operating Companies"** means the Broadcast Operating Companies on or after the Effective Date.

**1.128 "Reorganized Debtor(s)"** means, individually, any reorganized Debtor or its successor and, collectively, all reorganized Debtors or their successors, on or after the Effective Date.

**1.129 "Reorganized Freedom Communications"** means reorganized Freedom Communications or its successor, on and after the Effective Date.

**1.130 "Reorganized Freedom Holdings"** means reorganized Freedom Holdings or its successor, on and after the Effective Date.

**1.131 "Reorganized Subsidiary Debtor(s)"** means, individually, a reorganized Subsidiary Debtor or its successor and, collectively, all reorganized Subsidiary Debtors or their successors, on or after the Effective Date.

**1.132 "Request for Payment"** means a request for payment of an Administrative Claim filed with the Bankruptcy Court in connection with the Chapter 11 Cases.

**1.133 "Retained Litigation Rights"** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that are property of the Estates, whether arising under the Bankruptcy Code or non-bankruptcy law that are not (a) Released Causes of Action or (b) Transferred Causes of Action.

**1.134 "Retirement Plan"** has the meaning set forth in Section 6.5(b) of the Plan.

**1.135 "Schedules"** means the statements of financial affairs and the schedules of assets, liabilities, and contracts filed in the Bankruptcy Court by the Debtors, as amended or supplemented from time to time in accordance with Rule 1009 of the Bankruptcy Rules or orders of the Bankruptcy Court.

**1.136 "Secured Claim"** means a Claim that is secured by a Lien that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under Section 553 of the Bankruptcy Code; to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to Section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to Section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim.

**1.137 "Steering Committee Members"** means the members of the steering committee representing the Existing Lenders, including JPMorgan Chase Bank, N.A., Bank of New York Mellon, General Electric Capital Corporation, Royal Bank of Scotland PLC, Wachovia Bank, National Association, and any other Existing Lender that may from time to time be a member. Unless otherwise indicated, actions, consents, or agreements of the Steering Committee Members contemplated under the Plan must be unanimous.

**1.138 "Subordinated Claim"** means (a) any Claim against any of the Encumbered Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which shall include any Claim arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of any Interest, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim; (b) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages (but not general or ordinary negligence damages), to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a governmental unit in connection with a tax or other obligation owing to such unit; or (c) any Claim that is tardily filed under Section 501(a) of the Bankruptcy Code, except for any tardily filed Gonzalez Litigation Claim.

**1.139 "Subsidiary Debtors"** means, collectively, Freedom Communications, Freedom Broadcasting, Inc., Freedom Broadcasting of Florida, Inc., Freedom Broadcasting of Florida Licensee, L.L.C., Freedom Broadcasting of Michigan, Inc., Freedom Broadcasting of Michigan Licensee, L.L.C., Freedom Broadcasting of New York, Inc., Freedom Broadcasting of New York Licensee, L.L.C., Freedom Broadcasting of Oregon, Inc., Freedom Broadcasting of Oregon Licensee, L.L.C., Freedom Broadcasting of Southern New England, Inc., Freedom Broadcasting of Southern New England Licensee, L.L.C., Freedom Broadcasting of Texas, Inc., Freedom Broadcasting of Texas, Licensee, L.L.C., Freedom Broadcasting of Tennessee, Inc., Freedom Broadcasting of Tennessee Licensee, L.L.C., Freedom Magazines, Inc., Freedom Metro Information, Inc., Freedom Newspapers, Inc., Orange Country Register Communications, Inc., OCR Community Publications, Inc., OCR Information Marketing, Inc., Appeal-Democrat, Inc., Florida Freedom Newspapers, Inc., Freedom Arizona Information, Inc., Freedom Colorado Information, Inc., Freedom Eastern North Carolina Communications, Inc., Freedom Newspapers of Illinois, Inc., Freedom Newspapers of Southwestern Arizona, Inc., Freedom Shelby Star, Inc., Illinois Freedom Newspapers, Inc., Missouri Freedom Newspapers, Inc., Odessa American, The Times-News Publishing Company, Victor Valley Publishing Company, Daily Press, Freedom

Newspaper Acquisitions, Inc., The Clovis News-Journal, Freedom Newspapers of New Mexico L.L.C., Gaston Gazette LLP, Lima News, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, Freedom Newspapers, The Creative Spot, L.L.C., Freedom Interactive Newspapers, Inc., Freedom Interactive Newspapers of Texas, Inc., and Freedom Services, Inc., each of which is a Debtor.

**1.140** **"Subsidiary Interests"** means, collectively, the issued and outstanding shares of stock, membership units, or partnership interests in the Subsidiary Debtors, as of the Petition Date; as well as any stock options or other rights to purchase the stock, membership units, or partnership interests of any of the Subsidiary Debtors, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights, contractual or otherwise, to acquire or receive any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors, and any other rights based on the value (or increase in value) of any stock, membership units, partnership interests, or other equity ownership interests in any of the Subsidiary Debtors.

**1.141** **"Substantial Contribution Claim"** means a claim for compensation or reimbursement of costs and expenses relating to services rendered in making a substantial contribution in the Chapter 11 Cases pursuant to Section 503(b)(3), (4), or (5) of the Bankruptcy Code.

**1.142** **"Tax Items"** has the meaning set forth in Section 5.17(d) of the Plan.

**1.143** **"Term A Facility"** means a new secured term loan facility in the aggregate principal amount of $225 million, to be entered into by the Reorganized Debtors on the Effective Date, having terms and conditions substantially described on Exhibit A to the Plan, and to be substantially in the form included in the Plan Supplement.

**1.144** **"Term A Loan Obligations"** means the obligations of the Reorganized Debtors under the Term A Facility, to be distributed among the holders of Allowed Existing Lender Secured Claims on the Effective Date, as provided for in Section 3.2(b) of the Plan.

**1.145** **"Term B Facility"** means a new secured term loan facility in the aggregate principal amount of $100 million, to be entered into by the Reorganized Debtors on the Effective Date, having terms and conditions substantially described on Exhibit B to the Plan, and to be substantially in the form included in the Plan Supplement.

**1.146** **"Term B Loan Obligations"** means the obligations of the Reorganized Debtors under the Term B Facility, to be distributed among the holders of Allowed Existing Lender Secured Claims on the Effective Date, as provided for in Section 3.2(b) of the Plan.

**1.147** **"Third Party Release"** means the release provided for in Section 11.9(b) of the Plan.

**1.148** **"Third Party Releasees"** has the meaning set forth in Section 11.9(b) of the Plan.

**1.149** **"Tort Claim"** means, with the exception of any Claim for workers' compensation subject to Section 6.5(c) of the Plan, any tort Claim against the Encumbered Debtors for which coverage exists under the Debtors' insurance policies, including, without limitation, Claims for personal injury, wrongful death, defamation, slander, libel, invasion of privacy, or other tort liability.

**1.150 "Trade Unsecured Claim"** means a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date from, and held by, a provider of goods or services that (a) has continued to supply such goods or services to the Encumbered Debtors during the Chapter 11 Cases and (b) becomes a party to a fully executed Post-Emergence Trade Agreement. The term shall not include (i) any Claim arising from any employee or individual independent contractor relationship between any Debtor and any Person, (ii) any Claim arising from the rejection of an executory contract or unexpired lease, (iii) any Gonzalez Litigation Claim, (iv) any Non-Qualified Retirement Claim, (v) any Tort Claim, or (vi) any Subordinated Claim. For the avoidance of doubt, the term shall not include any Claim against the Unencumbered Debtors, which Claims are being Reinstated under the Plan.

**1.151 "Trade Unsecured Claim Escrow"** means the escrow to be established on the Effective Date to fund payments to holders of Allowed Trade Unsecured Claims in the amount of $5.5 million.

**1.152 "Transferred Cash"** means Cash in the aggregate amount of $14.5 million, to be transferred by the Encumbered Debtors to the Litigation Trust on the Effective Date.

**1.153 "Transferred Causes of Action"** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities of the Estates against the D&O Defendants that arose under applicable law prior to the Petition Date, ***subject to the limitations set forth in Section 5.17 of the Plan***.

**1.154 "Trial Court Disposition"** has the meaning set forth in Section 5.17(t) of the Plan.

**1.155 "Trust Indemnified Parties"** has the meaning set forth in Section 5.17(n) of the Plan.

**1.156 "Unencumbered Debtor(s)"** means, individually or collectively, each or all of Freedom Newspapers, Gaston Gazette LLP, Daily Press, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, and The Creative Spot, L.L.C.

**1.157 "Unimpaired"** means, with respect to any Claim, that such Claim is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.158 "Voting Deadline"** means the deadline established by the Bankruptcy Court by which the holders of Claims in Classes that are entitled to vote on the Plan must submit the Ballot indicating such Claim holder's vote on the Plan, in accordance with the procedures set forth in the Disclosure Statement and the instructions provided with the Ballot.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 2.1    Introduction

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such unclassified claims is set forth in Section 3.1 of the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. A Claim or Interest may be bifurcated and classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

## 2.2    Classes of Claims Against and Interests in Encumbered Debtors

*Class A1:    Other Priority Claims*

Class A1 consists of all Other Priority Claims against the Encumbered Debtors. Class A1 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

*Class A2:    Existing Lender Claims*

Class A2 consists of all Existing Lender Claims. Class A2 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

*Class A3:    Other Secured Claims*

Class A3 consists of separate sub-Classes, one for each Other Secured Claim against any of the Encumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Encumbered Debtor for all purposes under the Bankruptcy Code, including for voting purposes.

*Class A4:    General Unsecured Claims*

Class A4 consists of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, with the sub-Class for each Encumbered Debtor consisting of the General Unsecured Claims against such Encumbered Debtor. For example, the sub-Class for Freedom Communications will include all General Unsecured Claims against Freedom Communications, and the sub-Class for Freedom Broadcasting, Inc. will include all General Unsecured Claims against Freedom Broadcasting, Inc. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code, including for voting purposes.

*Class A5:    Non-Qualified Retirement Claims*

Class A5 consists of all Non-Qualified Retirement Claims. Class A5 is a single Class containing Claims against Freedom Communications.

*Class A6:    Intercompany Claims*

Class A6 consists of all Intercompany Claims against the Encumbered Debtors. Class A6 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

*Class A7: Tort Claims*

Class A7 consists of all Tort Claims against the Encumbered Debtors. Class A7 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.

*Class A8: Subordinated Claims*

Class A8 consists of all Subordinated Claims against the Encumbered Debtors. Class A8 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.

*Class A9: Subsidiary Interests*

Class A9 consists of all Subsidiary Interests in the Subsidiary Debtors who are Encumbered Debtors. Class A8 shall be deemed to consist of forty-two (42) separate sub-Classes, one for each of the Encumbered Debtors that are Subsidiary Debtors.

*Class A10: Old Freedom Stock Interests*

Class A10 consists of all Old Freedom Stock Interests.

*Class A11: Old Freedom Stock Rights*

Class A11 consists of all Old Freedom Stock Rights.

**2.3     Classes of Claims Against and Interests in Unencumbered Debtors**

*Class B1: Other Priority Claims*

Class B1 consists of all Other Priority Claims against the Unencumbered Debtors. Class B1 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

*Class B2: Other Secured Claims*

Class B2 consists of separate sub-Classes, one for each Other Secured Claim against any of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Unencumbered Debtor for all purposes under the Bankruptcy Code.

*Class B3: General Unsecured Claims*

General Unsecured Claims against the Unencumbered Debtors are classified in Class B3. Class B3 includes seven (7) separate sub-Classes, each consisting of the General Unsecured Claims against each of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.

*Class B4:  Intercompany Claims*

Class B4 consists of all Intercompany Claims against the Unencumbered Debtors. Class B4 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

*Class B5:  Subsidiary Interests*

Class B5 consists of all Subsidiary Interests in the Unencumbered Debtors.  Class B5 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

# ARTICLE III

# TREATMENT OF CLAIMS AND INTERESTS

**3.1    Unclassified Claims**

(a)    **Administrative Claims**

With respect to each Allowed Administrative Claim, except as otherwise provided for herein, and subject to the requirements of Sections 11.1 through 11.2 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different, less favorable treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Existing Lender Agent and the Existing Lenders shall be entitled to retain all payments made by the Debtors during the Chapter 11 Cases in full satisfaction of all Adequate Protection Obligations arising under the Cash Collateral Order, including any portion of the Adequate Protection Obligations that constitute an Administrative Claim under Section 507(b) of the Bankruptcy Code; *provided, however*, that subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, such payments shall be applied in accordance with the Existing Credit Agreement Documents to reduce the principal amount of the Existing Lender Secured Claims.  Any Existing Lender Fee Claim that has been incurred and is unpaid as of the Effective Date shall be paid in Cash on or as soon as practicable after the Effective Date, in full satisfaction, settlement, release and discharge of such Claim; *provided, however*, that subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, any such payments shall be deemed to be applied to reduce the principal amount of the Existing Lender Secured Claims in accordance with the Existing Credit Agreement Documents and the Cash Collateral Order.  Any replacement or other Liens created under the Cash Collateral Order shall terminate and shall have no further force and effect as of the Effective Date.

(b) **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, either, with the agreement of the Steering Committee Members, (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different, less favorable treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under Section 511(a) of the Bankruptcy Code), equal to such Allowed Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date.

**3.2     Classes of Claims Against and Interests in Encumbered Debtors**

(a)     **Class A1:  Other Priority Claims Against Encumbered Debtors**

Class A1 is not Impaired.

Class A1 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between an Encumbered Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different, less favorable treatment as to which the applicable Encumbered Debtor and such holder shall have agreed upon in writing.

(b)     **Class A2:  Existing Lender Claims**

Class A2 is Impaired.

The Existing Lender Claims shall be allowed in full in the Chapter 11 Cases, without setoff, subordination, avoidance, reduction, defense, setoff, recharacterization, or counterclaim, in the aggregate principal amount of not less than $770,552,344.03 as of the Petition Date plus $1,933,100.00 in respect of letters of credit issued and outstanding under the Existing Credit Agreement Documents as of the Petition Date.

Each of the Encumbered Debtors are jointly and severally obligated on the Existing Lender Claims.  Accordingly, Class A2 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.  The vote of each holder of an Existing Lender Claim shall be deemed to apply to each of the separate sub-Classes.

Subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, the aggregate amount of all payments made by the Debtors on account of Adequate Protection Obligations shall be deemed applied to reduce the principal amount of the

Existing Lender Secured Claims in accordance with the Existing Credit Agreement Documents and the Cash Collateral Order. In addition, the holders of Existing Lender Secured Claims, in full satisfaction, settlement, release, and discharge of and in exchange for the remaining amount of the Existing Lender Secured Claims, shall receive on the Effective Date their Pro Rata share (except as provided otherwise below) of each of (i) the Term A Loan Obligations, (ii) the Term B Loan Obligations, (iii) the Excess Cash, (iv) the Existing Lender Shares, and (v) the amount of the Trade Unsecured Claim Escrow, which shall be deposited by or on behalf of Existing Lenders into the Trade Unsecured Claim Escrow, and any remaining funds in the Trade Unsecured Claim Escrow after all required payments to holders of Allowed Trade Unsecured Claims have been made in accordance with Section 5.11(c) of the Plan. The entitlement of each holder of Existing Lender Secured Claims to receive its Pro Rata share of the Existing Lender Shares on the Effective Date pursuant to this Section 3.2(b) shall be satisfied by receipt of any combination of shares of New Common Stock and/or Existing Lender Warrants in such proportion to the extent necessary to comply with the Communications Act of 1934 (as amended) and FCC domestic and foreign ownership rules; *provided that* the sum of (i) the number of shares of Existing Lender Shares received by such Existing Lender and (ii) the number of shares of New Common Stock issuable upon the exercise of Existing Lender Warrants issued pursuant to this Section 3.2(b) received by such Existing Lender shall equal such Existing Lender's Pro Rata share of the Aggregate Existing Lender Share Number. In addition, as of the Effective Date, each holder of an Existing Lender Secured Claim shall be deemed to receive a Pro Rata share of the Class A2 Beneficial Trust Interests. The Class A2 Beneficial Trust Interests shall entitle the holders of Existing Lender Secured Claims to receive, after the Effective Date, if and when distributed, their allocated portion of the Net Litigation Proceeds.

The Existing Lenders shall accept the distributions on account of the Existing Lender Secured Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing Credit Agreement Documents, except for indemnification obligations, which shall receive the treatment provided under Section 6.6(c) of the Plan. The holders of Existing Lender Deficiency Claims shall not receive or retain any property under the Plan on account of any Existing Lender Deficiency Claims and all Existing Lender Deficiency Claims shall be deemed waived by the Existing Lenders and discharged as of the Effective Date.

The Existing Lenders shall be deemed to have received the Subsidiary Interests in the Encumbered Debtors and contributed such Subsidiary Interests back to their respective holders.

(c)     **Class A3: Other Secured Claims Against Encumbered Debtors**

Class A3 is Impaired.

Class A3 consists of separate sub-Classes for each Other Secured Claim against any of the Encumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Encumbered Debtor for all purposes under the Bankruptcy Code, including for voting purposes.

At the option of the Reorganized Debtors, with the agreement of the Steering Committee Members, either (i) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim against an Encumbered Debtor shall be Reinstated as of the

Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; (ii) the holder of an Allowed Other Secured Claim against an Encumbered Debtor shall (A) retain the Liens securing such Allowed Other Secured Claim and (B) receive regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under 26 U.S.C. § 6622 or, if applicable, under Section 511 of the Bankruptcy Code), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date; (iii) the collateral securing such Allowed Other Secured Claim against an Encumbered Debtor shall be surrendered to the holder of such Allowed Other Secured Claim on the Distribution Date; or (iv) the holder of the Allowed Other Secured Claim against an Encumbered Debtor shall be paid in full on the Distribution Date. The treatment applicable to each holder of an Other Secured Claim shall be announced in a filing made with the Bankruptcy Court no later than ten (10) days prior to the Confirmation Hearing.

The Debtors' failure to object to any Other Secured Claim against an Encumbered Debtor in the Chapter 11 Cases shall be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim holder. Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all prepetition Liens on property of any Encumbered Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreement governing such Claim until such Allowed Claim is paid in full. Nothing in this Section 3.2(c) or elsewhere in the Plan shall preclude the Debtors or the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of an Encumbered Debtor or the value of the property that secures any alleged Lien.

(d) **Class A4: General Unsecured Claims Against Encumbered Debtors**

Class A4 is Impaired.

Class A4 consists of separate sub-Classes for each of the Encumbered Debtors, with the sub-Class for each Encumbered Debtor consisting of the General Unsecured Claims against such Encumbered Debtor. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code, including for voting purposes.

As of the Distribution Date, each holder of an Allowed General Unsecured Claim against the Encumbered Debtors shall be deemed to receive a Pro Rata share of the Class A4 Beneficial Trust Interests. The Class A4 Beneficial Trust Interests shall entitle the holders of Allowed General Unsecured Claims to receive (i) on the Distribution Date, the Net Cash Proceeds and (ii) after the Distribution Date, if and when distributed, their allocated portion of the Net Litigation Proceeds. Under no circumstances shall any holder of an Allowed General Unsecured Claim against the Encumbered Debtors receive more than payment in full of such Claim plus Distribution Interest.

(e) **Class A5: Non-Qualified Retirement Claims**

Class A5 is Impaired.

Class A5 is a single Class containing Allowed Non-Qualified Retirement Claims against Freedom Communications.

The treatment of Allowed Non-Qualified Retirement Claims shall be limited to the receipt of benefits as follows:

(i)     All benefit obligations under the Non-Qualified DC Plan shall be reinstated as of the Petition Date on the following modified terms: (A) the account balances shall be reduced to seventy percent (70%) of the account balances determined as of the Petition Date; (B) no contribution credits shall be credited for the 2009 plan year or any future plan year, and no interest or earnings shall be credited to the reduced account balances on or after the Petition Date; (C) any unpaid benefits relating to the period between the Petition Date and the Effective Date that were due prior to the Effective Date shall be paid in a lump sum to the applicable participant or beneficiary reflecting such reduced account balance (without interest or earnings) on the Effective Date; and (D) any benefits payable on or after the Effective Date shall be paid in accordance with the terms of the applicable Non-Qualified DC Plan (as modified in accordance with the foregoing clauses);

(ii)     All benefit obligations under the Non-Qualified EB Plan shall be reinstated as of the Petition Date on the following modified terms: (A) the benefits shall be reduced to seventy percent (70%) of the benefits determined as of the Petition Date; (B) any benefit payments that were or are due thereunder on or after October 1, 2009 shall be paid at the rate of seventy percent (70%) of the benefit payment amount otherwise due (determined as of the Petition Date) in the form of payment applicable to such benefit under the Non-Qualified EB Plan (as in effect on the Petition Date); (C) any unpaid benefits relating to the period between October 1, 2009 and the Effective Date that were due prior to the Effective Date shall be paid in a lump sum to the applicable participant or beneficiary reflecting such reduced rate (without interest or earnings) on the Effective Date; and (D) any benefit payments payable on or after the Effective Date shall be paid in accordance with the terms of the applicable Non-Qualified EB Plan (as modified in accordance with the foregoing clauses); and

(iii)     All retirement and/or deferred compensation benefit obligations under the Individual Retirement Agreements shall be incorporated into the Non-Qualified EB Plan and shall be treated in the same manner as benefit obligations under the Non-Qualified EB Plan, as set forth above; *provided, however*, that no such benefit (as reduced as set forth above) shall be increased on or after the Petition Date by any cost of living adjustment or otherwise.

(f)     **Class A6:  Intercompany Claims Against Encumbered Debtors**

Class A6 is Impaired.

Class A6 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors.

With respect to each Intercompany Claim against any of the Encumbered Debtors, at the election of the Reorganized Debtors, with the consent of the Existing Lender Agent, the Intercompany Claim shall be adjusted, continued, capitalized, either directly or indirectly or in whole or in part as of the Effective Date, or shall be Reinstated on the Effective Date, and no such disposition shall require the consent of the holders of New Common Stock or the consent of any holder of Subsidiary Interests.

(g)  **Class A7:  Tort Claims Against Encumbered Debtors**

Class A7 is Impaired.

Class A7 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.

All holders of Allowed Tort Claims shall have the right to assert such Claims under the Debtors' applicable insurance policies.  Any recovery by such holders on account of such Allowed Claims shall be limited to the coverage that may be available under such insurance policies.  Such holders shall have no rights to any distributions under the Plan.

(h)  **Class A8:  Subordinated Claims Against Encumbered Debtors**

Class A8 is Impaired.

Class A8 shall be deemed to consist of forty-three (43) separate sub-Classes, one for each of the Encumbered Debtors, to the extent applicable.

The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.  All Subordinated Claims shall be discharged as of the Effective Date.

(i)  **Class A9:  Subsidiary Interests in Encumbered Debtors**

Class A9 is Impaired.

Class A9 shall be deemed to consist of forty-two (42) separate sub-Classes, one for each of the Encumbered Debtors that are Subsidiary Debtors.

On the Effective Date, the Subsidiary Interests in the Encumbered Debtors shall be deemed to have been distributed to the Existing Lenders on account of their Existing Lender Claims and then contributed back by the Existing Lender to the respective holders of the Subsidiary Interests.  The Subsidiary Interests shall thereafter be retained for the benefit of the holders of the New Securities, subject to any applicable restrictions arising under the Exit Facility, the Term A Facility, and the Term B Facility.

Notwithstanding the foregoing, if the Subsidiary Interests in the Reorganized Broadcast Licensee Companies are transferred to the Broadcast Trustee pursuant to the provisions of Section 5.16 of the Plan, such Subsidiary Interests shall be subject to the terms of the Broadcast Trust Agreement until transferred back to the Reorganized Broadcast Operating Companies.  When transferred back, such Subsidiary Interests shall be subject to the provisions in the paragraph above.

(j)  **Class A10:  Old Freedom Stock Interests**

Class A10 is Impaired.

All Old Freedom Stock Interests shall be cancelled as of the Effective Date. The holders of such Old Freedom Stock Interests shall not receive or retain any property under the Plan or otherwise on account thereof.

(k) **Class A11: Old Freedom Stock Rights**

Class A11 is Impaired.

All Old Freedom Stock Rights shall be cancelled as of the Effective Date. The holders of such Old Freedom Stock Rights shall not receive or retain any property under the Plan or otherwise on account thereof.

**3.3 Classes of Claims Against and Interests in Unencumbered Debtors**

(a) **Class B1: Other Priority Claims Against Unencumbered Debtors**

Class B1 is not Impaired.

Class B1 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between an Unencumbered Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different, less favorable treatment as to which the applicable Unencumbered Debtor and such holder shall have agreed upon in writing.

(b) **Class B2: Other Secured Claims Against Unencumbered Debtors**

Class B2 is not Impaired.

Class B2 consists of separate sub-Classes for each Other Secured Claim against any of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class with respect to the applicable Unencumbered Debtor for all purposes under the Bankruptcy Code.

The legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim against an Unencumbered Debtor shall be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code.

The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Other Secured Claim holder. Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all prepetition Liens on property of any Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreement governing such Claim until such Allowed Claim is paid in full. Nothing in this Section 3.3(b) or elsewhere in the Plan shall

preclude the Debtors or the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of a Debtor or the value of the property that secures any alleged Lien.

(c)    **Class B3:  General Unsecured Claims Against Unencumbered Debtors**

Class B3 is not Impaired.

Class B3 consists of separate sub-Classes consisting of the General Unsecured Claims against each of the Unencumbered Debtors. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.

The legal, equitable, and contractual rights of each holder of an Allowed General Unsecured Claim against an Unencumbered Debtor shall be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code. On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and (iii) the date on which such General Unsecured Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Claim, each holder of an Allowed General Unsecured Claim in Class B3 shall receive, in full satisfaction of and in exchange for, such Allowed General Unsecured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Cases not been filed.

(d)    **Class B4:  Intercompany Claims Against Unencumbered Debtors**

Class B4 is not Impaired.

Class B4 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

With respect to each Intercompany Claim against any of the Unencumbered Debtors, the legal, equitable, and contractual rights of the holder of the Intercompany Claim shall be Reinstated on the Effective Date or, with the consent of the holder, may be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part as of the Effective Date.

(e)    **Class B5:  Subsidiary Interests in Unencumbered Debtors**

Class B5 is not Impaired.

Class B5 shall be deemed to consist of seven (7) separate sub-Classes, one for each of the Unencumbered Debtors.

The legal, equitable, and contractual rights of each holder of a Subsidiary Interest in any of the Unencumbered Debtors shall be Reinstated on the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code.

**3.4**    **Reservation of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan, nothing shall affect the rights, defenses, and counterclaims of the Debtors, the Reorganized Debtors, or the Litigation Trustee,

both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

<h1 style="text-align:center">ARTICLE IV</h1>

<h2 style="text-align:center">ACCEPTANCE OR REJECTION OF THE PLAN</h2>

### 4.1    Impaired Classes of Claims Entitled to Vote

Holders of Claims in each Impaired Class of Claims are entitled to vote as a Class to accept or reject the Plan, other than Classes that are deemed to reject the Plan.  With respect to Claims against the Encumbered Debtors, the votes of holders of Claims in Classes A2, A3 (and each sub-Class thereof), A4 (and each sub-Class thereof), A5, and A7 (and each sub-Class thereof) shall be solicited with respect to the Plan.

### 4.2    Acceptance by an Impaired Class Entitled to Vote

In accordance with Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class or sub-Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class or sub-Class that have timely and properly voted to accept or reject the Plan.

### 4.3    Presumed Acceptances by Unimpaired Classes and Debtor-Only Classes

(a)    With respect to Classes of Claims against and Interests in the Encumbered Debtors, Class A1 is Unimpaired under the Plan.  With respect to Classes of Claims against and Interests in the Unencumbered Debtors, Classes B1, B2 (and each sub-Class thereof), B3 (and each sub-Class thereof), B4, and B5 are Unimpaired under the Plan.  Under Section 1126(f) of the Bankruptcy Code, holders of such Unimpaired Claims and Unimpaired Interests are conclusively presumed to have accepted the Plan, and the votes of such Unimpaired Claim holders and Unimpaired Interest holders shall not be solicited.

(b)    The Claims in Class A6 and the Interests in Class A9 are held by certain of the Debtors.  Although such Classes are Impaired, because the Debtors are proponents of the Plan, their acceptance of the treatment proposed for such Claims and Interests is presumed. Therefore, their votes shall not be solicited.

### 4.4    Classes Deemed to Reject Plan

Holders of Claims in Class A8 and Interests in Classes A10 and A11 are not entitled to receive or retain any property under the Plan.  Under Section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

### 4.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors shall request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter,

amend, or modify the Plan, the Plan Supplement, or any Exhibit to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

### 5.1    Continued Corporate Existence

The Reorganized Debtors shall continue to exist after the Effective Date as separate corporate, limited liability, or partnership entities, in accordance with the applicable laws in the respective jurisdictions in which they are organized and pursuant to the New Freedom Governing Documents in the case of Reorganized Freedom Holdings and the New Subsidiary Governing Documents in the case of the respective Reorganized Subsidiaries.

### 5.2    New Governing Documents

The New Freedom Governing Documents and the New Subsidiary Governing Documents shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. The New Freedom Charter and New Freedom By-Laws shall be in substantially the forms of such documents included in the Plan Supplement.

### 5.3    Revesting of Assets; Releases of Liens

Except as otherwise provided herein, the property of each Debtor's Estate, including all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, shall revest in the applicable Debtor on the Effective Date. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of each Reorganized Debtor shall be free and clear of all Claims and Interests, and all Liens with respect thereto, except as specifically provided in the Plan or the Confirmation Order.

### 5.4    Cancellation of Prepetition Obligations

On the Effective Date, except as otherwise specifically provided for in the Plan, the Existing Credit Agreement Documents and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be canceled and any such indebtedness or obligation of the Debtors shall be discharged.

### 5.5    Exit Funding

(a)    In addition to Cash remaining as of the Effective Date, the Cash necessary to make payments required to be made on the Effective Date and to provide working capital and satisfy other general corporate purposes after the Effective shall be obtained from the Exit Facility.

(b)    With the agreement of the Steering Committee Members, the obligations under the Exit Facility shall be secured by valid, binding, perfected first priority liens on inventory, accounts receivable, and other assets of the Reorganized Debtors, if necessary to obtain a commitment for such Exit Facility. In the event that the Exit Facility is provided by the Existing

Lender Agent or any Existing Lender, then the Exit Financing Share Allocation may be issued as compensation for such exit lender, as an administrative expense, to the extent necessary to obtain such Exit Facility; *provided that* if any existing Steering Committee Member offers to provide such Exit Facility to the Reorganized Debtors, all other Steering Committee Members shall have the opportunity to participate in such Exit Facility and the Exit Financing Share Allocation on a pro rata basis. Letters of credit under the Existing Credit Agreement Documents outstanding on the Effective Date shall be rolled into, and become letters of credit under, the Exit Facility without any further action by any party.

(c) The Reorganized Debtors shall be authorized to (a) enter into the Exit Facility, (b) grant any liens and security interests and incur or guaranty the indebtedness as required under the Exit Facility, and (c) issue, execute and deliver all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the Exit Facility and to take all other actions necessary to implement and effectuate borrowings under the Exit Facility. On the Effective Date, the Exit Facility, together with new promissory notes and guarantees, if any, evidencing obligations of the Reorganized Debtors thereunder, and all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective. The new promissory notes issued pursuant to the Exit Facility and all obligations under the Exit Facility and related documents shall be paid as set forth in the Exit Facility and related documents.

**5.6    Authorization and Issuance of New Securities**

(a) Reorganized Freedom Holdings shall (i) authorize on the Effective Date 21 million shares of New Common Stock; (ii) issue on the Effective Date 7 million shares of New Common Stock (subject to adjustment in respect of shares of New Common Stock issuable upon the exercise of the Existing Lender Warrants), representing 100% of the outstanding shares of New Common Stock as of such date (subject to the Exit Financing Share Allocation, if any); *provided* that the shares of New Common Stock to be distributed under the Plan to holders of Existing Lender Secured Claims pursuant to Section 3.2(b) of the Plan shall be contributed by Reorganized Freedom Holdings to Reorganized Freedom Communications for distribution by Reorganized Freedom Communications to such holders; (iii) reserve for issuance in accordance with the terms of the Plan a number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the antidilution provisions thereof) to satisfy the required distributions of (x) the Existing Lender Warrants and (y) the stock, options, and other awards granted under the New Equity Incentive Plan. In addition, pursuant to Section 5.5(b) of the Plan, the Exit Financing Share Allocation may be issued.

(b) On the Effective Date, Reorganized Freedom Holdings shall authorize the issuance of the Existing Lender Warrants.

(c) The New Securities to be issued and distributed pursuant to distributions under the Plan to Classes A2 and pursuant to Sections 5.5(b) and 6.6(b) of the Plan, shall be issued in exchange for or principally in exchange for Allowed Claims and Allowed Interests in such Classes, and for an administrative expense, and shall be exempt from registration under applicable securities laws pursuant to Section 1145 of the Bankruptcy Code.

(d) Upon the Effective Date (i) each Existing Lender shall be deemed to have executed, without any further action by such party, the New Stockholders Agreement and the Registration Rights Agreement and (ii) each holder of Existing Lender Warrants shall be deemed

to have executed, without any further action by such party, the Existing Lender Warrant Agreement.

**5.7    Directors of Reorganized Debtors**

(a)    The New Board shall be comprised of up to seven (7) directors, initially consisting of (i) six (6) independent and disinterested directors acceptable to the Steering Committee Members and (ii) Reorganized Freedom Holdings' chief executive officer. The designation of directors pursuant to the foregoing clause (i) shall be made at least five (5) days prior to the Voting Deadline and shall be announced in a filing made with the Bankruptcy Court no later than five (5) days prior to the Voting Deadline. The members of the New Board shall continue to serve as such until replaced or removed in accordance with the New Freedom Governing Documents, or until any of such individual's voluntary resignation. Each Steering Committee Member holding in excess of a threshold percentage (to be agreed among the Steering Committee Members) of the Existing Lender Secured Claims shall be entitled to appoint a representative to attend and observe all meetings of the New Board unless such rights would delay or adversely affect the FCC's grant of the long-form application.

(b)    The existing directors of the Subsidiary Debtors shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the New Subsidiary Governing Documents of the respective entity or applicable company policy, or until any of such individual's voluntary resignation; *provided*, *however*, that any such director who is not as of the Effective Date a member of the New Board or a full-time employee of any of the Reorganized Debtors shall be deemed to have resigned as of the Effective Date.

**5.8    Officers of Reorganized Debtors**

(a)    The existing senior officers of Freedom Holdings shall serve initially in the same capacities after the Effective Date for Reorganized Freedom Holdings until replaced or removed in accordance with the New Freedom Governing Documents or company policy, or until any of such individual's voluntary resignation.

(b)    The existing senior officers of the Subsidiary Debtors shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the New Subsidiary Governing Documents of the respective entity or applicable company policy, or until any of them may voluntarily resign.

**5.9    Indemnification of Reorganized Debtors' Directors, Officers, and Employees**

Upon the Effective Date, the New Freedom Governing Documents and the New Subsidiary Governing Documents shall contain customary indemnification provisions for directors, officers, and other key employees (as identified by the chief executive officer of Reorganized Freedom Holdings) serving the Reorganized Debtors, on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors.

**5.10    Management Incentive and Other Agreements**

(a)    On the Effective Date, Reorganized Freedom Holdings shall be authorized and directed to establish and implement the New Equity Incentive Plan, substantially in the form included in the Plan Supplement. The New Equity Incentive Plan shall reserve for issuance pursuant to awards a number of shares of New Common Stock (Class A Common Stock) up to

ten percent (10%) of the total number of shares of New Common Stock (i) issued and outstanding as of the Effective Date (including shares issued pursuant to the Exit Financing Share Allocation, if any) and (ii) issuable upon exercise of the Existing Lender Warrants as of the Effective Date. Members of management, employees, and directors of Reorganized Freedom Holdings and the other Reorganized Debtors shall receive such stock, options, or other awards under the New Equity Incentive Plan as are determined from time to time by the New Board (or an authorized committee thereof). The awards made to such recipients shall be in accordance with the terms of such determinations, subject to such terms as are more specifically described in the New Equity Incentive Plan. As of the Effective Date, pursuant to the Confirmation Order and Section 303 of the Delaware General Corporation Law, the New Equity Incentive Plan shall be deemed adopted by the unanimous action of the New Board and approved by the unanimous action of the stockholders of Reorganized Freedom Holdings (including, without limitation, for purposes of Section 422 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder). The foregoing sentence shall not be deemed to limit the application of Section 303 of the Delaware General Corporation Law to any other corporate action taken pursuant to the Plan. The New Equity Incentive Plan may be amended or modified from time to time by the New Board in accordance with its terms and any such amendment or modification shall not require an amendment of the Plan.

(b)     On or after the Effective Date, the Reorganized Debtors may implement an executive incentive plan, severance plan, or other employment agreements for their senior management team and other key employees either (i) having terms and conditions agreed to by the Debtors and the Steering Committee Members and set forth in the Plan Supplement if agreed to prior to the filing thereof or presented at the Confirmation Hearing if agreed to prior to the commencement thereof or (ii) having terms and conditions determined by the New Board or by the then-serving chief executive officer of Reorganized Freedom Holdings or such other person as may be authorized by the New Board.

**5.11    Post-Emergence Trade Agreement Procedure**

(a)     Any provider of goods or services who holds a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date may be afforded the opportunity to enter into a Post-Emergence Trade Agreement, in accordance with the following procedure:

(i)     The Encumbered Debtors shall make available to all providers of goods or services, at www.loganandco.com and as an attachment to the Disclosure Statement, a Notice of Desire to Enter into Post-Emergence Trade Agreement, in which each provider shall certify that (A) it holds a Claim based upon or arising from the Encumbered Debtors' receipt of goods or services in the ordinary course of business prior to the Petition Date, (B) it has continued to supply such goods or services to the Encumbered Debtors during the Chapter 11 Cases, and (C) it is willing to enter into and comply with the terms of the Post-Emergence Trade Agreement. A form Post-Emergence Trade Agreement is included as Exhibit E to the Plan.

(ii)     The deadline for returning a completed Notice of Desire to Enter into Post-Emergence Trade Agreement shall be five (5) days prior to the Voting Deadline.

(iii)     The Encumbered Debtors shall provide copies of the returned Notices of Desire to Enter into Post-Emergence Trade Agreement to the Existing Lender Agent.

(iv)     The Encumbered Debtors shall determine, in their business judgment, if the Reorganized Debtors will have a continuing need for the goods or services of the provider after the Effective Date, and shall so advise the Existing Lender Agent.

(v)     If, as determined by the Encumbered Debtors in their business judgment, the Reorganized Debtors will have a continuing need for the goods or services of the provider after the Effective Date, then the Encumbered Debtors shall deliver to the provider a form Post-Emergence Trade Agreement that contains the terms and conditions for the applicable provider, with a deadline for executing and returning the agreement, and shall provide a copy to the Existing Lender Agent and the Creditors' Committee (subject to the existing confidentiality protocol).

(vi)     As to each provider who timely returns an executed Post-Emergence Trade Agreement, and who has continued to supply such goods or services to the Encumbered Debtors through the Confirmation Date, the Encumbered Debtors shall execute the Post-Emergence Trade Agreement and return a copy to the provider of goods or services as soon as practicable between the Confirmation Date and the Effective Date.  The Encumbered Debtors shall provide a copy of each executed Post-Emergence Trade Agreement to the Existing Lender Agent and the Creditors' Committee (subject to the existing confidentiality protocol).

(b)     On the Effective Date, the Trade Unsecured Claim Escrow shall be established, into which the Encumbered Debtors shall deposit funds in the amount of $5.5 million.  The funds in the Trade Unsecured Claim Escrow shall be funds that otherwise would have been distributed to the Existing Lenders as Excess Cash under the Plan, and that, as of the Effective Date and subject to the terms of this section, shall constitute property of the Existing Lenders.  The Existing Lenders shall be deemed to have authorized the Reorganized Debtors to access funds in the Trade Unsecured Claim Escrow to make payments to holders of Allowed Trade Unsecured Claims pursuant to the terms of each such holder's Post-Emergence Trade Agreement.

(c)     Under the terms of the Post-Emergence Trade Agreement, as soon as reasonably practicable after the latest of (i) the Effective Date and (ii) the date on which such Trade Unsecured Claim becomes an Allowed Trade Unsecured Claim, each holder of an Allowed Trade Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Trade Unsecured Claim, Cash from the Trade Unsecured Claim Escrow equal to the amount or such portion of the Allowed Trade Unsecured Claim as the parties may agree.  In the event of an agreement to pay a portion of any Allowed Trade Unsecured Claim, the remaining portion shall be waived and shall not participate as a General Unsecured Claim under the Plan.  By executing a Post-Emergence Trade Agreement, the Reorganized Debtors shall not become obligated to pay any Trade Unsecured Claim or portion thereof that is not an Allowed Claim.

(d)     The Debtors shall be obligated to use the full amount of the Trade Unsecured Claim Escrow to satisfy Allowed Trade Unsecured Claims.

## 5.12     Retained Litigation Rights

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan (including the Mutual Release Agreement), in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, each Debtor or Reorganized Debtor shall retain all of

their respective Retained Litigation Rights that such Debtor or Reorganized Debtor may hold against any Person. Each Debtor or Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Retained Litigation Rights. Each Debtor or Reorganized Debtor or their respective successor(s) may pursue such Retained Litigation Rights as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan. For the avoidance of doubt, Retained Litigation Rights are exclusive of, and do not include, Transferred Causes of Action or Insurance Coverage Actions.

**5.13    Effectuating Documents; Further Transactions**

The chief executive officer, the president, the chief financial officer, the general counsel or any other appropriate officer of Freedom Holdings, or any applicable Debtor, or any of the Reorganized Debtors, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of Freedom Holdings, or any applicable Debtor, or any of the Reorganized Debtors, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

**5.14    Exemption From Certain Transfer Taxes**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Liens granted by the Debtors to secure the Exit Facility, the Term A Facility, and the Term B Facility, shall not be taxed under any law imposing a stamp tax or other similar tax. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

**5.15    Corporate Action**

On the Effective Date, the adoption and filing of the New Freedom Governing Documents, the appointment of the New Board, the adoption of the New Equity Incentive Plan, and all actions contemplated or necessary to implement the transactions described in the Plan shall be authorized and approved in all respects pursuant to the Plan. All matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the board of directors of the Reorganized Debtors are authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations or consents except for express consents required under the Plan. Without limiting the foregoing, the New Equity Incentive Plan shall be deemed to have been unanimously approved by the stockholders of Reorganized Freedom Holdings pursuant to Section 303 of the Delaware General Corporation Law.

**5.16    Interim Trust Control of Subsidiary Interests in Broadcast Licensee Companies**

(a)    The Debtors, with the agreement of the Existing Lender Agent (in consultation with the Steering Committee Members), shall designate the Person to serve as the Broadcast Trustee under the Plan, and shall file a written notice of such designation at least five (5) days prior to the Voting Deadline.

(b)    Prior to the Effective Date, each of the Broadcast Operating Companies shall enter into the Broadcast Trust Agreement with the Broadcast Trustee.  The Broadcast Trust Agreement shall provide that, *inter alia*, (i) on the Effective Date, all of the Subsidiary Interests in each of the Reorganized Broadcast Licensee Companies shall be issued to the Broadcast Trustee to be held in trust pursuant to the terms of the Broadcast Trust Agreement and subject to the continued supervision of the Bankruptcy Court if and only to the extent necessary for the FCC to grant the "short-form" applications referred to in subsection (d) of this Section 5.16; (ii) the beneficiaries of the trust shall be the Reorganized Broadcast Operating Companies, which shall continue to own all of the assets of the Broadcast Stations other than the Subsidiary Interests in the Reorganized Broadcast Licensee Companies, which own the FCC licenses; and (iii) following the Effective Date, and subject to the consent of the FCC, each of the Reorganized Broadcast Operating Companies shall have the right to acquire from the Broadcast Trustee all of the Subsidiary Interests in its respective Reorganized Broadcast Licensee Company as set forth in the Broadcast Trust Agreement.

(c)    Contemporaneously with the execution and delivery of the Broadcast Trust Agreement, the Broadcast Operating Companies shall enter into one or more Local Marketing Agreement(s) with the Broadcast Trustee (each an "LMA"), which LMAs shall become effective with respect to the Reorganized Broadcast Operating Companies and the Reorganized Licensee Companies as of the Effective Date and shall provide for the brokerage by the Reorganized Broadcast Operating Companies of all or substantially all of the programming and advertising time on the Broadcast Stations.  The effectiveness of the Broadcast Trust Agreement shall be conditioned upon the execution and delivery of the LMAs, and the effectiveness of the LMAs shall be conditioned upon the execution and delivery of the Broadcast Trust Agreement.  As consideration for the right to broker time on the Broadcast Stations, the Reorganized Broadcast Operating Companies shall reimburse the Reorganized Broadcast Licensee Companies for the costs and expenses incurred in connection with the operation of the Broadcast Stations, and shall pay the Broadcast Trustee an LMA fee to be agreed upon by the parties to the Broadcast Trust Agreement.

(d)    Following execution and delivery of the Broadcast Trust Agreement and the LMAs, each of the Broadcast Licensee Companies and the Broadcast Trustee shall file the appropriate applications with the FCC to request the FCC's consent to the transfer of control of the Broadcast Licensee Companies from the Broadcast Operating Companies (as debtors in possession) to the Broadcast Trustee using "short form" procedures.  The grant of such applications by the FCC without conditions that would prevent implementation of the structure contemplated herein shall be a condition to such implementation.

(e)    Assuming such grant by the FCC, on and as of the Effective Date, all of the Subsidiary Interests of the Reorganized Broadcast Licensee Companies shall be issued to the Broadcast Trustee, and the Reorganized Broadcast Operating Companies shall commence to broker all or substantially all of the programming and advertising time on each of the Broadcast Stations pursuant to the LMAs.

(f)     Following the Effective Date, the parties shall file applications seeking "long-form" FCC consent to transfer control of the Reorganized Broadcast Licensee Companies from the Broadcast Trustee to the Reorganized Broadcast Operating Companies.

(g)     If the Debtors, in consultation with the Existing Lender Agent, determine that: (i) the FCC is unlikely in a timely fashion to consent to a transfer of control of the Broadcast Licensee Companies from the Broadcast Operating Companies (as debtors in possession) to the Broadcast Trustee using "short-form" procedures, (ii) the FCC would be likely to impose conditions which would make it impracticable for the parties to implement the interim trust structure contemplated in this Section 5.16, or (iii) the parties are unable to reach agreement on the Broadcast Trust Agreement or LMAs, or for any other reason the interim trust structure is unlikely to be able to be implemented in a timely fashion and in a manner that would achieve its goals, then in place of that structure, subject to obtaining the consent of the Steering Committee Members (which consent shall not be unreasonably withheld), and as soon as practicable, the Debtors and the other appropriate parties shall file suitable "long-form" applications with the FCC requesting FCC consent to the transfer of control of the Broadcast Licensee Companies to the Reorganized Broadcast Operating Companies in order to effectuate the transactions contemplated by the Plan.

## 5.17     Litigation Trust

(a)     On the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purposes of (i) administering the Litigation Trust Assets, (ii) resolving all Claims to be treated as Class A4 Claims, and (iii) making all distributions as provided for under the Plan to the holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests (the "LT Beneficiaries") as provided for under the Plan.  The Litigation Trust is intended to qualify as a liquidation trust pursuant to United States Treasury Regulation Section 301.7701-4(d).  Except as expressly provided in Section 5.17(l), none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the Litigation Trust.

(b)     The holders of Class A4 Beneficial Trust Interests shall be limited to holders of Claims listed on Schedule F of the Debtors' Schedules as of the date hereof and Claims asserted in Proofs of Claim or Requests for Payment that are, or through the claims objection process become, Allowed Class A4 Claims.

(c)     On the Effective Date, in accordance with Section 1141 of the Bankruptcy Code, all of the Litigation Trust Assets, as well as the rights and powers of the Estates applicable to the Litigation Trust Assets, shall automatically vest in the Litigation Trust, free and clear of all Claims and Interests for the benefit of the LT Beneficiaries.  In connection with the vesting and transfer of the Litigation Trust Assets, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written or oral and including but not limited to all electronic information) relating to the Litigation Trust Assets and objections to the Class A4 Claims shall vest in the Litigation Trust.  The Debtors, the Reorganized Debtors, and the Litigation Trustee are authorized and required to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.

(d)     The transfer of the Litigation Trust Assets to the Litigation Trust shall be made for the benefit and on behalf of the LT Beneficiaries.  The Litigation Trust Assets comprising the Litigation Trust shall be treated for federal income tax purposes as being transferred by the Debtors to the LT Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and

then by the LT Beneficiaries to the Litigation Trust. For federal income tax purposes, the holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests shall be treated as the grantors and deemed owners of the Litigation Trust. The Litigation Trustee shall file federal income tax returns for the Litigation Trust as a grantor trust under IRC Section 671 and Treasury Income Tax Regulation Section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss deductions and credits ("Tax Items"). The holders of Class A2 Beneficial Trust Interests and Class A4 Beneficial Trust Interests shall report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. Upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the applicable Estates' rights, title and interest in the Litigation Trust Assets and the Debtors shall have no further interest in or with respect to the Litigation Trust Assets.

(e)     As soon as practicable after the Effective Date, (i) the Litigation Trustee shall determine the fair market value of the Litigation Trust Assets as of the Effective Date, based on his good faith determination, and (ii) the Litigation Trustee shall establish appropriate means to apprise the LT Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Litigation Trust, and the LT Beneficiaries) for all federal income tax purposes.

(f)     The Litigation Trust, acting through the Litigation Trustee, shall be authorized to exercise and perform the rights, powers, and duties held by the Estate with respect to the Litigation Trust Assets, including, without limitation, the authority under Section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy or insolvency trustee or examiner, or a receiver for the Creditors' Committee, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Transferred Causes of Action.

(g)     The Gonzalez Class Counsel, in the exercise of its absolute discretion, shall designate the Person that shall be appointed by the Bankruptcy Court in the Confirmation Order to serve as the Litigation Trustee, and shall file a written notice of such designation at least five (5) days prior to the Voting Deadline; *provided, however*, that in no event shall the Litigation Trustee be (i) a member of the Creditors' Committee or an advisor to or affiliate of any such member or (ii) a LT Beneficiary or an advisor to or affiliate of any such LT Beneficiary.

(h)     The responsibilities of the Litigation Trustee shall include, but shall not be limited to: (i) prosecuting through judgment and/or settling the Transferred Causes of Action and any defense asserted by the Litigation Trust in connection with any counterclaim or cross claim asserted by the D&O Defendants against the Litigation Trust in the D&O Action, and compelling the prosecution and/or settlement of the Insurance Coverage Actions against any D&O Insurer; (ii) facilitating the prosecution and/or settlement of objections to, and estimations of, Class A4 Claims; (iii) calculating and implementing all distributions required under the Plan to be made from the Litigation Trust Assets; (iv) filing all required tax returns, and paying taxes and all other obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (v) otherwise administering the Litigation Trust; (vi) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Existing Lender Agent and Reorganized Debtors only), and providing annual reports to the LT Beneficiaries, reflecting expenditures, receipts, and distributions; (vii) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Existing Lender Agent and Reorganized Debtors only), and providing annual reports to the LT Beneficiaries, with respect to the prosecution and resolution of the Transferred

Causes of Action and the objections to the Class A4 Claims; and (viii) such other responsibilities as may be vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee shall maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to LT Beneficiaries contemplated or effectuated under the Plan.

(i)     The powers and authority of the Litigation Trustee, without any further approval from the Bankruptcy Court, shall include, without limitation, the power, with sole authority and discretion: (i) to invest the Litigation Trust Assets, and withdraw funds of the Litigation Trust, make distributions, incur obligations for reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash, and pay taxes and other obligations owed by the Litigation Trust from funds held by the Litigation Trustee in accordance with the Plan; (ii) to engage professionals and service providers to assist the Litigation Trustee with respect to his responsibilities, including, but not limited to, any professionals employed by the Creditors' Committee; (iii) to evaluate and determine strategy with respect to the Transferred Causes of Action, the Insurance Coverage Actions, and the objections to Class A4 Claims, and to prosecute, compromise, transfer, release, abandon and/or settle the Transferred Causes of Action and the objections to Class A4 Claims on behalf of the Litigation Trust and to compel the D&O Defendants, at the expense of the Litigation Trust, to do the same with respect to Insurance Coverage Actions against the D&O Insurers; (iv) to liquidate any remaining Litigation Trust Assets, and provide for the distributions therefrom in accordance with the provisions of the Plan; (v) to otherwise administer the Litigation Trust; (vi) to interpret the provisions of the Plan relating to the Litigation Trust in the Litigation Trustee's reasonable discretion; and (vii) to exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee, on behalf of the Litigation Trust, shall have discretion to pursue, not pursue, and/or settle any and all Transferred Causes of Action and objections to Class A4 Claims as he determines to be in the best interests of the Litigation Trust, and the Litigation Trustee shall have no liability whatsoever for the outcome of that decision, except in the event that there is a Final Order determining that the Litigation Trustee committed fraud, self-dealing, intentional misrepresentation, or willful misconduct. In connection with the administration of the Litigation Trust, the Litigation Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of the provisions of the Plan relating to the Litigation Trust, within the bounds of the Plan and applicable law.

(j)     The Litigation Trustee may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist him in fulfilling his obligations under the Plan, and on whatever fee arrangement he deems appropriate, including, without limitation, contingency fee arrangements. The Litigation Trustee may, but is not required to, employ professionals that were previously employed by the Creditors' Committee. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. All such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Assets. The Reorganized Debtors shall have no liability therefor, except for the payment of up to $200,000 provided for in Section 5.17(l).

(k)     In addition to reimbursement for actual out-of-pocket expenses incurred by the Litigation Trustee, the Litigation Trustee shall be entitled to receive reasonable compensation for services rendered on behalf of the Litigation Trust on terms to be set forth in the Litigation Trust Agreement.  All such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Assets.  The Reorganized Debtors shall have no liability therefor.

(l)     From time to time after the Effective Date, no later than thirty (30) days after receipt of an invoice from the Litigation Trust, the Reorganized Debtors shall reimburse the Litigation Trust for reasonable fees and expenses up to, and not exceeding, an aggregate amount of $200,000 incurred in prosecution and/or settlement of objections to, and estimations of, Class A4 Claims.

(m)     The Litigation Trustee or any successor Litigation Trustee appointed pursuant to the Plan may be removed as Litigation Trustee for cause by order of the Bankruptcy Court upon motion of any holder of a Class A2 Beneficial Trust Interest or Class A4 Beneficial Trust Interest; *provided, however*, that any holder of a Class A2 Beneficial Trust Interest may seek to remove the Litigation Trustee without cause after all holders of Class A4 Beneficial Trust Interests have been paid in full by the Litigation Trustee.  For purposes of this provision, cause shall mean fraud, self-dealing, intentional misrepresentation, or willful misconduct.  In additional, the Litigation Trustee may resign with thirty (30) days' notice served on the LT Beneficiaries and filed with the Bankruptcy Court.  In the event that the Litigation Trustee is removed, resigns, or otherwise ceases to serve as Litigation Trustee, the Gonzalez Class Counsel shall appoint a successor Litigation Trustee.  Any successor Litigation Trustee shall be subject to the same qualifications and shall have the same rights, powers, duties, and discretion, and otherwise be in the same position, as the originally named Litigation Trustee.  References herein to the Litigation Trustee shall be deemed to refer to the successor Litigation Trustee acting hereunder.

(n)     From and after the Effective Date, the Litigation Trustee, his firm, company, partners, officers, directors, employees, professionals, representatives, successors, and assigns (collectively, the "<u>Trust Indemnified Parties</u>" and each a "<u>Trust Indemnified Party</u>") shall be, and hereby are, indemnified by the Litigation Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Trust Indemnified Party's good faith exercise of what such Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Trust Indemnified Party reasonably understands to be its duties conferred by the Litigation Trust Agreement, the Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the Transferred Causes of Action or objections to the Class A4 Claims, on and after the Effective Date.  The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to (i) the Litigation Trust Agreement or the Plan; (ii) the services to be rendered pursuant to the Litigation Trust Agreement or the Plan; (iii) any document or information, whether verbal or written, referred to herein or supplied to the Litigation Trustee; or (iv) proceedings by or on behalf of any creditor.  The Litigation Trust shall, on demand, advance or pay promptly out of the Litigation Trust Assets, on behalf of each Trust Indemnified Party, reasonable attorneys' fees

and other expenses and disbursements to which such Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; *provided, however*, that any Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Trust Indemnified Party.  In any matter covered by the first two sentences of this subsection, any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Litigation Trustee, at the Litigation Trust's expense, subject to the foregoing terms and conditions.

(o)　　　To effectively investigate, prosecute, compromise, and/or settle the Transferred Causes of Action, the Insurance Coverage Actions, and the objections to Class A4 Claims on behalf of the Litigation Trust, the Litigation Trustee and its counsel and representatives must have access to all documents and information relating to the Litigation Trust Assets and the objections to the Class A4 Claims and be able to exchange such information with the Reorganized Debtors on a confidential basis and in common interest without being restricted by or waiving any applicable work product, attorney-client, or other privilege.  Given the Litigation Trust's position as successor to the Litigation Trust Assets, sharing such information between the Reorganized Debtors and the Litigation Trustee and their counsel shall not waive or limit any applicable privilege or exemption from disclosure or discovery related to such information. Accordingly, on the Effective Date, the Reorganized Debtors and the Litigation Trustee shall enter into the Confidentiality and Common Interest Agreement providing for, inter alia, the Reorganized Debtors to provide reasonable access to, and the Litigation Trust shall have the right to secure, at its own expense, copies of, all of the Debtors' and Reorganized Debtors' records and information relating to the Litigation Trust Assets and objections to Class A4 Claims, including, without limitation, all electronic records or documents.  The Litigation Trustee shall also have full and complete access to, and the right to copy at the expense of the Litigation Trust, all reports, documents, memoranda and other work product of the Debtors and the Creditors' Committee and their respective professionals and advisors related to the Litigation Trust Assets and objections to Class A4 Claims.  From and after the Effective Date, the Reorganized Debtors and their officers, employees, agents, and professionals shall provide reasonable cooperation during normal business hours in responding to information requests of the Litigation Trustee regarding the Litigation Trust Assets and objections to Class A4 Claims. For a period of five years after the Effective Date, or the date of termination provided in this Section 5.17 if earlier, the Reorganized Debtors shall preserve all records and documents (including all electronic records or documents) related to the Transferred Causes of Action or, if any Transferred Cause of Action has been asserted in a pending action, then until such later time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved; *provided, however*, that nothing herein shall or shall be deemed to expand the scope of documents available, and/or require production of work product, to the Litigation Trust, that would not otherwise have been available to the Debtors or be available to the Reorganized Debtors.  To the extent that the Reorganized Debtors incur out of pocket costs and expenses for travel accommodations, electronic discovery and other forensic investigation and analysis or courier and mail service in performing their obligations under this Section 5.17 or in otherwise supporting the Litigation Trust to the extent such support is required by the Litigation Trust Agreement or is otherwise requested and provided under the Confidentiality and Common Interest Agreement, the Litigation Trust shall be required to reimburse the Reorganized Debtors for such actual costs and expenses within 15 days of receipt of a written invoice;

*provided, however*, that if such costs and expenses are third party costs and expenses, the Reorganized Debtors may require that such costs and expenses be incurred directly, and be paid in advance, by the Litigation Trust; *provided further, howeve*r, that the Reorganized Debtors shall not incur any such out of pocket cost or expense reasonably estimated to be in excess of $50 without the prior written consent of the Litigation Trust.

(p)     The Litigation Trust shall not (i) execute upon any assets of the D&O Defendants or (ii) record any judgment against the D&O Defendants; *provided*, *however*, that the Litigation Trust shall be entitled to recover any judgment, settlement, or other proceeds arising from or related to the Transferred Causes of Action only from the Debtors' director and officer insurance policies (the "<u>D&O Insurance Policies</u>") and other damages, if any, from the Debtors' director and officer insurance companies (the "<u>D&O Insurers</u>") related to any Insurance Coverage Action (subject to the allocation set forth in Section 5.17(v)); *provided*, *further*, that there shall be no limitation on a D&O Defendant's liability in the event that the subject director or chief executive officer (i) intentionally impairs or impedes insurance coverage, (ii) intentionally attempts to cause or causes the delay of any insurance coverage or the payment thereof, or (iii) is not entitled to insurance coverage on account of his or her failure to make a timely claim under the applicable policies or failure to cooperate with the insurers.

(q)     The D&O Defendants shall cooperate fully in good faith with the D&O Insurers in defense of any Transferred Cause of Action in which any D&O Defendant is a defendant (any such action, a "<u>D&O Action</u>") brought by the Litigation Trust.  In further cooperation with the D&O Insurers in defense of any action brought by the Litigation Trust, the D&O Defendants agree to either (i) accept counsel appointed by the Primary D&O Insurer(s), (ii) retain counsel that will accept the standard, usual, and customary rates paid by the Primary D&O Insurer(s), or (iii) if the D&O Defendants wish to retain other counsel, bear responsibility to pay any excess amounts over and above those standard, usual, and customary rates.  To the extent the D&O Insurers refuse to reimburse or advance the D&O Defendants for the defense of, or deny their duty to defend, any claims alleged by the Litigation Trust in a D&O Action, the D&O Defendants shall be liable and responsible for their own defense of the Transferred Causes of Action except as otherwise provided in Section 5.17(t), Section 5.17(v), and Section 6.6(a) of the Plan.

(r)     The D&O Defendants (i) shall defend any Insurance Coverage Action initiated by the Debtors' D&O Insurers, including if such Insurance Coverage Action is initiated as a counter or cross claim against the D&O Defendants and (ii) shall file any Insurance Coverage Action as deemed appropriate by the Litigation Trust against the Debtors' D&O Insurers.

(s)     In connection with any Insurance Coverage Action, the Litigation Trust shall (i) have the right to select capable and competent counsel with experience in insurance coverage and/or related litigation matters, as applicable, to represent the D&O Defendants; (ii) have the right to control the commencement, prosecution, disposition, settlement, or other resolution of the Insurance Coverage Action and (iii) be responsible for all costs and attorney's fees incurred by the D&O Defendants in connection with the prosecution or defense of such actions by counsel selected by the Litigation Trust.  Additionally, the D&O Defendants shall cooperate fully and in good faith with the Litigation Trust in pursuing or defending any Insurance Coverage Action, if necessary, and as applicable.  Subject to the applicable cooperation clauses in the D&O Insurance Policies, the D&O Defendants further agree to waive any and all actual or potential conflicts of interest so as to allow the D&O Defendants to be represented by one law

firm in each of (i) any and all Insurance Coverage Actions and (ii) any and all D&O Actions; and shall execute any necessary waivers or other documents reflecting such agreement upon request; *provided, however*, that such waiver shall not be required to the extent not permitted or authorized under applicable law or the applicable D&O Insurance Policies or as to which the D&O Insurers assert that such waiver shall either vitiate coverage or constitute a failure to cooperate under the D&O Insurance Policies.

(t)     Upon service of the complaint in a D&O Action, the D&O Defendants shall immediately tender their defense to the primary D&O Insurer(s) or such other D&O Insurer(s) which, pursuant to the applicable D&O Insurance Policies, becomes obligated to defend the D&O Defendants in the D&O Action or to advance or reimburse the D&O Defendants their costs and expenses incurred in defending the D&O Action (the "Primary D&O Insurer") and shall give notice of such complaint to the other D&O Insurers.  The Litigation Trust will not prosecute any D&O Action until the earlier of (i) the D&O Insurers providing a written statement (the "Coverage Statement") to the D&O Defendants as to whether they will reimburse or advance the D&O Defendants for the defense of, or defend, the D&O Action or (ii) 30 days following the date on which the D&O Defendants tender their defense to the D&O Insurers. Once a Coverage Statement is issued, (x) if the Coverage Statement states that the D&O Insurers will reimburse or advance the D&O Defendants for 90 percent or more of the costs and expenses of defending the D&O Action, or that the Primary D&O Insurer will assume a duty to defend the D&O Action, even if such statement indicates that reimbursement, advancement or defense by the D&O Insurers is subject to a reservation of rights, then the Litigation Trust may proceed with prosecution of the D&O Action and (y) if the Coverage Statement states that the D&O Insurers will reimburse or advance the D&O Defendants for less than 90 percent of the costs and expenses of defending the D&O Action (a "Coverage Denial"), the Litigation Trust will stay the D&O Action as to all causes of action for which such advancement or reimbursement was denied until the earlier of a summary adjudication by a trial court pursuant to subparagraphs (i)-(iii) below or a settlement in an Insurance Coverage Action on the issue of the D&O Insurers' obligations to reimburse or advance the D&O Defendants for the defense of, or the Primary D&O Insurer's obligation to defend, the D&O Action (the "Duty to Defend Issue"), subject to the following conditions (the "Conditions to Stay"):

(i)     Pursuant to the terms and provisions in Section 5.17(s) of the Plan, the Litigation Trust authorizes and the D&O Defendants (through counsel) file an Insurance Coverage Action against the D&O Insurers within 30 days of receipt by the D&O Defendants of a Coverage Denial;

(ii)     the D&O Defendants authorize counsel to file a motion for summary judgment or adjudication on the Duty to Defend Issue within 60 days of the filing of the Insurance Coverage Action. Such counsel shall be authorized to set the motion for summary judgment or adjudication for the earliest possible hearing date, pursuant to minimum statutory notice requirements, and on the earliest court date available for the trial court; and

(iii)     the D&O Defendants do not authorize counsel to, and do not on their own, stipulate or agree to continue the hearing or any other litigation deadlines related to the motion for summary judgment or adjudication.

In the event of a Coverage Denial, so long as the D&O Defendants comply with the Conditions to Stay, the stay of any D&O Action as to causes of action for which advancement or reimbursement was denied will remain in effect until settlement or summary adjudication on the

Duty to Defend Issue or, if the trial court denies summary adjudication on the ground that further proceedings are necessary to resolve the Duty to Defend Issue, until a subsequent order or judgment from the trial court on the Duty to Defend Issue (such settlement, summary adjudication or subsequent order or judgment, a "Trial Court Disposition"); *provided, however*, that if the Trial Court Disposition concludes that the D&O Insurers are obligated to reimburse or advance the D&O Defendants for less than ten percent of the costs and expenses of defending the D&O Action, or that the Primary D&O Insurer does not have an obligation to defend the D&O Action, then the D&O Action shall be stayed pending appeal of the Trial Court Disposition on the Duty to Defend Issue and shall not be terminated until a court of competent jurisdiction issues a final non-appealable judgment (or if the parties reach a settlement) obligating the D&O Insurers to reimburse or advance the D&O Defendants for the defense of, or obligating the Primary D&O Insurer to defend, one or more of the claims alleged by the Litigation Trust. If the Litigation Trust and any D&O Insurer reach a settlement that provides that such D&O Insurer has no obligation to reimburse or advance the D&O Defendants for the defense of, or to defend, one or more (but not all) claims alleged by the Litigation Trust, such settled claims shall be dismissed by the Litigation Trust. For the avoidance of doubt, in the event of a Coverage Denial, the Litigation Trust may proceed with a D&O Action prior to a Trial Court Disposition only if the Litigation Trust dismisses or stays those claims for which the D&O Insurers have denied coverage.

If any D&O Defendant fails to comply with any of the above Conditions to Stay, the stay of the action against the D&O Defendants will be lifted.

The Litigation Trust shall not, directly or indirectly, direct, encourage or otherwise cause counsel selected to represent any of the D&O Defendants in connection with the Insurance Coverage Action to fail to comply with any of the deadlines described above as a Condition to Stay; *provided, however*, that the Litigation Trust may also, in its sole discretion, stipulate to extend the stay of the action against the D&O Defendants beyond the dates set forth above for any reason.

The Litigation Trust shall provide written notice of any Trial Court Disposition to Reorganized Freedom Holdings. In the event any Trial Court Disposition determines that the D&O Insurers have no obligation to reimburse or advance the D&O Defendants for the defense of, or that the Primary D&O Insurer has no obligation to defend, one or more claims alleged by the Litigation Trust, the Litigation Trust shall advise Reorganized Freedom Holdings in such written notice as to whether the Litigation Trust will appeal such Trial Court Disposition.

(u) The duties, responsibilities, and powers of the Litigation Trustee shall terminate in accordance with the terms of the Litigation Trust Agreement after all of the Litigation Trust Assets have been liquidated and after all distributions have been made to the LT Beneficiaries.

(v) The proceeds from any Insurance Coverage Action, whether by settlement, judgment or otherwise, shall be applied (i) first, to reimburse the Litigation Trust for any costs, expenses or attorney's fees incurred by the Litigation Trust in prosecuting such Insurance Coverage Action, (ii) next, to reimburse the D&O Defendants for any costs, expenses and attorney's fees advanced or reimbursed on behalf of the D&O Defendants in defense of any D&O Action (other than amounts to be paid by the D&O Defendants pursuant to Section 5.17(q)(iii)), subject to the requirements of Section 6.6, and (iii) finally, the balance of any such

proceeds shall be delivered to and shall be the sole property of the Litigation Trust to be distributed to the LT Beneficiaries in accordance with the terms of the Plan.

**5.18    Approval of Compromises and Settlements Embodied in Plan**

The terms of the Plan represent compromises and settlements of certain issues among the Debtors, the Existing Lender Agent (in consultation with the Steering Committee Members), and the Creditors' Committee.  To the extent necessary, the Plan is deemed to be a motion for approval of the compromises and settlements and the Confirmation Order shall contain findings supporting and conclusions approving the compromises and settlements as fair and equitable and within the bounds of reasonableness.

**ARTICLE VI**

**TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

**6.1    Assumption of Contracts and Leases; Continuing Obligations**

(a)    On the Effective Date, in addition to all executory contracts and unexpired leases that have been previously assumed by the Debtors by order of the Bankruptcy Court, all executory contracts and unexpired leases of the Debtors listed on the Contract/Lease Schedules are hereby deemed assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  On or before the day that is ten (10) days before the Voting Deadline, the Debtors (after consultation with the Steering Committee Members) shall file the Contract/Lease Schedules; *provided, however*, that the Debtors reserve the right to amend the Contract/Lease Schedules at any time prior to the Effective Date.  The Debtors shall provide notice of any amendments to the Contract/Lease Schedules to the parties to the executory contracts and unexpired leases affected thereby and to the Creditors' Committee.

(b)    To the extent applicable, all executory contracts or unexpired leases of Reorganized Debtors assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

(c)    Each executory contract and unexpired lease assumed pursuant to Article VI of the Plan (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

(d)    In the event that any license granted to the Debtors by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtors, such license shall be deemed to be assumed pursuant to Section 365 of the Bankruptcy Code under the Plan; *provided, however,* that the assumption of the licenses issued by the FCC shall be subject to compliance with the rules and regulations of the FCC.

(e)    Continuing obligations of third parties to the Debtors under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or

prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, shall continue and shall be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtors or by order of Bankruptcy Court. The deemed rejection provided by Section 6.3 of the Plan shall not apply to any such continuing obligations.

(f)      To the extent any insurance policy under which the insurer has a continuing obligation to pay the Debtors or a third party on behalf of the Debtors is held by the Bankruptcy Court to be an executory contract and is not otherwise assumed upon motion by a Final Order, such insurance policy shall be treated as though it is an executory contract that is assumed pursuant to Section 365 of the Bankruptcy Code under the Plan. Any and all Claims (including Cure) arising under or related to any insurance policies or related insurance agreements that are assumed by the Debtors prior to or as of the Effective Date: (i) shall not be discharged; (ii) shall be Allowed Administrative Claims; and (iii) shall be paid in full in the ordinary course of business of the Reorganized Debtors as set forth in Section 3.1(a) of the Plan.

## 6.2      Cure Rights for Executory Contracts or Unexpired Leases Assumed under Plan

Any monetary Cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the later of (a) the Effective Date (or as soon as practicable thereafter), (b) as due in the ordinary course of business or (c) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree. In the event of a dispute regarding: (i) the amount of any Cure payments, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. The Debtors shall list Cure amounts for executory contracts and unexpired leases on the Contract/Lease Schedules. **The failure of any non-Debtor party to an executory contract or unexpired lease to file and serve an objection to the Cure amount listed on the Contract/Lease Schedules for such party's contract or lease by the deadline set forth on the Contract/Lease Schedules shall be deemed consent to such Cure amount**; *provided*, *however*, that prior to entry of a Final Order approving the assumption of an executory contract or unexpired lease, the Debtors shall be authorized to reject any executory contract or unexpired lease to the extent the Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by the Bankruptcy Court renders assumption of such executory contract or unexpired lease unfavorable to the Estates.

## 6.3      Rejection of Contracts and Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have rejected each prepetition executory contract and unexpired lease to which it is a party unless such contract or lease (i) is listed on the Contract/Lease Schedules as of the Confirmation Date, (ii) was previously assumed or rejected upon motion by a Final Order, (iii) previously expired or terminated pursuant to its own terms, or

(iv) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the rejection of the prepetition executory contracts and unexpired leases described above, as of the Effective Date.

## 6.4    Rejection Damage Claim Bar Date for Rejections Pursuant to Plan

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the claims agent and served upon counsel to the Reorganized Debtors and the Litigation Trustee within thirty (30) days after entry of the Confirmation Order. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a Proof of Claim filed by earlier applicable bar dates, or shall be otherwise Allowed, and if not shall be barred and unenforceable unless otherwise ordered by the Bankruptcy Court.

## 6.5    Employee Compensation and Benefit Programs

(a)    Except to the extent (i) otherwise provided for in the Plan (including, without limitation, otherwise provided in subparagraphs (d) and (f) of this Section 6.5 and in Section 6.6 of the Plan), (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation, benefit, and expense reimbursement programs, plans, policies, and agreements of the Debtors in effect during the pendency of the Chapter 11 Cases, including all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all benefits subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Cases, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan; *provided, however*, that the foregoing provision shall not apply to unpaid compensation and severance Claims that were not authorized to be paid under the First Day Employee Order, which unpaid Claims shall be treated as Other Priority Claims or General Unsecured Claims, as may be applicable.  Except as expressly provided in the Plan, nothing contained herein shall be deemed to modify the existing terms of any such employee compensation, benefit, and expense reimbursement program, plan, policy, or agreement, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

(b)    Subject to the rights of the Debtors and the Reorganized Debtors to terminate or amend as provided for in Section 6.5(a) of the Plan, the Debtors shall continue after the Effective Date the Retirement Plan of Freedom Communications, Inc. (the "Retirement Plan"), the qualified defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461, maintained by the Debtors.  As part of the continuation of the Retirement Plan, subject to any such termination or amendment, the Reorganized Debtors shall meet the minimum funding standards under ERISA and the Internal Revenue Code, pay all insurance premiums owed to the Pension Benefit Guaranty Corporation (the "PBGC"), and administer and operate the Retirement Plan in accordance with its terms and ERISA.  Nothing in the Plan is intended to release or discharge

any statutory liability or obligation of the Debtors or the Reorganized Debtors with respect to the PBGC or the Retirement Plan. Neither the PBGC nor the Retirement Plan shall be enjoined or precluded from enforcing such liability as a result of the Plan.

(c) In accordance with the authority provided by the First Day Employee Order, the Debtors shall, in the ordinary course of business, pay all valid prepetition claims, assessments and premiums arising under their workers' compensation program.

(d) The Non-Qualified DC Plan, the Non-Qualified EB Plan, and the Individual Retirement Agreements shall be treated as set forth in Section 3.2(e) of the Plan. To the extent the Non-Qualified DC Plan, Non-Qualified EB Plan, or any of the Individual Retirement Agreements are considered to be executory contracts, such Non-Qualified DC Plan, Non-Qualified EB Plan, or the Individual Retirement Agreements, shall be deemed to be assumed as modified by the Plan pursuant to Section 365 of the Bankruptcy Code under the Plan. Any Claims under the Non-Qualified DC Plan, Non-Qualified EB Plan, and the Individual Retirement Agreements shall be treated as Non-Qualified Retirement Claims.

(e) The Debtors' prepetition collective bargaining agreements shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

(f) As of the Effective Date, any and all stock based incentive plans or stock ownership plans of the Debtors entered into before the Effective Date (including, without limitation, the Freedom Holdings 2004 Long-Term Incentive Plan (as amended and restated) and the Freedom Holdings 2008 Restricted Stock Unit Award Plan), or other agreements or documents giving rise to Old Freedom Stock Rights, shall be terminated. To the extent such plans, agreements, or documents are considered to be executory contracts, such plans, agreements, or documents shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan.

(g) To the extent that a retired employee of the Debtors, or a spouse or surviving spouse of such a retired employee, was provided health benefits as of the Petition Date under the Debtors' self-funded group health plan for active employees of the Debtors, and the health insurance policy maintained under the Debtors' Executive Medical Reimbursement Plan (the "EMRP") pursuant to any prepetition agreement with the Debtors, the Reorganized Debtors shall continue to provide health benefits to such retired employees, spouses, and surviving spouses, notwithstanding the rejection of any such prepetition agreement, to the extent that the Reorganized Debtors continue to provide health benefits under the Reorganized Debtors' group health plan, the EMRP, or by other means to their active employees as a whole on or after the Effective Date. The continued health benefits provided to the retired employees, spouses, and surviving spouses shall be subject to any applicable laws. On and after the Effective Date, such retired employees, spouses, and surviving spouses shall have no greater or lesser rights to health benefits than the rights of the active employees as a whole participating in the Reorganized Debtors' group health plan or the EMRP or receiving health benefits on any other basis, including by contract; *provided, however*, that any such retired employee, spouse, or surviving spouse shall not be treated as having lesser rights by reason of receiving primary coverage under Medicare and secondary coverage under the Debtors' group health plan, EMRP, or other health benefits plan. Nothing herein shall restrict or limit the rights of the Reorganized Debtors to modify or terminate the Reorganized Debtors' group health plan, the EMRP, or any other health

benefits plan or agreement of the Reorganized Debtors at any time in anyway for active employees, and the rights of the Reorganized Debtors to so modify or terminate the Debtors' group health plan, the EMRP, or any other health benefits plan or agreement of the Reorganized Debtors on or after the Effective Date shall be reserved.  If the Reorganized Debtors' group health plan or the EMRP, or any other health benefits plan or agreement of the Reorganized Debtors, or any benefits provided thereunder, are modified or terminated as to active employees of the Reorganized Debtors, the benefits provided to such retired employees, spouses, and surviving spouses shall be similarly modified or terminated, and the Reorganized Debtors shall have no obligation to provide such retired employees, spouses, or surviving spouses with any health benefits that are eliminated or decreased as a result of any such modification or termination; *provided, however*, that if such health plan or the EMRP (or any successor plan that is equivalent to or superior to the health plan or the EMRP being provided to active employees of the Reorganized Debtors as of the Effective Date) is being provided to any active employees of the Reorganized Debtors, then such health plan or the EMRP as in effect on the Effective Date shall continue to be provided to such retired employees, spouses or surviving spouses.  In no event shall any retired employee, spouse, or surviving spouse be entitled on or after the Effective Date to any rights or benefits that exceed the rights or benefits provided to such retired employee, spouse, or surviving spouse under the applicable prepetition agreement and, to the extent provided under such prepetition agreement, such retired employee, spouse, or surviving spouse shall be required to maintain Medicare coverage at his or her expense as a condition to receiving health benefits from the Reorganized Debtors on and after the Effective Date.  Any and all Claims of the retired employees, spouses, and surviving spouses for health benefits pursuant to any prepetition agreement shall be deemed satisfied in full by the provisions of this subsection.

**6.6**      **Indemnification Obligations**

(a)      All Indemnification Obligations owed to any person who is a director, officer, or employee of the Debtors serving immediately prior to the Effective Date, other than any such director, officer, or employee that is a D&O Defendant (with respect to any Transferred Cause of Action only), shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order); *provided, however*, that in no event shall any Reorganized Debtor be required to indemnify any such director, officer, or employee to a greater extent than is provided under the charter, bylaws, or similar governing document of such Debtor in effect as of immediately prior to the Effective Date or permitted under the Delaware General Corporation Law (or other applicable law governing indemnities for such Debtor).  All Indemnification Obligations owed to any person who was a former director, officer, or employee of the Debtors immediately prior to the Effective Date shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order).

(b)      All Indemnification Obligations owed to any of the D&O Defendants with respect to an Insurance Coverage Action or Transferred Causes of Action only shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order); *provided, however*, that if, and to the extent that (i) the D&O Insurers do not reimburse or advance all or a portion of the costs, expenses, or attorney's fees incurred by

the D&O Defendants in defense of a D&O Action, and such D&O Action proceeds in accordance with the terms of Section 5.17 or (ii) the D&O Insurers advance on behalf of the D&O Defendants any of the costs, expenses, or attorney's fees incurred by the D&O Defendants in defense of the D&O Action subject to a reservation of rights, and a court of competent jurisdiction subsequently determines that the D&O Defendants must reimburse the D&O Insurers for all or a portion of the advancement or prior reimbursement of such costs, expenses and attorney's fees, then Reorganized Freedom Holdings shall reimburse the D&O Defendants from and, where applicable, advance on behalf of the D&O Defendants, such reasonable costs, expenses, and attorney's fees incurred by the D&O Defendants and not reimbursed by the D&O Insurers in defense of the D&O Action (the "Defense Expenses"), *provided further, however*, that Reorganized Freedom Holdings shall not advance Defense Expenses to a D&O Defendant unless such D&O Defendant, pursuant to applicable law, shall deliver to Reorganized Freedom Holdings an undertaking, by or on behalf of such D&O Defendant, to repay all amounts so advanced if it shall ultimately be determined that such person is not entitled to be indemnified against such Defense Expenses pursuant to this Section 6.6(b), *provided further, however*, that in the event it is later determined, by agreement, settlement, judgment, or otherwise, that the D&O Defendants were entitled to reimbursement of such Defense Expenses by the D&O Insurers, the D&O Defendants shall hold in trust and forthwith turn over any proceeds from an Insurance Coverage Action first to repay Reorganized Freedom Holdings for Defense Expenses advanced or reimbursed by Reorganized Freedom Holdings. In no event shall the reimbursement or advancement of Defense Expenses by Reorganized Freedom Holdings under this subsection exceed $500,000 in the aggregate. Notwithstanding the foregoing, in no event shall Reorganized Freedom Holdings reimburse or advance the D&O Defendants to a greater extent than is provided under the Amended and Restated Certificate of Incorporation of Freedom Holdings or permitted under the Delaware General Corporation Law. Any reimbursement or advancement of Defense Expenses by Reorganized Freedom Holdings shall be allocated pro rata among the D&O Defendants based on each D&O Defendant's proportionate share of the Defense Expenses. In no event shall the Litigation Trust be responsible for reimbursement of any Defense Expenses.

(c)     Notwithstanding anything to the contrary contained herein, all Indemnification Obligations arising under the Existing Credit Agreement Documents in favor of the Existing Lender Agent, the Existing Lenders, and their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Reorganized Debtors after the Effective Date.

**6.7     Insurance Rights**

Notwithstanding anything to the contrary in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening), nothing in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights of the Debtors' insurers, if any, in any respect. The rights of the Debtors' insurers shall be determined under their respective insurance policies and any related agreements with the Debtors, as applicable, subject, however, to the rights, if any, of the Debtors to assume or reject any such policy or agreement and the consequences of such assumption or rejection under Section 365 of the Bankruptcy Code.

**6.8     Limited Extension of Time to Assume or Reject**

(a)     Notwithstanding anything set forth in Article VI of the Plan, and except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor), in the event of a dispute as to whether a contract is executory or a lease is unexpired, Debtors' right to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed rejection provided for in Section 6.3 of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

(b)     Except with respect to a real property lease subject to Section 365(d)(4) of the Bankruptcy Code (unless otherwise agreed by the lessor), in the event the Debtors or the Reorganized Debtors become aware after the Confirmation Date of the existence of an executory contract or unexpired lease that was not included in the Contract/Lease Schedules, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Debtors or the Reorganized Debtors become aware of the existence of such contract or lease. The deemed rejection provided for in Section 6.3 of the Plan shall not apply to any such contract or lease unless a motion to assume or reject is not filed within such (30) day period.

**6.9     Postpetition Contracts and Leases**

The Debtors shall not be required to assume or reject any contract or lease entered into by the Debtors after the Petition Date. Any such contract or lease shall continue in effect in accordance with its terms after the Effective Date, unless the Debtor has obtained a Final Order of the Bankruptcy Court approving rejection of such contract and lease.

**6.10     Claims Arising from Assumption or Rejection**

All Allowed Claims arising from the assumption of any executory contract or unexpired lease shall be treated as Administrative Claims pursuant to Section 3.1(a) of the Plan; all Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as General Unsecured Claims pursuant to Section 3.2(d) or Section 3.3(c) of the Plan, depending on the Debtor against which each such Claim is held; and all other Allowed Claims relating to an executory contract or unexpired lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

**7.1     Distributions for Claims Allowed as of Effective Date**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to Section 8.4 of the Plan.  The Reorganized Debtors shall have the right, in their

discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant; *provided, however*, that any such acceleration with respect to payments to be made from the Litigation Trust shall be made by the Litigation Trustee pursuant to the terms of the Litigation Trust Agreement.

**7.2     Interest on Claims and Interests**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Interest shall not accrue or be paid upon any Disputed Claim or Disputed Interest in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim or Disputed Interest becomes an Allowed Claim or Disputed Interest.

**7.3     Designation of and Distributions by Disbursing Agent**

(a)     The Debtors shall, in their sole discretion, designate the Person to serve as the Disbursing Agent under the Plan, and shall file a written notice of such designation at least five (5) days prior to the Voting Deadline.

(b)     Unless otherwise provided herein, the Disbursing Agent shall make all distributions required to be made on the respective Distribution Date under the Plan, except that (i) payments made to holders of Existing Lender Claims and General Unsecured Claims from the Litigation Trust shall be made by the Litigation Trustee in accordance with the Litigation Trust Agreement and (ii) payments made to holders of Trade Unsecured Claims under the terms of each such holder's Post-Emergence Trade Agreement shall be made by the Reorganized Debtors from the Trade Unsecured Claim Escrow.

(c)     If the Disbursing Agent is an independent third party designated by the Debtors to serve in such capacity, such Disbursing Agent shall receive from the Debtors or the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services, on any agreed terms. No Disbursing Agent shall be required to give any bond, surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

(d)     If the Disbursing Agent is an independent third party, the Litigation Trustee and such third party may agree separately that such third party shall also make distributions on behalf of the Litigation Trustee from the Litigation Trust. In that event, the Litigation Trustee shall be responsible to pay such third party reasonable compensation for distribution services rendered to the Litigation Trust and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services, on any agreed terms. Any requirement for a bond, surety or other security for the performance of distribution services shall be subject to the agreement of such third party and the Litigation Trustee. In no event shall the Reorganized Debtors have any liability for the cost any bond, surety or other security or any liability or responsibility for any actions or inactions of the third party while acting on behalf of the Litigation Trustee.

**7.4     Means of Cash Payment**

Cash payments made pursuant to the Plan shall be in U.S. funds, by check or wire transfer or by such other commercially reasonable means as may be agreed to by the payor and the payee.

**7.5     Calculation of Distribution Amounts of New Securities**

No fractional shares of New Common Stock or Existing Lender Warrants shall be issued or distributed under the Plan.  Each Person entitled to receive New Common Stock or Existing Lender Warrants shall receive the total number of whole shares of New Common Stock and/or Existing Lender Warrants to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of New Common Stock or Existing Lender Warrants, the actual distribution of shares of such stock or warrants shall be rounded to the next higher or lower whole number as follows:  (a) fractions one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number.  Notwithstanding the foregoing, whenever rounding to the next lower whole number would result in such Person receiving no New Common Stock or no Existing Lender Warrants, such Person shall receive one (1) share of New Common Stock or one (1) Existing Lender Warrant, as the case may be.  If two or more Persons are entitled to equal fractional entitlements and the aggregate amount of New Common Stock or Existing Lender Warrants that would otherwise be issued to such Persons with respect to such fractional entitlements as a result of such rounding exceeds the number of whole shares and/or warrants which remain to be allocated, the Disbursing Agent shall allocate the remaining whole shares and/or warrants to such holders by random lot or such other impartial method as the Disbursing Agent deems fair.  Upon the allocation of all of the whole shares and/or warrants authorized under the Plan, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect.  The Disbursing Agent shall have the right to carry forward to subsequent distributions any applicable credits or debits arising from the rounding described in this paragraph.

**7.6     Delivery of Distributions**

(a)     Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or the Litigation Trustee, as applicable, (i) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtors, the claims agent, the Disbursing Agent, and the Litigation Trustee have been notified of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Debtors, the claims agent, the Disbursing Agent, and the Litigation Trustee after the date of any related Proof of Claim, (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and a written notice of a change of address has not been received by the Debtors, the claims agent, the Disbursing Agent, and the Litigation Trustee, or (iv) in the case of an Existing Lender Claim, at the addresses provided by the Existing Lenders.  To the extent that addresses are required to effect distributions to Existing Lenders, no distributions shall be made to any Existing Lender who fails to provide the Existing Lender Agent and the Debtors with written instructions as to the address at which such Existing Lender desires to receive distributions under the Plan, until such written instructions are provided.

(b)     If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent or the Litigation Trustee, as applicable, is notified by the Debtors, the claims agent, or such holder of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  If any distribution is made by check and such check is not returned but remains uncashed for six (6) months after the date of such check, the Disbursing Agent or the Litigation Trustee, as applicable, may cancel and void such check, and the distribution with respect thereto shall be deemed undeliverable.  If any holder is requested to provide a taxpayer identification number or to otherwise satisfy any tax withholding requirements with respect to a distribution and such holder fails to do within six (6) months of the date of such request, such holder's distribution shall be deemed undeliverable.

(c)     With respect to distributions to be made by the Disbursing Agent, unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of returned or otherwise undeliverable or unclaimed distributions made by the Disbursing Agent on behalf of the Reorganized Debtors shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (a) on or before the first (1st) anniversary of the Effective Date or (b) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property shall revert to the Reorganized Debtors free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  In the event of a timely claim for any returned or otherwise undeliverable or unclaimed distribution, the Reorganized Debtors shall deliver the applicable distribution amount or property to the Disbursing Agent for distribution pursuant to the Plan.  Nothing contained in the Plan shall require any Debtor, any Reorganized Debtor, or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(d)     With respect to distributions to be made by the Litigation Trustee, amounts in respect of returned or otherwise undeliverable or unclaimed distributions shall be retained in the Litigation Trust until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (a) on or before the first (1st) anniversary of the Effective Date or (b) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property shall revert to the Litigation Trust free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Nothing contained in the Plan shall require any Debtor, any Reorganized Debtor, or the Litigation Trustee to attempt to locate any holder of an Allowed Claim.

## 7.7     Application of Distribution Record Date

(a)     **Existing Lender Claims**

At the close of business on the Distribution Record Date, the register maintained by the Existing Lender Agent shall be closed and there shall be no further changes in the listed holders of the Existing Lender Claims for purposes of distributions under the Plan. The Reorganized Debtors, the Disbursing Agent, the Existing Lender Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Existing Lender Claims occurring after the Distribution Record Date and shall be entitled instead

to recognize and deal for all purposes hereunder with only those record holders stated on the register as of the close of business on the Distribution Record Date.

          (b)    **Other Claims**

At the close of business on the Distribution Record Date, the claims register maintained by the claims agent shall be closed and there shall be no further changes in the listed holders of the Claims. The Reorganized Debtors, the Disbursing Agent, the Litigation Trustee, the claims agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims register as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

**7.8**    **Withholding and Reporting Requirements**

In connection with the Plan and all distributions hereunder, the Disbursing Agent or the Litigation Trustee, as applicable, shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding, payment, and reporting requirements. The Disbursing Agent or the Litigation Trustee, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent or the Litigation Trustee, as applicable, for the payment and satisfaction of such withholding tax obligations in connection with such distribution. Any cash or other property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Section 7.6 of the Plan.

**7.9**    **Setoffs**

The Reorganized Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided*, *however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder; *provided further*, *however*, that all of the Debtors' rights to setoff are waived as to any Existing Lender.

**7.10**    **Prepayment**

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Reorganized Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; *provided*, *however,* that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

**7.11    De Minimis Distributions**

Neither the Reorganized Debtors, the Disbursing Agent, nor the Litigation Trustee shall have any obligation to make a Cash distribution with respect to any Claim (other than a Claim held by an Existing Lender) if the amount of the distribution is less than $20.00. The Claim of any holder (other than an Existing Lender) whose distribution is in an amount less than $20.00 shall be discharged, and such holder shall be forever barred from asserting such Claim against the Reorganized Debtors or their respective property; *provided, however*, that if the Claim is a Class A4 Claim, (a) it shall be included, regardless of amount, in all allocations made to determine distribution entitlements and (b) it shall not be discharged until all subsequent distributions under Sections 1.47 and 8.4 of the Plan have been made, although any such subsequent distribution shall be subject to the first sentence of this Section 7.11. Except with respect to distributions from the Litigation Trust, any Cash not distributed as a result of this provision shall be the property of the Reorganized Debtors, free of any restrictions, and any such Cash held by the Disbursing Agent shall be returned to the Reorganized Debtors following the Distribution Date that would have applied to any such distribution. For distributions from the Litigation Trust, any Cash not distributed as a result of this provision shall be the property of the Litigation Trust.

**7.12    No Distribution in Excess of Allowed Amount of Claim**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Plan).

**7.13    Allocation of Distributions**

All distributions received under the Plan by holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

**ARTICLE VIII**

**PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO**

**8.1    Prosecution of Objections to Claims**

 (a) **Objections to Claims**

All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline. If an objection has not been filed to a Proof of Claim or Request for Payment by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim, or Request for Payment, relates shall be treated as an Allowed Claim if such Claim has not been allowed earlier. The Reorganized Debtors or, with respect to Class A4 Claims only, the Litigation Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether such Debtor or the Litigation Trustee has previously

objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors or the Litigation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

Nothing in the Plan shall, or shall be construed to, limit, alter, impair, or release any objection or counterclaim to any Proof of Claim filed by a D&O Defendant.

(b)      **Authority to Prosecute Objections**

After the Effective Date, except with respect to Class A4 Claims, only the Reorganized Debtors shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims. The Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

With respect to Class A4 Claims, only the Litigation Trustee shall have the authority to file objections to such General Unsecured Claims and to settle, compromise, withdraw, or litigate to judgment objections to such Claims. The Litigation Trustee may settle or compromise any Disputed Class A4 Claim without approval of the Bankruptcy Court.

Nothing herein shall limit the contractual rights and obligations of any party, including any insurer, with respect to any Claim, under (i) an assumed agreement, including any assumed insurance policy, or (ii) any non-executory agreement, including a non-executory insurance policy, as to which such party has continuing obligations pursuant to Section 6.1(e) of the Plan or applicable law.

**8.2      Deemed Allowance of Gonzalez Litigation Claims**

The Gonzalez Litigation Claims shall be deemed to be Allowed Class A4 Claims in the aggregate amount of $29.5 million. In no event shall the Litigation Trust have any liability to the holders of Gonzalez Litigation Claims for any amount that exceeds the distribution entitlement applicable to an Allowed Class A4 Claim in the aggregate amount of $29.5 million and the Reorganized Debtors shall have no liability whatsoever to the holders of Gonzalez Litigation Claims.

**8.3      Treatment of Disputed Claims Pending Allowance**

Notwithstanding any other provisions of the Plan, no payments or distributions shall be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim; *provided, however*, that the Reorganized Debtors or, with respect to Class A4 Claims only, the Litigation Trustee, as applicable, may elect to withhold distributions on the portion of a Claim that is not Disputed until the portion of the Claim that is Disputed is resolved by Final Order.

**8.4    Allocations and Distributions for Disputed Class A4 Claims**

As soon as practicable prior to the initial Distribution Date applicable to Class A4 Claims, the Litigation Trustee shall determine the Pro Rata allocation of Class A4 Beneficial Trust Interests for holders of (a) Allowed General Unsecured Claims based upon their Allowed Claim amounts and (b) Disputed General Unsecured Claims based upon their Proof of Claims amounts or such other allocation amounts as may be agreed by such holders or ordered by the Bankruptcy Court. Any distributable amounts relating to the Pro Rata allocation for the holder of a Disputed General Unsecured Claim shall be available for distribution to such holder, but only in an amount reflecting the Pro Rata share attributable to the actual amount of such holder's Allowed Claim, on the Distribution Date following entry of a Final Order resolving such Claim, and otherwise shall be treated in accordance with the terms of the Litigation Trust Agreement.

**8.5    Distributions on Account of Other Disputed Claims Once Allowed**

The Disbursing Agent shall, on the applicable Distribution Dates, make distributions on account of any Disputed Claim that has become an Allowed Claim (not including any Disputed Class A4 Claims, which shall be subject to Section 8.4 of the Plan). Such distributions shall be made pursuant to the provisions of the Plan governing the applicable Class. Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

## ARTICLE IX

## CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**9.1    Conditions to Confirmation**

The following are conditions precedent to Confirmation, each of which must be satisfied or waived in accordance with Section 9.3 of the Plan:

(a)    the Disclosure Statement shall have been in form and substance reasonably satisfactory to the Debtors, the Steering Committee Members, and the Creditors' Committee, and an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court;

(b)    the Debtors shall have obtained a written commitment for the Exit Facility on terms and conditions that (i) are reasonably acceptable to the Steering Committee Members and the Debtors; and (ii) support the Debtors' demonstration that (x) the Plan is feasible; and (y) the Reorganized Debtors will have the ability to satisfy their obligations to pay current interest and principal under the Term A Facility and the Term B Facility;

(c)    the proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Steering Committee Members, and the Creditors' Committee, and shall, among other things:

(i)    provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into,

implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)  approve the Exit Facility;

(iii)  authorize the issuance of the New Securities; and

(iv)  provide that the amount of Houlihan's "Phase II Deferred Fees" (as referred to in Section 11.1(b) of the Plan) shall not exceed $4 million.

**9.2  Conditions to Effective Date**

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 9.3 of the Plan:

(a)  the Confirmation Order shall have been entered on or before March 19, 2010;

(b)  the Confirmation Order shall not then be stayed, vacated, or reversed, or shall not have been amended without the agreement of the Debtors, the Steering Committee Members, and, as to terms and provisions materially affecting holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee;

(c)  the Confirmation Order shall not then be subject to a pending appeal, and the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending;

(d)  the New Freedom Charter, the New Freedom By-Laws, the Exit Facility, the New Equity Incentive Plan, the Term A Facility, the Term B Facility, the Intercreditor Agreement, the New Stockholders Agreement, the Registration Rights Agreement, and the Existing Lender Warrant Agreement shall be in form and substance reasonably acceptable to the Debtors and the Steering Committee Members, and, to the extent any of such documents contemplates execution by one or more persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived in accordance with their respective terms;

(e)  the Litigation Trust Agreement shall be in form and substance reasonably acceptable to the Debtors, the Existing Lender Agent, the Gonzalez Class Counsel, and the Creditors' Committee, and, to the extent such document contemplates execution by one or more persons, such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of such document shall have been satisfied or waived in accordance with its terms;

(f)  there shall not have been any material adverse change (as measured against the information provided to the Existing Lender Agent and/or its advisors prior to the Petition Date) in the status of any claims against the Debtors on account of (i) pension funding liability, (ii) tax liability, and (iii) environmental liability; *provided that*, with respect to (i) and (ii), there shall not be a material adverse change if the Steering Committee Members and the Debtors are able to negotiate a mutually satisfactory response to such change, subject to any requirements of the Bankruptcy Code, within 15 business days of its discovery;

(g)     the Debtors shall have Cash on hand as of the Effective Date of at least $15 million;

(h)     the Exit Facility (i) shall be on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors; (ii) shall be in full force and effect upon closing, and (iii) shall provide for the extension of credit thereunder to be available upon closing;

(i)     all conditions precedent to the closing of the Exit Facility, the Term A Facility, and the Term B Facility as set on Exhibit A hereto shall have been satisfied or waived, as applicable;

(j)     all material governmental, regulatory, and third party approvals, waivers, or consents in connection with the Plan (including any required approvals or waivers by the FCC), if any, shall have been obtained and shall remain in full force and effect, and there shall exist no third party claim, action, suit, investigation, litigation, request for reconsideration, or proceeding pending in any court or before any arbitrator or governmental instrumentality, which would if successfully pursued prohibit the transactions contemplated by the Plan;

(k)     all motions necessary to effect the withdrawal and dismissal, with prejudice, by the Existing Lender Agent, any of the Existing Lenders, the Creditors' Committee, any member of the Creditors' Committee, or any holder of a Gonzalez Litigation Claim, of any litigation, discovery, appeals, or motions that seek or would have the effect of hindering, delaying, or objecting to the consummation of the Plan, shall have been filed by the applicable party, which motions shall be without condition other than the occurrence of the Effective Date;

(l)     the Mutual Release Agreement shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of such document shall have been satisfied or waived in accordance with its terms;

(m)     the Superior Court of California, County of Orange, presiding over the Gonzalez Litigation Claims, shall have approved the Mutual Release Agreement to the extent it relates to a release granted by the Gonzalez Class Counsel and a class representative on behalf of the holders of the Gonzalez Litigation Claims of each of the Existing Lenders, the Existing Lender Agent, the financial and legal advisors for the Existing Lenders and the Existing Lender Agent, each member of and Professional retained by the Creditors' Committee, each such member's professionals, and the Debtors for themselves and on behalf of their current and former directors, officers, and Professionals (exclusive of the D&O Defendants), as described in the Mutual Release Agreement;

(n)     the Debtors have provided a representation and warranty in a form and substance reasonably satisfactory to the Creditors' Committee that, as of the Confirmation Date, there are no claims that have been made or are pending against the D&O Insurance Policies, except for the notice of claim submitted by the Debtors on behalf of their directors and officers in connection with the examinations under Rule 2004 of the Bankruptcy Rules undertaken by the Creditors' Committee;

(o)     the Debtors have entered into Post-Emergence Trade Agreements evidencing that they have satisfied the requirement of Section 5.11(d) of the Plan; and

(p)     all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

**9.3    Waiver of Conditions**

With the exception of the conditions contained in Section 9.1(a), 9.2(a), and 9.2(b) of the Plan, each of the conditions set forth in Section 9.1 and Section 9.2 of the Plan may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing, *provided, however*, that any such waiver shall not be effective without the consent of the Steering Committee Members, which consent shall not be unreasonably withheld; *provided further, however*, that any such waiver with respect to Section 9.1(c), 9.2(e), and 9.2(n) of the Plan shall not be effective without the additional consent of the Creditors' Committee, which consent shall not be unreasonably withheld; and *provided further, however*, that with respect Section 9.2(c) or 9.2(k) of the Plan, if the particular matter to be waived materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, such waiver shall not be effective without the additional consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

## ARTICLE X

## RETENTION OF JURISDICTION

**10.1    Scope of Retention of Jurisdiction**

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including the resolution of any Request for Payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided, however,* that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)    hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)    effectuate performance of and payments under the provisions of the Plan;

(e)    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, the Retained Litigation Rights, or the Transferred Causes of Action;

(f)　　enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(g)　　hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(h)　　hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, *provided*, *however*, that any dispute arising under or in connection with the Exit Facility, Term A Facility, the Term B Facility, and the New Securities shall be determined in accordance with the governing law designated by the applicable document;

(i)　　consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)　　issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(k)　　enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(l)　　enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(m)　　except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

(n)　　hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(o)　　hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(p)　　hear and determine all matters arising under the Broadcast Trust Agreement or relating to the Broadcast Trustee, including, without limitation, with respect to any continuing supervision that may be required under Section 5.16(b) of the Plan;

(q)　　hear and determine all matters arising under the Litigation Trust Agreement or relating to the Litigation Trustee;

(r)　　hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(s)　　enter one or more final decrees closing some or all of the Chapter 11 Cases.

**10.2    Failure of the Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.1 of the Plan, the provisions of this Article X shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

**11.1    Professional Fee Claims; Expense Reimbursements**

(a)    All final applications seeking allowance and payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code and Substantial Contribution Claims under Section 503(b)(3), (4), or (5) of the Bankruptcy Code must be filed and served on the Reorganized Debtors, their counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such applications must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

(b)    In connection with the Professional Fee Claim of Houlihan, the Debtors, the Creditors' Committee, and Houlihan have settled all issues relating to the "Phase II Monthly Fees" and the "Phase II Deferred Fee," as such terms are defined in that certain First Amendment dated May 6, 2009 to that certain Engagement Agreement dated March 13, 2009 (the "Amended Engagement Agreement") as described in this paragraph. The Debtors (including the Litigation Trust), the Creditors' Committee, and the Steering Committee Members each agree that they have no objection to the final award of Phase II Monthly Fees in the amount set forth in the Amended Engagement Agreement and the Phase II Deferred Fee in the amount of $4 million. The Debtors further agree that the Phase II Monthly Fees and Phase II Deferred Fee as described in the preceding sentence are reasonable under the standards set forth in Sections 328(a) and 330(a) of the Bankruptcy Code. The Debtors and the Existing Lender Agent further each agree that they will oppose any objection raised by a party in interest to Houlihan's final fee application. Additionally, both Houlihan and the Creditors' Committee also have agreed that upon confirmation of this Plan, each party will dismiss with prejudice its appeal and cross-appeal, respectively, in the United States District Court for the District of Delaware regarding the Order Authorizing the Employment and Retention of Houlihan Lokey Howard & Zukin Capital, Inc. as Investment Bankers and Financial Advisors Pursuant to 11 U.S.C. §§ 327(a), 330, and 1107 and Fed. R. Bankr. P. 2014(a) and Del. Bankr. L.R. 2014-1, Nunc Pro Tunc to the Petition Date.  The Debtors (including the Litigation Trust), the Creditors' Committee, and the Existing Lender Agent each recognize that Houlihan intends to file a final fee application for the Phase II Monthly Fees in the amount set forth in the Amended Engagement Agreement and the Phase II Deferred Fee in the amount of $4 million in time to be heard at the Confirmation Hearing.  Such parties have no objection to the consideration of such final fee application at the Confirmation Hearing and, as a result, the Bankruptcy Court has agreed to hear such final fee application at that time.  Any other fees and all expense reimbursements provided for under the Amended

Engagement Agreement shall be subject to the final application process described in Section 11.1(a) of the Plan.

(c)     Each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay reasonable professional fees and expenses in connection with services rendered to it after the Effective Date.

## 11.2    Administrative Claims Bar Date

All Requests for Payment of an Administrative Claim (other than as set forth in Sections 3.1(a) and 11.1 and this Section 11.2 of the Plan) must be filed with the Bankruptcy Court and served on counsel for the Debtors or Reorganized Debtors no later than forty-five (45) days after the Effective Date.  The Debtors shall provide supplemental notice of such filing deadline by mail with respect to known claimants and by publication with respect to unknown claimants. Unless the Debtors or Reorganized Debtors object to an Administrative Claim by the applicable Claims Objection Deadline, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that the Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  Notwithstanding the foregoing, (a) no Request for Payment need be filed with respect to an undisputed postpetition obligation which was paid or is payable by any of the Debtors in the ordinary course of business; *provided, however*, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; (b) no Request for Payment need be filed with respect to Cure owing under an executory contract or unexpired lease if (i) the amount of Cure is fixed or proposed to be fixed by the Confirmation Order or other order of the Bankruptcy Court either pursuant to the Plan or pursuant to a motion to assume and fix the amount of Cure filed by the Debtors and (ii) a timely objection asserting an increased amount of Cure has been filed by the non-Debtor party to the subject contract or lease; and (c) no Request for Payment need be filed with respect to fees payable pursuant to Section 1930 of Title 28 of the United States Code.

## 11.3    Payment of Statutory Fees

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date shall be paid by the Reorganized Debtors.  The obligation of the Reorganized Debtors to pay such fees as to any one of their cases shall continue only until such case is closed, dismissed, or converted.

## 11.4    Modifications and Amendments

The Debtors may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date, *provided*, *however*, that any such alteration, amendment, or modification shall not be effective without the consent of the Steering Committee Members and, if such alteration, amendment, or modification materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors

may, with the agreement of the Steering Committee Members and, if the provision at issue materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided*, *however,* that prior notice of such proceedings shall be served to the extent required by the Bankruptcy Rules or order of the Bankruptcy Court.

## 11.5    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor, with the agreement of the Steering Committee Members and, if such term or provision materially affects holders of General Unsecured Claims, Trade Unsecured Claims, or Non-Qualified Retirement Claims, the Creditors' Committee, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Each of the Debtors reserves the right to sever itself from the Plan, in which event the Plan shall continue as to all other non-severing Debtors.

## 11.6    Successors and Assigns and Binding Effect

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such entity, including, but not limited to, the Reorganized Debtors and all other parties in interest in the Chapter 11 Cases.

## 11.7    Compromises and Settlements

From and after the Effective Date, the Reorganized Debtors may compromise and settle various Claims against them and/or Retained Litigation Rights and other claims that they may have against other Persons without any further approval by the Bankruptcy Court; *provided, however*, that the foregoing shall not apply to any Transferred Causes of Action or Disputed Class A4 Claims, which shall be compromised and settled only in accordance with the terms of the Litigation Trust Agreement and the Plan.  Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them and Retained Litigation Rights or other claims that they may have against other Persons, with the exception of the Transferred Causes of Action and Disputed Class A4 Claims.

## 11.8    Releases and Satisfaction of Subordination Rights

All Claims against the Debtors and all rights and claims between or among the holders of Claims relating in any manner whatsoever to any alleged subordination rights shall be deemed satisfied by the distributions under, described in, contemplated by, and/or implemented in

Sections 3.1, 3.2, 3.3, and 3.4 of the Plan. Distributions under, described in, contemplated by, and/or implemented by the Plan to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any alleged subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**11.9    Releases and Related Matters**

    (a)    **Debtor Releases**

        **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Estates, including the Litigation Trustee on behalf of the Litigation Trust acting in the capacity of a bankruptcy or insolvency trustee or examiner, or a receiver for the Creditors' Committee, and any other successor to the Debtors or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, whether pursuing a derivative cause of action or otherwise, shall be deemed to forever release, waive, and discharge:**

        **(i)    all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors, against (A) any of the other Debtors and any of the Debtors' non-Debtor affiliates, (B) except with respect to the Transferred Causes of Action against the D&O Defendants, the Debtors' current and former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, and (C) the Existing Lenders, the Existing Lender Agent, and any of their respective current or former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (but solely in their respective capacities as such); *provided, however,* that nothing in this Section 11.9(a) shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any of their employees that is based upon an alleged breach of a confidentiality, noncompete, or (as to non-officer employees only) any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors; and *provided further, however*, that nothing in this Section 11.9(a) shall operate as a release of intercompany obligations between any of the Debtors or between any of the Debtors and their non-Debtor subsidiaries unless otherwise provided for in the Plan; and**

(ii)    all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities arising under (and solely arising under) Chapter 5 of the Bankruptcy Code against any provider of goods or services to the Debtors.

In no event shall any Transferred Cause of Action be subject to the foregoing release, waiver, and discharge.

(b)    **Third Party Releases**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of any Claim that votes to accept the Plan (each a "<u>Releasing Party</u>") shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, against (i) the Debtors' current and former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (exclusive of the D&O Defendants) and (ii) the Existing Lenders, the Existing Lender Agent, and any of their respective current or former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates (but solely in their respective capacities as such) (the Persons identified in clauses (i) and (ii) collectively, the "<u>Third Party Releasees</u>"), in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

Each of the Third Party Releasees shall be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), taking place on or prior to the Effective Date against each Releasing Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.  For the avoidance of doubt and notwithstanding anything herein to the contrary, any release provided under this Section 11.9(b) by any Existing Lender shall not affect any right, claim, remedy, or cause of action such lender or its affiliates may have related to any equipment leases.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is (i) in exchange for the good and valuable consideration provided by the Third Party Releasees, representing good faith settlement and compromise of the claims released herein; (ii) in the best interests of the Debtors and

all holders of Claims and Interests; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any claim released by the Releasing Parties against any of the Third Party Releasees or their respective properties.

      (c)      **Mutual Agreed Releases**

      **On the Effective Date, each of the Existing Lenders, the Existing Lender Agent, the financial and legal advisors for the Existing Lenders and the Existing Lender Agent, each member of and Professional retained by the Creditors' Committee, each such member's professionals, the Gonzalez Class Counsel and a class representative for themselves and on behalf of the holders of Gonzalez Litigation Claims, and the Debtors for themselves and on behalf of their current and former directors, officers, and Professionals (exclusive of the D&O Defendants) shall enter into and execute the Mutual Release Agreement, pursuant to which each executing party thereto releases all other executing parties thereto from all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, held by each such executing party against all other executing parties in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.**

      **For the avoidance of doubt and notwithstanding anything herein to the contrary, any release provided under the Mutual Release Agreement by any Existing Lender shall not affect any right, claim, remedy, or cause of action such lender or its affiliates may have related to any equipment leases.**

      (d)      **Waiver of Statutory Limitations on Releases**

      **THE LAWS OF SOME STATES (FOR EXAMPLE, CALIFORNIA CIVIL CODE §1542) PROVIDE, IN WORDS OR SUBSTANCE THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS DECISION TO RELEASE. THE RELEASING PARTIES IN EACH OF SECTIONS 11.9(a), (b), AND (c) OF THE PLAN ARE DEEMED TO HAVE WAIVED ANY RIGHTS THEY MAY HAVE UNDER SUCH STATE LAWS AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT.**

## 11.10  Discharge of the Debtors

      (a)      Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Interests of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan

on account of such Claims; and upon the Effective Date, except as otherwise provided herein or in the Confirmation Order, (i) the Debtors, and each of them, shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (C) the holder of a Claim based upon such debt accepted the Plan, and (ii) all Interests shall be terminated.

(b)     As of the Effective Date, except as provided in the Plan or in the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, causes of action, liabilities, or Interests relating to the Debtors based upon any act, omission, transaction, or other activity of any nature that occurred prior to the Confirmation Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

(c)     The discharge of the Debtors pursuant to the Plan is not intended to limit in any way the Debtors' insurance coverage or to deprive any third party of any rights to such coverage that may otherwise exist.

## 11.11  Injunction

(a)     **Except as provided in the Plan or in the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner or in any place any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance in any manner or in any place; or (iv) commencing or continuing any action, in each such case in any manner or in any place or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

(b)     **As of the Effective Date, all Persons that have held, currently hold, or may hold, a claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Section 11.9 of the Plan or is subject to exculpation pursuant to Section 11.12 of the Plan are permanently enjoined from taking any of the following actions on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner or in any place any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any**

Lien or encumbrance in any manner or in any place; or (iv) commencing or continuing any action, in each such case in any manner or in any place or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(c)     Without limiting the effect of the foregoing upon any person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 11.11.

## 11.12    Exculpation and Limitation of Liability

(a)     **None of (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Existing Lenders, (iv) the Existing Lender Agent, (v) the Creditors' Committee, or (vi) any of the respective current or former members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates of the foregoing (but solely in their respective capacities as such), shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct, or willful violation of federal or state securities laws or the Internal Revenue Code (in each case as determined by a Final Order), and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

(b)     **Notwithstanding any other provision of the Plan, no holder of a Claim or an Interest, no other party in interest, none of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates, and none of their respective successors or assigns, shall have any right of action against (i) any Debtor, (ii) any Reorganized Debtor, (iii) any of the Existing Lenders, (iv) the Existing Lender Agent, (v) the Creditors' Committee, or (vi) any of the respective current or former members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders, or affiliates of the foregoing (but solely in their respective capacities as such), for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code (in each case as determined by a Final Order).**

## 11.13    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or

otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

### 11.14 Revocation, Withdrawal, or Non-Consummation

(a) The Debtors reserve the right to revoke or withdraw the Plan as to all Debtors at any time prior to the Confirmation Date and to file subsequent plans of reorganization for all Debtors. If the Debtors revoke or withdraw the Plan in its entirety, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

(b) The Debtors reserve the right, with the agreement of each of the Steering Committee Members and the Creditors' Committee, to revoke or withdraw the Plan as to any one or more (but not all) Debtors at any time prior to the Confirmation Date and to file subsequent plans of reorganization for any one or more Debtors as to which the Plan is withdrawn or revoked. A revocation or withdrawal of the Plan as to any one or more (but not all) Debtors shall not affect the Plan as it relates to the other non-revoking or non-withdrawing Debtors.

### 11.15 Plan Supplement

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court at least five (5) days prior to the Voting Deadline. Upon such filing, all documents included in the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours or may be accessed online at www.deb.uscourts.gov (cm/ecf) or www.loganandco.com. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors in accordance with Section 11.16 of the Plan.

### 11.16 Notices

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor or a Reorganized Debtor under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Rachel Sagan
Vice President and General Counsel
FREEDOM COMMUNICATIONS HOLDINGS, INC.
17666 Fitch
Irvine, California 92614
Telephone: 949-798-3535
Facsimile:  949-789-3524

with copies to:

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: 213-485-1234
Facsimile: 213-891-8763

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: 212-906-1200
Facsimile: 212-751-4864

Michael R. Nestor
Kara Hammond Coyle
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:302-571-6600
Facsimile: 302-571-1253

## 11.17  Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and its members shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases.  The Professionals retained by the Creditors' Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered after the Effective Date, except as may be necessary to file applications pursuant to Section 11.1(a) of the Plan.

## 11.18  Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

## 11.19   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof; *provided, however*, that any and all provisions relating to or dealing with the Transferred Causes of Action and/or the Insurance Coverage Actions shall be governed by and interpreted under the laws of the State of California; *provided further, however*, that nothing herein shall affect the choice of law applicable to the Transferred Causes of Action.

[space intentionally left blank]

Dated: January 28, 2010

Freedom Communications Holdings, Inc.
(for itself and on behalf of the Subsidiary Debtors)

By: _Mark A. McEachen_

Mark A. McEachen
Senior Vice President and Chief Financial Officer

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:    302-571-6600
Facsimile:    302-571-1253
Email:        mnestor@ycst.com
              kcoyle@ycst.com

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:    213-485-1234
Facsimile:    213-891-8763
Email:        robert.klyman@lw.com

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:    212-906-1200
Facsimile:    212-751-4864
Email:        rosalie.gray@lw.com
              michael.riela@lw.com

Co-Counsel for Debtors and Debtors in Possession

# EXHIBIT A

## TO

### JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
### OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS

### <u>Material Terms of Term A Facility</u>

| | |
|---|---|
| **Principal Amount and Type:** | A term loan facility (the "<u>Term A Facility</u>") in an aggregate principal amount of $225 million representing a conversion of a portion of the Existing Lender Secured Claims into the Term A Loans as of the Closing Date. |
| **Borrower:** | Reorganized Freedom Communications (the "<u>Borrower</u>") |
| **Guarantors:** | Reorganized Freedom Holdings and each of the Borrower's direct and indirect existing and future subsidiaries (collectively, the "<u>Guarantors</u>"; the Borrower and the Guarantors, collectively, the "<u>Loan Parties</u>"). |
| **Administrative Agent** | JPMorgan Chase Bank, N.A. (in such capacity, the "<u>Term A Administrative Agent</u>"). |
| **Collateral Agent:** | JPMorgan Chase Bank, N.A. |
| **Lenders:** | Holders of Secured Lender Claims as of the Closing Date (collectively, the "<u>Term A Lenders</u>"). |
| **Interest Rates and Fees:** | <u>***Interest Rate***</u>: <br><br> The Borrower may elect that the Term A Loans bear interest at a rate per annum equal to: (i) the Alternate Base Rate plus the Applicable Margin; or (ii) the Adjusted LIBO Rate plus the Applicable Margin. <br><br> As used herein: <br><br> "***ABR Loans***" means Term A Loans bearing interest based upon the Alternate Base Rate. <br><br> "***Adjusted LIBO Rate***" means, for any Eurodollar Loan for an interest period selected by the Borrower equal to one, two, three or six months, a rate per annum determined by the Term A Administrative Agent to be equal to the quotient of the LIBO Rate for such loan for such interest period divided by 1 minus the statutory reserve rate for such loan for such interest period; *provided that*, for purposes of the Term A Facility, the Adjusted LIBO Rate for any interest period shall in no event be less than 3.50% per annum. <br><br> "***Alternate Base Rate***" means, with respect to any ABR Loan, for any |

day, the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month interest period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; *provided that*, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time on such day; and provided further that the Alternate Base Rate shall in no event at any time be less than 4.50% per annum. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

"*Applicable Margin*" means (a) with respect to ABR Loans, 5.00% per annum and (b) with respect to Eurodollar Loans, 6.00% per annum.

"*Eurodollar Loans*" means Term A Loans bearing interest based upon the LIBO Rate.

"*Federal Funds Effective Rate*" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding business day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a business day, the average of the quotations for such day for such transactions received by the Term A Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*LIBO Rate*" means, with respect to any Eurodollar Loan for any interest period therefor, the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time, two London business days prior to the commencement of such interest period, as the rate for dollar deposits with a maturity comparable to such interest period.

"*Prime Rate*" means the rate of interest per annum publicly announced from time to time by the Term A Administrative Agent (or other designated bank) as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

**_Interest Payment Date_**:

On the last day of each relevant interest period and, in the case of any

| | interest period longer than three months, on each successive date three months after the first day of such interest period. |
|---|---|
| | ***Default Rate***: |
| | At any time upon the occurrence and during the continuation of any event of default under the Term A Facility, all outstanding Term A Loans shall bear interest at 2% above the Term A Interest Rate. Without limiting the foregoing, overdue interest, fees and other amounts under the Term A Loan shall bear interest at 2% above the Term A Interest Rate. |
| | ***Rate Basis***: |
| | All per annum rates shall be calculated on the basis of a year of 360 days, except that interest based on the Prime Rate shall be calculated on the basis of a year of 365/366 days, as applicable. |
| | ***Agency Fee***: |
| | An administrative agency fee payable to the Term A Administrative Agent in such amount and at such times as shall be agreed in writing between the Borrower and the Term A Administrative Agent. |
| **Maturity:** | Four years after the Effective Date |
| **Optional Prepayments:** | Term A Loans may be prepaid by the Borrower without premium or penalty (but subject to payment of break funding costs, if any, as described below) in minimum amounts to be agreed in the Term A Loan Documents (as defined below). |
| **Mandatory Prepayments:** | The following amounts shall be applied to prepay the Term A Loans: |
| | (a) 100% of the net proceeds of any sale or other disposition of assets (including as a result of casualty or condemnation) by Holdings, the Borrower or any of its subsidiaries (subject to certain customary exceptions (including reinvestment rights) and minimum thresholds to be agreed); |
| | (b) 100% of the net proceeds of any debt incurrence by the Borrower or any of its subsidiaries after the Closing Date (subject to certain customary exceptions to be agreed); |
| | (c) 50% of Free Cash Flow (to be defined in a manner to be agreed upon by the Debtors and the Steering Committee Members) for any fiscal year of the Borrower (commencing with the fiscal year ending on or nearest to December 31, 2010, and which will be defined to include tax refunds and other extraordinary receipts received during such fiscal year); and |

| | |
|---|---|
| | (d) other amounts subject to customary mandatory prepayment provisions, including, but not limited to, net proceeds of equity issuances, tax refunds and extraordinary receipts.<br><br>Each such mandatory prepayment of principal of the Term A Loans shall be applied to reduce scheduled payments of principal due after the date of such prepayment in the inverse order of maturity. Amounts prepaid in respect of Term A Loans may not be reborrowed. |
| **Collateral:** | The obligations of the Loan Parties in respect of the Term A Facility shall be secured by (i) a first priority, perfected security interest in all assets of the Loan Parties, whether consisting of real property, personal, tangible or intangible property, including all of the capital stock of the Borrower's subsidiaries (other than the Exit Facility Collateral), except for those assets as to which the Term A Administrative Agent shall determine in its sole discretion that the costs of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby and other customary exclusions acceptable to the Term A Administrative Agent (the "Term A Collateral") and (ii) a second priority, perfected security interest in all of the Exit Facility Collateral, if applicable.  In the case of the assets of, and the ownership interests in, the Reorganized Broadcast Licensee Companies, the grant of such security interests shall be limited to the extent required by law, and shall occur following "long-form" consent of the FCC to the transfer of control of the Reorganized Broadcast Licensee Companies to Reorganized Freedom Holdings, unless the grant of such security interests as of the Effective Date shall be permitted under applicable law or approved by the FCC; *provided, however*, that a first priority, perfected security interest in the beneficial interests held by the Reorganized Broadcast Operating Companies in the trust formed under the Broadcast Trust Agreement shall be granted as security for the obligations of the Loan Parties in respect of the Term A Facility as of the Effective Date.<br><br>The liens securing the Term A Loans will be subject to and governed by an intercreditor agreement between the Term A Lenders and the Term B Lenders (the "Intercreditor Agreement"), on terms acceptable to the Steering Committee Members. |
| **Amortization:** | The Borrower shall make quarterly amortization payments of $3.75 million per quarter, paid in arrears, totaling $15 million annually beginning the first quarter following the first anniversary of the Effective Date and continuing quarterly thereafter. |
| **Closing Date Conditions Precedent:** | The occurrence of the Closing Date with respect to the Term A Facility, the Term B Facility, and the Exit Facility (the "Facilities") is subject to the satisfaction or written waiver of conditions by the Steering Committee Members that are customary, necessary or |

appropriate for the loans of this type, including, without limitation, the following:

(a) The Loan Parties shall have executed and delivered reasonably satisfactory definitive financing documentation with respect to the Facilities, including credit agreements, security documents, intercreditor agreements and other legal documentation mutually satisfactory to the Steering Committee Members, which shall reflect the terms and conditions set forth in Exhibit A and Exhibit B.

(b) All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Borrower and its subsidiaries (including shareholder approvals, if any) shall have been obtained and shall be in full force and effect.

(c) The respective New Agent under each Facility shall have received such closing documents thereunder as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, insurance certificates, loss payable and additional insured endorsements, opinions of counsel, organizational documents, title insurance policies, collateral releases (which releases may be effected by the Confirmation Order), consents, landlord/mortgagee/bailee waivers, financing statements and consignment or similar filings, all in form and substance reasonably acceptable to the Steering Committee Members.

(d) The Debtors shall have cash on hand of at least $15 million.

(e) The corporate and capital structure (including the terms of debt other than the Facilities) of the Borrower and its subsidiaries shall be acceptable to the Steering Committee Members, which condition shall be deemed satisfied if the corporate and capital structure of the Borrower and its subsidiaries is consistent with the Term Sheet.

(f) There shall not have been any material adverse change (as measured against the information provided to the Agent and/or its advisors prior to the Petition Date) in the status of any claims against the Debtors on account of (i) pension funding liability, (ii) tax liability and (iii) environmental liability; *provided that,* with respect to (i) and (ii), there shall not be a material adverse change if the Steering Committee Members and the Debtors are able to negotiate a mutually satisfactory response to such change, subject to any requirements of the Bankruptcy Code, within 15 business days of its discovery.

(g) With respect to each of the Facilities, the execution, delivery, and performance by the Borrower of such facility, the borrowing of the loans thereunder and the use of proceeds thereof shall be in compliance with applicable law, including but not limited to

| | |
|---|---|
| | compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System.<br><br>(h) Liens creating security interests in the Collateral of the requisite priority shall have been perfected.<br><br>(i) All fees required to be paid, and all expenses for which invoices have been presented, shall have been paid on or before the Closing Date.<br><br>(j) The Borrower shall have issued New Common Stock to the Secured Lenders as contemplated in the Plan.<br><br>(k) Satisfaction of all conditions precedent to the Effective Date as set forth in the Plan. |
| **Documentation:** | The credit documentation for the Term A Facility (the "Term A Loan Documents") shall contain representations and warranties, covenants and events of default relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and other terms deemed appropriate by the Term A Lenders as set forth below. |
| **Representations:** | The credit documentation for the Term A Facility (the "Term A Loan Documents") shall contain representations and warranties relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following: financial statements; absence of undisclosed liabilities; no material adverse change; existence and standing, authorization and validity; compliance with law; corporate power and authority; enforceability of Term A Loan Documents; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; no burdensome restrictions; taxes; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; labor matters; accuracy of disclosure; perfection and priority of security interests under the Term A Loan Documents; and enforceability of guarantees by the Guarantors under the Term A Loan Documents. |
| **Affirmative Covenants:** | The Term A Loan Documents shall contain affirmative covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following: delivery of monthly, quarterly and annual financial statements (in each case, within a time period to be agreed); quarterly compliance certificates and annual projections; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws; maintenance of property and insurance; maintenance of books and records; right of the Term A |

| | |
|---|---|
| | Lenders and the Term A Administrative Agent to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; casualty and condemnation; use of proceeds; and further assurances (including with respect to security interests in after-acquired property). |
| **Financial Covenants:** | The Term A Loan Documents shall contain financial covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following:  (i) Minimum EBITDA, (ii) maximum capital expenditures, (iii) a minimum fixed charge coverage ratio and (iv) a maximum leverage ratio.  Covenant levels to be negotiated to provide flexibility reasonably acceptable to the Steering Committee Members and the Debtors for the first 18 months after the Effective Date. |
| **Negative Covenants:** | The Term A Loan Documents shall contain negative covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following:  limitations on: indebtedness (including guarantee obligations and preferred stock of subsidiaries); liens; mergers, consolidations, liquidations and dissolutions; sales of assets; payment of restricted payments (including dividends and other payments in respect of capital stock); investments (including acquisitions), loans and advances; sale and leaseback transactions; swap agreements; optional payments and modifications of subordinated debt and certain other debt to be determined; transactions with affiliates; changes in fiscal year; negative pledge clauses and other restrictive agreements; and amendment of material documents. |
| **Events of Default:** | The Term A Loan Documents shall contain events of default relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following:  nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of representations and warranties; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default to occurrence of a default (whether or not resulting in acceleration) under any other agreement governing indebtedness, in excess of an amount to be agreed upon, of the Borrower or any of its subsidiaries; bankruptcy events; certain ERISA events; material judgments; any of the Term A Loan Documents shall cease to be in full force and effect or any Loan Party shall so assert; any security interests created by the security documents shall cease to be enforceable and of the same priority purported to be created thereby; and a change of control (the definition of which is to be |

| | |
|---|---|
| | agreed). |
| **Voting:** | Amendments, waivers and consents with respect to the Term A Loan Documents shall require the approval of Term A Lenders holding not less than a majority of the aggregate amount of the Term A Loans, except that the consent of each Term A Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of amortization or final maturity of any Term A Loan, (ii) reductions in the principal of any Term A Loan or the rate of interest or any fee or extensions of any due date thereof, (iii) modifications to any of the voting percentages, (iv) modifications to the pro rata sharing requirements of the Term A Loan Documents, (v) assignment by any Loan Party of its rights under the Term A Loan Documents and (vi) release of all or substantially all of the Guarantors, and release of all or substantially all of the Collateral, except as permitted in the Term A Loan Documents. |
| **Assignments and Participations:** | The Term A Lenders shall be permitted to assign all or a portion of their Term A Loans with the consent, not to be unreasonably withheld, of the Term A Administrative Agent, unless the assignee is a Term A Lender, an affiliate of a Term A Lender or an approved fund. In the case of partial assignments (other than to another Term A Lender, an affiliate of a Term A Lender or an approved fund, the minimum assignment amount shall be $5 million, unless otherwise agreed by the Term A Administrative Agent. The Term A Lenders shall also be permitted to sell participations in their loans. Participants shall have the same benefits as the Term A Lenders with respect to yield protection and increased cost provisions. Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of the Term A Lender from which it purchased its participation would be required. Pledges of loans in accordance with applicable law shall be permitted without restriction. Each Term A Lender may disclose information to prospective participants and assignees. The Term A Administrative Agent will be entitled to a processing fee of $3,500 from the assignor or the assignee in connection with any assignment. |
| **Yield Protection:** | The Term A Loan Documents shall contain customary provisions (a) protecting the Term A Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Term A Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a loan on a day other than the last day of an interest period with respect thereto. |
| **Expenses and Indemnification:** | The Borrower shall pay (a) all reasonable out-of-pocket expenses of the Term A Administrative Agent associated with the preparation, execution, delivery and administration of the Term A Loan |

Documents and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel), (b) all out-of-pocket expenses of the Term A Administrative Agent and the Term A Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Term A Loan Documents and (c) fees and expenses associated with collateral monitoring, collateral reviews and appraisals (including field examination fees plus out-of-pocket expenses), environmental reviews and fees and expenses of other advisors and professionals engaged by the Term A Administrative Agent.

The Term A Administrative Agent and the Term A Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent found in a Final Order to have resulted from the gross negligence or willful misconduct of the indemnified party).

| **Governing Law and Forum:** | State of New York. |
| **Counsel to Term A Administrative Agent:** | Cravath, Swaine & Moore LLP. |

**EXHIBIT B**

**TO**

**JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS**

**<u>Material Terms of Term B Facility</u>**

| | |
|---|---|
| **Principal Amount and Type:** | A term loan facility (the "<u>Term B Facility</u>") in an aggregate principal amount of $100 million, representing a conversion of a portion of the Secured Lender Claims into the Term B Loans as of the Closing Date. |
| **Borrowers:** | The Borrower. |
| **Guarantors:** | The Guarantors. |
| **Administrative Agent** | An entity to be determined (in such capacity, the "<u>Term B Administrative Agent</u>"). |
| **Collateral Agent:** | To be determined. |
| **Lenders:** | Holders of Secured Lender Claims as of the Closing Date (collectively, the "<u>Term B Lenders</u>"). |
| **Interest Rates and Fees:** | ***<u>Interest Rate</u>***: <br><br> The Term B Loan shall bear interest at a fixed rate of 14.00% per annum (the "<u>Term B Interest Rate</u>"). <br><br> ***<u>Interest Payment Dates</u>***: <br><br> Interest payments shall be made quarterly in arrears. Interest shall be paid in cash or, if cash on hand and availability under the Revolving Credit Facility, pro forma for a quarterly cash election interest payment under the Term B Loan, are less than $40 million in the aggregate (the "<u>Availability</u>"), the Borrower shall have the option to add such interest to the principal amount of the Term B Loan (a "<u>PIK Election</u>"), in each case, quarterly in arrears. Principal added pursuant to a PIK Election will bear interest at 14%. <br><br> For purposes of determining whether the Borrower can make a PIK Election in respect of the first quarterly interest payment in each fiscal year, the Availability shall be calculated as of the date of such first quarterly interest payment after giving effect to the amount of the mandatory prepayment to be made by the Borrower in respect of Free Cash Flow for the prior fiscal year if such payment has not been previously made. |

| | |
|---|---|
| | ***Default Rate***: <br><br> At any time upon the occurrence and during the continuation of any event of default under the Term B Facility, all outstanding Term B Loans shall bear interest at 2% above the Term B Interest Rate. Without limiting the foregoing, overdue interest, fees and other amounts under the Term B Facility shall bear interest at 2% above the Term B Interest Rate. <br><br> ***Rate Basis***: <br><br> Interest payments will be calculated on the basis of a 360-day year of twelve 30-day months. <br><br> ***Agency Fee***: <br><br> An administrative agency fee payable to the Term B Administrative Agent in such amount and at such times as shall be agreed in writing between the Borrower and the Term B Administrative Agent. |
| **Maturity:** | Five years after the Effective Date. |
| **Optional Prepayments:** | Subject to the prior indefeasible payment in full of the Term A Loans, the Term B Loans may be prepaid by the Borrower without premium or penalty in minimum amounts to be agreed in the Term B Loan Documents. |
| **Mandatory Prepayments:** | Subject to the prior indefeasible payment in full in cash of the Term A Loans, the following amounts shall be applied to prepay the Term B Loans: <br><br> (a) 100% of the net proceeds of any sale or other disposition of assets (including as a result of casualty or condemnation) by the Borrower or any of its subsidiaries (subject to certain customary exceptions (including reinvestment rights) and minimum thresholds to be agreed) or receipt of tax refunds or other extraordinary receipts; <br><br> (b) 100% of the net proceeds of any debt incurrence by the Borrower or any of its subsidiaries after the Closing Date (subject to certain customary exceptions to be agreed); <br><br> (c) 50% of Free Cash Flow (to be defined in a manner to be agreed upon by the Debtors and the Steering Committee Members) for any fiscal year of the Borrower (commencing with the fiscal year ending on or nearest to December 31, 2010); and <br><br> (d) other amounts subject to customary mandatory prepayment provisions, including, but not limited to, net proceeds of equity issuances, tax refunds and extraordinary receipts. |

| | |
|---|---|
| | Each such mandatory prepayment shall be applied ratably to the Term B Loans. Amounts prepaid in respect of Term B Loans may not be reborrowed. |
| **Collateral:** | The obligations of the Loan Parties in respect of the Term B Facility shall be secured by (i) a second priority, perfected security interest in the Term A Collateral, and (ii) a third priority, perfected security interest in all of the Exit Facility Collateral, if applicable. In the case of the assets of, and the ownership interests in, the Reorganized Broadcast Licensee Companies, the grant of such security interests shall be limited to the extent required by law, and shall occur following "long-form" consent of the FCC to the transfer of control of the Reorganized Broadcast Licensee Companies to Reorganized Freedom Holdings, unless the grant of such security interests as of the Effective Date shall be permitted under applicable law or approved by the FCC.<br><br>The liens securing the Term B Loans will be subject to and governed by the Intercreditor Agreement. |
| **Amortization:** | N/A |
| **Closing Date Conditions Precedent:** | Same as for the Term A Facility. |
| **Documentation:** | The credit documentation for the Term B Facility (the "<u>Term B Loan Documents</u>") shall contain representations and warranties, covenants and events of default relating to the Borrower and its subsidiaries customary for financings of this type and other terms deemed appropriate by the Term B Lenders as set forth below. |
| **Representations:** | Substantially the same as for the Term A Loan. |
| **Affirmative Covenants:** | Substantially the same as for the Term A Loan. |
| **Financial Covenants:** | The Term B Loan Documents shall contain financial covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Steering Committee Members, including, without limitation, the following: (a Minimum EBITDA, (b) maximum capital expenditures, (c) a minimum fixed charge coverage ratio, and (d) a maximum leverage ratio (each with greater headroom than the corresponding covenant levels contained in the Term A Facility). Covenant levels to be negotiated to provide flexibility reasonably acceptable to the Steering Committee Members and the Debtors for the first 18 months after the Effective Date. |
| **Negative Covenants:** | To be based substantially upon the negative covenants in the Term A Facility (but with less restrictive baskets and thresholds to be agreed). |

| | |
|---|---|
| **Events of Default:** | To be based substantially upon the events of default in the Term A Facility (but with less restrictive grace periods and thresholds to be agreed). |
| **Voting:** | Substantially the same as for the Term A Facility. |
| **Assignments and Participations:** | Substantially the same as for the Term A Facility. |
| **Yield Protection:** | Substantially the same as for the Term A Facility. |
| **Expenses and Indemnification:** | Substantially the same as for the Term A Facility. |
| **Governing Law and Forum:** | State of New York. |

EXHIBIT C

TO

**JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS**

**Material Terms of New Common Stock**

| | |
|---|---|
| **Issue:** | Common stock, $0.001 par value. |
| **Issuer:** | Reorganized Freedom Holdings. |
| **Authorized Shares:** | 21 million shares of New Common Stock. |
| **Initial Issuance:** | 7 million shares of New Common Stock, subject to adjustment for the Existing Lender Warrants and the Exit Financing Share Allocation, if any. |
| **Classes:** | The New Common Stock shall consist of (i) a class of full voting common stock (the "Class A Common Stock") and (ii) a separate class of limited-voting common stock (the "Class B Common Stock"). |
| | Subject to compliance with the Communications Act of 1934 (as amended) and the ownership rules, regulations, and/or policies of the FCC, each holder of an Existing Lender Secured Claim shall take its New Common Stock in the form of either Class A Common Stock, Class B Common Stock, and/or Existing Lender Warrants. |
| **Conversion Rights:** | Each share of Class B Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Class A Common Stock, and each share of Class A Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Class B Common Stock; *provided that*, at all times, there must be outstanding at least one share of Class A Common Stock; *provided further* that the New Common Stock will not be convertible if any such conversion would result in a violation of any ownership restrictions imposed by the Communications Act of 1934 (as amended) or the ownership rules, regulations, and/or policies of the FCC. |
| **Economic Rights:** | The economic rights of the Class A Common Stock and Class B Common Stock shall be identical. |
| **Class A Voting Rights** | The holders of the Class A Common Stock will be entitled to one vote for each share of Class A Common Stock held by such holder of record on the books of Reorganized Freedom Holdings for all matters |

| | |
|---|---|
| | on which stockholders of Reorganized Freedom Holdings are entitled to vote. |
| **Class B Voting Rights and Limitations:** | The Class B Common Stock will not be entitled to general voting rights, but will be entitled to vote on an "as converted" basis (together with the holders of the Class A Common Stock, voting as a single class) on certain non-ordinary course transactions, including (a) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking pari passu with or senior to the New Common Stock as to dividends or liquidation preference, including additional New Common Stock; (b) any amendment to Reorganized Freedom Holdings' certificate of incorporation or by-laws; (c) any amendment to any shareholders or comparable agreement; (d) any sale, lease or other disposition of all or substantially all of the assets of Reorganized Freedom Holdings through one or more transactions; (e) any recapitalization, reorganization, consolidation or merger of Reorganized Freedom Holdings; (f) to the extent that holders of Class A Common Stock have the right to vote thereon, any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Freedom Holdings, except as may be provided for under the New Equity Incentive Plan or any other management incentive plan; and (g) to the extent that holders of Class A Common Stock have the right to vote thereon, any redemption, purchase or other acquisition by Reorganized Freedom Holdings of any of its capital stock (except for purchases from employees upon termination of employment).

The Class B Common Stock will be entitled to a separate class vote on any amendment or modification of any rights or privileges of the Class B Common Stock that does not equally affect the Class A Common Stock. In any liquidation, dissolution or winding up of Reorganized Freedom Holdings, all assets will be distributed to holders of the New Common Stock on a pro rata basis. |
| **Initial Board of Directors:** | The New Board shall be comprised of up to seven (7) directors, initially consisting of (i) six (6) independent and disinterested directors acceptable to the Steering Committee Members and (ii) Freedom Holdings' chief executive officer. Successor directors shall be appointed and/or elected in accordance with the New Freedom Governing Documents. Each Steering Committee Member holding more than a threshold percentage (to be agreed upon among the Steering Committee Members) of the Existing Lender Secured Claims shall have the right to appoint one representative to attend and observe all board meetings. |
| **New Stockholders Agreement:** | Each holder of New Common Stock shall be deemed to enter into the New Stockholders Agreement, which agreement shall be on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors, and which, without limitation, shall provide for (i) |

| | |
|---|---|
| | customary "drag along" and "tag along" rights, (ii) obligations for holders of the New Common Stock to provide such information as Reorganized Freedom Holdings reasonably may require to ensure compliance with the Communications Act of 1934 (as amended) and the rules, regulations, and/or policies of the FCC, (iii) information rights, including the right of prospective purchasers of the New Common Stock or Existing Lender Warrants to obtain non-public information upon execution of a confidentiality agreement, and (iv) certain preemptive rights. |
| **Transfer Restrictions:** | The Class A Common Stock and the Class B Common Stock may be transferred to the extent set forth in the New Stockholders Agreement; *provided that* (i) any transfer that would require the prior consent of the FCC will not occur until such consent shall have been granted and (ii) no transfer shall be permitted that would result in a violation of any ownership restrictions imposed by the Communications Act of 1934 (as amended), or the ownership rules, regulations, and/or policies of the FCC. The New Board shall have the power to ensure compliance with Section 310(b) of the Communications Act of 1934 (as amended) and the FCC's ownership rules, including the power to decline to allow the transfer of shares and the power to redeem shares.<br><br>In addition, the New Stockholders Agreement shall provide for a moratorium on trading New Common Stock and Existing Lender Warrants until FCC approval of the "long-form" applications. |
| **Registration Rights Agreement:** | On the Effective Date, Reorganized Freedom Holdings and the Secured Lenders shall enter into a Registration Rights Agreement on terms and conditions reasonably acceptable to the Steering Committee Members and the Debtors, which, without limitation, shall provide for (a) "piggyback" registration rights for the New Common Stock (with customary exceptions, including Reorganized Holding's initial public offering) and (b) following the initial public offering of Reorganized Freedom Holdings, if any, for those holders of New Common Stock that cannot sell freely under Rule 144 of the Securities Act of 1933, as amended, S-3 or "short-form" demand registration rights for the New Common Stock (with customary limitations). |

**JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS**

**Material Terms of Existing Lender Warrants**

| | |
|---|---|
| **Securities to be Issued:** | Reorganized Freedom Holdings will issue the Existing Lender Warrants to the Existing Lenders pursuant to Section 3.2(b) of the Plan. Subject to the restrictions on exercise set forth below, each Existing Lender Warrant will entitle its holder to purchase one share of either Class A Common Stock or Class B Common Stock, at the election of the holder, at the Exercise Price (as defined below). |
| **Exercise:** | The Existing Lender Warrants shall be exercisable immediately after issuance and until the Expiration Date (as defined below); *provided that* the Existing Lender Warrants shall not be exercised without the consent of Reorganized Freedom Holdings, which consent shall not be withheld unless such exercise would result in violation of any ownership restrictions imposed by the Communications Act of 1934 (as amended) or the ownership rules, regulations, and/or policies of the FCC.  No Existing Lender Warrant shall be exercisable after the Expiration Date.  Each holder of Existing Lender Warrants shall provide to Reorganized Freedom Holdings such information as Reorganized Freedom Holdings may require in order to determine whether such a violation may occur. |
| **Exercise Price:** | The exercise price (the "Exercise Price") shall be $0.001 per share of New Common Stock. |
| **Cashless Exercise:** | If the New Common Stock is listed on a national securities exchange (as such term is defined in the U.S. Securities and Exchange Act of 1934), in lieu of paying the Exercise Price, a holder of Existing Lender Warrants shall have the option (the "Cashless Exercise Option") to receive, upon exercise of the Existing Lender Warrants, shares of New Common Stock with a market value equal to the difference between (i) the market value of the shares of New Common Stock that would have been issuable upon exercise of the Existing Lender Warrants for cash and (ii) the aggregate Exercise Price. |
| **Term:** | The thirtieth anniversary of the Effective Date (the "Expiration Date"). |
| **Anti-Dilution**: | Proportional anti-dilution adjustments in the event of subdivisions, splits, combinations and reverse splits. |
| **Distributions**: | Any distributions made to the holders of New Common Stock (other |

| | than distributions of New Common Stock) will be made pro rata to holders of Existing Lender Warrants based upon their respective ownership of New Common Stock on an as-exercised basis, *provided that* no such distribution shall be made to either holders of Existing Lender Warrants or holders of New Common Stock if (x) an FCC ruling prohibits such distribution, or (y) such distribution is reasonably likely to cause (i) a violation of any ownership restriction imposed under the Communications Act of 1934 (as amended) or the ownership rules, regulations, and/or policies of the FCC or (ii) any such holder of Existing Lender Warrants to be deemed to hold an attributable interest in Reorganized Freedom Holdings.  If Reorganized Freedom Holdings shall make a distribution to the holders of New Common Stock in shares of New Common Stock, Reorganized Freedom Holdings shall make a corresponding distribution of Existing Lender Warrants pro rata to holders of Existing Lender Warrants based upon their respective ownership of New Common Stock on an as-exercised basis.

All distributions shall be paid to holders of Existing Lender Warrants and holders of New Common Stock concurrently. |
|---|---|
| **Merger or Consolidation**: | Except as provided in the next sentence, upon a merger or a consolidation of Reorganized Freedom Holdings, each Existing Lender Warrant will be exercisable solely into the right to receive the kind and amount of consideration to which such holder would have been entitled as a result of such merger or consolidation had the Existing Lender Warrant been exercised immediately prior thereto. In the event of a merger or a consolidation of Reorganized Freedom Holdings in which the only consideration payable to holders of New Common Stock is cash, each holder of an Existing Lender Warrant shall be entitled to receive solely the cash consideration to which such holder would have been entitled as a result of such merger or consolidation, less the Exercise Price, had the Existing Lender Warrant been exercised immediately prior thereto.
In the event of a merger or a consolidation of Reorganized Freedom Holdings, if the holders of New Common Stock have the right to receive more than a single type of consideration based on any form of stockholder election, then the holders of the Existing Lender Warrants shall have the right to make a corresponding election as to the type of consideration that they are entitled to receive. |
| **Registration Rights**: | Upon exercise of the Existing Lender Warrants, holders will be entitled to registration rights in respect of shares of New Common Stock to the extent provided for in the Registration Rights Agreement. |
| **Stockholders' Agreement**: | On the Effective Date, each holder of Existing Lender Warrants shall be deemed to have entered into the Stockholders' Agreement, and will be subject to the provisions thereof, including the transfer restrictions and tag-along and drag-along rights described therein. |
| **Voting Rights:** | None. |

**EXHIBIT E**

**TO**

**JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS**

<u>**FORM OF POST-EMERGENCE TRADE AGREEMENT**</u>

[*THIS IS A FORM DOCUMENT PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE DEBTORS RESERVE THE RIGHT TO MODIFY THE FORM WITH THE CONSENT OF THE EXISTING LENDER AGENT AND THE CREDITORS' COMMITTEE. ONLY FINAL AGREEMENTS PRINTED ON THE DEBTORS' FORMAL LETTERHEAD WILL BE OPERATIVE. THE DEBTORS WILL DELIVER FINAL AGREEMENTS TO SELECTED PROVIDERS OF GOODS AND/OR SERVICES PURSUANT TO THE PROCEDURES AND ON THE TIMEFRAME SET FORTH IN THE PLAN*]

**POST-EMERGENCE TRADE AGREEMENT**

This Agreement is made and entered into by and between [NAME OF FREEDOM ENTITY or ENTITIES] (together "Customer") and [NAME OF PROVIDER] ("Vendor").

**Whereas**, on September 1, 2009 (the "Petition Date"), Freedom Communications Holdings, Inc., together with certain of its affiliates, including Customer (collectively, the "Debtors"), filed voluntary petitions (the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**Whereas**, Vendor (i) holds a claim or claims against Customer arising from Customer's receipt of goods and/or services in the ordinary course of business prior to the Petition Date (any such claim or claims, together, the "Prepetition Claim"), (ii) has continued to supply goods and/or services to Customer during the Chapter 11 Cases on substantially the same terms or better than the terms under which Vendor provided goods and/or services to Customer immediately prior to, or within 90 days of, the Petition Date, and (iii) is willing to enter into and comply with the terms of this Agreement;

**Whereas**, Section 5.11 of the Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., Et al., Debtors (the "Plan") contains procedures (the "Post-Emergence Trade Credit Procedures") whereby certain vendors of the Debtors will have their prepetition claims paid, in whole or part as may be agreed, in exchange for agreeing to maintain preexisting trade terms after the Debtors' emergence from bankruptcy;

**Whereas**, Vendor has reviewed the Plan and is familiar with the Post-Emergence Trade Credit Procedures; and

**Whereas**, Customer desires to obtain goods and/or services from Vendor and Vendor desires to provide goods and/or services to Customer on the terms and conditions set forth herein;

**Now**, **therefore**, for good and valuable consideration received, Customer and Vendor agree as follows:

1.      Capitalized terms contained herein but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

2.      This Agreement shall be effective and binding upon each party hereto on the Effective Date of the Plan.

3.      As soon as reasonably practicable after the later of (a) the Effective Date and (b) the date on which the Prepetition Claim becomes Allowed, Customer (or its affiliate) shall pay Vendor the amount of its Allowed Prepetition Claim. Such amount shall either be the amount set forth on Exhibit A or the amount to be determined by Final Order. The payment when made shall constitute full satisfaction, settlement, release, and discharge of the Prepetition Claim.

4.      As of the Agreement Date, and in exchange for the good and valuable consideration received hereunder, Vendor agrees to immediately release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan, against (i) the Existing Lenders and any of their respective affiliates, (ii) the Existing Lender Agent and any of its affiliates, and (iii) any of the respective present or former directors, officers, employees, advisors, or professionals of any of the foregoing (but solely in their respective capacities as such).

5.      Vendor shall continue from and after the Agreement Date to provide to Customer the goods and/or services described on Exhibit A on the terms (the "Trade Terms") set forth on Exhibit A.

6.      Customer shall pay Vendor for such goods and/or services on the terms set forth on Exhibit A.

7.      Customer and Vendor agree that the Trade Terms are substantially the same or better than the terms (the "Prepetition Trade Terms") under which Vendor provided goods and/or services to Customer immediately prior to, or within 90 days of, the Petition Date. The Prepetition Trade Terms shall be determined by reference to either performance immediately before the Petition Date or the 90-day period prior to the Petition Date, whichever such terms are more favorable to Customer.

8.      In the event Customer fails to make payment by the due date specified on Exhibit A, Vendor shall provide written notice to Customer that if such failure is not cured within ten

(10) days of Customer's receipt of such written notice, then Customer shall be in breach of this Agreement.

       9.      In the event of a breach of this Agreement resulting from nonpayment as provided in paragraph 8, Vendor shall have the immediate right to terminate its performance under this Agreement. Customer shall have no liability to Vendor for goods and/or services not provided by Vendor to Customer or for any lost profit or other damages as a result of such termination.

       10.     This Agreement shall continue for the term set forth on Exhibit A, unless terminated pursuant to paragraph 9. In addition, Customer may terminate this Agreement at any time and for any reason by providing thirty (30) days written notice of termination to Vendor, delivered by email, facsimile or overnight mail.

       11.     Neither Customer nor Vendor shall have any liability to the other for any obligation arising from and after the date of a termination pursuant to paragraph 9 or 10 of this Agreement.

       12.     If Vendor fails to perform under this Agreement, Vendor shall be obligated to return to Customer the amount paid pursuant to paragraph 3. In addition, Customer shall have all rights available under law or equity to enforce this Agreement or to recover any damages occasioned by Vendor's failure to perform.

       13.     Vendor agrees that Customer may assign its rights and obligations under this Agreement at any time to any affiliate or third party.

       14.     This Agreement together with Exhibit A forms the entire agreement between Customer and Vendor as to the subject matter hereto and supersedes all prior communications between the parties as to the subject matter hereof.

       15.     Neither this Agreement nor Exhibit A shall be modified except by a writing signed by both Customer and Vendor.

       16.     This Agreement shall be governed by the laws of the State of California.

       17.     This Agreement may be executed in counterparts. Signatures delivered by pdf email or by facsimile shall have the same force and effect and original signatures.

| [NAME OF FREEDOM ENTITY] | [NAME OF PROVIDER] |
|---|---|
| By:_____ <br>    Name:_____ <br>    Title:_____ <br> Dated: _____(the Agreement Date) <br> Address:_____ <br> _____ <br> _____ <br> Telephone:_____+_____ <br> Facsimile:_____ <br> Email:_____ | By:_____ <br>    Name:_____ <br>    Title:_____ <br> Dated: _____ <br> Address:_____ <br> _____ <br> _____ <br> Telephone:_____ <br> Facsimile:_____ <br> Email:_____ |

**EXHIBIT A**
**TO POST-EMERGENCE TRADE AGREEMENT**


**NAME OF PROVIDER:**


**AMOUNT OF ALLOWED CLAIM TO BE PAID**
**(indicate amount if agreed or indicate that amount will be determined by Final Order):**


**DESCRIPTION OF GOODS/SERVICES:**


**TRADE TERMS:**


**TERM OF AGREEMENT:**


**OTHER AGREEMENTS:**


**Initials:**

_____    _____
Customer      Vendor

**Exhibit 2**

**Disclosure Statement Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------- x
In re:                                             :    Chapter 11
                                                   :
FREEDOM COMMUNICATIONS                             :    Case No. 09-13046 (BLS)
HOLDINGS, INC., et al.,                            :
                                                   :    Jointly Administered
            Debtors.¹                              :
                                                   :    Related Document: 745
-------------------------------------------------- x
```

## ORDER (I) APPROVING DISCLOSURE STATEMENT, (II) DETERMINING DATES, PROCEDURES AND FORMS APPLICABLE TO SOLICITATION PROCESS, (III) ESTABLISHING VOTE TABULATION PROCEDURES, (IV) ESTABLISHING OBJECTION DEADLINE AND SCHEDULING HEARING TO CONSIDER CONFIRMATION OF PLAN, AND (V) APPROVING PLAN PROCEDURE FOR ASSUMING CONTRACTS AND LEASES

Upon the motion (the "Motion")[2] of the Debtors for an order pursuant to Bankruptcy

Code sections 105(a), 365(a) and (b), 1123(b)(2), 1125(b) and 1126(b), Bankruptcy Rules 2002,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Freedom Communications Holdings, Inc. (2814); Freedom Communications, Inc. (0750); Freedom Broadcasting, Inc. (0025); Freedom Broadcasting of Florida, Inc. (6581); Freedom Broadcasting of Florida Licensee, L.L.C. (1198); Freedom Broadcasting of Michigan, Inc. (6110); Freedom Broadcasting of Michigan Licensee, L.L.C. (1122); Freedom Broadcasting of New York, Inc. (6522); Freedom Broadcasting of New York Licensee, L.L.C. (9356); Freedom Broadcasting of Oregon, Inc. (7291); Freedom Broadcasting of Oregon Licensee, L.L.C. (9295); Freedom Broadcasting of Southern New England, Inc. (7274); Freedom Broadcasting of Southern New England Licensee, L.L.C. (1177); Freedom Broadcasting of Texas, Inc. (2093); Freedom Broadcasting of Texas Licensee, L.L.C. (1147); Freedom Broadcasting of Tennessee, Inc. (7961); Freedom Broadcasting of Tennessee Licensee, L.L.C. (9430); Freedom Magazines, Inc. (0328); Freedom Metro Information, Inc. (1604); Freedom Newspapers, Inc. (3240); Orange County Register Communications, Inc. (7980); OCR Community Publications, Inc. (9752); OCR Information Marketing, Inc. (7983); Appeal-Democrat, Inc. (4121); Florida Freedom Newspapers, Inc. (4227); Freedom Arizona Information, Inc. (5796); Freedom Colorado Information, Inc. (7806); Freedom Eastern North Carolina Communications, Inc. (5563); Freedom Newspapers of Illinois, Inc. (2222); Freedom Newspapers of Southwestern Arizona, Inc. (5797); Freedom Shelby Star, Inc. (8425); Illinois Freedom Newspapers, Inc. (8308); Missouri Freedom Newspapers, Inc. (8310); Odessa American (7714); The Times-News Publishing Company (0230); Victor Valley Publishing Company (6082); Daily Press (3610); Freedom Newspaper Acquisitions, Inc. (4322); The Clovis News-Journal (5820); Freedom Newspapers of New Mexico L.L.C. (5360); Gaston Gazette LLP (4885); Lima News (6918); Porterville Recorder Company (7735); Seymour Tribune Company (7550); Victorville Publishing Company (7617); Freedom Newspapers (7766); The Creative Spot, L.L.C. (2420); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Services, Inc. (3125). The address for Freedom Communications Holdings, Inc. and certain other Debtors is 17666 Fitch, Irvine, California 92614.

[2]  Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion or in the proposed Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of Freedom Communications Holdings Inc., et. al., Debtors (the "Plan").

3017, 3018 and 3020, and Local Rule 3017-1 (i) approving the proposed disclosure statement, (ii) approving the dates, procedures and forms applicable to the solicitation and plan noticing process, (iii) approving certain vote tabulation procedures, (iv) establishing the deadline for filing objections to the plan and scheduling the hearing to consider confirmation of the plan, and (v) approving the procedure set forth in the plan for assuming executory contracts and unexpired leases, all as more particularly described in the Motion; and the Debtors having advised the Court that subsequent modifications to the Debtors' proposed plan of reorganization necessitate changes to certain procedures and forms described in and attached to the Motion, which changes are reflected in this Order; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest; and it appearing that notice of the Motion was good and sufficient under the particular circumstances and that no other or further notice need be given; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is GRANTED.

2.     Any and all objections to approval of the Disclosure Statement, to the extent not previously resolved or withdrawn, are overruled. The Disclosure Statement in the form dated January 21, 2010, as it may be further modified pursuant to this Order, is approved, and found to contain "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. Prior to the commencement of solicitation, the Debtors are authorized to make additional correcting, conforming and finalizing changes to the Disclosure Statement and to the corresponding Plan. The Disclosure Statement in its final form shall be titled "Disclosure Statement with Respect to Joint Plan of Reorganization Under Chapter 11, Title 11, United

2

States Code of Freedom Communications Holdings, Inc., et al., Debtors," shall bear a date that corresponds to the commencement of the solicitation process, and shall be filed of record on such date.

3. Logan & Company, Inc. is authorized to serve as the Debtors solicitation and noticing agent to assist the Debtors in mailing solicitation packages and notices, receiving and tabulating ballots cast on the Plan, and certifying to the Court the results of the balloting (the "Voting Agent").

4. The record date for determining the holders of claims and interests entitled to vote to accept or reject the Plan and to receive solicitation and noticing materials as provided herein is January 21, 2010, at 5:00 p.m. (Eastern Time) (the "Voting Record Date"); provided, however, that for holders of Existing Lender Claims, the Voting Record Date shall be January 22, 2010, at 5:00 p.m. (Eastern Time). Only the holders of claims and interests as of the Voting Record Date are entitled to the voting and notice rights provided for herein.

5. The date by which all ballots cast to accept or reject the Plan must be received by the Voting Agent is March 1, 2010, at 4:00 p.m. (Eastern Time) (the "Voting Deadline"). The Debtors may extend the Voting Deadline, at any time before or after the Voting Deadline, in favor of any voter, any class of voters or all voters by filing notice of the extension(s) with the Court and by serving a copy of such notice(s) upon the Voting Agent. Ballots not received by the Voting Deadline, or by any extended voting deadline as provided for herein, shall not be counted.

6. The forms of ballots attached to this Order as Exhibit A for Existing Lender Secured Claims in Class A2, Other Secured Claims in Class A3 (and each sub-class thereof), General Unsecured Claims in Class A4 (and each sub-class thereof), Non-Qualified

3

Retirement Claims in Class A5, and the Tort Claims in Class A7 (and each sub-class thereof) are hereby approved, subject to the right of the Debtors to make additional correcting, conforming and formatting changes to such forms of ballots.

7. No later than seven (7) business days after the date of entry of the order approving the Disclosure Statement (the "Solicitation Commencement Date"), the Debtors, through the Voting Agent, shall commence the solicitation and noticing process by placing the solicitation materials and notices approved herein in the mail, first class postage prepaid.

8. The solicitation materials to be transmitted on or before the Solicitation Commencement Date to those holders, as of the Voting Record Date, of Existing Lender Secured Claims in Class A2, Other Secured Claims in Class A3 (and each sub-class thereof), General Unsecured Claims in Class A4 (and each sub-class thereof), Non-Qualified Retirement Claims in Class A5, and Tort Claims in Class A7 (and each sub-class thereof) that are entitled to vote on the Plan (as described in paragraph 9 below), shall include the following: (a) the Confirmation Hearing Notice, in paper form; (b) a CD containing the Disclosure Statement and all exhibits, including the Plan; (c) an instruction letter for use of the CD or obtaining a paper copy of the Disclosure Statement, in paper form; (d) an appropriate ballot (as described in paragraph 6), in paper form; (e) any approved solicitation letters; and (f) a pre-addressed return envelope (collectively, the "Solicitation Package"). The solicitation letter from the Creditor's Committee, in the form attached hereto as Exhibit I, is authorized and approved.

9. With respect to Class A2, and as an alternative to first class mailing for holders of Existing Lender Claims as to which the Voting Agent has not received a mailing address within two (2) business days after the Voting Record Date, the Voting Agent shall provide the Existing Lender Agent (JPMorgan Chase Bank, N.A.) with a complete Solicitation

4

Package (less the pre-addressed return envelope) in PDF form and the Existing Lender Agent shall post the Solicitation Package no later than the Solicitation Commencement Date on the IntraLinks website accessible to all holders of Existing Lender Claims.

          10.     The following holders of Existing Lender Secured Claims in Class A2, Other Secured Claims in Class A3 (and each sub-class thereof), General Unsecured Claims in Class A4 (and each sub-class thereof), Non-Qualified Retirement Claims in Class A5, and Tort Claims in Class A7 (and each sub-class thereof) are entitled to vote on the Plan and thus to receive the Solicitation Package:

      (a)     holders, as of the Voting Record Date, of Existing Lender Secured Claims in Class A2, based upon the records of the Existing Lender Agent, and in the amount shown on such records;

      (b)     holders, as of the Voting Record Date, of Other Secured Claims in Class A3, General Unsecured Claims in Class A4, Non-Qualified Retirement Claims in Class A5, and Tort Claims in Class A7 (with the express exception of holders of Gonzalez Litigation Claims, which shall be governed by paragraph 16 below):

            (i)     who have filed timely proofs of claim (or untimely proofs of claim that have been allowed as timely by the Court on or before the Voting Record Date), in the amounts asserted in such proofs of claim; provided that such proofs of claim (x) have not been disallowed by an order of the Court entered on or before the Voting Record Date, (y) are not the subject of an objection to the entirety of the claim pending as of the Voting Record Date (with voting permitted only with respect to the amount thereof that is not subject to objection) or (z) do not allege claims that are wholly contingent or wholly unliquidated (with voting permitted only with respect to the amount thereof that is fixed); or

            (ii)     who have not filed timely proofs of claim but whose claims are scheduled in the Debtors' schedules of liabilities (or any amendments thereto) and are not designated therein as contingent, unliquidated or disputed or listed therein as zero or unknown in amount, in the amounts set forth in the schedules of liabilities (or any amendments thereto).

provided, however, that any voting creditor who has filed duplicate or amended proofs of claims with respect to a single claim against a single Debtor shall be entitled to receive only one Solicitation Package and one ballot for voting such claim; any voting creditor who has filed

multiple proofs of claim asserting different claims or the same claim against multiple Debtors shall receive a Solicitation Package for each such proof of claim; and any voting creditor who has filed a single proof of claim asserting claims against multiple Debtors, contrary to the direction in the bar date order to file separate proofs of claim against each Debtor, shall be deemed to have a disputed claim for purposes of voting, except in cases where the voting creditor has obtained a separate order permitting the filing of a single proof of claim.

11.     Any creditor who has filed a proof of claim that does not identify the particular Debtor against which the claim is asserted shall be deemed to have asserted a claim against Freedom Communications, Inc., and if such creditor is otherwise entitled to vote on the Plan such creditor shall receive a ballot for voting a claim against Freedom Communications, Inc. The ballot provided to any creditor shall not be finally determinative as to the particular Debtor against which the claim is ultimately allowed, and all rights to object to the claim and to seek to transfer the liability for the claim to another Debtor are hereby preserved.

12.     Any holder of an Other Secured Claim in Class A3, a General Unsecured Claim in Class A4, a Non-Qualified Retirement Claim in Class A5, or a Tort Claim in Class A7 (with the express exception of any holder of a Gonzalez Litigation Claim, which shall be governed by paragraph 16 below), whose claim is (a) asserted as wholly unliquidated or wholly contingent in a timely proof of claim, (b) asserted in an untimely proof of claim that has not been allowed by the Court as timely on or before the Voting Record Date, (c) asserted in a proof of claim as to which an objection to the entirety of the claim is pending as of the Voting Record Date, (d) asserted in a single proof of claim against multiple Debtors, or (e) listed in the schedules of liabilities as contingent, unliquidated or disputed or as zero or unknown in amount, and not asserted in a timely proof of claim in a manner other than as wholly unliquidated or

6

wholly contingent (collectively, the "Disputed Claimants") shall not be permitted to vote on the Plan except as provided herein. On or before the Solicitation Commencement Date, the Voting Agent shall mail, first class postage prepaid, to each of the Disputed Claimants a package that includes the following: (a) a notice in substantially the form attached hereto as Exhibit B (the "Notice of Disputed Claim Status"), in paper copy form; (b) a CD containing the Disclosure Statement and all exhibits, including the Plan; and (c) an instruction letter for use of the CD or obtaining a paper copy of the Disclosure Statement, in paper form (collectively, the "Disputed Claimant Package"). Disputed Claimants shall be permitted to obtain from the Voting Agent a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their claims temporarily allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed with the Court and served upon the Debtors' counsel and the Voting Agent by no later than February 22, 2010, at 4:00 p.m. (Eastern Time) (the "Rule 3018 Motion Deadline"). Any party timely filing and serving a Rule 3018 Motion shall be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline, then at a hearing to be held in advance of the Confirmation Hearing on a date and at a time to be arranged by the Debtors and noticed to the moving party, the Court shall determine whether the provisional ballot should be counted as a vote on the Plan. Nothing herein affects the Debtors' right to object to any proof of claim after the Voting Record Date. With respect to any such objection, the Debtors may request, on notice, that any vote cast by the holder of the disputed claim not be counted in determining whether the requirements of Bankruptcy Code section 1126(c) have been met. In the absence of any such request by the

Debtors, the holder of a claim subject to an objection filed after the Voting Record Date shall be entitled to vote in accordance with its proof of claim.

13.     On or before the Solicitation Commencement Date, the Voting Agent shall mail, first class postage prepaid, to holders of Administrative Claims, Priority Tax Claims, Other Priority Claims against the Encumbered Debtors in Class A1, Other Priority Claims against the Unencumbered Debtors in Class B1, Other Secured Claims against the Unencumbered Debtors in Class B2, General Unsecured Claims against the Unencumbered Debtors in Class B3, and Subsidiary Interests in the Unencumbered Debtors in Class B5 (collectively, the "Unimpaired Holders"), a notice in substantially the form attached hereto as Exhibit C (the "Notice of Non-Voting Status"), in lieu of a Solicitation Package. The Notice of Non-Voting Status satisfies the requirements of Bankruptcy Rule 3017(d) with respect to Unimpaired Holders.

14.     On or before the Solicitation Commencement Date, the Voting Agent shall mail, first class postage prepaid, to holders of Subordinated Claims in Class A8, Old Freedom Stock Interests in Class A10, and Old Freedom Stock Rights in Class A11 (the "Deemed Rejecting Holders"), a notice in substantially the form attached hereto as Exhibit D (the "Notice of Deemed Rejecting Status"), in lieu of a Solicitation Package. The requirements of Bankruptcy Rule 3017(d) are waived with respect to the Deemed Rejecting Holders and the Deemed Rejecting Notice is deemed to satisfy any solicitation or noticing needs of the Deemed Rejecting Holders.

15.     On or before the Solicitation Commencement Date, the Voting Agent shall mail, first class postage prepaid, to the Debtors' executory contract and unexpired lease parties (the "Contract/Lease Parties"), a notice in substantially the form attached hereto as Exhibit E (the

8

"Contract/Lease Party Notice"), which notice is hereby approved. The Contract/Lease Procedures described in the Contract/Lease Party Notice are hereby approved.

16.     Notwithstanding any provision to the contrary in this Order, the Gonzalez Litigation Claims, through the Gonzalez Class Counsel (Daniel J. Callahan), shall be permitted to vote one claim in the amount of $29,500,000 in the Class A4 sub-class applicable to Freedom Communications, Inc.; provided, however, that pending confirmation and consummation of the Plan, such vote shall be without prejudice to any objections by the Debtors or other parties in interest to any and all Proofs of Claim asserting Gonzalez Litigation Claims (including such class claim) on any and all grounds. All Proofs of Claim asserting Gonzalez Litigation Claims shall be disregarded for purposes of voting, and the Voting Agent shall neither transmit ballots to nor count ballots received from holders of Gonzalez Litigation Claims (except for the one class claim permitted to vote as provided above). In lieu of any other notice or other transmittal required under this Order, the Voting Agent shall mail to all holders of Gonzalez Litigation Claims who filed Proofs of Claim before the Voting Record Date a notice substantially in the form attached hereto as Exhibit F (the "Gonzalez Class Notice." With the consent of the Gonzalez Class Counsel, the requirements of Bankruptcy Rule 3017(d) are waived with respect to the holders of Gonzalez Litigation Claims and the Gonzalez Class Notice is deemed to satisfy any solicitation or noticing needs of such holders.

17.     No Solicitation Packages or other notices approved herein shall be transmitted to (a) holders of claims listed on the schedules of liabilities (or any amendment thereto) that have already been paid in full during these cases or that are authorized to be paid in full in the ordinary course of business pursuant to orders previously entered by this Court, (b) holders of claims listed on the schedules of liabilities (or any amendment thereto) as contingent,

unliquidated or disputed or as zero or unknown in amount, if such holders did not file proofs of claim, (c) any person to whom the Debtors mailed a notice of the commencement of the case and first meeting of creditors or a notice of the bar date for filing proofs of claim if either of such notices was returned marked "undeliverable" or "moved - no forwarding address" or for a similar reason, unless the Debtors have been informed in writing by such person of that person's new address, or (d) any Debtor who may be the holder of an Intercompany Claim against another Debtor or may the holder of Subsidiary Interest in another Debtor.

18.     On or as soon as practicable after the Solicitation Commencement Date, the Debtors or the Voting Agent shall mail to the United States Trustee and each of the other parties on the 2002 Service List maintained in these cases, for informational purposes, a Solicitation Package and a copy of all forms of ballots and notices approved herein.

19.     Unless otherwise directed by this Court, the Voting Agent shall follow the guidelines set forth below in tabulating the votes to accept or reject the Plan:

(a)     Subject to subparagraph (b) below, any ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan shall be counted and shall be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan.

(b)     The following ballots shall not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (i) any ballot received after the Voting Deadline unless the Debtors have granted an extension of the Voting Deadline with respect to such ballot; (ii) any ballot that is illegible or contains insufficient information to permit the identification of the claimant; (iii) any ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan; (iv) any ballot cast by a Disputed Claimant who has not filed a Rule 3018(a) Motion by the Rule 3018(a) Motion Deadline, or who has timely filed a Rule 3018(a) Motion that is not granted by the Court; (v) any ballot that does not indicate an acceptance or a rejection; or (vi) any unsigned ballot.

(c)     Notwithstanding Bankruptcy Rule 3018(a), whenever two or more ballots are cast voting the same claim prior to the Voting Deadline, the last-dated ballot received prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede any prior ballots, without prejudice to the Debtors' right to object to

10

the validity of the second ballot on any basis permitted by law, including under Bankruptcy Rule 3018(a), and, if the objection is sustained, to count the first ballot for all purposes.

(d)     Claim or interest splitting on a ballot shall not be permitted.

(e)     Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline or, with the written consent of the Debtors, after the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the amount of such Claim(s), (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Voting Agent prior to the Voting Deadline.

(f)     Ballots sent via facsimile or electronic mail shall not be accepted by the Voting Agent.

(g)     For purposes of the numerosity requirement of Bankruptcy Code section 1126(c), separate claims held by a single creditor (creditor names that are not identical shall not be considered to be a single creditor) in a particular class shall be aggregated as if such creditor held one claim against the Debtors in such class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan. To be considered a single creditor, the address associated with each claim must be substantially similar.

(h)     The Voting Agent shall segregate any votes cast by creditors whose claims have been paid, based upon information provided by the Debtors as to claim payments, and shall calculate acceptances and rejections of the Plan both including such votes and excluding such votes. In the event the voting result for any class or sub-class is affected by the inclusion or the exclusion of votes cast by creditors with paid claims, the Court shall decide how such votes should be treated.

20.     The hearing to consider confirmation of the Plan shall be held on March 9, 2010, at 10:00 a.m. (Eastern Time) and the deadline for filing objections to confirmation of the Plan shall be March 1, 2010, at 4:00 p.m. (Eastern Time).

21.     The form of notice of the confirmation hearing date and objection deadline attached hereto as <u>Exhibit G</u> (the "<u>Confirmation Hearing Notice</u>") is hereby approved. The Confirmation Hearing Notice shall be included in the Solicitation Packages mailed to holders of

11

claims in Classes A2, A3, A4, A5, and A7 (subject to the other provisions of this Order) and to each person on the 2002 Service List, and shall be posted on the Debtors' website available via http://www.loganandco.com.

22.    On or about the Solicitation Commencement Date, a notice in substantially the form of Exhibit H attached to the Motion shall be published within the United States in The Orange County Register and in the national edition of The New York Times.

23.    The following procedures (the "Contract/Lease Schedules Procedures") shall govern the assumption of executory contracts and unexpired leases pursuant to the Contract/Lease Schedules provided for in the Plan:

(a)    At least ten (10) days before the Voting Deadline, the Debtors shall file with the Court an omnibus written notice of their intent to assume (the "Assumption Notice") any executory contract or unexpired lease listed on the accompanying Contract/Lease Schedule (the "Proposed Assumed Contracts/Leases"). The Debtors shall serve the Assumption Notice upon the following parties (collectively, the "Assumption Notice Parties"): (i) the counterparties to the Proposed Assumed Contracts/Leases; (ii) known counsel to the counterparties to the Proposed Assumed Contracts/Leases; (iii) the U.S. Trustee; (iv) counsel to the agent for the Debtors' prepetition secured bank group; (v) counsel to the Committee; and (vi) all parties who have requested notice pursuant to Bankruptcy Rule 2002. The Assumption Notice shall also be posted on the Voting Agent's website.

(b)    All Proposed Assumed Contracts/Leases shall be deemed to be subject to a motion to assume such executory contract or unexpired lease pursuant to Bankruptcy Code section 365.

(c)    The Assumption Notice shall include a summary of the provision of the Plan providing for assumption pursuant to a Contract/Lease Schedule and a description of the deadlines and procedures for filing objections to the proposed assumption and proposed cure amount (as set forth below). The Assumption Notice shall be accompanied by a Contract/Lease Schedule that identifies each executory contracts and unexpired leases to be assumed under the Plan and sets forth any cure obligation associated with each such contract and lease, and by a proposed Assumption Order (as defined below).

(d)    Should any of the Assumption Notice Parties wish to object to the proposed assumption of any Proposed Assumed Contract/Lease or to the proposed cure amount for any Proposed Assumed Contract/Lease, then within fifteen days from

the date that the Debtors served the Assumption Notice, such party must file a written objection with the Court and serve such objection on (i) Freedom Communications Holdings Inc., attn: Rachel Sagan, 17666 Fitch, Irvine, California 92614, (ii) Latham & Watkins LLP, attn: Robert A. Klyman, 355 South Grand Ave., Los Angeles, California 90071, (iii) Latham & Watkins LLP, attn: Rosalie Walker Gray, 885 Third Ave, New York, New York 10022, (iv) Young Conaway Stargatt & Taylor, LLP, attn: Michael R. Nestor, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, (v) Cravath, Swaine & Moore LLP, attn: Robert H. Trust, 825 Eighth Ave., New York, New York 10019, (vi) Duane Morris LLP, attn: Richard W. Riley, 1100 North Market Street, Suite 1200, Wilmington, Delaware 19801, (vii) Pachulski Stang Ziehl & Jones, LLP, attn: Robert J. Feinstein, 780 Third Avenue, 36th Floor, New York, New York 10017, (viii) Pachulski Stang Ziehl & Jones, LLP, attn: Bruce Grohsgal, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899, (ix) the Office of the United States Trustee, attn: David L. Buchbinder, J. Caleb Boggs Federal Building, 844 N. King Street, Suite 2207, Lock Box 35, Wilmington, Delaware 19801.

(e)     If no timely objection is filed and served with respect to the proposed assumption of any Proposed Assumed Contract/Lease or the proposed cure amount for any Proposed Assumed Contract/Lease, the Debtors shall file with the Court a certificate of no objection (a "Certificate of No Objection"). After the Debtors file the Certificate of No Objection, the Court may enter an order substantially in the form that was served with the Assumption Notice (the "Assumption Order"), providing for assumption as of the Effective Date with a binding cure amount in the amount set forth on the Contract/Lease Schedule, without further notice or a hearing.

(f)     If an objection as to any Proposed Assumed Contract/Lease is timely and properly filed and served, unless the parties agree otherwise in writing, the Debtors' request to assume and determine cure amount pursuant to the Assumption Notice shall be set for hearing on the next omnibus hearing date or such earlier date as this Court may allow. If such objection is overruled by the Court or is withdrawn, the Proposed Assumed Contract/Lease shall be assumed as of the Effective Date with a binding cure amount in the amount set forth on the Contract/Lease Schedule, pursuant to an Assumption Order to be submitted by the Debtors.

(g)     No Proposed Assumed Contract/Lease shall be deemed rejected pursuant to the Plan or otherwise if it is included in a Contract/Lease Schedule filed and served at least ten (10) days before the Voting Deadline.

(h)     The Debtors shall have the right to amend the Contract/Lease Schedules at any time prior to the Effective Date. The Debtors shall provide notice of any amendments to the Contract/Lease Schedules to the parties to the executory contracts and unexpired leases affected thereby and to the other Assumption Notice Parties.

13

24.     The Debtors are authorized to take all actions necessary to effectuate the

relief granted pursuant to this Order.

25.     This Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation or enforcement of this Order.

Dated:     Wilmington, Delaware
           2  22  , 2010

Honorable Brendan L. Shannon
United States Bankruptcy Judge

14

**NOTE:**

The exhibits to the Disclosure Statement Order may be obtained by parties in interest from Logan & Company, Inc.'s webpage at http://www.loganandco.com, or by contacting Logan & Company, Inc. in writing at 546 Valley Road, Upper Montclair, New Jersey 07043, by telephone at (973) 509-3190, or by email at freedom@loganandco.com. The exhibits are also available for inspection during regular business hours at the Clerk's Office, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, or may be viewed on the Court's website at http://www.deb.uscourts.gov by following the directions for accessing the ECF system on such website.

**Exhibit 3**

**Plan Support Agreement**

**and**

**Stockholder Consents**

# **PLAN SUPPORT AGREEMENT**

This PLAN SUPPORT AGREEMENT (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, this "Agreement"), dated as of September 1, 2009, is entered into by and among (x) Freedom Communications Holdings, Inc., a Delaware corporation ("Holdings"), Freedom Communications, Inc., a Delaware corporation (the "Company"), each of the undersigned direct and indirect subsidiaries of the Company (collectively, with Holdings and the Company, the "Debtors") and (y) each undersigned lender (each a "Consenting Lender" and together, the "Consenting Lenders") under that certain Credit Agreement dated May 18, 2004 (as amended, modified or supplemented from time to time, the "Prepetition Credit Facility") among the Company, Holdings, the lenders party thereto (collectively, the "Secured Lenders") and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "Agent"). Each of the Debtors and the Consenting Lenders are referred to herein individually as a "Party", and collectively as the "Parties".

RECITALS

WHEREAS, the Debtors and the Consenting Lenders have negotiated a transaction that will effectuate a financial restructuring of the debt and equity of the Debtors on the terms and conditions set forth in the Plan (as defined below) (the "Restructuring") that is to be implemented in voluntary cases commenced by the Debtors under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), on a consensual basis pursuant to a plan of reorganization to be confirmed under Chapter 11 of the Bankruptcy Code, the terms and conditions of which will be substantially consistent with those described in the term sheet which is attached hereto as Exhibit A (including any annexes and schedules attached thereto, the "Term Sheet"), and, if not specified in the Term Sheet, that is otherwise in form and substance reasonably satisfactory to the Consenting Lenders (the "Plan").

WHEREAS, in order to implement the Restructuring, the Debtors have agreed, subject to the terms and conditions of this Agreement, (i) to prepare and file, in any case(s) filed under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), (a) the Plan and (b) a disclosure statement that is substantially consistent with the Plan and the Term Sheet and otherwise is in form and substance reasonably satisfactory to the Consenting Lenders (the "Disclosure Statement") and (ii) to use commercially reasonable efforts to have the Disclosure Statement approved and the Plan confirmed by the Bankruptcy Court and consummated thereafter.

WHEREAS, the Debtors and the Consenting Lenders, who collectively hold more than fifty percent of the claims under the Prepetition Credit Facility, have agreed to support the Restructuring on the terms and subject to the conditions set forth herein.

AGREEMENT

NOW, THEREFORE, in consideration of the premises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. <u>Incorporation of Term Sheet and Definitions</u>

The Term Sheet is expressly incorporated herein by reference and is made part of this Agreement.  All references herein to "this Agreement" or "herein" shall include the Term Sheet.  The general terms and conditions of the Restructuring, as supplemented by the terms and conditions of this Agreement, are set forth in the Term Sheet.  In the event the terms and conditions as set forth in the Term Sheet and this Agreement are inconsistent, the terms and conditions as set forth in the Term Sheet shall govern.  Capitalized terms used and not defined in this Agreement shall have the meaning ascribed to them in the Term Sheet.

2. <u>Implementation of the Restructuring</u>

Subject to the terms and conditions of this Agreement, the Parties agree severally and not jointly to use commercially reasonable efforts to complete the Restructuring through the Plan on terms and conditions consistent with those set forth herein.  The Parties shall cooperate with each other in good faith and shall coordinate their activities in connection with (a) the implementation of the Restructuring and (b) the pursuit of the Restructuring and confirmation and consummation of the Plan.  Furthermore, each Party shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement, and each Party shall refrain from taking any action that would reasonably be expected to frustrate the purposes and intent of this Agreement and the Restructuring, including proposing a plan of reorganization that is not the Plan (or filing a disclosure statement with respect thereto).  Each Party hereby covenants and agrees severally and not jointly, from the date hereof until this Agreement has been terminated in accordance with Section 5 below, (i) to negotiate in good faith the definitive documents implementing, achieving and relating to the Restructuring, including, but not limited to, the order of the Bankruptcy Court confirming the Plan, the Disclosure Statement and other related documents, each of which are more specifically described in the Term Sheet and each of which shall contain terms and conditions substantially consistent in all respects with the Term Sheet and, if not specified in the Term Sheet, otherwise in form and substance reasonably satisfactory to the Consenting Lenders and the Debtors (collectively with the Plan and the Disclosure Statement, the "<u>Definitive Documents</u>"), and (ii) to execute (to the extent they are a party thereto) the Definitive Documents and otherwise support and seek to effect the actions and transactions contemplated thereby.

2

3.   <u>Consenting Lenders' Obligations to Support the Restructuring</u>

Subject to the terms and conditions of this Agreement, each Consenting Lender severally (and not jointly) agrees that, until this Agreement has been terminated in accordance with Section 5 and in connection with the Restructuring and the Plan upon the terms set forth in this Agreement, it will (i) not object to, or otherwise commence any proceeding to alter or oppose, the Restructuring or the confirmation of the Plan; (ii) not take any action that is materially inconsistent with, or that would unreasonably delay the consummation of, the Restructuring or the Plan in accordance with the terms of this Agreement; (iii) subject to Sections 10(c) and 24, vote, and cause its controlled affiliates and funds, as appropriate, to vote to accept the Plan in the Chapter 11 Cases; (iv) not object to the approval of the Disclosure Statement; (v) not vote for, consent to, intentionally induce or participate directly or indirectly in the formation of any other plan of reorganization or liquidation proposed or filed, or to be proposed or filed, in the Chapter 11 Cases; (vi) not commence or support any action or proceeding to shorten or terminate the period during which only the Debtors may propose and/or seek confirmation of the Plan; (vii) not directly or indirectly seek, solicit or encourage any other plan, proposal or offer of winding up, liquidation, reorganization, merger, consolidation, dissolution, restructuring of any Debtor or the sale of any or all assets of any Debtor; (viii) not commence or support any action filed by any party in interest to appoint a trustee, conservator, receiver or examiner for the Debtors, or to dismiss the Chapter 11 Cases, or to convert the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; (ix) not instruct the Agent to take any action that is inconsistent with the terms and conditions of this Agreement and if the Agent takes or threatens to take any such action, direct or cause the Agent to be directed not to take such action; and (x) subject to the terms of this Agreement, not withdraw, revoke or act inconsistently with any of the foregoing unless and until this Agreement is terminated in accordance with its terms.  Nothing contained herein shall limit the ability of a Consenting Lender to consult with the Debtors, or to appear and be heard, concerning any matter arising in the Chapter 11 Cases so long as such consultation or appearance is not inconsistent with such Consenting Lender's obligations under this Agreement, the Plan and the Term Sheet.

4.   <u>Debtors' Obligations to Support the Restructuring.</u>

The Debtors hereby agree (a) to file the Chapter 11 Cases with respect to the Restructuring with the Bankruptcy Court on or prior to 11:59 P.M. (Eastern) on September 3, 2009 (such filing date, the "<u>Petition Date</u>") and to file the Plan and the Disclosure Statement with the Bankruptcy Court on or prior to 11:59 P.M. (Eastern) on the date that is 60 days following the Petition Date; (b) not to assert or support any assertion by any third party that, prior to issuing any termination notice pursuant to Section 5, a Consenting Lender shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and hereby waives, to the greatest extent possible, the applicability of the automatic stay for the giving of such notice); (c) to prepare or cause the preparation, as soon as practicable after the date hereof, of each of the Plan, the Disclosure Statement and (in consultation with the Agent) the Definitive Documents; (d) to use all reasonable commercial efforts to consummate the Restructuring and Plan within the timeframe contemplated by this Agreement and take any and all necessary and

appropriate actions in furtherance of the Restructuring and the confirmation and consummation of the Plan; (e) to use all reasonable commercial efforts to obtain any and all required regulatory and/or third-party approvals for such Restructuring, including any approvals or waivers (to the extent deemed advisable by the Debtors and the Consenting Lenders) required by the FCC to consummate the Restructuring; (f) not to seek to implement any transaction or series of transactions that would effect a restructuring on different terms from the Restructuring or propose or support any plan of reorganization or liquidation in the Chapter 11 Cases other than the Plan; (g) not to take any action that is inconsistent with, or that would unreasonably delay or impede approval or confirmation and consummation of the Plan or that is otherwise inconsistent with this Agreement; (h) not to directly or indirectly seek, solicit, support or encourage any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, liquidation or restructuring of any of the Debtors that could reasonably be expected to prevent, delay or impede the confirmation and consummation of the Restructuring and the Plan; and (i) to provide written notice to the Agent and each Consenting Lender, within two business days of making such determination, if any Debtor determines that it would be inconsistent with its fiduciary duties to pursue confirmation and consummation of the Plan and the Restructuring contemplated by this Agreement; provided that nothing contained in this Agreement shall be deemed to prevent any Debtor from taking or failing to take any action that it is obligated to take (or fail to take) in the performance of any fiduciary or similar duty which such Debtor owes to any other person.

## 5.   Termination of Obligations

(a)      This Agreement shall terminate and all of the obligations of the Parties shall be of no further force or effect in the event that (i) the Plan is confirmed and becomes effective pursuant to a final non-appealable order, (ii) the Parties mutually agree to such termination in writing or (iii) this Agreement is terminated pursuant to paragraph (b), (c) or (d) of this Section 5.

(b)      The Debtors may terminate this Agreement by written notice to the Agent upon the occurrence of any of the following events:

(i)      a determination by the board of directors of Holdings (the "Board") that proceeding with the Restructuring and pursuit of confirmation and consummation of the Plan would be inconsistent with the Board's fiduciary obligations under applicable law;

(ii)      a breach by any Consenting Lender of its material obligations hereunder, which breach is not cured within five business days after the giving of written notice by the Debtors of such breach to such Consenting Lender; or

(iii)      any Consenting Lender shall assert any claim or cause of action against any Debtor or any of its current directors, officers or advisors relating to the Prepetition Credit Facility, except to enforce the terms of this Agreement.

(c)     This Agreement may be terminated upon the occurrence of any of the following events (it being understood that the following termination events are intended solely for the benefit of the Consenting Lenders) (the "Lender Termination Events"):

(i)     failure of the Debtors to meet either of the deadlines set forth in Paragraphs 4(a) above;

(ii)     11:59 P.M. (Eastern) on the date that is 60 days after the Petition Date, unless on or prior to such time the Debtors have filed the Disclosure Statement and Plan with the Bankruptcy Court;

(iii)     11:59 P.M. (Eastern) on the date that is 90 days after the Petition Date, unless on or prior to such time the Bankruptcy Court has entered an order, in form and substance reasonably satisfactory to the Consenting Lenders, approving the Disclosure Statement under section 1125 of the Bankruptcy Code;

(iv)     11:59 P.M. (Eastern) on the date that is 150 days after the Petition Date, unless on or prior to such time the Bankruptcy Court has entered an order, in form and substance reasonably satisfactory to the Consenting Lenders, confirming the Plan under section 1129 of the Bankruptcy Code;

(v)     11:59 P.M. (Eastern) on the date that is 330 days after the Petition Date (the "Consummation Deadline"), unless on or prior to such time the Plan has become effective in accordance with its terms; *provided* that the Consummation Deadline may be extended by the Consenting Lenders, in their discretion, for 30 days so long as (i) the Consummation Deadline has not been delayed as a result of any breach of the Debtors' material obligations under this Agreement, including any failure by the Debtors to submit any filings with the FCC necessary to obtain the requisite approvals or waivers from the FCC to consummate the Restructuring and (ii) the Parties hereto are waiting solely for any such approvals or waivers from the FCC in order for the Consummation Deadline to occur;

(vi)     the "Termination Date" has occurred (after giving effect to any cure and notice periods) under, and as defined, in any interim or final order issued by the Bankruptcy Date authorizing the Debtors to use the cash collateral of the Agent and the Secured Lenders;

(vii)     filing by the Debtors of a plan of reorganization or liquidation (or disclosure statement related thereto) in the Chapter 11 Cases that is not the Plan;

(viii)     after filing of the Plan, any amendment or modification to the Plan or the Disclosure Statement, or the filing of any pleading by any of the Debtors that seeks to amend or modify the Plan, the Disclosure Statement, the Definitive Documents or any documents related thereto, which amendment, modification or filing is inconsistent with this Agreement and the Term Sheet;

5

(ix)     any of the Debtors publicly announces its support for any plan of reorganization or liquidation that is materially inconsistent with the Plan, withdraws, or files a motion to withdraw the Plan, gives the notice described in Paragraph 4(i) or otherwise evinces an intention in writing not to proceed with the pursuit of confirmation and consummation of the Plan or to proceed with any alternative Chapter 11 plan or transaction;

(x)     a breach by the Debtors of their material obligations hereunder, which breach is not cured within five business days after the giving of written notice by the Agent (acting on behalf of the Consenting Lenders) of such breach;

(xi)     any representation or warranty made by any Debtor pursuant to this Agreement shall prove to have been false or misleading in any material respect when so made;

(xii)     the issuance of an order in the Chapter 11 Cases terminating any Debtor's exclusive right to file a plan or plans of reorganization under section 1121 of the Bankruptcy Code; *provided* that such order is not the result of a motion filed by any Consenting Lender;

(xiii)     any event, development or circumstance occurs that results in any Debtor being unable to perform its material obligations under this Agreement;

(xiv)     a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the Debtors' businesses shall be appointed in any of the Chapter 11 Cases or any of the Debtors shall file a motion or other request for such relief;

(xv)     any Debtor shall file a motion or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking the avoidance, of the liens securing the Secured Lenders' claims under the Prepetition Credit Facility, or any other cause of action is asserted by any Debtor against the Agent, any Secured Lender, or any their respective affiliates, subsidiaries, members, directors, officers, representatives, attorneys or advisors relating to the Prepetition Credit Facility, except to enforce the terms of this Agreement;

(xvi)     any of the Chapter 11 Cases shall have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code;

(xvii)     any member of the Series A Stockholder Committee or any holder of Series B Common Stock (or their respective successors or assigns) shall (i) take action in opposition to the Plan or the transactions contemplated thereby, (ii) fail to take actions necessary to implement the Plan; <u>provided</u> that the Debtors reserve the right to reimburse the holders of Old Equity for any reasonable expenses incurred in performing such actions, or (iii) not consent to the release of the Secured Lenders and the Debtors, as long as reciprocal releases are granted to holders of Old Equity as part of the Plan (such member or holder, a "Dissenting Holder"); *provided* that it shall not be a Lender

6

Termination Event hereunder if, after receiving written notice from the Agent (acting on behalf of the Consenting Lenders), the Debtors amend or modify the Term Sheet or, if applicable, the Plan and Disclosure Statement to provide (i) that such Dissenting Holder shall not receive or retain any property on account of its Old Equity under the Plan or (ii) if (and only if) the Debtors are unable to amend or modify the Plan as described in clause (i) under applicable bankruptcy law, that all holders of Old Equity shall not receive or retain any property on account of such Old Equity under the Plan; it being agreed and understood that such Term Sheet, as amended and modified pursuant to clause (i) or (ii) above, or, if applicable, such Plan and Disclosure Statement, as amended and modified pursuant to clause (i) or (ii) above, shall become for all purposes under this Agreement the "Term Sheet" or, if applicable, the "Plan" and "Disclosure Statement".

Upon the occurrence of any Lender Termination Event under (A) paragraphs (i), (ii), (iii), (iv), (v), (vi), (x) or (xii) of this Section 5(c), this Agreement shall terminate automatically without further action required by any party and (B) paragraph (vii), (viii), (ix), (xi), (xiii), (xiv), (xv), (xvi) or (xvii) of this Section 5(c), this Agreement shall terminate after the giving of written notice by the Agent (acting on behalf of the Consenting Lenders) of such Lender Termination Event (the date of termination under clause (A) or (B), the "Termination Date"). For the avoidance of doubt, the automatic stay arising under section 362 of the Bankruptcy Code shall be deemed waived or modified to the greatest extent permitted under law for purposes of providing notice hereunder.

(d)     The Debtors or the Consenting Lenders (by written notice executed by the Agent acting at the direction of the Consenting Lenders) may terminate this Agreement by written notice to the Parties in the event that the Bankruptcy Court or other governmental authority shall have issued any order, injunction or other decree or take any other action, in each case, which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Restructuring and/or the Plan substantially on the terms and conditions set forth in this Agreement.

(e)     If this Agreement is terminated pursuant to this Section 5, all further obligations of the Parties hereunder shall be terminated without further liability, *provided* that each Party shall have all rights and remedies available to it under applicable law (for all matters unrelated to this Agreement), the Prepetition Credit Facility and any documents or agreements ancillary thereto. If this Agreement is terminated at a time when permission of the Bankruptcy Court is required for a Consenting Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Debtors shall not oppose any attempt by such Consenting Lender to change or withdraw (or cause to change or withdraw) such vote at such time so long as the respective Consenting Lender has complied with the provisions of this Section 5. Upon a termination of this Agreement in accordance with this Section 5, no Party hereto shall have any continuing liability or obligation to any other Party hereto and the provisions of this Agreement shall have no further force or effect, except for the provisions in Sections 13-25, each of which shall survive termination of this Agreement; *provided* that no such termination shall

relieve any party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

6.  Representations of the Debtors

Each Debtor hereby represents and warrants to each Consenting Lender as follows:

(a)  Power and Authority.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

(b)  Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

(c)  No Conflicts.  To the best of the Company's knowledge, the execution, delivery and performance by it of this Agreement and the transactions contemplated hereby do not and shall not conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it, Holdings or any of their respective subsidiaries is a party, other than as a result of the commencement of the Debtors' Chapter 11 Cases or taking action in furtherance thereof.

(d)  Binding Obligation.  This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms.

(e)  Governmental Consents.  The execution, delivery and performance by it of this Agreement and the transactions contemplated hereby do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action by, any federal, state or other governmental authority or regulatory body, except (i) in connection with the commencement of the Chapter 11 Cases, the approval of the Disclosure Statement and the confirmation of the Plan and (ii) in connection with any approvals or waivers required by the FCC to transfer ownership and control of Holdings or its subsidiaries to the Secured Lenders and, to the extent applicable, holders of Old Equity upon the consummation of the Restructuring.

(f)  No Consent or Approval.  Except as expressly provided in this Agreement and Holdings' and the Company's certificates of incorporation, no consent or approval by any other person or entity is required in order for it to carry out the provisions of this Agreement and the transactions contemplated hereby.

(g)  No Material Misstatement or Omission.  None of the material and information relating to pension, environmental or tax issues provided by or on behalf of the Debtors to the Agent or the Consenting Lenders in connection with the Restructuring contemplated in this Agreement, when read or considered together, contains any untrue

statement of a material fact or omits to state a material fact necessary in order to prevent the statements made therein from being materially misleading.

7.  Representations of the Consenting Lenders

Each of the Consenting Lenders, severally, but not jointly, represents and warrants to the Parties as follows:

(a)  Holdings by Consenting Lenders. As of the date hereof, with respect to the Secured Lender Claims held by such Consenting Lender as set forth on such Consenting Lender's signature page hereto, such Consenting Lender either is (i) the sole legal owner and beneficial owner of its share of the Secured Lender Claims and has full power and voting authority over such Secured Lender Claims, (ii) is the legal owner of its share of the Secured Lender Claims and has the power and authority to bind the legal and beneficial owner(s) of such Secured Lender Claims to the terms of this Agreement or (iii) has received direction from the party having full power and voting authority over such Secured Lender Claims to execute this Agreement.

(b)  Sufficiency of Information Received. Such Consenting Lender has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for such Consenting Lender to evaluate the financial risks inherent in the Restructuring and accept the terms of the Plan as set forth in the Term Sheet.

(c)  Power and Authority. It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

(d)  Authorization. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

(e)  Governmental Consents. The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body except any approvals or waivers required by the FCC to transfer ownership and control of Holdings or its subsidiaries to the Secured Lenders and, to the extent applicable, the holders of Old Equity upon the consummation of the Restructuring.

(f)  Binding Obligation. This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by general principles of equity relating to enforceability.

9

8.  Conditions to Effectiveness.

This Agreement shall become effective and binding upon each of the Parties on the date on which all of the following conditions are satisfied or waived (the "Effective Date"):

(a)     The Agent shall have received duly executed signature pages for this Agreement from (i) each of the Debtors and (ii) Consenting Lenders holding not less than 50% of the Secured Lender Claims;

(b)     The Agent shall have received resolutions from each Debtor evidencing the corporate, partnership or limited liability company authority of such Debtor to execute, deliver and perform its obligations under this Agreement and the transactions contemplated hereby; and

(c)     The Agent shall have received an executed shareholder consent from the Series A Common Stockholder Committee and each Series B Stockholder (x) providing for an agreement by such Committee and Series B Stockholder to (i) not take action in opposition to the Plan or the transactions contemplated thereby, (ii) take actions necessary to implement the Plan; provided that the Debtors reserve the right to reimburse the holders of Old Equity for any reasonable expenses incurred in performing such actions, and (iii) consent to the release of the Secured Lenders and the Debtors, as long as reciprocal releases are granted to holders of Old Equity as part of the Plan and (y) otherwise in form and substance reasonably satisfactory to the Consenting Lenders.

9.  Additional Claims and Interests Subject.

(a)     Nothing in this Agreement shall be deemed to limit or restrict the ability or right of a Consenting Lender to purchase or take assignment of any additional Secured Lender Claims ("Additional Claims") against or interests in any Debtor or any affiliate of any Debtor; provided, however, that in the event a Consenting Lender purchases or takes assignment of any such Additional Claims or other interests after the date hereof, such Additional Claims or other interests shall immediately upon such acquisition become subject to the terms of this Agreement.

(b)     Notwithstanding anything to the contrary contained herein, any Consenting Lender may, at any time and without notice to or consent from any other Party, pledge or grant a security interest in all or a portion of its rights (including rights to payment of interest and repayment of principal) under the Prepetition Credit Facility in order to secure obligations of such Consenting Lender to a Federal Reserve Bank; provided that no such pledge or grant of a security interest shall release such Consenting Lender from any of its obligations hereunder or substitute any such pledgee or grantee for such Consenting Lender as a party hereto.

(c)     Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of each Consenting Lender contained in this Agreement

relates solely to such Consenting Lender's rights and obligations as a Secured Lender under the Prepetition Credit Facility with respect to the principal amounts identified on such Consenting Lender's signature page  and does not bind such Consenting Lender or its affiliates with respect to any other indebtedness, obligations or liabilities owed by Holdings, the Company or any of their respective subsidiaries and affiliates to such Consenting Lender or any affiliate of such Consenting Lender (for the avoidance of doubt, if the Consenting Lender is specified on the relevant signature page as a particular group or business within an entity, "Consenting Lender" shall mean such group or business and shall not mean the entity or its affiliates, or any other desk or business thereof, or any third party funds advised thereby).  For purposes of this Agreement, "Consenting Lender" shall not include a holder of loans under the Prepetition Credit Facility  signatory hereto in its capacity or to the extent of its holdings as a public-side broker, dealer or market maker of loans under the Prepetition Credit Facilty or any other claim against or security in the Debtors.

10. Restrictions on Transfer.

(a)    Except as set forth in Section 10(b), each Consenting Lender hereby agrees that, for so long as this Agreement shall remain in effect as to it, it shall not sell, transfer or assign all or any of its Secured Lender Claims, as the case may be, or any option thereon or any right or interest (voting, participation or otherwise) therein (each, a "Transfer") without the prior written consent of Holdings.

(b)    Notwithstanding the foregoing, any Consenting Lender may Transfer any or all of its respective Secured Lender Claims, provided that, as a condition precedent, the transferee thereof agrees in writing, in the form attached hereto as Exhibit B, to be bound by the terms of this Agreement.

(c)    Any Transfer of any Secured Lender Claim that does not comply with the foregoing shall be deemed void *ab initio*.

11. Joinder.

Subject to Section 10(a), any person or entity that receives or acquires a portion of the Secured Lender Claims pursuant to a Transfer by a Consenting Lender to such person or entity hereby agrees to be bound by this Agreement (as may have been amended, restated or otherwise modified) (a "Joining Lender Party") by executing and delivering a joinder in the form of Exhibit B hereto (the "Lender Joinder").  The Joining Lender Party shall thereafter be deemed a "Consenting Lender" and a party for all purposes under this Agreement in respect of the Secured Lender Claims acquired by such Joining Lender Party.  By executing the Lender Joinder, the Joining Lender Party will have made the representations and warranties set forth in Section 7 of this Agreement to each of the other Parties.

12. Pending Transfers

Notwithstanding anything to the contrary provided herein, if a Consenting Lender has assigned all or a portion of the Secured Lender Claims under the Prepetition Credit Facility that it beneficially owns as of the date hereof but such assignment has not settled as of the date hereof (such Secured Lender Claims, "Pending Transfer Credit Agreement Obligations"), then such Consenting Lender shall be permitted to exclude from the amount of the Secured Lender Claims listed on its signature page an amount of Pending Transfer Credit Agreement Obligations equal to the Pending Transfer Credit Agreement Obligations assigned to any transferee that has instructed such Consenting Lender not to execute this Agreement (such excluded Obligations, the "Excluded Credit Agreement Obligations"). Such Consenting Lender shall not be bound by the terms hereof with respect to any Excluded Credit Agreement Obligations.

13. Prior Negotiations

This Agreement, including any exhibits, constitutes the entire understanding of the parties with respect to the subject matter hereof; *provided*, *however*, that any confidentiality agreement between any of the Debtors and any Consenting Lender (including the confidentiality provisions of the Prepetition Credit Facility) shall remain in full force and effect in accordance with its terms. No representations, oral or written, other than those set forth herein, may be relied on by any party in connection with the subject matter hereof.

14. Amendment or Waiver

No waiver, modification or amendment of the terms of this Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by each of the Debtors and the Consenting Lenders. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement whether or not similar, nor shall any waiver be deemed a continuing waiver. Any modification of this Section 15 shall require the written consent of all Parties.

15. Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.

Notwithstanding the foregoing consent to New York jurisdiction, upon any commencement of the Chapter 11 Cases and until the effective date of the Plan, each of the Parties agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

16. <u>Specific Performance</u>

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

17. <u>Reservation of Rights</u>

(a)     Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner, waive, limit, impair or restrict the ability of each (i) Consenting Lender to protect and preserve its rights, remedies and interests, including its claims against the Debtors and (ii) Debtor to protect and preserve its rights, remedies and interests.  If the Restructuring contemplated herein is not consummated, or if this Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

(b)     Notwithstanding anything herein to the contrary, each Consenting Lender and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Debtor or any affiliate of any Debtor or any other Person, including, but not limited to, any Person proposing or entering into a transaction related to or involving any Debtor or any affiliate thereof.

(c)     Without limiting Section 17(a) in any way, if the Restructuring contemplated by this Agreement or otherwise set forth in the Plan are not consummated as provided herein, if a Termination Date occurs, or if this Agreement is otherwise terminated for any reason, the Consenting Lenders and the Debtors each fully reserve any and all of their respective rights, remedies and interests under the Prepetition Credit Facility, applicable law and in equity.

18. <u>Headings</u>

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

19. Notice

Any notices or other communications required or permitted hereunder may be given by email to (i) each Consenting Lender to the email address on the signature page of this Agreement, with a copy to Cravath, Swaine & Moore LLP, 825 Eighth Ave., New York, NY 10009, Attn:  Robert Trust, Telephone (212) 474-1472, Facsimile (212) 474-3700, email:  rtrust@cravath.com and (ii) the Debtors as follows:

> Freedom Communications Holdings, Inc.
> 17666 Fitch
> Irvine, California 92614
> Attn: Rachel Sagan, General Counsel
> Telephone: (949) 789-3535
> Facsimile: (949) 789-3524
> Email: rachel_sagan@link.freedom.com
>
> *with a copy to*:
>
> Latham & Watkins LLP
> 355 South Grand Avenue.
> Los Angeles, CA 90071
> Attn: Robert Klyman
> Telephone: (213) 485-1234
> Facsimile: (213) 891-8763
> Email: robert.klyman@lw.com

20. Successors and Assigns, Several Obligations

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided* that nothing in this Section 20 shall be deemed to permit any Transfer of any Secured Lender Claims or any vote or consent of Consenting Lenders other than in accordance with the terms of this Agreement.  The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.  The agreements, representations and obligations of the Consenting Lenders under this Agreement are several and not joint in all respects.  Any breach of this Agreement by a Consenting Lender shall not result in liability for any other non-breaching Consenting Lender.

21. Third-Party Beneficiaries

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof.

[[3164419]]

22. Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this agreement may be delivered by facsimile or electronic mail which shall be deemed to be an original for the purposes of this paragraph.

23. Consideration

It is hereby acknowledged by the Parties that no consideration shall be due or paid to the Consenting Lenders in exchange for their support of the Restructuring, in accordance with the terms and conditions of this Agreement, other than the obligations imposed upon the Debtors, the Consenting Lenders pursuant to the terms of this Agreement.

24. Acknowledgement

This Agreement is not, and shall not be deemed to be, an offer of securities or a solicitation for consents to the Plan. Each Consenting Lender's acceptance of the Plan shall not be solicited until it has received the the Plan contemplated by this Agreement, the Disclosure Statement in the form approved by the Bankruptcy Court in respect of the Plan contemplated by this Agreement and other solicitation material in connection therewith.

25. Public Announcement and Bankruptcy Court Filings

The Parties agree that all public announcements of the entry into or the terms and conditions of this Agreement shall be mutually, reasonably acceptable to each of the Parties. The Debtors may disclose this Agreement and the contents hereof in their Chapter 11 Cases or other proceedings under the Bankruptcy Code or as otherwise required by applicable law.

26. FCC Compliance and Approval

The Parties acknowledge and agree that certain terms of the Restructuring regarding the form and allocation of consideration to be provided to the Secured Lenders may need to be modified for the Restructuring to be approved by the FCC under the Communications Act of 1934, as amended, and the rules and regulations of the FCC (including its media and foreign ownership limitations) (collectively, the "Act") and for the reorganized Debtors to remain in compliance with the Act after the Restructuring is consummated (it being understood and agreed that such modifications shall be required to be reasonably satisfactory to the Consenting Lenders and the Debtors). The Parties shall cooperate in all reasonable respects, and provide each other such information as each reasonably may request, in order to evaluate and determine the most expedient means of satisfying the objectives of the foregoing sentence, and whether seeking any such waiver is in fact advisable (as determined by the Debtors and the Consenting Lenders) in light of the circumstances.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

FREEDOM COMMUNICATIONS HOLDINGS, INC. on its own behalf and on behalf of each of the entities listed on Schedule 1 to the Term Sheet

By: _Mark A. McEachen_

Name:

Title:

[Consenting Lenders' signature pages on following pages]

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

JPMORGAN CHASE BANK, N.A.

By: _____
        Name: Charles O. Freedgood
        Title: Managing Director

Address:        _277 Park Ave, Floor 8, New York, NY, 10172____
                    _New York, NY, 10172_____
Telephone:      _212-622-4513_____
Facsimile:      _212-622-4560_____

Holdings under the Prepetition Credit Facility pursuant to Paragraph 7(a):

$_____63,409,693.54__

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
      Name:    Thomas Costello
      Title:     Duly Authorized Signatory

Address:       201 Merritt Seven
                  Norwalk CT 06851
Telephone:   203-229-1803
Facsimile:   203-956-4585
Email:       Thomas.Costello@ge.com

Holdings under the Prepetition Credit Facility pursuant to

Paragraph 7(a): $ 101,164,039

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

SUNTRUST BANK

By: _____
    Name: Janet R. Naifeh
    Title: Senior Vice President


Address:     401 Commerce Street
                Suite 2500, Nashville, TN   37219
Telephone:   (615) 748-4026
Facsimile:   (615) 748-5700
Email:       jan.naifeh@suntrust.com

Holdings under the Prepetition Credit Facility pursuant to Paragraph 7(a):
$ 83,080,288.60

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

ROYAL BANK OF SCOTLAND PLC

By: _____
Name: Joseph Siow
Title: Vice President


Address: 600 Washington Blvd
         Stamford CT  06901
Telephone: (203) 897-1320
Facsimile: _____
Email: Joseph.siow@RBS.com

Holdings under the Prepetition Credit Facility pursuant to Paragraph 7(a):
$ ~~_____~~
$ 74,891,439.68

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

WACHOVIA BANK, NATIONAL ASSOCIATION

By: _Ronald F Bentien_

    Name:
    Title:    **Ronald F. Bentien, Jr**
               **Director**

Address:    301 S. College St., D1053-151
                  Charlotte, NC 28288
Telephone:  704 - 383 - 0884
Facsimile:   704 - 383 - 6249
Email:      fritz.bentien@wachovia.com

Holdings under the Prepetition Credit Facility pursuant to Paragraph 7(a):
$ 66,543,442.44

[Plan Support Agreement Signature Page]

## EXHIBIT A

Term Sheet

# FREEDOM COMMUNICATIONS HOLDINGS, INC.

### PRELIMINARY OUTLINE OF PRINCIPAL TERMS OF
### CHAPTER 11 PLAN OF REORGANIZATION

This Term Sheet sets forth the material terms of a restructuring.  Each element of this Term Sheet is consideration for the other elements and an integral aspect of the proposed restructuring of the debt and equity of Freedom Communications, Inc. (the "Company"), Freedom Communications Holdings, Inc. ("Holdings") and their respective subsidiaries (the "Restructuring").

This Term Sheet is proffered by JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") for the Secured Lenders (as defined below) in the nature of a settlement proposal and in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import.  This Term Sheet and the information contained herein are strictly confidential and contain material non-public information.  This Term Sheet is not an offer with respect to any securities or solicitation of acceptances of a chapter 11 plan.  Such offer or solicitation only will be made in compliance with all applicable securities laws and/or provisions of the Bankruptcy Code.  This Term Sheet is part of, and will be attached to, the Plan Support Agreement (the "Plan Support Agreement") among Holdings, the Company, the Agent and certain Secured Lenders party thereto (the "Consenting Lenders") and is subject to the terms thereof.

| I.  PARTIES: | |
|---|---|
| **Debtors:** | The Company (and, as reorganized pursuant to the Plan, the "Reorganized Company"), Holdings (and, as reorganized pursuant to the Plan, "Reorganized Holdings") and substantially all of their respective direct and indirect subsidiaries listed on Schedule 1 hereto (collectively, the "Debtors"and, as reorganized pursuant to the Plan, the "Reorganized Debtors"). |
| **Secured Lenders:** | The lenders (collectively, the "Secured Lenders") party  to the Credit Agreement, dated as of May 18, 2004 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Facility"), among the Company, Holdings, the Agent and the Secured Lenders.   The Debtors will agree, as part of the Restructuring, that all claims arising under the Prepetition Credit Facility (including funded loans and contingent reimbursement obligations in respect of letters of credit issued and outstanding thereunder, the "Secured Lender Claims") shall be allowed in full in the chapter 11 cases, without setoff, subordination, avoidance, reduction, defense, setoff, recharacterization or counterclaim to be treated in accordance with the Plan.  The claims held by the Secured Lenders (inclusive of |

| | accrued and unpaid principal and interest, fees, expenses and other obligations and charges), shall be collectively referred to herein as the "<u>Secured Lender Claims</u>". |
|---|---|
| **Holders of Trade Unsecured Claims:** | Any holder of any unsecured claim arising prior to the date of the commencement of the Debtors' chapter 11 cases (the "<u>Petition Date</u>") relating to the receipt of goods or services by the Debtors in the ordinary course of the Debtors' businesses from trade creditors or service providers that agree to continue to supply such goods and services to the Reorganized Debtors on substantially the same trade terms that, or better trade terms than, offered to the Debtors immediately prior to the Petition Date or, if more favorable, within the 90 day period prior to the Petition Date (each such claim, a "<u>Trade Unsecured Claim</u>"). |
| **Holders of General Unsecured Claims:** | Any holder of all other claims that are not Secured Lender Claims, administrative and priority claims, priority tax claims, other secured claims, Trade Unsecured Claims or intercompany claims (each such claim a "<u>General Unsecured Claim</u>"). General Unsecured Claims include, without limitation, all claims arising from (a) the rejection of executory contracts and real property leases, (b) the litigation captioned <u>Gonzalez v. Freedom Communications, Inc.</u>, Case No. 03CC08756, Superior Court of California, County of Orange, (c) any other litigation that could have been brought prior to the Petition Date and (d) the termination of any unqualified pension plan of the Debtors. |
| **Equity Interest Holders:** | Holders of all equity interests in Holdings and any claim arising from the purchase or sale of any such equity interests, in each case outstanding prior to the effective date of the Plan (the "<u>Effective Date</u>"), including, without limitation, any preferred stock, common stock, stock options or other rights to purchase the stock of Holdings, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in Holdings prior to the Effective Date (collectively, the "<u>Old Equity</u>"). |
| **II. PLAN DISTRIBUTIONS AND TREATMENT OF CLAIMS:** | |
| **Administrative and Priority Claims:** | Except to the extent that a holder of an allowed administrative or priority claim and the Debtors or the Reorganized Debtors, as the case may be, agree to different treatment, each allowed administrative or priority claim shall be paid in full in cash or as otherwise provided in the Bankruptcy Code. |
| **Priority Tax Claims:** | Except to the extent that a holder of an allowed priority tax claim and the Debtors (with the consent of the Agent) or Reorganized Debtors, as the case may be, agree to different treatment, each holder of an allowed priority tax claim shall receive, at the option of the Debtors or the Reorganized Debtors, as the case may be, (a) |

| | |
|---|---|
| | cash on the Effective Date in an amount equal to such allowed priority tax claim or (b) over a period through the fifth anniversary of the Petition Date, deferred cash payments in an aggregate amount equal to such allowed priority tax claim, plus interest on such aggregate amount over such period. All allowed priority tax claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
| **Other Secured Claims:** | At the option of the Debtors (with the consent of the Agent), each allowed other secured claim will be treated as follows under the Plan: (a) reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code; (b) the holder of an allowed other secured claim shall receive the collateral securing such claim and any interest required to be paid pursuant to section 506(b) of the Bankruptcy Code; or (c) receive such other treatment as the Debtors and the applicable holder of an allowed other secured claim shall agree. Prepetition liens with respect to allowed other secured claims that are rendered unimpaired shall survive the Effective Date and shall continue in accordance with contractual or statutory terms until such claims have been paid in full. |
| **Prepetition Credit Facility Claims:** | On the Effective Date, the holders of allowed Secured Lender Claims shall receive, in full satisfaction of such claims, their pro rata share of (i) $225 million in Term Loan A obligations owed by the Reorganized Company on the terms described in Annex A (the "Term A Loans"), (ii) $100 million in Term Loan B obligations owed by the Reorganized Company on the terms described in Annex B (the "Term B Loans" and, together with the Term A Loans, the "Term Facilities"), (iii) any cash held by the Debtors or the Reorganized Debtors as of the Effective Date in excess of $15 million and (iv) 100% of the primary equity interests (the "New Common Stock") in Reorganized Holdings (subject to dilution from the distribution of 2% of the New Common Stock on a pro rata basis to holders of Old Equity under the Plan, any equity awards under the New Management Incentive Plan, the exercise of the Warrants and an award, if any, of New Common Stock as compensation to the Exit Revolving Lenders (all as defined or described below)). Changes to the form or the allocation of the consideration to be distributed to the Secured Lenders may be required to obtain approvals and waivers from the Federal Communications Commission (the "FCC") to consummate the Restructuring. |
| **Trade Unsecured Claims:** | Except to the extent that a holder of an allowed Trade Unsecured Claim and the Debtors or the Reorganized Debtors, as the case may be, agree to different treatment, each allowed Trade Unsecured Claim shall be paid in full in cash for such claim on the later of the Effective Date and the date on which payment on account of such claim is due in the ordinary course of business. |

3

| | |
|---|---|
| | Allowed Trade Unsecured Claims eligible for payment shall be paid from the distribution otherwise payable under the Plan to the Secured Lenders on account of the secured portion of the Secured Lender Claims. |
| **General Unsecured Claims:** | On the Effective Date, holders of allowed General Unsecured Claims shall receive their pro rata share of $5 million (the "Unsecured Compensation"); provided that, if the class of General Unsecured Claims does not vote to accept the Plan, all holders of General Unsecured Claims shall permanently forfeit their pro rata share of the Unsecured Compensation.<br><br>Allowed General Unsecured Claims eligible for payment shall be paid from the distribution otherwise payable under the Plan to the Secured Lenders on account of the secured portion of the Secured Lender Claims.<br><br>If any holder of an allowed General Unsecured Claim takes any action (including, without limitation, filing any objection to approval of the Plan or the Disclosure Statement) that delays, hinders or impedes implementation or consummation of the Restructuring or does not consent to the release of the Secured Lenders and the Debtors, such holder, to the maximum extent permitted under applicable bankruptcy law, shall forfeit any recovery hereunder.<br><br>Any amounts forfeited by holders of General Unsecured Claims shall be retained by the Reorganized Debtors, but shall be counted for purposes of determining the pro rata distribution among the nonforfeiting holders. |
| **Intercompany Claims:** | On or as soon as practicable after the Effective Date, and after consultation with and approval by the Agent, all Intercompany Claims will either be reinstated to the extent determined to be appropriate by the Company or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of the Reorganized Debtors. |
| **Equity Interests:** | On the Effective Date, Old Equity shall be cancelled, and each holder of Old Equity shall receive (i) its pro rata share of 2% of the New Common Stock in Reorganized Holdings, subject to dilution as a result of any equity awards under the New Management Incentive Plan and an award, if any, of New Common Stock as compensation to the Exit Revolving Lenders and (ii) its pro rata share of warrants to purchase 10% of the New Common Stock on the terms described in Annex D (the "Warrants"), subject to dilution as a result of any equity awards under the New Management Incentive Plan; provided that, if the class of Old Equity holders does not vote to accept the Plan, all holders of Old |

4

| | |
|---|---|
| | Equity shall permanently forfeit their pro rata share of the New Common Stock and the Warrants. |
| | Holders of Old Equity eligible to receive payment shall be paid from the distribution otherwise payable under the Plan to the Secured Lenders on account of the secured portion of the Secured Lender Claims. |
| | With respect to any holder of Old Equity that (i) takes action in opposition to the Plan or the transactions contemplated thereby, (ii) fails to take actions necessary to implement the Plan; provided that the Debtors reserve the right to reimburse the holders of Old Equity for any reasonable expenses incurred in performing such actions, or (iii) does not consent to the release of the Secured Lenders and the Debtors, as long as reciprocal releases are granted to such holder of Old Equity as part of the Plan, such holder, to the maximum extent permitted under applicable bankruptcy law, shall forfeit any recovery hereunder. |
| | Any New Common Stock or Warrants forfeited by holders of the Old Equity shall not be issued, but shall be counted for purposes of determining the pro rata distribution among the nonforfeiting holders. |
| **Subsidiary Equity Interests** | The Company and Holdings shall retain all of their issued and outstanding shares of stock of, or membership interests in, their respective subsidiaries, subject to tax and accounting considerations. |
| **Executory Contracts:** | All executory contracts and unexpired leases not specifically assumed or rejected prior to the date on which the Plan is confirmed, or set forth on a schedule of contracts to be assumed and/or rejected as of the Effective Date pursuant to the order confirming the Plan (the "Confirmation Order"), shall be rejected on and as of the Effective Date. |
| **III. CORPORATE GOVERNANCE AND MANAGEMENT** | |
| **Board of Directors of Reorganized Holdings:** | The initial board of directors of Reorganized Holdings shall consist of the Chief Executive Officer and four independent and disinterested individuals identified and agreed to by the Consenting Lenders. Successor directors will be appointed and/or elected in accordance with Reorganized Holdings' charter and by-laws. |
| | Consenting Lender holding more than a certain threshold percentage in amount of the Secured Lender Claims (such threshold percentage to be agreed upon by the Consenting Lenders) shall have the right to appoint one representative to attend and observe all board meetings of Reorganized Holdings. |

5

| | |
|---|---|
| **Holdings' Status:** | Reorganized Holdings shall be a private (non-reporting) company. The New Common Stock will: (i) not be registered; (ii) not be listed on any national exchange; and (iii) be transferable by the recipients thereof under the Plan pursuant to the exemption from registration granted by section 1145(c) of the Bankruptcy Code (except with respect to any such recipient deemed to be an "underwriter"). |
| **New Common Stock:** | The New Common Stock shall consist of (i) a class of full voting common stock (the "Class A Common Stock") and (ii) a separate class of limited-voting common stock (the "Class B Common Stock").[1] Each Secured Lender shall have the option to choose to take its New Common Stock in the form of Class A Common Stock or Class B Common Stock. The New Common Stock allocated to Old Equity shall be Class A Common Stock.<br><br>Each share of Class B Common Stock will be convertible at the option of the holder, exercisable at any time, into one share of Class A Common Stock; provided that, at all times, there must be outstanding at least one share of Class A Common Stock.<br><br>The economic rights of the Class A Common Stock and Class B Common Stock shall be identical. The Class B Common Stock will not be entitled to general voting rights, but will be entitled to vote on an "as converted" basis (together with the holders of the Class A Common Stock, voting as a single class) on certain non-ordinary course transactions, including (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking pari passu with or senior to the New Common Stock as to dividends or liquidation preference, including additional New Common Stock; (ii) any amendment to Reorganized Holding's certificate of incorporation or by-laws; (iii) any amendment to any shareholders or comparable agreement; (iv) any sale, lease or other disposition of all or substantially all of the assets of Reorganized Holdings through one or more transactions; (v) any recapitalization, reorganization, consolidation or merger of Reorganized Holdings; (vi) to the extent that holders of Class A Common Stock have the right to vote thereon, any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Holdings, except as may be provided for under the New Management Incentive Plan or any other management incentive plan; and (vii) to the extent that holders of Class A Common Stock have the right to vote thereon, any redemption, purchase or other acquisition by Reorganized |

---

[1] The determination of whether to have one or more classes of common stock will be subject to consideration of, among other things, certain FCC, tax, accounting and other issues. The classes of common stock described herein and the rights thereof may need to be adjusted to meet certain requirements of the FCC.

[[3163289]]

| | |
|---|---|
| | Holdings of any of its capital stock (except for purchases from employees upon termination of employment). |
| | The Class B Common Stock will be entitled to a separate class vote on any amendment or modification of any rights or privileges of the Class B Common Stock that does not equally affect the Class A Common Stock. In any liquidation, dissolution or winding up of the Reorganized Company, all assets will be distributed to holders of the New Common Stock on a pro rata basis. |
| | Nothing contained in this Section "New Common Stock" shall impact the recoveries described above in the section "Equity Interests." |
| **Charter Documents:** | The charter documents for the Reorganized Debtors shall be in a form reasonably satisfactory to the Consenting Lenders and the Debtors. |
| **Chief Executive Officer:** | The Chief Executive Officer of Reorganized Holdings shall be selected by the Board of Directors of Reorganized Holdings. |
| **New Management Incentive Plan:** | There shall be a management incentive plan (the "New Management Incentive Plan"), pursuant to which up to 10% of the equity of Reorganized Holdings shall be reserved for the Board of Directors of Reorganized Holdings to grant options to purchase New Common Stock to the members of such Board and the members of the management of the Reorganized Company. The New Management Incentive Plan will contain terms and conditions (including the form of equity grant) reasonably acceptable to the Agent and the Company. |
| **New Stockholders' Agreement:** | Each holder of New Common Stock shall be deemed to enter into the New Stockholders' Agreement on terms and conditions reasonably acceptable to the Consenting Lenders and the Debtors, which, without limitation, shall provide for customary "drag along" and "tag along" rights and the right to vote on certain non-ordinary course transactions (including, but not limited to, (i) - (vii) specified in the description of Class A Common Stock and Class B Common Stock provided above). |
| **Registration Rights Agreement:** | On the Effective Date, Reorganized Holdings and the Secured Lenders shall enter into a Registration Rights Agreement on terms and conditions reasonably acceptable to the Consenting Lenders and the Debtors, which, without limitation, shall provide for (i) "piggyback" registration rights for the New Common Stock (with customary exceptions, including Reorganized Holding's initial public offering); (ii) following the initial public offering of Reorganized Holdings, if any, for those holders of New Common Stock that cannot sell freely under Rule 144 of the Securities Act of 1933, as amended, S-3 or "short-form" demand registration rights for the New Common Stock (with customary limitations); (iii) |

7

| | |
|---|---|
| | information rights, including the right of prospective purchasers of the New Common Stock to obtain non-public information upon execution of a confidentiality agreement; and (iv) preemptive rights (with customary exceptions). |

## IV. OTHER TERMS

| | |
|---|---|
| **Releases and Exculpations:** | The Plan will include releases by the Debtors, mutual third-party releases and exculpation provisions. Such releases and exculpations shall be for the benefit of (as applicable) and binding upon (i) the Debtors, (ii) the current and former officers and directors of the Debtors, (iii) the Agent and (iv) the Secured Lenders, as well as, in the case of the persons and entities identified in the foregoing subsections (i) – (iv), any of their respective agents, members, employees, directors, officers, stockholders, representatives, advisors, attorneys, subsidiaries or affiliates (the "Released Parties"), to the fullest extent permitted by law including, without limitation, those related to the Prepetition Credit Facility. |
| **Exit Financing:** | The Reorganized Debtors shall obtain exit financing (the "Exit Financing") on terms and conditions satisfactory in all respects to the Debtors and the Consenting Lenders consisting of a revolving loan in an amount of at least $25 million (the "Revolving Credit Facility"). In the event such Exit Financing is provided by the Agent or any of the Secured Lenders (the "Exit Revolving Lenders"), then up to 20% of the New Common Stock shall be set aside as compensation for such Exit Revolving Lenders to the extent necessary to obtain such Exit Financing; provided that if any existing Consenting Lender offers to provide such Exit Financing to the Reorganized Debtors, all other Consenting Lenders shall have the opportunity to participate in such Exit Financing on a pro rata basis. |
| | Letters of credit under the Prepetition Credit Facility outstanding on the Effective Date of the Plan shall be rolled into, and become letters of credit under, the Revolving Credit Facility without any further action by any party. |
| | The obligations under the Revolving Credit Facility shall be secured by valid, binding, perfected first priority liens on inventory, accounts and other assets of the Reorganized Debtors, if necessary to obtain a commitment for such Revolving Credit Facility, with the consent of the Consenting Lenders (the "Revolving Facility Collateral"). |
| **Conditions Precedent To Confirmation:** | Usual and customary conditions precedent to the confirmation of the Plan, each of which may be waived in writing by the Consenting Lenders, shall include, but not be limited to, the following: |
| | (a)  the Company shall have obtained a commitment (for at least |

8

| | $25 million) for the Revolving Credit Facility, on terms and conditions that (i) are reasonably acceptable to the Consenting Lenders and the Debtors; and (ii) support the Debtors' demonstration that (x) the Plan is feasible; and (y) the Reorganized Company will have the ability to satisfy its obligations to pay current interest and principal under the Term Facilities; and<br><br>(b) the Disclosure Statement shall be consistent with the provisions of this Term Sheet and otherwise in form and substance reasonably satisfactory to the Consenting Lenders and the Debtors. |
|---|---|
| **Conditions Precedent To Effective Date:** | Conditions precedent to the consummation of the Plan, each of which may be waived in writing by the Consenting Lenders, shall include, but not be limited to, the following:<br><br>(a) a Confirmation Order in form and substance reasonably satisfactory to the Consenting Lenders and the Debtors shall have been entered by the Bankruptcy Court and shall have become a final order, not reversed, modified, vacated, subject to a stay or pending an appeal;<br><br>(b) the Debtors and other parties thereto shall have executed and delivered appropriate definitive documentation regarding the Restructuring, including, without limitation, (i) the Revolving Credit Facility and all documents ancillary thereto; (ii) each of the Term Facilities and all documents ancillary thereto; (iii) an intercreditor agreement; (iv) the New Stockholders' Agreement; (v) a warrant agreement stating the terms of the Warrants; (vi) the amended and restated certificate of incorporation and by-laws of the Reorganized Debtors (which documents shall contain provisions requiring no more than majority approval to amend such documents); and (vii) the Registration Rights Agreement, each in form and substance reasonably satisfactory to the Debtors and the Consenting Lenders;<br><br>(c) all material governmental, regulatory and third party approvals, waivers and/or consents in connection with the Restructuring (including any required approvals or waivers by the FCC), if any, shall have been obtained and shall remain in full force and effect, and there shall exist no third party claim, action, suit, investigation, litigation, request for reconsideration or proceeding pending in any court or before any arbitrator or governmental instrumentality, which would prohibit the transactions contemplated by the Restructuring;<br><br>(d) There shall not have been any material adverse change (as measured against the information provided to the Agent and/or its advisors prior to the Petition Date) in the status of any |

| | |
|---|---|
| | claims against the Debtors on account of (i) pension funding liability, (ii) tax liability and (iii) environmental liability; <u>provided</u> that, with respect to (i) and (ii), there shall not be a material adverse change if the Consenting Lenders and the Debtors are able to negotiate a mutually satisfactory response to such change, subject to any requirements of the Bankruptcy Code, within 15 business days of its discovery.<br><br>(e) the Debtors shall have cash on hand as of the Effective Date of at least $15 million;<br><br>(f) the Revolving Credit Facility (i) shall have closed on terms and conditions reasonably acceptable to the Consenting Lenders and the Debtors; (ii) shall be in full force and effect, and (iii) the extension of credit thereunder shall be available upon (and subject to) the Effective Date;<br><br>(g) all other conditions precedent relating to the Revolving Credit Facility and the Term Facilities, as set forth in Annex C hereto, shall have been satisfied or waived, as applicable;<br><br>(h) Other conditions to confirmation and effectiveness customary for transactions of this type. |
| **Cooperation:** | The Debtors and their respective directors and officers shall reasonably cooperate with the Agent and the Secured Lenders in obtaining any third party consents or approvals necessary or desirable for consummation of the Plan, including providing documents and information when reasonably requested by the Agent and taking any steps necessary to obtain the requisite approvals and waivers from the FCC. |
| **Expenses:** | The Company will reimburse all fees and expenses required to be paid under the Prepetition Credit Agreement in connection with the Restructuring, including, but not limited to, the fees and expenses of counsel (including but not limited to Cravath, Swaine & Moore LLP, Duane Morris LLP and WilmerHale) and financial advisors (including but not limited to Loughlin Meghji & Co.) |
| **First Day Pleadings:** | The Company shall use commercially reasonable efforts to deliver or cause to be delivered to the Agent's counsel all pleadings, motions and other documents to be filed on behalf of the Debtors with the bankruptcy court on the "first day" of the Debtors' chapter 11 cases (the "<u>First Day Pleadings</u>") no later than 5 business days before the anticipated Petition Date. Notwithstanding the foregoing, certain motions relating to cash collateral and preservation of net operating losses may be delivered to counsel for the Agent less than 5 business days before the anticipated Petition Date. The Agent shall not object to any First Day Pleadings approved by the Agent prior to the Petition Date, so long as the order entered by the bankruptcy court approving such First Day |

[[3163289]]

| | |
|---|---|
| | Pleadings is in form and substance reasonably satisfactory to the Agent. |
| **Use of Cash Collateral** | Within two business days after the commencement of the Debtors' chapter 11 cases, the bankruptcy court shall have entered an interim order (the "<u>Interim Order</u>") in form and substance satisfactory to the Consenting Lenders and the Debtors authorizing the use of cash collateral. The Interim Order shall provide, among other things: |
| | (i)    Stipulations and admissions by the Debtors as to the validity, priority, perfection and extent of the Agent's and the Secured Lenders' claims and liens, a release and waiver of any right to initiate or prosecute any claims, counterclaims, causes of action, defenses or setoff rights against the Agent, the Secured Lenders or any of their respective affiliates, members, subsidiaries, agents, officers, directors, employees and attorneys, subject to an investigation period and an amount to be set aside solely for such investigation but not for initiation or prosecution of a cause of action against the Agent, the Secured Lenders or any of their respective affiliates, members, subsidiaries, agents, officers, directors, employees and attorneys; |
| | (ii)   Delivery every four weeks by the Debtors of a 13-week budget for approval by the Consenting Lenders; |
| | (iii)  Adequate protection comprised of at least the following: |
| |     (a)  Payment of any accrued interest, fees and expenses, to the extent approved by the Bankruptcy Court; |
| |     (b)  Interest payments on the Prepetition Credit Facility during the chapter 11 cases at the rates in effect immediately prior to the Petition Date, to the extent approved by the Bankruptcy Court; |
| |     (c)  Payment of the Agent's fees and expenses and payment of up to $100,000 in aggregate fees and expenses of the Consenting Lenders, in each case as provided for in the Prepetition Credit Facility, to the extent approved by the Bankruptcy Court; |
| |     (d)  Payment to the Agent for the ratable benefit of the Secured Lenders of net cash proceeds from sale of collateral outside the ordinary course of business; |
| |     (e)  Replacement liens for the Agent and the Secured Lenders; |
| |     (f)  A superpriority claim pursuant to Section 507(b) of the Bankruptcy Code for the Agent and the Secured Lenders; |
| |     (g)  Financial reporting requirements; |
| |     (h)  Access to Debtors' records and premises to monitor |

11

| | |
|---|---|
| | collateral; |
| | (iv) Certain termination events to be agreed upon, including: |
| |     (a) Failure to comply with certain chapter 11 plan milestones; |
| |     (b) Failure to comply with the cash collateral order; |
| |     (c) Failure to operate within permitted variance of budget; and |
| |     (d) Failure to obtain entry of a final order in form and substance satisfactory to the Agent authorizing use of cash collateral within 30 days after the commencement of the chapter 11 cases |
| |     (e) Failure to comply with certain financial covenants to be agreed upon; and |
| | (v) Other customary and usual terms, including a carve-out for the Debtors' professionals and the Office of the US Trustee, including a waiver of claims under section 506(c) to the extent approved by the Bankruptcy Court. |

[[3163289]]

## <u>Material Terms of Term A Facility</u>

| | |
|---|---|
| **Principal Amount and Type:** | A term loan facility (the "<u>Term A Facility</u>") in an aggregate principal amount of $225 million representing a conversion of a portion of the Secured Lender Claims into the Term A Loans as of the Closing Date. |
| **Borrower:** | The Reorganized Company (the "<u>Borrower</u>") |
| **Guarantors:** | Reorganized Holdings and each of the Borrower's direct and indirect existing and future wholly-owned subsidiaries (collectively, the "<u>Guarantors</u>"; the Borrower and the Guarantors, collectively, the "<u>Loan Parties</u>"). |
| **Administrative Agent** | JPMorgan Chase Bank, N.A. (in such capacity, the "<u>Term A Administrative Agent</u>"). |
| **Collateral Agent:** | JPMorgan Chase Bank, N.A. |
| **Lenders:** | Holders of Secured Lender Claims as of the Closing Date (collectively, the "<u>Term A Lenders</u>"). |
| **Fees and Interest Rates** | As set forth on Annex A-1 below. |
| **Maturity:** | Four years after the Effective Date |
| **Optional Prepayments** | Term A Loans may be prepaid by the Borrower without premium or penalty (but subject to payment of break funding costs, if any, as described below) in minimum amounts to be agreed in the Term A Loan Documents (as defined below). |
| **Mandatory Prepayments** | The following amounts shall be applied to prepay the Term A Loans:<br><br>(a) 100% of the net proceeds of any sale or other disposition of assets (including as a result of casualty or condemnation) by Holdings, the Borrower or any of its subsidiaries (subject to certain customary exceptions (including reinvestment rights) and minimum thresholds to be agreed);<br><br>(b) 100% of the net proceeds of any debt incurrence by the Borrower or any of its subsidiaries after the Closing Date (subject to certain customary exceptions to be agreed);<br><br>(c) 50% of Free Cash Flow (to be defined in a manner to be agreed upon by the Debtors and the Consenting Lenders) for any fiscal year of the Borrower (commencing with the fiscal year ending on or nearest to December 31, 2010, and which will be defined to include tax refunds and other extraordinary receipts received during such fiscal year); and |

| | |
|---|---|
| | (d) other amounts subject to customary mandatory prepayment provisions, including, but not limited to, net proceeds of equity issuances, tax refunds and extraordinary receipts.<br><br>Each such mandatory prepayment of principal of the Term A Loans shall be applied to reduce scheduled payments of principal due after the date of such prepayment in the inverse order of maturity. Amounts prepaid in respect of Term A Loans may not be reborrowed. |
| **Collateral:** | The obligations of the Loan Parties in respect of the Term A Facility shall be secured by (i) a first priority, perfected security interest in all assets of the Loan Parties, whether consisting of real property, personal, tangible or intangible property, including all of the capital stock of the Borrower's subsidiaries (other than the Revolving Facility Collateral), except for those assets as to which the Term A Administrative Agent shall determine in its sole discretion that the costs of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby and other customary exclusions acceptable to the Term A Administrative Agent (the "Term A Collateral") and (ii) a second priority, perfected security interest in all of the Revolving Facility Collateral, if applicable.<br><br>The liens securing the Term A Loans will be subject to and governed by an intercreditor agreement between the Term A Lenders and the Term B Lenders (the "Intercreditor Agreement"), on terms acceptable to the Consenting Lenders.. |
| **Amortization:** | The Borrower shall make quarterly amortization payments of $3.75 million per quarter, paid in arrears, totaling $15 million annually beginning the first quarter following the first anniversary of the Effective Date and continuing quarterly therafter. |
| **Closing Date Conditions Precedent** | The Term Facilities shall become effective as of the date (the "Closing Date", which shall be the same date as the Effective Date) on which the conditions precedent described in Annex C hereto shall be satisfied or waived. |
| **Documentation** | The credit documentation for the Term A Facility (the "Term A Loan Documents") shall contain representations and warranties, covenants and events of default relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and other terms deemed appropriate by the Term A Lenders as set forth below. |
| **Representations** | The credit documentation for the Term A Facility (the "Term A Loan Documents") shall contain representations and warranties relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Consenting |

14

| | Lenders, including without limitation the following: financial statements; absence of undisclosed liabilities; no material adverse change; existence and standing, authorization and validity; compliance with law; corporate power and authority; enforceability of Term A Loan Documents; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; no burdensome restrictions; taxes; insurance; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; labor matters; accuracy of disclosure; perfection and priority of security interests under the Term A Loan Documents; and enforceability of guarantees by the Guarantors under the Term A Loan Documents. |
|---|---|
| **Affirmative Covenants** | The Term A Loan Documents shall contain affirmative covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Consenting Lenders, including without limitation the following: delivery of monthly, quarterly and annual financial statements (in each case, within a time period to be agreed); quarterly compliance certificates and annual projections; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws; maintenance of property and insurance; maintenance of books and records; right of the Term A Lenders and the Term A Administrative Agent to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; casualty and condemnation; use of proceeds; and further assurances (including with respect to security interests in after-acquired property). |
| **Financial Covenants** | The Term A Loan Documents shall contain financial covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Consenting Lenders, including without limitation the following: (i) Minimum EBITDA, (ii) maximum capital expenditures, (iii) a minimum fixed charge coverage ratio and (iv) a maximum leverage ratio. Covenant levels to be negotiated to provide flexibility reasonably acceptable to the Consenting Lenders and the Debtors for the first 18 months after the Effective Date. |
| **Negative Covenants** | The Term A Loan Documents shall contain negative covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Consenting Lenders, including without limitation the following: limitations on: indebtedness (including guarantee obligations and preferred stock of subsidiaries); liens; mergers, consolidations, liquidations and dissolutions; sales of assets; payment of restricted payments (including dividends and other payments in respect of capital stock); investments (including acquisitions), loans and advances; sale and leaseback transactions; swap agreements; optional payments and modifications of subordinated debt and certain other debt to be determined; transactions with affiliates; changes in fiscal |

15

| | |
|---|---|
| | year; negative pledge clauses and other restrictive agreements; and amendment of material documents. |
| **Events of Default** | The Term A Loan Documents shall contain events of default relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Consenting Lenders, including without limitation the following: nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of representations and warranties; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default to occurrence of a default (whether or not resulting in acceleration) under any other agreement governing indebtedness, in excess of an amount to be agreed upon, of the Borrower or any of its subsidiaries; bankruptcy events; certain ERISA events; material judgments; any of the Term A Loan Documents shall cease to be in full force and effect or any Loan Party shall so assert; any security interests created by the security documents shall cease to be enforceable and of the same priority purported to be created thereby; and a change of control (the definition of which is to be agreed). |
| **Voting** | Amendments, waivers and consents with respect to the Term A Loan Documents shall require the approval of Term A Lenders holding not less than a majority of the aggregate amount of the Term A Loans, except that the consent of each Term A Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of amortization or final maturity of any Term A Loan, (ii) reductions in the principal of any Term A Loan or the rate of interest or any fee or extensions of any due date thereof, (iii) modifications to any of the voting percentages, (iv) modifications to the pro rata sharing requirements of the Term A Loan Documents, (v) assignment by any Loan Party of its rights under the Term A Loan Documents and (vi) release of all or substantially all of the Guarantors, and release of all or substantially all of the Collateral, except as permitted in the Term A Loan Documents. |
| **Assignments and Participations** | The Term A Lenders shall be permitted to assign all or a portion of their Term A Loans with the consent, not to be unreasonably withheld, of the Term A Administrative Agent, unless the assignee is a Term A Lender, an affiliate of a Term A Lender or an approved fund. In the case of partial assignments (other than to another Term A Lender, an affiliate of a Term A Lender or an approved fund, the minimum assignment amount shall be $5 million, unless otherwise agreed by the Term A Administrative Agent. The Term A Lenders shall also be permitted to sell participations in their loans. Participants shall have the same benefits as the Term A Lenders with respect to yield protection and increased cost provisions. Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of the Term A Lender from |

16

| | |
|---|---|
| | which it purchased its participation would be required. Pledges of loans in accordance with applicable law shall be permitted without restriction. Each Term A Lender may disclose information to prospective participants and assignees. The Term A Administrative Agent will be entitled to a processing fee of $3,500 from the assignor or the assignee in connection with any assignment. |
| **Yield Protection** | The Term A Loan Documents shall contain customary provisions (a) protecting the Term A Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Term A Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a loan on a day other than the last day of an interest period with respect thereto. |
| **Expenses and Indemnification** | The Borrower shall pay (a) all reasonable out-of-pocket expenses of the Term A Administrative Agent associated with the preparation, execution, delivery and administration of the Term A Loan Documents and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel), (b) all out-of-pocket expenses of the Term A Administrative Agent and the Term A Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Term A Loan Documents and (c) fees and expenses associated with collateral monitoring, collateral reviews and appraisals (including field examination fees plus out-of-pocket expenses), environmental reviews and fees and expenses of other advisors and professionals engaged by the Term A Administrative Agent.

The Term A Administrative Agent and the Term A Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent found in a final judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the indemnified party). |
| **Governing Law and Forum** | State of New York. |
| **Counsel to Term A Adminstrative Agent** | Cravath, Swaine & Moore LLP. |

[[3163289]]

**INTEREST AND CERTAIN FEES**

| Interest Rate | The Borrower may elect that the Term A Loans bear interest at a rate per annum equal to: (i) the Alternate Base Rate plus the Applicable Margin; or (ii) the Adjusted LIBO Rate plus the Applicable Margin. |
|---|---|
| | As used herein: |
| | "***ABR Loans***" means Term A Loans bearing interest based upon the Alternate Base Rate. |
| | "***Adjusted LIBO Rate***" means, for any Eurodollar Loan for an interest period selected by the Borrower equal to one, two, three or six months, a rate per annum determined by the Term A Administrative Agent to be equal to the quotient of the LIBO Rate for such loan for such interest period divided by 1 minus the statutory reserve rate for such loan for such interest period; provided that, for purposes of the Term A Facility, the Adjusted LIBO Rate for any interest period shall in no event be less than 3.50% per annum. |
| | "***Alternate Base Rate***" means, with respect to any ABR Loan, for any day, the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month interest period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time on such day; and provided further that the Alternate Base Rate shall in no event at any time be less than 4.50% per annum. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively. |
| | "***Applicable Margin***" means (a) with respect to ABR Loans, 5.00% per annum and (b) with respect to Eurodollar Loans, 6.00% per annum. |
| | "***Eurodollar Loans***" means Term A Loans bearing interest based upon the LIBO Rate. |
| | "***Federal Funds Effective Rate***" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding business day by the Federal Reserve Bank of New York, or, if such rate is not so |

| | published for any day that is a business day, the average of the quotations for such day for such transactions received by the Term A Administrative Agent from three Federal funds brokers of recognized standing selected by it. |
|---|---|
| | "*LIBO Rate*" means, with respect to any Eurodollar Loan for any interest period therefor, the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time, two London business days prior to the commencement of such interest period, as the rate for dollar deposits with a maturity comparable to such interest period. |
| | "*Prime Rate*" means the rate of interest per annum publicly announced from time to time by the Term A Administrative Agent (or other designated bank) as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective. |
| **Interest Payment Dates** | On the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period. |
| **Default Rate** | At any time upon the occurrence and during the continuation of any event of default under the Term A Loan Facility, all outstanding Term A Loans shall bear interest at 2% above the Term A Interest Rate. Without limiting the foregoing, overdue interest, fees and other amounts under the Term A Loan shall bear interest at 2% above the Term A Interest Rate. |
| **Rate Basis** | All per annum rates shall be calculated on the basis of a year of 360 days, except that interest based on the Prime Rate shall be calculated on the basis of a year of 365/366 days, as applicable. |
| **Agency Fee** | An administrative agency fee payable to the Term A Administrative Agent in such amount and at such times as shall be agreed in writing between the Borrower and the Term A Administrative Agent. |

**Material Terms of Term B Facility**

| | |
|---|---|
| **Principal Amount and Type:** | A term loan facility (the "Term B Facility") in an aggregate principal amount of $100 million, representing a conversion of a portion of the Secured Lender Claims into the Term B Loans as of the Closing Date. |
| **Borrowers:** | The Borrower |
| **Guarantors:** | The Guarantors |
| **Administrative Agent** | An entity to be determined (in such capacity, the "Term B Administrative Agent"). |
| **Collateral Agent:** | [TBD] |
| **Lenders:** | Holders of Secured Lender Claims as of the Closing Date (collectively, the "Term B Lenders"). |
| **Fees and Interest Rates** | As set forth on Annex B-1 below. |
| **Maturity:** | Five years after the Effective Date |
| **Optional Prepayments** | Subject to the prior indefeasible payment in full of the Term A Loans, the Term B Loans may be prepaid by the Borrower without premium or penalty in minimum amounts to be agreed in the Term B Loan Documents. |
| **Mandatory Prepayments** | Subject to the prior indefeasible payment in full in cash of the Term A Loans, the following amounts shall be applied to prepay the Term B Loans: <br><br>(a) 100% of the net proceeds of any sale or other disposition of assets (including as a result of casualty or condemnation) by the Borrower or any of its subsidiaries (subject to certain customary exceptions (including reinvestment rights) and minimum thresholds to be agreed) or receipt of tax refunds or other extraordinary receipts; <br><br>(b) 100% of the net proceeds of any debt incurrence by the Borrower or any of its subsidiaries after the Closing Date (subject to certain customary exceptions to be agreed); <br><br>(c) 50% of Free Cash Flow (to be defined in a manner to be agreed upon by the Debtors and the Consenting Lenders) for any fiscal year of the Borrower (commencing with the fiscal year ending on or nearest to December 31, 2010); and <br><br>(d) other amounts subject to customary mandatory prepayment provisions, including, but not limited to, net proceeds of equity |

| | |
|---|---|
| | issuances, tax refunds and extraordinary receipts.<br><br>Each such mandatory prepayment shall be applied ratably to the Term B Loans. Amounts prepaid in respect of Term B Loans may not be reborrowed. |
| **Collateral:** | The obligations of the Loan Parties in respect of the Term B Facility shall be secured by (i) a second priority, perfected security interest in the Term A Collateral, and (ii) a third priority, perfected security interest in all of the Revolving Facility Collateral, if applicable.<br><br>The liens securing the Term B Loans will be subject to and governed by the Intercreditor Agreement. |
| **Amortization:** | N/A |
| **Closing Date Conditions Precedent** | Same as for the Term A Facility. |
| **Documentation** | The credit documentation for the Term B Facility (the "Term B Loan Documents") shall contain representations and warranties, covenants and events of default relating to the Borrower and its subsidiaries customary for financings of this type and other terms deemed appropriate by the Term B Lenders as set forth below. |
| **Representations** | Substantially the same as for the Term A Loan. |
| **Affirmative Covenants** | Substantially the same as for the Term A Loan. |
| **Financial Covenants** | The Term B Loan Documents shall contain financial covenants relating to Holdings, the Borrower and its subsidiaries customary for financings of this type and acceptable to the Consenting Lenders, including without limitation the following: (i) Minimum EBITDA, (ii) maximum capital expenditures, (iii) a minimum fixed charge coverage ratio and (iv) a maximum leverage ratio (each with greater headroom than the corresponding covenant levels contained in the Term A Facility. Covenant levels to be negotiated to provide flexibility reasonably acceptable to the Consenting Lenders and the Debtors for the first 18 months after the Effective Date. |
| **Negative Covenants** | To be based substantially upon the negative covenants in the Term A Facility (but with less restrictive baskets and thresholds to be agreed). |
| **Events of Default** | To be based substantially upon the events of default in the Term A Facility (but with less restrictive grace periods and thresholds to be agreed). |
| **Voting** | Substantially the same as for the Term A Facility. |

21

| | |
|---|---|
| **Assignments and Participations** | Substantially the same as for the Term A Facility. |
| **Yield Protection** | Substantially the same as for the Term A Facility. |
| **Expenses and Indemnification** | Substantially the same as for the Term A Facility. |
| **Governing Law and Forum** | State of New York. |

[[3163289]]

**INTEREST AND CERTAIN FEES**

| | |
|---|---|
| **Interest Rate** | The Term B Loan shall bear interest at a fixed rate of 14.00% per annum (the "<u>Term B Interest Rate</u>"). |
| **Interest Payment Dates** | Interest payments shall be made quarterly in arrears. Interest shall be paid in cash or, if cash on hand and availability under the Revolving Credit Facility, pro forma for a quarterly cash election interest payment under the Term B Loan, are less than $40 million in the aggregate (the "<u>Availability</u>"), the Borrower shall have the option to add such interest to the principal amount of the Term B Loan (a "<u>PIK Election</u>"), in each case, quarterly in arrears. Principal added pursuant to a PIK Election will bear interest at 14%.<br><br>For purposes of determining whether the Borrower can make a PIK Election in respect of the first quarterly interest payment in each fiscal year, the Availability shall be calculated as of the date of such first quarterly interest payment after giving effect to the amount of the mandatory prepayment to be made by the Borrower in respect of Free Cash Flow for the prior fiscal year if such payment has not been previously made. |
| **Default Rate** | At any time upon the occurrence and during the continuation of any event of default under the Term B Facility, all outstanding Term B Loans shall bear interest at 2% above the Term B Interest Rate. Without limiting the foregoing, overdue interest, fees and other amounts under the Term B Facility shall bear interest at 2% above the Term B Interest Rate. |
| **Rate Basis** | Interest payments will be calculated on the basis of a 360-day year of twelve 30-day months. |
| **Agency Fee** | An administrative agency fee payable to the Term B Administrative Agent in such amount and at such times as shall be agreed in writing between the Borrower and the Term B Administrative Agent. |

**CONDITIONS PRECEDENT**

| Conditions Precedent: | The occurrence of the Closing Date with respect to the Term Facilities and the Revolving Credit Facility (the "Facilities") is subject to the satisfaction or written waiver of conditions by the Consenting Lenders that are customary, necessary or appropriate for the loans of this type, including, without limitation, the following: |
|---|---|
| | (i) The Loan Parties shall have executed and delivered reasonably satisfactory definitive financing documentation with respect to the Facilities, including credit agreements, security documents, intercreditor agreements and other legal documentation mutually satisfactory to the Consenting Lenders, which shall reflect the terms and conditions set forth in Annex A and Annex B. |
| | (ii) All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Borrower and its subsidiaries (including shareholder approvals, if any) shall have been obtained and shall be in full force and effect. |
| | (iii) The respective New Agent under each Facility shall have received such closing documents thereunder as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, insurance certificates, loss payable and additional insured endorsements, opinions of counsel, organizational documents, title insurance policies, collateral releases (which releases may be effected by the Confirmation Order), consents, landlord/mortgagee/bailee waivers, financing statements and consignment or similar filings, all in form and substance reasonably acceptable to the Consenting Lenders. |
| | (iv) The Debtors shall have cash on hand of at least $15 million. |
| | (v) The corporate and capital structure (including the terms of debt other than the Facilities) of the Borrower and its subsidiaries shall be acceptable to the Consenting Lenders, which condition shall be deemed satisfied if the corporate and capital structure of the Borrower and its subsidiaries is consistent with the Term Sheet. |
| | (vi) There shall not have been any material adverse change (as measured against the information provided to the Agent and/or its advisors prior to the Petition Date) in the status of any claims against the Debtors on account of (i) pension funding liability, (ii) tax liability and (iii) environmental liability; provided that, with respect to (i) and (ii), there shall not be a material adverse change if the Consenting Lenders and the Debtors are able to negotiate a mutually satisfactory response to such change, subject to any requirements of the Bankruptcy Code, within 15 business days of |

| | its discovery. |
|---|---|
| | (vii) With respect to each Facility, the execution, delivery, and performance by the Borrower of such facility, the borrowing of the loans thereunder and the use of proceeds thereof shall be in compliance with applicable law, including but not limited to compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System. |
| | (viii) Liens creating security interests in the Collateral of the requisite priority shall have been perfected. |
| | (ix) All fees required to be paid, and all expenses for which invoices have been presented, shall have been paid on or before the Closing Date. |
| | (x) The Borrower shall have issued New Common Stock to the Secured Lenders as contemplated in the Term Sheet. |
| | (xi) Satisfaction of all conditions precedent to the Effective Date. |

[[3163289]]

**Material Terms of the Warrants**

| | |
|---|---|
| **Securities to be Issued:** | Reorganized Holdings will issue the Warrants which will entitle holders thereof to receive up to 10% of the outstanding fully diluted New Common Stock as of the Effective Date.[2] Each Old Equity holder will receive Warrants to purchase its pro rata share of such New Common Stock. Each Warrant will entitle its holder to purchase one share of New Common Stock at the Exercise Price (as defined below). |
| **Exercise:** | The Warrants shall be exercisable immediately after issuance and until the Expiration Date (as defined below); provided Warrants shall not be exercised without the consent of Reorganized Holdings, which consent shall not be withheld unless such exercise would cause Reorganized Holdings not to comply with the rules and regulations promulgated by the FCC. No Warrant shall be exercisable after the Expiration Date. |
| **Exercise Price:** | The exercise price (the "Exercise Price") shall be set at a price per share that would result in full recovery to the Secured Lenders on account of the portion of their Secured Claims converted to equity under the Plan (the "Full Recovery Price") plus an amount equal to the Full Recovery Price multiplied by 15%. |
| **Cashless Exercise:** | If the New Common Stock is listed on a national securities exchange (as such term is defined in the U.S. Securities and Exchange Act of 1934), in lieu of paying the Exercise Price, a holder of Warrants shall have the option (the "Cashless Exercise Option") to receive, upon exercise of the Warrants, shares of New Common Stock with a market value equal to the difference between (i) the market value of the shares of New Common Stock that would have been issuable upon exercise of the Warrants for cash and (ii) the aggregate Exercise Price. |
| **Term:** | The earlier of December 31, 2014 and the consummation of a Transaction (as defined below) (the "Expiration Date"). |
| **Effect of Triggering Events:** | In the event a binding agreement (the "Agreement") to implement a transaction (including, a merger, consolidation or sale of all or substantially all of Reorganized Holdings' assets) (a "Transaction") is agreed to and executed by the Debtors as of a date (the "Agreement Date") that is on or prior to the Expiration Date, on the date of the closing of the Transaction (the "Closing Date"), either: |

---

[2] The Warrants are subject to dilution by any equity awards under the New Management Incentive Plan, but not by any award of New Common Stock as compensation to the Exit Revolving Lenders.

(a) if the New Common Stock is exchanged for consideration consisting of cash or securities listed on a national securities exchange (as such term is defined in the U.S. Securities and Exchange Act of 1934) other than common stock, then the Warrants will be automatically cancelled and deemed surrendered in exchange for the greater of (i) an amount of cash equal to the value of the Warrants on the Closing Date, calculated using the Black-Scholes method for valuing options and the following assumptions: (a) volatility shall be fixed at 40%, (b) the risk free rate shall be the then current effective U.S. Federal government interest rate for a bond or note with a remaining time to maturity equal to the remaining term of the Warrant, (c) the exercise price shall be the Exercise Price in effect on the Closing Date, (d) the term of the Warrant shall be the remaining term of the Warrant, measured from the Agreement Date and (e) the underlying security price for purposes of the Black-Scholes calculation shall be the value of the consideration received in respect of each outstanding share of New Common Stock pursuant to the Transaction and (ii) an amount of cash equal to the difference between (x) the value of the consideration that such holder would have received in the Transaction if such holder had exercised its Warrants for shares of New Common Stock immediately prior to the Transaction; provided that if any portion of the Transaction consideration consists of securities, the "value" of such securities shall be the weighted average price during the 10 trading days immediately preceding closing of the Transaction and (y) the aggregate Exercise Price of such holder's Warrants; or

(b) if the New Common Stock is exchanged for any other form of consideration (including, but not limited to, the common stock of another entity) (the "Transaction Consideration"), then the Warrants will be automatically cancelled and deemed surrendered in exchange for an amount of consideration, which shall be of the same form and allocation as that which comprises the Transaction Consideration, equal to the value of the Warrants on the Closing Date, calculated using the Black-Scholes method for valuing options and the following assumptions: (a) volatility shall be fixed at 40%, (b) the risk free rate shall be the then current effective U.S. Federal government interest rate for a bond or note with a remaining time to maturity equal to the remaining term of the Warrant, (c) the exercise price shall be the Exercise Price in effect on the Closing Date, (d) the term of the Warrant shall be the remaining term of the Warrant, measured from the Agreement Date and (e) the underlying security price for purposes of the Black-Scholes calculation shall be the value of the Transaction Consideration received in respect of each outstanding share of New Common Stock pursuant to the Transaction. The value of the Transaction Consideration shall be determined by (i) a nationally-recognized investment bank selected by the board of

[[3163289]]

| | |
|---|---|
| | directors (a "<u>Valuation Banker</u>") (for the avoidance of doubt, such Valuation Banker may also advise the board with respect to other aspects of the Transaction) or (ii) the board of directors of Reorganized Holdings, <u>provided</u> that, if the value of the Transaction Consideration is determined by (x) the board of directors of Reorganized Holdings or (y) a Valuation Banker that is affiliated with any shareholder of Reorganized Holdings, such valuation must be accompanied by receipt of a fairness opinion, solely with respect to the value of the non-cash consideration, from a nationally-recognized investment bank that is not affiliated with any shareholder of Reorganized Holdings.  A determination of a Valuation Banker or the board of directors of Reorganized Holdings that complies with the foregoing provisions shall be binding on Reorganized Holdings and the Warrant holders; |
| | <u>provided</u> that, with respect to both (a) and (b) above, if (i) the Agreement Date is on or prior to the Expiration Date and (ii) the Transaction fails to close by the Expiration Date due to delays caused by the process of obtaining the requisite approvals and waivers from the FCC (and for no other cause), then the Expiration Date shall be extended and become the earliest of (i) the Closing Date, (ii) the date the Agreement is terminated or (iii) the date that is 10 business days after the requisite approvals and waivers are obtained from the FCC. |
| **Anti-Dilution:** | Weighted average proportional anti-dilution adjustments in the event of below market stock issuances, distributions, subdivisions, splits, combinations and reverse splits. |
| **Registration Rights:** | None |
| **Transferability:** | The Warrants shall not be transferable, except to:<br><br>(a)  trusts, estates, partnerships and other entities whose primary owners and/or primary beneficiaries are holders of any Warrants;<br><br>(b)  members of the family of any holder of any Warrants;<br><br>(c)  affiliates and subsidiaries of any holder of any Warrant; and<br><br>(d)  other holders of any Warrants. |
| **Voting Rights:** | None |

[[3163289]]

**<u>List of Filing Entities</u>**

1.  Freedom Communications Holdings, Inc.
2.  Freedom Communications, Inc.
3.  Freedom Broadcasting, Inc.
4.  Freedom Broadcasting of Florida, Inc.
5.  Freedom Broadcasting of Florida Licensee, L.L.C.
6.  Freedom Broadcasting of Michigan, Inc.
7.  Freedom Broadcasting of Michigan Licensee, L.L.C.
8.  Freedom Broadcasting of New York, Inc.
9.  Freedom Broadcasting of New York Licensee, L.L.C.
10. Freedom Broadcasting of Oregon, Inc.
11. Freedom Broadcasting of Oregon Licensee, L.L.C.
12. Freedom Broadcasting of Southern New England, Inc.
13. Freedom Broadcasting of Southern New England Licensee, L.L.C.
14. Freedom Broadcasting of Texas, Inc.
15. Freedom Broadcasting of Texas, Licensee, L.L.C.
16. Freedom Broadcasting of Tennessee, Inc.
17. Freedom Broadcasting of Tennessee Licensee, L.L.C.
18. Freedom Magazines, Inc.
19. Freedom Metro Information, Inc.
20. Freedom Newspapers, Inc.
21. Orange Country Register Communications, Inc.
22. OCR Community Publications, Inc.
23. OCR Information Marketing, Inc.
24. Appeal-Democrat, Inc.
25. Florida Freedom Newspapers, Inc.
26. Freedom Arizona Information, Inc.
27. Freedom Colorado Information, Inc.
28. Freedom Eastern North Carolina Communications, Inc.
29. Freedom Newspapers of Illinois, Inc.
30. Freedom Newspapers of Southwestern Arizona, Inc.
31. Freedom Shelby Star, Inc.
32. Illinois Freedom Newspapers, Inc.
33. Missouri Freedom Newspapers, Inc.
34. Odessa American
35. The Times-News Publishing Company
36. Victor Valley Publishing Company
37. Daily Press
38. Freedom Newspaper Acquisitions, Inc.
39. The Clovis News-Journal
40. Freedom Newspapers of New Mexico L.L.C.
41. Gaston Gazette LLP
42. Lima News
43. Porterville Recorder Company
44. Seymour Tribune Company
45. Victorville Publishing Company

46.   Freedom Newspapers
47.   The Creative Spot, L.L.C.
48.   Freedom Interactive Newspapers, Inc.
49.   Freedom Interactive Newspapers of Texas, Inc.
50.   Freedom Services, Inc.

[[3163289]]

# **EXHIBIT B**

Form of Transfer Agreement

# EXHIBIT B

## LENDER JOINDER

This Lender Joinder to the Plan Support Agreement, dated as of September 1, 2009, by and among Freedom Communications Holdings, Inc., Freedom Communications, Inc. (the "Company"), and certain of the Company's subsidiaries and affiliates set forth on Schedule ___ of the Agreement (as annexed hereto on Annex I) and the Consenting Lenders signatory thereto (the "Agreement"), is executed and delivered by [_____] (the "Joining Lender Party") as of [_____], 20[__]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.    Agreement to be Bound.  The Joining Lender Party hereby agrees to be bound by all of the terms of the Agreement, attached to this Lender Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Consenting Lender" and a party for all purposes under the Agreement.

2.    Representations and Warranties.  With respect to the aggregate principal amount of Secured Lender Claims held by the Joining Lender Party upon consummation of the Transfer of such Secured Lender Claims, the Joining Lender Party hereby makes the representations and warranties of a Consenting Lender set forth in Section 7 of the Agreement to each of the other Parties in the Agreement.

3.    Governing Law.  This Lender Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS
INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Lender Party has caused this Lender Joinder to be executed as of the date first written above.

_____

Entity Name of Joining Lender Party

Authorized Signatory:

By: _____

    Name:

    Title:

    Principal Amount of
    Secured Lender Claims $_____

    Address: _____

AMENDMENT NO. 1 AND AGREEMENT (this "<u>Amendment</u>") is dated as of September 10, 2009, to the Plan Support Agreement dated as of September 1, 2009 (as amended or modified from time to time, the "<u>Plan Support Agreement</u>") by and among FREEDOM COMMUNICATIONS HOLDINGS, INC., a Delaware corporation ("<u>Holdings</u>"), FREEDOM COMMUNICATIONS, INC., a Delaware corporation (the "<u>Company</u>"), each of the undersigned direct and indirect subsidiaries of the Company (collectively, with Holdings and the Company, the "<u>Debtors</u>") and the Consenting Lenders party thereto.

WHEREAS the Debtors and the Consenting Lenders have agreed to support the Restructuring on the terms and subject to the conditions set forth in the Plan Support Agreement.

WHEREAS the Debtors have requested, and the Consenting Lenders have agreed, to amend the Plan Support Agreement upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.  <u>Defined Terms.</u>  Capitalized terms used but not defined herein have the meanings assigned to them in the Plan Support Agreement.

SECTION 2.  <u>Amendment to Exhibit A to the Plan Support Agreement.</u> Exhibit A, Section "Use of Cash Collateral", subclause (iv)(d) is hereby amended by replacing the phrase "within 30 days after the commencement of the chapter 11 cases" with "no later than October 5, 2009, which may be extended to October 6, 2009 with the consent of the Agent".

SECTION 3.  <u>Agreement.</u>  The Consenting Lenders hereby agree that, if the Debtors shall have delivered the Case Budget to the Consenting Lenders no later than September 22, 2009, then the Termination Date shall be the earlier of (a) 11:59 P.M. (New York City time) on October 5, 2009, which may be extended to October 6, 2009 with the consent of the Agent, unless the Final Order shall have been entered on or prior to such date, and  (b) the date upon which an Event of Default shall have occurred and is continuing beyond any applicable grace period.  For purposes hereof, "Case Budget", "Termination Date" and "Event of Default" are used as such terms are defined in paragraph 15 of the interim cash collateral order entered by the Bankruptcy Court on September 2, 2009.

SECTION 4.  <u>Representations and Warranties.</u>  To induce the other parties hereto to enter into this Amendment, the Debtors represent and warrant to each of the Consenting Lenders that, after giving effect to this Amendment, (a) the representations

and warranties set forth in Section 6 of the Plan Support Agreement are true and correct in all material respects on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case they are true and correct in all material respects as of such earlier date, and (b) no Lender Termination Event has occurred or is continuing.

SECTION 5.  Full Force and Effect; Limited Amendment.  Except as expressly set forth herein, this Amendment (a) shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Consenting Lenders, the Agent or the Debtors under the Plan Support Agreement or any of the Definitive Documents and (b) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Plan Support Agreement or any other Definitive Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect.  Nothing herein shall be deemed to entitle the Debtors to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Plan Support Agreement or any other Definitive Document in similar or different circumstances.  On and after the date hereof, any reference to the Plan Support Agreement contained in the Definitive Documents shall mean the Plan Support Agreement as modified hereby.

SECTION 6.  **Applicable Law.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.**

SECTION 7.  Counterparts.  This Amendment may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one agreement.  Delivery of an executed signature page to this Amendment by facsimile transmission shall be effective as delivery of a manually signed counterpart of this Amendment.

SECTION 8.  Headings.  The Section headings used herein are for convenience of reference only, are not part of this Amendment and are not to affect the construction of, or to be taken into consideration in interpreting, this Amendment.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

FREEDOM COMMUNICATIONS HOLDINGS, INC. on its own behalf and on behalf of each of the entities listed on Schedule 1 to the Term Sheet

By: _Mark A. M. Eachen._
Name:
Title:

[Consenting Lenders' signature pages on following pages]

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

JPMorgan Chase Bank, N.A.

By: _____
     Name:  Charles O. Freedgood
     Title:  Managing Director

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

SUNTRUST BANK

By: _____

    Name:

    Title:    **Kris Anderson, SVP**

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

Royal Bank of Scotland

[NAME OF LENDER]

By: _____

    Name:

    Title:

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

General Electric Capital Corporation

By: _____
    Name:  Thomas Costello
    Title:  Duly Authorized Signatory

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

Wachovia Bank, National Association

By: _Ronald F Bentien_

    Name:  Ronald F. Bentien Jr.
    Title:    Director

AMENDMENT NO. 2 AND AGREEMENT (this "Amendment") is dated as of October 5, 2009, to the Plan Support Agreement dated as of September 1, 2009 (as amended or modified from time to time, the "Plan Support Agreement") by and among FREEDOM COMMUNICATIONS HOLDINGS, INC., a Delaware corporation ("Holdings"), FREEDOM COMMUNICATIONS, INC., a Delaware corporation (the "Company"), each of the undersigned direct and indirect subsidiaries of the Company (collectively, with Holdings and the Company, the "Debtors") and the Consenting Lenders party thereto.

WHEREAS the Debtors and the Consenting Lenders have agreed to support the Restructuring on the terms and subject to the conditions set forth in the Plan Support Agreement.

WHEREAS the Debtors have requested, and the Consenting Lenders have agreed, to amend the Plan Support Agreement upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.  Defined Terms.  Capitalized terms used but not defined herein have the meanings assigned to them in the Plan Support Agreement.

SECTION 2.  Amendment to Exhibit A to the Plan Support Agreement. Exhibit A, Section "Use of Cash Collateral", subclause (iv)(d) is hereby amended by replacing the phrase "within 30 days after the commencement of the chapter 11 cases" with "no later than October 14, 2009, which may be extended to October 15, 2009 with the consent of the Agent".

SECTION 3.  Agreement.  The Consenting Lenders hereby agree that the Termination Date shall be the earlier of (a) 11:59 P.M. (New York City time) on October 14, 2009, which may be extended to October 15, 2009 with the consent of the Agent, unless the Final Order shall have been entered on or prior to such date, and  (b) the date upon which an Event of Default shall have occurred and be continuing beyond any applicable grace period.  For purposes hereof, "Termination Date" and "Event of Default" are used as such terms are defined in paragraph 15 of the interim cash collateral order entered by the Bankruptcy Court on September 2, 2009.

SECTION 4.  Representations and Warranties.  To induce the other parties hereto to enter into this Amendment, the Debtors represent and warrant to each of the Consenting Lenders that, after giving effect to this Amendment, (a) the representations and warranties set forth in Section 6 of the Plan Support Agreement are true and correct

in all material respects on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case they are true and correct in all material respects as of such earlier date, and (b) no Lender Termination Event has occurred or is continuing.

SECTION 5. <u>Full Force and Effect; Limited Amendment</u>. Except as expressly set forth herein, this Amendment (a) shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Consenting Lenders, the Agent or the Debtors under the Plan Support Agreement or any of the Definitive Documents and (b) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Plan Support Agreement or any other Definitive Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle the Debtors to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Plan Support Agreement or any other Definitive Document in similar or different circumstances. On and after the date hereof, any reference to the Plan Support Agreement contained in the Definitive Documents shall mean the Plan Support Agreement as modified hereby.

SECTION 6. **<u>Applicable Law.</u> THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.**

SECTION 7. <u>Counterparts.</u> This Amendment may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one agreement. Delivery of an executed signature page to this Amendment by facsimile transmission shall be effective as delivery of a manually signed counterpart of this Amendment.

SECTION 8. <u>Headings.</u> The Section headings used herein are for convenience of reference only, are not part of this Amendment and are not to affect the construction of, or to be taken into consideration in interpreting, this Amendment.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

FREEDOM COMMUNICATIONS HOLDINGS, INC. on its own behalf and on behalf of each of the entities listed on Schedule 1 to the Term Sheet

By: _____

Name:

Title:

[Consenting Lenders' signature pages on following pages]

4

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

SunTrust Bank

Consenting Lender Name

By:

Name:
Title:    **SunTrust Bank**
          **JANET R. NAIFEH**
          Senior Vice President

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

*The Royal Bank of Scotland plc*

Consenting Lender Name

By: *Paul J Horton*

Name: *Paul J. Horton*

Title: *Managing Director*

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

_JPMorgan Chase Bank, N.A._
Consenting Lender Name

By: _____

  Name: Charles O. Freedman

  Title: Managing Director

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

_General Electric Capital Corporation_
Consenting Lender Name

By: _____

    Name: Thomas Costello
    Title: Duly Authorized Signatory

Accepted and agreed to by the
Consenting Lender named below:

**CONSENTING LENDER:**

WACHOVIA BANK, NATIONAL ASSOCIATION
Consenting Lender Name

By: _Ronald F Bentien Jr_
  Name:
  Title:        **Ronald F. Bentien, Jr**
                   **Director**

# ACTION BY WRITTEN CONSENT
## OF THE SERIES A COMMON STOCKHOLDER COMMITTEE
## OF
## FREEDOM COMMUNICATIONS HOLDINGS, INC.

The undersigned, constituting all of the members of the Series A Common Stockholder Committee (the "Committee") of Freedom Communications Holdings, Inc., a Delaware corporation (the "Company"), pursuant to Section 228 of the General Corporation Law of the State of Delaware, and the certificate of incorporation or other equivalent constituent document of each subsidiary of the Company, as applicable, respectively, hereby consent to the approval and adoption of the following resolutions with the same force and effect as if they had been unanimously approved and adopted at a duly convened meeting of the Committee and direct that this Action by Unanimous Written Consent be filed with the minutes of the proceedings of the Committee.

WHEREAS, the holders (each a "Stockholder" and collectively, the "Stockholders") of a majority of the outstanding shares of Series A Common Stock of the Company party (the "Series A Common Stock") are party to the Committee Formation and Voting Agreement, dated as of November 25, 2008, with the Company (the "Voting Agreement");

WHEREAS, pursuant to the Voting Agreement, a majority of the Stockholders agreed to the formation of the Committee;

WHEREAS, pursuant to the Voting Agreement, the Committee is authorized and directed, in its sole and absolute discretion, to vote or execute a written consent on behalf of the Stockholders with respect to, among other matters, a voluntary bankruptcy filing by the Company and/or Freedom Communications, Inc., a Delaware corporation ("FCI");

WHEREAS, pursuant to the Voting Agreement, each Stockholder irrevocably appointed Thomas Bassett, Raymond Bryan, Robin Hardie, Gregory Wallace and R. David Threshie, acting separately and without the others, the attorney and proxy (the "Proxyholders") of such Stockholder with respect to the shares of Series A Common Stock owned beneficially or of record by such Stockholder (the "Shares");

WHEREAS, pursuant to the Voting Agreement, each of the Proxyholders is empowered to exercise all voting and other rights, including without limitation, the power to vote, and execute and deliver written consents with respect to, the Shares with respect to, among other matters, a voluntary bankruptcy filing by the Company and FCI;

WHEREAS, Article Fifth, Part II, Common Stock, Section 4(e) of the Company's Amended and Restated Certificate of Incorporation requires the affirmative vote or written consent of holders of a majority of the outstanding shares of Series A Common Stock, voting or consenting as a separate class ("Series A Approval"), in order for the Company to take certain actions, including without limitation a voluntary bankruptcy filing;

WHEREAS, Article Sixth, Section (c), of the Amended and Restated Certificate of Incorporation of FCI requires Series A Approval for FCI to take certain actions, including without limitation a voluntary bankruptcy filing.

NOW, THEREFORE, BE IT RESOLVED, that the Committee consents to and approves a voluntary filing by each of the entities listed on Exhibit A attached hereto (the "Filing Entities"), requesting relief under the provisions of chapter 11 of title 11 of the United States Code.

BE IT FURTHER RESOLVED, that the Committee hereby consents to, approves and ratifies any and all actions that may be taken in connection with the Filing Entities' bankruptcy cases that may require the Committee's or the Stockholders' consent.

BE IT FURTHER RESOLVED, that the Committee further agrees to (i) support a plan of reorganization proposed by the Company so long as it contains the terms set forth on Exhibit B hereto (the "Plan"), (ii) not take any action or inaction that would unreasonably delay consummation of the Plan and (iii) upon receipt of a disclosure statement that is approved by the United States Bankruptcy Court having jurisdiction over the bankruptcy case (the "Bankruptcy Court") and related solicitation materials, vote to accept the Plan so long as:

1.    The Company commences its bankruptcy case on or before September 3, 2009 (the "Petition Date");

2.    The Company files the Plan and a related disclosure statement (the "Disclosure Statement"), and such documents contain the terms set forth on Exhibit B hereto;

3.    The Bankruptcy Court enters an order approving the Disclosure Statement on or before the date that is 90 days following the Petition Date; and

4.    The Bankruptcy Court enters an order confirming the Plan on or before a date that is 150 days following the Petition Date, and such Plan contains the terms set forth on Exhibit B hereto.

The Agreement in the preceding resolution shall be referred to as the "Support Agreement."

BE IT FURTHER RESOLVED, that each member of the Committee and each Stockholder that may be bound hereby agrees (severally and not jointly) that if such member or Stockholder sells or transfers any Shares, a precondition to the valid sale or transfer of such Shares shall be that the purchaser or transferee, as applicable, must agree in writing to be bound by the terms of this Written Consent including, without limitation, the Support Agreement.

IN WITNESS WHEREOF, the undersigned have duly executed this Written Consent.


THOMAS W. BASSETT
Date: _____, 2009


RAYMOND C.H. BRYAN
Date: _____, 2009


ROBIN J. HARDIE
Date: _____, 2009


GREGORY J. WALLACE
Date: _____, 2009


R. DAVID THRESHIE
Date: _____, 2009


3

IN WITNESS WHEREOF, the undersigned have duly executed this Written Consent.

THOMAS W. BASSETT
Date: _____, 2009

RAYMOND C.H. BRYAN
Date: _____, 2009

ROBIN J. HARDIE
Date: _____, 2009

GREGORY J. WALLACE
Date: _____, 2009

R. DAVID THRESHIE
Date: _____, 2009

3

2009-08-31 17:51          >> Latham&WatersWest

IN WITNESS WHEREOF, the undersigned have duly executed this Written Consent.

THOMAS W. BASSETT
Date: _____, 2009

RAYMOND C.H. BRYAN
Date: _____, 2009



ROBIN J. HARDIE
Date: 29 Aug , 2009

GREGORY J. WALLACE
Date: _____, 2009

R. DAVID THRESHIE
Date: _____, 2009

IN WITNESS WHEREOF, the undersigned have duly executed this Written Consent.


_____
THOMAS W. BASSETT
Date: _____, 2009


_____
RAYMOND C.H. BRYAN
Date: _____, 2009


_____
ROBIN J. HARDIE
Date: _____, 2009


_____
GREGORY J. WALLACE
Date: ___8/31_____, 2009


_____
R. DAVID THRESHIE
Date: _____, 2009


3

IN WITNESS WHEREOF, the undersigned have duly executed this Written Consent.


_____
THOMAS W. BASSETT
Date: _____, 2009


_____
RAYMOND C.H. BRYAN
Date: _____, 2009


_____
ROBIN J. HARDIE
Date: _____, 2009


_____
GREGORY J. WALLACE
Date: _____, 2009


_____
R. DAVID THRESHIE
Date: 8 - 31 _____, 2009

1.   Freedom Communications Holdings, Inc.
2.   Freedom Communications, Inc.
3.   Freedom Broadcasting, Inc.
4.   Freedom Broadcasting of Florida, Inc.
5.   Freedom Broadcasting of Florida Licensee, L.L.C.
6.   Freedom Broadcasting of Michigan, Inc.
7.   Freedom Broadcasting of Michigan Licensee, L.L.C.
8.   Freedom Broadcasting of New York, Inc.
9.   Freedom Broadcasting of New York Licensee, L.L.C.
10.  Freedom Broadcasting of Oregon, Inc.
11.  Freedom Broadcasting of Oregon Licensee, L.L.C.
12.  Freedom Broadcasting of Southern New England, Inc.
13.  Freedom Broadcasting of Southern New England Licensee, L.L.C.
14.  Freedom Broadcasting of Texas, Inc.
15.  Freedom Broadcasting of Texas, Licensee, L.L.C.
16.  Freedom Broadcasting of Tennessee, Inc.
17.  Freedom Broadcasting of Tennessee Licensee, L.L.C.
18.  Freedom Magazines, Inc.
19.  Freedom Metro Information, Inc.
20.  Freedom Newspapers, Inc.
21.  Orange County Register Communications, Inc.
22.  OCR Community Publications, Inc.
23.  OCR Information Marketing, Inc.
24.  Appeal-Democrat, Inc.
25.  Florida Freedom Newspapers, Inc.
26.  Freedom Arizona Information, Inc.
27.  Freedom Colorado Information, Inc.
28.  Freedom Eastern North Carolina Communications, Inc.
29.  Freedom Newspapers of Illinois, Inc.
30.  Freedom Newspapers of Southwestern Arizona, Inc.
31.  Freedom Shelby Star, Inc.
32.  Illinois Freedom Newspapers, Inc.
33.  Missouri Freedom Newspapers, Inc.
34.  Odessa American
35.  The Times-News Publishing Company
36.  Victor Valley Publishing Company
37.  Daily Press
38.  Freedom Newspaper Acquisitions, Inc.
39.  The Clovis News-Journal
40.  Freedom Newspapers of New Mexico L.L.C.
41.  Gaston Gazette LLP
42.  Lima News
43.  Porterville Recorder Company
44.  Seymour Tribune Company

45. Victorville Publishing Company
46. Freedom Newspapers
47. The Creative Spot, L.L.C.
48. Freedom Interactive Newspapers, Inc.
49. Freedom Interactive Newspapers of Texas, Inc.
50. Freedom Services, Inc.

# FREEDOM COMMUNICATIONS HOLDINGS, INC.

## EXHIBIT B

| I. PLAN DISTRIBUTIONS AND TREATMENT OF CLAIMS: | |
| --- | --- |
| **Prepetition Credit Facility Claims:** | On the Effective Date, the holders of allowed Secured Lender Claims shall receive, in full satisfaction of such claims, their pro rata share of: (i) $225 million in Term Loan A obligations owed by the Reorganized Company (the "Term A Loans") secured by a first priority lien on the assets of the Reorganized Company, (ii) $100 million in Term Loan B obligations owed by the Reorganized Company secured by a second priority lien on the assets of the Reorganized Company (the "Term B Loans" and, together with the Term A Loans, the "Term Facilities"), (iii) any cash held by the Debtors or the Reorganized Debtors as of the Effective Date in excess of $15 million and (iv) 98% of the primary equity interests (the "New Common Stock") in Reorganized Holdings (subject to dilution from post-reorganization issuances, including the distribution of any equity awards under the New Management Incentive Plan, the exercise of the Warrants and an award, if any, of New Common Stock as compensation to the Exit Revolving Lenders (all as defined or described below)). <br><br> The Term Facilities will have flexible financial covenants for the first 18 months following the Effective Date, all on terms reasonably acceptable to the Lenders and the Company. <br><br> Term A Loans will mature in 4 years and Term B Loans will mature in 5 years. <br><br> Interest Rate/Amortization of Term Facilities: <br><br> •Term A Loans: LIBOR+600 bps Cash (3.50% LIBOR floor); $15 million annual amortization beginning in 2011 <br><br> •Term B Loans: 14% Cash/PIK; If cash on hand and revolver availability exceeds $40 million, the Company must pay cash interest; otherwise the Company may elect PIK (the liquidity test shall include a mechanism to adjust for any projected liquidity |

| | |
|---|---|
| | fluctuations in Q1 of each year); No scheduled amortization |
| **Trade Unsecured Claims:** | Except to the extent that a holder of an allowed Trade Unsecured Claim and the Debtors or the Reorganized Debtors, as the case may be, agree to different treatment, each allowed Trade Unsecured Claim shall be paid in full in cash for such claim on the later of the Effective Date and the date on which payment on account of such claim is due in the ordinary course of business. |
| **General Unsecured Claims:** | On the Effective Date, holders of allowed General Unsecured Claims shall receive their pro rata share of $5 million (the "Unsecured Compensation"); provided that, if the class of General Unsecured Claims does not vote to accept the Plan, all holders of General Unsecured Claims shall permanently forfeit their pro rata share of the Unsecured Compensation.<br><br>Allowed General Unsecured Claims eligible for payment shall be paid from the distribution otherwise payable under the Plan to the Secured Lenders on account of the secured portion of the Secured Lender Claims. |
| **Equity Interests:** | On the Effective Date, Old Equity shall be cancelled, and each holder of Old Equity shall receive (i) its pro rata share of 2% of the New Common Stock in Reorganized Holdings, subject to dilution as a result of any post-reorganization issuances, including equity awards under the New Management Incentive Plan and an award, if any, of New Common Stock as compensation to the Exit Revolving Lenders and (ii) its pro rata share of warrants to purchase up to 10% of the New Common Stock on the terms described in Annex D (the "Warrants"), subject to dilution as a result of any equity awards under the New Management Incentive Plan; provided that, if the class of Old Equity holders does not vote to accept the Plan, all holders of Old Equity shall permanently forfeit their pro rata share of the New Common Stock and the Warrants.<br><br>Warrants to expire on 12/31/2014 with an exercise price that would result in full recovery to the lenders plus an additional 15% premium based on equity portion of recovery<br><br>The Warrants shall not be transferable, except to:<br><br>• trusts, estates, partnerships and other entities whose primary owners and/or primary beneficiaries are holders of any Warrants;<br><br>• members of the family of any holder of any Warrants; |

NY\1565031.1

|  | - affiliates and subsidiaries of any holder of any Warrant; and<br>- other holders of any Warrants.<br><br>In the event of a change of control, the Warrants shall be automatically cancelled and deemed surrendered in exchange for consideration in whatever form provided under the transaction in an amount equal to the Fair Market Value of the Warrants. The Fair Market Value shall equal the Black-Scholes valuation, using the following variables: (i) the applicable risk free rate at the time of valuation, (ii) the applicable exercise price for the period during which the transaction is consummated, (iii) the amount of time remaining in the exercise period at the time of a signed agreement that ultimately closes, (iv) the transaction price, (v) 40% volatility.<br><br>Value of transaction/consideration (if not cash or publicly traded securities) shall be determined by the Board based on advice from an independent, nationally-recognized advisor/appraiser.<br><br>No voting rights for holders of Warrants. |
|---|---|

## II. CORPORATE GOVERNANCE AND MANAGEMENT

| | |
|---|---|
| **Board of Directors of Reorganized Holdings:** | The initial board of directors of Reorganized Holdings shall consist of the Chief Executive Officer and four individuals identified and agreed to by the lenders who execute the Plan Support Agreement ("Consenting Lenders"). Successor directors will be appointed and/or elected in accordance with Reorganized Holdings' charter and by-laws.<br><br>Each Consenting Lender shall have the right to appoint one representative to attend and observe all board meetings of Reorganized Holdings. |
| **Holdings' Status:** | Reorganized Holdings shall be a private (non-reporting) company. The New Common Stock will: (i) not be registered; (ii) not be listed on any national exchange; and (iii) be transferable by the recipients thereof under the Plan pursuant to the exemption from registration granted by section 1145(c) of the Bankruptcy Code (except with respect to any such recipient deemed to be an "underwriter"). |
| **Chief Executive Officer:** | The Chief Executive Officer of Reorganized Holdings shall be selected by the Board of Directors of Reorganized Holdings. |
| **New Management Incentive Plan:** | There shall be a management incentive plan (the "New Management Incentive Plan"), pursuant to which up to [TBD]% of the equity of Reorganized Holdings shall be reserved for the Board of Directors of Reorganized Holdings to grant options to purchase New Common Stock to the members of such Board and the |

3

| | |
|---|---|
| | members of the management of the Reorganized Company. The New Management Incentive Plan will contain terms and conditions (including the form of equity grant) reasonably acceptable to the Agent and the Company. |

## III. OTHER TERMS

| | |
|---|---|
| **Exit Financing:** | The Reorganized Debtors shall obtain exit financing (the "<u>Exit Financing</u>") on terms and conditions satisfactory in all respects to the Debtors and the Consenting Lenders consisting of a revolving loan in an amount of at least $25 million (the "<u>Revolving Credit Facility</u>").  In the event such Exit Financing is provided by the Agent or any of the Secured Lenders (the "<u>Exit Revolving Lenders</u>"), then up to 20% of the New Common Stock shall be set aside as compensation for such Exit Revolving Lenders to the extent necessary to obtain such Exit Financing; provided that if any existing Consenting Lender offers to provide such Exit Financing to the Reorganized Debtors, all other Consenting Lenders shall have the opportunity to participate in such Exit Financing on a pro rata basis. |
| | Letters of credit under the Prepetition Credit Facility outstanding on the Effective Date of the Plan shall be rolled into, and become letters of credit under, the Revolving Credit Facility without any further action by any party. |
| | The obligations under the Revolving Credit Facility shall be secured by valid, binding, perfected first priority liens on inventory, accounts and other assets of the Reorganized Debtors, if necessary to obtain a commitment for such Revolving Credit Facility, with the consent of the Consenting Lenders (the "<u>Revolving Facility Collateral</u>"); such liens shall be senior to the liens granted under the Term Facilities. |

# ACTION BY WRITTEN CONSENT AND SUPPORT AGREEMENT
## OF THE SERIES B COMMON STOCKHOLDERS
## OF
## FREEDOM COMMUNICATIONS HOLDINGS, INC.

Pursuant to Section 228 of the Delaware General Corporation Law

The undersigned, being the holder of all of the issued and outstanding shares of Series B Common Stock ("Voting Stock") of Freedom Communications Holdings, Inc., a Delaware corporation (the "Company") has authority to and, subject to the terms and conditions hereof, does hereby consent to and approve with respect to all such shares, pursuant to Article Fifth, Part II, Common Stock, Section 4(g) of the Amended and Restated Certificate of Incorporation of the Company; and the certificate of incorporation or other equivalent constituent document of each subsidiary of the Company, respectively, the following:

      1.    The voluntary filing of petitions by each of the entities listed on Exhibit A attached hereto (the "Filing Entities") for relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), to implement the terms of a restructure described on Exhibit B attached hereto (the "Restructure").

      2.    The taking of actions necessary to implement the Restructure in connection with the Filing Entities' bankruptcy cases (the consents in clauses 1 and 2, collectively, the "Consent").

Furthermore, the undersigned further agrees as follows (the "Support Agreement"): (i) to not take any action in opposition to the plan of reorganization proposed by the Company so long as it contains, and is consistent with, the terms set forth on Exhibit B and Exhibit C hereto (on such terms, the "Plan"); (ii) the taking of actions necessary to implement the Restructure in connection with the Filing Entities' bankruptcy cases at the Company's expense; and (iii) upon receipt of a disclosure statement that is approved by the United States Bankruptcy Court having jurisdiction over the bankruptcy case (the "Bankruptcy Court") and related solicitation materials, to vote to accept the Plan so long as:

      a.    The Company commences its bankruptcy case on or before September 3, 2009 (the "Petition Date");

      b.    The Company files the Plan and a related disclosure statement (the "Disclosure Statement"), and such documents contain the terms set forth on, and are otherwise consistent with, Exhibit B hereto;

      c.    The Bankruptcy Court enters an order approving the Disclosure Statement on or before the date that is 90 days following the Petition Date; and

d.     The Bankruptcy Court enters an order confirming the Plan on or before a date that is 150 days following the Petition Date, and such Plan contains the terms set forth on, and is otherwise consistent with, Exhibit B hereto (the requirements set forth in clauses a.-d., the "Support Agreement Requirements").

In the event that (i) the Support Agreement Requirements are not satisfied or are breached or otherwise cease to be satisfied, (ii) without the written consent of the undersigned, any change to the terms of Exhibit B that negatively impacts the recoveries set forth therein to the holders of the Voting Stock and Series C Common Stock (the "Shares") (a) is filed as part of any modification, amendment or supplement to the Plan or the Disclosure Statement or (b) is effected by entry of an order of the Bankruptcy Court; provided that nothing herein shall preclude the undersigned from opposing entry of such an order, or (c) is granted by any motion or application by any person or entity in the chapter 11 cases for the Filing Entities or (iii) any lawsuit, adversary proceeding or other cause of action is commenced by any of the Filing Entities or the lenders under that certain Credit Agreement dated as of May 18, 2004 (as amended, modified or supplemented from time to time) against the undersigned or any other holder of Voting Stock or holder of shares of Series C Common Stock or their respective affiliates, partners, members, representatives, advisors, sub-advisors, managers, employees or agents, other than an action to enforce the Support Agreement, the undersigned's obligations under the Support Agreement shall, to the extent permitted by applicable law, be immediately and without any further action, terminated, rescinded, revoked and have no force and effect.

So long as the Support Agreement has not been terminated, the Company will not, and will cause its subsidiaries not to, sue the undersigned or any other holder of Voting Stock or holder of shares of Series C Common Stock of the Company or their respective affiliates, partners, members, representatives, advisors, sub-advisors, managers, employees or agents, other than an action to enforce the Support Agreement.

The undersigned further agrees that if it sells or transfers any Shares, a precondition to the valid sale or transfer of such Shares shall be that the purchaser or transferee, as applicable, must agree in writing to be bound by the terms of this Consent and the Support Agreement.

Notwithstanding anything herein to the contrary, with respect to any affiliate, officer, director or employee of the undersigned or its affiliates and advisors serving on the board of directors of the Company or any of its subsidiaries, the terms of this Consent and the Support Agreement shall not be construed so as to limit such person's exercise (in his or her sole discretion) of his or her fiduciary duties to any person arising from his or her service on such board of directors, and any such exercise (in the sole discretion of such person) of such fiduciary duties shall not be deemed to constitute a breach of the terms of this letter agreement by the undersigned.

This Consent and the Support Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any otherwise governing principles of conflicts of laws.

This Consent and the Support Agreement may be executed in any number of counterparts (including facsimile counterparts), all of which together shall constitute a single instrument.

Dated: August 31, 2009

BLACKSTONE FAMILY
COMMUNICATIONS PARTNERSHIP I,
L.P.

By: Blackstone Communications
Management Associates I, L.L.C., General
Partner

By: _David Tolley_____
    Name: DAVID TOLLEY
    Title: SENIOR MANAGING DIRECTOR

BLACKSTONE FC CAPITAL PARTNERS
IV-A L.P.

By: Blackstone Management Associates IV
L.L.C., General Partner

By: _David Tolley_____
    Name: DAVID TOLLEY
    Title: SENIOR MANAGING DIRECTOR

BLACKSTONE FAMILY INVESTMENT
PARTNERSHIP IV-A L.P.

By: Blackstone Management Associates IV
L.L.C., General Partner

By: _David Tolley_____
    Name: DAVID TOLLEY
    Title: SENIOR MANAGING DIRECTOR

BLACKSTONE FC COMMUNICATIONS
PARTNERS L.P.

By: Blackstone Communications
Management Associates I L.L.C., General
Partner

By: _David Tolley_

Name: DAVID TOLLEY
Title: SENIOR MANAGING DIRECTOR

BLACKSTONE FC CAPITAL PARTNERS
IV L.P.

By: Blackstone Management Associates IV
L.L.C., General Partner

By: _David Tolley_

Name: DAVID TOLLEY
Title: SENIOR MANAGING DIRECTOR

Acknowledged and Agreed on behalf of itself
and the other Filing Entities:

FREEDOM COMMUNICATIONS HOLDINGS, INC.

By: _Mark A. McEachen_

MARK A. MCEACHEN
Name:
Title: CFO

## Exhibit A

1. Freedom Communications Holdings, Inc.
2. Freedom Communications, Inc.
3. Freedom Broadcasting, Inc.
4. Freedom Broadcasting of Florida, Inc.
5. Freedom Broadcasting of Florida Licensee, L.L.C.
6. Freedom Broadcasting of Michigan, Inc.
7. Freedom Broadcasting of Michigan Licensee, L.L.C.
8. Freedom Broadcasting of New York, Inc.
9. Freedom Broadcasting of New York Licensee, L.L.C.
10. Freedom Broadcasting of Oregon, Inc.
11. Freedom Broadcasting of Oregon Licensee, L.L.C.
12. Freedom Broadcasting of Southern New England, Inc.
13. Freedom Broadcasting of Southern New England Licensee, L.L.C.
14. Freedom Broadcasting of Texas, Inc.
15. Freedom Broadcasting of Texas, Licensee, L.L.C.
16. Freedom Broadcasting of Tennessee, Inc.
17. Freedom Broadcasting of Tennessee Licensee, L.L.C.
18. Freedom Magazines, Inc.
19. Freedom Metro Information, Inc.
20. Freedom Newspapers, Inc.
21. Orange County Register Communications, Inc.
22. OCR Community Publications, Inc.
23. OCR Information Marketing, Inc.
24. Appeal-Democrat, Inc.
25. Florida Freedom Newspapers, Inc.
26. Freedom Arizona Information, Inc.
27. Freedom Colorado Information, Inc.
28. Freedom Eastern North Carolina Communications, Inc.
29. Freedom Newspapers of Illinois, Inc.
30. Freedom Newspapers of Southwestern Arizona, Inc.
31. Freedom Shelby Star, Inc.
32. Illinois Freedom Newspapers, Inc.
33. Missouri Freedom Newspapers, Inc.
34. Odessa American
35. The Times-News Publishing Company
36. Victor Valley Publishing Company
37. Daily Press
38. Freedom Newspaper Acquisitions, Inc.
39. The Clovis News-Journal
40. Freedom Newspapers of New Mexico L.L.C.
41. Gaston Gazette LLP
42. Lima News
43. Porterville Recorder Company
44. Seymour Tribune Company

45. Victorville Publishing Company
46. Freedom Newspapers
47. The Creative Spot, L.L.C.
48. Freedom Interactive Newspapers, Inc.
49. Freedom Interactive Newspapers of Texas, Inc.
50. Freedom Services, Inc.

# FREEDOM COMMUNICATIONS HOLDINGS, INC.

## EXHIBIT B

| | |
|---|---|
| **I. PLAN DISTRIBUTIONS AND TREATMENT OF CLAIMS:** | |
| **Prepetition Credit Facility Claims:** | On the Effective Date, the holders of allowed Secured Lender Claims shall receive, in full satisfaction of such claims, their pro rata share of: (i) $225 million in Term Loan A obligations owed by the Reorganized Company (the "Term A Loans") secured by a first priority lien on the assets of the Reorganized Company, (ii) $100 million in Term Loan B obligations owed by the Reorganized Company secured by a second priority lien on the assets of the Reorganized Company (the "Term B Loans" and, together with the Term A Loans, the "Term Facilities"), (iii) any cash held by the Debtors or the Reorganized Debtors as of the Effective Date in excess of $15 million and (iv) 98% of the primary equity interests (the "New Common Stock") in Reorganized Holdings (subject to dilution from post-reorganization issuances, including the distribution of any equity awards under the New Management Incentive Plan, the exercise of the Warrants and an award, if any, of New Common Stock as compensation to the Exit Revolving Lenders (all as defined or described below)). |
| | The Term Facilities will have flexible financial covenants for the first 18 months following the Effective Date, all on terms reasonably acceptable to the Lenders and the Company. |
| | Term A Loans will mature in 4 years and Term B Loans will mature in 5 years. |
| | Interest Rate/Amortization of Term Facilities: |
| | •Term A Loans: LIBOR+600 bps Cash (3.50% LIBOR floor); $15 million annual amortization beginning in 2011 |
| | •Term B Loans: 14% Cash/PIK; If cash on hand and revolver availability exceeds $40 million, the Company must pay cash interest; otherwise the Company may elect PIK (the liquidity test shall include a mechanism to adjust for any projected liquidity |

| | |
|---|---|
| | fluctuations in Q1 of each year); No scheduled amortization |
| **Trade Unsecured Claims:** | Except to the extent that a holder of an allowed Trade Unsecured Claim and the Debtors or the Reorganized Debtors, as the case may be, agree to different treatment, each allowed Trade Unsecured Claim shall be paid in full in cash for such claim on the later of the Effective Date and the date on which payment on account of such claim is due in the ordinary course of business. |
| **General Unsecured Claims:** | On the Effective Date, holders of allowed General Unsecured Claims shall receive their pro rata share of $5 million (the "Unsecured Compensation"); provided that, if the class of General Unsecured Claims does not vote to accept the Plan, all holders of General Unsecured Claims shall permanently forfeit their pro rata share of the Unsecured Compensation.<br><br>Allowed General Unsecured Claims eligible for payment shall be paid from the distribution otherwise payable under the Plan to the Secured Lenders on account of the secured portion of the Secured Lender Claims. |
| **Equity Interests:** | On the Effective Date, Old Equity shall be cancelled, and each holder of Old Equity shall receive (i) its pro rata share of 2% of the New Common Stock in Reorganized Holdings, subject to dilution as a result of any post-reorganization issuances, including equity awards under the New Management Incentive Plan and an award, if any, of New Common Stock as compensation to the Exit Revolving Lenders and (ii) its pro rata share of warrants to purchase up to 10% of the New Common Stock on the terms described in Annex D (the "Warrants"), subject to dilution as a result of any equity awards under the New Management Incentive Plan; provided that, if the class of Old Equity holders does not vote to accept the Plan, all holders of Old Equity shall permanently forfeit their pro rata share of the New Common Stock and the Warrants.<br><br>Warrants to expire on 12/31/2014 with an exercise price that would result in full recovery to the lenders plus an additional 15% premium based on equity portion of recovery<br><br>The Warrants shall not be transferable, except to:<br><br>&bull; trusts, estates, partnerships and other entities whose primary owners and/or primary beneficiaries are holders of any Warrants;<br><br>&bull; members of the family of any holder of any Warrants; |

2

| | |
|---|---|
| | • affiliates and subsidiaries of any holder of any Warrant; and<br><br>• other holders of any Warrants.<br><br>In the event of a change of control, the Warrants shall be automatically cancelled and deemed surrendered in exchange for consideration in whatever form provided under the transaction in an amount equal to the Fair Market Value of the Warrants. The Fair Market Value shall equal the Black-Scholes valuation, using the following variables: (i) the applicable risk free rate at the time of valuation, (ii) the applicable exercise price for the period during which the transaction is consummated, (iii) the amount of time remaining in the exercise period at the time of a signed agreement that ultimately closes, (iv) the transaction price, (v) 40% volatility.<br><br>Value of transaction/consideration (if not cash or publicly traded securities) shall be determined by the Board based on advice from an independent, nationally-recognized advisor/appraiser.<br><br>No voting rights for holders of Warrants. |

## II. CORPORATE GOVERNANCE AND MANAGEMENT

| | |
|---|---|
| **Board of Directors of Reorganized Holdings:** | The initial board of directors of Reorganized Holdings shall consist of the Chief Executive Officer and four individuals identified and agreed to by the lenders who execute the Plan Support Agreement ("Consenting Lenders"). Successor directors will be appointed and/or elected in accordance with Reorganized Holdings' charter and by-laws.<br><br>Each Consenting Lender shall have the right to appoint one representative to attend and observe all board meetings of Reorganized Holdings. |
| **Holdings' Status:** | Reorganized Holdings shall be a private (non-reporting) company. The New Common Stock will: (i) not be registered; (ii) not be listed on any national exchange; and (iii) be transferable by the recipients thereof under the Plan pursuant to the exemption from registration granted by section 1145(c) of the Bankruptcy Code (except with respect to any such recipient deemed to be an "underwriter"). |
| **Chief Executive Officer:** | The Chief Executive Officer of Reorganized Holdings shall be selected by the Board of Directors of Reorganized Holdings. |
| **New Management Incentive Plan:** | There shall be a management incentive plan (the "New Management Incentive Plan"), pursuant to which up to [TBD]% of the equity of Reorganized Holdings shall be reserved for the Board of Directors of Reorganized Holdings to grant options to purchase New Common Stock to the members of such Board and the |

NY\1565031.1

| | members of the management of the Reorganized Company. The New Management Incentive Plan will contain terms and conditions (including the form of equity grant) reasonably acceptable to the Agent and the Company. |
|---|---|
| **III. OTHER TERMS** | |
| **Exit Financing:** | The Reorganized Debtors shall obtain exit financing (the "<u>Exit Financing</u>") on terms and conditions satisfactory in all respects to the Debtors and the Consenting Lenders consisting of a revolving loan in an amount of at least $25 million (the "<u>Revolving Credit Facility</u>"). In the event such Exit Financing is provided by the Agent or any of the Secured Lenders (the "<u>Exit Revolving Lenders</u>"), then up to 20% of the New Common Stock shall be set aside as compensation for such Exit Revolving Lenders to the extent necessary to obtain such Exit Financing; provided that if any existing Consenting Lender offers to provide such Exit Financing to the Reorganized Debtors, all other Consenting Lenders shall have the opportunity to participate in such Exit Financing on a pro rata basis.<br><br>Letters of credit under the Prepetition Credit Facility outstanding on the Effective Date of the Plan shall be rolled into, and become letters of credit under, the Revolving Credit Facility without any further action by any party.<br><br>The obligations under the Revolving Credit Facility shall be secured by valid, binding, perfected first priority liens on inventory, accounts and other assets of the Reorganized Debtors, if necessary to obtain a commitment for such Revolving Credit Facility, with the consent of the Consenting Lenders (the "<u>Revolving Facility Collateral</u>"); such liens shall be senior to the liens granted under the Term Facilities. |

NY\1565031.1

**Exhibit 4**

**Filed and Scheduled Claims as of December 11, 2009 by Debtor and Plan Class**

**Freedom Communications Holdings, Inc. et. al.**

**Filed Claims (as of December 11, 2009) and Scheduled Claims (as of November 18-19, 2009) by Debtor and Plan Class**

| Encumbered Debtors | Class A1 Other Priority Claims | | Class A2 Existing Lender Claims | | Class A3 Other Secured Claims | | Class A4 General Unsecured Claims | | Class A5 Non-Qualified Retirement Claims | | Class A6 Intercompany Claims | | Class A7 Tort Claims | | Class A8 Subordinated Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Filed | Scheduled[1] | Filed | Scheduled[2] | Filed | Scheduled | Filed[3] | Scheduled | Filed | Scheduled | Filed | Scheduled | Filed | Scheduled | Filed[4] |
| FREEDOM COMMUNICATIONS HOLDINGS, INC. | $79,161 | $0 | $772,485,444 | $772,485,444 | $3,947,634 | $0 | $1,441,426 | $0 | $0 | $0 | $0 | $2,117 | $0 | $0 | $148,627 |
| FREEDOM COMMUNICATIONS, INC. [5] | $1,122,488 | $0 | $772,485,444 | $772,485,444 | $337,770 | $0 | $143,841,657 | $5,648,193 | $8,991,852 | $17,801,169 | $0 | $1,778,538,993 | $7,100,000 | $0 | $168,785 |
| FREEDOM BROADCASTING, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $172,971 | $64,324 | $0 | $0 | $0 | $212,804,289 | $0 | $0 | $8,631 |
| FREEDOM BROADCASTING OF FLORIDA, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $2,627,992 | $484,584 | $0 | $0 | $0 | $48,513,198 | $0 | $0 | $4,560 |
| FREEDOM BROADCASTING OF FLORIDA LICENSEE, L.L.C. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $30,475 | $38,135 | $0 | $0 | $0 | $90,833,333 | $0 | $0 | $0 |
| FREEDOM BROADCASTING OF MICHIGAN, INC. | $755 | $0 | $772,485,444 | $772,485,444 | $85,565 | $0 | $2,763,704 | $1,184,885 | $0 | $0 | $0 | $226,248,873 | $0 | $0 | $12,082 |
| FREEDOM BROADCASTING OF MICHIGAN LICENSEE, L.L.C. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $40,145 | $0 | $0 | $0 | $114,723,489 | $0 | $0 | $0 |
| FREEDOM BROADCASTING OF NEW YORK, INC. | $1,600 | $0 | $772,485,444 | $772,485,444 | $6,398 | $0 | $2,521,137 | $833,285 | $0 | $0 | $0 | $65,363,123 | $0 | $0 | $39,033 |
| FREEDOM BROADCASTING OF NEW YORK LICENSEE, L.L.C. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $13,120 | $30,921 | $0 | $0 | $0 | $16,194,171 | $0 | $0 | $768 |
| FREEDOM BROADCASTING OF OREGON, INC. | $800 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $198,676 | $110,597 | $0 | $0 | $0 | $15,556,573 | $0 | $0 | $0 |
| FREEDOM BROADCASTING OF OREGON LICENSEE, L.L.C. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $15,510 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FREEDOM BROADCASTING OF SOUTHERN NEW ENGLAND, INC. | $12,629 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $116,050 | $0 | $0 | $0 | $0 | $12,392,875 | $0 | $0 | $0 |
| FREEDOM BROADCASTING OF SOUTHERN NEW ENGLAND LICENSEE L.L.C. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FREEDOM BROADCASTING OF TEXAS, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $45,000 | $0 | $268,720 | $453,394 | $0 | $0 | $0 | $23,526,834 | $0 | $0 | $0 |
| FREEDOM BROADCASTING OF TEXAS LICENSEE, L.L.C. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $6,240 | $0 | $0 | $0 | $60,105 | $0 | $0 | $0 |
| FREEDOM BROADCASTING OF TENNESSEE, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $813,154 | $442,147 | $0 | $0 | $0 | $31,273,098 | $0 | $0 | $9,216 |
| FREEDOM BROADCASTING OF TENNESSEE LICENSEE, L.L.C. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $23,510 | $0 | $0 | $0 | $103,745 | $0 | $0 | $0 |
| FREEDOM MAGAZINES, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FREEDOM METRO INFORMATION, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $30,304,440 | $0 | $0 | $0 |
| FREEDOM NEWSPAPERS, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $1,340,408 | $0 | $17,785 | $202,567 | $0 | $0 | $0 | $137,877,649 | $0 | $0 | $0 |
| ORANGE COUNTY REGISTER COMMUNICATIONS, INC. | $424,273 | $0 | $772,485,444 | $772,485,444 | $33,178 | $0 | $103,909,446 | $0 | $0 | $0 | $0 | $5,693,340 | $0 | $0 | $20,090 |
| OCR COMMUNITY PUBLICATIONS, INC. | $4 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $21 | $58,447 | $0 | $0 | $0 | $22,294,198 | $0 | $0 | $0 |
| OCR INFORMATION MARKETING, INC. | $200 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,042,900 | $0 | $0 | $0 |
| APPEAL-DEMOCRAT, INC. | $797 | $3,489 | $772,485,444 | $772,485,444 | $30 | $0 | $58,008 | $317,512 | $0 | $0 | $0 | $33,320,179 | $0 | $0 | $2,654 |
| FLORIDA FREEDOM NEWSPAPERS, INC. | $320 | $0 | $772,485,444 | $772,485,444 | $11,066 | $0 | $316,031 | $562,161 | $0 | $0 | $0 | $92,168,380 | $0 | $0 | $4,744 |
| FREEDOM ARIZONA INFORMATION, INC. | $10,950 | $16,285 | $772,485,444 | $772,485,444 | $2,114,993 | $0 | $806,280 | $737,529 | $0 | $0 | $0 | $168,083,426 | $0 | $0 | $810 |
| FREEDOM COLORADO INFORMATION, INC. | $0 | $10,950 | $772,485,444 | $772,485,444 | $0 | $0 | $169,841 | $983,027 | $0 | $0 | $0 | $132,186,826 | $0 | $0 | $2,272 |
| FREEDOM EASTERN NORTH CAROLINA COMMUNICATIONS, INC | $3,238 | $2,821 | $772,485,444 | $772,485,444 | $14,804 | $0 | $122,227 | $305,542 | $0 | $0 | $0 | $59,754,144 | $0 | $0 | $4,008 |
| FREEDOM NEWSPAPERS OF ILLINOIS, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $134,236 | $123,734 | $0 | $0 | $0 | $22,622,065 | $0 | $0 | $946 |
| FREEDOM NEWSPAPERS OF SOUTHWESTERN ARIZONA, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $40,528 | $177,155 | $0 | $0 | $0 | $35,013,828 | $0 | $0 | $1,410 |
| FREEDOM SHELBY STAR, INC. | $0 | $1,162 | $772,485,444 | $772,485,444 | $0 | $0 | $17,371 | $63,214 | $0 | $0 | $0 | $14,341,031 | $0 | $0 | $1,083 |
| ILLINOIS FREEDOM NEWSPAPERS, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $4,977 | $84,362 | $0 | $0 | $0 | $13,373,070 | $0 | $0 | $1,241 |
| MISSOURI FREEDOM NEWSPAPERS, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $140 | $0 | $46,827 | $181,946 | $0 | $0 | $0 | $16,149,480 | $0 | $0 | $774 |
| ODESSA AMERICAN | $0 | $0 | $772,485,444 | $772,485,444 | $37 | $0 | $32,260 | $135,366 | $0 | $0 | $0 | $24,599,677 | $0 | $0 | $3,476 |
| THE TIMES-NEWS PUBLISHING COMPANY | $10,000 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $29,040 | $146,023 | $0 | $0 | $0 | $25,995,115 | $5,000,000 | $0 | $1,867 |
| VICTOR VALLEY PUBLISHING COMPANY | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FREEDOM NEWSPAPER ACQUISITIONS, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $827 | $0 | $0 | $0 | $0 | $88,223,509 | $0 | $0 | $0 |
| THE CLOVIS NEWS-JOURNAL | $0 | $0 | $772,485,444 | $772,485,444 | $11,890 | $0 | $5,559 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FREEDOM NEWSPAPERS OF NEW MEXICO, L.L.C. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $15,523 | $147,010 | $0 | $0 | $0 | $12,346,854 | $0 | $0 | $582 |
| LIMA NEWS | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $48,795 | $198,053 | $0 | $0 | $0 | $35,692,671 | $0 | $0 | $2,476 |
| FREEDOM INTERACTIVE NEWSPAPERS, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $9,236 | $0 | $0 | $0 | $0 | $30,257,068 | $0 | $0 | $132 |
| FREEDOM INTERACTIVE NEWSPAPERS OF TEXAS, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $0 | $0 | $315 | $9,739 | $0 | $0 | $0 | $32,488,793 | $0 | $0 | $0 |
| FREEDOM SERVICES, INC. | $0 | $0 | $772,485,444 | $772,485,444 | $129,322 | $0 | $2,680 | $2,160 | $0 | $0 | $0 | $1,154,129,362 | $0 | $0 | $0 |
| TOTAL | $1,667,215 | $34,707 | $772,485,444 | $772,485,444 | $8,078,235 | $0 | $260,596,895 | $13,811,466 | $8,991,852 | $17,801,169 | $0 | $4,794,092,821 | $12,100,000 | $0 | $440,257 |

[1] Certain Other Priority Claims have been paid since the Petition Date pursuant to order of the Bankruptcy Court.

[2] The Existing Lender Claims against each of the Debtors other than Freedom Communications, Inc., the borrower, are guarantee Claims and thus were scheduled as contingent Claims. They are listed here because they are entitled to be asserted in their full amount against each Debtor.

[3] The amounts listed for each of Freedom Communications, Inc. and Orange County Register Communications, Inc. include class Proofs of Claim relating to the Gonzalez Litigation in the approximate amount of $102.7 million each.

[4] Includes late claims filed through January 8, 2010.

[5] Pursuant to the bar date order, Proofs of Claim filed without identifying the particular Debtor against which the claim is asserted are deemed to have been asserted against Freedom Communications, Inc.; provided, however, that the Debtors have the right to seek an order transferring such claim to another Debtor.

**DISCLAIMER AS TO FILED CLAIMS**

The general bar date for filing Proofs of Claim was December 11, 2009. As of that date, approximately 3,220 Proofs of Claim were filed against the Encumbered Debtors, alleging an aggregate amount of $1.093 billion plus additional undeterminable and unknown amounts of unliquidated and contingent claims. Some of the filed Proofs of Claim are duplicative, as certain parties filed Proofs of Claim against multiple Debtors for the same liability (for example, a class Proof of Claim relating to the Gonzalez Litigation was filed in the approximate amount of $102.7 million against two Debtors, adding $205.4 million to the filed amount total for Class A4). Certain claimants may have mistakenly filed Proofs of Claim against the wrong Debtor. The Debtors will review all Proofs of Claim and reserve the right to object to any Proofs of Claim, including, without limitation, Proofs of Claim that are filed in amounts, priorities, or other bases that vary from the Debtors' books and records or that are asserted against the wrong Debtor. For example, in the absence of the compromise embodied in the Plan, the Debtors would dispute all liability for Claims alleged in the Gonzalez Litigation and would expect to challenge all Proofs of Claim filed with respect thereto. At this time, the Debtors cannot predict the exact amount of claims that will ultimately be Allowed against each of the Debtors.

**DISCLAIMER AS TO SCHEDULED CLAIMS**

This summary reflects the Debtors' best estimate of their unpaid liability for Claims as reflected in their Amended and Restated Schedules of Assets and Liabilities filed on November 18 and 19, 2009. This summary does not include (except where noted) contingent, unliquidated, or disputed Claims (including, without limitation, the Claims alleged in the Gonzalez Litigation, which are alleged by the Gonzalez Claimants to be in the aggregate amount of approximately $102.7 million, absent the compromise embodied in the Plan) or rejection damage Claims (which the Debtors estimate to be in the aggregate amount of $4.5 million).

The aggregate amount of scheduled Class A4 General Unsecured Claims listed on this summary is different from the $39.0 estimate otherwise provided by the Debtors, because the $39.0 million: (a) excludes the following amounts that are included in the scheduled amount on this summary: (i) approximately $3.5 million for critical vendors paid under the applicable first day order, (ii) approximately $5.5 million attributable to potential Trade Unsecured Claims that are proposed to be paid from the Trade Unsecured Claim Escrow, and (iii) approximately $300,000 attributable to utilities holding deposits, who may be treated as holders of Other Secured Claims; and (b) includes the following amounts that are not included in the scheduled amount on this summary: (i) an agreed amount of $29.5 million for the Gonzalez Litigation Claims (only for purposes of the compromise embodied in the Plan), (ii) potential escheatment liability of approximately $400,000, and (iii) estimated rejection damage claims of $4.5 million.

**Freedom Communications Holdings, Inc. et. al.**

**Filed Claims (as of December 11, 2009) and Scheduled Claims (as of November 18-19, 2009) by Debtor and Plan Class**

| Unencumbered Debtors | Class B1 Other Priority Claims | | Class B2 Other Secured Claims | | Class B3 General Unsecured Claims | | Class B4 Intercompany Claims | |
|---|---|---|---|---|---|---|---|---|
| | Filed | Scheduled[1] | Filed | Scheduled | Filed | Scheduled | Filed | Scheduled |
| DAILY PRESS | $0 | $0 | $0 | $0 | $69,409 | $245,024 | $0 | $53,032,134 |
| GASTON GAZETTE, LLP | $1,762 | $0 | $1,062 | $0 | $101,354 | $510,161 | $0 | $53,783,500 |
| PORTERVILLE RECORDER COMPANY | $0 | $0 | $363 | $0 | $15,066 | $98,040 | $0 | $12,284,054 |
| SEYMOUR TRIBUNE COMPANY | $0 | $0 | $0 | $0 | $70,199 | $85,123 | $0 | $7,433,944 |
| VICTORVILLE PUBLISHING COMPANY | $0 | $0 | $2,869 | $0 | $10,075 | $0 | $0 | $2,326 |
| FREEDOM NEWSPAPERS | $2,387 | $3,609 | $0 | $0 | $320,487 | $600,992 | $0 | $88,276,973 |
| THE CREATIVE SPOT, LLC | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL** | **$4,149** | **$3,609** | **$4,294** | **$0** | **$586,590** | **$1,539,340** | **$0** | **$214,812,931** |

[1] Certain Other Priority Claims have been paid since the Petition Date pursuant to order of the Bankruptcy Court.

**DISCLAIMER AS TO FILED CLAIMS**

The general bar date for filing Proofs of Claims was December 11, 2009. As of that date, approximately 180 Proofs of Claim were filed against the Unencumbered Debtors, alleging aggregate fixed liability of $689,725 and undeterminable amounts of unliquidated and contingent liability. Some of the alleged liability is duplicative, as certain parties filed Proofs of Claim against multiple Debtors for the same liability. Certain claimants may have mistakenly filed Proofs of Claim against the wrong Debtor and thus the amount of their claims may not appear on this summary. The Debtors will review all Proofs of Claim and reserve the right to object to any Proofs of Claim, including, without limitation, Proofs of Claim that are filed in amounts, priorities, or other bases that vary from the Debtors' books and records or that are asserted against the wrong Debtor. At this time, the Debtors cannot predict the exact amount of Claims that will ultimately be Allowed against each of the Debtors.

**DISCLAIMER AS TO SCHEDULED CLAIMS**

This summary reflects the Debtors' best estimate of their liability for Claims as reflected in their Amended and Restated Schedules of Assets and Liabilities filed on November 18 and 19, 2009.

This summary does not include contingent, unliquidated, or disputed Claims or rejection damage Claims.

# Exhibit 5

# Prepetition Organizational Chart

# ORGANIZATIONAL CHARTS



# BROADCAST DIVISION



**Freedom Communications, Inc.**
a Delaware corporation

**Freedom Broadcasting, Inc.**
a Delaware corporation

Freedom Broadcasting of
Michigan, Inc.
a Delaware corporation
WWMT-TV (*CBS, Channel 3*) Kalamazoo, MI
WLAJ-TV (*ABC, Channel 53*) Lansing, MI

Freedom Broadcasting of
Texas, Inc.
a California corporation
KFDM-TV (*CBS, Channel 6*) Beaumont, TX

Freedom Broadcasting of
Florida, Inc.
a Delaware corporation
WPEC-TV (*CBS, Channel 12*)
West Palm Beach, FL

Freedom Broadcasting of
Southern New England, Inc.
a Delaware corporation

Freedom Broadcasting
of Oregon, Inc.
a California corporation
KTVL-TV (*CBS, Channel 10*)
Medford, OR

Freedom Broadcasting
of New York, Inc.
a New York corporation
WRGB-TV (*CBS, Channel 6*)
WCWN-TV (*CW Network*)
Albany, Schenectady and
Troy, NY

Freedom Broadcasting
of Michigan Licensee,
L.L.C.
a Delaware limited
liability company

Freedom
Broadcasting of
Tennessee, Inc.
a Tennessee
corporation
WTVC-TV (*ABC, Channel 9*)
Chattanooga, TN

Freedom Broadcasting
of Florida Licensee,
L.L.C.
a Delaware limited
liability company

Freedom Broadcasting
of Southern New
England Licensee,
L.L.C.
a Delaware limited
liability company

Freedom Broadcasting
of Oregon Licensee,
L.L.C.
a Delaware limited
liability company

Freedom Broadcasting of
New York Licensee, L.L.C.
a Delaware limited liability
company

Freedom
Broadcasting of
Tennessee
Licensee, L.L.C.
a Delaware limited
liability company

Freedom Broadcasting of Texas
Licensee, L.L.C.
a Delaware limited liability
company

# FREEDOM ORANGE COUNTY



**Freedom Communications, Inc.**
a Delaware corporation

The Orange County Register
Santa Ana, CA
an unincorporated Division of FCI

Freedom Newspapers, Inc.
a Delaware corporation

Orange County Register Communications, Inc.
a California corporation

OCR Community
Publications, Inc.
a California corporation

OCR Information
Marketing, Inc.
a California corporation

---------- = Operational
(not ownership)

The Orange County Register
Santa Ana, CA
a Division of FCI

Weeklies
(publication)

Excelsior
(publication)

Coast Magazine
Coast Kids
(publications)

Preferred Destinations
Magazine
(publication)

# NEWSPAPERS DIVISION



**Freedom Communications, Inc.**
a Delaware corporation

**Freedom Newspapers, Inc.**
a Delaware corporation

Appeal-Democrat, Inc., a CA corporation

Florida Freedom Newspapers, Inc. a FL corporation

Freedom Eastern North Carolina Communications, Inc., a DE corporation

Freedom Newspapers of Southwestern Arizona, Inc., a CA corporation

Freedom Shelby Star, Inc., a DE corporation

Illinois Freedom Newspapers, Inc., an IL corporation

Freedom Newspapers of Illinois, Inc., a DE corporation

Missouri Freedom Newspapers, Inc. a MO corporation

The Times-News Publishing Company, a NC corporation

Freedom Spanish Language Publications, Inc., a CA corporation **(DISSOLVED 12/31/05)**

Freedom Arizona Information, Inc. a California corporation

Freedom Colorado Information, Inc. a Delaware corporation

Freedom Publicaciones SA de CV a Mexican corporation

(Officially suspended operations in Mexico in 2004)

Freedom Interactive Newspapers, Inc. a CA corporation

Freedom Interactive Newspapers of Texas, Inc., a DE corporation

Victor Valley Publishing Company a CA corporation

Daily Press, a CA general partnership

(70% GP interest held by Victor Valley Publishing Company, 30% held by Victorville Publishing Company; FCI effectively owns 98.95%)

Freedom Newspaper Acquisitions, Inc. a DE corporation

Clovis News-Journal a NM general partnership

(FCI holds 1%, FNAI holds 99% GP interest; FCI effectively owns 100%)

Freedom Newspapers of New Mexico, L.L.C., a DE limited liability company

(30% membership interest held by FNAI; 70% held by Clovis News-Journal; FCI effectively owns 100% of FNNM)

Freedom Newspapers, a TX general partnership
(80% GP interest held by FCI; 19.95% GP interest held by FNAI; FCI effectively owns 99.95%)

The Creative Spot, L.L.C., a Delaware limited liability company

(Operations ceased in 2003)

Odessa American, a TX general partnership

(59.6% GP interest held by FCI; 40.4% GP interest held by FNAI; FCI effectively owns 100%)

Victorville Publishing Company, a CA limited partnership

(4.41% GP interest held by FCI; FNAI holds 92.08% LP interests; FCI effectively owns 96.49%)

Porterville Recorder Company, a CA limited partnership

(72.68% GP interest held by FCI; FNAI holds 25.63% LP interest; FCI effectively owns 98.31%)

Seymour Tribune Company, a CA limited partnership

(82% GP interest held by FCI; FNAI holds 17.58% LP interest; FCI effectively owns 99.58%)

Lima News, an OH general partnership

(78.45% GP interest held by FCI; FNAI holds 21.55% GP interest; FCI effectively owns 100%)

Gaston Gazette LLP, a NC limited liability partnership

(83.93% GP interest held by FCI; FNAI holds 15.78% GP interests; FCI effectively owns 99.68%)

# INTERACTIVE NEWSPAPERS



**Freedom Communications, Inc.**
a Delaware corporation

**Freedom Newspapers, Inc.**
a Delaware corporation
100 % subsidiary of FCI

**Freedom Interactive Newspapers, Inc.**
a California corporation
100 % subsidiary of FNI

**Freedom Interactive Newspapers of Texas, Inc.**
a DE corporation
100% subsidiary of FIN

# FORMER MAGAZINE DIVISION

**Freedom Communications, Inc.**
a Delaware corporation

**Freedom Magazines, Inc.**
a California corporation

**Exhibit 6**

**Debtor Specific Information Chart**



# FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL.
## DEBTOR SPECIFIC INFORMATION CHART

<u>**See Legend, page 20**</u>

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| **Freedom Communications Holdings, Inc.**<br><br>**Chapter 11 Case No. 09-13046**<br><br>Address:<br>17666 Fitch<br>Irvine, CA 92614<br><br>Primary Operations:<br>Holding Company | C | DE | CA | <u>Directors:</u><br>William F. Baker<br>Thomas W. Bassett = Chair<br>Raymond C. H. Bryan<br>Jill A. Greenthal<br>Robin J. Hardie<br>Burl Osborne<br>Chris Philibbosian<br>James J. Spanfeller<br>David M. Tolley<br>Gregory J. Wallace<br><br><u>Officers:</u><br>Burl Osborne = Interim P & CEO<br>Mark A. McEachen = SVP & CFO<br>Jonathan Segal = SVP& P, Newspapers Division<br>Doreen D. Wade = SVP & P, Broadcast Division<br>Douglas S. Bennett = SVP, Technology & Administration<br>Rachel L. Sagan = VP, GC & S<br>Marcy E. Bruskin = VPHR & OD<br>Nancy S. Trillo = VP, Enterprise Finance, C & T<br>Katherine Bartzoff = AS | Authorized: 18,800,000<br><br>Senior Preferred Stock: 100,000<br>Par Value $0.01<br><br>Junior Preferred Stock: 100,000<br>Par Value $0.01<br><br>Common Stock: 18,600,000<br>Par Value $0.001<br><br>Series A Common: 6,000,000 authorized<br>Series B Common: 6,000,000 authorized<br>Series C Common: 6,000,000 authorized<br>Series D Common: 600,000 authorized<br><br>Series A Common:<br>Issued: 3,300,028.80<br>Outstanding: 3,300,028.80<br><br>Series B Common:<br>Issued: 1,317,405.38<br>Outstanding: 1,317,405.38<br><br>Series C Common:<br>Issued: 1,684,210.16<br>Outstanding: 1,684,210.16<br>Series A Senior Preferred:<br>Issued: 9,075.0470<br>Outstanding: 9,075.0470<br><br>Series A Junior Preferred:<br>Issued: 7,895.6000<br>Outstanding: 7,895.6000 |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| **Freedom Communications, Inc.**<br><br>**Chapter 11 Case No. 09-13047**<br><br>Address:<br>17666 Fitch<br>Irvine, CA  92614<br><br>Primary Operations:<br>Holding Company<br>Owner of The Orange County Register | C | DE | CA, CO, FL, IN, NC, OH, TX | Directors:<br>William F. Baker<br>Thomas W. Bassett = Chair<br>Raymond C. H. Bryan<br>Jill A. Greenthal<br>Robin J. Hardie<br>Burl Osborne<br>Chris Philibbosian<br>James J. Spanfeller<br>David M. Tolley<br>Gregory J. Wallace<br><br>Officers:<br>Burl Osborne = Interim P & CEO<br>Mark A. McEachen = SVP & CFO<br>Jonathan Segal = SVP& P, Newspapers Division<br>Doreen D. Wade = SVP & P, Broadcast Division<br>Douglas S. Bennett = SVP, Technology & Administration<br>Rachel L. Sagan = VP, GC & S<br>Marcy E. Bruskin = VPHR & OD<br>Nancy S. Trillo = VP, Enterprise Finance, C & T<br>Katherine Bartzoff = AS | Authorized: 1,000<br>$0.001 Par Value<br><br>Common Stock:                1,000<br><br>Issued & Outstanding:            100 to FCHI |
| **Freedom Services, Inc.**<br><br>**Chapter 11 Case No. 09-13096**<br><br>Address:<br>17666 Fitch<br>Irvine, CA  92614<br><br>Primary Operations:<br>Enterprise shared services organization for payroll and accounts payable | C | DE | CA | Directors:<br>Nancy S. Trillo<br>Mark A. McEachen<br>Marcy E. Bruskin<br><br>Officers:<br>Nancy S. Trillo = P & C<br>Mark A. McEachen = SVP & CFO<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized:   $0.01 Par Value<br>1,000 Common<br>   500 Preferred<br><br>Outstanding:<br>100 Common Issued to FCI |
| **Freedom Newspapers, Inc.**<br><br>**Chapter 11 Case No. 09-13066**<br><br>Address:<br>17666 Fitch<br>Irvine, CA  92614<br><br>Primary Operations:<br>Holding Company | C | DE | CA | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Lee Knapp = VP, Operations<br>Michael H. Burns, VP, Sales<br>Terri Nelson = VP, Finance<br>Dianne Ippolito = VPHR<br>Nancy S. Trillo = VPC | Authorized: $0.01 Par Value<br>1,000 Common<br>   500 Preferred<br><br>Outstanding:<br>100 Common issued to FCI |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| | | | | Terry Horne = VP<br>Jennie Lambert = VP<br>Olaf Frandsen = VP<br>Karen Hanes = VP<br>Julie Moreno = VP<br>Steven Pope = VP<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | |
| **Appeal-Democrat, Inc.**<br><br>**Chapter 11 Case No. 09-13070**<br><br>Address:<br>1530 Ellis Lake Drive<br>Marysville, CA 95901<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Appeal Democrat<br>BAFB Life<br>Best of Yuba-Sutter<br>Colusa Sun-Herald<br>Corning Observer<br>Explore 99 Things<br>Medical Directory<br>Orland Press-Register<br>Smart Saver<br>Smart Shopper<br>Willows Journal<br>Y-S Fair | C | CA | | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Dave Schmall = VP* & PUB, Appeal-Democrat<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: No Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding:<br>100 Common issued to FNI |
| **Florida Freedom Newspapers, Inc.**<br><br>**Chapter 11 Case No. 09-13071**<br><br>Address:<br>501 W. 11th Street<br>Panama City, FL 32401<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Coastal Treasures<br>Crestview News Bulletin | C | FL | | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Karen E. Hanes = VP & PUB, The News Herald<br>Tom C. Conner = VP* & PUB, Northwest Florida Daily News<br>Eric "Rick" J. Thomason = VP* & PUB, The Destin Log, The Log Extra & The Walton Sun<br>Nancy S. Trillo = VPC | Authorized: $100.00 Par Value<br>50 Common<br><br>Outstanding:<br>50 Common issued to FNI |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Cuffed<br>Eglin Dispatch<br>Gulf Defender<br>Holmes County Times-Advertiser<br>Hurlburt Warrior<br>Northwest Florida Daily News<br>Santa Rosa Press Gazette<br>The Crestview News Extra<br>The Destin Log<br>The Free Press<br>The News Herald<br>The Star<br>The Times<br>The Walton Sun<br>The Weekly Advertiser<br>Washington County News | | | | Rachel L. Sagan = S<br>Katherine Bartzoff = AS | |
| **Freedom Arizona Information, Inc.**<br><br>**Chapter 11 Case No. 09-13072**<br><br>Address:<br>120 West First Avenue<br>Mesa, AZ 85210<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Active Lifestyles<br>Ahwatukee Foothills News<br>Chandler Tribune<br>Clipper Marketplace Magazine<br>Daily News-Sun<br>Daily News-Sun Healthy Living<br>Daily News-Sun Southwest Living<br>Gilbert Tribune<br>Glendale/Peoria Today<br>Mesa Tribune<br>Queen Creek Tribune<br>Surprise Today<br>The East Valley Tribune | C | CA | AZ | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Julie Moreno = VP & PUB, East Valley Tribune<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: No Par Value<br>1,000 Common<br>500 Preferred<br><br>Outstanding:<br>100 Common Issued to FNI |
| **Freedom Colorado Information, Inc.**<br><br>**Chapter 11 Case No. 09-13073**<br><br>Address: | C | DE | CO | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo | Authorized: $0.01 Par Value<br>1,000 Common<br>500 Preferred<br><br>Outstanding: |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| 30 South Prospect Street<br>Colorado Springs, CO 80903<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Fresh Ink<br>Military Guide - Welcome Home<br>Pikes Peak Parent Magazine<br>Springs Savings<br>Springs Values<br>Springs Wheel<br>The Gazette<br>TV Magazine<br>Your Hub | | | | **Officers:**<br>Steven Pope = P* & PUB, The Gazette<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | 100 Common Issued to FNI |
| **Freedom Eastern North Carolina Communications, Inc.**<br><br>**Chapter 11 Case No. 09-13074**<br><br>Address:<br>1300 Gum Branch Road<br>Jacksonville, NC 28540<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Brandywine Bay Phone Directory<br>Community Health Plus +<br>Craven County Medical Directory<br>Cuisine<br>Discover Coastal Carolina<br>ENC Brides<br>ENC Home Planner<br>ENC Medical Directory<br>Fairfield Harbour Phone Directory<br>Greenbrier Gazette<br>Greenbrier Gazette Phone Directory<br>Havelock News<br>Historic New Bern Herald<br>HOMEPLACE Magazine<br>Homes Magazine<br>Jones Post<br>Kidsville News<br>Leisure Living | C | DE | NC | **Directors:**<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>**Officers:**<br>Vernon DeBolt = P & PUB, Sun Journal<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $0.01 Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding:<br>100 Common issued to FNI |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Life Styles<br>MAX Entertainment Guide<br>Penny Saver -- Jacksonville<br>Penny Saver -- Kinston<br>Pines Perspective Phone Directory<br>Places of Worship<br>Real Estate Magazine<br>River Bend Phone Directory<br>River Bender<br>Simply Pets<br>Sound Waves of Brandywine Bay<br>Sun Journal<br>Taberna Tribune<br>Taberna Tribune Phone Directory<br>The Daily News<br>The Fairfield Harbour Beacon<br>The Free Press<br>The Pines Perspective<br>The Shopper<br>The Shoreline<br>Topsail Advertiser<br>Trent Woods Phone Directory<br>Trent Woods Times | | | | | |
| **Freedom Newspaper Acquisitions, Inc.**<br><br>**Chapter 11 Case No. 09-13084**<br><br>Address:<br>17666 Fitch<br>Irvine, CA 92614<br><br>Primary Operations:<br>Holding Company<br>Inactive | C | DE | CA, IN, NM | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $0.01 Par Value<br>1,000 Common<br>500 Preferred<br><br>Outstanding:<br>100 Common issued to FNI |
| **Freedom Newspapers of New Mexico, L.L.C.**<br><br>**Chapter 11 Case No. 09-13086**<br><br>Address:<br>521 Pile Street<br>Clovis, NM 88101<br><br>Primary Operations:<br>Newspaper and Related Publishing | LLC | DE | NM | Directors:<br>N/A<br><br>Positions:<br>Ray Sullivan = LLC VP* & Senior PUB, Clovis News-Journal, The Quay County Sun and Portales News-Tribune | Units Issued to:<br>30.00% to FNAI<br>70.00% to The Clovis News-Journal<br><br>Effective Ownership:<br>FCI holds 1.00% interest<br>FNAI holds 99.00% interest<br>No Minority Partners<br>FNAI is Managing Member |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Titles:<br>ADMart<br>Cannon Connections<br>Clovis News-Journal<br>Farm & Ranch<br>Healthy You<br>Portales News-Tribune<br>Quay County Sun<br>Welcome Home | | | | | |
| **The Clovis News-Journal**<br><br>**Chapter 11 Case No. 09-13085**<br><br>Address:<br>521 Pile Street<br>Clovis, NM 88101<br><br>Primary Operations:<br>Holding Company | GP | NM | | Directors:<br>N/A<br><br>Officers:<br>N/A | FCI holds 1.00% interest<br>FNAI holds 99.00% interest<br>No Minority Partners<br>FCI is Managing General Partner<br>(See FNNM above) |
| **Freedom Newspapers**<br><br>**Chapter 11 Case No. 09-13092**<br><br>Address:<br>1400 E. Nolana Loop<br>McAllen, TX 78504<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>El Extra (Brownsville)<br>El Extra (McAllen)<br>El Nuevo Heraldo<br>Island Breeze<br>Mid-Valley Town Crier<br>RGVSports.com The Magazine<br>The Brownsville Herald<br>The Coastal Current Weekly<br>The Monitor<br>TV Y Todo<br>Valley Morning Star<br>La Frontera (discontinued) | GP | TX | | Directors<br>N/A<br><br>Positions:<br>Tyler Patton = PUB, Valley Morning Star<br>Daniel Cavazos = PUB, The Brownsville Herald<br>Olaf Frandsen = PUB, The Monitor<br>John Greider = GM, Mid-Valley Town Crier | FCI holds 80.00% interest<br>FNAI holds 19.95% interest<br>Minority partners hold .05% interest<br>FCI is Managing Partner |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| **The Creative Spot, L.L.C.**<br><br>**Chapter 11 Case No. 09-13093**<br><br>Address:<br>1400 E. Nolana Loop<br>McAllen, TX 78504<br><br>Primary Operations:<br>Inactive | LLC | DE | TX | | FN holds 100% interest |
| **Freedom Newspapers of Illinois, Inc.**<br><br>**Chapter 11 Case No. 09-13075**<br><br>Address:<br>111 E. Broadway<br>Alton, IL 62002<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Flaire: For Women<br>Home Style<br>The Telegraph<br>Thrive | C | DE | IL | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>James Shrader = VP* & PUB, The Telegraph<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $0.01 Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding:<br>100 Common issued to FNI |
| **Freedom Newspapers of Southwestern Arizona, Inc.**<br><br>**Chapter 11 Case No. 09-13076**<br><br>Address:<br>2055 South Arizona Avenue<br>Yuma, AZ 85364<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>33.10<br>4 Duners<br>Bajo El Sol<br>Desert Farm & Ranch<br>Health Connections<br>Living in Yuma<br>Marketplace<br>Raising Yuma | C | CA | AZ | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Julie Moreno = VP<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: No Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding:<br>100 Common issued to FNI |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| RE Weekly<br>Southwest Living<br>Summer in Yuma<br>Super Shopper<br>The Sun<br>Winter in Yuma<br>Winter Visitor Connection<br>Yuma Business Direct | | | | | |
| **Freedom Shelby Star, Inc.**<br><br>**Chapter 11 Case No. 09-13077**<br><br>Address:<br>315 E. Graham Street<br>Shelby, NC  28150<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Cleveland County Extra<br>Cleveland Home Magazine<br>Cleveland Now<br>Lake Lure<br>Medical Directory<br>Newcomer Guide<br>Rutherford Now<br>Senior Living<br>The Star<br>Your Health | C | DE | NC | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Skip Foster = VP* & PUB, The Shelby Star<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $0.01 Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding:<br>100 Common issued to FNI |
| **Gaston Gazette, LLP**<br><br>**Chapter 11 Case No.  09-13087**<br><br>Address:<br>1893 Remount Road<br>Gastonia, NC  28054<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Discover Gaston<br>Gaston Homes Magazine<br>Gaston Shop and Save<br>Gaston Women | LLP | NC | | Directors:<br>N/A<br><br>Positions:<br>Jennie Lambert = PUB, The Gaston Gazette | FCI holds 83.93%  interest<br>FNAI holds 15.78%  interest<br>Minority partners hold .29% interest<br>FCI is Managing Partner |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| The Gaston Gazette<br>The Wedding Planner | | | | | |
| **Illinois Freedom Newspapers, Inc.**<br><br>**Chapter 11 Case No. 09-13078**<br><br>Address:<br>235 W. State Street<br>Jacksonville, IL 62650<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Community<br>Journal Courier | C | IL | | **Directors:**<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>**Officers:**<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Kent A. Kilpatrick = VP* & PUB, Jacksonville Journal-Courier<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $0.01 Par Value<br>1,000 Common<br><br>Outstanding:<br>1,000 Common issued to FNI |
| **Lima News**<br><br>**Chapter 11 Case No. 09-13088**<br><br>Address:<br>3515 Elida Road<br>Lima, OH 45807<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Baby Magazine<br>Generations Magazine<br>Grand Lake Guide<br>Indian Lake Directory<br>Marketplace<br>Medical Directory<br>Putman Voice<br>Real Estate Marketplace<br>The Lima News<br>Wedding Planner | GP | OH | | **Directors:**<br>N/A<br><br>**Positions:**<br>James Shine = Acting PUB, The Lima News | FCI holds 78.45% interest<br>FNAI holds 21.55% interest<br>No Minority Partners<br>FCI is Managing Partner |
| **Missouri Freedom Newspapers, Inc.**<br><br>**Chapter 11 Case No. 09-13079**<br><br>Address:<br>700 S. Massachusetts Ave. | C | MO | | **Directors:**<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>**Officers:** | Authorized: $0.01 Par Value<br>1,000 Common<br><br>Outstanding:<br>1,000 Common issued to FNI |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Sedalia, MO 65301<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>The Benton County Plainsman<br>The Henry County Plainsman<br>The Johnson County Plainsman<br>The Morgan County Plainsman<br>The Pettis County Plainsman<br>The Saline County Plainsman<br>The Sedalia Democrat<br>Whiteman Warrior | | | | Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>David Phillips = VP* & PUB, Sedalia Democrat<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | |
| **Odessa American**<br><br>**Chapter 11 Case No. 09-13080**<br><br>Address:<br>222 W. Fourth Street<br>Odessa, TX 79761<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Basin Smart Shopper<br>Odessa American | GP | TX | | <u>Directors:</u><br>N/A<br><br><u>Positions:</u><br>Patrick Canty = PUB, Odessa American | FCI holds 59.6% interest<br>FNAI holds 40.4% interest<br>No Minority Interests<br>FCI is Managing Partner |
| **Porterville Recorder Company**<br><br>**Chapter 11 Case No. 09-13089**<br><br>Address:<br>115 E. Oak Avenue<br>Porterville, CA 93257<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Noticiero Semanal<br>Porterville Recorder<br>South Valley Review<br>Wanted | LP | CA | | <u>Directors:</u><br>N/A<br><br><u>Positions:</u><br>Mark Fazzone = PUB, Porterville Recorder | FCI holds 72.68% interest<br>FNAI holds 25.63% interest<br>Minority partners hold 1.69% interest<br>FCI is Managing General Partner |
| **Seymour Tribune Company** | LP | CA | IN | <u>Directors:</u> | FCI holds 82.00% interest |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| **Chapter 11 Case No. 09-13090**<br><br>Address:<br>110 St. Louis Avenue<br>Seymour, IN 47274<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Business 2 Business<br>The Tribune<br>The Tribune Marketplace Connection | | | | N/A<br><br>Positions:<br>Richard Davis = PUB, The Tribune | FNAI holds 17.58% interest<br>Minority partners hold .42% interest<br>FCI is General Partner |
| **The Times – News Publishing Company**<br><br>**Chapter 11 Case No. 09-13081**<br><br>Address:<br>707 S. Main Street<br>Burlington, NC 27215<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Alamance at Home<br>Alamance Direct<br>Coupon Clipper<br>Times-News | C | NC | | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Paul Mauney = VP* & PUB, Times-News<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $100 Par Value<br>5,000 Common<br><br>Outstanding:<br>5,000 Common Issued to FNI |
| **Victor Valley Publishing Company**<br><br>**Chapter 11 Case No. 09-13082**<br><br>Address:<br>13891 Park Avenue<br>Victorville, CA 92392<br><br>Primary Operations:<br>Holding Company<br>Inactive | C | CA | | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Stephan Wingert = VP & PUB, DP, Desert Dispatch & Hesperia Star<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $100 Par Value<br>250 (Capital Stock)<br><br>Outstanding:<br>160 Issued to FNI |
| **Daily Press** | GP | CA | | Directors:<br>N/A | VVPC holds 70.00% interest<br>VPC holds 30.00% interest |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| **Chapter 11 Case No. 09-13083**<br><br>Address:<br>13891 Park Avenue<br>Victorville, CA 92392<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>AV Review<br>Barstow, Desert Dispatch<br>Daily Press<br>El Mojave<br>Fresh Ink<br>Hesperia Star<br>Review<br>The Leader | | | | Positions:<br>Stephen Wingert = PUB | Effective Ownership:<br>FCI effectively holds<br>  98.95% interest<br><br>Minority partners effectively hold<br>  1.05% interest<br>FCI is Managing Partner |
| **Victorville Publishing Company**<br><br>**Chapter 11 Case No. 09-13091**<br><br>Address:<br>13891 Park Avenue<br>Victorville, CA 92392<br><br>Primary Operations:<br>Holding Company<br>Inactive | LP | CA | | Directors:<br>N/A<br><br>Officers:<br>N/A | FCI holds 4.41% interest<br>FNAI holds 92.08% interest<br>Minority partners hold 3.51% interest<br>FCI is Managing General Partner<br>(See DP above) |
| **Freedom Metro Information, Inc.**<br><br>**Chapter 11 Case No. 09-13065**<br><br>Address:<br>17666 Fitch<br>Irvine, CA 92614<br><br>Primary Operations:<br>Inactive | C | DE | AZ, CA, CO | Directors:<br>Terry Horne<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Terry Horne = P<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $0.01 Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding:<br>100 Common issued to FCI |
| **Orange County Register Communications, Inc. (fka Freedom Orange County Information, Inc.)**<br><br>**Chapter 11 Case No. 09-13067** | C | CA | | Directors:<br>Terry Horne<br>Mark A. McEachen<br>Nancy S. Trillo | Authorized: No Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding: |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Address:<br>625 N. Grand Avenue<br>Santa Ana, CA 92701<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Operator of The Orange County Register | | | | **Officers:**<br>Terry Horne = P & CEO<br>Mark A. McEachen = SVP & CFO<br>Kenneth F. Brusic = SVP, Content*<br>Michael Henry = VP, Finance<br>Richard (Rick) Sant = VP, Operations<br>Dianne Ippolito = VPHR<br>Cathy Taylor = VP, Editorial and Commentary<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS<br><br>*expanded role includes Content Leader for all divisions | 100 Common Issued to FNI |
| **OCR Community Publications, Inc.**<br><br>**Chapter 11 Case No. 09-13068**<br><br>Address:<br>625 N. Grand Avenue<br>Santa Ana, CA 92701<br><br>Primary Operations:<br>Newspaper and Related Publishing<br><br>Titles:<br>Aliso Viejo News/Laguna Niguel News<br>Anaheim Bulletin<br>Anaheim Hills News<br>Canyon Life / Rancho Santa Margarita<br>Capistrano Valley News<br>Coast<br>Coast Kids<br>Dana Point News<br>Excélsior<br>Fountain Valley View<br>Fullerton News Tribune<br>Ladera Post<br>Laguna News-Post<br>Laguna Woods Globe<br>OC Saver<br>Orange City News<br>Placentia News-Times<br>Preferred Destinations<br>Saddleback Valley News<br>San Clemente Sun Post News<br>Star Progress | C | CA | | **Directors:**<br>Terry Horne<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>**Officers:**<br>Terry Horne = P & CEO<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: No Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding:<br>100 Common Issued to OCRC |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| The Current<br>The Huntington Beach Wave<br>The Irvine World News/OC Post<br>The Tustin News<br>Yorba Linda Star | | | | | |
| **OCR Information Marketing, Inc.**<br><br>**Chapter 11 Case No. 09-13069**<br><br>Address:<br>625 N. Grand Avenue<br>Santa Ana, CA 92701<br><br>Primary Operations:<br>Inactive | C | CA | | Directors:<br>Terry Horne<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Terry Horne = P & CEO<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: No Par Value<br>1,000 Common<br>   500 Preferred<br><br>Outstanding:<br>100 Common Issued to OCRC |
| **Freedom Magazines, Inc.**<br><br>**Chapter 11 Case No. 09-13064**<br><br>Address:<br>17666 Fitch<br>Irvine, CA 92614<br><br>Primary Operations:<br>Inactive | C | CA | | Directors:<br>Mark A. McEachen<br>Nancy S. Trillo<br>Marcy E. Bruskin<br><br>Officers:<br>Nancy S. Trillo = P & C<br>Mark A. McEachen = SVP & CFO<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized:  Par Value<br>1,000,000 Common<br><br>Outstanding:<br>1,000 Common Issued to FCI |
| **Freedom Broadcasting, Inc.**<br><br>**Chapter 11 Case No. 09-13048**<br><br>Address:<br>17666 Fitch<br>Irvine, CA 92614<br><br>Primary Operations:<br>Holding Company<br>Inactive | C | DE | CA | Directors:<br>Doreen D. Wade<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Doreen D. Wade = P<br>Mark A. McEachen = SVP & CFO<br>Brien Kennedy = EVP, Broadcast Sales<br>William A. Rinchik = VP, Finance & New Ventures<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized:  $0.01 Par Value<br>1,000 Common<br>   500 Preferred<br><br>Outstanding:<br>100 Common Issued to FCI |
| **Freedom Broadcasting of Florida, Inc.**<br><br>**Chapter 11 Case No. 09-13049** | C | DE | FL | Directors:<br>Doreen D. Wade<br>Mark A. McEachen<br>Nancy S. Trillo | Authorized:  $0.01 Par Value<br>1,000 Common<br>   500 Preferred |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Address:<br>1100 Fairfield Drive<br>West Palm Beach, FL 33407<br><br>Primary Operations:<br>Broadcast Television<br><br>Stations:<br>WPEC (CBS)<br>WPEC-DT2 (Mi Pueblo) | | | | Officers:<br>Doreen D. Wade = P<br>Brien Kennedy = EVP & GM, WPEC<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Outstanding:<br>1,000 Common Issued to FBI |
| Freedom Broadcasting of Michigan, Inc.<br><br>Chapter 11 Case No. 09-13051<br><br>Address:<br>5815 S. Pennsylvania Avenue<br>Lansing, MI 48911<br><br>Primary Operations:<br>Broadcast Television<br><br>Stations:<br>WLAJ (ABC)<br>WLAJ-DT2 (CW)<br>WWMT (CBS)<br>WWMT-DT2 (CW) | C | DE | MI | Directors:<br>Doreen D. Wade<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Doreen D. Wade = P<br>Mark A. McEachen = SVP & CFO<br>James Lutton = VP & GM, WWMT and WLAJ<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $0.01 Par Value<br>1,000 Common<br>  500 Preferred<br><br>Outstanding:<br>100 Common Issued to FBI |
| Freedom Broadcasting of New York, Inc.<br><br>Chapter 11 Case No. 09-13053<br><br>Address:<br>1400 Balltown Road<br>Schenectady, NY 12309<br><br>Primary Operations:<br>Broadcast Television<br><br>Stations:<br>WCWN (CW)<br>WCWN-DT2 (Universal Sports)<br>WRGB (CBS)<br>WRGB-DT2 (This TV) | C | NY | | Directors:<br>Doreen D. Wade<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Doreen D. Wade = P<br>Mark A. McEachen = SVP & CFO<br>Robert Furlong = VP & GM, WRGB & WCWN<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: No Par Value<br>200 Common<br><br>Outstanding:<br>200 Common Issued to FBI |
| Freedom Broadcasting of Oregon, Inc.<br><br>Chapter 11 Case No. 09-13055 | C | CA | OR | Directors:<br>Doreen D. Wade<br>Mark A. McEachen | Authorized: No Par Value<br>500,000 Common |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Address:<br>1440 Rossanley Drive<br>Medford, OR 97501<br><br>Primary Operations:<br>Broadcast Television<br><br>Stations:<br>KTVL (CBS)<br>KTVL-DT2 (CW) | | | | Nancy S. Trillo<br><br>**Officers:**<br>Doreen D. Wade = P<br>Mark A. McEachen = SVP & CFO<br>Kingsley Kelley = VP & GM, KTVL<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Outstanding:<br>500,000 Common Issued to FBI |
| **Freedom Broadcasting of Southern New England, Inc.**<br><br>**Chapter 11 Case No. 09-13057**<br><br>Address:<br>17666 Fitch<br>Irvine, CA 92614<br><br>Primary Operations:<br>Inactive | C | DE | MA, RI | **Directors:**<br>Doreen D. Wade<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>**Officers:**<br>Doreen D. Wade = P<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $1.00 Par Value<br>1,000 Common<br>   500 Preferred<br><br>Outstanding:<br>1,000 Common Issued to FBI |
| **Freedom Broadcasting of Tennessee, Inc.**<br><br>**Chapter 11 Case No. 09-13062**<br><br>Address:<br>4279 Benton Drive<br>Chattanooga, TN 37406<br><br>Primary Operations:<br>Broadcast Television<br><br>Stations:<br>WTVC (ABC)<br>WTVC-DT2 (This TV) | C | TN | | **Directors:**<br>Doreen D. Wade<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>**Officers:**<br>Doreen D. Wade = P<br>Mark A. McEachen = SVP & CFO<br>Michael Costa = VP & GM, WTVC<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $100.00 Par Value<br>1,000 Common<br><br>Outstanding:<br>1,000 Common Issued to FBTX |
| **Freedom Broadcasting of Texas, Inc.**<br><br>**Chapter 11 Case No. 09-13059**<br><br>Address:<br>2955 I-10 East<br>Beaumont, TX 77702<br><br>Primary Operations: | C | CA | LA, TX | **Directors:**<br>Doreen D. Wade<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>**Officers:**<br>Doreen D. Wade = P<br>Mark A. McEachen = SVP & CFO<br>Larry Beaulieu = VP & GM, KFDM | Authorized: No Par Value<br>1,000,000 Common<br><br>Outstanding:<br>1,000,000 Common Issued to FBI |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Broadcast Television<br><br>Stations:<br>KFDM (CBS)<br>KFDM-DT2 (CW) | | | | Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | |
| **Freedom Broadcasting of Florida Licensee, L.L.C.**<br><br>**Chapter 11 Case No. 09-13050**<br><br>Address:<br>1100 Fairfield Drive<br>West Palm Beach, FL 33407<br><br>Primary Operations:<br>Special Purpose Entity<br>FCC License Holder | LLC | DE | | N/A | Units Issued to:<br>100% to FBFL |
| **Freedom Broadcasting of Michigan Licensee, L.L.C.**<br><br>**Chapter 11 Case No. 09-13052**<br><br>Address:<br>5815 S. Pennsylvania Avenue<br>Lansing, MI 48911<br><br>Primary Operations:<br>Special Purpose Entity<br>FCC License Holder | LLC | DE | | N/A | Units Issued to:<br>100% to FBMI |
| **Freedom Broadcasting of New York Licensee, L.L.C.**<br><br>**Chapter 11 Case No. 09-13054**<br><br>Address:<br>1400 Balltown Road<br>Schenectady, NY 12309<br><br>Primary Operations:<br>Special Purpose Entity<br>FCC License Holder | LLC | DE | | N/A | Units Issued to:<br>100% to FBNY |
| **Freedom Broadcasting of Oregon Licensee, L.L.C.**<br><br>**Chapter 11 Case No. 09-13056**<br><br>Address: | LLC | DE | | N/A | Units Issued to:<br>100% to FBOR |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| 1440 Rossanley Drive<br>Medford, OR 97501<br><br>Primary Operations:<br>Special Purpose Entity<br>FCC License Holder | | | | | |
| **Freedom Broadcasting of Southern New England Licensee, L.L.C.**<br><br>**Chapter 11 Case No. 09-13058**<br><br>Address:<br>17666 Fitch<br>Irvine, CA 92614<br><br>Primary Operations:<br>Inactive | LLC | DE | | N/A | Units Issued to:<br>100% to FBSNE |
| **Freedom Broadcasting of Tennessee Licensee, L.L.C.**<br><br>**Chapter 11 Case No. 09-13063**<br><br>Address:<br>4279 Benton Drive<br>Chattanooga, TN 37406<br><br>Primary Operations:<br>Special Purpose Entity<br>FCC License Holder | LLC | DE | | N/A | Units Issued to:<br>100% to FBTN |
| **Freedom Broadcasting of Texas Licensee, L.L.C.**<br><br>**Chapter 11 Case No. 09-13061**<br><br>Address:<br>2955 I-10 East<br>Beaumont, TX 77702<br><br>Primary Operations:<br>Special Purpose Entity<br>FCC License Holder | LLC | DE | | N/A | Units Issued to:<br>100% to FBTX |
| **Freedom Interactive Newspapers, Inc.**<br><br>**Chapter 11 Case No. 09-13094** | C | CA | | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo | Authorized: No Par Value<br>1,000 Common<br>500 Preferred |

| Entity Name, Address, and Primary Operations | Type of Entity | State of Organization | States qualified to do business | List of current officers and directors | List of authorized capital stock and amounts outstanding (by class and series) |
|---|---|---|---|---|---|
| Address:<br>17666 Fitch<br>Irvine, CA 92614<br><br>Primary Operations:<br>Holding Company<br>Inactive | | | | Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Outstanding:<br>100 Common Issued to FNI |
| **Freedom Interactive Newspapers of Texas, Inc.**<br><br>**Chapter 11 Case No. 09-13095**<br><br>Address:<br>1400 E. Nolana Loop<br>McAllen, TX 78504<br><br>Primary Operations:<br>Inactive | C | DE | TX | Directors:<br>Jonathan Segal<br>Mark A. McEachen<br>Nancy S. Trillo<br><br>Officers:<br>Jonathan Segal = P<br>Mark A. McEachen = SVP & CFO<br>Nancy S. Trillo = VPC<br>Rachel L. Sagan = S<br>Katherine Bartzoff = AS | Authorized: $0.01 Par Value<br>1,000 Common<br>500 Preferred<br><br>Outstanding:<br>100 Common Issued to FIN |

# Legend

Type of Entity:
C = C-Corporation
GP = General Partnership
LP = Limited Partnership
LLC = Limited Liability Company
LLP = Limited Liability Partnership
NPC = Non-Profit Corporation

Officer & Director:
Chair = Chairman
D = Director
P = President
CEO = Chief Executive Officer
CFO = Chief Financial Officer
EVP = Executive VP
SVP = Senior VP
VP = Vice President
VPC = VP and Controller
VPHR & OD = VP, Human Resources and Organizational Development
VPCIO = VP, Chief Information Officer
VPCA = VP, Corporate Affairs
VPSH = VP, Shareholder Relations
GC = General Counsel
S = Secretary
T = Treasurer
C = Controller
AS = Assistant Secretary
PUB = Publisher
GM = General Manager

Entity Name:
FCHI = Freedom Communications Holdings, Inc.
FCI = Freedom Communications, Inc.
FSI = Freedom Services, Inc.
FBI = Freedom Broadcasting, Inc.
FBFL = Freedom Broadcasting of Florida, Inc.
FBMI = Freedom Broadcasting of Michigan, Inc.
FBNY = Freedom Broadcasting of New York, Inc.
FBOR = Freedom Broadcasting of Oregon, Inc.
FBSNE = Freedom Broadcasting of Southern New England, Inc.
FBTN = Freedom Broadcasting of Tennessee, Inc.
FBTX = Freedom Broadcasting of Texas, Inc.
FENC = Freedom Eastern North Carolina Communications, Inc.
FNI = Freedom Newspapers, Inc.
FNAI = Freedom Newspaper Acquisitions, Inc.
FNNM = Freedom Newspapers of New Mexico, L.L.C.
FPSA = Freedom Publicaciones S.A. de C.V.
FSLP = Freedom Spanish Language Publications, Inc.
VVPC = Victor Valley Publishing Company
FMI = Freedom Magazines, Inc.
FMET = Freedom Metro Information, Inc.
FAII = Freedom Arizona Information, Inc.
FCII = Freedom Colorado Information, Inc.

OCRC = Orange County Register Communications, Inc. (fka Freedom Orange County Information, Inc.)
OCRINFO = OCR Information Marketing, Inc.
OCRPUB = OCR Community Publications, Inc.
FIN = Freedom Interactive Newspapers, Inc.
FINTX = Freedom Interactive Newspapers of Texas, Inc.
CNJ = The Clovis News-Journal (a New Mexico GP)
DP = Daily Press (a California GP)
FN = Freedom Newspapers (a Texas GP)
GG = Gaston Gazette, L.L.P. (a North Carolina LLP)
LIMA = Lima News (an Ohio GP)
OA = Odessa American (a Texas GP)
PRC = Porterville Recorder Company (a California LP)
STC = Seymour Tribune Company (a California LP)
VPC = Victorville Publishing Company (a California LP)


**\* = Title for corporate maintenance purposes only.**

**Exhibit 7**

**Historical Executive Compensation Information**

**HISTORICAL EXECUTIVE COMPENSATION**

The following chart contains historical compensation information for those individuals who are or were members of the Debtors' senior management team during 2009 (not including restructuring consultants who served in management)

| 2009 | Scott N. Flanders | Burl Osborne | Mark A. McEachen | Douglas S. Bennett | Jonathan Segal* | Doreen D. Wade* | Rachel L. Sagan* | Marcy E. Bruskin* | Nancy S. Trillo* |
|---|---|---|---|---|---|---|---|---|---|
| Salary/Regular Pay | $ 452,308 | $ 435,500 | $ 235,385 | $ 391,987 | $ 433,151 | $ 315,781 | $ 270,096 | $ 249,038 | $ 253,846 |
| MBO | 1,175,000 | | 133,334 | 247,824 | 241,684 | 192,812 | 143,263 | 119,966 | 100,122 |
| Other | 54,734 | | 10,659 | 446 | 2,635 | 9,975 | 168 | 430 | 804 |
| | $ 1,682,042 | $ 435,500 | $ 379,378 | $ 640,257 | $ 677,470 | $ 518,568 | $ 413,527 | $ 369,435 | $ 354,772 |
| **2008** | **Scott N. Flanders** | | | **Douglas S. Bennett** | **Jonathan Segal*** | **Doreen D. Wade*** | **Rachel L. Sagan*** | **Marcy E. Bruskin*** | **Nancy S. Trillo*** |
| Salary/Regular Pay | $ 800,000 | | | $ 392,788 | $ 434,615 | $ 317,000 | $ 265,000 | $ 250,000 | $ 250,000 |
| MBO | 457,600 | | | 54,141 | 66,938 | 56,228 | 62,607 | 39,992 | 36,881 |
| Other | 383,316 | | | 6,778 | 29,586 | 22,085 | 6,553 | 60,150 | 61,561 |
| | $ 1,640,916 | | | $ 453,707 | $ 531,139 | $ 395,312 | $ 334,160 | $ 350,142 | $ 348,442 |
| **2007** | **Scott N. Flanders** | | | **Douglas S. Bennett** | **Jonathan Segal*** | **Doreen D. Wade*** | **Rachel L. Sagan*** | **Marcy E. Bruskin*** | **Nancy S. Trillo*** |
| Salary/Regular Pay | $ 800,000 | | | $ 375,000 | $ 425,000 | $ 316,528 | $ 263,692 | $ 249,831 | $ 249,615 |
| MBO | 663,440 | | | 70,426 | 191,176 | 160,088 | 98,773 | 80,476 | 77,935 |
| Other | 204,301 | | | 478,491 | 123,708 | 95,318 | 68,173 | 9,671 | 9,671 |
| | $ 1,667,741 | | | $ 923,917 | $ 739,884 | $ 571,934 | $ 430,638 | $ 339,978 | $ 337,221 |

Note:

(1) MBO amounts represent monies paid in that year (i.e., 2009 represents bonus earned in 2008 and paid in 2009 and the quarterly 2009 bonuses paid to date).

(2) Payments to Mr. Osborne are consulting fees paid through December 2009. Directors' fees and expenses are not included.

(3) Other amounts represent Group Term Life taxable income, relocation expenses/bonuses, auto reimbursement and gross up, non-qualified DC plan contribution, club memberships, etc.

(4) 2009 information is through the paycheck dated 12/31/2009. The 4th quarter 2009 bonus will be paid, if earned, in 2010.

(5) Except for Mr. McEachen, all either have been or are currently members of the Phantom Stock Appreciation Rights and Restricted Stock Units programs, which are part of the Old Freedom Stock Rights under the Plan.
      Such rights have no current value and will be cancelled under the Plan.

(6) * Indicates that the individual is a participant of the frozen Freedom Communications Defined Benefit Pension Plan and participated in the Non-Qualified / Excess Defined Benefit Pension Plan.

(7) With the exception of Mr. Osborne and Mr. McEachen, all were participants in the Non-Qualified Defined Contribution portion of the Freedom Communications, Inc. 401(k) Retirement Savings Plan.

(8) The information above represents gross wages and other income for the calendar year indicated. Any pre-tax deduction (e.g., 401(k), Section 125) that would impact taxable income are not accounted for in the information.

**Exhibit 8**

**Notice of Desire to Enter into Post-Emergence Trade Agreement**

In re:

**Freedom Communications Holdings, Inc.,** *et al.,*

Debtors.

## NOTICE OF DESIRE TO ENTER INTO POST-EMERGENCE TRADE AGREEMENT

*Capitalized terms used in this Notice have the meanings provided in the Joint Plan of Reorganization under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al., Debtors (the "Plan")*

DISCLAIMER

THE PROVISIONS OF THE PLAN GOVERNING TRADE UNSECURED CLAIMS ARE SUBJECT TO BANKRUPTCY COURT APPROVAL. IF BANKRUPTCY COURT APPROVAL IS NOT GRANTED, THIS NOTICE SHALL BE NULL AND VOID FOR ALL PURPOSES.

## COMPLETE THE INFORMATION BELOW:

_____          _____
Name of Claimant/Provider of Goods or Services          Contact Person

_____
Address of Claimant/Provider

_____          _____          _____
Telephone Number          Facsimile Number          Email Address

_____
Name of Debtor Obligated on Claim / Debtor who Obtained Goods or Services[1]

_____
Nature of Goods or Services Obtained by Debtor from Claimant/Provider

_____          _____
Provider's Account Number with Debtor          Provider's Taxpayer ID Number

$_____  _          Proof of Claim Filed:          Yes___ No___
Amount of Claim (as of 9/1/2009)          503(b)(9) Request for Payment Filed:  Yes___ No___

## THE ABOVE-IDENTIFIED CLAIMANT/PROVIDER HEREBY CERTIFIES, AGREES AND REPRESENTS:

1.      Claimant/Provider holds a Claim based upon or arising from the above-identified Debtor's receipt of goods or services in the ordinary course of business prior to September 1, 2009 (the "Petition Date").

---

[1]      This form does not apply to holders of Claims against the following Debtors: Freedom Newspapers, Gaston Gazette LLP, Daily Press, Porterville Recorder Company, Seymour Tribune Company, Victorville Publishing Company, and The Creative Spot, L.L.C. Such Debtors are referred to in the Plan as Unencumbered Debtors. Please refer to the provisions of the Plan relating to the treatment of Claims against Unencumbered Debtors.

2.      Claimant/Provider has continued to supply such goods or services to the Debtor from Petition Date through the date hereof on the same or better terms as were provided to the Debtor immediately prior to the Petition Date or within 90 days prior to the Petition Date.

3.      Claimant/Provider has reviewed the Joint Plan of Reorganization under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al., Debtors (the "Plan") and, in particular, the provisions relating to Trade Unsecured Claims and Post-Emergence Trade Agreements.

4.      Claimant/Provider understands that the provisions of the Plan relating to Trade Unsecured Claims and Post-Emergence Trade Agreements may not be approved by the Bankruptcy Court and, if not approved, it will not be possible for Claimant/Provider's Claim to become a Trade Unsecured Claim. Instead, Claimant/Provider's Claim will be treated as a General Unsecured Claim under the Plan.

5.      Claimant/Provider has reviewed the proposed form of Post-Emergence Trade Agreement attached hereto as Exhibit A (a copy is also available at www.loganandco.com).

6.      Claimant/Provider is willing to enter into and comply with the terms of the Post-Emergence Trade Agreement.

7.      Claimant/Provider understands that the Debtor may decline to enter into a Post-Emergence Trade Agreement if it determines that it will not have a continuing need for the goods or services of the Claimant/Provider after the Effective Date of the Plan. If the Debtor declines to enter into a Post-Emergence Trade Agreement with Claimant/Provider, it will not be possible for Claimant/Provider's Claim to become a Trade Unsecured Claim. Instead, Claimant/Provider's Claim will be treated as a General Unsecured Claim under the Plan.

8.      Claimant/Provider understands that, if the Debtor enters into a Post-Emergence Trade Agreement with Claimant/Provider, Claimant/Provider's Claim must be an Allowed Claim, as defined in the Plan, before it is entitled to payment. If agreed under the terms of the Post-Emergence Trade Agreement, the payment amount may be less than the full amount of the Allowed Claim.

9.      Claimant/Provider understands that if the Debtor decides to enter into a Post-Emergence Trade Agreement with Claimant/Provider, Debtor will deliver to Claimant/Provider a form Post-Emergence Trade Agreement, with a deadline for executing and returning the agreement. If Claimant/Provider timely returns an executed Post-Emergence Trade Agreement, and if Claimant/Provider has continued to supply goods or services to the Debtor up to the Effective Date of the Plan, the Debtors will execute the Post-Emergence Trade Agreement and return a copy to Claimant/Provider as soon as practicable after the Effective Date.

Date: _____

By (*signature*): _____

Name of Signatory: _____

Title/Position: _____

Claimant/Provider: _____

**Submit original executed notice by <u>February 24, 2010</u> to:**

Freedom Communications Holdings, Inc., attn: Rachel Sagan, 17666 Fitch, Irvine, California 92614,

**With copies to:**

Latham & Watkins LLP, attn: Michael J. Riela, 885 Third Ave, New York, New York 10022

Young Conaway Stargatt & Taylor, LLP, attn: Kara Hammond Coyle, 1000 West Street, 17th Floor, Wilmington, Delaware 19801

**Exhibit 9**

**Reorganized Debtors' Projected Financial Information**

**FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL.**
**REORGANIZED DEBTORS' PROJECTED FINANCIAL INFORMATION**

**A.      Introduction.**

As a condition to confirmation of a plan of reorganization, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management analyzed the ability of the Debtors to meet their obligations under the Plan with sufficient liquidity and capital resources to conduct their businesses. As a consequence, the Debtors' management developed and prepared the following projections of the Reorganized Debtors' financial statements (the "**Projections**") for the fiscal years 2010 through 2014 (the "**Projection Period**").

Furthermore, because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, no representations can be made as to the accuracy of the Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that the Debtors considered or consider the Projections to predict reliably future performance. The Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS, BUDGETS OR STRATEGIES OR MAKE EXTERNAL PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITIONS OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT ANTICIPATE THAT THEY WILL, AND DISCLAIM ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS, BUDGETS OR PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO STOCKHOLDERS AFTER THE EFFECTIVE DATE.**

**B.      Projections.**

The Projections should be read in conjunction with the assumptions, qualifications and explanations set forth herein and the Disclosure Statement.

The Projections set forth below have been prepared based on the assumption that the Effective Date will be June 30, 2010. Although the Debtors are seeking to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when or if the Effective Date will actually occur.[1]

---

[1] Note: Numbers in the following financial statements may not add due to rounding.

The Reorganized Debtors' Projected Consolidated Statements of Operations set forth below present the projected consolidated results of operations of the Reorganized Debtors for 2010 through 2014.

**Freedom Communications Holdings, Inc., et al.**
**Consolidated Projected Statements of Operations**
*($ in millions)*

|  | Pro Forma | Projections | | | |
|---|---|---|---|---|---|
|  | 2010 | 2011 | 2012 | 2013 | 2014 |
| Revenue |  |  |  |  |  |
| Newspapers | $397.8 | $416.8 | $435.9 | $451.2 | $464.7 |
| Broadcast | 96.0 | 90.5 | 102.1 | 95.3 | 107.1 |
| Interactive | 41.4 | 52.0 | 57.9 | 66.0 | 76.3 |
|    Total Revenue | 535.2 | 559.4 | 595.9 | 612.5 | 648.1 |
|  |  |  |  |  |  |
| Operating Expenses |  |  |  |  |  |
| Payroll and Benefits | 226.6 | 232.0 | 239.4 | 245.0 | 250.8 |
| Newsprint and Ink | 50.5 | 49.9 | 52.4 | 53.6 | 55.7 |
| Depreciation and Amortization | 39.0 | 38.2 | 35.7 | 36.0 | 35.6 |
| Other Operating Expenses | 166.0 | 170.3 | 176.0 | 179.8 | 184.3 |
|    Total Operating Expenses | 482.1 | 490.4 | 503.6 | 514.5 | 526.5 |
|  |  |  |  |  |  |
| **Operating Income** | **53.1** | **68.9** | **92.3** | **98.0** | **121.6** |
|  |  |  |  |  |  |
| Other Expenses |  |  |  |  |  |
| Corporate Expenses [1] | 52.4 | 33.2 | 33.5 | 33.9 | 34.2 |
| Interest Expense | 39.1 | 36.3 | 36.8 | 36.2 | 34.3 |
| Other Expenses | 12.2 | 9.9 | 4.8 | 4.9 | 5.2 |
|    (Loss) Earnings Before Taxes | (50.6) | (10.5) | 17.2 | 23.0 | 47.8 |
|  |  |  |  |  |  |
| Income Tax Expense | 11.1 | 8.7 | 5.8 | 3.8 | 1.9 |
| **Net (Loss) Income** | **($61.7)** | **($19.2)** | **$11.4** | **$19.2** | **$45.9** |
|  |  |  |  |  |  |
| **Normalized EBITDA** | **$60.8** | **$73.9** | **$94.5** | **$100.1** | **$123.0** |

*(1) Corporate expenses includes non-recurring charges of $19.5 million in 2010 related to professional fees and other restructuring expenses.*

*Note: The Projections assume that the Term A Facility is refinanced during the Projection Period.*

The Reorganized Debtors' Projected Consolidated Balance Sheets set forth below present the projected consolidated financial position of the Reorganized Debtors including the contemplated new capital structure of the Reorganized Debtors, giving effect to confirmation and consummation of the transactions contemplated by the Plan, as of the end of each fiscal year from 2010 to 2014.

**Freedom Communications Holdings, Inc., et al.**
**Consolidated Projected Balance Sheets**
*($ in millions)*

| | Pro Forma | | Projections | | |
| --- | --- | --- | --- | --- | --- |
| | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Assets:** | | | | | |
| Cash and Cash Equivalents | $19.4 | $22.1 | $17.9 | $19.6 | $33.8 |
| Receivables - net | 71.3 | 75.7 | 79.3 | 82.7 | 86.1 |
| Inventories - net | 5.7 | 5.6 | 5.9 | 6.0 | 6.3 |
| Deferred Income Taxes | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| Prepaid Expenses and Other Current Assets | 22.3 | 22.9 | 23.8 | 24.2 | 25.0 |
| Total Current Assets | 122.4 | 130.0 | 130.5 | 136.2 | 154.9 |
| | | | | | |
| Property, Plant & Equipment, Net | 178.2 | 162.1 | 147.4 | 132.3 | 117.6 |
| Intangible Assets | 377.9 | 375.8 | 374.8 | 373.8 | 372.9 |
| Other Assets | 10.5 | 5.1 | 5.1 | 5.1 | 5.1 |
| **Total Assets** | **$689.0** | **$673.0** | **$657.8** | **$647.5** | **$650.5** |
| | | | | | |
| **Liabilities & Stockholders' (Deficiency) Equity** | | | | | |
| Accrued Payroll & Benefits | $48.6 | $56.3 | $57.7 | $59.0 | $60.3 |
| Accounts Payable | 15.0 | 14.7 | 15.2 | 15.5 | 15.9 |
| Unearned Subscription Revenue | 18.7 | 18.4 | 18.5 | 18.6 | 18.6 |
| Current Pension & Related Liability | 19.8 | 21.1 | 19.9 | 18.9 | 18.9 |
| Other Accrued Liabilities | 52.6 | 52.6 | 52.6 | 52.6 | 52.6 |
| Total Current Liabilities | 154.7 | 163.1 | 164.0 | 164.6 | 166.3 |
| | | | | | |
| Long-Term Liabilities: | | | | | |
| Bank Debt, Including Current Portion | 328.0 | 333.6 | 318.6 | 301.9 | 272.7 |
| Long-Term Pension and Related Liability | 86.1 | 68.7 | 52.5 | 37.3 | 22.1 |
| Deferred Income Taxes - Long-Term | 103.3 | 110.0 | 113.8 | 115.6 | 115.5 |
| Other Long-Term Liabilities | 18.5 | 18.4 | 18.3 | 18.2 | 18.1 |
| Total Long-Term Liabilities | 535.9 | 530.8 | 503.3 | 473.1 | 428.5 |
| | | | | | |
| Minority Interest | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| | | | | | |
| Stockholders' (Deficiency) Equity | (1.9) | (21.1) | (9.6) | 9.6 | 55.5 |
| | | | | | |
| **Total Liabilities & Stockholders' (Deficiency) Equity** | **$689.0** | **$673.0** | **$657.8** | **$647.5** | **$650.5** |

*Note: The Projections assume that the Term A Facility is refinanced during the Projection Period.*

The Reorganized Debtors' Projected Consolidated Statements of Cash Flows set forth below present the projected cash flows of the Reorganized Debtors for fiscal years 2010 to 2014.

*Freedom Communications Holdings, Inc., et al.*
*Consolidated Projected Statement of Cash Flows*
*($ in millions)*

| | Pro Forma | | Projections | | |
| --- | --- | --- | --- | --- | --- |
| | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Cash Flows from Operating Activities** | | | | | |
| Net (Loss) Income | ($61.7) | ($19.2) | $11.4 | $19.2 | $45.9 |
| | | | | | |
| *Reconciliation of net (loss) income to net cash* | | | | | |
| *provided by operations:* | | | | | |
| Plus: Depreciation & Amortization | 39.0 | 38.2 | 35.7 | 36.0 | 35.6 |
| Plus: Amortization of Deferred Financing Costs | 7.7 | 5.5 | 0.0 | 0.0 | 0.0 |
| Plus: Deferred Taxes | 9.1 | 6.7 | 3.8 | 1.8 | (0.1) |
| Plus: PIK Interest | 7.4 | 15.8 | 0.0 | 0.0 | 0.0 |
| | | | | | |
| *Changes in assets and liabilities:* | | | | | |
| Receivables, net | 1.4 | (4.4) | (3.6) | (3.4) | (3.5) |
| Inventories, net | 0.8 | 0.1 | (0.3) | (0.1) | (0.2) |
| Prepaid Expenses and Other Current Assets | 0.5 | (0.6) | (0.9) | (0.4) | (0.9) |
| Accounts Payable | (4.9) | (0.3) | 0.5 | 0.3 | 0.4 |
| Pension and Related Liabilities | 2.0 | (16.1) | (17.4) | (16.2) | (15.2) |
| Accrued Liabilities and Other Long-Term Liabilities | (4.3) | 7.4 | 1.6 | 1.3 | 1.3 |
| | | | | | |
| **Cash Flows from Operating Activities** | **(3.1)** | **33.0** | **30.9** | **38.6** | **63.4** |
| | | | | | |
| **Cash Flows from Investing Activities** | | | | | |
| Capital Expenditures | (16.0) | (20.0) | (20.0) | (20.0) | (20.0) |
| **Cash Flows from Investing Activities** | **(16.0)** | **(20.0)** | **(20.0)** | **(20.0)** | **(20.0)** |
| | | | | | |
| **Cash Flows from Financing Activities** | | | | | |
| Principal Payments on LT Obligations - Post Effective Date | (4.5) | (10.3) | (15.1) | (16.8) | (29.3) |
| Payments on LT Obligations and Other Claims - Effective Date | (29.7) | 0.0 | 0.0 | 0.0 | 0.0 |
| **Cash Flows from Financing Activities** | **(34.2)** | **(10.3)** | **(15.1)** | **(16.8)** | **(29.3)** |
| | | | | | |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | **($53.3)** | **$2.7** | **($4.2)** | **$1.7** | **$14.2** |
| | | | | | |
| **Cash and Cash Equivalents at Beginning of Period** | **$72.7** | **$19.4** | **$22.1** | **$17.9** | **$19.6** |
| | | | | | |
| **Cash and Cash Equivalents at End of Period** | **$19.4** | **$22.1** | **$17.9** | **$19.6** | **$33.8** |

*Note: The Projections assume that the Term A Facility is refinanced during the Projection Period.*

## C.     Accounting Policies.

The Projections have been prepared using accounting policies that are consistent with those applied in the Debtors' historical financial statements.

## D.     Summary of Significant Assumptions.

The Debtors, with the assistance of various professionals, prepared the Projections for the fiscal years 2010-2014. The Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors and the newspaper and broadcasting industries, general business and economic conditions and other matters, most of which are beyond the control of the Debtors or the Reorganized Debtors and their management. Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will vary from the projected results. These variations may be material. Although the Debtors believe that the assumptions

underlying the Projections, when considered on an overall basis, are reasonable in light of current circumstances, no representation can be or is being made with respect to the accuracy of the Projections or the ability of the Reorganized Debtors to achieve the projected results of operations. In deciding whether to vote to accept or reject the Plan, claimants must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections.

Additional information relating to the principal assumptions used in preparing the Projections is set forth below:

**General Market Conditions**

The Projections take into account the current market environment in which the Debtors compete, including many economic and financial forces that are beyond the control of the Debtors and management. The Debtors operate in the newspaper and broadcasting markets throughout the United States. Economic growth or slowdowns on a national or regional basis may impact the Reorganized Debtors' revenues, as well as changes in the newspaper and broadcasting industries may impact performance.

**Methodology**

The Projections were prepared based on several key assumptions, as discussed below.

**Revenue and Operating Expenses**

**Newspaper Revenue**: The Projections assume newspaper revenue declines by approximately 7% in 2010 and increases by approximately 5% in 2011, 5% in 2012, 4% in 2013, and 3% in 2014. The Projections assume the newspaper segment's core advertising revenue (primarily local, national, and classified categories) is essentially flat over the 2009 to 2014 period, increasing at approximately a 2% compound annual growth rate. Newspaper revenue from circulation is also projected to remain essentially flat from 2009 to 2014, increasing at approximately a 1% compound annual growth rate, as the Debtors expect to be able to offset continued declines in circulation volume through increased unit pricing. Newspaper revenue from commercial printing and other sources is projected to increase at approximately a 3% compound annual growth rate from 2009 to 2014.

**Broadcast Revenue**: Broadcast revenue is forecast to increase by approximately 16% in 2010, decline by 6% in 2011, increase by 13% in 2012, decline by 7% in 2013 and increase by 12% in 2014. The Projections assume that the broadcasting segment's core advertising from local and national sources increase at approximately a 3% compound annual growth rate from 2009 to 2014. Revenue from political sources is projected to be approximately $10.6 million in even years when significant political activities are taking place and approximately $1.3 million to $1.4 million in odd years. The Debtors also expect to benefit from an increase in retransmission fees due to the renegotiation of contracts with the major multi-channel television providers. The majority of the improvement in retransmission fees is projected to occur in 2010 as new contracts come into effect and to increase as contracted in 2011 through 2014.

**Interactive Revenue**: Interactive revenue is forecast to increase by approximately 19% in 2010, 26% in 2011, 11% in 2012, 14% in 2013, and 16% in 2014. Interactive revenue growth is driven primarily by the Debtors' partnership with other online partners, which allows the Debtors to effectively pool inventory and sell to a wider audience through its partners' sales force as well as its own dedicated interactive sales force. Total advertising revenue from interactive sources as a percentage of advertising revenue is projected to increase from approximately 9% in 2009 to 16% in 2014.

**Payroll & Benefits**: Payroll and benefits expenses for the Debtors' newspaper, broadcasting and interactive divisions are forecast to decline by approximately 5% in 2010, but increase by approximately 2% in 2011, 3% in 2012, 2% in 2013 and 2% in 2014. The payroll and benefits forecast reflects a bottoms-up analysis of payroll and benefits expenses in 2010. Payroll and benefits are projected to decline in 2010, driven primarily by reductions in headcount in the newspaper and broadcasting divisions, partially offset by the midyear reinstatement of a component of the Debtors' 401k match program and 2 percent salary increases. 2011 reflects a full year of the 401(k) match reinstatement and salary increases. Payroll and benefit costs are expected to increase modestly from 2011 to 2014, reflecting the impact of inflation.

**Newsprint and Ink**: Newsprint and ink expenses are forecast to decline by approximately 8% in 2010 and 1% in 2011, but increase by approximately 5% in 2012, 2% in 2013 and 4% in 2014. Over the Projection Period, newsprint and ink costs are projected to increase at less than a 1% compound annual rate from 2009 through 2014.

**Other Operating Expenses**: Other operating expenses are projected to decline by approximately 2% in 2010 and are projected to increase by approximately 3% in 2011, 3% in 2012, 2% in 2013 and 2% in 2014. Other operating expenses include programming expenses, purchased content, outside services, operating supplies, repair and maintenance, promotion and marketing, travel and entertainment, insurance, utilities, and other similar expenses.

**Corporate Expenses**: Corporate expenses are projected to decline by approximately 28% in 2010 and 37% in 2011 and are projected to increase by approximately 1% in each of 2012, 2013 and 2014. The declines in corporate overhead in 2010 and 2011 are due in large part to the elimination of non-recurring expenses associated with the bankruptcy and severance costs associated with the Debtors' operational restructuring, including the outsourcing of certain functions. From 2012 through 2014, the Debtors expect to be able to increase corporate overhead at less than inflation by continuing to selectively reduce expenses.

**Non-Recurring Expenses**: Non-recurring expenses are projected to decline from $37.2 million in 2009 to $21.1 million in 2010. Non-recurring expenses include costs related to the Debtors' bankruptcy and operational restructuring.

**Depreciation & Amortization**: Depreciation and amortization is projected based on current book values of property, plant and equipment and amortizable intangible assets, and on useful life assumptions for existing property, plant and equipment and intangible assets and property, plant and equipment generated through new capital spending.

**Interest Expense**:  The Projections assume that interest expense during the period prior to emergence is in accordance with the Existing Credit Agreement Documents and has been reflected as interest expense.  Subject to a finding in the Confirmation Order that the Existing Lender Claims are undersecured, interest payments made during this period by the Debtors on account of Adequate Protection Obligations will be deemed applied to reduce the principal amount of the Existing Lender Secured Claims.

Post-emergence, the Projections reflect interest expense incurred related to borrowings under the Term A Facility and Term B Facility to be put in place under the Plan.  The Projections do not reflect the interest expense of potential exit financing.  The Term A Facility will have a principal balance of $225 million, a maturity of four years and an interest rate of LIBOR + 6.0%, subject to a LIBOR floor of 3.5%. The Term B Facility will have a principal balance of $100 million, a maturity of five years and an interest rate of 14.0%, which can be paid in cash, or paid-in-kind ("**PIK**"), at the Reorganized Debtors' option under certain conditions.  The Projections assume the Reorganized Debtors elect the PIK option through the end of 2011 and the cash pay option for the remainder of the Projection Period.  The Projections also assume the Term A Facility is refinanced during the Projection Period.

**Income Taxes Expense**:  The Projections reflect forecasted income tax expense applied to pre-tax (loss) income. Cash taxes are assumed to be paid currently and are calculated by adjusting pre-tax (loss) income to reflect estimated temporary differences including the differences between book and tax depreciation and amortization.

The Projections assume that the Debtors' Federal net operating loss ("**NOL**") completely offsets the cancellation of indebtedness income ("**CODI**").  CODI is not reflected in the consolidated forecasted statement of operations.

**Capital Expenditures**:  Capital expenditures for 2010 through 2014 reflect the Reorganized Debtors' anticipated maintenance capital expenditures plus minimal additional revenue generating capital expenditures, primarily to support the Reorganized Debtors' projected interactive revenue growth.

**Capital Structure**:  The Reorganized Debtors' emergence capital structure is assumed as follows:

(a)      Term A Facility: On or after the Effective Date, the Reorganized Debtors will be indebted under the Term A Facility, which is projected to possess the following terms: a principal balance of $225 million, a maturity of 4 years and an interest rate of LIBOR + 6.0%, subject to a LIBOR floor of 3.5%. The Term A Facility will be allocated pro rata among the holders of Allowed Existing Lender Secured Claims under the Plan and will represent restated debt involving no new-money funding.

(b)      Term B Facility: On or after the Effective Date, the Reorganized Debtors will be indebted under the Term B Facility, which is projected to possess the following terms: a principal balance of $100 million, a maturity of 5 years and an interest rate of 14.0% either in cash or PIK at the Reorganized Debtors' option under certain conditions. The Term B Facility will be allocated pro rata among the holders of Allowed Existing Lender Secured Claims under the Plan and will represent restated debt involving no new-money

funding.

(c)     The projections make no assumption with regard to potential exit financing.

(d)     New Common Stock/New Warrants

**Working Capital**:  Working capital accounts are projected based on historical trends adjusted for implications of the Debtors' bankruptcy filing.  Contributions to the Reorganized Debtors' defined benefit plan during the Projection Period have been estimated by the Debtors' actuary based on current interest rate and market conditions.

**Other:**  On January 15, 2010, the Debtor signed a letter of intent to sell its Phoenix, Arizona, businesses for approximately $2.1 million.  The transaction is anticipated to close by February 28, 2010, subject to approval by the Bankruptcy Court.   Results for the Phoenix businesses have been excluded from the consolidated projected statements of operations; however, no adjustments have been reflected in the consolidated projected balance sheets, including the sale proceeds.   The impact on the consolidated projected cash flow statements of not making such adjustments is not considered significant.  Revenue and expense variances included in this document are calculated excluding the results of the Phoenix businesses.

**Exhibit 10**

**Liquidation Analysis**

**FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL.**
<u>LIQUIDATION ANALYSIS</u>

In connection with the Plan and Disclosure Statement, the following hypothetical liquidation analysis (the "Liquidation Analysis") has been prepared by the Debtors' management with the assistance of their financial advisors. This Liquidation Analysis should be read in conjunction with the Plan and the Disclosure Statement.

The Debtors, with the assistance of their financial advisors, have prepared this Liquidation Analysis for the purpose of evaluating whether the Plan meets the so-called "best interests of creditors" test under Section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis has been prepared assuming the Debtors' current chapter 11 cases convert to chapter 7 proceedings under the Bankruptcy Code on June 30, 2010 (the "Liquidation Date") and their assets are liquidated in a traditional liquidation with the loss of going concern value attributable to these assets. A chapter 7 trustee (the "Trustee") would be appointed or elected to commence the liquidation of all of the Debtors' assets. To maximize recovery, the liquidation is assumed to occur over a three-to-six month period (the "Wind Down Period"). The Liquidation Analysis is based on unaudited book values as of August 31, 2009, and these values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date. However, the Liquidation Analysis does not include recoveries, if any, resulting from potential litigation claims, including, without limitation, preference claims, fraudulent conveyance litigation, or other avoidance actions.[1]

Estimating recoveries in any hypothetical chapter 7 liquidation case is an uncertain process due to the number of unknown variables and is necessarily speculative. Thus, extensive use of estimates and assumptions have been made that, although considered reasonable by the Debtors' management and their financial advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7 PROCEEDINGS, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THE LIQUIDATION ANALYSIS.

The Liquidation Analysis indicates the values, which may be obtained upon disposition of assets pursuant to hypothetical chapter 7 liquidation, as an alternative to continued operation

---

[1] Net litigation recoveries, if any, would be subject to valid lien rights, if any, and would be applied in accordance with any legal priorities under Chapter 7.

of the business as proposed under the Plan. Accordingly, values discussed herein are different than amounts referred to in the Plan, which illustrate the value of the Debtors' business as a going concern.

In preparing the Liquidation Analysis, the amount of Allowed Claims has been projected based upon the Debtors' books and records. The analysis will be updated if necessary in conjunction with the Confirmation Hearing to reflect any changes based on a review of scheduled Claims and all Proofs of Claims associated with pre-petition and post-petition obligations. Additional Claims were estimated to include certain post-petition obligations which would be asserted in a hypothetical chapter 7 liquidation. These potential Claims include, without limitation, Claims for trade payables incurred during the chapter 11 cases. In the event litigation were necessary to resolve Claims asserted in a chapter 7 liquidation, the delay could be prolonged and Claims could further increase. The effects of this delay on the value of distributions under the hypothetical liquidation have not been considered. No Order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the estimated amounts set forth in the Liquidation Analysis. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH IN THE LIQUIDATION ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY AND SIGNIFICANTLY DIFFER FROM THE AMOUNT OF CLAIMS ESTIMATED IN THE LIQUIDATION ANALYSIS. NOTHING CONTAINED IN THIS HYPOTHETICAL LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.

The Plan separately treats Claims against and Interests in the Encumbered Debtors, all of which are obligated on the Existing Lender Claims, and Claims against and Interests in the Unencumbered Debtors, none of which are obligated on the Existing Lender Claims. Based upon a going concern analysis, the Debtors concluded that the financial position of the Unencumbered Debtors warranted the reinstatement of their Claims and Interests under the Plan. In a chapter 7 liquidation, however, the treatment of unsecured claims against the Unencumbered Debtors would be substantially less favorable than the treatment afforded by the Plan, and for a variety of reasons such claims may ultimately fare no better in a liquidation than unsecured claims against the Encumbered Debtors. Because of the reinstatement of all Claims against and Interests in the Unencumbered Debtors, the Debtors have not provided a separate liquidation analysis for each of the Unencumbered Debtors.

Notwithstanding the different positions of the Encumbered Debtors and the Unencumbered Debtors, the Liquidation Analysis is presented on a consolidated basis. The Debtors do not believe that the amount available for unsecured creditors of any individual Debtor would be materially different from the consolidated results. In fact, the recovery deficiency for

unsecured creditors of the Encumbered Debtors may be slightly greater than estimated, due to the fact that such creditors do not have recourse to the assets of the Unencumbered Debtors, and the recovery deficiency for unsecured creditors of the Unencumbered Debtors may be slightly less than estimated.

EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS LIQUIDATION ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT THESE ANALYSES IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND REORGANIZED DEBTORS DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE LIQUIDATION ANALYSIS (OR ANY OTHER PART OF THE DISCLOSURE STATEMENT) TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THIS LIQUIDATION ANALYSIS IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS OR INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE LIQUIDATION ANALYSIS.

THIS LIQUIDATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

| ($ in millions) | Book Value as of 8/31/2009 | Recovery (%) | | Recovery ($) | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **Assets** | | | | | |
| Cash and Equivalents | $73.7 | 100.0% | 100.0% | $73.7 | $73.7 |
| Accounts Receivable, net | 60.6 | 51.8% | 72.6% | 31.4 | 44.0 |
| Inventory | 5.5 | 33.2% | 51.7% | 1.8 | 2.8 |
| Prepaid Expenses | 22.1 | 54.2% | 62.9% | 12.0 | 13.9 |
| Other Current Assets | 13.1 | 0.0% | 17.1% | 0.0 | 2.2 |
| PP&E, net | 209.1 | 33.1% | 48.0% | 69.1 | 100.4 |
| Intangibles, net | 380.6 | 22.6% | 35.2% | 86.2 | 133.8 |
| Other Long-Term Assets | 20.9 | 3.5% | 8.3% | 0.7 | 1.7 |
| **Total Assets/Proceeds** | $785.5 | 35.0% | 47.4% | $274.9 | $372.7 |
| | | | | | |
| Less: Wind-Down Costs | | | | | |
| Shutdown Costs | | | | $44.0 | $34.0 |
| Trustee Fees | | | | 8.2 | 11.2 |
| Professional Fees | | | | 6.0 | 4.0 |
| **Total Liquidation Costs** | | | | $58.2 | $49.2 |
| | | | | | |
| **Net Proceeds Available for Payment of Claims** | | | | **$216.7** | **$323.5** |
| | | | | | |
| **Pre-Petition Bank Loan Claims** | | | | **$770.6** | **$770.6** |
| Pre-Petition Bank Loan Implied Recovery | | | | 216.7 | 323.5 |
| *% Recovery* | | | | *28.1%* | *42.0%* |
| Pre-Petition Bank Loan Deficiency Claim | | | | $553.9 | $447.1 |
| Excess in Proceeds over Bank Loan Claims | | | | $0 | $0 |
| | | | | | |
| **Administrative Claims** | | | | **$54.3** | **$29.7** |
| Administrative Claims Implied Recovery | | | | 0 | 0 |
| *% Recovery* | | | | *0.0%* | *0.0%* |
| Excess in Proceeds over Administrative Claims | | | | $0 | $0 |
| | | | | | |
| **Unsecured Claims** | | | | **$186.5** | **$186.5** |
| Unsecured Claims Implied Recovery | | | | 0 | 0 |
| *% Recovery* | | | | *0.0%* | *0.0%* |
| Excess in Proceeds over Unsecured Claims | | | | $0 | $0 |

*Note: Book value as of 8/31/2009 is shown pro forma for return of Gonzalez escrow.*

## <u>Notes:</u>

**<u>Cash and Equivalents</u>**: The Liquidation Analysis assumes that operations during the liquidation period will not generate additional cash available for distribution except for net proceeds from the disposition of non-cash assets. All other outstanding cash balances are assumed to be 100% recoverable.

**<u>Accounts Receivable</u>**: Accounts receivable consists of net accounts receivable. The liquidation value of accounts receivable is estimated by applying a discount factor partially based on historical trends to the accounts receivable aging schedule. Estimated recoveries used in the analysis range from 60% to 80% for current accounts, and from 0% to 10% for delinquent accounts. The liquidation value of total net accounts receivable is assumed to be approximately 52% to 73% of net book value.

**Inventory**:  Inventory consists of raw materials including paper, ink, and other production supplies.  Paper is assumed to be liquidated at 47% to 70% of its net book value.  Ink and other supplies are assumed to be liquidated for minimal recoveries due to the high disposal costs for opened ink.  The liquidation value of total inventory is assumed to be approximately 33% to 52% of net book value.

**Prepaid Expenses**:  Prepaid expenses consist of the cash surrender value for various life insurance policies, trade contracts, prepaid software maintenance, insurance, taxes, rent, and postage. The cash surrender value associated with the life insurance policies is assumed to be liquidated for 100% of its net book value with other prepaid expenses assumed to be liquidated for various recoveries, including trade contracts assumed to be 0% recoverable.  The liquidation value of total prepaid expenses is assumed to be approximately 54% to 63% of net book value.

**Other Current Assets**: Other current assets consist of deferred income taxes, broadcast rights, and deposits.  Deferred income taxes are assumed to have no liquidation value. Deposits relate primarily to the Debtor's workers' compensation insurance program and are assumed to have a 0% to 25% recovery. The liquidation value of total other current assets is assumed to be approximately 0% to 17% of net book value.

**Property, Plant, and Equipment**: Property, plant, and equipment consist of land, buildings & improvements, furniture & general office, machinery & equipment, and capital projects in process.  The estimated recovery of the land and buildings & improvements is 60% to 75%.  The liquidation value of leased assets included within building & improvements is assumed to be zero.   The liquidation value of total property, plant, and equipment is assumed to be approximately 33% to 48% of net book value.

**Intangible Assets**: Intangible assets consist of goodwill and other intangible assets.  Goodwill is assumed to have no recovery.  Other intangible assets include newspaper mastheads, network affiliation agreements, FCC licenses, and advertising and subscriber lists and are assumed to have a recovery of 0% to 75%.  The liquidation value of total intangible assets is assumed to be approximately 23% to 35% of net book value.

**Other Long-Term Assets**:  Other long-term assets consist of deferred financing fees associated with the Debtor's various loan agreements, and other miscellaneous investments, deposits, and receivables.  The deferred financing fees are assumed to have a recovery of 0%.   All other long-term assets are assumed to have a recovery of 14% to 34%.   The liquidation value of total other long-term assets is assumed to be approximately 4% to 8% of net book value.

**Wind-Down Costs**: Wind-Down Costs consist of shutdown costs, trustee fees, and professional fees.  Shutdown costs are assumed to be approximately $34 million to $44 million and include 4-6 months of certain corporate payroll, minimal staff at locations to complete closures, disassemble equipment, and oversee the sale process, and 4-6 months of certain building expenses such as utilities, tax, and maintenance. Trustee fees are assumed to be 3% of gross

liquidation proceeds. Professional fees are assumed to be between $4 million and $6 million. See also the note below concerning Qualified Pension Liabilities.

**Pre-Petition Bank Loan Claims**: Secured bank loan claims include claims under the pre-petition Credit Agreement dated May 18, 2004, as amended, supplemented or otherwise modified. These claims are referred to in the Plan as the Existing Lender Claims. Such claims are secured by liens on substantially all of the Debtors' assets. They are entitled to receive the liquidation proceeds from all liened assets. To the extent not paid in full from such proceeds, the deficiency claim is an unsecured claim.

**Administrative Claims**: Administrative claims includes 503(b)(9) claims, income tax claims, and post-petition claims. Post-petition claims are assumed to be operating expenses excluding compensation, depreciation and amortization, and bad debt expense for a 1-2 month period. There may also be unpaid professional fees, the amount of which is not included. See also the note below concerning Qualified Pension Liabilities.

**Unsecured Claims**: Unsecured claims are estimated to include, among other things, non-qualified retirement plan claims, trade claims, and claims resulting from the rejection of leases and other executory contracts. The analysis does not reflect any contingent, unliquidated or disputed claims. In particular, it does not reflect any claim on account of the Gonzalez class action claims, since the settlement of those claims is no longer effective and the Debtors deny all liability for such claims. If the Gonzalez class action claims are allowed, notwithstanding the Debtors' objection, the allowed amount could exceed the settlement amount, further increasing the amount of unsecured claims. Unsecured claims in this analysis exclude an implied $447 million to $554 million in Bank Loan Deficiency Claims that would also participate. See also the note below concerning Qualified Pension Liabilities.

**Qualified Pension Liabilities**: The Plan assumes the continuation of the Debtors' Retirement Plan, which is a qualified pension plan. In a chapter 7 liquidation, however, the Retirement Plan would terminate. A termination would result in substantial unfunded benefit liabilities that would likely be treated as unsecured claims. In addition, the PBGC may assert a termination premium. Although it is not clear if a claim for a termination premium would be allowed on the particular facts, or if allowed, whether the claim would be entitled to treatment as an administrative claim of the chapter 7 and thus payable as wind-down costs, as an administrative claim of the chapter 11, as a tax or other type of priority claim, or as an unsecured claim, the claim could be asserted in the amount of approximately $24 million. The Debtors are jointly and severally obligated for any and all claims of the PBGC.

**Exhibit 11**

**Reorganized Value Analysis**

**A. Projected Financial Statements**.

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This standard is referred to as "feasibility." In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses.

The Projections, which are set forth in Exhibit 9 to the Disclosure Statement, should be read in conjunction with Exhibit 10 of the Disclosure Statement, the assumptions, qualifications and footnotes to tables containing the Projections (which include projected statements of operations, projected balance sheets, and projected statements of cash flows), and the historical consolidated financial information (including the notes and schedules thereto) made available at www.loganandco.com.

The Projections assume that the Plan will be confirmed and consummated as of June 30, 2010 with Allowed Claims and Allowed Interests treated as described in the Plan. Except as otherwise provided in the Plan, expenses incurred as a result of the Chapter 11 Cases are assumed to be paid on the Effective Date. If the Debtors do not emerge from Chapter 11 on or before June 30, 2010, additional Administrative Expenses will be incurred until such time as a plan of reorganization is confirmed and becomes effective. Such additional Administrative Expenses could significantly impact the Reorganized Debtors' cash flows if the Effective Date is materially later than the Effective Date assumed in the Projections.

It is important to note that the Projections and estimates of equity values for the Reorganized Debtors may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Reorganized Debtors. These assumptions include, among other things, global economic conditions, newspaper and broadcasting industry trends, media advertising growth rates and trends, the cost of newsprint, labor and other operating costs, access to and availability of credit markets, the regulatory environment and inflation. Please refer to Exhibit 9 of the Disclosure Statement for a discussion of many of the factors that could have a material effect on the information provided in this section.

The estimates of equity value for the Reorganized Debtors are not intended to reflect the equity values that may be attainable in public or private markets. They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NOT REVIEWED THE

ACCOMPANYING PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO, (I) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF THE NEW EQUITY INTERESTS OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, OR (II) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS PROVIDED IN CONNECTION WITH THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS' MANAGEMENT. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, AFTER CONSULTATION WITH THE DEBTORS' FINANCIAL ADVISORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE MATERIAL ACCURACY OF THE PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. FINALLY, THE PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE DEBTORS, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE.

**B. Valuation.**

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY,

MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

In conjunction with formulating the Plan, the Debtors determined that it would be necessary to estimate the post-confirmation going concern enterprise value for the Reorganized Debtors. The Debtors requested that Houlihan Lokey advise them with respect to the reorganization value of the Reorganized Debtors on a going concern basis. Solely for purposes of the Plan, the estimated range of reorganization value of the Reorganized Debtors was assumed to be $400.0 million to $500.0 million (with a midpoint value of $450.0 million) as of June 30, 2010. Houlihan Lokey's estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF JUNE 30, 2010, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO HOULIHAN LOKEY AS OF OCTOBER 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the reorganization value of the Reorganized Debtors of between $400.0 million and $500.0 million less assumed total net debt of $310.0 million, Houlihan Lokey has estimated the range of equity value for the Reorganized Debtors between approximately $90.0 million and $190.0 million.

The foregoing estimate of the reorganization value of the Reorganized Debtors is based on a number of assumptions, including a successful implementation of the Debtors' business plan, the achievement of the forecasts reflected in the Projections, the restructured of existing secured credit facilities in the form of the Term A Facility and the Term B Facility, access to the Exit Facility, the continuing leadership of the existing management team, market conditions as of October 2009 continuing through the assumed Effective Date of June 2010 or as assumed in the Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Projections prepared by the management of the Debtors and included in as Exhibit 9 to this Disclosure Statement, Houlihan Lokey assumed that such Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Houlihan Lokey's estimate of a range of reorganization values assumes that the Projections will be achieved by the Reorganized Debtors in all material respects,

including revenue growth and improvements in operating margins, earnings and cash flow. Certain of the results forecasted by the management of the Debtors are significantly better than the recent historical results of operations of the Debtors. As a result, to the extent that the estimate of enterprise values is dependent upon the Reorganized Debtors performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projected Financial Information, such performance may have a material impact on the Projections and on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF THE REORGANIZED DEBTORS, HOULIHAN LOKEY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO HOULIHAN LOKEY BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESSES AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS THE DEBTORS' OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT HOULIHAN LOKEY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESSES OF THE DEBTORS;

- CONSIDERED RELEVANT PRECEDENT RESTRUCTURING TRANSACTIONS IN THE NEWSPAPER AND TELEVISION BROADCASTING INDUSTRIES;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESSES; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH HOULIHAN LOKEY CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESSES, OPERATING ASSETS AND LIABILITIES AND THE REORGANIZED DEBTORS' PROJECTIONS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, HOULIHAN LOKEY DID NOT INDEPENDENTLY

VERIFY THE DEBTORS' PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY HOULIHAN LOKEY REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS

THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-

TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

**C. Valuation Methodology.**

Houlihan Lokey performed a variety of analyses and considered a variety of factors in preparing the valuation of the Reorganized Debtors. Several generally accepted valuation techniques for estimating the Reorganized Debtors' enterprise value were used. Houlihan Lokey conducted a consolidated valuation and a sum of parts valuation for both of the Debtors' business units and relied primarily on three methodologies: comparable public company analysis, discounted cash flow analysis, and precedent transactions analysis. Houlihan Lokey's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' enterprise value.

In preparing its valuation estimate, Houlihan Lokey performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Houlihan Lokey's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

(a) Comparable Public Company Analysis. A comparable public company analysis estimates value based on a comparison of the Debtors' financial statistics with the financial statistics of public companies that are similar to the Debtors. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Debtors. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, location of markets, growth prospects, market share, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In performing the Comparable Public Company Analysis, the following publicly traded companies in the newspaper and television broadcasting industries were deemed generally

comparable to the Debtors' business units in some or all of the factors described above and were selected:

- Newspaper: Gatehouse Media, Inc.; Lee Enterprises, Inc.; and The McClatchy Company;

- Television Broadcasting: Belo Corp.; Gray Television, Inc.; LIN Television Corp.; Nexstar Broadcasting Group, Inc.; Sinclair Broadcast Group, Inc.;

- Diversified Newspaper and/or Television Broadcasting: The E.W. Scripps Company; Gannett Company, Inc.; Journal Communications, Inc.; Media General, Inc.; The New York Times Company,

Houlihan Lokey excluded several companies that were deemed not comparable because of size and status of comparable companies, among other things. Houlihan Lokey analyzed the current and historical trading value utilizing both the book value and market value of debt securities for the comparable newspaper and diversified newspaper and/or television broadcasting companies as a multiple of the most recent twelve months, projected fiscal year 2009 and projected fiscal year 2010 EBITDA. Houlihan Lokey analyzed the current and historical trading value for the comparable television broadcasting companies as multiple of the average of actual fiscal year 2008 and projected fiscal year 2009 and the average of projected fiscal year 2009 and projected fiscal year 2010. The projections used were based on the average of available Wall Street research analyst projections. Where projections were unavailable, information is based on LTM data. Houlihan Lokey valued the Debtors' newspaper and television broadcasting businesses separately. Houlihan Lokey, with the assistance of the Debtors, allocated corporate and other unallocated expenses to each of the Debtors' newspaper and television broadcasting segments to derive the Debtors' Newspaper EBITDA and the Debtors' Television Broadcasting EBITDA. Selected multiples derived from the Comparable Public Company Analysis for newspaper companies were applied to the Debtors' Newspaper EBITDA and selected multiples derived from the Comparable Public Company Analysis for television broadcasting companies were applied to the Debtors' Television Broadcasting EBITDA and the two segments were added together to help determine the range of Enterprise Value for the consolidated Debtors. Selected multiples derived from the Comparable Public Company Analysis for the diversified newspaper and/or television broadcasting companies were observed.

Newspaper Comparable Public Company Multiples:

|  | Book Value of Debt | Market Value of Debt |
|---|---|---|
| Total Enterprise Value / 2009E EBITDA | 5.8 - 12.6x | 4.2 - 5.0x |

| | Book Value of Debt | Market Value of Debt |
|---|---|---|
| Total Enterprise Value / 2010E EBITDA | 6.7x | 4.9x |
| Concluded Range | 4.5 – 5.5x | |

Television Broadcasting Comparable Public Company Multiples:

| | Book Value of Debt | Market Value of Debt |
|---|---|---|
| Total Enterprise Value / Average of 2008A and 2009E EBITDA | 7.7 - 10.5x | 7.1 - 8.6x |
| Total Enterprise Value / Average of 2009E and 2010E EBITDA | 9.0 - 10.5x | 7.3 - 8.8x |
| Concluded Range | 8.5 – 9.5x | |

Diversified Newspaper and/or Television Broadcasting Comparable Public Company Multiples:

| | Book Value of Debt | Market Value of Debt |
|---|---|---|
| Total Enterprise Value / 2009E EBITDA | 5.8 - 15.3x | 5.4x |
| Total Enterprise Value / 2010E EBITDA | 5.4 - 9.7x | 5.4x |

(b) Discounted Cash Flow Analysis. The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the consolidated Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows. Houlihan Lokey's discounted cash flow valuation is based on the operating results included in the Debtors' Projections. Houlihan Lokey discounted the projected cash flows for each of the Debtors' newspaper and television broadcasting segments and terminal value using the Debtors' estimated weighted average cost of capital of

10.0% - 12.0% for the Debtors' television broadcasting segment and 11.5% - 13.5% for the Debtors' newspaper segment.

This approach relies on the Debtors' ability to project future cash flows with some degree of accuracy. Because the Debtors' Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized.

Houlihan Lokey cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' Projections.

(c) Precedent Transactions Analysis. Precedent transactions analysis estimates value by examining publicly announced restructurings. An analysis of the disclosed enterprise value as a multiple of various operating statistics reveals industry multiples for companies in similar lines of businesses to the Debtors. These restructuring multiples are calculated based on the mid-point of the announced enterprise value range pursuant to the disclosure statement of the companies that are comparable to the Debtors.

Unlike the comparable public company analysis, the valuation in this methodology may include a "distressed" discount, representing the uncertainty of the company as a going concern given its recent bankruptcy filing.

Thus, this methodology generally does not provide valuations in line with comparable public company analysis. Other aspects of value that manifest itself in a precedent transactions analysis include the following:

- Circumstances surrounding the company's perception by its suppliers and consumers, after emerging from bankruptcy, may introduce "diffusive quantitative results" into the analysis (e.g., an additional discount may be applied if certain suppliers threaten to reject the company's business going forward, given the cancellation of their claims while the company was in bankruptcy).

- The market environment is not identical for company valuations occurring at different periods of time.

- Circumstances pertaining to the company's ability to achieve its projections may have an impact on the enterprise value (e.g., a company with overly aggressive projections may be viewed as riskier and therefore demand a higher discount rate, leading to a lower DCF valuation).

As with the comparable company analysis, because no company undergoing a restructuring is identical, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each restructuring are specific to such restructuring, and there are

inherent differences between the businesses, operations and prospects of each company. Therefore, qualitative judgments must be made concerning the differences between the characteristics of the comparable companies that are undergoing or have undergone a restructuring, and other factors and issues that could have a different material effect on each restructuring. The number of completed restructurings also limits this analysis.

In performing the Precedent Transactions Analysis, Houlihan Lokey analyzed restructuring documents and news articles for the following companies:

- Journal Register Company

- The Star Tribune Company

- American Community Newspapers, Inc.

- Ion Media Networks, Inc.

- NV Broadcasting, LLC

- Young Broadcasting, Inc.


THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY HOULIHAN LOKEY REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH HOULIHAN LOKEY'S VALUATION ANALYSIS.

**Exhibit 12**

**Estimated Class A4 Claim Recovery Analysis**

# Freedom Communications, Inc.

($'s in 000s)

| | | | | Net Litigation Proceeds of | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Estimated Claim Amount | Recovery Excluding Net Litigation Proceeds | | Gross Recovery | $ 5,000 | $ 10,000 | $ 15,000 | $ 20,000 | $ 25,000 | | | | |
| | | | | Litigation Cost (a) | 1,500 | 2,000 | 2,500 | 3,000 | 3,500 | | | | |
| Unsecured Creditor Class | | | | Net Recovery | $ 3,500 | $ 8,000 | $ 12,500 | $ 17,000 | $ 21,500 | | | | |
| General Unsecured Claims (Class A4): | | | | | | | | | | | | | |
| Gonzalez Class | $ 29,500 | $ 10,968 | 37.2% | | $ 13,615 | 46.2% | $ 17,019 | 57.7% | $ 20,423 | 69.2% | $ 23,827 | 80.8% | $ 27,231 | 92.3% |
| Other General Unsecured | 9,500 | 3,532 | 37.2% | | 4,385 | 46.2% | 5,481 | 57.7% | 6,577 | 69.2% | 7,673 | 80.8% | 8,769 | 92.3% |
| | 39,000 | 14,500 | 37.2% | | 18,000 | 46.2% | 22,500 | 57.7% | 27,000 | 69.2% | 31,500 | 80.8% | 36,000 | 92.3% |

Recovery Milestones:
    The estimated Class A4 recovery is 70% if net litigation proceeds are $12,800 (total recovery of $27,300).
    The estimated Class A4 recovery is 100% if net litigation proceeds are $24,500 (total recovery of $39,000).

**Sensitivity Analysis:  Increases/(Decreases) to Total Amount of Class A4 Claims**

| | Class A4 Claim Amount | Recovery Excluding Net Litigation Proceeds | | Net Litigation Proceeds of | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Change in Class A4 Amount | | | | $ 3,500 | | $ 8,000 | | $ 12,500 | | $ 17,000 | | $ 21,500 | |
| | $ 39,000 | $ 14,500 | 37.2% | $ 18,000 | 46.2% | $ 22,500 | 57.7% | $ 27,000 | 69.2% | $ 31,500 | 80.8% | $ 36,000 | 92.3% |
| ($1,500) decrease in claims | 37,500 | 14,500 | 38.7% | 18,000 | 48.0% | 22,500 | 60.0% | 27,000 | 72.0% | 31,500 | 84.0% | 36,000 | 96.0% |
| $2,000 increase in claims | 41,000 | 14,500 | 35.4% | 18,000 | 43.9% | 22,500 | 54.9% | 27,000 | 65.9% | 31,500 | 76.8% | 36,000 | 87.8% |
| $5,000 increase in claims | 44,000 | 14,500 | 33.0% | 18,000 | 40.9% | 22,500 | 51.1% | 27,000 | 61.4% | 31,500 | 71.6% | 36,000 | 81.8% |
| $7,500 increase in claims | 46,500 | 14,500 | 31.2% | 18,000 | 38.7% | 22,500 | 48.4% | 27,000 | 58.1% | 31,500 | 67.7% | 36,000 | 77.4% |

Notes:
(a) Litigation cost is calculated based on $1,000 plus 10% of recovery.