## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                                          :     Chapter 11
                                                :
FREEDOM COMMUNICATIONS HOLDINGS,  :     Case No. 09-13046 (BLS)
INC., et al.,                                   :
                                                :     Jointly Administered
              Debtors.[1]                       :
------------------------------------------------------------- x

**Hearing:  March 9, 2010 at 10:00 am (ET)**
**Objection Deadline:  March 2, 2010 at 4:00 pm (ET)**

## MOTION OF THE DEBTORS FOR ORDER, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004 AND 6006 AND LOCAL BANKRUPTCY RULE 6004-1 (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF FREEDOM ARIZONA INFORMATION, INC. TO 1013 COMMUNICATIONS, LLC, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, SUBJECT TO HIGHER AND BETTER BIDS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (III) AUTHORIZING THE REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AS OF THE DATE THE SALE IS CLOSED; (IV) AUTHORIZING PAYMENT OF COMMISSION AND EXPENSE REIMBURSEMENT TO DIRKS, VAN ESSEN & MURRAY ON A FINAL BASIS; AND (V) GRANTING RELATED RELIEF

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Freedom Communications Holdings, Inc. (2814); Freedom Communications, Inc. (0750); Freedom Broadcasting, Inc. (0025); Freedom Broadcasting of Florida, Inc. (6581); Freedom Broadcasting of Florida Licensee, L.L.C. (1198); Freedom Broadcasting of Michigan, Inc. (6110); Freedom Broadcasting of Michigan Licensee, L.L.C. (1122); Freedom Broadcasting of New York, Inc. (6522); Freedom Broadcasting of New York Licensee, L.L.C. (9356); Freedom Broadcasting of Oregon, Inc. (7291); Freedom Broadcasting of Oregon Licensee, L.L.C. (9295); Freedom Broadcasting of Southern New England, Inc. (7274); Freedom Broadcasting of Southern New England Licensee, L.L.C. (1177); Freedom Broadcasting of Texas, Inc. (2093); Freedom Broadcasting of Texas Licensee, L.L.C. (1147); Freedom Broadcasting of Tennessee, Inc. (7961); Freedom Broadcasting of Tennessee Licensee, L.L.C. (9430); Freedom Magazines, Inc. (0328); Freedom Metro Information, Inc. (1604); Freedom Newspapers, Inc. (3240); Orange County Register Communications, Inc. (7980); OCR Community Publications, Inc. (9752); OCR Information Marketing, Inc. (7983); Appeal-Democrat, Inc. (4121); Florida Freedom Newspapers, Inc. (4227); The Seller Information, Inc. (5796); Freedom Colorado Information, Inc. (7806); Freedom Eastern North Carolina Communications, Inc. (5563); Freedom Newspapers of Illinois, Inc. (2222); Freedom Newspapers of Southwestern Arizona, Inc. (5797); Freedom Shelby Star, Inc. (8425); Illinois Freedom Newspapers, Inc. (8308); Missouri Freedom Newspapers, Inc. (8310); Odessa American (7714); The Times-News Publishing Company (0230); Victor Valley Publishing Company (6082); Daily Press (3610); Freedom Newspaper Acquisitions, Inc. (4322); The Clovis News-Journal (5820); Freedom Newspapers of New Mexico L.L.C. (5360); Gaston Gazette LLP (4885); Lima News (6918); Porterville Recorder Company (7735); Seymour Tribune Company (7550); Victorville Publishing Company (7617); Freedom Newspapers (7766); The Creative Spot, L.L.C. (2420); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Services, Inc. (3125).  The address for Freedom Communications Holdings, Inc. and certain other Debtors is 17666 Fitch, Irvine, California 92614.

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")
hereby move (this "Motion") for entry of an order substantially in the form annexed hereto as
**Exhibit A**, pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the
"Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure
(the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules for the United States Bankruptcy
Court for the District of Delaware (the "Local Rules"): (i) authorizing the sale of certain assets of
Freedom Arizona Information, Inc. (the "Seller") to 1013 Communications, LLC (the "Buyer")
free and clear of liens, claims, encumbrances and other interests, except as set forth in the Asset
Purchase Agreement (as defined below), subject to higher and better bids under the terms and
conditions set forth herein; (ii) authorizing the assumption and assignment of certain executory
contracts and unexpired leases to the Buyer; (iii) authorizing the rejection of certain executory
contracts and unexpired leases as of the date the sale is closed; (iv) allowing and authorizing on a
final basis (without the need for further application to this Court) the payment of a commission
in the amount of $91,500 and expense reimbursement in the amount of $1,094.58, to Dirks, Van
Essen & Murray ("DV&M"), the sale advisor that the Debtors retained by order of this Court in
connection with this sale; and (v) granting related relief.  In support of this Motion, the Debtors
respectfully submit as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and
1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion
in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief
requested herein are Bankruptcy Code sections 105(a), 363 and 365, Bankruptcy Rules 2002,
6004 and 6006, and Local Rule 6004-1.

## BACKGROUND

2.     On September 1, 2009 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee has been requested in these chapter 11 cases.  On September 10, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors for these cases (the "Committee").

3.     The Debtors in these cases consist of 50 entities within a corporate family led by parent company Freedom Communications Holdings, Inc. ("Freedom Holdings").  Freedom Holdings is the direct owner of Freedom Communications, Inc. ("Freedom Communications").  Freedom Communications is, in turn, the direct or indirect owner of the other 48 Debtors, as well as six non-Debtor affiliates.

4.     Together, the Debtors operate a media business in two primary industry segments: newspaper publishing and broadcast television.  Headquartered in Orange County, California, their operations extend to 15 states within the United States and utilize the services of in excess of 8,200 employees and independent contractors.  Their newspaper publishing segment produces approximately 90 daily and weekly publications, including 30 daily newspapers, as well as ancillary magazines and other specialty publications.  They operate eight television stations within their broadcast television segment, including five CBS affiliates, two ABC affiliates, and one CW affiliate.  In addition, the Debtors operate an interactive business which offers website complements, as well as digital and mobile products, to their newspaper and broadcast properties.

5.     The Debtors believe that the best interests of their estates and all parties will be served by proceeding as quickly as possible through the chapter 11 process.  Towards that end, on October 31, 2009, the Debtors filed a proposed disclosure statement and plan of reorganization, and subsequently modified the disclosure statement and plan of reorganization to address objections and reflect negotiations with parties in interest.  By order dated January 22, 2010, this Court approved the Debtors' disclosure statement (the "Disclosure Statement").  On January 28, 2010, the Debtors filed the latest version of their proposed plan of reorganization (the "Plan") and Disclosure Statement.  The hearing to consider confirmation of the Plan is scheduled to be held on March 9, 2010.

## RELIEF REQUESTED

6.     By this Motion, the Debtors request entry of an order (i) authorizing the sale of the Purchased Business Assets and the Purchased Real Property (as each term is defined below), including without limitation, the assets comprising the East Valley Tribune, Mesa Tribune, Gilbert Tribune, Chandler Tribune, Queen Creek Tribune, Daily News-Sun, and Ahwatukee Foothill News newspapers and the Arizona Interactive Media Group, to the Buyer under the terms of that certain Asset Purchase Agreement, dated February 12, 2010, among the Seller, the Buyer and Freedom Newspapers, Inc. for purposes of Article VII thereof, which is annexed hereto as **Exhibit B** (the "Asset Purchase Agreement"),[2] but subject to higher and better bids; (ii) authorizing the assumption and assignment of the executory contracts and unexpired leases that are set forth in the list annexed hereto as **Exhibit C** (the "Assigned Contracts"), and authorizing the payment of cure payments to the counterparties to the Assigned Contracts only in the amounts set forth in **Exhibit C**; (iii) authorizing the rejection of certain executory contracts and

---

[2] Capitalized terms used but not defined herein shall have the meanings provided to them in the Asset Purchase Agreement.

unexpired leases as of the date the sale is closed; (iv) allowing and authorizing on a final basis (without the need for further application to this Court) the payment of a commission in the amount of $91,500 and expense reimbursement in the amount of $1,094.58, to DV&M and (v) granting related relief.

7.     The Debtors believe that those parties most likely to be interested in acquiring the Purchased Business Assets and the Purchased Real Property have already been contacted through the marketing efforts of the Debtors and DV&M. Accordingly, the Debtors have decided to seek this Court's authorization to sell the Purchased Business Assets and the Purchased Real Property to the Buyer pursuant to the Asset Purchase Agreement, without the requirement of a formal "two step" auction and sale process.

8.     Nevertheless, if any bona-fide alternative bid for all of the Purchased Business Assets and the Purchased Real Property that satisfies the terms and conditions set forth herein (such bid, an "Alternative Qualifying Bid") is submitted by March 5, 2010 (the "Bid Deadline"), the Debtors will conduct an auction prior to this Court's hearing in respect of this Motion (the "Sale Hearing"), in which the Buyer and any party submitting Alternative Qualifying Bid would be invited to participate (the "Auction"). The Debtors will inform counsel for the Committee and counsel for the administrative agent for the Debtors' pre-petition bank debt (the "Administrative Agent") of the terms of all bids they receive, including those bids that are not Alternative Qualifying Bids. If no Alternative Qualifying Bid is submitted on or before the Bid Deadline, then the Debtors will not hold the Auction and will request this Court's approval to sell the Purchased Business Assets and the Purchased Real Property to the Buyer pursuant to the Asset Purchase Agreement.

9.     The Buyer has informed the Debtors that it will not accept assignment of certain

of the Debtors' existing executory contracts and unexpired leases pertaining to the Purchased

Business Assets and the Purchased Real Property, and the Debtors do not intend to retain those

contracts and leases after the sale is closed.  Those executory contracts and unexpired leases are

listed in **Exhibit D** annexed hereto (the "Rejected Contracts").[3]  The Debtors seek to reject the

Rejected Contracts, effective as of the date the transaction under the Asset Purchase Agreement

is closed (the "Sale Closing Date") even if the Sale Closing Date occurs after the effective date

of the Plan (the "Plan Effective Date").[4]  While the Debtors currently expect the Sale Closing

Date to occur on or before the Plan Effective Date, in the event the Sale Closing Date occurs

after the Plan Effective Date, the Debtors seek authority to reject the Rejected Contracts effective

as of the Sale Closing Date (instead of the Plan Effective Date).

10.     Finally, the Debtors request authority to pay a commission in the amount of

$91,500 and to reimburse expenses in the amount of $1,094.58 to DV&M, the sale advisor that

the Debtors retained pursuant to an order of this Court dated October 5, 2009.[5]  A calculation of

---

[3]  The Debtors reserve the right to amend **Exhibit C** and **Exhibit D** in all respects (including, but not limited to, adding or removing executory contracts and unexpired leases thereon) prior to the Sale Closing Date.

[4]  Section 6.3 of the Plan provides:

"[e]xcept as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have rejected each prepetition executory contract and unexpired lease to which it is a party unless such contract or lease (i) is listed on the Contract/Lease Schedules as of the Confirmation Date, (ii) was previously assumed or rejected upon motion by a Final Order, (iii) previously expired or terminated pursuant to its own terms, or (iv) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the rejection of the prepetition executory contracts and unexpired leases described above, as of the Effective Date."

[5]  This Court's October 5, 2009 order approving the Debtors' retention of DV&M provides that the Debtors may request this Court's allowance of DV&M's commission and reimbursement of expenses as part of a motion requesting approval of the sale of the relevant assets.

the commission and a detailed description of the expenses for which DV&M requests the expense reimbursement are annexed hereto as **Exhibit E**.

**OVERVIEW OF THE TRANSACTION**

I.    **The Purchased Business Assets and the Purchased Real Property**

        11.    The Debtors request authority for the Seller to sell, convey, transfer, assign and deliver to the Buyer all of its right, title and interest to the Purchased Business Assets and Purchased Real Property that are described below, free and clear of all liens, claims, encumbrances and other interests, except for certain liabilities that are to be assumed by the Buyer pursuant to the Asset Purchase Agreement and the Permitted Encumbrances, as defined in the Asset Purchase Agreement:[6]

> Purchased Business Assets:  All of the tangible and intangible assets owned solely by the Seller and used primarily in the operation of the businesses operated in connection with (A) the publication of the East Valley Tribune, Mesa Tribune, Gilbert Tribune, Chandler Tribune and Queen Creek Tribune newspapers and the eastvalleytribune.com, evtrib.com, aztrib.com, gilberttribune.com, chandlertribune.com and queencreektribune.com websites and domain names, (B) the Daily News-Sun and yourwestvalley.com, dailynews-sun.com, surprisetoday.com and westvalleypreps.com websites and domain names, (C) the Ahwatukee Foothill News and ahwatukee.com website and domain name, and (D) the Arizona Interactive Media Group and azimg.com, veep4u.com, and azclipper.com websites and domain names (the "Purchased Business"), including all of the Seller's right, title and interest in and to the following (except to the extent that any of the following contain Excluded Assets, as defined below)):
>
> (a)    Subject to certain purchase price and post-closing adjustments as set forth in the Asset Purchase Agreement, all current assets relating primarily to the Purchased Business, including accounts receivables, notes receivables, inventory and prepaid expenses;
>
> (b)    all machinery, equipment, printing presses, owned vehicles, furniture, furnishings, fixtures, office equipment, supplies, tools, parts, printing plates and other tangible personal property that is either (x) listed on

---

[6] The following is a summary of the relevant terms of the Asset Purchase Agreement.  To the extent there is any inconsistency between this summary and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

Exhibit A, or (y) both (1) used or held in connection with the Purchased Business and (2) located on either the Purchased Real Property or the real property described in Exhibit B to that certain real property lease that is attached as Exhibit J to the Asset Purchase Agreement, subject to the leases being assigned to Buyer pursuant to a certain lease assignment and assumption attached as Exhibit I to the Asset Purchase Agreement;

(c)     all right, title and interest in, to and under (i) all Assigned Contracts and (ii) all orders, commitments and agreements relating to subscriptions and advertisements which have been entered into by the Seller prior to the Sale Closing Date;

(d)     (i) all trademarks, service marks, domain names, trade dress, logos, tradenames and corporate names, and registrations and applications for registration thereof, (ii) all copyrightable works, copyrights and registrations and applications for registration thereof, (iii) all Software, (iv) all internet or worldwide web sites and all related content and programming, and (v) all trade secrets, know-how and confidential business, financial and marketing information, confidential manufacturing and production processes and techniques, confidential research and development information, and confidential customer and supplier lists and information, whether patentable or unpatentable and whether or not reduced to practice (the "Intellectual Property"), goodwill and all copies and tangible embodiments thereof, and all licenses and sublicenses granted and obtained with respect thereto (to the extent transferable and included with the Assigned Contracts), and rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions, in each case owned by or licensed to the Seller relating exclusively to the Purchased Business (but, in each case, excluding the Intellectual Property that is (i) not primarily related to the Purchased Business, or (ii) not solely owned by Seller), including, without limitation, (i) the tradenames East Valley Tribune, Mesa Tribune, Gilbert Tribune, Chandler Tribune and Queen Creek Tribune newspapers and the eastvalleytribune.com, evtrib.com and aztrib.com websites and domain names, (ii) the tradename Daily News-Sun and the yourwestvalley.com, dailynews-sun.com, surprisetoday.com and westvalleypreps.com websites and domain names, (iii) the tradename Ahwatukee Foothills News and the ahwatukee.com website and domain name, and (iv) the tradename Arizona Interactive Media Group and the azimg.com, veep4u.com, and azclipper.com websites and domain names;

(e)     permits relating solely to the Purchased Business to the extent transferable under applicable law, including, without limitation, any Purchased Business's qualification as a newspaper of general circulation and registration as a newspaper entitled to second-class postage rates;

(f)     all other technical information, data and know-how relating exclusively to the Purchased Business, including; all such products and publications currently produced, formerly produced or contemplated for production by Seller, and all such techniques, discoveries, improvements, designs, patterns, production processes, specifications and other non-public information and data;

(g)     all of the editorial material, photos, art work and related files owned by or licensed to the Seller relating exclusively to the Purchased Business and prepared, created or acquired by the Seller solely with respect to the Purchased Business, including, without limitation, such editorial material, photos and artwork in the process of preparation;

(h)     all of the Seller's subscription and circulation lists, customer lists and supplier lists and correspondence relating solely to the Purchased Business and all promotional and advertising literature and materials (including original mats and plates in the possession of advertising agencies and all advertising space reservations, advertising insertion orders, records of current and former advertisers and any prospect lists for advertising) relating solely to the Purchased Business and all materials used for mailing list development and subscription promotion and fulfillment for the publications and websites solely of the Purchased Business;

(i)     all of the Seller's library and archives of back and current issues of the publications and websites solely of the Purchased Business and other materials owned by the Seller relating historically to the publication and distribution of the publications and websites solely of the Purchased Business;

(j)     all masthead rights;

(k)     all telephone, telex and telephone facsimile numbers and other directory listings utilized by the Seller exclusively in the conduct of the Purchased Business;

(l)     all books and records (including all data and other information stored on discs, tapes or other media) other than income Tax books and records and personnel files (of which Buyer shall receive a copy);

(m)     all computer hardware and Software owned solely by the Seller and used primarily in the conduct of the Purchased Business, together with all users' manuals, training manuals and other system and operations documentation relating to such computer hardware and Software;

(n)     all claims, deposits, prepayments, credits, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment; and

(o)    all guarantees, warranties, indemnities and similar rights in favor of the Seller with respect to any Purchased Business Assets.

Purchased Real Property: Certain real property located at 10102 West Santa Fe Drive, Sun City, Arizona and all improvements, buildings, parking facilities and other structures located thereon, together with any appurtenant easements, rights of way, licenses and hereditaments thereto.

12.    Section 8.1(a) of the Asset Purchase Agreement provides that such agreement may be terminated by either party if the closing has not occurred by the close of business on the later of (a) March 31, 2010, (b) five business days after the sale order becomes a final, non-appealable order (but in no event later than 62 days after the date of the Asset Purchase Agreement), or (c) such later date as the Buyer and the Seller agree; provided that if the closing shall not have occurred on or before the applicable deadline above due to a material breach of any representation, warranty, covenant or agreement contained in the Asset Purchase Agreement by the Buyer or the Seller, then the breaching party may not terminate the Asset Purchase Agreement pursuant to section 8.1(a) thereof.

## II.    **The Purchase Price**

13.    Pursuant to the Asset Purchase Agreement, the purchase price for the Purchased Business Assets and the Purchased Real Property would be (a) $2,050,000; plus or minus (b) a working capital adjustment as described in the Asset Purchase Agreement; plus (c) any Severance Liabilities and any employer payroll Taxes paid by Seller or its Affiliates in connection with Severance Liabilities, that in the aggregate exceed $779,000; plus (d) the cure amounts for the Assigned Contracts (collectively, the "Purchase Price"). The Asset Purchase Agreement provides for a possible post-closing adjustment to the purchase price, as well as a mechanism for determining such post-closing adjustment.

### III. The Assigned Contracts and the Rejected Contracts

14.     **Exhibit C** hereto sets forth the executory contracts and unexpired leases that the Debtors seek to assume and assign to the Buyer, as well as the cure amount the Debtors believe is owed in respect of each executory contract and unexpired lease (the "Cure Amounts").  Any objection to the assumption and assignment of any contract or lease included in **Exhibit C** or the Cure Amount for each contract and lease set forth in **Exhibit C** must be filed on or before the objection deadline that is established with respect to this Motion.  Any objection with respect to a Cure Amount must state with specificity the cure amount(s) the objecting party believes is required, and the objecting party must provide appropriate documentation to support such assertion.  The Debtors request that, if an objection is timely filed, this Court resolve any dispute regarding the assumption and assignment of any Contract or the Cure Amounts at the Sale Hearing.

15.     If no objection to the assumption and assignment of the Assigned Contracts is timely received on or before March 2, 2010 at 4pm (ET), then the Debtors request (a) that the Cure Amounts set forth in **Exhibit C** be controlling and (b) that this Court deem satisfied the requirements of Bankruptcy Code sections 365(b)(1) and 365(f)(2).  The Successful Bidder (as defined below) shall be required to demonstrate adequate assurance of future performance to this Court and each counterparty to executory contracts and unexpired leases, as necessary, as required by Bankruptcy Code section 365(f)(2).

16.     The Debtors reserve the right to amend **Exhibit C** and **Exhibit D** in all respects (including, but not limited to, adding or removing executory contracts and unexpired leases thereon) prior to the Sale Closing Date.  If the Debtors amend **Exhibit C** by adding new contracts or leases, or by reducing a proposed cure amount, then the counterparties to the

affected contracts and leases shall be provided notice of such amendments and shall have up to 17 days to object to such amendment. If the Debtors make any such amendments to **Exhibit C** more than 17 days prior to the Sale Hearing (as defined below), the Debtors will request Court authorization to assume and assign the contracts and leases set forth in **Exhibit C** as amended during the Sale Hearing. To the extent the Debtors make any such amendments to **Exhibit C** after the date that is 17 days prior to the Sale Hearing, then the Debtors will request Court authorization to assume and assign the new contracts set forth in such amendments and to pay the reduced cure amounts as set forth in such amendments on or after the Sale Hearing.

17.     The Debtors also request entry of an order authorizing them to reject the Rejected Contracts as of the Sale Closing Date, even if the Sale Closing Date occurs after the Plan Effective Date, the terms of the Plan notwithstanding. The Debtors request this relief because they need to continue their contractual relationships under the Rejected Contracts until the Sale Closing Date. The Debtors believe that this relief will not prejudice the counterparties to the Rejected Contracts because they will continue to perform under the Rejected Contracts until the Sale Closing Date, and counterparties will be afforded a full opportunity to file proofs of claim against the Debtors arising out of purported rejection damages.

## IV.     The Debtors' Marketing Efforts

18.     Since the summer or fall of 2008, the Debtors have sought to sell the Purchased Business Assets and the Purchased Real Property. At that time, the Debtors retained Cribb, Greene & Associates, a newspaper and publication brokerage firm ("Cribb"), as their broker to sell those assets. Until the middle of 2009, Cribb worked with the Debtors in their attempt to sell the assets, contacting several potential purchasers. Ultimately, the Debtors replaced Cribb with DV&M as their broker.

19.    Since September 2009, DV&M worked diligently to find parties interested in purchasing the Purchased Business Assets and the Purchased Real Property. Specifically, DV&M contacted 37 prospective purchasers, and welcomed any inquiries or expressions of interest from parties that DV&M did not affirmatively contact. However, these marketing efforts have yielded limited interest, with the exception of that demonstrated by the Buyer. Indeed, of the prospective purchasers, fifteen executed non-disclosure agreements and received certain information regarding the Purchased Business Assets and the Purchased Real Property.

20.    The expressions of interest that were provided by other prospective purchasers were inferior to the terms under which the Buyer has agreed to purchase the Purchased Business Assets and the Purchased Real Property. Specifically, other than the Buyer, only one party submitted a formal expression of interest to purchase all of the Purchased Business Assets and the Purchased Real Property since the Petition Date. However, that party's proposed purchase price was lower than the Buyer's, and that party was unable to demonstrate that it had the financial wherewithal to consummate the transaction. Additionally, one party submitted a formal expression of interest to purchase only some of the Purchased Business Assets (for example, that party did not wish to purchase the East Valley Tribune newspaper and the Arizona Interactive Media Group), and three other parties informally expressed interest in purchasing only one business unit. The Debtors have determined in their business judgment that a transaction to sell only some of the Purchased Business Assets would be undesirable. Specifically, many of the functions of the business units are integrated in Phoenix, Arizona, thus making it difficult to sell individual business units. Moreover, any transaction that excluded the East Valley Tribune newspaper and the Arizona Interactive Media Group would have left the Debtors with significant employee severance obligations.

21.     The Debtors believe that the parties most likely to be interested in acquiring the Purchased Business Assets and the Purchased Real Property have been contacted through the marketing efforts that have been made to date.  Accordingly, the Debtors have decided to sell the Purchased Business Assets and the Purchased Real Property pursuant to the Asset Purchase Agreement and without the expense and delay of pursuing a formal "two-step" auction and sale process.  Nevertheless, if an Alternative Qualifying Bid is submitted by Bid Deadline, the Debtors will conduct an auction prior to the Sale Hearing, in which the Buyer and any party submitting an Alternative Qualifying Bid would be invited to participate.

22.     To enhance the possibility that one or more parties submit an Alternative Qualifying Bid, the Debtors will serve this Motion on parties that have previously expressed interest to DV&M in purchasing the Purchased Business Assets or the Purchased Real Property within the last twelve months, as well as any parties the Debtors or DV&M believe may be interested in purchasing the Purchased Business Assets and the Purchased Real Property (collectively, the "Interested Parties").  Should any Interested Party desire confidential or otherwise non-public information regarding the Debtors, the Purchased Business Assets or the Purchased Real Property, such Interested Party will be required to enter into a confidentiality agreement satisfactory to the Debtors in their business judgment.  Any party desiring to receive such confidential or otherwise non-public information must demonstrate to the Debtors' satisfaction (in the Debtors' reasonable business judgment, in consultation with counsel for the Committee and counsel for the Administrative Agent) that the party has the financial wherewithal to submit an Alternative Qualifying Bid.

# REQUIREMENTS FOR ALTERNATIVE
# QUALIFYING BIDS AND POTENTIAL AUCTION

23.    The Debtors propose that if, and only if, an Alternative Qualifying Bid is submitted to the Debtors on or before the Bid Deadline, then on or before March 8, 2010 at 10:00 a.m. prevailing Eastern Time,[7] they will commence the Auction at the offices of Young, Conaway, Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, to sell the Purchased Business Assets and the Purchased Real Property.  If no Alternative Qualifying Bid is submitted by the Bid Deadline, then the Debtors will not hold the Auction and will request this Court's approval to sell the Purchased Business Assets and the Purchased Real Property to the Buyer pursuant to the terms of the Asset Purchase Agreement.

24.    To qualify an Alternative Qualifying Bid, each bid (other than any bid submitted by the Buyer) must satisfy the following requirements:

- it states that the bidder offers to purchase **all** of the Purchased Business Assets and the Purchased Real Property upon the terms and conditions substantially as set forth in the Asset Purchase Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Debtors determine, after consultation with counsel for the Committee and counsel for the Administrative Agent, provide maximum value to the Seller's estate;

- it states that the bidder's offer is irrevocable until the Sale Closing Date;

- it includes a duly authorized and executed agreement, reflecting, if any, the bidder's proposed amendments and modifications thereto, as well as the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules to the agreement, and a copy of such agreement and all exhibits and schedules thereto marked to show those amendments and modifications to the Asset Purchase Agreement;

---

[7] If any Auction is held, the Debtors will file a notice with this Court stating the date, time and location of the Auction, and will notify each party that submits an Alternative Qualifying Bid of such date and time.  The Debtors may adjourn the Auction without further notice by announcement at the Auction.

- the bidder's duly authorized and executed agreement, together with all exhibits and schedules thereto, do not contain terms that are materially worse for the Seller than the terms of the Asset Purchase Agreement;

- it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtors, in consultation with counsel for the Committee and counsel for the Administrative Agent to make a determination as to the bidder's financial and other capabilities to consummate the transaction contemplated by the agreement that is delivered by the bidder;

- it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

- it fully discloses the identity of each entity that will be purchasing the Purchased Business Assets and the Purchased Real Property;

- it identifies which of the Debtors' executory contracts and unexpired leases pertaining to the Purchased Business the bidder wishes to have assumed and assigned, and provides evidence of the bidder's ability to provide adequate assurance of future performance of such executory contracts and unexpired leases.

- it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Business Assets and the Purchased Real Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Business Assets and the Purchased Real Property in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Business Assets and the Purchased Real Property or the completeness of any information provided in connection therewith, except as expressly stated in the agreement that is delivered by the bidder; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

- it includes evidence, in form and substance satisfactory to Debtors, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the agreement that is delivered by the bidder and the transactions contemplated thereby;

- it is accompanied by a good faith deposit (the "Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Seller (or such other party as the Debtors may determine) in an amount equal to 10% of the purchase price. The Debtors will retain the Good Faith Deposits of all bidders

(except for the Successful Bidder, as defined below) in an interest-bearing account until ten days after the Sale Closing Date, after which they shall be released to the respective bidders. If the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall have no obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtors;

- it contains all other information that is reasonably requested by the Debtors; and

- it is received by the Bid Deadline.

25. As soon as practicable after the Bid Deadline, the Sellers will notify each bidder in writing as to whether or not its bid constitutes an Alternative Qualified Bid. During the Auction, bidding for the Purchased Business Assets and the Purchased Real Property shall continue until the Debtors (after consulting with counsel for the Committee and counsel for the Administrative Agent) determine in their business judgment that they have received the highest or otherwise best bid for such assets. The Debtors will then determine (after consultation with counsel for the Committee and counsel for the Administrative Agent) and announce at the Auction which bid has been determined to be the highest or otherwise best bid (the "Successful Bidder").

26. The Debtors intend to present the bid of the Successful Bidder for approval of this Court at the Sale Hearing. In the event of a failure to consummate a sale of the Purchased Business Assets and the Purchased Real Property after the conclusion of the Sale Hearing because of a breach or default under the terms of the bid of the Successful Bidder, the next highest or otherwise best Alternative Qualifying Bid (if any), as determined by the Debtors and disclosed during the Sale Hearing shall be deemed the "Alternative Successful Bidder" without further order of this Court, and the parties shall be authorized to consummate the transaction contemplated by the Alternative Qualifying Bid submitted by the Alternative Successful Bidder

without further order of this Court.  All of the Debtors' rights with respect to the breaching Successful Bidder will be reserved.

<b><u>BASIS FOR THE RELIEF REQUESTED</u></b>

**I.**     **<u>Applicable Legal Standards</u>**

27.     Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a), which confers broad powers on bankruptcy courts, provides, in relevant part, as follows: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In pertinent part, Bankruptcy Rule 6004 states that, "all sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1).  With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that,

> ... the notice of a proposed use, sale or lease of property . . . shall include . . . the terms and conditions of any private sale and the deadline for filing objections.  The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.

Fed. R. Bankr. P. 2002 (c)(1).

28.     To approve the use, sale, or lease of property out of the ordinary course of business, this Court must find "some articulated business justification" for the proposed action. *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the "articulated business justification" and good faith tests of *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Dairies*); *Titusville*

*Country Club v. PennBank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 19 (Bankr. E.D. Pa. 1987). There is a strong presumption in applicable principles of law "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in Chapter 11, especially where a debtor is a Delaware corporation) (quotations omitted).

29.     Generally, courts have applied four factors in determining whether a sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. *See Lionel*, 722 F.2d at 1071 (setting forth the "sound business purpose" test); *Abbotts Dairies*, 788 F.2d at 145-57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement); *Delaware & Hudson Ry.*, 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

30.     This fundamental analysis does not change if the proposed sale is private, rather than public. *See, e.g.*, *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or

substantially all of the estate assets not in the ordinary course of business under § 363(b)."). The bankruptcy court "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991), *vacated on other grounds*, 165 B.R. 1 (D.P.R. 1992); *accord, In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985). Here, the proposed sale of the Purchased Business Assets and the Purchased Real Property to the Buyer, subject to higher and better bids, meets all of these requirements and should be approved.

II.     **Proceeding With the Sale to the Buyer, Subject to**
        **Higher and Better Bids Under the Terms and Conditions**
        **Herein, Reflects an Exercise of the Debtors' Business Judgment**

        31.     There is a sound business justification for the Debtors' proposal to sell the Purchased Business Assets and the Purchased Real Property to the Buyer, subject to higher and better bids, rather than through a formal two step auction and sale process. The Debtors submit that an order granting the relief requested herein is a matter within the discretion of the Court and would be consistent with the provisions of the Bankruptcy Code. *See* 11 U.S.C. § 105(a). Based on the marketing process the Debtors have engaged in prior to filing this Motion, the indications of interest received in connection therewith, the Debtors believe that the offer from the Buyer to be embodied in the Asset Purchase Agreement is more beneficial to the Debtors' estates than any outcome that the Debtors would obtain through a formal two-step auction and sale process. Moreover, the business that is being sold to the Buyer is operating at a loss, and the Debtors estimate that the three-week delay that is inherent in a two-step auction and sale process will result in their suffering additional losses totaling at least $180,000.

        32.     In the Debtors' business judgment, the Asset Purchase Agreement provides them with strong assurances that the Buyer is motivated to close the contemplated transaction in a

timely manner. Further, the Debtors believe that the Buyer has demonstrated good faith intent to close the contemplated transaction. Moreover, the Debtors will reduce their administrative costs and realize maximum value for the Purchased Business Assets and the Purchased Real Property through their sale as a going concern. It is estimated that the sale will relieve the Debtors of approximately $1.5 million in shutdown costs that would be incurred if the Debtors were unable to dispose of the Purchased Business Assets and the Purchased Real Property through the sale. Thus, the Debtors believe that the sale must be completed in accordance with the timeframe described herein to preserve and maximize the value of the Purchased Business Assets and the Purchased Real Property.

33. As noted above, since 2008 the Debtors pursued a sale of or other strategic transaction involving the Purchased Business Assets and the Purchased Real Property. Despite having contacted 37 prospective purchasers and having received executed non-disclosure agreements from fifteen prospective purchasers, DV&M received a very limited number of formal or informal expressions of interest. The Debtors determined in the exercise of their business judgment that the terms proposed by the Buyer would deliver the most value to their estates and creditors. As noted above, only one party other than the Buyer submitted a formal expression of interest to purchase all the Purchased Business Assets and the Purchased Real Property since the Petition Date. However, the purchase price offered by such party was less than the purchase price offered by the Buyer, and that party was unable to demonstrate that it had the financial wherewithal to consummate the transaction. Other parties only expressed interest in purchasing some of the Purchased Business Assets, which transactions would have been difficult to consummate (given the integrated nature of the Purchased Business Assets) and likely would have exposed the Debtors to significant employee severance obligations.

34.     Nevertheless, subject to the terms, conditions and requirements for Alternative Qualifying Bids as set forth herein, the Debtors will consider other proposals for the Purchased Business Assets and the Purchased Real Property, and may hold an Auction prior to the Sale Hearing.

## III.     The Purchase Price is Fair and Reasonable

35.     The Debtors submit that the Purchase Price represents a fair and reasonable price for the Purchased Business Assets and the Purchased Real Property.  In the Debtors' view, the Asset Purchase Agreement represents significant value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the Purchased Business Assets and the Purchased Real Property at a price that will represent fair and reasonable consideration.  *See, e.g., Mellon Bank, N.A., v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991) (price amounted to reasonably equivalent value under the Bankruptcy Code), *cert. denied*, 503 U.S. 937 (1992).

## IV.     Adequate and Reasonable Notice of this Motion and the Sale Will Be Provided

36.     The Debtors will serve this Motion as required by the applicable procedural rules. *See* Fed. R. Bankr. P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); *see also Delaware & Hudson Ry.*, 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).  The Debtors will also serve the Motion on the Interested Parties.  Accordingly, the Debtors will provide adequate notice of the sale.

## V. The Sale Should Be Approved Under Bankruptcy Code Section 363(f)

37.     In accordance with Bankruptcy Code section 363(f), a debtor in possession may sell property under Bankruptcy Code section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

38.     Considering that any objections to this Motion must be resolved by consent of the objecting party or adjudicated by the Court, the Debtors expect that they can satisfy at least one of the subsections of Bankruptcy Code section 363(f).  Moreover, any liens, claims, encumbrances and other interests asserted against the Purchased Business Assets and the Purchased Real Property will attach to the proceeds of the sale with the same force, effect and priority as such liens have on the same, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto.  Accordingly, the Debtors request that the sale be approved "free and clear," with any liens, claims, encumbrances, and interests to attach to proceeds of the sale.

39.     Pursuant to Local Rule 6004-1, the Debtors highlight the following provision in the proposed sale order that would limit the Buyer's successor liability:

"The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise provided in the Asset Purchase Agreement, and the Motion contains sufficient notice of such limitation in accordance with Local Rule 6004-1. Except as set forth in the Asset Purchase Agreement, neither the purchase of the Purchased Business Assets and the Purchased Real Property by the Buyer or its affiliates, nor the fact that the Buyer or its affiliates are using any of the Purchased Business Assets and the Purchased Real Property previously operated by the Debtors, will cause the Buyer or any of its affiliates to be deemed a successor in any respect to the Debtors' businesses within the meaning of (i) any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations) for purposes of this provision, the term "affiliate" shall mean each entity that is treated as a single employer with the Buyer, (ii) under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtors are a party, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (v) any cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (vi) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the Sale Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes of any kind for any period, (viii) any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Purchased Business Assets and the Purchased Real Property prior to the Sale Closing Date, and (ix) any litigation.""

**VI.  The Sale is Proposed in Good Faith Within the**
**Meaning of Bankruptcy Code Section 363(m), and the Sale**
**is Not Subject to Avoidance Under Bankruptcy Code Section 363(n)**

40.    At the Sale Hearing, the Debtors will request a finding that the Buyer is a good-

faith purchaser entitled to the protections of Bankruptcy Code section 363(m).  Section 363(m)

protects the sale of a debtor's property to a good faith purchaser.  Section 363(m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

41.    Bankruptcy Code section 363(m) fosters the policy of not only affording finality

to the judgment of the bankruptcy court, but particularly to give finality to those orders and

judgments upon which third parties rely.  *See, e.g., In re Abbotts Dairies of Penn., Inc.*, 788 F.2d

143 at 147; *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11

U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless

there is a stay pending appeal").

42.    The Asset Purchase Agreement has been negotiated at arms-length and in good

faith.  The Buyer is not affiliated with any of the Debtors or their representatives.  Accordingly,

this Court should find that the Buyer has acted in good faith within the meaning of section

363(m).  *See generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.)*, No. 89 Civ. 3704

(KMW), 1990 WL 212899 (S.D.N.Y. 1990) (holding that to show lack of good faith, a party

must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other

bidders"); *see also generally In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988)

(quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing*

*Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).

43.     At the Sale Hearing, the Debtors will request a finding of this Court that neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement, or the sale of the Purchased Business Assets and the Purchased Real Property pursuant thereto, to be avoided under Bankruptcy Code section 363(n).[8]

## VII.    Assumption and Assignment of the Assigned Contracts and Rejection of the Rejected Contracts as of the Sale Closing Date Should be Approved

44.     The Debtors also request authorization to assume and assign the Assigned Contracts to the Buyer or the Successful Bidder (if the Successful Bidder is not the Buyer). Bankruptcy Code section 365 authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

45.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See*

---

[8]  Bankruptcy Code section 363(n) provides:

"The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection."

*Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

46.     Here, the Assigned Contracts being assumed and assigned to the Buyer or the Successful Bidder (if the Successful Bidder is not the Buyer) are an integral part of the sale transaction and, accordingly, the assumption and assignment of the Assigned Contracts will enhance the value of the Debtors' estates and is reasonable. The Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of the Assigned Contracts will be satisfied at the hearing on this Motion. The Debtors, in exercising their sound business judgment, believe that selling the Purchased Business Assets and the Purchased Real Property and assuming and assigning the Assigned Contracts to the Buyer or the Successful Bidder (if the Successful Bidder is not the Buyer) would be in the best interests of their estates.

47.     Moreover, the Debtors will provide all parties to the Assigned Contracts an opportunity to be heard. Specifically, **Exhibit C** identifying each of the Assigned Contracts and the Cure Amount with respect to each Assigned Contract will be provided to each counterparty to an Assigned Contract. If no objection with respect to the assumption and assignment of an Assigned Contract is received, the assignment of the applicable Assumed Contract, and the Cure

Amount would be approved. Thus, the Debtors respectfully submit that the assumption and assignment of the Assigned Contracts should be approved.

48.     To facilitate the assumption and assignment of the Assigned Contracts, the Debtors further request that this Court find the anti-assignment provisions of the Assigned Contracts, if any, to be unenforceable under Bankruptcy Code section 365(f).

49.     Bankruptcy Rule 6006(e) allows for the assumption and assignment of multiple executory contracts in one motion upon authorization of the Court. The Debtors therefore request that the Court permit the Debtors to assume and assign all of the Assigned Contracts through this Motion.

## VIII.  The Commission and Expense Reimbursement to DV&M Should be Allowed and Approved on a Final Basis

50.     Pursuant to an order of this Court dated October 5, 2009, this Court authorized the Debtors to retain DV&M as their sale advisor. That order provides that DV&M's commissions would be subject to review under Bankruptcy Code section 328(a), except that the U.S. Trustee is entitled to review requests for payment of the commission and reimbursement of expenses under the standards set forth in Bankruptcy Code section 330.

51.     Bankruptcy Code section 328(a) provides:

"The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

52. Congress intended in Bankruptcy Code section 328(a) to enable debtors to retain professionals pursuant to specific fee arrangements to be determined at the time of the court's approval of the retention, subject to reversal only if the terms are found to be improvident in light of "developments not capable of being anticipated at the time of fixing such terms and conditions." 11 U.S.C. § 328(a); *see also Donaldson, Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862-63 (5th Cir. 1997) ("If the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment.").

53. Accordingly, Bankruptcy Code section 328 permits the compensation of professionals, including sale advisors, on terms that reflect the nature of their services and market conditions. The terms of DV&M's engagement letter and DV&M's requested commission reflect (a) the nature of the services provided by DV&M and (b) the fee structure provisions typically utilized by DV&M and other advisory firms, which do not bill their clients on an hourly basis for services like those to be rendered pursuant to the DV&M engagement letter and generally are compensated on a transactional basis. Considering the services that DV&M has provided and the market prices for DV&M's services, the Debtors submit that the commission is reasonable under the standards set forth in Bankruptcy Code sections 328(a) and 330. Moreover, the Debtors submit that terms and conditions of DV&M's employment (including the commission to be paid to DV&M) are not improvident in light of developments that were incapable of being anticipated as of October 5, 2009, when this Court authorized the Debtors to retain DV&M as their sale advisor. Thus, DV&M is entitled to its commission pursuant to Bankruptcy Code section 328(a).

54. Bankruptcy Code section 330 also permits the allowance and payment of DV&M's commission and expense reimbursements. Section 330 provides for the compensation of reasonable and necessary services rendered by professionals based on the time, the nature, the extent and the value of such services, and the cost of comparable services other than in a case under the Bankruptcy Code. *See* 11 U.S.C. § 330. The test for determining necessity is objective; focusing on what services a reasonable professional would have performed under the same circumstances. *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998). This test does not rely on hindsight to determine the ultimate success or failure of the professional's actions. *See id.*; *In re Keene Corp.*, 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997). . Ultimately, if the services of a professional are reasonably likely to benefit the debtor's estate, they should be compensable. *See Angelika Films*, 227 B.R. at 42.

55. The Debtors respectfully submit that the compensation sought by DV&M is necessary and reasonable. The services that DV&M rendered to the Debtors require a high degree of professional competence and expertise, and DV&M was required to expend substantial effort in providing those services. DV&M performed efficiently, effectively and economically, and the results obtained to date have benefited the Debtors, their estates and creditors. Thus, the Debtors request allowance of DV&M's requested commission in the amount of $91,500 and expense reimbursements in the amount of $1,094.58 on a final basis, and request authorization to pay such amounts.

## IX. Relief from the Fourteen-Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

56. The Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after

entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that "an order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors request that the order granting the relief requested by this Motion be effective immediately, by providing that the stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

57.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See, e.g.*, Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and 6006(d) and the advisory committee notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, the stay period may be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See, e.g.*, 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6004.09 (L. King, 15th rev. ed.).

## NOTICE

58.     Notice of the filing of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the agent for the Debtors' prepetition secured bank group; (d) all parties known to the Debtors (based on the Debtors' very recent lien search) to hold any liens, claims or encumbrances against the Purchased Business Assets and the Purchased Real Property; (e) the counterparties to each of the Assumed Contracts and the Rejected Contracts; (f) the Interested Parties; and (g) all parties who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order substantially in the form annexed hereto as **Exhibit A**, granting the relief requested in the Motion, and that this Court grant such other and further relief as may be just and proper.

Dated: Wilmington, Delaware  
    February 16, 2010

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: 302-571-6600
Fax: 302-571-1253

- and -

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: 213-485-1234
Fax: 213-891-8763

- and –

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: 212-906-1200
Fax: 212-751-4864

Counsel for Debtors and Debtors in
Possession