4.   Multiple Counterparts.  This Bill of Sale may be executed in one or more counterparts (including by facsimile), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.   Succession and Assignment.  Neither this Bill of Sale nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other parties which shall not be unreasonably withheld; except that Seller may, without such consent, assign this Bill of Sale and its rights and obligations hereunder to any Affiliate of Seller or to a successor in interest which shall assume all obligations and liabilities of Seller hereto.  Subject to the foregoing, this Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, and no other person shall have any right, benefit or obligation under this Bill of Sale as a third party beneficiary or otherwise.

6.   Entire Agreement.  This Bill of Sale and the Purchase Agreement constitute the entire agreement between the parties and supersede any prior understandings, agreements or representations by or between the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

7.   Governing Law.  The parties agree that this Bill of Sale and any disputes, controversies or claims arising hereunder or related to the transactions contemplated hereby shall be interpreted according to the laws of the State of Delaware, excluding its choice of law rules that would apply any other law.  If any matters in dispute are required to be settled by litigation, then such trials will be decided by the Bankruptcy Court.  **THE PARTIES WAIVE TRIAL BY JURY IN ANY SUCH ACTION(S) AND CONFIRM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO TRANSACTIONS CONTEMPLATED BY THIS BILL OF SALE.**  Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 9.2 of the Purchased Agreement.

8.   Amendment.  No amendment of any provision of this Bill of Sale shall be valid unless the same shall be in writing and signed by each party except as expressly provided herein.

11.  Headings.  The paragraph headings contained in this Bill of Sale are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Bill of Sale.

12.  Severability.  The invalidity or unenforceability of any provision of this Bill of Sale shall not affect the validity or enforceability of any other provisions of this Bill of Sale.  In the event that any of the provisions of this Bill of Sale shall be held by a court or other

2

tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Bill of Sale shall otherwise remain in full force and effect.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

3

IN WITNESS WHEREOF, the Parties hereto have executed this Bill of Sale on the date first written above.

"SELLER"
**FREEDOM ARIZONA INFORMATION, INC.,**
a California corporation

By: _____
    Name: _____
    Its: _____


"BUYER"
**1013 COMMUNICATIONS, LLC,**
a Nevada limited liability company

By: _____
    Name: _____
    Its: _____

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), effective as of [ ], 2010 (the "Effective Date"), is made and entered into by and between Freedom Arizona Information, Inc., a California corporation and/or its assigns ("Seller"), and 1013 Communications, LLC, a Nevada limited liability company ("Buyer"). Capitalized terms used in this Agreement not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

WHEREAS, Seller and certain of its affiliates are debtors in possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 1, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 09-13046;

WHEREAS, Buyer and Seller have entered into that certain Asset Purchase Agreement, made and effective as of February 12, 2010 (the "Asset Purchase Agreement"); and

WHEREAS, to effectuate the transactions described in the Asset Purchase Agreement, Seller desires to assign to Buyer the Purchased Business Assets and Assumed Liabilities (as such terms are defined in the Asset Purchase Agreement), and Buyer desires to assume from Seller the Purchased Business Assets and Assumed Liabilities, in each case, upon the terms and conditions set forth in the Asset Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, Buyer and Seller agree as follows:

1.      Assignment of Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and subject to the terms and conditions of the Asset Purchase Agreement, Seller does hereby sell, convey, transfer, assign and deliver to Buyer all of Seller's right, title and interest as of the Effective Time in and to the Purchased Business Assets, including, but not limited to, those under the Assumed Contracts set forth on **Exhibit A.**

2.      Assumption of Obligations and Liabilities. Subject to the terms and conditions of the Asset Purchase Agreement, Buyer hereby accepts the foregoing assignments and assumes, and agrees to timely, promptly and fully pay, perform, satisfy and discharge the Assumed Liabilities, including, but not limited to, those under the Assumed Contracts set forth on **Exhibit A.**

3.      Terms of the Asset Purchase Agreement. The terms of the Asset Purchase Agreement, including, but not limited to the parties' representations, warranties, covenants and agreements relating to the Purchased Business Assets, are incorporated herein by this reference and will remain in full force and effect to the full extent provided therein. This Agreement is intended to evidence the consummation of the transactions contemplated by the Asset Purchase Agreement and is subject to its provisions. This Agreement is not intended in any way to supersede, limit, expand or qualify any provision of the Asset Purchase Agreement. If there is

any conflict or inconsistency between the Asset Purchase Agreement and this Agreement, the Asset Purchase Agreement will control.

**EXCEPT AS EXPRESSLY SET FORTH IN THE ASSET PURCHASE AGREEMENT, THE SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE PURCHASED BUSINESS ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. THE BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE PROVIDED IN A THE ASSET PURCHASE AGREEMENT, THE BUYER IS PURCHASING THE PURCHASED BUSINESS ASSETS ON AN "AS IS, WHERE IS" BASIS.**

4. <u>Further Assurances</u>. If at any time after the Closing, any further actions are necessary to carry out the purposes of this Agreement, each party hereto will take such further actions (including but not limited to the execution and delivery of further instruments and documents) as the other party may reasonably request, all at the sole cost any expense of the requesting party.

5. <u>Multiple Counterparts</u>. This Agreement may be executed in one or more counterparts (including by facsimile), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6. <u>Choice of Law</u>. The parties agree that this Agreement and any disputes, controversies or claims arising hereunder or related to the transactions contemplated hereby shall be interpreted according to the laws of the State of Delaware, excluding its choice of law rules that would apply any other law. If any matters in dispute are required to be settled by litigation, then such trials will be decided by the Bankruptcy Court. **THE PARTIES WAIVE TRIAL BY JURY IN ANY SUCH ACTION(S) AND CONFIRM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.** Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 9.2</u> of the Asset Purchase Agreement.

**[Signature page follows.]**

LA\2045275.3

IN WITNESS WHEREOF, each party has caused this Agreement to be executed on its behalf as of the Effective Date.

BUYER:                                              SELLER:

1013 Communications, LLC,                           Freedom Arizona Information, Inc.,
a Nevada limited liability company,                 a California corporation

By _____               By _____
    Name:_____              Name:_____
    Its:_____                Its:_____

LA\2045275.3

# EXHIBIT A

## ASSUMED CONTRACTS

LA\2045275.3

**Exhibit I**

**Lease Assignment and Assumption**

**[SEE ATTACHED]**

# ASSIGNMENT AND ASSUMPTION OF LEASE
## (AND LANDLORDS' CONSENT TO ASSIGNMENT AND ASSUMPTION OF LEASE)

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment"), is made and entered into as of this [    ]th day of [        ], 2010, by and between Freedom Arizona Information, Inc., a California corporation, (hereinafter collectively referred to as "Assignor"), and 1013 Communications, LLC, a Nevada limited liability company (hereinafter referred to as "Assignee"), with reference to the following facts:

        A.      Assignor is the tenant under a certain Lease dated [  ], amended [    ] (collectively, the "Lease"), attached hereto as Exhibit A, with [      ] (hereinafter referred to as the "Landlord"), of those certain premises located at [        ] and further described in the Lease (the "Premises");

        B.      Assignor and Assignee have entered into that certain Asset Purchase Agreement dated February 12, 2010 (the "Purchase Agreement"), pursuant to which Assignor shall assume and assign to Assignee under section 365 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., all of Assignor's right, title and interests in, to and under certain executory contracts, including the Lease, and Assignee shall assume and perform the obligations under such executory contracts;

        C.      Assignor is desirous of assigning to Assignee, and Assignee is desirous of assuming from Assignor, all of Assignor's right, title, and interest in, to and under said Lease, upon the following terms and conditions; and

        D.      Landlord agrees to consent to said assignment upon the terms and conditions hereinafter set forth, and to promptly execute the Consent to Assignment and Assumption of Lease attached hereto (the "Landlord Consent").

NOW, THEREFORE, it is mutually agreed by and between the parties as follows:

        1.      Assignor hereby assigns and transfers to Assignee all of Assignor's right, title, and interest in, to and under said Lease, to be effective as of the Effective Time (as hereinafter defined).

        2.      Assignee hereby covenants and agrees to and does accept said assignment and in addition hereby expressly assumes and agrees to be bound by and to fully and timely keep, perform, and fulfill each and all of the terms, covenants, conditions, and obligations required to be observed, kept, performed, and/or fulfilled by Assignor as tenant under said Lease as of the Effective Time, in the place and stead of Assignor.

3.     In consideration of the assignment of the Lease, Assignee hereby covenants and agrees, effective as of the date upon which the transactions contemplated by the Purchase Agreement are consummated (the "Closing Date"), to assume and fully perform, discharge and satisfy the obligations of "Tenant" under the Lease, as set forth in the Lease. This Assignment shall become effective as of 11:59 p.m. California time on the Closing Date (the "Effective Time").

4.     Upon Assignor's receipt of payment of the Closing Purchase Price from Assignee under the Purchase Agreement, Assignor hereby assigns to Assignee all of Assignor's right, title and interest to the Security Deposit as set forth in the Lease. Assignee shall deliver to Assignor an executed copy of the Landlord Consent within two (2) business days following Landlord's execution and delivery of such Landlord Consent.

5.     Landlord hereby consents to the Assignment subject to the terms and conditions set forth herein.

6.     At or after the Effective Time, the provisions of the Lease may be modified or amended or changed by agreement between Landlord and Assignee at any time, or by course of conduct, without the consent of or without notice to Assignor, including, without limitation, any extension or termination of the Term pursuant to the Lease or otherwise, and such modification, amendment or change shall not release Assignor from its obligations under the Lease prior to the Effective Time. This Assignment shall not be amended or modified except in writing and signed by the parties hereto.

7.     This Assignment shall be binding on, and shall inure to the benefit of, the parties hereto and their respective heirs, legal representatives, successors, and assigns.

8.     This Assignment (together with the Lease) embodies the entire understanding between Landlord, Assignor and Assignee with respect to the subject matters herein.

9.     The parties acknowledge that each party and its counsel, if any, have reviewed and approved this Assignment and that no rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall be employed in the interpretation of this Assignment or any amendments or exhibits to it or any document executed and delivered by either party in connection with this Assignment. Whenever required by the context of this Assignment, the singular shall include the plural, the masculine shall include the feminine, and

vice versa. If any provision of this Assignment shall be determined to be illegal or unenforceable, such determination shall not affect any other provision of this Assignment and all such provisions shall remain in full force and effect.

10.      This Assignment shall be governed by and construed in accordance with the laws of the state in which the Premises is located.

11.      Each individual executing this Assignment on behalf of Assignor, Assignee and Landlord hereby covenants and warrants that the respective party has full right and authority to enter into this Assignment and that the person signing on behalf of such party is authorized to do so.

12.      If this Assignment is executed in counterparts, each counterpart shall be deemed an original which together shall constitute the same document.

[signatures on following page]

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and

Assumption of Lease on the day and year appearing beside their respective signatures.

"ASSIGNOR"

Date: _____, 2010    **FREEDOM ARIZONA INFORMATION, INC.,**
a California corporation,

By: _____
_____
_____


"ASSIGNEE"

Date: _____, 2010    **1013 COMMUNICATIONS, LLC,**
a Nevada limited liability company

By: _____
_____
_____

## CONSENT TO ASSIGNMENT AND ASSUMPTION OF LEASE

The undersigned, Landlord of the premises described in the foregoing Assignment and Assumption of Lease pursuant to said Lease referred to therein, does hereby consent to the foregoing assignment of rights and delegation of duties, and does hereby agree to accept, as of the Effective Time, the performance of 1013 Communications, LLC, a Nevada limited liability company, as tenant under said Lease, in the place and stead of Freedom Arizona Information, Inc., a California corporation, who, notwithstanding any provision to the contrary set forth in the Lease, is hereby expressly released from any liability or obligations which arise at or after the Effective Time under the terms of said Lease.

Further, the undersigned Landlord does hereby certify and acknowledge that said Lease is in full force and effect and that there exists no event of default by the tenant thereunder and, to the best knowledge of Landlord, no event has occurred which, upon the passage of time or the giving of notice, or both, would result in any event of default or prevent the tenant from exercising and obtaining the benefits of any rights contained therein.

This Consent to Assignment and Assumption of Lease shall be binding on the undersigned and its heirs, legal representatives, successors, and assigns.

IN WITNESS WHEREOF, the undersigned has executed this Consent to Assignment and Assumption of Lease on the day and year set forth below.

[_____]

Date: _____, 2010          By: _____
                                     Name: _____
                                     Title: _____

EXHIBIT A

[Lease]

**Exhibit J**

**Real Property Lease**

**[SEE ATTACHED]**

# AIR COMMERCIAL REAL ESTATE ASSOCIATION
## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET
### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

**1.**    **Basic Provisions ("Basic Provisions").**

    1.1   **Parties:**   This   Lease   (**"Lease"**),   dated   for   reference   purposes   only
_____ , 20 _____ ,   .   is   made   by   and   between
Freedom Arizona Information, Inc. _____
_____ (**"Lessor"**)
and 1013 Communications, LLC _____
_____ (**"Lessee"**),
(collectively the **"Parties,"** or individually a **"Party"**).

    1.2   **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly known as _____
located in the County of _____ , State of _____ ,
and generally described as (describe briefly the nature of the property and, if applicable, the **"Project"**, if the property is located within a Project)
See Exhibit A attached hereto. _____
_____
_____ (**"Premises"**). (See also Paragraph 2)

    1.3   **Term:** month-to-month in Lessee's discretion _____ ~~years and~~ _____ ~~months~~ (**"Original Term"**)
commencing    Closing Date _____ (**"Commencement**   **Date"**)   and   ending
on the Expiration Date as defined in Paragraph 51 _____ (~~**"Expiration Date"**~~). (See also Paragraph 3)

    1.4   **Early Possession:** N/A _____ (**"Early Possession Date"**).
(See also Paragraphs 3.2 and 3.3)

    1.5   **Base Rent:** $10,000.00   per month (**"Base Rent"**), payable on the   first _____ day of
each month commencing _____ . (See also Paragraph 4)

☐ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _____

    1.6   **Base Rent and Other Monies Paid Upon Execution:**

         (a)    **Base Rent:** $10,000.00 _____ for the ~~period~~ first month _____
_____ .

         (b)    **Security Deposit:** $ _____ (**"Security Deposit"**). (See also Paragraph 5)

         (c)    **Association Fees:** $ _____ for the period _____

         (d)    **Other:** $ _____ for _____
_____

         (e)    **Total Due Upon Execution of this Lease:** $ _____

    1.7   **Agreed Use:** publishing and otherwise operating the East Valley Tribune and all related purposes _____ . (See also Paragraph 6)

    1.8   **Insuring Party:** Lessor is the **"Insuring Party"** unless otherwise stated herein. (See also Paragraph 8)

    1.9   **Real Estate Brokers:** (See also Paragraph 15)

         (a) **Representation:** The following real estate brokers (the **"Brokers"**) and brokerage relationships exist in this transaction (check applicable boxes):

☐ N/A _____ represents Lessor exclusively (**"Lessor's Broker"**);
☐ N/A _____ represents Lessee exclusively (**"Lessee's Broker"**); or
☐ N/A _____ represents both Lessor and Lessee (**"Dual Agency"**).

         (b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to in their separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.

    1.10   **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____
_____ (**"Guarantor"**). (See also Paragraph 37)

    1.11   **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☑ an Addendum consisting of Paragraphs 51 _____ ~~through~~ _____ ;
☐ a plot plan depicting the Premises;
☐ a current set of the Rules and Regulations;
☐ a Work Letter;
☑ other (specify): Exhibit A - Legal Description of Premises
                      Exhibit B - Lessee Machinery and Equipment
_____ .

**2.**    **Premises.**

_____                                                      _____
INITIALS                                                      INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                        FORM STN-10-6/07E

2.1 **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less. **Note: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2 **Condition.** Lessor shall deliver the Premises to Lessee ~~broom clean and free of debris~~ on the Commencement Date or the Early Possession Date, whichever first occurs ("**Start Date**"), ~~and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air-conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.~~

2.3 (a) **Title.** Lessor represents and warrants to Lessee as of the execution date of this Agreement that Lessor has full authority to enter into and execute this Agreement.

(b) **Personal Property.** Lessor agrees and acknowledges that all of the equipment, conduits, fixtures and personal property of Lessee shall remain the personal property of Lessee and Lessee shall have the right to remove the same at any time during the Original Term, whether or not said items are considered fixtures and attachments to real property under applicable laws. If such time for removal causes Lessee to remain on the Premises after termination of this Agreement, the holdover provisions of Paragraph 26 below shall apply. Lessee shall compensate Lessor for any damages done to the Premises by such removal.

(c) **Rights Upon Sale.** Should Lessor, at any time during the Original Term decide (i) to sell or transfer all or any part of the Premises to a purchaser other than Lessee, or (ii) to grant to a third party by easement or other legal instrument an interest in and to that portion of the Premises occupied by lessee, such sale or grant of an easement or interest therein shall be under and subject to this Agreement and any such purchaser or transferee shall recognize Lessee's rights under the terms of this Agreement.

~~2.3 (a) **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:~~

~~(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.~~

~~(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay Interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.~~

~~(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.~~

2.4 **Acknowledgements.** Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC (as defined in Paragraph 51) and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements (as defined in Paragraph 51) and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, and (c) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or

INITIALS           INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION      FORM STN-10-6/07E

warranties with respect to said matters other than as set forth in this Lease. ~~In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.~~ Without limiting the foregoing, Lessee accepts the Premises absolutely AS IS and WHERE IS, without any representation or warranty of any kind.

      2.5     **Lessee as Prior Owner/Occupant.** The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

**3.     Term.**

      3.1     **Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

      3.2     **Early Possession.** If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such early possession shall not affect the Expiration Date.

      3.3 Intentionally Omitted.

      ~~3.3     Delay In Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.~~

      3.4     **Lessee Compliance.** Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.     Rent.**

      4.1.     **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

      4.2     **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

      4.3     **Association Fees.** In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.

**5.**     **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within ~~90~~ 15 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment of any monies to be paid by Lessee under this Lease.

**6.**     **Use.**

      6.1     **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, ~~or any other legal use which is reasonably comparable thereto,~~ and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. ~~Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of~~

_____                                                   _____
**INITIALS**                                                 **INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                       FORM STN-10-6/07E

~~the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.~~

6.2 **Hazardous Substances.**

(a) **Reportable Uses Require Consent.** The term **"Hazardous Substance"** as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. **"Reportable Use"** shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. **No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.**

~~(e) **Lessor Indemnification.** Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.~~

(f) **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) ~~if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater,~~ give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the ~~amount by which the~~ cost of the remediation of such Hazardous Substance Condition ~~exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater~~. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3 ~~**Lessee's Compliance with Applicable Requirements.**~~ Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements,

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

without regard to whether such Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

      6.4    **Inspection; Compliance.** Lessor and Lessor's **"Lender"** (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets ( **MSDS**) to Lessor within 10 days of the receipt of a written request therefor.

**7.**    **Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.**

      7.1    **Lessee's Obligations.**

          (a) **In General.** Subject to the provisions of Paragraph 2.2 (Condition), ~~2.3 (Compliance), 6.3~~ (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building (as defined in Paragraph 51) in a first-class condition (including, e.g. graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building.

          (b) **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof. To the best knowledge of Lessor, Lessor has provided copies of all such service contracts currently in force with respect to the Premises.

          (c) **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

          (d) ~~Intentionally Omitted.~~ ~~Replacement. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (i.e. 1/144th of the cost per month). Lessee shall pay Interest on the unamortized balance but may prepay its obligation at any time.~~

      7.2    **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

      7.3    **Utility Installations; Trade Fixtures; Alterations.**

          (a) **Definitions.** The term **"Utility Installations"** refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term **"Trade Fixtures"** shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term **"Alterations"** shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. **"Lessee Owned Alterations and/or Utility Installations"** are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

          (b) **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent , which may be withheld in Lessor's sole discretion. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to ~~3 month's Base Rent in the aggregate or a sum equal~~ to one month's Base Rent ~~in any one year~~. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor which may be withheld in Lessor's sole discretion. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in

written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

      (c) **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

    7.4    **Ownership; Removal; Surrender; and Restoration.**

      (a) **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

      (b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made by Lessee without the required consent.

      (c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. ~~Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear.~~ Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment and the Lessee Machinery and Equipment (as hereinafter defined) as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor , which may be withheld in Lessor's sole discretion, shall constitute a holdover under the provisions of Paragraph 26 below. Exhibit B attached hereto is a list of certain machinery and equipment, including without limitation certain Trade Fixtures, owned by Lessee (the "Lessee Machinery and Equipment"). Notwithstanding any provisions of this Lease to the contrary, and without limiting the foregoing, on or before the Expiration Date, Lessee shall remove all Lessee Machinery and Equipment from the Premises; provided, however, that Lessee may leave on the Premises the Lessee Machinery and Equipment designated on Exhibit B to be left at the Premises.

8.    **Insurance; Indemnity.**

    8.1    **Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 ~~except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence~~. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

    8.2    **Liability Insurance.**

      (a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only. Lessee's liability policies shall include Blanket Contractual and Tenants and Fire Damage Legal Liability, Products, Completed Operations, Independent Contractors and Personal Injury.

      (b) **Carried by Lessor.** Lessor shall have the right to maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

    8.3    **Property Insurance - Building, Improvements and Rental Value.**

      (a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4 **Lessee's Property; Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5 **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6 **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7 **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee except to the extent such claims or damages may be due to or caused by the gross negligence or willful misconduct of lessor, or its employees, contractors or agents. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8 **Exemption of Lessor and its Agents from Liability**. Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9 **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9. **Damage or Destruction.**

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-10-6/07E

9.1 **Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 61 months or less from the date of the damage or destruction, or prior to the Expiration Date, if sooner. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 62 months or less from the date of the damage or destruction, or prior to the Expiration Date, if sooner. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance , in, on, or under the Premises which requires remediation.

9.2 **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee ~~shall, at Lessor's election,~~ may make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible , which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3 **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4 **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5 **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6 **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days

following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

      9.7    **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.    **Real Property Taxes.**

      10.1    **Definition.** As used herein, the term **"Real Property Taxes"** shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

      10.2    **Payment of Taxes.** In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date. If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent. Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

      10.3    **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

      10.4    **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting.**

      12.1    **Lessor's Consent Required.**

        (a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent. , which may be withheld in Lessor's sole discretion.

        (b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

        (c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. **"Net Worth of Lessee"** shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

        (d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

        ~~(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.~~

        ~~(f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.~~

        (g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party

vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

     12.2    **Terms and Conditions Applicable to Assignment and Subletting.**

     (a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

     (b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment.  Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

     (c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

     (d) In the event of any Default or Breach by Lessee, Lessor  may proceed directly against Lessee, any Guarantors  or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

     (e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be  reasonably requested. (See also Paragraph 36)

     (f)  Any assignee of, or sublessee under, this Lease shall, by reason of accepting such  assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

     (g) Lessor's consent to any assignment or subletting shall not transfer  to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

     12.3    **Additional Terms and Conditions Applicable to Subletting.**  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

     (a) Lessee hereby assigns  and transfers  to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

     (b)  In the event of a Breach  by Lessee, Lessor may, at its  option, require sublessee  to attorn to Lessor,  in which event Lessor  shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

     (c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

     (d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

     (e) Lessor shall  deliver a copy of any notice of Default  or Breach  by Lessee to the sublessee, who shall  have the right to  cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

**13.**    **Default; Breach; Remedies.**

     13.1    **Default; Breach.**  A **"Default"** is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease.  A **"Breach"** is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

     (a) The abandonment of the Premises;  or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

     (b)  The failure  of Lessee to make any payment of  Rent or any Security  Deposit required  to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

     (c)  The failure  of Lessee to allow Lessor and/or its  agents access  to the Premises  or the commission  of waste, act or acts  constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

     (d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

     (e) A Default by Lessee as to the terms,  covenants, conditions  or provisions  of this Lease, or of the rules  adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice;

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2      **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice   of failure to make any payment required under this Lease and 30 days in all other instances (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises  by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee:  (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession  and recover the Rent as it becomes due, in which event Lessee may sublet  or assign, subject only to reasonable limitations.  Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial  decisions of the state wherein the Premises  are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3      **Inducement Recapture.**  Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as **"Inducement Provisions,"** shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease.  Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee.  The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4      **Late Charges.**  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender.  Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to  .10% of each such overdue amount or $100, whichever is greater.  The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5      **Interest.**  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments.  The interest ( "Interest") charged shall be computed at the

____
INITIALS

____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6 **Breach by Lessor.**

(a) **Notice of Breach.** Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

~~(b) Performance by Lessee on Behalf of Lessor. In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.~~

14. **Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15. **Brokerage Fees.**

15.1 Intentionally Omitted. ~~Additional Commission. In addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.~~

15.2 Intentionally Omitted. ~~Assumption of Obligations. Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.~~

15.3 **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16. **Estoppel Certificates.**

(a) Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17. **Definition of Lessor.** The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall

**INITIALS**

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.     **Severability.**  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.     **Days.**  Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.     **Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.     **Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.     **No Prior or Other Agreements; Broker Disclaimer.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.     **Notices.**
          23.1     **Notice Requirements.**  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.
          23.2     **Date of Notice.**  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     **Waivers.**
          (a)     No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.
          (b)     The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.
          (c)     THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.     **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**
          (a)     When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:
                    (i)     Lessor's Agent.  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations:  To the Lessor:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  To the Lessee and the Lessor:  a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
                    (ii)     Lessee's Agent.  An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations.  To the Lessee:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  To the Lessee and the Lessor:  a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair

dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)    Agent Representing Both Lessor and Lessee.    A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b)    Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)    Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.    **No Right To Holdover.**  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.    **Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.    **Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.    **Binding Effect; Choice of Law.**  This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.    **Subordination; Attornment; Non-Disturbance.**

30.1    **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, **"Security Device"**), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as **"Lender"**) shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2    **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Devise to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3    **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a **"Non-Disturbance Agreement"**) from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4    **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    **Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or

_____                                                                                                      _____
INITIALS                                                                                                            INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                        FORM STN-10-6/07E

judgment. The term, **"Prevailing Party"** shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.     **Lessor's Access; Showing Premises; Repairs.**  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises.  All such activities shall be without abatement of rent or liability to Lessee.

33.     **Auctions.**  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent.  Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.     **Signs.**  Lessor may place on the Premises ordinary "**For Sale**" signs at any time and ordinary "**For Lease**" signs during the last 6 months of the term hereof.  Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.  If Lessee desires to install signage on the Premises, Lessee will provide written notice to Lessor, and Lessor will accommodate such signage as long as it is permitted by Applicable Requirements. provided, however, that Lessor may withhold consent to any proposed signage that is in Lessor's opinion too large, deceptive, unattractive or otherwise inconsistent with or inappropriate to the Premises. Lessee's installation and maintenance of signage shall be undertaken in accordance with Paragraph 7.  Lessee shall repair all damage to the Premises resulting from the removal of signs installed by Lessee.

35.     **Termination; Merger.**  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies.  Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.     **Consents.**  Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed.  Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor.  Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent.  The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given.  In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.     **Guarantor.**
        37.1        **Execution.**  The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.
        37.2        **Default.**  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide:  (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.     **Quiet Possession.**  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.     **Options.**  If Lessee is granted an Option, as defined below, then the following provisions shall apply:
        39.1        **Definition.  "Option"** shall mean:  (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.
        39.2        **Options Personal To Original Lessee.**  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.
        39.3        **Multiple Options.**  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.
        39.4        **Effect of Default on Options.**
                    (a)  Lessee shall have no right to exercise an Option:  (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are

_____
**INITIALS**

_____
**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

cured, during the 12 month period immediately preceding the exercise of the Option.

(b)   The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)   An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.     **Multiple Buildings.**  If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

41.     **Security Measures.**  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.     **Reservations.**  Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.    ~~**Performance Under Protest.**~~ ~~If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment.~~

44.     **Authority; Multiple Parties; Execution.**

(a)   If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)   If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)   This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45.     **Conflict.**  Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.     **Offer.**  Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.     **Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.     **Waiver of Jury Trial.**  **THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.**

49.     **Mediation and Arbitration of Disputes.**  An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ **is not** attached to this Lease.

50.     **Americans with Disabilities Act.**  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION            FORM STN-10-6/07E

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:

1.  SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.  RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

**WARNING:**  IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: _____   Executed  at: _____
On: _____   On: _____

**By LESSOR:**                          **By LESSEE:**
_____         _____
_____         _____

By: _____    By: _____
Name  Printed: _____    Name  Printed: _____
Title: _____    Title: _____
By: _____    By: _____
Name  Printed: _____    Name  Printed: _____
Title: _____    Title: _____
Address: _____    Address: _____
_____         _____
Telephone:(____) _____    Telephone:(____) _____
Facsimile:(____) _____    Facsimile:(____) _____
Federal ID No. _____    Federal ID No. _____

**BROKER:**                             **BROKER:**
_____         _____
_____         _____

Attn: _____     Attn: _____
Title: _____    Title: _____
Address: _____    Address: _____
_____         _____
Telephone:(____) _____    Telephone:(____) _____
Facsimile:(____) _____    Facsimile:(____) _____
Federal ID No. _____    Federal ID No. _____

**NOTICE:**  These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you are utilizing the most current form:  AIR Commercial Real Estate Association,  800 W 6th Street, Suite 800, Los Angeles, CA 90017.  Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association.  All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

_____                              _____
INITIALS                                INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                      FORM STN-10-6/07E

## ADDENDUM

51.     Certain Definitions.  The following words used in this Lease shall have the following meanings:

"**Applicable Requirements**" means building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances.

"**Building**" means any building on the Premises.

"**Expiration Date**" means the earlier of (i) the date that is one year after the Commencement Date, and (ii) the date Lessor designates as the expiration date of this Lease by written notice from Lessor to Lessee; provided, however, that Lessor shall not have the right to designate a date prior to ninety (90) days after the date of Lessor's written notice.

"**HVAC**" means heating, ventilating and air conditioning systems.

EXHIBIT A

LEGAL DESCRIPTION OF PREMISES

[Attached]

Exhibit A

## PARCEL NO. 1:

That part of Lot 2, Block 12, MESA CITY, a subdivision recorded in Book 3 of Maps, page 11, records of Maricopa County, Arizona, described as follows:

BEGINNING at the Southeast corner of said Lot 2;

THENCE North 220 feet;

THENCE West 65 feet;

THENCE South 220 feet;

THENCE East 65 feet to the point of beginning

NOTE: A plat of MESA recorded in Book 23 of Maps, page 18, records of Maricopa County, Arizona, purports to show said premises as a portion of Lot 2, Block 12, MESA.

## PARCEL NO. 2:

Lot 3, Block 12, MESA CITY, a subdivision recorded in Book 3 of Maps, page 11, records of Maricopa County, Arizona;

EXCEPT the North 10 feet thereof; and

EXCEPT beginning at the Northeast corner of said Lot 3;

THENCE West 113 feet;

THENCE Northwesterly 39.6 feet to a point that is 180 feet East and 10 feet North of the Northwest corner of Lot 4, Block 12 of said subdivision;

THENCE South 10 feet;

THENCE West 14.3 feet to the Northwest corner of said Lot 3;

THENCE South 10 feet;

THENCE East 14.3 feet;

THENCE Southeasterly 39.6 feet to a point which is 113 feet West and 20 feet South of the Northeast corner of said Lot 3;

THENCE East 103 feet;

THENCE South 90 feet to the Northwest corner of that certain abandoned alleyway abandoned by the City of Mesa in Resolution 4435, recorded in Docket 14153, page 445;

CASE No. 00604535

THENCE East along the North line of said abandoned alleyway, 10 feet to a point on the East line of said Lot 3, coinciding with the Northeast corner of said abandoned alleyway;

THENCE North along the East line of said Lot 3, 110 feet to the point of beginning.

NOTE: A plat of MESA recorded in Book 23 of Maps, page 18, records of Maricopa County, Arizona, purports to show said premises as a portion of Lot 3, Block 12, MESA.


## PARCEL NO. 3:

Lot 4, Block 12, MESA CITY, a subdivision recorded in Book 3 of Maps, page 11, records of Maricopa County, Arizona;

EXCEPT the North 10 feet thereof;

NOTE: A plat of MESA recorded in Book 23 of Maps, page 18, records of Maricopa County, Arizona, purports to show said premises as a portion of Lot 4, Block 12, MESA.


## PARCEL NO. 4:

The South 45 feet of the North 110 feet of Lot 2, Block 12, MESA CITY, a subdivision recorded in Book 3 of Maps, page 11, records of Maricopa County, Arizona;

EXCEPT the East 4.3 feet thereof; and BEGINNING at the Southeast corner of said Lot 2; and

EXCEPT beginning at a point 80 feet South and 170 feet West of the Northeast corner of Lot 1, Block 12, of said subdivision;

THENCE West 80 feet;

THENCE South 30 feet;

THENCE East 80 feet to the point of beginning; and

EXCEPT the West 10 feet thereof.

NOTE: A plat of MESA recorded in Book 23 of Maps, page 18, records of Maricopa County, Arizona, purports to show said premises as a portion of Lot 2, Block 12, MESA.


## PARCEL NO. 5:

That part of Lot 2, Block 12, MESA CITY, a subdivision recorded in Book 3 of Maps, page 11, records of Maricopa County, Arizona, described as follows:

From the Northeast corner of said Lot 2, run South along the East line of said Lot 2, 65 feet to the North line of the South 45 feet of the North 110 feet of said Lot 2;

THENCE West along said last mentioned North line to a point on the West line of the East 4.3 feet of said Lot 2, said point being the TRUE POINT OF BEGINNING;

THENCE continuing West along the North line of the South 45 feet of the North 110 feet of said Lot 2, 80 feet to the East line of the West 80.7 feet of said Lot 2;

CASE No. 00604535

THENCE North along said last mentioned East line 45 feet to a point on the South line of premises conveyed to the City of Mesa by Deed recorded in Docket 454, page 415;

THENCE East along the South line of said premises conveyed to the City of Mesa as aforesaid, 60 feet to the beginning of a curve having a radius of 20 feet and bearing Southeasterly and the right;

THENCE along said curve an arc distance of 31.42 feet to the end of said curve on the West line of said premises conveyed to the City of Mesa, as aforesaid;

THENCE South along said last mentioned West line and along the West line of other premises conveyed to the City of Mesa by Deed recorded in Docket 459, page 146, 25 feet to the TRUE POINT OF BEGINNING.

NOTE: A plat of MESA recorded in Book 23 of Maps, page 18, records of Maricopa County, Arizona, purports to show said premises as a portion of Lot 2, Block 12, MESA.

## PARCEL NO. 6:

That part of Lot 2, Block 12, MESA CITY, a subdivision recorded in Book 3 of Maps, page 11, records of Maricopa County, Arizona, described as follows:

BEGINNING at a point 80 feet South and 170 feet West of the Northeast corner of Lot 1, Block 12, of said subdivision;

THENCE West 80 feet;

THENCE South 30 feet;

THENCE East 80 feet;

THENCE North 30 feet to the point of beginning.

NOTE: A plat of MESA recorded in Book 23 of Maps, page 18, records of Maricopa County, Arizona, purports to show said premises as a portion of Lot 2, Block 12, MESA.

## PARCEL NO. 7:

The West 100 feet of the South 220 feet of Lot 2, Block 12, MESA CITY, a subdivision recorded in Book 3 of Maps, page 11, records of Maricopa County, Arizona;

NOTE: A plat of MESA recorded in Book 23 of Maps, page 18, records of Maricopa County, Arizona, purports to show said premises as a portion of Lot 2, Block 12, MESA.

EXHIBIT B

LESSEE MACHINERY AND EQUIPMENT

[Attached]

# Freedom Arizona Information, Inc. Lease Exhibit B

## Lessee Machinery and Equipment

*Note: Seller makes no representations or warranties regarding the assets balances, depreciation or net book value numbers contained herein.

| Asset ID | Description | Asset Type |
|---|---|---|
| A000351 | CONVEYOR-3 | Newspaper Equipment |
| A000352 | DOUBLE POWER DEFLECTOR BUNDLE DIVERTER-3 | Newspaper Equipment |
| A000353 | 10' STEEL ROLLER LOADER-2 | Newspaper Equipment |
| A000354 | 10' STEEL ROLLER LOADER | Newspaper Equipment |
| A000355 | 8' MAT TOP CONVEYOR | Newspaper Equipment |
| A000356 | 16' MAT TOP CONVEYOR | Newspaper Equipment |
| A000357 | 10' MAT TOP CONVEYOR | Newspaper Equipment |
| A000361 | STRAPPING MACHINE | Newspaper Equipment |
| A000362 | HOPPER LOADER | Newspaper Equipment |
| A000363 | JOGGER-4 | Newspaper Equipment |
| A000364 | STRAPPING REEL AND DISPENSER | Newspaper Equipment |
| A000375.1 | STACKER-3 | Newspaper Equipment |
| A000375.2 | STACKER-3 | Newspaper Equipment |
| A000375.3 | STACKER-3 | Newspaper Equipment |
| A000376.1 | STACKER-2 | Newspaper Equipment |
| A000376.2 | STACKER-2 | Newspaper Equipment |
| A000377 | SIX HOPPER/TWO FEEDER INSERTER-2 | Newspaper Equipment |
| A000378 | 16 HOPPER/TWO FEEDER INSERTER | Newspaper Equipment |
| A000380 | EIGHT HOPPER/TWO FEEDER INSERTER | Newspaper Equipment |
| A000381 | CUSTOM WASTEPAPER DUMPSTER-5 | Newspaper Equipment |
| A000382.1 | HOPPER LOADER | Newspaper Equipment |
| A000382.2 | HOPPER LOADER | Newspaper Equipment |
| A000382.3 | HOPPER LOADER | Newspaper Equipment |
| A000382.4 | HOPPER LOADER | Newspaper Equipment |
| A000384.1 | BELT CONVEYOR SYSTEM | Newspaper Equipment |
| A000384.2 | BELT CONVEYOR SYSTEM | Newspaper Equipment |
| A000385.1 | STRAPPER-3 | Newspaper Equipment |
| A000385.2 | STRAPPER-3 | Newspaper Equipment |
| A000385.3 | STRAPPER-3 | Newspaper Equipment |
| A000391 | DIGITAL BUNDLE COUNTER | Newspaper Equipment |
| A000393 | 6' MAT TOP CONVEYOR | Newspaper Equipment |
| A000397.1 | STRAPPING MACHINE-5 | Newspaper Equipment |
| A000397.5 | STRAPPING MACHINE-5 | Newspaper Equipment |
| A000399 | OVERHEAD DUAL CONVEYER SYSTEM WITH FIVE STACK | Newspaper Equipment |

# Freedom Arizona Information, Inc. Lease Exhibit B

## Lessee Machinery and Equipment

*Note: Seller makes no representations or warranties regarding the assets balances, depreciation or net book value numbers contained herein.

| Asset ID | Description | Asset Type |
|---|---|---|
| A000400 | 50' OVERHEAD CONVEYOR-2 | Newspaper Equipment |
| A000401 | 120' OVERHEAD CONVEYOR | Newspaper Equipment |
| A000402 | CONVEYOR CONTROLLER-2 | Newspaper Equipment |
| A000403 | PAPER JOGGER-38 | Newspaper Equipment |
| A002835 | RIGGING AND HOISTING EQUIPMENT | Newspaper Equipment |
| Mesa002510 | Wayne Dalton Door for Digital Page Racks | Newspaper Equipment |
| Mesa003320 | SLS 1000 Rebuild Inserter -Mesa | Newspaper Equipment |
| MESA3440 | Tiger Rollers and conveyor belting - vertical | Newspaper Equipment |
| MESA3920 | Vision Plate Vendor | Newspaper Equipment |
| MESA4540 | Computer to Plate - Mesa | Newspaper Equipment |
| MESA4630.1 | Rollerslat Conveyors, with Bundle Pacers | Newspaper Equipment |
| MESA4630.2 | Rollerslat Conveyors, with Bundle Pacers | Newspaper Equipment |
| MESA4630.3 | Rollerslat Conveyors, with Bundle Pacers | Newspaper Equipment |
| MESA4630.4 | Rollerslat Conveyors, with Bundle Pacers | Newspaper Equipment |
| MESA4630.5 | Rollerslat Conveyor | Newspaper Equipment |
| MESA4640 | NP 5000 High Speed Newspaper Trapping Machine | Newspaper Equipment |
| MESA5160 | SLS #1 Feeder Expansion from 6:2 to 10:2 | Newspaper Equipment |
| MESA5520 | Quipp 500 Stacking Machine | Newspaper Equipment |
| MESA5800 | 5203HS Inline Labeling Machine | Newspaper Equipment |
| MESA9420 | Tensor Press | Newspaper Equipment |
| A000214 | IMAGE SETTER | Photo Chemical Composers |
| A000125 | COMPRESSED AIR DISTRIBUTION SYSTEM | Photo Processing Equipment |
| A000151 | PLATE CABINET | Photo Processing Equipment |
| A000156 | PLATE BENDER | Photo Processing Equipment |
| A000218 | IMAGE SETTER | Photo Processing Equipment |
| A000219 | PROCESSOR | Photo Processing Equipment |
| A000224 | PROCESSOR | Photo Processing Equipment |
| A000225 | IMAGE SETTER | Photo Processing Equipment |
| A000276 | IMAGER | Photo Processing Equipment |
| A000500 | STROBE CONTROLLER | Photo Processing Equipment |
| A000501 | CYC PAPER DROP REEL | Photo Processing Equipment |
| A000504 | PANTAGRAPH-2 | Photo Processing Equipment |
| A000505 | STROBE LIGHT-2 | Photo Processing Equipment |
| Mesa000780 | PLATE PROCESSOR | Photo Processing Equipment |

# Freedom Arizona Information, Inc. Lease Exhibit B

## Lessee Machinery and Equipment

*Note: Seller makes no representations or warranties regarding the assets balances, depreciation or net book value numbers contained herein.

| Asset ID | Description | Asset Type |
|---|---|---|
| A000297 | 75 H.P. AIR COMPRESSOR | Primary Press Equipment |
| A000298 | 100 H.P. AIR COMPRESSOR | Primary Press Equipment |
| A000301 | INK PUMP | Primary Press Equipment |
| A000302 | INK DISTRIBUTION SYSTEM | Primary Press Equipment |
| A000303 | 5,000 GALLON BLACK INK TANK | Primary Press Equipment |
| A000304 | 5 H.P. INK PUMP | Primary Press Equipment |
| A000305 | AIR COMPRESSOR | Primary Press Equipment |
| A000310 | STEEL ROLLER INVENTORY | Primary Press Equipment |
| A000312 | PLATE CYLINDER-2 | Primary Press Equipment |
| A000313 | EIGHT UNIT PRESS WITH FOUR HALF DECKS, 1 DOUB | Primary Press Equipment |
| A000315 | 35 LB. INK CANISTER-37 | Primary Press Equipment |
| A000316 | INK DISTRIBUTION SYSTEM | Primary Press Equipment |
| A000317 | 200 LB. INK CANISTER-15 | Primary Press Equipment |
| A000318 | DEEP SINK | Primary Press Equipment |
| A000320 | ROLLER RACK-2 | Primary Press Equipment |
| A000321 | 56" INK ROLLER-22 | Primary Press Equipment |
| A000325 | INK PUMP-10 | Primary Press Equipment |
| A000330 | REEL CART-5 | Primary Press Equipment |
| Mesa001790 | Osmosis System | Primary Press Equipment |
| Mesa001930.1 | Air Dryers | Primary Press Equipment |
| Mesa001930.2 | Air Dryers | Primary Press Equipment |
| Mesa003180 | Digital Page Packs | Primary Press Equipment |
| Mesa003190 | Addition to Digital Page Packs (asset #Mesa00 | Primary Press Equipment |
| 000460 | (3) SATELLITE DISHES ECHOSTAR 2800 | Television Technical Equipment |
| MESA4600 | Computer to Plate - Sun City (Moved to Mesa property) | Newspaper Equipment |

# Freedom Arizona Information, Inc. Lease Exhibit B

# Lessee Machinery and Equipment Permitted to Remain on Premises at the End of the Term

Utility Installations
Alterations
Lessor and Lessee understand that certain Lessee Machinery and Equipment may be fundamental to the structural integrity of the Buildings ("Fundamental Machinery and Equipment"). Lessor and Lessee shall use their commercially reasonable efforts to identify and agree upon a list of such Fundamental Machinery and Equipment prior to the Closing Date (as defined in that certain Asset Purchase Agreement by and among 1013 Communications, LLC, a Nevada limited liability company, Freedom Arizona Information, Inc., a California corporation, and solely for purposes of ARTICLE VII thereof, Freedom Newspapers, Inc., a Delaware corporation), which list shall be incorporated into this Exhibit B of Lessee Machinery and Equipment Permitted to Remain on Premises at the End of the Term.

**Exhibit K**

**Sale Motion**

**[SEE ATTACHED]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                      :     Chapter 11

                            :

FREEDOM COMMUNICATIONS HOLDINGS, :     Case No. 09-13046 (BLS)
INC., et al.,

                            :

          Debtors.[1]         :     Jointly Administered

------------------------------------------------------------ x

## MOTION OF THE DEBTORS FOR ORDER, PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004 AND 6006 AND LOCAL BANKRUPTCY RULE 6004-1 (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF FREEDOM ARIZONA INFORMATION, INC. TO 1013 COMMUNICATIONS, LLC, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, SUBJECT TO HIGHER AND BETTER BIDS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES;(III) AUTHORIZING THE REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AS OF THE DATE THE SALE IS CLOSED; (IV) AUTHORIZING PAYMENT OF COMMISSION AND EXPENSE REIMBURSEMENT TO DIRKS, VAN ESSEN & MURRAY ON A FINAL BASIS; AND (V) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Freedom Communications Holdings, Inc. (2814); Freedom Communications, Inc. (0750); Freedom Broadcasting, Inc. (0025); Freedom Broadcasting of Florida, Inc. (6581); Freedom Broadcasting of Florida Licensee, L.L.C. (1198); Freedom Broadcasting of Michigan, Inc. (6110); Freedom Broadcasting of Michigan Licensee, L.L.C. (1122); Freedom Broadcasting of New York, Inc. (6522); Freedom Broadcasting of New York Licensee, L.L.C. (9356); Freedom Broadcasting of Oregon, Inc. (7291); Freedom Broadcasting of Oregon Licensee, L.L.C. (9295); Freedom Broadcasting of Southern New England, Inc. (7274); Freedom Broadcasting of Southern New England Licensee, L.L.C. (1177); Freedom Broadcasting of Texas, Inc. (2093); Freedom Broadcasting of Texas Licensee, L.L.C. (1147); Freedom Broadcasting of Tennessee, Inc. (7961); Freedom Broadcasting of Tennessee Licensee, L.L.C. (9430); Freedom Magazines, Inc. (0328); Freedom Metro Information, Inc. (1604); Freedom Newspapers, Inc. (3240); Orange County Register Communications, Inc. (7980); OCR Community Publications, Inc. (9752); OCR Information Marketing, Inc. (7983); Appeal-Democrat, Inc. (4121); Florida Freedom Newspapers, Inc. (4227); The Seller Information, Inc. (5796); Freedom Colorado Information, Inc. (7806); Freedom Eastern North Carolina Communications, Inc. (5563); Freedom Newspapers of Illinois, Inc. (2222); Freedom Newspapers of Southwestern Arizona, Inc. (5797); Freedom Shelby Star, Inc. (8425); Illinois Freedom Newspapers, Inc. (8308); Missouri Freedom Newspapers, Inc. (8310); Odessa American (7714); The Times-News Publishing Company (0230); Victor Valley Publishing Company (6082); Daily Press (3610); Freedom Newspaper Acquisitions, Inc. (4322); The Clovis News-Journal (5820); Freedom Newspapers of New Mexico L.L.C. (5360); Gaston Gazette LLP (4885); Lima News (6918); Porterville Recorder Company (7735); Seymour Tribune Company (7550); Victorville Publishing Company (7617); Freedom Newspapers (7766); The Creative Spot, L.L.C. (2420); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Services, Inc. (3125). The address for Freedom Communications Holdings, Inc. and certain other Debtors is 17666 Fitch, Irvine, California 92614.

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")

hereby move (this "Motion") for entry of an order substantially in the form annexed hereto as

**Exhibit A**, pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules for the United States Bankruptcy

Court for the District of Delaware (the "Local Rules"): (i) authorizing the sale of certain assets of

Freedom Arizona Information, Inc. (the "Seller") to 1013 Communications, LLC (the "Buyer")

free and clear of liens, claims, encumbrances and other interests, except as set forth in the Asset

Purchase Agreement (as defined below), subject to higher and better bids under the terms and

conditions set forth herein; (ii) authorizing the assumption and assignment of certain executory

contracts and unexpired leases to the Buyer; (iii) authorizing the rejection of certain executory

contracts and unexpired leases as of the date the sale is closed; (iv) allowing and authorizing on a

final basis (without the need for further application to this Court) the payment of a commission

in the amount of $91,500 and expense reimbursement in the amount of $1,094.58, to Dirks, Van

Essen & Murray ("DV&M") the sale advisor that the Debtors retained by order of this Court in

connection with this sale; and (v) granting related relief. In support of this Motion, the Debtors

respectfully submit as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409. The predicates for the relief

requested herein are Bankruptcy Code sections 105(a), 363 and 365, Bankruptcy Rules 2002,

6004 and 6006, and Local Rule 6004-1.

2

## BACKGROUND

2.      On September 1, 2009 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee has been requested in these chapter 11 cases. On September 10, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors for these cases (the "Committee").

3.      The Debtors in these cases consist of 50 entities within a corporate family led by parent company Freedom Communications Holdings, Inc. ("Freedom Holdings"). Freedom Holdings is the direct owner of Freedom Communications, Inc. ("Freedom Communications"). Freedom Communications is, in turn, the direct or indirect owner of the other 48 Debtors, as well as six non-Debtor affiliates.

4.      Together, the Debtors operate a media business in two primary industry segments: newspaper publishing and broadcast television. Headquartered in Orange County, California, their operations extend to 15 states within the United States and utilize the services of in excess of 8,200 employees and independent contractors. Their newspaper publishing segment produces approximately 90 daily and weekly publications, including 30 daily newspapers, as well as ancillary magazines and other specialty publications. They operate eight television stations within their broadcast television segment, including five CBS affiliates, two ABC affiliates, and one CW affiliate. In addition, the Debtors operate an interactive business which offers website complements, as well as digital and mobile products, to their newspaper and broadcast properties.

5. The Debtors believe that the best interests of their estates and all parties will be served by proceeding as quickly as possible through the chapter 11 process. Towards that end, on October 31, 2009, the Debtors filed a proposed disclosure statement and plan of reorganization, and subsequently modified the disclosure statement and plan of reorganization to address objections and reflect negotiations with parties in interest. By order dated January 22, 2010, this Court approved the Debtors' disclosure statement (the "Disclosure Statement"). On January 28, 2010, the Debtors filed the latest version of their proposed plan of reorganization (the "Plan") and Disclosure Statement. The hearing to consider confirmation of the Plan is scheduled to be held on March 9, 2010.

## RELIEF REQUESTED

6. By this Motion, the Debtors request entry of an order (i) authorizing the sale of the Purchased Business Assets and the Purchased Real Property (as each term is defined below) to the Buyer under the terms of that certain Asset Purchase Agreement, dated February 12, 2010, between the Seller and the Buyer, which is annexed hereto as **Exhibit B** (the "Asset Purchase Agreement"),[2] but subject to higher and better bids; (ii) authorizing the assumption and assignment of the executory contracts and unexpired leases that are set forth in the list annexed hereto as **Exhibit C** (the "Assigned Contracts"), and authorizing the payment of cure payments to the counterparties to the Assigned Contracts only in the amounts set forth in **Exhibit C**; (iii) authorizing the rejection of certain executory contracts and unexpired leases as of the date the sale is closed; (iv) allowing and authorizing on a final basis (without the need for further application to this Court) the payment of a commission in the amount of $91,500 and expense reimbursement in the amount of $1,094.58, to DV&M and (v) granting related relief.

---

[2] Capitalized terms used but not defined herein shall have the meanings provided to them in the Asset Purchase Agreement.

4

7.     The Debtors believe that those parties most likely to be interested in acquiring the Purchased Business Assets and the Purchased Real Property already have been contacted through the marketing efforts of the Debtors and DV&M.  Accordingly, the Debtors have decided to seek this Court's authorization to sell the Purchased Business Assets and the Purchased Real Property to the Buyer pursuant to the Asset Purchase Agreement, without the requirement of a formal "two step" auction and sale process.

8.     Nevertheless, if any bona-fide alternative bid for all of the Purchased Business Assets and the Purchased Real Property that satisfies the terms and conditions set forth herein (such bid, an "Alternative Qualifying Bid") is submitted by March 5, 2010 (the "Bid Deadline"), the Debtors will conduct an auction prior to this Court's hearing in respect of this Motion (the "Sale Hearing"), in which the Buyer and any party submitting Alternative Qualifying Bid would be invited to participate (the "Auction").  The Debtors will inform counsel for the Committee and counsel for the administrative agent for the Debtors' pre-petition bank debt (the "Administrative Agent") of the terms of all bids they receive, including those bids that are not Alternative Qualifying Bids.  If no Alternative Qualifying Bid is submitted on or before the Bid Deadline, then the Debtors will not hold the Auction and will request this Court's approval to sell the Purchased Business Assets and the Purchased Real Property to the Buyer pursuant to the Asset Purchase Agreement.

9.     The Buyer has informed the Debtors that it will not accept assignment of certain of the Debtors' existing executory contracts and unexpired leases pertaining to the Purchased Business Assets and the Purchased Real Property, and the Debtors do not intend to retain those contracts and leases after the sale is closed.  Those executory contracts and unexpired leases are

5

listed in **Exhibit D** annexed hereto (the "Rejected Contracts").[3] The Debtors seek to reject the Rejected Contracts, effective as of the date the transaction under the Asset Purchase Agreement is closed (the "Sale Closing Date") even if the Sale Closing Date occurs after the effective date of the Plan (the "Plan Effective Date").[4] While the Debtors currently expect the Sale Closing Date to occur on or before the Plan Effective Date, in the event the Sale Closing Date occurs after the Plan Effective Date, the Debtors seek authority to reject the Rejected Contracts effective as of the Sale Closing Date (instead of the Plan Effective Date).

10.     Finally, the Debtors request authority to pay a commission in the amount of $91,500 and to reimburse expenses in the amount of $1,094.58 to DV&M, the sale advisor that the Debtors retained pursuant to an order of this Court dated October 5, 2009.[5] A calculation of the commission and a detailed description of the expenses for which DV&M requests the expense reimbursement are annexed hereto as **Exhibit E**.

---

[3] The Debtors reserve the right to amend **Exhibit C** and **Exhibit D** in all respects (including, but not limited to, adding or removing executory contracts and unexpired leases thereon) prior to the Sale Hearing.

[4] Section 6.3 of the Plan provides:

"[e]xcept as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have rejected each prepetition executory contract and unexpired lease to which it is a party unless such contract or lease (i) is listed on the Contract/Lease Schedules as of the Confirmation Date, (ii) was previously assumed or rejected upon motion by a Final Order, (iii) previously expired or terminated pursuant to its own terms, or (iv) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the rejection of the prepetition executory contracts and unexpired leases described above, as of the Effective Date."

[5] This Court's October 5, 2009 order approving the Debtors' retention of DV&M provides that the Debtors may request this Court's allowance of DV&M's commission and reimbursement of expenses as part of a motion requesting approval of the sale of the relevant assets.

6

## OVERVIEW OF THE TRANSACTION

### I.     The Purchased Business Assets and the Purchased Real Property

11.     The Debtors request authority for the Seller to sell, convey, transfer, assign and deliver to the Buyer all of its right, title and interest to the Purchased Business Assets and Purchased Real Property that are described below, free and clear of all liens, claims, encumbrances and other interests, except for certain liabilities that are to be assumed by the Buyer pursuant to the Asset Purchase Agreement and the Permitted Encumbrances, as defined in the Asset Purchase Agreement:[6]

> Purchased Business Assets: All of the tangible and intangible assets owned solely by the Seller and used primarily in the operation of the businesses operated in connection with (A) the publication of the East Valley Tribune, Mesa Tribune, Gilbert Tribune, Chandler Tribune and Queen Creek Tribune newspapers and the eastvalleytribune.com, evtrib.com, aztrib.com, gilberttribune.com, chandlertribune.com and queencreektribune.com websites and domain names, (B) the Daily News-Sun and yourwestvalley.com, dailynews-sun.com, surprisetoday.com and westvalleypreps.com websites and domain names, (C) the Ahwatukee Foothill News and ahwatukee.com website and domain name, and (D) the Arizona Interactive Media Group and azimg.com, veep4u.com, and azclipper.com websites and domain names (the "Purchased Business"), including all of the Seller's right, title and interest in and to the following (except to the extent that any of the following contain Excluded Assets, as defined below)):
>
> (a)     Subject to certain purchase price and post-closing adjustments as set forth in the Asset Purchase Agreement, all current assets relating primarily to the Purchased Business, including accounts receivables, notes receivables, inventory and prepaid expenses;
>
> (b)     all machinery, equipment, printing presses, owned vehicles, furniture, furnishings, fixtures, office equipment, supplies, tools, parts, printing plates and other tangible personal property that is either (x) listed on Exhibit A, or (y) both (1) used or held in connection with the Purchased Business and (2) located on either the Purchased Real Property or the real property described in Exhibit B to that certain real property lease that is attached as Exhibit J to the Asset Purchase Agreement, subject to the

---

[6] The following is a summary of the relevant terms of the Asset Purchase Agreement. To the extent there is any inconsistency between this summary and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

leases being assigned to Buyer pursuant to a certain lease assignment and assumption attached as Exhibit I to the Asset Purchase Agreement;

(c) all right, title and interest in, to and under (i) all Assigned Contracts and (ii) all orders, commitments and agreements relating to subscriptions and advertisements which have been entered into by the Seller prior to the Sale Closing Date;

(d) (i) all trademarks, service marks, domain names, trade dress, logos, tradenames and corporate names, and registrations and applications for registration thereof, (ii) all copyrightable works, copyrights and registrations and applications for registration thereof, (iii) all Software, (iv) all internet or worldwide web sites and all related content and programming, and (v) all trade secrets, know-how and confidential business, financial and marketing information, confidential manufacturing and production processes and techniques, confidential research and development information, and confidential customer and supplier lists and information, whether patentable or unpatentable and whether or not reduced to practice (the "Intellectual Property"), goodwill and all copies and tangible embodiments thereof, and all licenses and sublicenses granted and obtained with respect thereto (to the extent transferable and included with the Assigned Contracts), and rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions, in each case owned by or licensed to the Seller relating exclusively to the Purchased Business (but, in each case, excluding the Intellectual Property that is (i) not primarily related to the Purchased Business, or (ii) not solely owned by Seller), including, without limitation, (i) the tradenames East Valley Tribune, Mesa Tribune, Gilbert Tribune, Chandler Tribune and Queen Creek Tribune newspapers and the eastvalleytribune.com, evtrib.com and aztrib.com websites and domain names, (ii) the tradename Daily News-Sun and the yourwestvalley.com, dailynews-sun.com, surprisetoday.com and westvalleypreps.com websites and domain names, (iii) the tradename Ahwatukee Foothills News and the ahwatukee.com website and domain name, and (iv) the tradename Arizona Interactive Media Group and the azimg.com, veep4u.com, and azclipper.com websites and domain names;

(e) permits relating solely to the Purchased Business to the extent transferable under applicable law, including, without limitation, any Purchased Business's qualification as a newspaper of general circulation and registration as a newspaper entitled to second-class postage rates;

(f) all other technical information, data and know-how relating exclusively to the Purchased Business, including; all such products and publications currently produced, formerly produced or contemplated for production by Seller, and all such techniques, discoveries, improvements, designs,

8

patterns, production processes, specifications and other non-public information and data;

(g)    all of the editorial material, photos, art work and related files owned by or licensed to the Seller relating exclusively to the Purchased Business and prepared, created or acquired by the Seller solely with respect to the Purchased Business, including, without limitation, such editorial material, photos and artwork in the process of preparation;

(h)    all of the Seller's subscription and circulation lists, customer lists and supplier lists and correspondence relating solely to the Purchased Business and all promotional and advertising literature and materials (including original mats and plates in the possession of advertising agencies and all advertising space reservations, advertising insertion orders, records of current and former advertisers and any prospect lists for advertising) relating solely to the Purchased Business and all materials used for mailing list development and subscription promotion and fulfillment for the publications and websites solely of the Purchased Business;

(i)    all of the Seller's library and archives of back and current issues of the publications and websites solely of the Purchased Business and other materials owned by the Seller relating historically to the publication and distribution of the publications and websites solely of the Purchased Business;

(j)    all masthead rights;

(k)    all telephone, telex and telephone facsimile numbers and other directory listings utilized by the Seller exclusively in the conduct of the Purchased Business;

(l)    all books and records (including all data and other information stored on discs, tapes or other media) other than income Tax books and records and personnel files (of which Buyer shall receive a copy);

(m)    all computer hardware and Software owned solely by the Seller and used primarily in the conduct of the Purchased Business, together with all users' manuals, training manuals and other system and operations documentation relating to such computer hardware and Software;

(n)    all claims, deposits, prepayments, credits, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment; and

(o)    all guarantees, warranties, indemnities and similar rights in favor of the Seller with respect to any Purchased Business Assets.

> Purchased Real Property: Certain real property located at 10102 West Santa Fe Drive, Sun City, Arizona and all improvements, buildings, parking facilities and other structures located thereon, together with any appurtenant easements, rights of way, licenses and hereditaments thereto.

## II.   The Purchase Price

12.    Pursuant to the Asset Purchase Agreement, the purchase price for the Purchased Business Assets and the Purchased Real Property would be (a) $2,050,000; plus or minus (b) a working capital adjustment as described in the Asset Purchase Agreement; plus (c) any Severance Liabilities and any employer payroll Taxes paid by Seller or its Affiliates in connection with Severance Liabilities, that in the aggregate exceed $779,000; plus (d) the cure amounts for the Assigned Contracts (collectively, the "Purchase Price"). The Asset Purchase Agreement provides for a possible post-closing adjustment to the purchase price, as well as a mechanism for determining such post-closing adjustment.

## III.   The Assigned Contracts and the Rejected Contracts

13.    Exhibit C hereto sets forth the executory contracts and unexpired leases that the Debtors seek to assume and assign to the Buyer, as well as the cure amount the Debtors believe is owed in respect of each executory contract and unexpired lease (the "Cure Amounts"). Any objection to the assumption and assignment of any contract or lease included in Exhibit C or the Cure Amount for each contract and lease set forth in Exhibit C must be filed on or before the objection deadline that is established with respect to this Motion. Any objection with respect to a Cure Amount must state with specificity the cure amount(s) the objecting party believes is required, and the objecting party must provide appropriate documentation to support such assertion. The Debtors request that, if an objection is timely filed, this Court resolve any dispute regarding the assumption and assignment of any Contract or the Cure Amounts at the Sale Hearing.

NY\1615069.4

14.     If no objection to the assumption and assignment of the Assigned Contracts is timely received, the Debtors request (a) that the Cure Amounts set forth in **Exhibit C** be controlling and (b) that this Court deem satisfied the requirements of Bankruptcy Code sections 365(b)(1) and 365(f)(2).  The Successful Bidder (as defined below) shall be required to demonstrate adequate assurance of future performance to this Court and each counterparty to executory contracts and unexpired leases, as necessary, as required by Bankruptcy Code section 365(f)(2).

15.     The Debtors reserve the right to amend **Exhibit C** and **Exhibit D** in all respects (including, but not limited to, adding or removing executory contracts and unexpired leases thereon) prior to the Sale Hearing.  If the Debtors amend **Exhibit C** by adding new contracts or leases, or by reducing a proposed cure amount, then the counterparties to the affected contracts and leases shall be provided notice of such amendments and shall have 20 days to object to such amendment.  If the Debtors make any such amendments to **Exhibit C** more than 20 days prior to the Sale Hearing (as defined below), the Debtors will request Court authorization to assume and assign the contracts and leases set forth in **Exhibit C** as amended during the Sale Hearing.  To the extent the Debtors make any such amendments to **Exhibit C** after the date that is 20 days prior to the Sale Hearing, then the Debtors will request Court authorization to assume and assign the new contracts set forth in such amendments and to pay the reduced cure amounts as set forth in such amendments after the Sale Hearing.

16.     The Debtors also request entry of an order authorizing them to reject the Rejected Contracts as of the Sale Closing Date, even if the Sale Closing Date occurs after the Plan Effective Date, the terms of the Plan notwithstanding.  The Debtors request this relief because they need to continue their contractual relationships under the Rejected Contracts until the Sale

11

Closing Date.  The Debtors believe that this relief will not prejudice the counterparties to the Rejected Contracts because they will continue to perform under the Rejected Contracts until the Sale Closing Date, and counterparties will be afforded a full opportunity to file proofs of claim against the Debtors arising out of purported rejection damages.

## IV.    The Debtors' and DV&M's Marketing Efforts

17.    Since the summer or fall of 2008, the Debtors have sought to sell the Purchased Business Assets and the Purchased Real Property.  At that time, the Debtors retained Cribb, Greene & Associates, a newspaper and publication brokerage firm ("Cribb") as their broker to sell those assets.  Until the middle of 2009, Cribb worked with the Debtors in their attempt to sell the assets, contacting several potential purchasers.  Ultimately, the Debtors replaced Cribb with DV&M as their broker.

18.    Since September 2009, DV&M worked diligently to find parties interested in purchasing the Purchased Business Assets and the Purchased Real Property.  Specifically, DV&M contacted 37 prospective purchasers, and welcomed any inquiries or expressions of interest from parties that DV&M did not affirmatively contact.  However, these marketing efforts have yielded limited interest with the exception of that demonstrated by the Buyer.  Indeed of the prospective purchasers, fifteen executed non-disclosure agreements and received certain information regarding the Purchased Business Assets and the Purchased Real Property.

19.    The expressions of interest that were provided by other prospective purchasers were inferior to the terms under which the Buyer has agreed to purchase the Purchased Business Assets and the Purchased Real Property.  Specifically, other than the Buyer, only one party submitted a formal expression of interest to purchase all of the Purchased Business Assets and the Purchased Real Property during this period.  However, that party's proposed purchase price

was lower than the Buyer's, and that party was unable to demonstrate that it had the financial wherewithal to consummate the transaction. Additionally, one party submitted a formal expression of interest to purchase only some of the Purchased Business Assets (for example, that party did not wish to purchase the East Valley Tribune newspaper and the Arizona Interactive Media Group), and three other parties informally expressed interest in purchasing only one business unit. The Debtors have determined in their business judgment that a transaction to sell only some of the Purchased Business Assets would be undesirable. Specifically, many of the functions of the business units are integrated in Phoenix, Arizona, thus making it difficult to sell individual business units. Moreover, any transaction that excluded the East Valley Tribune newspaper and the Arizona Interactive Media Group would have left the Debtors with significant employee severance obligations.

20.     The Debtors believe that the parties most likely to be interested in acquiring the Purchased Business Assets and the Purchased Real Property have been contacted through the marketing efforts that have been made to date. Accordingly, the Debtors have decided to sell the Purchased Business Assets and the Purchased Real Property pursuant to the Asset Purchase Agreement and without the expense and delay of pursuing a formal "two-step" auction and sale process. Nevertheless, if an Alternative Qualifying Bid is submitted by Bid Deadline, the Debtors will conduct an auction prior to the Sale Hearing, in which the Buyer and any party submitting an Alternative Qualifying Bid would be invited to participate.

21.     To enhance the possibility that one or more parties submit an Alternative Qualifying Bid, the Debtors will serve this Motion on parties that have previously expressed interest to DV&M in purchasing the Purchased Business Assets or the Purchased Real Property within the last twelve months, as well as any parties the Debtors or DV&M believe may be

interested in purchasing the Purchased Business Assets and the Purchased Real Property (collectively, the "Interested Parties"). Should any Interested Party desire confidential or otherwise non-public information regarding the Debtors, the Purchased Business Assets or the Purchased Real Property, such Interested Party will be required to enter into a confidentiality agreement satisfactory to the Debtors in their business judgment. Any party desiring to receive such confidential or otherwise non-public information must demonstrate to the Debtors' satisfaction (in Debtors' reasonable business judgment, after consultation with counsel for the Committee and counsel for the Administrative Agent) that the party has the financial wherewithal to submit an Alternative Qualifying Bid.

## REQUIREMENTS FOR ALTERNATIVE
## QUALIFYING BIDS AND POTENTIAL AUCTION

22.     The Debtors propose that if, and only if, an Alternative Qualifying Bid is submitted to the Debtors on or before the Bid Deadline, then on or before March 8, 2010 at 10:00 a.m. prevailing Eastern Time,[7] they will commence the Auction at the offices of Young, Conaway, Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, to sell the Purchased Business Assets and the Purchased Real Property. If no Alternative Qualifying Bid is submitted by the Bid Deadline, then the Debtors will not hold the Auction and will request this Court's approval to sell the Purchased Business Assets and the Purchased Real Property to the Buyer pursuant to the terms of the Asset Purchase Agreement.

23.     To qualify an Alternative Qualifying Bid, each bid (other than any bid submitted by the Buyer) must satisfy the following requirements:

---

[7] If any Auction is held, the Debtors will file a notice with this Court stating the date, time and location of the Auction, and will notify each party that submits an Alternative Qualifying Bid of such date and time. The Debtors may adjourn the Auction without further notice by announcement at the Auction.

14

- it states that the bidder offers to purchase **all** of the Purchased Business Assets and the Purchased Real Property upon the terms and conditions substantially as set forth in the Asset Purchase Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Debtors determine, after consultation with counsel for the Committee and counsel for the Administrative Agent, provide maximum value to the Seller's estate;

- it states that the bidder's offer is irrevocable until the Sale Closing Date;

- it includes a duly authorized and executed agreement, reflecting, if any, the bidder's proposed amendments and modifications thereto, as well as the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules to the agreement, and a copy of such agreement and all exhibits and schedules thereto marked to show those amendments and modifications to the Asset Purchase Agreement;

- the bidder's duly authorized and executed agreement, together with all exhibits and schedules thereto, do not contain terms that are materially worse for the Seller than the terms of the Asset Purchase Agreement;

- it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtors, in consultation with counsel for the Committee and counsel for the Administrative Agent to make a determination as to the bidder's financial and other capabilities to consummate the transaction contemplated by the agreement that is delivered by the bidder;

- it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

- it fully discloses the identity of each entity that will be purchasing the Purchased Business Assets and the Purchased Real Property;

- it identifies which of the Debtors' executory contracts and unexpired leases pertaining to the Purchased Business the bidder wishes to have assumed and assigned, and provides evidence of the bidder's ability to provide adequate assurance of future performance of such executory contracts and unexpired leases.

- it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Business Assets and the Purchased Real Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Business Assets and the Purchased Real Property in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express

15

or implied (by operation of law or otherwise), regarding the Purchased Business Assets and the Purchased Real Property or the completeness of any information provided in connection therewith, except as expressly stated in the agreement that is delivered by the bidder; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

- it includes evidence, in form and substance satisfactory to Debtors, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the agreement that is delivered by the bidder and the transactions contemplated thereby;

- it is accompanied by a good faith deposit (the "Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Seller (or such other party as the Debtors may determine) in an amount equal to 10% of the purchase price. The Debtors will retain the Good Faith Deposits of all bidders (except for the Successful Bidder, as defined below) in an interest-bearing account until ten days after the Sale Closing Date, after which they shall be released to the respective bidders. If the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall have no obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtors;

- it contains all other information that is reasonably requested by the Debtors; and

- it is received by the Bid Deadline.

24.     As soon as practicable after the Bid Deadline, the Sellers will notify each bidder in writing as to whether or not its bid constitutes an Alternative Qualified Bid. During the Auction, bidding for the Purchased Business Assets and the Purchased Real Property shall continue until the Debtors (after consulting with counsel for the Committee and counsel for the Administrative Agent) determine in their business judgment that they have received the highest or otherwise best bid for such assets. The Debtors will then determine (after consultation with counsel for the Committee and counsel for the Administrative Agent) and announce at the Auction which bid has been determined to be the highest or otherwise best bid (the "Successful Bidder").

16

25.     The Debtors intend to present the bid of the Successful Bidder for approval of this Court at the Sale Hearing, which shall be scheduled by the Court. In the event of a failure to consummate a sale of the Purchased Business Assets and the Purchased Real Property after the conclusion of the Sale Hearing because of a breach or default under the terms of the bid of the Successful Bidder, the next highest or otherwise best Alternative Qualifying Bid (if any), as determined by the Debtors and disclosed during the Sale Hearing shall be deemed the "Alternative Successful Bidder" without further order of this Court, and the parties shall be authorized to consummate the transaction contemplated by the Alternative Qualifying Bid submitted by the Alternative Successful Bidder without further order of this Court. All of the Debtors' rights with respect to the breaching Successful Bidder will be reserved.

## BASIS FOR THE RELIEF REQUESTED

### I.     Applicable Legal Standards

26.     Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a), which confers broad powers on bankruptcy courts, provides, in relevant part, as follows: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In pertinent part, Bankruptcy Rule 6004 states that, "all sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). With respect to the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that,

> ... the notice of a proposed use, sale or lease of property . . . shall include . . . the terms and conditions of any private sale and the deadline for filing objections. The notice of a proposed use, sale or

NY\1615069.4

> lease of property, including real estate, is sufficient if it generally
> describes the property.

Fed. R. Bankr. P. 2002 (c)(1).

27.     To approve the use, sale, or lease of property out of the ordinary course of

business, this Court must find "some articulated business justification" for the proposed action.

*See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986)

(implicitly adopting the "articulated business justification" and good faith tests of *Committee of*

*Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983));

*see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding

that the Third Circuit had adopted a "sound business purpose" test in *Abbotts Dairies*); *Titusville*

*Country Club v. PennBank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa.

1991); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 19

(Bankr. E.D. Pa. 1987). There is a strong presumption in applicable principles of law "that in

making a business decision[,] the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company."

*Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147

B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality

by analogy" in Chapter 11, especially where a debtor is a Delaware corporation) (quotations

omitted).

28.     Generally, courts have applied four factors in determining whether a sale of a

debtor's assets should be approved: (a) whether a sound business reason exists for the proposed

transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction

has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice

is provided. *See Lionel*, 722 F.2d at 1071 (setting forth the "sound business purpose" test);

*Abbotts Dairies*, 788 F.2d at 145-57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement); *Delaware & Hudson Ry.*, 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

29. This fundamental analysis does not change if the proposed sale is private, rather than public. *See, e.g., In re Ancor Exploration Co.*, 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)."). The bankruptcy court "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991), *vacated on other grounds*, 165 B.R. 1 (D.P.R. 1992); *accord, In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985). Here, the proposed sale of the Purchased Business Assets and the Purchased Real Property to the Buyer, subject to higher and better bids, meets all of these requirements and should be approved.

**II.  Proceeding With the Sale to the Buyer, Subject to**
**Higher and Better Bids Under the Terms and Conditions**
**Herein, Reflects an Exercise of the Debtors' Business Judgment**

30. There is a sound business justification for the Debtors' proposal to sell the Purchased Business Assets and the Purchased Real Property to the Buyer, subject to higher and better bids, rather than through a formal two step auction and sale process. The Debtors submit that an order granting the relief requested herein is a matter within the discretion of the Court and would be consistent with the provisions of the Bankruptcy Code. *See* 11 U.S.C. § 105(a). Based

on the marketing process the Debtors have engaged in prior to filing this Motion, the indications

of interest received in connection therewith, the Debtors believe that the offer from the Buyer to

be embodied in the Asset Purchase Agreement is more beneficial to the Debtors' estates than any

outcome that the Debtors would obtain through a formal two-step auction and sale process.

Moreover, the business that is being sold to the Buyer is operating at a loss, and the Debtors

estimate that the three-week delay that is inherent in a two-step auction and sale process will

result in their suffering additional losses totaling at least $180,000.

31.     In the Debtors' business judgment, the Asset Purchase Agreement with the Buyer

provides them with strong assurances that the Buyer is motivated to close the contemplated

transaction in a timely manner.  Further, the Debtors believe that the Buyer has demonstrated

good faith intent to close the contemplated transaction.  Moreover, the Debtors will reduce their

administrative costs by the sale, while realizing maximum value for the Purchased Business

Assets and the Purchased Real Property through their sale as a going concern.  It is estimated that

the sale will relieve the Debtors of approximately $1.5 million in shutdown costs that would be

incurred if the Debtors were unable to dispose of the Purchased Business Assets and the

Purchased Real Property through the sale.  Thus, the Debtors believe that the sale must be

completed in accordance with the timeframe described herein to preserve and maximize the

value of the Purchased Business Assets and the Purchased Real Property.

32.     As noted above, since 2008 the Debtors pursued a sale of or other strategic

transaction involving the Purchased Business Assets and the Purchased Real Property.  As

described above, despite having contacted 37 prospective purchasers and having received

executed non-disclosure agreements from fifteen prospective purchasers, DV&M received a very

limited number of formal or informal expressions of interest.  The Debtors determined in the

20

exercise of their business judgment that the terms proposed by the Buyer would deliver the most value to their states and creditors. As noted above, only one party other than the Buyer submitted a formal expression of interest to purchase all the Purchased Business Assets and the Purchased Real Property since September 2009. However, the purchase price that party offered was less than the purchase price offered by the Buyer, and that party was unable to demonstrate that it had the financial wherewithal to consummate the transaction. Other parties only expressed interest in purchasing some of the Purchased Business Assets, which transactions would have been difficult to consummate (given the integrated nature of the Purchased Business Assets) and likely would have exposed the Debtors to significant employee severance obligations.

33.     Nevertheless, subject to the terms, conditions and requirements for Alternative Qualifying Bids set forth herein, the Debtors will consider other proposals for the Purchased Business Assets and the Purchased Real Property, and may hold an Auction prior to the Sale Hearing.

**III.     The Purchase Price is Fair and Reasonable**

34.     The Debtors submit that the Purchase Price represents a fair and reasonable price for the Purchased Business Assets and the Purchased Real Property. In the Debtors' view, the Asset Purchase Agreement represents significant value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the Purchased Business Assets and the Purchased Real Property at a price that will represent fair and reasonable consideration. *See, e.g., Mellon Bank, N.A., v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991) (price amounted to reasonably equivalent value under the Bankruptcy Code), *cert. denied*, 503 U.S. 937 (1992).

NY\1615069.4

## IV.    Adequate and Reasonable Notice of this Motion and the Sale Will Be Provided

35.    The Debtors will serve this Motion as required by the applicable procedural rules. *See* Fed. R. Bankr. P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); *see also Delaware & Hudson Ry.*, 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement). The Debtors will also serve the Motion on the Interested Parties. Accordingly, the Debtors will provide adequate notice of the sale.

## V.    The Sale Should Be Approved Under Bankruptcy Code Section 363(f)

36.    In accordance with Bankruptcy Code section 363(f), a debtor in possession may sell property under Bankruptcy Code section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

37.    Considering that any objections to this Motion must be resolved by consent of the objecting party or adjudicated by the Court, the Debtors expect that they can satisfy at least one of the subsections of Bankruptcy Code section 363(f). Moreover, any liens, claims,

22

encumbrances and other interests asserted against the Purchased Business Assets and the Purchased Real Property will attach to the proceeds of the sale with the same force, effect and priority as such liens have on the same, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto. Accordingly, the Debtors request that the sale be approved "free and clear," with any liens, claims, encumbrances, and interests to attach to proceeds of the sale.

## VI. The Sale is Proposed in Good Faith Within the Meaning of Bankruptcy Code Section 363(m), and the Sale is Not Subject to Avoidance Under Bankruptcy Code Section 363(n)

38.     At the Sale Hearing, the Debtors will request a finding that the Buyer is a good-faith purchaser entitled to the protections of Bankruptcy Code section 363(m). Section 363(m) protects the sale of a debtor's property to a good faith purchaser. Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

39.     Bankruptcy Code section 363(m) fosters the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely. *See, e.g., In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 at 147; *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

40.     The Asset Purchase Agreement has been negotiated at arms-length and in good faith. The Buyer is not affiliated with any of the Debtors or their representatives. Accordingly,

23

this Court should find that the Buyer has acted in good faith within the meaning of section 363(m). *See generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.)*, No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y. 1990) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also generally In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).

41.     At the Sale Hearing, the Debtors will request a finding of this Court that neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement, or the sale of the Purchased Business Assets and the Purchased Real Property pursuant thereto, to be avoided under Bankruptcy Code section 363(n).[8]

## VII.    Assumption and Assignment of the Assigned Contracts and Rejection of the Rejected Contracts as of the Sale Closing Date Should be Approved

42.     The Debtors also request authorization to assume and assign the Assigned Contracts to the Buyer or the Successful Bidder (if the Successful Bidder is not the Buyer). Bankruptcy Code section 365 authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A

---

[8] Bankruptcy Code section 363(n) provides:

"The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection."

debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

43.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

44.    Here, the Assigned Contracts being assumed and assigned to the Buyer or the Successful Bidder (if the Successful Bidder is not the Buyer) are an integral part of the sale transaction and, accordingly, the assumption and assignment of the Assigned Contracts will enhance the value of the Debtors' estates and is reasonable. The Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of the Assigned Contracts will be satisfied at the hearing on this Motion. The Debtors, in exercising their sound business judgment, believe that selling the Purchased Business Assets and the Purchased Real Property and assuming and assigning the Assigned Contracts to the Buyer or the Successful Bidder (if the Successful Bidder is not the Buyer) would be in the best interests of their estates.

45.     Moreover, the Debtors will provide all parties to the Assigned Contracts an opportunity to be heard.  Specifically, **Exhibit C** identifying each of the Assigned Contracts and the Cure Amount with respect to each Assigned Contract will be provided to each counterparty to an Assigned Contract.  If no objection with respect to the assumption and assignment of an Assigned Contract is received, the assignment of the applicable Assumed Contract, and the Cure Amount would be approved.  Thus, the Debtors respectfully submit that the assumption and assignment of the Assigned Contracts should be approved.

46.     Bankruptcy Rule 6006(e) allows for the assumption and assignment of multiple executory contracts in one motion upon authorization of the Court.  The Debtors therefore request that the Court permit the Debtors to seek authority to assume and assign all of the Assigned Contracts through this Motion.

47.     To facilitate the assumption and assignment of the Assigned Contracts, the Debtors further request that this Court find the anti-assignment provisions of the Assigned Contracts, if any, to be unenforceable under Bankruptcy Code section 365(f).

## VIII.  The Commission and Expense Reimbursement to DV&M Should be Allowed and Approved on a Final Basis

48.     Pursuant to an order of this Court dated October 5, 2009, this Court authorized the Debtors to retain DV&M as their sale advisor.  That order provides that DV&M's commissions would be subject to review under Bankruptcy Code section 328(a), except that the U.S. Trustee is entitled to review requests for payment of the commission and reimbursement of expenses under the standards set forth in Bankruptcy Code section 330.

49.     Bankruptcy Code section 328(a) provides:

"The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any

reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

50.     Congress intended in Bankruptcy Code section 328(a) to enable debtors to retain professionals pursuant to specific fee arrangements to be determined at the time of the court's approval of the retention, subject to reversal only if the terms are found to be improvident in light of "developments not capable of being anticipated at the time of fixing such terms and conditions." 11 U.S.C. § 328(a); *see also Donaldson, Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862-63 (5th Cir. 1997) ("If the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment.").

51.     Accordingly, Bankruptcy Code section 328 permits the compensation of professionals, including sale advisors, on terms that reflect the nature of their services and market conditions. The terms of DV&M's engagement letter and DV&M's requested commission reflect (a) the nature of the services provided by DV&M and (b) the fee structure provisions typically utilized by DV&M and other advisory firms, which do not bill their clients on an hourly basis for services like those to be rendered pursuant to the DV&M engagement letter and generally are compensated on a transactional basis. Considering the services that DV&M has provided and the market prices for DV&M's services, the Debtors submit that the commission is reasonable under the standards set forth in Bankruptcy Code sections 328(a) and 330. Moreover, the Debtors submit that terms and conditions of DV&M's employment

27

(including the commission to be paid to DV&M) are not improvident in light of developments that were incapable of being anticipated as of October 5, 2009, when this Court authorized the Debtors to retain DV&M as their sale advisor. Thus, DV&M is entitled to its commission pursuant to Bankruptcy Code section 328(a).

52.     Bankruptcy Code section 330 also permits the allowance and payment of DV&M's commission and expense reimbursements. Section 330 provides for the compensation of reasonable and necessary services rendered by professionals based on the time, the nature, the extent and the value of such services, and the cost of comparable services other than in a case under the Bankruptcy Code. *See* 11 U.S.C. § 330. The test for determining necessity is objective; focusing on what services a reasonable professional would have performed under the same circumstances. *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998). This test does not rely on hindsight to determine the ultimate success or failure of the professional's actions. *See id.*; *In re Keene Corp.*, 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997). . Ultimately, if the services of a professional are reasonably likely to benefit the debtor's estate, they should be compensable. *See Angelika Films*, 227 B.R. at 42.

53.     The Debtors respectfully submit that the compensation sought by DV&M is necessary and reasonable. The services that DV&M rendered to the Debtors require a high degree of professional competence and expertise, and DV&M was required to expend substantial effort in providing those services. DV&M performed efficiently, effectively and economically, and the results obtained to date have benefited the Debtors, their estates and creditors. Thus, the Debtors request allowance of DV&M's requested commission in the amount of $91,500 and expense reimbursements in the amount of $1,094.58 on a final basis, and request authorization to pay such amounts.

28

## IX. Relief from the Fourteen-Day Waiting Periods
## Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

54.     The Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that "an order authorizing the trustee to assign an executory contract or unexpired lease ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors request that the order granting the relief requested by this Motion be effective immediately, by providing that the stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

55.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See, e.g.*, Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and 6006(d) and the advisory committee notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, the stay period may be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See, e.g.*, 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6004.09 (L. King, 15th rev. ed.).

## NOTICE

56.     Notice of the filing of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the agent for the Debtors' prepetition secured bank group; (d) all parties known to the Debtors (based on the Debtors' very recent lien search) to hold any liens, claims or encumbrances against the Purchased Business Assets and the Purchased Real Property; (e) the counterparties to each of the Assumed Contracts and the Rejected

Contracts; (f) the Interested Parties; and (g) all parties who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

NY\1615069.4

**WHEREFORE**, the Debtors respectfully request that the Court enter an order substantially in the form annexed hereto as **Exhibit A**, granting the relief requested in the Motion, and that this Court grant such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
February _____, 2010

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

_____

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: 302-571-6600
Fax: 302-571-1253
Email: mnestor@ycst.com
         kcoyle@ycst.com
- and -

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: 213-485-1234
Fax: 213-891-8763
Email: robert.klyman@lw.com

- and –

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: 212-906-1200
Fax: 212-751-4864
Email: rosalie.gray@lw.com
         michael.riela@lw.com

Counsel for Debtors and Debtors in
Possession

**Exhibit L**

**Sale Order**

**[SEE ATTACHED]**

```
---------------------------------------------------------- x
In re:                                         :    Chapter 11
                                               :
FREEDOM COMMUNICATIONS HOLDINGS, :             Case No. 09-13046 (BLS)
INC., et al.,                                  :
                                               :
              Debtors.¹                        :    Jointly Administered
---------------------------------------------------------- x
```

**ORDER UNDER SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004 AND 6006 AND LOCAL BANKRUPTCY RULE 6004-1 (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF FREEDOM ARIZONA INFORMATION, INC. TO 1013 COMMUNICATIONS, LLC, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, SUBJECT TO HIGHER AND BETTER BIDS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (III) AUTHORIZING THE REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AS OF THE DATE THE SALE IS CLOSED; (IV) AUTHORIZING PAYMENT OF COMMISSION AND EXPENSE REIMBURSEMENT TO DIRKS, VAN ESSEN & MURRAY ON A FINAL BASIS; AND (V) GRANTING RELATED RELIEF**

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Freedom Communications Holdings, Inc. (2814); Freedom Communications, Inc. (0750); Freedom Broadcasting, Inc. (0025); Freedom Broadcasting of Florida, Inc. (6581); Freedom Broadcasting of Florida Licensee, L.L.C. (1198); Freedom Broadcasting of Michigan, Inc. (6110); Freedom Broadcasting of Michigan Licensee, L.L.C. (1122); Freedom Broadcasting of New York, Inc. (6522); Freedom Broadcasting of New York Licensee, L.L.C. (9356); Freedom Broadcasting of Oregon, Inc. (7291); Freedom Broadcasting of Oregon Licensee, L.L.C. (9295); Freedom Broadcasting of Southern New England, Inc. (7274); Freedom Broadcasting of Southern New England Licensee, L.L.C. (1177); Freedom Broadcasting of Texas, Inc. (2093); Freedom Broadcasting of Texas Licensee, L.L.C. (1147); Freedom Broadcasting of Tennessee, Inc. (7961); Freedom Broadcasting of Tennessee Licensee, L.L.C. (9430); Freedom Magazines, Inc. (0328); Freedom Metro Information, Inc. (1604); Freedom Newspapers, Inc. (3240); Orange County Register Communications, Inc. (7980); OCR Community Publications, Inc. (9752); OCR Information Marketing, Inc. (7983); Appeal-Democrat, Inc. (4121); Florida Freedom Newspapers, Inc. (4227); The Seller Information, Inc. (5796); Freedom Colorado Information, Inc. (7806); Freedom Eastern North Carolina Communications, Inc. (5563); Freedom Newspapers of Illinois, Inc. (2222); Freedom Newspapers of Southwestern Arizona, Inc. (5797); Freedom Shelby Star, Inc. (8425); Illinois Freedom Newspapers, Inc. (8308); Missouri Freedom Newspapers, Inc. (8310); Odessa American (7714); The Times-News Publishing Company (0230); Victor Valley Publishing Company (6082); Daily Press (3610); Freedom Newspaper Acquisitions, Inc. (4322); The Clovis News-Journal (5820); Freedom Newspapers of New Mexico L.L.C. (5360); Gaston Gazette LLP (4885); Lima News (6918); Porterville Recorder Company (7735); Seymour Tribune Company (7550); Victorville Publishing Company (7617); Freedom Newspapers (7766); The Creative Spot, L.L.C. (2420); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Services, Inc. (3125). The address for Freedom Communications Holdings, Inc. and certain other Debtors is 17666 Fitch, Irvine, California 92614.

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and

debtors in possession (collectively, the "Debtors"), pursuant to Bankruptcy Code sections 105(a),

363 and 365, Bankruptcy Rules 2002, 6004 and 6006 and Local Rule 6004-1 for entry of an order

(i) authorizing the sale of certain assets of Freedom Arizona information, Inc. (the "Seller") to

1013 Communications, LLC (the "Buyer"), free and clear of liens, claims, encumbrances and other

interests (other than the liabilities and obligations assumed by the Buyer pursuant to the Asset

Purchase Agreement), subject to higher and better bids; (ii) authorizing the assumption and

assignment of the Assigned Contracts; (iii) authorizing the rejection of the Rejected Contracts as of

the Sale Closing Date; (iv) authorizing payment of a commission in the amount of $91,500 and

expense reimbursements in the amount of $1,094.58 to DV&M on a final basis; and (v) granting

related relief; and the Court having reviewed the Motion and the Asset Purchase Agreement; and

the Court having determined that the relief requested in the Motion is in the best interests of the

Debtors, their estates, creditors and other parties-in-interest; and due and adequate notice of the

Motion having been given under the circumstances; and all objections to the Motion having been

withdrawn, resolved or overruled on their merits; and upon the remainder of the record herein; and

after due deliberation thereon, and good and sufficient cause appearing therefor, it is hereby

FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334,

and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and

the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Due and adequate notice of the Motion, the Asset Purchase Agreement, the hearing,

and the subject matter thereof has been provided to all parties-in-interest herein, and no other or

---

[2] All capitalized terms included but not defined herein shall have the meaning ascribed to such terms in the Motion.

further notice is necessary. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

C.     Granting the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion.

D.     The Asset Purchase Agreement was negotiated and proposed, and has been entered into by the parties, in good faith, from arms-length bargaining positions, and without collusion. The Buyer is a good faith purchaser within the meaning of Bankruptcy Code section 363(m) and is entitled to the protection thereof.

E.     Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement, or the sale of the Purchased Business Assets and the Purchased Real Property pursuant thereto and hereto, to be avoided under Bankruptcy Code section 363(n).

F.     Under the circumstances, and due and adequate notice having been provided, it is the best interests of the Debtors, their creditors, and all other parties-in-interest herein that the Purchased Business Assets and the Purchased Real Property be sold to the Buyer in accordance with the terms of the Asset Purchase Agreement under Bankruptcy Code section 363(b) and Bankruptcy Rules 2002(c)(1) and 6004(f)(1) and that the Assigned Contracts be assumed by the Debtors and assigned to the Buyer pursuant to Bankruptcy Code section 365. The sale process described in the Motion is reasonable and appropriate under the circumstances.

G.     The consideration provided by the Buyer for the Purchased Business Assets and the Purchased Real Property pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Business Assets and the Purchased Real Property, (iii)

will provide a greater recovery for the Debtors' creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States and any state, territory or possession thereof.

H.     The Debtors are authorized to sell the Purchased Business Assets and the Purchased Real Property free and clear of all interests of any kind or nature whatsoever, except as set forth in the Asset Purchase Agreement, because one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) have been satisfied.  Those holders of interests who did not object to the Motion or the relief requested therein, or who imposed and then withdrew their objections, are deemed to have consented to the sale pursuant to Bankruptcy Code section 363(f)(2).  Those holders of interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Liens, Claims, Encumbrances and Interests (as defined below), if any, attach to the proceeds of the sale of the Purchased Business Assets and the Purchased Real Property ultimately attributable to the property against or in which they claim or may claim any Claims, Encumbrances and Interests, with such Claims, Encumbrances and Interests being subject to treatment by separate order of this Bankruptcy Court

I.     Except as otherwise provided in the Asset Purchase Agreement, the Purchased Business Assets and the Purchased Real Property shall be sold free and clear of all claims, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement,

contribution, indemnity, exoneration, products liability, alter-ego, environmental, pension or tax,

decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature,

if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or

other exercise of any attributes of ownership, debts arising in any way in connection with any

agreements, acts, or failures to act, of the Debtors or the Debtors' predecessors or affiliates, claims

(as that term is used in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands,

guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of

any kind and nature, whether known or unknown, choate or inchoate, filed or unfilled, scheduled

or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or

disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured,

material or non-material, disputed or undisputed, whether arising prior to or subsequent to the

commencement of the bankruptcy case, and whether imposed by agreement, understanding, law,

equity or otherwise, including claims otherwise arising under doctrines of successor liability

(collectively, "Liens, Claims, Encumbrances and Interests").

      J.    The transfer of the Purchased Business Assets and the Purchased Real Property to

the Buyer is a legal, valid and effective transfer of the Purchased Business Assets and the

Purchased Real Property, and, except as may otherwise be provided in the Asset Purchase

Agreement, shall vest the Buyer with all right, title and interest of the Debtors to the Purchased

Business Assets and the Purchased Real Property free and clear of any and all Liens, Claims,

Encumbrances and Interests. Except as specifically provided in the Asset Purchase Agreement or

this Order, the Buyer shall not assume or become liable for any Liens, Claims, Encumbrances and

Interests relating to the Purchased Business Assets and the Purchased Real Property.

5

K.     The transfer of the Purchased Business Assets and the Purchased Real Property to

the Buyer free and clear of all Liens, Claims, Encumbrances and Interests, except as otherwise

provided in the Asset Purchase Agreement, will not result in any undue burden or prejudice to any

holders of any Liens, Claims, Encumbrances and Interests as all such Liens, Claims,

Encumbrances and Interests of any kind or nature whatsoever shall attach to the net proceeds of the

sale of the Purchased Business Assets and the Purchased Real Property received by the Debtors in

the order of their priority, with the same validity, force and effect which they now have as against

the Purchased Business Assets and the Purchased Real Property and subject to any claims and

defenses the Debtors or other parties may possess with respect thereto.  Except as otherwise

provided in the Asset Purchase Agreement, all persons having Liens, Claims, Encumbrances or

Interests of any kind or nature whatsoever against or in any of the Debtors or the Purchased

Business Assets and the Purchased Real Property shall be forever barred, estopped and

permanently enjoined from pursuing or asserting such Liens, Claims, Encumbrances or Interests

against the Buyer, any of their assets, property, successors or assigns, or the Purchased Business

Assets and the Purchased Real Property.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is granted.

2.     All objections and responses to the Motion or relief provided herein that have not

been withdrawn, waived or settled, are hereby overruled and denied on the merits.

3.     Pursuant to Bankruptcy Code sections 105, 363 and 365, the Debtors are hereby

authorized to enter into the Asset Purchase Agreement and to sell, transfer, and convey the

Purchased Business Assets and the Purchased Real Property to the Buyer, free and clear of all

Liens, Claims, Encumbrances and Interests relating to the Purchased Business Assets and the

6

Purchased Real Property, except as set forth in the Asset Purchase Agreement. Such transfer shall constitute a legal, valid, binding and effective transfer of the Purchased Business Assets and the Purchased Real Property.

4.     Pursuant to Bankruptcy Code section 363(b), the Debtors and the Buyer, as well as their officers, employees, and agents, shall be, and hereby are, authorized to take any and all actions and/or execute any and all documents as may be necessary or desirable to consummate the transactions contemplated by the Asset Purchase Agreement. Any actions taken by the Debtors and the Buyer that were necessary or desirable to consummate such transactions prior to the entry of this Order are hereby ratified.

5.     This Order and the Asset Purchase Agreement shall be binding upon the Debtors, all creditors and stockholders of the Debtors, and any trustees appointed in these proceedings or any trustees appointed in any subsequent proceedings under chapter 7 or chapter 11 of the Bankruptcy Code relating to the Debtors, and all other parties-in-interest herein.

6.     The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court; *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

7.     The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under Bankruptcy Code section 363(m), including with respect to the transfer of the Assigned Contracts as part of the sale of the Purchased Business Assets and the Purchased Real Property pursuant to Bankruptcy Code section 365 and this Order.

NY\1616751.2

8.     Pursuant to Bankruptcy Code sections 105(a) and 365, and subject to and conditioned upon the closing of the sale, the Debtors' assumption and assignment of the Assigned Contracts, in the manner contemplated and on the terms set forth in the Motion or the Asset Purchase Agreement, is hereby approved, and the requirements of Bankruptcy Code section 365(b) with respect thereto are hereby deemed satisfied.

9.     Upon the closing of the sale, the Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract that prohibits, restricts, or conditions such assignment or transfer and, pursuant to Bankruptcy Code section 365(k), the Debtors shall be relieved from any further liability with respect to the Assigned Contracts arising after such assumption and assignment to the Buyer.

10.     Any party having the right to consent to the assumption or assignment of the Assigned Contracts that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by Bankruptcy Code section 365(c). Any anti-assignment provisions of the Assigned Contracts are unenforceable under Bankruptcy Code section 365(f).

11.     Any non-debtor party to an Assigned Contract is hereby barred, enjoined and prohibited from asserting any claim or debt against the Debtors or their property or estates other than the Cure Amount for such Assigned Contract as set forth in **Exhibit C** to the Motion or from offsetting, seeking to offset, recoup, deduct or set-off any claims such party may have against the Debtors from any amounts that may be or may become due in the future from or to the Buyer under such Assigned Contract.

12.     Adequate assurance of future performance under the Assigned Contracts has been demonstrated by or on behalf of the Buyer, and the Buyer shall be entitled to have the Debtors assume such Assigned Contract, pursuant to Bankruptcy Code section 365, and to have such Assigned Contract assigned to the Buyer.

13.     The failure of the Debtors or the Buyer to enforce at any time one or more terms of conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' or the Buyer's rights to enforce every term and condition of the Assigned Contracts.

14.     After the payment of the Cure Amounts (if any) set forth in **Exhibit C** of the Motion with respect to the Assigned Contracts, the Debtors are not and will not be in default of any of their obligations under such contracts with the possible exception of defaults identified in Bankruptcy Code section 365(b)(2), which defaults, if any, are null and void and without effect.

15.     Notwithstanding the terms of any chapter 11 plan in these cases or any order confirming a chapter 11 plan to the contrary, the Debtors are hereby authorized to reject the Rejected Contracts set forth in **Exhibit D** to the Motion effective as of the Sale Closing Date, even if the Sale Closing Date occurs after the effective date of such chapter 11 plan.

16.     All rights and defenses of the Debtors in respect of the Rejected Contracts are preserved, including all rights and defenses of the Debtors with respect to a claim for damages arising as a result of the rejection of the Rejected Contracts, including, but not limited to any right to assert an offset, recoupment, counterclaim or deduction. In addition, nothing in this Order shall limit the Debtors' ability to subsequently assert that any particular Rejected Contract is not an executory contract or that any particular lease is a secured financing arrangement.

17.     Any claims against the Debtors arising from the rejection of the Rejected Contracts must be filed in accordance with this Court's October 5, 2009 *Order Granting First Motion*

*Pursuant to 11 U.S.C. §§ 105, 365, and 554 and Fed. R. Bankr. P. 6006, 9007 and 9014(I)*

*Authorizing Rejection of Certain Executory Contracts and Unexpired Leases and the Abandonment*

*of Related Property, Nunc Pro Tunc to the Petition Date and (II) Establishing Procedures for*

*Future Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Related*

*Property* [D.I. 202]. For the avoidance of doubt, the effective date of the rejection of the Rejected

Contracts shall be the Sale Closing Date, and not the date of this Order or the effective date of a

chapter 11 plan in these cases.

18. The Buyer is not a "successor" to the Debtors or their estates by reason of any

theory of law or equity, and the Buyer shall not assume, nor be deemed to assume, or in any way

be responsible for any liability or obligation of any of the Debtors and/or their estates including,

but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim

against the Debtors or against an insider of the Debtors, or similar liability except as otherwise

provided in the Asset Purchase Agreement, and the Motion contains sufficient notice of such

limitation in accordance with Local Rule 6004-1. Except as set forth in the Asset Purchase

Agreement, neither the purchase of the Purchased Business Assets and the Purchased Real

Property by the Buyer or its affiliates, nor the fact that the Buyer or its affiliates are using any of

the Purchased Business Assets and the Purchased Real Property previously operated by the

Debtors, will cause the Buyer or any of its affiliates to be deemed a successor in any respect to the

Debtors' businesses within the meaning of (i) any foreign, federal, state or local revenue, pension,

ERISA, tax, labor, employment, antitrust, environmental, or other law, rule or regulation

(including without limitation filing requirements under any such laws, rules or regulations) for

purposes of this provision, the term "affiliate" shall mean each entity that is treated as a single

employer with the Buyer, (ii) under any products liability law or doctrine with respect to the

Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtors are a party, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (v) any cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (vi) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the Sale Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes of any kind for any period, (viii) any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Purchased Business Assets and the Purchased Real Property prior to the Sale Closing Date, and (ix) any litigation.

19.     Except as set forth in the Asset Purchase Agreement, pursuant to Bankruptcy Code sections 105 and 363, all persons and entities, including, but not limited to, the Debtors, the

NY\1616751.2

Committee, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien, Claim, Encumbrance or Interest of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Purchased Business Assets and the Purchased Real Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Purchased Business Assets and the Purchased Real Property or the transfer of the Purchased Business Assets and the Purchased Real Property to the Buyer, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Lien, Claim, Encumbrance or Interest, whether by payment, setoff, or otherwise, directly or indirectly, against the Buyer or any affiliates, successors or assigns thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates, financial advisors and representatives (each of the foregoing in its individual capacity), or the Purchased Business Assets and the Purchased Real Property. For the avoidance of doubt, the foregoing shall not prevent the Debtors, their estates, successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns in accordance with the terms of the Asset Purchase Agreement.

20.     All of the Debtors' interests in the Purchased Business Assets and the Purchased Real Property to be acquired by the Buyer under the Asset Purchase Agreement shall be, as of the Sale Closing Date and upon the occurrence of the closing, transferred to and vested in the Buyer. Upon the occurrence of the closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased

NY\1616751.2

Business Assets and the Purchased Real Property acquired by the Buyer under the Asset Purchase Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Business Assets and the Purchased Real Property to the Buyer.

21.     Except as otherwise provided in the Asset Purchase Agreement, on the Sale Closing Date, the Debtors, the Buyer and each of the Debtors' creditors are authorized to execute such documents and take all other actions as may be necessary to release the Debtors' creditors' respective interests or claims against the Purchased Business Assets and the Purchased Real Property, if any, as may have been recorded or may otherwise exist.

22.     Except as otherwise provided in the Asset Purchase Agreement, all persons or entities, presently or on or after the Sale Closing Date, in possession of some or all of the Purchased Business Assets and the Purchased Real Property are directed to surrender possession of the Purchased Business Assets and the Purchased Real Property to the Buyer on the Sale Closing Date or at such time thereafter as the Buyer may request.

23.     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

24.     In the event of a failure to consummate the sale of the Purchased Business Assets and the Purchased Real Property after the entry of this Order because of a breach or default of the Asset Purchase Agreement by the Buyer, the next highest or otherwise best Alternative Qualifying Bid (if any), as determined by the Debtors and disclosed during the Sale Hearing shall be deemed the Successful Bidder without further order of this Court, and the parties shall be authorized to consummate the transaction contemplated by the Alternative Qualified Bid submitted by such

13

Successful Bidder without further order of this Court, and the terms of this Order shall apply in equal force to the Successful Bidder.

25.    Pursuant to Bankruptcy Code sections 328 and 330, the requested commission of DV&M in the amount of $91,500 and the requested reimbursement of expenses of DV&M in the amount of $1,094.58 are hereby allowed and approved in their entirety on a final basis, without the need for further application to this Court. The Debtors are authorized to remit payment to DV&M in the amounts set forth in this decretal paragraph, less any amounts previously paid on account of such commission and expense reimbursements.

26.    The stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

27.    This Court shall retain exclusive jurisdiction to resolve any dispute arising from or relating to the Asset Purchase Agreement or this Order.


Dated: Wilmington, Delaware
_____, 2009


                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

14

**Exhibit M**

**Phoenix Properties Working Capital Detail for the Month Ended September 30, 2009**

**[SEE ATTACHED]**

# Phoenix Properties Working Capital Detail

Unaudited Balance Sheed For the Month Ended September 30, 2009

| | Sept 2009 | |
|---|---|---|
| **Current Assets** | | |
| CURRENT ASSETS: | | |
| 10203 - BANK ONE - LOCK BOX | $ 284,222 | |
| 10710 - PBM CASH SUSPENSE - MESA/SUN CITY | - | |
| 10711 - ADVERTISING CASH SUSPENSE | - | |
| 10720 - PETTY CASH - MESA, SUN CITY, AHWATUKEE | 2,075 | |
| TOTAL CURRENT ASSETS: | 286,297 | A1 |
| | | |
| ACCOUNTS RECEIVABLES: | | |
| 12000 - A/R - ADVERTISING CLEARING | (24,634) | |
| 12000 - MONSTER RECEIVABLE | 4,712 | A2 |
| 12009 - RESERVE FOR SALES ADJUSTMENT | (2,557) | |
| 12010 - A/R - LOCAL ADVERTISING | 2,549,981 | |
| 12110 - A/R - CIRCULATION-HD CARRIERS - MESA (Use Summary) | 5,504 | |
| 12110 - A/R - CIRCULATION-HD CARRIERS - SUN CITY (Use Summary) | 6 | |
| 12111 - SUBSCRIBER A/R - MESA | 218 | |
| 12111 - SUBSCRIBER A/R - SUN CITY | 3,276 | |
| 12120 - A/R - CIRCULATION-SC CARRIERS - MESA | 16,766 | |
| 12120 - A/R - CIRCULATION-SC CARRIERS - SUN CITY | 12,768 | |
| 12200 - A/R - COMMERCIAL PRINTING | 874,709 | A3 (Tutor Time A/R included in total) |
| 12201 - A/R - RETURNED CHECKS | - | |
| 12510 - RESERVE FOR DOUBTFUL ACCTS - ADVERTISING | (1,378,991) | A4 (Tutor time reserve included in total) |
| 12610 - RESERVE FOR PBM | (10,408) | |
| 12620 - RESERVE FOR DOUBTFUL ACCTS - CIRCULATION | (37,993) | |
| TOTAL ACCOUNTS RECEIVABLES: | 2,013,357 | |

# Phoenix Properties Working Capital Detail

Unaudited Balance Sheed For the Month Ended September 30, 2009

|  | Sept 2009 |
|---|---|
| **INVENTORIES:** | |
| 13010 - INVENTORY NEWSPRINT - MESA | 248,425 |
| 13010 - INVENTORY NEWSPRINT - SUN CITY | 65,372 |
| 13020 - INVENTORY NP NON-STANDARD - MESA | 40,496 |
| 13020 - INVENTORY NP NON-STANDARD - SUN CITY | 6,685 |
| 13070 - INVENTORY BLACK INK - MESA | 28,329 |
| 13070 - INVENTORY BLACK INK - SUN CITY | 6,745 |
| 13080 - INVENTORY COLOR INK - MESA | 47,529 |
| 13080 - INVENTORY COLOR INK - SUN CITY | 4,176 |
| 13101 - INVENTORY MISC. PRODUCTION SUPPLIES | 50 |
| 13110 - INVENTORY FILM/PAPER - SUN CITY | 778 |
| 13115 - INVENTORY CHEMICALS - MESA | 7,424 |
| 13120 - INVENTORY PLATES - MESA | 35,812 |
| 13120 - INVENTORY PLATES - SUN CITY | 27,448 |
| 13125 - INVENTORY BLANKETS | 7,332 |
| 13165 - INVENTORY CIRCULATION SUPPLIES - MESA | 13,653 |
| 13165 - INVENTORY CIRCULATION SUPPLIES - SUN CITY | 9,060 |
| 13190 - INVENTORY PRESS PARTS | 102,640 |
| 13191 - INVENTORY OTHER - MESA | 22,193 |
| 13191 - INVENTORY OTHER - SUN CITY | 876 |
| 13195 - INVENTORY OFFICE SUPPLIES - SUN CITY | 2,158 |
| 13200 - NEWSPRINT LIFO RESERVE | (74,952) |
| TOTAL INVENTORY: | 602,228 |
| **PREPAIDS:** | |
| 13800 - PREPAID MAINTENANCE - MESA | 24,704 |
| 13800 - PREPAID MAINTENANCE - SUN CITY | 31,729 |
| - PREPAID MONSTER RESUMES | 933 |
| 13900 - PREPAID OTHER | 9,059 |
| 13901 - A/R CONTRA TRADE | 21,960 |
| 13910 - PREPAID POSTAGE - MESA | 130,606 |
| 13910 - PREPAID POSTAGE - SUN CITY | 1,488 |
| 13920 - PREPAID RENT | 47,035 |
| TOTAL PREPAIDS: | 267,513 |
| **OTHER CURRENT ASSETS:** | |
| 14100-01-8350 - A/R EMPLOYEES | 39,000 |
| 14430 - PREPAID DEPOSITS | 50,754  A5 (includes Utility deposit of $13,415) |
| TOTAL OTHER CURRENT ASSETS: | 89,754 |
| **Total Current Assets** | $  3,259,149 |

# Phoenix Properties Working Capital Detail

## Unaudited Balance Sheed For the Month Ended September 30, 2009

| | Sept 2009 | |
|---|---|---|
| **Current Liabilities** | | |
| Accounts Payable: | | |
| 0000-21009-00000-01-0000-0000 EAC - Front Counter Sales | $ 14,703 | |
| 0000-21200-00000-01-0000-0000 Accrued Carrier | 25,321 | |
| 0000-21200-00000-02-0000-0000 Accrued Carrier | - | |
| 0000-21300-00000-01-0000-0000 Accrued Insurance-Carrier | 30,005 | |
| 0000-21400-00000-01-0000-0000 A/P Newsprint | 158,634 | |
| 0000-21400-00000-02-0000-0000 A/P Newsprint | 36,593 | |
| 0000-21402-00000-00-0000-0000 Dell Payable | - | |
| 0000-21424-63800-01-0000-0000 Payable - Monster | 10,799 | L4 |
| 0000-21100-00000-01-0000-0000 Accounts Payable-Other | 27,440 | |
| Total Accounts Payable | 303,496 | |
| | | |
| Accrued Payroll & Benefits: | | |
| 0000-22000-00000-00-0000-0000 Accrued Payroll - General | 263,285 | |
| 0000-22010-00000-01-0000-0000 Accrued Vacation | - | |
| 0000-22015-00000-01-0000-0000 Accrued Payroll-Management Grid Bonus | 133,204 | |
| 0000-22015-00000-02-0000-0000 Accrued Payroll-Management Grid Bonus | - | |
| 0000-22015-00000-03-0000-0000 EC PRP Bonus Accrual | - | |
| 0000-22030-00000-01-0000-0000 PRP Bonus Accrual | - | |
| 0000-22030-00000-02-0000-0000 PRP Bonus Accrual | - | |
| 0000-22043-00000-01-0000-0000 Other Bonus Accrual | 47,554 | |
| 0000-22045-00000-01-0000-0000 Accrued Payroll-Commissions | 136,053 | |
| 0000-22045-00000-02-0000-0000 Accrued Payroll-Commissions | 23,841 | |
| 0000-22050-00000-00-0000-0000 Accrued Severance | 41,113 | |
| 0000-22110-00000-01-0000-0000 FICA Taxes Payable | 44,469 | |
| 0000-22310-00000-01-0000-0000 Benefits Payable - Employer Portion | 25,401 | |
| 0000-22613-00000-01-0000-0000 401k Flat 3% Accrual | 25,314 | |
| 0000-22614-00000-01-0000-0000 401k Transition Accrual | 1,695 | |
| 0000-22010-00000-00-0000-0000 Accrued Vacation | 203,497 | L2 (assumed vacation at 50% at the moment) |
| Total Accrued Payroll & Benefits | 945,427 | L1 |
| | | |
| Unearned Subscription Revenue: | | |
| 0000-23000-00000-01-0000-0000 Prepaid Subscriptions | 6,730 | |
| 0000-23001-00000-01-0000-0000 Prepaid NIE Donations | - | |
| 0000-23001-00000-02-0000-0000 Prepaid NIE Donations | 3,475 | |
| 0000-23009-00000-01-0000-0000 HD Subscription Refund (suspense) | 184 | |
| 0000-23000-00000-02-0000-0000 Prepaid Subscriptions | 272,968 | |
| Total Unearned Subscription Revenue | 283,356 | |

# Phoenix Properties Working Capital Detail

## Unaudited Balance Sheed For the Month Ended September 30, 2009

| | Sept 2009 | |
|---|---:|---|
| Other Accrued Liabilities: | | |
| 0000-25114-00000-01-0000-0000 Real Property Taxes | 170,375 | L3 |
| 0000-25121-00000-01-0000-0000 Local Sales Tax Payable | 16,941 | |
| 0000-25121-00000-02-0000-0000 Local Sales Tax Payable | 5,015 | |
| 0000-25121-00000-03-0000-0000 Local Sales Tax Payable | 702 | |
| 0000-25300-00000-01-0000-0000 Accrued Telephone | 26,675 | |
| 0000-25400-00000-01-0000-0000 Accrued Rent | 633,523 | L5 |
| 0000-25701-00000-01-0000-0000 Accrued AP - No Invoice received | 166,336 | |
| 0000-25700-00000-01-0000-0000 Accrued T & E | 13,185 | |
| 0000-25710-00000-01-0000-0000 Deferred Revenue | 196,460 | |
| 0000-25711-00000-01-0000-0001 Deferred Trade Advertising Revenue | 21,960 | |
| 0000-25114-00000-02-0000-0000 Real Property Taxes | 39,366 | |
| Total Other Accrued Liabilities | 1,290,538 | |
| **Total Current Liabilities** | $ 2,822,816 | |
| **Unadjusted Net Working Capital** | $ 436,332 | |

# Phoenix Properties Working Capital Detail

Unaudited Balance Sheed For the Month Ended September 30, 2009

**Sept 2009**

## Benchmark Net Working Capital

| | | |
|---|---:|---|
| Starting Current Assets | $ 3,259,149 | |
| Less Cash | (286,297) | A1 |
| Less Monster receivable | (4,712) | A2 |
| Less Tutor Time receivable | (416,102) | A3 |
| Less Tutor Time Bad Debt Reserve | 392,367 | A4 |
| Less Utilities Deposit with SRP | (13,415) | A5 |
| Less JM receivable | (39,000) | A6 |
| | | |
| Adjusted Current Assets | $ 2,891,991 | |
| | | |
| Starting Current Liabilities | $ 2,822,816 | |
| Less total accrued payroll | (945,427) | L1 |
| Add back assumed vacation (estimate) | 101,749 | L2 |
| Less Real Property Taxes on EVT property | (170,375) | L3 |
| Less Monster Liability | (10,799) | L4 |
| Less Accrued Rent on Rejected Leases | (633,523) | L5 |
| Add back post petition liabilities in A/P system | 222,429 | |
| | | |
| Adjusted Current Liabilities | $ 1,386,869 | |
| | | |
| **Benchmark Net Working Capital** | **$ 1,505,121** | |

**Exhibit N**

**Grant Deed**

**[SEE ATTACHED]**

When recorded return to:

_____
_____
_____
_____

# SPECIAL WARRANTY DEED

For valuable consideration, Freedom Arizona Information, Inc., a California corporation ("Grantor"), hereby conveys to 1013 Communications, LLC, a Nevada limited liability company, ("Grantee"), the following real property situated in Maricopa County, Arizona, together with all rights and privileges appurtenant thereto (the "Property"):

## See Exhibit A attached hereto,

SUBJECT TO current taxes and other assessments, reservations in patents and all easements, rights-of-way, encumbrances, liens, covenants, conditions, and restrictions, obligations, liabilities, and other matters as may appear of record, and all matters that an accurate survey of the Property or physical inspection of the Property would disclose.

Notwithstanding any warranty that may otherwise be implied from the use of any word, phrase or clause herein, Grantor does not warrant title to the Property other than to covenant and agree that Grantor has not encumbered the Property by its own acts except as referenced above, without warranty as to the acts of any other party.

DATED this _____ day of _____, 2010.

_____
_____


By _____

Its _____

LA\2061331.1

STATE OF _____ )
                        ) ss.
County of _____ )

     The foregoing document was acknowledged before me this ____ day of _____, 20___, by _____, as _____ of _____, a _____, on behalf of the _____.


_____
Notary Public

My Commission Expires:

_____

**Exhibit A**
**to**
**Special Warranty Deed**

**[Attach Legal Description of Real Property]**

**Exhibit O**

**Freedom Severance Plan**

**[SEE ATTACHED]**



# FREEDOM
## COMMUNICATIONS, INC.

**ASSOCIATE SEVERANCE PROGRAM**

1. **ELIGIBILITY**

All regular associates employed by Freedom Communications, Inc and its subsidiaries ("the Company") for a minimum of 30 days at the time of the layoff will be eligible under the severance policy. Associates with normal hours of less than forty (40) will be eligible for severance pro-rated based on their normal hours worked per pay period.

Associates are not eligible for this plan if:

- They have an alternative written employment or severance agreement with the Company and such agreement has been disclosed to and accepted by the Corporate Vice President, Human Resources; or
- They are classified by the Company as a temporary associate, per diem or independent contractor; or
- Normal hours worked is less than 20 hours per week; or
- They voluntarily resign their position; or
- They are offered an alternative position within the Company or Successor Company, defined as any company that continues to operate business of the Company, that does not require relocation; or
- They are terminated for cause, as determined by the Company, or for unsatisfactory job performance, as determined by the Company; or
- They leave the Company due to retirement, disability or death.

2. **NOTICE AND CONDITIONS OF PARTICIPATION IN THIS PROGRAM**

This policy will be in effect in the event of a job elimination due to a reduction in force at a location that result in job eliminations or a requirement of relocation to maintain a position. Associates offered positions but who decline those positions for reasons other than the requirement of relocation of a distance of 50 miles or more, will not be covered under this plan. This program supersedes all prior severance arrangements unless those arrangements have been disclosed to the Corporate Vice President of Human Resources in accordance with eligibility provisions outlined below.

- Associates will be given two (2) weeks' notice or pay in lieu of notice.

- In order to receive the severance pay outlined below, associates must remain employed until they are released by the Company and must sign a standard General Settlement and Release Agreement provided by the Company.

- Associates terminated for cause are not eligible to receive the severance program. "Cause" includes the kinds of issues for which you could be terminated from the Company, such as a violation of Company rules or continuing poor performance.

3. **SEVERANCE PAY**

Updated 01/09

- One (1) week of base pay for each completed full year of service, to a maximum of 52 weeks of severance. Base pay does not include overtime or incentive pay.

- The minimum severance pay will be four (4) weeks.

- The Company reserves the right to determine method of payment. Severance may be paid in bi-weekly installments or as a lump sum as the Company deems appropriate at the time.

- The Company reserves the right to provide a discretionary supplemental severance in an amount to be determined by the Division President and Division HR leader with approval of the Corporate VP, Human Resources and CEO.

## 4. BENEFITS

An associate eligible for health benefits and currently covered by our plans will be given the option to continue his/her coverage under Consolidated Omnibus Benefit Reconciliation Act (COBRA). The Company may agree to reimburse an associate for the COBRA continuation for the length of the severance period or a period of three (3) months; whichever is shorter. If the associate satisfies the COBRA continuation coverage requirements and elects COBRA coverage, the Company will reimburse the monthly COBRA continuation premium cost(s) (at an amount not to exceed the cost of the COBRA continuation coverage in effect and as elected upon the date of the initial qualifying event, the termination date) associated with the initial COBRA election(s) made by the associate. The associate will then have the right to continue their benefits for the remainder of the COBRA period at their discretion and will be responsible for the COBRA costs. Should the associate become eligible for benefits under another plan, the subsidy for the benefit continuation will cease.

## 5. BONUS PAYMENTS

Associates who participate in a short term bonus program will be eligible for a bonus payment pro-rated to their date of termination. Participation in any long term incentive will be governed by the plan document in effect at the time of termination. In the event of a merger or acquisition, the payment will be based on the results achieved through the date the transaction is finalized. In the event of a layoff due to the closing of a location or a department, payment will be based on whether a bonus is payable to all other participants as of the end of the bonus period. Any bonus, if earned, will be payable when bonuses to all other participants in the plan are calculated and paid or with all other severance payments.

Those associates eligible for sales incentives will be compensated for all business completed as of their last day of employment.

## 6. VACATION

Associates will be paid for all unused accrued vacation as of the termination date.

## 7. OUTPLACEMENT ASSISTANCE

Outplacement assistance may be made available through the Company's Human Resources Department.

## 8. OTHER BENEFITS AND PERQUISITES

Any other benefit plans or perquisites the associate may be participating in as an active associate will be handled on a discretionary basis at the time of termination.

9.   **REHIRE RIGHTS**

In the event an associate who has been severed under this policy is offered a new position, for which they will return to work prior to the completion of the severance period (base + supplemental number of weeks) and they were paid severance in a lump sum payment, they will be required to reimburse the company for the remaining severance period. If the associate is being paid on a bi-weekly basis, the remaining severance payments will be terminated.

10.   **RIGHTS TO AMEND OR CHANGE THE PLAN**

The Company reserves the right to amend or change the Plan at any time.

All decisions and actions by the Company are binding with respect to any questions arising out of or in connection with the administration, interpretation and application of the Policy and the rules will be binding upon all persons having any interest in the Policy.

**Addendum A to Severance Program**

1.   **ELIGIBILITY**

This Policy applies to all associates in the position of **Publisher for the  Newspaper Divisions, General Manager for the Broadcast Division and certain Division level Vice Presidents reporting directly to a Division President**, at time of termination, who are not currently covered by an alternative severance or employment agreement.

Associates are not eligible for this plan if:
- They have an alternative written employment or severance agreement with the Company and such agreement has been disclosed to and accepted by the Corporate Vice President, Human Resources; or
- They are classified by the Company as a temporary associate, per diem or independent contractor; or
- Normal hours worked is less than 20 hours per week; or
- They voluntarily resign their position; or
- They are offered an alternative position within the Company or Successor Company, defined as any company that continues to operate business of the Company, that does not require relocation of primary residence or a significant change in status, total compensation or responsibility; or
- They are terminated for cause, as determined by the Company, or for unsatisfactory job performance, as determined by the Company; or
- They leave the Company due to retirement, disability or death.

2.   **NOTICE AND CONDITIONS OF PARTICIPATION IN THIS PROGRAM**

This policy will be in effect in the event of a job elimination due to a reduction in force at a location that result in job eliminations or a requirement of relocation to maintain a position. Associates offered positions but who decline those positions for reasons other than the requirement of relocation of a distance of 50 miles or more, will not be covered under this plan. This program supersedes all prior severance arrangements unless those arrangements have been disclosed to the Corporate Vice President of Human Resources in accordance with eligibility provisions outlined below.

- Associates will be given two (2) weeks' notice or pay in lieu of notice.

- In order to receive the severance pay outlined below, associates must remain employed until they are released by the Company and must sign a standard General Settlement and Release Agreement provided by the Company.

- Associates terminated for cause are not eligible to receive the severance program. "Cause" includes the kinds of issues for which you could be terminated from the Company, such as a violation of Company rules or continuing poor performance.

Updated 01/09

3.   **SEVERANCE PAY**

If at the time of termination the incumbent has been employed by the company for less than one (1) year the eligible participant will be eligible for six (6) months of severance. Severance pay does not include incentive.

If the incumbent has been employed for a minimum of one (1) year, they will be entitled to one (1) year of severance. Severance pay does not include incentive pay unless otherwise authorized and approved by the Corp VP Human Resources and the CEO.

The Company reserves the right to determine method of payment. Severance may be paid in bi-weekly installments or as a lump sum as the Company deems appropriate at the time.

4.   **BENEFITS**

An associate eligible for health benefits and currently covered by our plans will be given the option to continue his/her coverage under Consolidated Omnibus Benefit Reconciliation Act (COBRA). The Company may agree to reimburse the associate for the COBRA continuation for the length of the severance period or a period of six (6) months; whichever is shorter. If the associate satisfies the COBRA continuation coverage requirements and elects COBRA coverage, the Company will reimburse the monthly COBRA continuation premium cost(s) (at an amount not to exceed the cost of the COBRA continuation coverage in effect and as elected upon the date of the initial qualifying event, the termination date) associated with the initial COBRA election(s) made by the associate. The associate will then have the right to continue their benefits for the remainder of the COBRA period at their discretion and will be responsible for the COBRA costs. Should the associate become eligible for benefits under another plan, the subsidy for the benefit continuation will cease.

5.   **BONUS PAYMENTS**

Associates who participate in a short term bonus program will be eligible for a bonus payment pro-rated to their date of termination. Participation in any long term incentive will be governed by the plan document in effect at the time of termination. In the event of a merger or acquisition, the payment will be based on the results achieved through the date the transaction is finalized. In the event of a layoff due to the closing of a location or a department, payment will be based on whether a bonus is payable to all other participants as of the end of the bonus period. Any bonus, if earned, will be payable when bonuses to all other participants in the plan are calculated and paid or with all other severance payments.

6.   **VACATION**

Associates will be paid for all unused accrued vacation as of the termination date.

7.   **OUTPLACEMENT ASSISTANCE**

Outplacement assistance may be made available through the Company's Human Resources Department.

8.   **OTHER BENEFITS AND PERQUISITES**

Any other benefit plans or perquisites the associate may be participating in as an active associate will be handled on a discretionary basis at the time of termination.

9.      **REHIRE RIGHTS**

In the event an associate who has been severed under this policy is offered a new position, for which they will return to work prior to the completion of the severance period (base + supplemental number of weeks) and they were paid severance in a lump sum payment, they will be required to reimburse the company for the remaining severance period.  If the associate is being paid on a bi-weekly basis, the remaining severance payments will be terminated.

10.     **RIGHTS TO AMEND OR CHANGE THE PLAN**

The Company reserves the right to amend or change the Plan at any time.

All decisions and actions by the Company are binding with respect to any questions arising out of or in connection with the administration, interpretation and application of the Policy and the rules will be binding upon all persons having any interest in the Policy.

1.    **ELIGIBILITY**

This Policy applies to all associates in the position of **Director or Non-corporate officer Vice President in the Corporate office**, at time of termination, who are not currently covered by an alternative severance or employment agreement.

Associates are not eligible for this plan if:
- They have an alternative written employment or severance agreement with the Company and such agreement has been disclosed to and accepted by the Corporate Vice President, Human Resources; or
- They are classified by the Company as a temporary associate, per diem or independent contractor; or
- Normal hours worked is less than 20 hours per week; or
- They voluntarily resign their position; or
- They are offered an alternative position within the Company or Successor Company, defined as any company that continues to operate business of the Company, that does not require relocation of primary residence or a significant change in status, total compensation or responsibility; or
- They are terminated for cause, as determined by the Company, or for unsatisfactory job performance, as determined by the Company; or
- They leave the Company due to retirement, disability or death.

2.    **NOTICE AND CONDITIONS OF PARTICIPATION IN THIS PROGRAM**

This policy will be in effect in the event of a job elimination due to a reduction in force at a location that result in job eliminations or a requirement of relocation to maintain a position. Associates offered positions but who decline those positions for reasons other than the requirement of relocation of a distance of 50 miles or more, will not be covered under this plan. This program supersedes all prior severance arrangements unless those arrangements have been disclosed to the Corporate Vice President of Human Resources in accordance with eligibility provisions outlined below.

- Associates will be given two (2) weeks' notice or pay in lieu of notice.

- In order to receive the severance pay outlined below, associates must remain employed until they are released by the Company and must sign a standard General Settlement and Release Agreement provided by the Company.

- Associates terminated for cause are not eligible to receive the severance program. "Cause" includes the kinds of issues for which you could be terminated from the Company, such as a violation of Company rules or continuing poor performance.

3.    **SEVERANCE PAY**

If at the time of termination the incumbent has been employed by the company for less than one (1) year the eligible participant will be eligible for three (3) months of severance. Severance pay does not include incentive.

If the incumbent has been employed for a minimum of one (1) year, they will be entitled to six (6) months of severance. Severance pay does not include incentive pay.

The Company reserves the right to determine method of payment. Severance may be paid in bi-weekly installments or as a lump sum as the Company deems appropriate at the time.

4.    **BENEFITS**

An associate eligible for health benefits and currently covered by our plans will be given the option to continue his/her coverage under Consolidated Omnibus Benefit Reconciliation Act (COBRA). The Company may agree to reimburse the associate for the COBRA continuation for the length of the severance period or a period of three (3) months; whichever is shorter. If the associate satisfies the COBRA continuation coverage requirements and elects COBRA coverage, the Company will reimburse the monthly COBRA continuation premium cost(s) (at an amount not to exceed the cost of the COBRA continuation coverage in effect and as elected upon the date of the initial qualifying event, the termination date) associated with the initial COBRA election(s) made by the associate. The associate will then have the right to continue their benefits for the remainder of the COBRA period at their discretion and will be responsible for the COBRA costs. Should the associate become eligible for benefits under another plan, the subsidy for the benefit continuation will cease.

5.    **BONUS PAYMENTS**

Associates who participate in a short term bonus program will be eligible for a bonus payment pro-rated to their date of termination. Participation in any long term incentive will be governed by the plan document in effect at the time of termination. In the event of a merger or acquisition, the payment will be based on the results achieved through the date the transaction is finalized. In the event of a layoff due to the closing of a location or a department, payment will be based on whether a bonus is payable to all other participants as of the end of the bonus period. Any bonus, if earned, will be payable when bonuses to all other participants in the plan are calculated and paid or with all other severance payments.

6.    **VACATION**

Associates will be paid for all unused accrued vacation as of the termination date.

7.    **OUTPLACEMENT ASSISTANCE**

Outplacement assistance may be made available through the Company's Human Resources Department.

8.    **OTHER BENEFITS AND PERQUISITES**

Any other benefit plans or perquisites the associate may be participating in as an active associate will be handled on a discretionary basis at the time of termination.

9.     **REHIRE RIGHTS**

In the event an associate who has been severed under this policy is offered a new position, for which they will return to work prior to the completion of the severance period (base + supplemental number of weeks) and they were paid severance in a lump sum payment, they will be required to reimburse the company for the remaining severance period.  If the associate is being paid on a bi-weekly basis, the remaining severance payments will be terminated.

10.    **RIGHTS TO AMEND OR CHANGE THE PLAN**

The Company reserves the right to amend or change the Plan at any time.

All decisions and actions by the Company are binding with respect to any questions arising out of or in connection with the administration, interpretation and application of the Policy and the rules will be binding upon all persons having any interest in the Policy.

**Exhibit P**

**Seller's Bad Debt Reserve Policy**

**[SEE ATTACHED]**


FREEDOM
COMMUNICATIONS, INC.

| Subject | Category | | Number |
|---|---|---|---|
| **Accounts Receivable Allowance Methodologies** | | New | |
| Division | | Partial Revision | Issue Date: |
| **All** | | | Revision Date: October 2008 |
| | | Complete Revision | Supersedes: |

1. <u>Purpose and Scope</u>

   The purpose of this policy is to provide minimum reserve guidelines to be used when calculating the bad debt allowance and to provide guidance regarding the write-off of account balances determined to be uncollectible.

2. <u>Policy</u>

   2.1. General

   Advertising receivables must be supported by a detailed aged trial balance. The aged trial balance must be reconciled to the general ledger on a monthly basis. Reserves for uncollectible receivables must be calculated on a monthly basis. At a minimum, an allowance should be calculated based on the Corporate formula (see the table at 3.1 below). Additional reserves should be calculated for specific accounts that are known to have a higher risk of loss due to specific circumstances (see Section 3.2.5).

   2.2. Major Accounts

   When risk of loss increases for major accounts (i.e., accounts with significant regional and/or national profiles) the specific circumstances should be communicated to the location Publisher, General Manager and Business Manager, the division VP Finance, the VP Enterprise Accounting and the Regional Controller. Because these accounts have the potential to impact multiple Freedom entities, the need may arise for a coordinated response directed by the VP Enterprise Accounting. For example, such a response may involve the need for direct communication between Freedom's General Counsel and the corporate office of the specific major account.

3. <u>Procedures</u>

   3.1. Reserve Calculation

   The pre-established bad debt reserve percentages should be applied against the various aging categories by receivable type after adding back credit balances.

| Effective Date: 1/1/03 | Review Date/Frequency: Annual | Approved by: FCI Enterprise Accounting |
|---|---|---|



| Subject | Category | Number |
|---------|----------|--------|
| **Accounts Receivable Allowance Methodologies** | . | |

| Category/Type | Current | 30 | 60 | 90 | 120 | 180 | 240 | 300 |
|---------------|---------|-----|-----|------|------|------|------|------|
| Newspaper - Display, Contract Classified, National, Legal | 0.5% | 5% | 10% | 25% | 60% | 90% | 100% | |
| Newspaper - Classified Transient, Circulation – Carrriers* | 1.0% | 25% | 50% | 100% | | | | |
| Magazine | 0.0% | 1% | 2% | 5% | 25% | 50% | 85% | 100% |
| Magazine - List Rental | 0.0% | 2% | 5% | 25% | 50% | 100% | | |
| Broadcast | 0.0% | 0% | 2% | 5% | 25% | 50% | 100% | |
| Interactive Media | 0.5% | 5% | 10% | 25% | 60% | 90% | 100% | |

*(Newspapers only - Typically, for transient and carrier receivable balances, a more aggressive allowance percentage is used due to the higher risk associated with these accounts).

3.2.  Reserve Calculation / Write-Off Guidelines

The reserve should be calculated on a monthly basis using the reserve templates for your respective division. Select the appropriate excel accounts receivable reserve template from the associated template listing provided on the web site.

The following procedures should be performed for all divisions each month:

3.2.1.  Amounts from the accounts receivable aging should be entered into the appropriate aging category in the excel template. Your aging may need to be further stratified to complete the spreadsheet (e.g., to breakout significant high risk accounts requiring higher reserve percentages).

3.2.2.  Deduct any credit balances by adding them back in the space provided. The reserve percentages should be applied after adding back credit balances. Note: trade credits included in the aging should not be included in the calculation.

3.2.3.  Compare the total reserve required to the existing reserve balance per the general ledger, and adjust the allowance for bad debt expense accordingly.

3.2.4.  Accounts considered uncollectible, but have not met the criteria for write-off per the 'Substantiation for Bad Debt Write-offs' policy should be reserved 100% or for the specific amount that is determined to be uncollectible. These balances should be separately identified on the worksheet and be deducted from





| Subject | Category | Number |
|---|---|---|
| **Accounts Receivable Allowance Methodologies** | | |

the aging amounts included in the worksheet to avoid duplication in the allowance calculation. Care must be exercised to ensure that the balances in these accounts as listed on the worksheet are classified in the proper aging category and are removed from the list should they be written off during the accounting period.

3.2.5. Account balances that are determined to be uncollectible per the 'Substantiation of Bad Debt Write-offs' policy should be written off throughout the year at such time as they are determined uncollectible. Further clarification on specific write-off criteria is provided below:

3.2.5.1. Accounts should not be written off based on a specific number of days past due. However, balances in accounts that have aged to over 240 days past due should be further evaluated to determine their collectibility. If determined uncollectible, they should be written off and documented per the criteria established in the 'Substantiation of Bad Debt Write-offs' policy.

3.2.5.2. Accounts submitted to a collection agency should not be written off until such time as confirmation has been received from the collection agency regarding collectibility of the account and management has determined that the account is not collectible. These accounts should be reserved at 100% at the time they are submitted to the collection agency.

3.2.5.3. Accounts filing for bankruptcy protection should not be written off; however should be reserved 100% at the time Freedom receives official notice from the courts as to the customers filing if not previously reserved for. If, based on the relevant information received following the filing but before notice from the courts as to the result of the filing, management determines that the account should be written off, the reasons for that determination should be fully documented, approved and incorporated in the account file at time of write-off.

All write-offs should be approved in accordance with the appropriate Schedule of Authorizations policy.

4. <u>A/R Reserve Templates (See web site link)</u>





| Subject | Category | Number |
|---|---|---|
| **Accounts Receivable Allowance Methodologies** | | |


"AR Allowance Broadcast.xls"


"AR Allowance Newspapers.xls"


"AR Allowance Interactive.xls"


"AR Allowance Magazine.xls"

5.  Freedom Arizona Information, Inc. uses a different method of grouping the aging buckets, as DTI does not allow for as many buckets as the corporate policy uses. Agings are grouped and reserved based on the following:

|  | Current | 30 day | 60 day | 90 day | over 120 |
|---|---|---|---|---|---|
| Non-transient | .5% | 10% | 25% | 75% | 100% |
| Transient | 1% | 1% | 25% | 50% | 100% |



# DISCLOSURE LETTER

delivered by

## Freedom Arizona Information, Inc.

("Seller")

to

1013 Communications, LLC

("Buyer")


Dated as of February 12, 2010

# INTRODUCTION

This Disclosure Letter is made and delivered by Freedom Arizona Information, Inc. ("Seller") pursuant to that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of February 12, 2010, by and among 1013 Communications, LLC, a Nevada limited liability company ("Buyer"), Seller, and solely for purposes of Article VII, Freedom Newspapers, Inc., a Delaware corporation. Capitalized terms used but not defined in this Disclosure Letter shall have the same meanings given to them in the Purchase Agreement, unless the context of such use requires otherwise. Cross-references to schedules or attachments are to the indicated schedule or attachment in this Disclosure Letter, unless otherwise described or indicated.

The section numbers below correspond to the section numbers in the Purchase Agreement that are modified by the disclosures; provided, however, that any exception, qualification, limitation, document or other item described in any provision, subprovision, section or subsection of the Disclosure Letter with respect to a particular representation, warranty or covenant contained in the Purchase Agreement shall be deemed to be an exception or qualification with respect to all other representations, warranties and covenants contained in the Purchase Agreement to which such exception, qualification, limitation, document or other item is applicable. Any descriptions of agreements herein are summaries only and are qualified in their entirety by the specific terms of such agreements, copies of which have been made available to Buyer.

Certain information in this Disclosure Letter may not be required to be disclosed pursuant to the Purchase Agreement. Any such information is included solely for informational purposes, and nothing in the Disclosure Letter is intended to broaden the scope of any representation, warranty or covenant of Sellers contained in the Purchase Agreement. It is expressly understood and acknowledged that any exceptions set forth herein shall not constitute a basis for a claim of a breach of any of the representations and warranties or covenants made in the Purchase Agreement.

The provision of monetary or other quantitative thresholds for disclosure does not and shall not be deemed to create or imply a standard of materiality hereunder. The inclusion of any information in the Disclosure Letter (or any update thereto) shall not be deemed to be an admission or acknowledgment, in and of itself, that such information is required by the terms of the Purchase Agreement to be disclosed, is material, has resulted in or would result in a Material Adverse Effect or is outside the ordinary course of business. Nor shall the inclusion of any information in the Disclosure Letter (or any update thereto) constitute an admission of fault, culpability or liability with respect to any claim, action, lawsuit or proceeding or an admission that any breach, violation, default or event of default exists with respect to any contract or agreement.

The attachments to this Disclosure Letter form an integral part of this Disclosure Letter and are incorporated by reference for all purposes as if set forth fully herein.

1

**SCHEDULE 4.3**

**STATUS OF ASSETS AND LEASES OF SELLER**

1. Excluded Assets

2. Those services and assets contemplated by <u>Schedule 2.01</u> of the Transition Services Agreement

3. Those assets provided pursuant to the Excluded Contracts and other Contracts not assumed by Buyer.

4. The trade name Gilbert Tribune remains registered in Arizona to Cox Arizona Publications, Inc.

## SCHEDULE 4.4

## LITIGATION

None.

4

## **SCHEDULE 4.5**

## **COMPLIANCE WITH LAW**

None.

LA\2059613.4

## SCHEDULE 4.6

## INTELLECTUAL PROPERTY

### REGISTERED
### TRADEMARKS

Federal:

| MARK | OWNER | APP. NO. | REG. NO. |
|---|---|---|---|
| AHWATUKEE FOOTHILLS NEWS | Freedom Arizona Information, Inc. | 78/302,769 | 2,964,971 |
| CHANDLER CONNECTION | Freedom Arizona Information, Inc. | 78/301,184 | 2,893,454 |
| DAILY NEWS-SUN | Freedom Arizona Information, Inc. | 78/301,189 | 2,939,741 |
| EAST VALLEY TRIBUNE | Freedom Arizona Information, Inc. | 76/089,718 | 2,847,813 |
| EAST VALLEY TRIBUNE CONNECTION | Freedom Arizona Information, Inc. | 78/630,964 | 3,085,475 |
| GLENDALE TODAY | Freedom Arizona Information, Inc. | 78/928,300 | 3,449,523 |
| NORTHWEST VALLEY COMMERCIAL PRINTING | Freedom Arizona Information, Inc. | 78/302,773 | 2,940,994 |
| NORTHWEST VALLEY NEWS | Freedom Arizona Information, Inc. | 78/302,755 | 2,993,461 |
| NORTHWEST VALLEY NEWSPAPERS | Freedom Arizona Information, Inc. | 78/302,752 | 2,993,460 |
| PEORIA TODAY | Freedom Arizona Information, Inc | 78/928,303 | 3,449,524 |
| PRIME TIMES | Freedom Arizona Information, Inc. | 78/928,310 | 3,449,525 |
| SCOTTSDALE TRIBUNE | Freedom Arizona Information, Inc. | 75/366,973 | 2,277,198 |
| SCOTTSDALE TRIBUNE CONNECTION | Freedom Arizona Information, Inc. | 78/630,740 | 3,087,591 |
| SCOTTSDALE VIEWS | Freedom Arizona Information, Inc. | 78/301,151 | 2,947,757 |
| SURPRISE TODAY | Freedom Arizona Information, Inc. | 78/301,156 | 2,886,626 |
| THE MESA TRIBUNE | Freedom Arizona Information, Inc. | 78/928,334 | Pending |
| VEEP | Freedom Arizona Information, Inc. dba FAZI | 77/485,576 | 3,628,497 |

State:

| MARK | STATE | OWNER | REG. NO. |
|------|-------|-------|----------|
| TRIBUNE NEWSPAPERS | Arizona | Freedom Arizona Information, Inc. | 24827 |
| THE TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 41690 |

**REGISTERED
TRADE NAMES**

State:

| MARK | STATE | OWNER | REG. NO. |
|------|-------|-------|----------|
| BEST OF AHWATUKEE | Arizona | Freedom Arizona Information, Inc. | 472601 |
| CHANDLER TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 412227 |
| EAST VALLEY CLASSIFIED | Arizona | Freedom Arizona Information, Inc. | 381687 |
| QUEEN CREEK TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 412223 |
| GOLD CANYON TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 412225 |
| MARICOPA TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 412221 |
| SAN TAN TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 412222 |
| TEMPE TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 412226 |
| APACHE JUNCTION TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 412224 |
| U & YOUR HOME | Arizona | Freedom Arizona Information, Inc. | 409396 |
| OCOTILLO TRIBUNE | Arizona | Freedom Arizona Information, Inc. | 409097 |
| EXCLUSIVE LIFESTYLES MAGAZINE | Arizona | Freedom Arizona Information, Inc. | 262753 |

## REGISTERED
## DOMAIN NAMES

1.  eastvalleytribune.com – Mesa

2.  eastvalley.com – Mesa

3.  evtrib.com – Mesa

4.  aztrib.com – Mesa

5.  dailynews-sun.com - Daily News Sun

6.  yourwestvalley.com – Mesa

7.  getoutaz.com - Mesa

8.  ahwatukee.com – Ahwatukee

9.  scottsdaleviews.com - Mesa

10. surprisetoday.com – Mesa

11. westvalleypreps.com – Mesa

12. azimg.com – AZIMG

13. veep4u.com – AZIMG

14. azclipper.com - AZIMG

15. Chandlertribune.com

16. Gilberttribune.com

17. Queencreektribune.com

8

# COPYRIGHTS

None of the following copyrights is registered and is disclosed :

1. Mesa Tribune
2. Chandler Tribune
3. Queen Creek Tribune
4. East Valley Tribune
5. Surprise Today
6. ClipperMarketplace
7. Glendale/Peoria Today
8. Glendale Today
9. Peoria Today
10. Chandler Connection
11. Ahwatukee Foothills News
12. Daily News-Sun
13. Active Lifestyles
14. Get Out
15. Healthy Living
16. Southwest Living
17. Ahwatukee Sunday
18. Stars & Stripes
19. Maricopa Tribune
20. Maricopa Connection
21. U & Your Home
22. Ocotillo Tribune
23. Apache Junction Tribune
24. Gold Canyon Tribune
25. San Tan Tribune
26. Tempe Tribune

## SCHEDULE 4.7

## COLLECTIVE BARGAINING AGREEMENTS AND LABOR MATTERS

None.

LA\2059613.4

## SCHEDULE 4.8

### EMPLOYEES

Seller may elect to pay bonuses to certain employees pursuant to the Freedom Communications 2009 Quarterly Bonus Plan.

## SCHEDULE 4.9
## ENVIRONMENTAL, HEALTH AND SAFETY MATTERS

None.

LA\2059613.4

## SCHEDULE 4.12
## VEHICLES

| **Asset ID** | **Vehicle Description** |
|---|---|
| 1. MESA6090 | 2007 Chevrolet Cargo Van 1500 |
| 2. Mesa000020 | 2000 S-10 P/U |
| 3. Mesa003260 | Volkswagen Bus for Marketing |
| 4. Mesa003330 | 2004 Toyota Tacoma |
| 5. Mesa003340 | 2002 GMC SIERRA |
| 6. MESA4580 | 2004 Nissan Frontier |
| 7. MESA4590 | 1999 GMC W4500  Truck |
| 8. MESA5180 | Ford 2 Door Club Wagon, Econoline |
| 9. MESA5950 | 1993 Ford from Hurley Transportation Company |
| 10. MESA5980 | 1993 Ford Box Truck |
| 11. A000011 | 1995 CHEVROLET BOX VAN |

5

## SCHEDULE 4.13

## BROKER'S AND FINDER'S FEES

1.     Commission payable to Dirks, Van Essen & Murray

6