# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                            :     Chapter 11

FREEDOM COMMUNICATIONS HOLDINGS,: Case No. 09-13046 (BLS)
INC., et al.,

             Debtors.[1]         :     Jointly Administered

------------------------------------------------------- x

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE OF FREEDOM COMMUNICATIONS HOLDINGS, INC., ET AL., DEBTORS, AS MODIFIED

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Freedom Communications Holdings, Inc. (2814); Freedom Communications, Inc. (0750); Freedom Broadcasting, Inc. (0025); Freedom Broadcasting of Florida, Inc. (6581); Freedom Broadcasting of Florida Licensee, L.L.C. (1198); Freedom Broadcasting of Michigan, Inc. (6110); Freedom Broadcasting of Michigan Licensee, L.L.C. (1122); Freedom Broadcasting of New York, Inc. (6522); Freedom Broadcasting of New York Licensee, L.L.C. (9356); Freedom Broadcasting of Oregon, Inc. (7291); Freedom Broadcasting of Oregon Licensee, L.L.C. (9295); Freedom Broadcasting of Southern New England, Inc. (7274); Freedom Broadcasting of Southern New England Licensee, L.L.C. (1177); Freedom Broadcasting of Texas, Inc. (2093); Freedom Broadcasting of Texas Licensee, L.L.C. (1147); Freedom Broadcasting of Tennessee, Inc. (7961); Freedom Broadcasting of Tennessee Licensee, L.L.C. (9430); Freedom Magazines, Inc. (0328); Freedom Metro Information, Inc. (1604); Freedom Newspapers, Inc. (3240); Orange County Register Communications, Inc. (7980); OCR Community Publications, Inc. (9752); OCR Information Marketing, Inc. (7983); Appeal-Democrat, Inc. (4121); Florida Freedom Newspapers, Inc. (4227); The Seller Information, Inc. (5796); Freedom Colorado Information, Inc. (7806); Freedom Eastern North Carolina Communications, Inc. (5563); Freedom Newspapers of Illinois, Inc. (2222); Freedom Newspapers of Southwestern Arizona, Inc. (5797); Freedom Shelby Star, Inc. (8425); Illinois Freedom Newspapers, Inc. (8308); Missouri Freedom Newspapers, Inc. (8310); Odessa American (7714); The Times-News Publishing Company (0230); Victor Valley Publishing Company (6082); Daily Press (3610); Freedom Newspaper Acquisitions, Inc. (4322); The Clovis News-Journal (5820); Freedom Newspapers of New Mexico L.L.C. (5360); Gaston Gazette LLP (4885); Lima News (6918); Porterville Recorder Company (7735); Seymour Tribune Company (7550); Victorville Publishing Company (7617); Freedom Newspapers (7766); The Creative Spot, L.L.C. (2420); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Services, Inc. (3125). The address for Freedom Communications Holdings, Inc. and certain other Debtors is 17666 Fitch, Irvine, California 92614.

# TABLE OF CONTENTS

Page

I.  OVERVIEW OF THE PLAN ................................................................................... 3

    A.  Summary of the Plan .................................................................................. 4

    B.  Plan Solicitation ......................................................................................... 7

    C.  Results of the Plan Solicitation ................................................................. 9

II.  THE PLAN SHOULD BE CONFIRMED BECAUSE IT COMPLIES WITH ALL OF THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE .................................................................................................................. 10

    A.  Section 1129(a) Requirements ................................................................ 10

        1.  The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)) ................................. 10

            a.  The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ........... 10

            b.  The Plan Satisfies the Requirements of Section 1123 of the Bankruptcy Code. .......................................... 11

                (1)  Mandatory Provisions ........................................ 11

                (2)  Certain Permissive Provisions .......................... 13

                (3)  Approval of the Compromises and Settlements Embodied in the Plan ...................................... 14

                (4)  Release, Exculpation, Injunction and Limitation of Liability Provisions of the Plan ......................... 16

        2.  The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)) ................................. 25

        3.  The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden by Law (Section 1129(a)(3)) ............................. 25

        4.  Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Court Approval (Section 1129(a)(4)). ........... 26

        5.  The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers and Insiders (Section 1129(a)(5)) .......... 27

6.     The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission (Section 1129(a)(6))..................................................................... 29

7.     The Plan is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7))........................................................................... 29

8.     The Plan Has Been Accepted by Nearly All Classes Entitled to Vote On the Plan (Section 1129(a)(8))...................................................... 32

9.     The Plan Provides for the Payment in Full of All Allowed Priority Claims (Section 1129(a)(9))...................................................................... 32

10.    At Least One Class of Impaired Claims Has Accepted the Plan (Section 1129(a)(10))..................................................................... 35

11.    The Plan Meets the Feasibility Requirement of Section 1129(a)(11) of the Bankruptcy Code........................................................ 36

12.    All Court and United States Trustee Fees Have Been or Will be Paid (Section 1129(a)(12))............................................................... 39

13.    The Plan Adequately and Properly Treats Retiree Benefits (Section 1129(a)(13))..................................................................... 39

14.    Section 1129(a)(14) Does Not Apply to the Debtors................................ 40

15.    Section 1129(a)(15) Does Not Apply to the Debtors................................ 40

16.    Transfers of Property of the Plan Will be Made in Accordance With any Applicable Provisions of Non-Bankruptcy Law that Govern the Transfer of Property by a Corporation or a Trust that is Not a Moneyed, Business, or Commercial Corporation or Trust (Section 1129(a)(16))..................................................................... 40

B.    Section 1129(b) Cramdown Requirements ............................................ 41

1.     The Plan Complies with Section 1129(b)(1) of the Bankruptcy Code Because It Does Not Discriminate Unfairly Against Holders of Claims and Equity Interests in Rejecting Classes. ............................... 42

2.     The Plan Complies with Section 1129(b) of the Bankruptcy Code Because It Is Fair and Equitable with Respect to Holders of Claims and Equity Interests in Rejecting Classes..................................... 44

C.    Section 1129(d) of the Bankruptcy Code............................................. 45

III.   THE UNRESOLVED OBJECTIONS SHOULD BE OVERRULED ............................. 46

    A.   To the Extent the Taxing Authority Objections Have Not Been Resolved, They Should be Overruled .................................................................................. 46

    B.   The U.S. Trustee's Objection Must be Overruled ............................................... 47

        1.   The Provisions of the Plan Relating to an Administrative Claims Bar Date are Fair and Reasonable, and Are Consistent With the Bankruptcy Code, Established Caselaw and Constitutional Due Process ...................................................................................................... 47

        2.   The U.S. Trustee's Remaining Objections Should be Overruled ............. 52

IV.   CONCLUSION ............................................................................................................. 53

# TABLE OF AUTHORITIES

## CASES

*City of New York v. New York N.H. & H.R. Co.*,
    344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953) .............................................................. 50, 51

*Corestates Bank, N.A. v. United Chem. Tech., Inc.*,
    202 B.R. 33 (E.D. Pa. 1996) ............................................................. 36

*Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*,
    No. 02 Civ. 9629, 2003 WL 21355214 (S.D.N.Y. June 11, 2003) .......................................... 50

*DePippo v. Kmart Corp.*,
    335 B.R. 290 (S.D.N.Y. 2005) ............................................................. 50

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*,
    209 F.3d 252 (3d Cir. 2000) ............................................................. 50

*Gillman v. Continental Airlines (In re Continental Airlines)*,
    203 F.3d 203 (3d Cir. 2000) ............................................................. 19, 20

*In re 11,111, Inc.*,
    117 B.R. 471 (Bankr. D. Minn. 1990) ............................................................. 42

*In re AAIPharma, Inc.*,
    Case No. 05-11341 (PJW) ............................................................. 18

*In re America Online Latin America*,
    Case No. 05-11778 (KG) (Bankr. D. Del. April 25, 2006) ....................................... 24

*In re America West Airlines, Inc.*,
    179 B.R. 893 (Bankr. D. Ariz. 1995) ............................................................. 43

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) ............................................................. 11, 22

*In re Armstrong World Indus., Inc.*,
    432 F.3d 507 (3d Cir. 2005) ............................................................. 44

*In re Benjamin Coal Co.*,
    978 F.2d 823 (3d Cir. 1992) ............................................................. 49

*In re Briscoe Enters., Ltd.*,
    994 F.2d 1160 (5th Cir. 1993) ............................................................. 36, 37

*In re Buffets Holdings, Inc.*,
  Case No. 08-10141 (MFW) (Bankr. D. Del. April 17, 2009) .................................................... 24

*In re Buttonwood Partners, Ltd.*,
  111 B.R. 57 (Bankr. S.D.N.Y 1990) ........................................................................................ 42

*In re Caldwell*,
  76 B.R. 643 (Bankr. E.D. Tenn. 1987) ...................................................................................... 10

*In re Cellular Info. Sys., Inc.*,
  171 B.R. 926 (Bankr. S.D.N.Y. 1994) ...................................................................................... 25

*In re Century Glove, Inc.*,
  1993 WL 239489 (D. Del. Feb. 10, 1993) ........................................................................ 10, 25

*In re Coram Healthcare Corp.*,
  271 B.R. 228 (Bankr. D. Del. 2001) .......................................................................................... 25

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) .................................................................................... 15, 19

*In re Drexel Burnham Lambert Group Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................................................... 25

*In re Dura Automotive Systems, Inc.*,
  Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008) ...................................................... 24

*In re Eddington Thread Mfg., Co., Inc.*,
  181 B.R. 826 (Bankr. E.D. Pa. 1995) ........................................................................................ 36

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) .............................................................................. 19, 43, 44

*In re Great Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D. N.J. 2000) .................................................................................... 36, 37

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987) .................................................................................................... 11

*In re Kennedy*,
  158 B.R. 589 (Bankr. D. N.J. 1993) ..................................................................................... 42, 43

*In re Key3Media Group, Inc.*,
  336 B.R. 93 ................................................................................................................................ 15

*In re Master Mortgage*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994) ................................................................... 19, 20, 24, 52

*In re Mayer Pollack Steel Corp.*,
174 B.R. 414 (Bankr. E.D. Pa. 1994) ............................................................... 36

*In re MCorp Financial, Inc.*,
160 B.R. 941 (S.D. Tex. 1993) ....................................................................... 43

*In re Meridian Automotive Systems Composites Operations, Inc.*,
Case No. 05-11168 (MFW) (Bankr. D. Del. December 6, 2006) ............................ 24

*In re Mrs. Fields' Original Cookies, Inc.*,
Case No. 08-11953 (PJW) (Bankr. D. Del. October 2, 2008) ............................... 24

*In re Nellson Nutraceutical, Inc.*,
Case No. 06-10072 (CSS) (Bankr. D. Del. September 10, 2008) ........................... 24

*In re Neshaminy Office Building Assocs.*,
62 B.R. 798 (E.D. Pa. 1986) ......................................................................... 15

*In re Pliant Corp.*,
Case No. 06-10001 (MFW) (Bankr. D. Del. June 23, 2006) ................................. 24

*In re Polysat, Inc.*,
152 B.R. 886 (Bankr. E.D. Pa. 1993) ............................................................. 49

*In re PPI Enters. (U.S.), Inc.*,
228 B.R. 339 (Bankr. D. Del. 1998) ............................................................... 44

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ......................................................... 36, 37

*In re PWS Holding Corp.*,
228 F.3d 245 .................................................................................... 20, 32

*In re Resorts Int'l*,
145 B.R. 412 (Bankr. D. N.J. 1990) ............................................................... 42

*In re RFE Indus., Inc.*,
283 F.3d 159 (3d Cir. 2002) ......................................................................... 16

*In re Texaco, Inc.*,
85 B.R. 934 (Bankr. S.D.N.Y. 1988) .............................................................. 26

*In re T-H New Orleans Ltd. P'ship*,
116 F.3d 790 (5th Cir. 1997) ................................................................... 36, 37

*In re U.S.H. Corp.*,
223 B.R. 654 (Bankr. S.D.N.Y. 1998) ......................................................... 50, 51

*In re UAL Corp.*,
    398 B.R. 243 (N.D. Ill. 2008) ........................................................... 51, 52

*In re Union Meeting Partners*,
    165 B.R. 553 (Bankr. E.D. Pa. 1994) .............................................. 45

*In re W.T. Grant and Co.*,
    699 F.2d 599 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983) .............. 15

*In re WorldCom, Inc.*,
    2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003) .......................... 37

*In re XO Comms., Inc.*,
    301 B.R. 782 (Bankr. S.D.N.Y. 2003) ............................................ 51

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ...................................... 17, 19, 22, 23

*Kane v. Johns-Mansville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ........................................................... 10, 36

*Mennonite Bd. of Missions v. Adams*,
    462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) ..................... 50

*Meyers v. Martin (In re Meyers)*,
    91 F.3d 389 (3d Cir. 1996) ........................................................... 15

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) .......................... 50, 51

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. Inc. (In re U.S. Truck Co.)*,
    800 F.2d 581 (6th Cir. 1986) ........................................................ 11

*Tulsa Prof'l Collection Serv., Inc. v. Pope*,
    485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988) .................... 50

## STATUTES

11 U.S.C. § 1114 ......................................................................... 39

11 U.S.C. § 1122 ......................................................................... 10, 11

11 U.S.C. § 1122(a) ..................................................................... 10, 11, 12

11 U.S.C. § 1122(b) ..................................................................... 33

11 U.S.C. § 1123 ......................................................................... 10, 12, 15

11 U.S.C. § 1123(a)(1) .......................................................................................... 12

11 U.S.C. § 1123(a)(2) .......................................................................................... 12

11 U.S.C. § 1123(a)(3) .......................................................................................... 12

11 U.S.C. § 1123(a)(4) .......................................................................................... 12

11 U.S.C. § 1123(a)(5) ...................................................................................... 12, 13

11 U.S.C. § 1123(a)(6) ...................................................................................... 12, 13

11 U.S.C. § 1123(a)(7) .................................................................................. 12, 13, 14

11 U.S.C. § 1123(a)(8) .......................................................................................... 12

11 U.S.C. § 1123(b) ........................................................................................... 14, 15

11 U.S.C. § 1123(b)(2) .......................................................................................... 14

11 U.S.C. § 1123(b)(3)(A) ...................................................................................... 14

11 U.S.C. § 1123(b)(3)(B) ...................................................................................... 14

11 U.S.C. § 1124(2) ................................................................................... 2, 5, 35, 46

11 U.S.C. § 1125 ................................................................................................... 25

11 U.S.C. § 1125(e) ............................................................................................... 26

11 U.S.C. § 1126 ............................................................................................... 25, 35

11 U.S.C. § 1126(c) ............................................................................................... 32

11 U.S.C. § 1126(d) ............................................................................................... 32

11 U.S.C. § 1126(f) ............................................................................................. 9, 32

11 U.S.C. § 1126(g) ......................................................................................... 9, 32, 45

11 U.S.C. § 1129 ................................................................................................... 10

11 U.S.C. § 1129(a)(1) ........................................................................................... 10

11 U.S.C. § 1129(a)(10) ...................................................................................... 35, 36

11 U.S.C. § 1129(a)(11) ...................................................................................... 36, 38

11 U.S.C. § 1129(a)(12) .......................................................................................... 39

11 U.S.C. § 1129(a)(13) .................................................................................. 39, 40

11 U.S.C. § 1129(a)(14) .................................................................................. 40

11 U.S.C. § 1129(a)(15) .................................................................................. 40

11 U.S.C. § 1129(a)(16) .................................................................................. 41

11 U.S.C. § 1129(a)(2) .................................................................................... 25

11 U.S.C. § 1129(a)(3) .................................................................................... 25, 26, 52

11 U.S.C. § 1129(a)(4) .................................................................................... 26, 27

11 U.S.C. § 1129(a)(5) .................................................................................... 27, 29

11 U.S.C. § 1129(a)(5)(A)(i) .......................................................................... 27, 28

11 U.S.C. § 1129(a)(5)(A)(ii) ......................................................................... 28

11 U.S.C. § 1129(a)(5)(B) .............................................................................. 28

11 U.S.C. § 1129(a)(6) .................................................................................... 29

11 U.S.C. § 1129(a)(7) .................................................................................... 29, 32

11 U.S.C. § 1129(a)(8) .................................................................................... 32

11 U.S.C. § 1129(a)(9) .................................................................................... 33

11 U.S.C. § 1129(a)(9)(A) .............................................................................. 46

11 U.S.C. § 1129(a)(9)(C) .............................................................................. 2, 35, 46

11 U.S.C. § 1129(b) ........................................................................................ passim

11 U.S.C. § 1129(b)(1) .................................................................................... 41, 42

11 U.S.C. § 1129(b)(2)(B)(ii) ......................................................................... 44

11 U.S.C. § 1129(b)(2)(C)(ii) ......................................................................... 44

11 U.S.C. § 1129(d) ........................................................................................ 45

11 U.S.C. § 1141(a) ........................................................................................ 50

11 U.S.C. § 1141(d)(1) .................................................................................... 48, 49, 51

11 U.S.C. § 1141(d)(1)(A) .............................................................................. 47, 48, 49

11 U.S.C. § 301 .......................................................................................................... 33

11 U.S.C. § 302 .......................................................................................................... 33

11 U.S.C. § 303 .......................................................................................................... 33

11 U.S.C. § 365 .......................................................................................................... 39

11 U.S.C. § 507(a) ..................................................................................................... 33

11 U.S.C. § 507(a)(1) ................................................................................................ 33

11 U.S.C. § 507(a)(2) ................................................................................................ 33

11 U.S.C. § 507(a)(3) ................................................................................................ 33

11 U.S.C. § 507(a)(4) ................................................................................................ 33

11 U.S.C. § 507(a)(5) ................................................................................................ 33

11 U.S.C. § 507(a)(6) ................................................................................................ 33

11 U.S.C. § 507(a)(7) ................................................................................................ 33

11 U.S.C. § 507(a)(8) ................................................................................................ 33

11 U.S.C. § 524(e) ..................................................................................................... 20

28 U.S.C. § 959(a) ..................................................................................................... 51

## **RULES**

Fed. R. Bankr. P. 3016(c) .......................................................................................... 24

Fed. R. Bankr. P. 3017 .............................................................................................. 25

Fed. R. Bankr. P. 3018 .............................................................................................. 25

Fed. R. Bankr. P. 9019 ................................................................................... 15, 16, 18

On January 28, 2010, the above-captioned debtors and debtors-in-possession

(collectively, the "Debtors") filed their final form of *Joint Plan of Reorganization Under*

*Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al.,*

*Debtors* (as modified and supplemented, the "Plan").[2] Following the solicitation of votes with

respect to the Plan, except for three subclasses in Class A3 (Other Secured Claims against certain

of the Encumbered Debtors) one subclass in Class A7 (Tort Claims against The Times News

Publishing Company, one of the Encumbered Debtors), every impaired Class of Claims that was

entitled to vote on the Plan has overwhelmingly voted to accept the Plan. Pursuant to section

1129(b) of the Bankruptcy Code, the Plan is confirmable over the rejection of Class A3 sub-

Classes and the Class A7 sub-Class and the Classes that are deemed to reject the Plan.

 The strong level of support for the Plan among the impaired voting Classes is not

surprising, as the Plan is the product of a compromise and agreement among the Debtors, the

Official Committee of Unsecured Creditors (the "Creditors' Committee"),[3] and the

administrative agent (the "Existing Lender Agent") for the Debtors' pre-petition secured lenders

(collectively, the "Existing Lenders"), in consultation with the Steering Committee Members.[4]

 A hearing to consider confirmation of the Plan (the "Confirmation Hearing") is scheduled

to be held on March 9, 2010 at 10:00 a.m. prevailing Eastern Time. In connection with the

Confirmation Hearing, the Debtors submit this memorandum of law in support of confirmation

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan that was filed on January 28, 2010 [Docket No. 986], as modified by the *First Modification to Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc. et. Al., Debtors*, dated February 24, 2010 [Docket No. 1083] and any future modifications.

[3] The current members of the Creditors' Committee are Pension Benefit Guaranty Corporation, Nelson Gonzalez, Telerep LLC, Pitman Co., and Alan J. Bell.

of the Plan (the "Memorandum") to address the basic requirements set forth in the Bankruptcy Code for confirmation and to address the objections to the Plan. In further support of confirmation of the Plan, the Debtors intend to submit the declarations of (a) Mark McEachen, the Chief Financial Officer of Freedom Communications Holdings, Inc. (the "McEachen Declaration"); (b) LeeAnn Gliha, a director of Houlihan, Lokey, Howard & Zukin Capital, Inc., the Debtors' financial advisors (the "Gliha Declaration"); and (c) Kate Logan of Logan & Company, Inc., the Debtors' claims, noticing and balloting agent (the "Balloting Agent").

In total, the Debtors received four timely objections to confirmation of the Plan. Three of those objections were filed by taxing authorities (the "Taxing Authority Objections") whose Allowed Other Secured Claims will be Reinstated as of the effective date of the Plan (the "Effective Date") in accordance with the provisions of section 1124(2) of the Bankruptcy Code and/or whose Allowed Priority Tax Claims will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, and/or whose post-petition taxes will be satisfied by Administrative Claim treatment that comports with the Bankruptcy Code's requirements.[5] The other timely objection was filed by the Acting United States Trustee for Region 3 (the "U.S. Trustee"). All of the objecting parties have communicated to the Debtors' counsel their willingness to withdraw their objections, other than the U.S. Trustee and the Texas Tax Jurisdictions. The Debtors submit that to the extent these remaining objections remain

---

[4] The Steering Committee Members are Existing Lenders that currently include JPMorgan Chase Bank, N.A., The Bank of New York Mellon, General Electric Capital Corporation, Royal Bank of Scotland PLC, and Wachovia Bank, National Association.

[5] The Taxing Authority Objections were filed by Maricopa County, Arizona [Docket No. 1041]; the United States of America [Docket No. 1089]; and certain Texas tax jurisdictions (consisting of Cameron County, Ector CAD, City of Harlingen, Harlingen CISD, Jefferson County, City of McAllen, Orange County, Pharr-San Juan-Alamo CISD, South Texas College, South Texas ISD, City of Weslaco and Weslaco ISD) (the "Texas Tax Jurisdictions") [Docket No. 1099].

unresolved prior to the Confirmation Hearing, such objections should be overruled in their entirety for the reasons set forth in this Memorandum.

## I.    OVERVIEW OF THE PLAN

The Plan, which has been overwhelmingly approved by creditors entitled to vote, provides a very significant return to creditors. The Plan is the product of intense, contentious, lengthy and arm's-length litigation and negotiation among the Debtors, the Creditors' Committee and the Existing Lender Agent.   For example, many motions that have been filed in these chapter 11 cases were hotly contested.  In addition, (a) in response to discovery demands by the Creditors' Committee, the Debtors produced more than two million pages of documents; (b) the Creditors' Committee took more than a dozen depositions (via Bankruptcy Rule 2004 examinations and in connection with contested matters); and (c) the witnesses who testified in court in connection with such motions were subjected to lengthy and intense cross-examination.

In addition, the Creditors' Committee and/or counsel for Nelson Gonzalez (the chair of the Creditors' Committee) filed motions for authority to solicit alternate restructuring transactions and the appointment of an examiner, and also filed appeals of orders relating to the Debtors' use of cash collateral and the retention of Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") as the Debtors' financial advisor.  Moreover, the Creditors' Committee asserted that it was prepared to commence litigation against the Existing Lenders and the Debtors' board of directors, among others, asserting claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, recovery of various preferential and fraudulent transfers and for subordination of claims.

After months of intense negotiation, discovery, motion practice and litigation, the parties began negotiating the terms of a consensual plan of reorganization.  Those negotiations were

lengthy and arm's length, and involved substantial give and take among the parties. The Debtors participated in these negotiations and formulated the Plan with the good faith intention of reorganizing as going concerns.

## A. Summary of the Plan

The restructuring proposal embodied in the Plan strengthens the Debtors' capital structure, preserves the Debtors' core business and operations and positions the Debtors to prosper in the future. The Plan also provides very significant recoveries to holders of Allowed Claims against the Debtors. In brief, the Plan:[6]

(a)     separately classifies the Claims against and Interests in (A1 through A11) the Encumbered Debtors which are the Debtors against which the Existing Lenders hold Claims, and the Claims against and Interests in (B1 through B5) the Unencumbered Debtors, which are Debtors against which the Existing Lenders hold no Claims;

(b)     provides for full payment of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims;

(c)     provides for holders of Allowed Other Secured Claims against the Encumbered Debtors, at the option of the Debtors with the agreement of the Steering Committee Members: (i) to have their rights reinstated on the Effective Date in accordance with section 1124(2) of the Bankruptcy Code, (ii) to retain their Liens securing their Allowed Other Secured Claims and receive regular installment payments (over a period of up to five years after the Petition Date) in Cash with a total value equal to such Allowed Other Secured Claim, (iii) to receive the collateral securing such Allowed Other Secured Claim on the Distribution Date, or (iv) to receive payment in full on the Distribution Date;

(d)     provides for holders of Allowed Other Secured Claims against the Unencumbered Debtors to have their rights reinstated on the Effective Date in accordance with section 1124(2) of the Bankruptcy Code;

---

[6] This summary is provided for ease of reference only, and is subject in all respects to the terms of the Plan itself. A chart summarizing the material terms, treatment and distributions to holders of Allowed Claims against and Interests in the Debtors under the Plan is included in Article I.B. of the Disclosure Statement, dated January 28, 2010 [Docket No. 987] (the "Disclosure Statement"). Nothing herein shall be deemed to be an amendment or modification of the Plan. To the extent that there is any inconsistency between this summary and the terms of the Plan, the terms of the Plan shall control.

(e)     provides for the Existing Lenders to (i) become creditors under two new secured term loan facilities to be entered into by the Reorganized Debtors, in the aggregate principal amount of $325 million, (ii) receive 100% of the shares of new common stock of reorganized Freedom Communications Holdings, Inc. ("Freedom Holdings") (subject to dilution as set forth in the Plan), and (iii) receive the amount of cash held by the Reorganized Debtors as of the Effective Date that exceeds $15 million (subject to the terms and conditions of the Plan);

(f)     provides for holders of Allowed General Unsecured Claims against the Encumbered Debtors to receive (i) Cash in the aggregate amount of $14.5 million less the amount needed to fund the future costs of the Litigation Trust and (ii) the proceeds (if any) received by the Litigation Trust from the pursuit of certain limited causes of action that are described in detail in the Plan;

(g)     provides for holders of Allowed General Unsecured Claims against the Unencumbered Debtors to have their rights reinstated on the Effective Date in accordance with section 1124(2) of the Bankruptcy Code;

(h)     provides for Non-Qualified Retirement Claims to be reinstated on modified terms that are set forth in the Plan, which will allow holders of such Non-Qualified Retirement Claims to continue receiving a significant portion of their benefits after the Effective Date;

(i)     provides for holders of Allowed Tort Claims to assert such Claims under the Debtors' applicable insurance policies; and

(j)     provides the holders of Subordinated Claims, Old Freedom Stock Interests and Old Freedom Stock Rights shall not receive or retain any property under the Plan or otherwise on account of such Subordinated Claims, Old Freedom Stock Interests or Old Freedom Stock Rights.

The keystone of the Plan is a compromise and settlement among the Debtors, the Creditors' Committee, and the Existing Lender Agent in consultation with the Steering Committee Members, which compromise and settlement are the result of extensive arm's length negotiations between the parties and their advisors. The Plan provides meaningful recoveries to holders of most classes of Allowed Claims against the Debtors. It bears noting that creditors of the Encumbered Debtors would not be entitled to any recoveries on account of their Allowed Claims under the Bankruptcy Code's absolute priority rule, because (a) the Existing Lenders

have perfected security interests in substantially all of the Encumbered Debtors' assets, either directly or indirectly,[7] and (b) the value of those assets is significantly less than the amount of the Existing Lenders' Claims against the Encumbered Debtors under that certain credit agreement dated May 18, 2004, as amended, and is in the aggregate approximate amount of approximately $772 million (the "Credit Agreement").

The Creditors' Committee has alleged that there exist legal bases to avoid and/or subordinate the Existing Lenders' liens and Claims, and that the Encumbered Debtors possess assets that are not encumbered by the Existing Lenders' liens. The Debtors and the Steering Committee Members strongly disagree with these allegations. However, any attendant litigation would necessarily be at considerable expense to all parties, take time to adjudicate, and be wrought with uncertainty. The Debtors submit that without the compromises and settlements embodied in the Plan, creditors of the Encumbered Debtors (other than the Existing Lenders) would be legally entitled to no recovery, absent a successful challenge by the Creditors' Committee to avoid and/or subordinate the Existing Lenders' liens and Claims. The Debtors submit that the Plan provides significant recoveries to holders of Allowed General Unsecured Claims against the Encumbered Debtors, has been accepted by substantially all of the voting Classes of Claims, and yields the maximum recovery possible to all such stakeholders without the risk, uncertainty and cost of litigation.

---

[7] Seven of the Encumbered Debtors are guarantors who have granted a lien on their assets in favor of the Existing Lenders, but their primary assets, consisting of Federal Communications Commission ("FCC") licenses, are not subject to that lien. Nevertheless, the value of the FCC licenses flows to the Existing Lenders, because the holders of the interests of these seven Encumbered Debtors have pledged their Interests to secure their obligations to the Existing Lenders. Thus, if such pledges are valid, the Existing Lenders would assert a right to any value in the assets of these seven Encumbered Debtors in excess of the amount of their obligations.

## B.     Plan Solicitation

With the assistance of the Balloting Agent, the Debtors commenced the solicitation of votes with respect to the Plan on January 28, 2010 by distributing the Plan, the Disclosure Statement and related materials to holders of Claims in Class A2, Class A3 (and each sub-class thereof), Class A4 (and each sub-class thereof), Class A5 and Class A7 (and each sub-class thereof) as required by this Court's January 22, 2010 *Order (I) Approving Disclosure Statement, (II) Determining Dates, Procedures and Forms Applicable to Solicitation Process, (III) Establishing Vote Tabulation Procedures, (IV) Establishing Objection Deadline and Scheduling Hearing to Consider Confirmation of Plan, and (V) Approving Plan Procedure for Assuming Contracts and Leases* (the "Solicitation Order") [Docket No. 962]. Specifically, the Debtors transmitted: (a) a notice of the hearing to consider confirmation of the Plan, in paper form (the "Confirmation Hearing Notice"); (b) a CD containing the Disclosure Statement and all exhibits, including the Plan; (c) an instruction letter for use of the CD or obtaining a paper copy of the Disclosure Statement, in paper form; (d) an appropriate ballot, in paper form; (e) any approved solicitation letters; and (f) a pre-addressed return envelope (collectively, the "Solicitation Package"), to all known holders of the applicable Classes of Claims as of January 21, 2010 at 5:00 p.m. prevailing Eastern Time (the "Voting Record Date"). The Voting Record Date for the Existing Lenders was January 22, 2010 at 5:00 p.m. prevailing Eastern Time.

In addition, as required by the Solicitation Order, through the Balloting Agent, the Debtors transmitted to holders of Administrative Claims, Priority Tax Claims and Other Priority Claims against the Encumbered Debtors in Class A1, Other Priority Claims against the Unencumbered Debtors in Class B1, Other Secured Claims against the Unencumbered Debtors in Class B2, General Unsecured Claims against the Unencumbered Debtors in Class B3, and

Subsidiary Interests in the Unencumbered Debtors in Class B5 (collectively, the "Unimpaired Classes"), a notice of non-voting status in lieu of the Solicitation Package. Through the Balloting Agent, Debtors also transmitted to holders of Subordinated Claims in Class A8, Old Freedom Stock Interests in Class A10 and Old Freedom Stock Rights in Class A11 (the "Deemed Rejecting Classes") a notice of deemed rejection status in lieu of a Solicitation Package.

The Debtors published the Confirmation Hearing Notice in the national edition of *The New York Times* and the *Orange County Register*, as required by the Solicitation Order. Moreover, even though they were not required to do so, the Debtors also published the Confirmation Hearing Notice in the local daily newspapers owned and operated by the Debtors, and in a newspaper serving each of the Debtors' broadcast markets, specifically: *Chattanooga Times Free Press*; *Medford Mail Tribune*; *Palm Beach Post*; *Daily Gazette*; *Lansing State Journal*; *The Beaumont Enterprise*; *Battle Creek Enquirer*; *The Destin Log*; *The Walton Sun*; *Yuma Sun (The Sun)*; *Jacksonville Daily News (The Daily News)*; *New Bern Sun Journal (Sun Journal)*; *Kinston Free Press (The Free Press)*; *Jones Post*; *Appeal-Democrat*; *Colusa Sun-Herald*; *Corning Observer*; *Orlando Press-Register*; *Willows Journal*; *Odessa American*; *The Tribune*; *The Lima News*; *Jacksonville Journal Courier (Journal Courier)*; *The Telegraph*; *Porterville Recorder*; *The Monitor*; *The Gaston Gazette*; *Daily News-Sun*; *Surprise Today*; *Peoria and Glendale Today*; *Daily Press*; *The Desert Dispatch*; *Hesperia Star*; *Lucerne Valley Leader (The Leader)*; *El Mojave*; *The Brownsville Herald*; *The Gazette*; *Mesa Tribune*; *Gilbert Tribune*; *Chandler Tribune*; *Queen Creek Tribune*; *The Shelby Star (The Star)*; *Valley Morning Star*; *Island Breeze*; *Panama City News Herald (The News Herald)*; *Burlington Times (Times-*

*News)*; *The Sedalia Democrat*; *Clovis News-Journal*; *Portales News-Tribune*; *Quay County Sun*; and *Ahwatukee Foothills News*.

Pursuant to the Solicitation Order, the deadline for returning ballots accepting or rejecting of the First Amended Plan was March 1, 2010 at 4:00 p.m. prevailing Eastern Time. Thus, the voting parties were given 31 days after solicitation was commenced to vote on the Plan.

## C.      Results of the Plan Solicitation

Pursuant to section 1126(f) of the Bankruptcy Code, Class A1 (Other Priority Claims against the Encumbered Debtors), Class B1 (Other Priority Claims against the Unencumbered Debtors), Class B2 (Other Secured Claims against the Unencumbered Debtors), Class B3 (General Unsecured Claims against the Unencumbered Debtors), Class B4 (Intercompany Claims against the Unencumbered Debtors) and Class B5 (Subsidiary Interests against the Unencumbered Debtors) would be unimpaired and thus are deemed to have accepted the Plan and not entitled to vote.

Pursuant to section 1126(g) of the Bankruptcy Code, Class A8 (Subordinated Claims against Encumbered Debtors), Class A10 (Old Freedom Stock Interests) and Class A11 (Old Freedom Stock Rights) would not receive or retain any property under the plan on account of such Claims or Interests and thus are deemed to have rejected the Plan. The Debtors seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code as to such Classes.

All of the Impaired Classes that were entitled to vote have accepted the Plan, except for three sub-Classes in Class A3 (Other Secured Claims against certain of the Encumbered Debtors) one sub-Class in Class A7 (Tort Claims against The Times News Publishing Company, one of the Encumbered Debtors). *See Declaration of Kate Logan Certifying the Ballots Accepting or*

*Rejecting the Debtors' Plan of Reorganization*, which will be filed with this Court (the "Voting Declaration").

## II. THE PLAN SHOULD BE CONFIRMED BECAUSE IT COMPLIES WITH ALL OF THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE

### A. Section 1129(a) Requirements

#### 1. The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization if "[t]he plan complies with the applicable provisions of this title." The phrase "applicable provisions" has been interpreted to include sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the contents of a plan of reorganization. *See, e.g., Kane v. Johns-Mansville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988); *In re Century Glove, Inc.*, 1993 WL 239489, at *6 (D. Del. Feb. 10, 1993).

#### a. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if it is substantially similar to other claims or interests in the class. *See In re Caldwell*, 76 B.R. 643, 644 (Bankr. E.D. Tenn. 1987). Claims or interests in a class need not be identical, but should be similar in legal character or effect with respect to the debtor. *See In re AOV Indus., Inc.*, 792 F.2d 1140, 1150-51 (D.C. Cir. 1986) (affirming plan confirmation where claims guaranteed by third party were grouped with non-guaranteed claims).

Section 1122(a) of the Bankruptcy Code does not require placement of all claims that are substantially similar in the same class, simply because they may share some attributes. *See, e.g., In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("[t]he express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not,

though, address the presence of similar claims in different classes."). The debtor must simply advance a legitimate reason supported by credible proof for the separate classification. *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. Inc. (In re U.S. Truck Co.)*, 800 F.2d 581, 585 (6th Cir. 1986) (affirming plan confirmation over objection by collective bargaining unit, finding that section 1122(a) "does not require that similar claims be grouped together, but merely that any group created must be homogenous"). Thus, section 1122 of the Bankruptcy Code provides debtors with significant flexibility to create classification schemes that will facilitate reorganization.

The Plan designates a total of sixteen classes of Claims against and Interests in the Debtors. This classification scheme complies with section 1122(a) of the Bankruptcy Code because each class contains only claims or interests that are substantially similar to each other. Furthermore, the classification scheme created by the Plan is based on the similar nature of Claims or Interests contained in each class and not on an impermissible purpose. Finally, similar claims have not been placed into different classes to affect the outcome of the vote on the Plan. Because each class consists of only substantially similar claims or interests, this Court should approve the classification scheme as set forth in the Plan as satisfying section 1122(a) of the Bankruptcy Code.

### b. The Plan Satisfies the Requirements of Section 1123 of the Bankruptcy Code.

#### (1) Mandatory Provisions

The Plan meets the seven mandatory requirements of sections 1123(a)(1)-(7) of the Bankruptcy Code,[8] which require that a plan (1) designate classes of claims and interests; (2)

---

[8] Section 1123(a)(8) of the Bankruptcy Code is applicable only in cases in which the debtor is an individual.

specify unimpaired classes of claims and interests; (3) specify treatment of impaired classes of claims and interests; (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest; (5) provide adequate means for implementation of the plan; (6) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (7) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.

Specifically, Article II of the Plan designates classes of claims and interests, as required by section 1123(a)(1) of the Bankruptcy Code. Article III and Article IV of the Plan specify the classes of claims and interests that are unimpaired under the Plan, as required by section 1123(a)(2), as well as the treatment of each class of claims and interests that is impaired, as required by section 1123(a)(3) of the Bankruptcy Code. The Plan also satisfies section 1123(a)(4) of the Bankruptcy Code because the treatment of each claim or interest within a class is the same as the treatment of each other claim or interest within that class.

Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation," and gives several examples of what may constitute "adequate means." Article V of the Plan sets forth the means for implementation of the Plan, including for example the closing of the Exit Facility, the issuance of the New Securities, the formation of the Litigation Trust, and Article V of the Plan sets forth the means by which distributions will be made to holders of Allowed Claims, which will be adequate to implement the Plan.

Under section 1123(a)(6) of the Bankruptcy Code, a corporate debtor's plan must provide that the debtor's corporate charter will prohibit the issuance of nonvoting equity securities. The

Reorganized Debtors' proposed new corporate charters, the forms of which are included in the plan supplement that was filed on February 24, 2010 [Docket No. 1087] (the "Plan Supplement"), comply with the requirements of section 1123(a)(6).

Section 1123(a)(7) of the Bankruptcy Code states that a plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). The continuing officers and the continuing and new directors of the Reorganized Debtors will be appointed in a manner consistent with the interests of holders of Claims and Interests and with public policy, and the manner in which successor officers and directors will be chosen is also consistent with those interests and with public policy. Sections 5.7 and 5.8 of the Plan set forth the means by which the Reorganized Debtors' officers and directors would be selected. The Debtors' *Notice of Designation of Directors Pursuant to Section 5.7(a) of Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et. al., Debtors*, filed on February 24, 2010 [Docket No. 1085] (the "D&O Designation Notice") identifies the individuals proposed to serve, after the Effective Date, as directors of the Reorganized Debtors.[9] No party has suggested that the Plan provisions for the manner of selection of officers and directors and their successors are inconsistent with public policy or the interests of creditors and equity security holders. The Plan therefore complies with section 1123(a)(7) of the Bankruptcy Code.

### (2)    Certain Permissive Provisions

---

[9] It is possible that the list will be modified through an amended notice to be filed with this Court.

Section 1123(b) of the Bankruptcy Code describes certain permissive plan provisions, some of which the Plan contains. For example, as permitted by section 1123(b)(2) of the Bankruptcy Code, Article VI of the Plan provides for the assumption or rejection of certain of the Debtors' executory contracts and unexpired leases. Furthermore, as permitted by section 1123(b)(3)(B) of the Bankruptcy Code, section 5.17 of the Plan provides for the creation of a litigation trust (the "Litigation Trust") that may prosecute and/or settle the Debtors' estates' causes of action against certain parties, subject to the terms and limitations set forth in that section of the Plan.

### (3) Approval of the Compromises and Settlements Embodied in the Plan

As permitted by section 1123(b)(3)(A) of the Bankruptcy Code and as stated in section 5.18 of the Plan, the Plan represents compromises and settlements of certain legal issues that currently exist among the Debtors, the Existing Lender Agent, the Existing Lenders, and the Creditors' Committee. As noted above, these compromises and settlements will permit most classes of Allowed Claims against the Encumbered Debtors to receive meaningful recoveries without the delays and significant uncertainties that would arise if the Creditors' Committee were to litigate the claims and causes of action it believes exist against the Existing Lenders. If the Creditors' Committee were to lose in litigation against the Existing Lenders, holders of Allowed Claims against the Encumbered Debtors (other than the Existing Lenders) would be legally entitled to zero recoveries under the strict application of the Bankruptcy Code's absolute priority rule. Even if the Creditors' Committee were to prevail in litigation against the Existing Lenders, holders of Allowed Claims against the Encumbered Debtors likely would not receive any recoveries under a chapter 11 plan until much later.

To the extent necessary, the Plan is a motion for approval of the compromises and settlements embodied therein. Ample authority exists to approve such compromises and settlements under section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Where a compromise is part of a plan, bankruptcy courts have a duty to determine if the proposed compromise is "fair and equitable." *In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (Bankr. D. Del. 2004). "The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019." *Id.* Under Bankruptcy Rule 9019, approval of a proposed settlement is within the "sound discretion" of the bankruptcy court. *See, e.g.*, *In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in *Meyers v. Martin (In re Meyers)*, 91 F.3d 389 (3d Cir. 1996). The bankruptcy court should not substitute its judgment for that of the debtor. *Neshaminy*, 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983). In other words, the court does not need to make a determination that the settlement is the best possible compromise. *In re Key3Media Group, Inc.*, 336 B.R. at 93.

The Third Circuit has enumerated the following four-factor test to be used in deciding whether to approve a compromise or settlement: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re RFE Indus., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002) (citation omitted).

Here, the relevant Rule 9019 factors are satisfied. First, the probability of success in litigation cannot be precisely calculated. The Creditors' Committee believes that it is likely to

succeed in prosecuting the claims and causes of action it thinks the Debtors' estates have against the Existing Lender Agent and the Existing Lenders. However, the Debtors disagree, and believe that the Creditors' Committee's chances of success are small. Second, the Creditors' Committee would likely not face difficulties in collection on any final judgment against the Existing Lender Agent and the Existing Lenders. Third, any litigation would be extremely complex, and the expense, inconvenience and delay attending such litigation would be considerable. Such litigation would create significant litigation expenses that would have to be borne by the estates, and litigation would delay any distributions to holders of Allowed Claims under a reorganization plan. Fourth, the Debtors believe that the settlement embodied in the Plan are in the paramount interest of their creditors.

### (4) Release, Exculpation, Injunction and Limitation of Liability Provisions of the Plan

In connection with the compromises and settlements embodied therein, the Plan also includes certain limited release, exculpation, injunction and limited liability provisions that are appropriate under the facts of these chapter 11 cases and that are permissible under established legal precedent in this jurisdiction. In summary, section 11.9(a) of the Plan provides for the Debtors' release of (a) certain of the Debtors' estates' claims, rights and causes of action against any of the other Debtors and their non-Debtor affiliates; (b) the Debtors' current and former directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or affiliates;[9] and (c) the Existing Lenders, the Existing Lender Agent and any of their current and former directors, officers, employees, advisors, attorneys, professionals, agents, partners,

---

[9] Subject to the limitations set forth in section 5.17 of the Plan, the Debtors' estates would *not* be releasing claims, rights and causes of action against the current or former directors of Freedom Holdings and Freedom Communications and the current interim chief executive officer of Freedom Holdings that arose under applicable law prior to the Petition Date. The Litigation Trust would pursue those claims, rights and causes of action subject to the limitations of section 5.17 of the Plan.

stockholders or affiliates in their capacities as such (the parties described in (b) and (c) above, the "Released Parties"). Section 11.9(a) of the Plan also provides for the release of all of the Debtors' estates' claims, rights and causes of action arising under chapter 5 of the Bankruptcy Code against any provider of goods or services to the Debtors.

Moreover, section 11.9(b) of the Plan provides that each holder of a Claim that votes to accept the Plan shall be deemed to forever release, waive, and discharge all claims, rights and causes of action against the Released Parties.[10] It must be emphasized that the Plan does *not* include non-consensual, third-party releases of claims and causes of action against the Released Parties. Rather, section 11.9(b) of the Plan provides for third-party releases only by those who vote to accept the Plan. Such a provision is permissible pursuant to established legal precedent in this jurisdiction. *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999).

The releases contained in section 11.9 of the Plan and the exculpation, injunction and limitation of liability provisions contained in sections 11.11 and 11.12 of the Plan were negotiated and agreed upon at arm's length and in good faith by the Debtors, the Existing Lender Agent in consultation with the Steering Committee Members and the Creditors' Committee. These parties agree that these provisions are integral components of the compromise and settlement embodied in the Plan, and were designed to resolve potential litigation in connection with activities during and prior to these chapter 11 cases.

The Debtors, who have a fiduciary obligation to maximize value for their estates, do not believe that valid claims or causes of action exist against the Released Parties. Moreover, the

---

[10]   Additionally, section 11.9(b) of the Plan provides that the Released Parties would release claims and causes of action that are based on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date relating to the Debtors, their estates, the Reorganized Debtors, the chapter 11 cases, the conduct of the Debtors' business or the Plan (other than the rights under the Plan and the contracts and other documents delivered thereunder) against holders of Claims that vote to accept the Plan.

Debtors, the Creditors' Committee, and the Existing Lender Agent (in consultation with the Steering Committee Members) have consented to the Plan's release, exculpation, injunction and limitation of liability provisions after having had ample opportunity to review, analyze and pursue and all potential causes of action against those who benefit therefrom. The Debtors submit that the Plan's release, exculpation, injunction and limitation of liability provisions are the product of good faith and arm's-length negotiations in connection with the global settlement reached between the parties, have been critical to obtaining the support of the various constituencies for the Plan, are not objected to by any party in interest and, as part of the Plan, have been accepted by all classes of impaired Classes that voted to accept the Plan. In addition, Court approval of the Plan's release, exculpation, injunction and limitation of liability provisions will eliminate the costs and risks of litigation, are part and parcel of a comprehensive global settlement that provides holders of Allowed Claims against the Encumbered Debtors to receive meaningful recoveries promptly, and will allow the Reorganized Debtors to focus on operations after emergence, rather than being distracted by litigation.

While some courts have focused solely on the Rule 9019 standards in evaluating debtor releases of third parties in a plan (*see In re AAIPharma, Inc.*, Case No. 05-11341 (PJW), Transcript of Record at 44-45 [Docket No. 893] (Bankr. D. Del. Jan. 18, 2006)), others focus upon "additional factors ... relevant to determine the fairness of the compromise." *Coram Healthcare*, 315 B.R. at 335 (*citing Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 212-214 (3d Cir. 2000); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999). In the *Zenith* case, the bankruptcy court applied the factors identified in *In re Master Mortgage*, 168 B.R. 930, 934 (Bankr. W.D. Mo. 1994), in connection with examination of debtor releases. The

*Master Mortgage* court approved releases and indicated that the following five factors were important to its decision:

i. There is an identity of interest between the debtor and the third party such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

ii. The non-debtor has contributed substantial assets to the reorganization;

iii. The injunction is essential to the reorganization (without it, there is little likelihood of success);

iv. A substantial majority of the creditors have agreed to support the injunction. Specifically, the impacted class, or classes, "overwhelmingly" votes to accept the proposed plan treatment; and

v. The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*Master Mortgage*, 168 B.R. at 935. However, the principal focus of the release discussion in the *Master Mortgage* case was not a debtor release, but a plan provision enjoining creditors and equity security holders from asserting claims against the debtor's largest secured creditor. Likewise, in *Continental*, the Third Circuit was faced with a plan provision authorizing the non-consensual release and permanent injunction of shareholder lawsuits against present and former officers and directors of the debtors. *See Continental*, 203 F.3d at 205.

Here, the releases by non-debtors that are set forth in section 11.9(b) of the Plan are strictly consensual, granted as a result of each such claimant's voting in favor of the Plan. Moreover, the Debtors' releases in section 11.9(a) of the Plan are also consensual, granted in the context of the global settlement achieved among the Debtors, the Existing Lender Agent and the Creditors' Committee. As the Third Circuit held in *In re PWS Holding Corp.*, 228 F.3d at 245 n.21, its holding in *Continental* should not be extended to serve as a standard by which debtor releases should be measured. "Section 524(e) [of the Bankruptcy Code] provides that the

bankruptcy discharge of the debtor does not operate to relieve non-debtors of their liabilities, but by its terms it does not govern provisions in a plan by which a debtor releases its own claims against third parties." *Id.* Accordingly, the Debtors submit that the Court need not engage in a *Master Mortgage* inquiry as to whether additional factors exist to support the grant of the Debtors' releases of the Released Parties. Nevertheless, the Debtors submit that the *Master Mortgage* factors support approval of the Plan's release, exculpation, injunction and limitation of liability provisions.

First, the Existing Lender Agent and the Existing Lenders enjoy a right to contractual indemnity under the Debtors' credit facility. Section 9.05 of the Debtors' pre-petition credit agreement grants the Existing Lender Agent and the Existing Lenders an indemnity by Freedom Communications, Inc. for certain losses or expenses they may incur. Additionally, the current and former officers, directors, employees and agents of Freedom Holdings and Freedom Communications, Inc. ("Freedom Communications") are entitled to indemnification to the fullest extent authorized by Delaware law, pursuant to those Debtors' certificates of incorporation and bylaws.[11] Since a suit against the Existing Lender Agent, the Existing Lenders, or current or former directors and officers would likely give rise to indemnification claims against the Debtors' estates, thereby depleting those estates and diluting creditor recoveries, the releases provided for in the Plan are appropriate.

Second, the Debtors believe that because the Existing Lenders have security interests in substantially all of the assets of the Encumbered Debtors, either directly or indirectly, and because the Existing Lenders' claims are undersecured, no other creditors of the Encumbered

---

[11] Delaware General Corporation Law section 145 allows a company to indemnify any person sued as a director, officer, employee or agent of the company "if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."

Debtors would be legally entitled to recoveries under the Bankruptcy Code's absolute priority rule. Nevertheless, the Existing Lenders, who have agreed to restructure their secured debt and to be repaid over a period of years after the Debtors' reorganization, are converting a substantial amount of their pre-petition secured debt into equity under the Plan, and have agreed to a Plan that would provide significant recoveries to holders of Allowed Claims against the Encumbered Debtors. For example, under the Plan, the Existing Lenders have agreed to provide for the following recoveries to creditors from their collateral: (a) $14.5 million cash for the ultimate benefit of holders of Allowed General Unsecured Claims against the Encumbered Debtors; (b) a 70% reinstatement of Allowed Non-Qualified Retirement Claims; and (c) $5.5 million for payment to certain trade vendors that meet the requirements to participate in the Post-Emergence Trade program. Additionally, the Existing Lenders agreed to waive their unsecured deficiency claim.

Moreover, the Creditors' Committee has communicated to the Debtors its belief that the Debtors' estates have significant claims and causes of action to avoid and/or subordinate the Existing Lenders' liens and claims, and that the Encumbered Debtors possess assets that are not encumbered by the Existing Lenders' liens. Under the Plan, the Creditors' Committee has agreed to the settlement and release of such claims and causes of action, in exchange for the recoveries to be provided to holders of Allowed Claims against the Encumbered Debtors under the Plan. Because of the concessions between the Existing Lenders and the Creditors' Committee to settle and compromise the claims and causes of action the Creditors' Committee believes to exist against the Existing Lenders, the Debtors will be promptly able to satisfy claims entitled to administrative and priority treatment in full, and to distribute value through the Plan to creditors of the Encumbered Debtors – value that, if the Debtors were forced to liquidate their

assets, would not be sufficient to pay administrative and priority claims in full, and would be inadequate for the Debtors to propose a confirmable plan. *See In re AOV Indus.*, 792 F.2d 1140, 1142 (D.C. Cir. 1986) (holding that creditor's release of claims as part of negotiation of chapter 11 plan constituted a substantial contribution to reorganization).

As stated in the Gliha Declaration, the Debtors' management, together with Houlihan Lokey, prepared a liquidation analysis (the "Liquidation Analysis"). A copy of the Liquidation Analysis is attached to the Disclosure Statement as Exhibit 10. The Liquidation Analysis was completed after extensive due diligence by the Debtors and Houlihan Lokey and includes a detailed description of the assumptions, analysis and result of a hypothetical chapter 7 liquidation of the Debtors. As set forth in the Liquidation Analysis, the undisputed result of the collective efforts of the parties who negotiated the terms of the Plan has been the Debtors' ability to propose a Plan that provides recoveries for classes of Allowed Claims against the Encumbered Debtors that equal or exceed what they would obtain in a liquidation. Notably, absent the compromises and settlements reflected in the Plan, it is possible that such creditors (other than the Existing Lenders) would have received no distributions on account of their Allowed Claims.

The Debtors' officers and directors contributed, among other ways, through the stable maintenance of the Debtors' business operations during this restructuring process, at a time of continued upheaval in the U.S. economy. *See Zenith*, 241 B.R. at 111 (officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring with the plan funder). In addition, many of the parties being released under the Plan have played a principal role in orchestrating the ultimate compromises set forth in the Plan, thereby contributing in a substantial way to the Debtors reaching this result, which is in the best interests of all creditors and parties in interest. *Id.* at 110

(released parties "instrumental in formulating the Plan, ... share an identity of interest with [the debtor] in seeing that the Plan succeed and the company reorganize").

Third, the release, exculpation, injunction and limitation of liability provisions are integral elements of the Plan. The Plan represents an agreement among the parties in the Debtors' chapter 11 cases, which is premised on all of its mutually-interdependent elements, including the releases. Without the releases, the Debtors, the Existing Lender Agent and the Creditors' Committee would not have agreed to the global Plan settlement, which settlement directly benefits holders of the Debtors' estates and creditors.

Fourth, almost all of the Classes of Claims that are entitled to vote have overwhelmingly approved the Plan, and no party or person that would be economically affected by the proposed release, exculpation and injunction provisions has presented an objection to these features of the Plan. Further, the non- Debtor releases contained in section 11.9(b) of the Plan, to the extent granted by holders of Claims entitled to vote, were granted solely at the option of the voting claimant.

Fifth, the only interested parties arguably affected by the Debtors' release of the Released Parties are those whose rights are impaired under the Plan. Here, the Liquidation Analysis demonstrates that, by virtue of the global resolution of all matters through the Plan as opposed to a liquidation, the releases are fair. This is particularly true, given that the distribution that the holders of Allowed Claims against the Encumbered Debtors will receive is solely because of the substantial contributions by the Released Parties. Accordingly, the Debtors submit that any collateral rights that claimants might forego as a result of the releases under the Plan are overshadowed by the real consideration that such claimants are entitled to receive under the Plan.

Consensual third party releases such as those in the Plan are commonly approved in this District. *See, e.g., In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. April 17, 2009); *In re Mrs. Fields' Original Cookies, Inc.*, Case No. 08-11953 (PJW) (Bankr. D. Del. October 2, 2008); *In re Nellson Nutraceutical, Inc.*, Case No. 06-10072 (CSS) (Bankr. D. Del. September 10, 2008); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008); *In re Meridian Automotive Systems Composites Operations, Inc.*, Case No. 05-11168 (MFW) (Bankr. D. Del. December 6, 2006); *In re Pliant Corp.*, Case No. 06-10001 (MFW) (Bankr. D. Del. June 23, 2006); *In re America Online Latin America*, Case No. 05-11778 (KG) (Bankr. D. Del. April 25, 2006).

Articles IV.I.3, IV.I.4, IV.I.6, and IV.I.8 of the Disclosure Statement and sections 11.9, 11.11 and 11.12 of the Plan comply with the requirements of Bankruptcy Rule 3016(c) that "the plan and disclosure statement shall describe in specific and conspicuous language (bold, italics, or underlined text) all acts to be enjoined and entities that would be subject to the injunction." The applicable release, exculpation, injunction and limitation of liability provisions are clearly identified in the Plan and Disclosure Statement, are displayed in bold font, and specifically identify all acts to be enjoined and identify all entities that would be subject to the injunction.

In its objection to the Plan, the U.S. Trustee noted that the Debtors bear the burden at the Confirmation Hearing to demonstrate how the parties to be released under the Plan satisfy the *Master Mortgage* standards. The Debtors submit that, based on the circumstances and the record of the Debtors' chapter 11 cases and the record that will be adduced at the Confirmation Hearing (including the Declaration of Mark McEachen in support of confirmation of the Plan, which will be filed with this Court prior to the Confirmation Hearing), the paramount interest of creditors and other parties-in-interest supports the inclusion of the release, exculpation, injunction and

limitation of liability provisions as permissible elements of the Plan, are reasonable and appropriate, and, therefore, should be approved.

### 2. The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent comply with the applicable provisions of the Bankruptcy Code. Here, the Debtors have complied with the provisions of the Bankruptcy Code and the Bankruptcy Rules, including without limitation sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018 regarding the Disclosure Statement and the Plan solicitation. Accordingly, the requirements of section 1129(a)(2) have been satisfied. *See, e.g., In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (Section 1129(a)(2) is satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to plan).

### 3. The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden by Law (Section 1129(a)(3)).

Section 1129(a)(3) of the Bankruptcy Code requires a plan to have been "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (citations omitted). In determining whether a plan has been proposed in good faith, courts have recognized that they should avoid applying any hard and inflexible rules, but should instead evaluate each case on its own merits. *See In re Century Glove*, Civ. No. 90-400-SLR, 1993 WL 239489 at *4 (D. Del. Feb. 10, 1993) (good faith should be evaluated in light of

the totality of circumstances surrounding confirmation); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (same).

The Debtors proposed the Plan in good faith and not by any means forbidden by law. The Plan itself, the process leading to its formulation, and the support for the Plan received from all Classes entitled to vote except for three subclasses of Class A3 and one subclass of Class A7, provide independent evidence of the Debtors' good faith. The Debtors and their directors, officers, employees, agents, affiliates and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, thereby satisfying the "good faith" requirement of section 1129(a)(3) of the Bankruptcy Code.

### 4. Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Court Approval (Section 1129(a)(4)).

Section 1129(a)(4) of the Bankruptcy Code provides that a bankruptcy court shall confirm a plan only if "[a]ny payment made or to be made by the proponent, [or] by the debtor, … for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." *See, e.g., In re Texaco, Inc.*, 85 B.R. 934, 939 (Bankr. S.D.N.Y. 1988). Except as otherwise provided in the Plan or certain prior orders of this Court, any payments made or to be made for services or for costs and expenses incurred in connection with these chapter 11 cases are subject to this Court's approval. For example, fees to be paid to the Debtors' retained professionals are subject to objection by interested parties and this Court's approval, through the fee application process.

Additionally, the Debtors will incur fees and costs under the Plan in connection with various aspects of implementation. For instance, the Plan provides for the creation of a Broadcast Trust to facilitate FCC approvals. The Broadcast Trust Agreement has been filed in

the Plan Supplement. As set forth therein, the Broadcast Trustee will be entitled to compensation from the Debtors of $12,500 per month and reimbursement of reasonable expenses. In addition, the Plan provides for the creation of a Litigation Trust. Under the Litigation Trust Agreement, which has been filed in the Plan Supplement, the Litigation Trustee is entitled to compensation from the Litigation Trust of $4,000 per month and reimbursement of reasonable expenses. In addition, the Plan provides for the Existing Lenders to receive new loans under the Term A Facility, under which JPMorgan Chase Bank, N.A. will serve as agent, and under the Term B Facility, under which The Bank of New York Mellon will serve as agent. The Debtors will be required pay certain fees, including at closing and on an annual basis, and to reimburse certain expenses to the agents. Similarly, the Debtors will be required to pay fees and expenses to General Electric Capital Corporation, the agent under the Exit Facility, as set forth in the Exit Facility commitment letter included in the Plan Supplement. The Debtors submit that the fees and expenses to be paid to the various agents are standard in term and revolving credit facilities and not in excess of market rates. The Debtors will also require the services of a Disbursing Agent to assist with distributions under the Plan. The Plan provides that the Debtors may pay reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services, on any agreed terms. The Debtors will also be responsible for the fees and expenses of a stock transfer agent for the New Common Stock and a warrant agent for the Existing Lender Warrants. Based on the foregoing, the Debtors submit that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

     **5.    The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers and Insiders (Section 1129(a)(5)).**

Section 1129(a)(5) of the Bankruptcy Code contains three requirements. First, pursuant to section 1129(a)(5)(A)(i), the proponent of a plan must disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director [or] officer … [of] a successor to the debtor under the plan." 11 U.S.C. § 1129(a)(5)(A)(i). The method for selecting each of the persons who will serve as directors and officers of the Reorganized Debtors is discussed in sections 5.7 and 5.8 of the Plan. The identities of the proposed directors and officers of the Reorganized Debtors are set forth in the D&O Designation Notice.

Second, section 1129(a)(5)(A)(ii) requires that the appointment or continuance in office of each director or officer must be "consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A)(ii). Pursuant to section 5.7 of the Plan, the initial board of directors of Reorganized Freedom Holdings shall be comprised of up to seven directors, initially consisting of up to six independent and disinterested directors acceptable to the Steering Committee Members and the chief executive officer of Reorganized Freedom Holdings. The Plan provides that the existing directors of the Reorganized Subsidiary Debtors would continue to serve in their same respective capacities after the Effective Date, until replaced or removed in accordance with the governing documents or company policy of the applicable reorganized Debtor, or until any of such individual's voluntary resignation. In the Debtors' view, each of the individuals proposed to serve as an officer or director of Reorganized Freedom Holdings has the requisite background, experience, skill and expertise to serve in such capacity.

Third, section 1129(a)(5)(B) of the Bankruptcy Code requires that the plan proponent disclose "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." 11 U.S.C. § 1129(a)(5)(B). Any required

disclosures, to the extent currently known, were made in the Disclosure Statement, the D&O

Designation Notice or in the Plan Supplement. Accordingly, the Plan satisfies the requirements

of section 1129(a)(5) of the Bankruptcy Code.

> **6.      The Plan Does Not Contain Any Rate Changes**
> **Subject to the Jurisdiction of Any Governmental**
> **Regulatory Commission (Section 1129(a)(6)).**

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission

having jurisdiction over the rates charged by the reorganized debtor in the operation of its

business approve any rate change provided for in the plan. The Plan does not provide for or

contemplate any rate change that would require the approval of any regulatory agency.

Accordingly, section 1129(a)(6) of the Bankruptcy Code is inapplicable in these chapter 11

cases.

> **7.      The Plan is in the Best Interests of**
> **Creditors and Interest Holders (Section 1129(a)(7)).**

The "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code requires

that each holder of a claim or interest in an impaired class either accept the plan or receive or

retain property that is not worth less, as of the effective date of the plan, than the amount that

such holder of the claim or interest would receive or retain if the debtor were liquidated under

chapter 7. 11 U.S.C. § 1129(a)(7). With respect to Class A1 (Other Priority Claims against the

Encumbered Debtors), Class B1 (Other Priority Claims against the Unencumbered Debtors),

Class B2 (Other Secured Claims against the Unencumbered Debtors), Class B3 (General

Unsecured Claims against the Unencumbered Debtors), Class B4 (Intercompany Claims against

the Unencumbered Debtors) and Class B5 (Subsidiary Interests against the Unencumbered

Debtors), section 1129(a)(7) of the Bankruptcy Code is not implicated because these Classes are

unimpaired. The remaining classes are impaired, so the "best interests test" is applied to them.

Under the Plan, the Debtors estimate that (a) holders of Allowed Administrative Claims
Allowed Priority Tax Claims, Allowed Other Priority Claims (Classes A1 and B1) and Allowed
Other Secured Claims (Classes A3 and B2) would receive a 100% recovery on account of such
claims; (b) the Existing Lender Claims (Class A2) would receive a recovery of between 55.1% to
67.8% on account of such claims; (c) holders of Allowed General Unsecured Claims against the
Encumbered Debtors (Class A4) would receive a recovery of between 37.2% to 100% on
account of such claims; (d) holders of Allowed General Unsecured Claims against he
Unencumbered Debtors (Class B3) would receive a 100% recovery on account of such claims;
(e) holders of Non-Qualified Retirement Claims against the Encumbered Debtors (Class A5)
would receive a 70% recovery on account of such claims; (f) Intercompany Claims (Classes A6
and B4) would receive a 100% recovery on account of such claims; and (g) Tort Claims against
the Unencumbered Debtors (Class A7) will receive a recovery on account of such claims that is
subject to (i) the holders prevailing in substantiating the merits of their underlying tort claims
and (ii) applicable insurance coverage. *See* Disclosure Statement, Article I.B.

In contrast, as set forth in detail in the Liquidation Analysis, the proceeds from a
hypothetical chapter 7 liquidation of the Debtors would yield (at the higher end) approximately
$324 million in net proceeds of the estimated range (after taking into account liquidation
expenses). After subtracting liquidation expenses, the proceeds from a hypothetical chapter 7
liquidation would provide each impaired class with the estimated recoveries set forth in the table
below. As shown, none of these estimated chapter 7 recoveries is more than the estimated
recoveries as set forth in the Plan.

| Class | Claim | Highest Estimated Chapter 7 Recovery | Estimated Plan Recovery |
|-------|-------|--------------------------------------|-------------------------|
|       |       |                                      |                         |

| Class | Claim | Highest Estimated Chapter 7 Recovery | Estimated Plan Recovery |
|---|---|---|---|
| Administrative | $16,900,000.00 | 0% | 100% |
| Priority Tax | $0.00 | NA | 100% |
| A1 | $35,000.00 | 0% | 100% |
| A2 | $772,000,000.00 | 42% | 55%-68% |
| A3 | $0.00 | NA | 100% |
| A4 | $39,000,000.00 | 0% | 37%-100% |
| A5 | $17,800,000.00 | 0% | 70% |
| A6 | $4,800,000,000.00 | 0% | 100% |
| A7 | $0.00 | 0% beyond insurance | Subject to insurance coverage |
| A8 | TBD | 0% | 0% |
| A9 | Subsidiary Interest – Encumbered | 0% | 0% |
| A10 | Old Freedom Stock Interests | 0% | 0% |
| A11 | Old Freedom Stock Rights | 0% | 0% |

It also should be noted that the holder of the Class A7 Claim that voted to reject the Plan is no worse off under the Plan than it is in a chapter 7 liquidation. First, both under the Plan and in a chapter 7 liquidation, the holders of Allowed Tort Claims against the Encumbered Debtors would have the legal right to assert such Claims against the Debtors' applicable insurance policies. Nothing in the Plan curtails this right. Second, as a practical matter, the Debtors believe that the proceeds of their existing insurance policies are sufficient to cover all tort claims

that have been asserted to date. Accordingly, the Plan satisfies the requirements of section

1129(a)(7) of the Bankruptcy Code.

**8.      The Plan Has Been Accepted by Nearly All Classes
         Entitled to Vote On the Plan (Section 1129(a)(8)). The
         Rejecting Classes Will Be Reinstated or Have Full Access to Insurance**

Subject to the exceptions identified in section 1129(b) of the Bankruptcy Code, section

1129(a)(8) of the Bankruptcy Code requires that each class of claims and interests either has

accepted the Plan or is not impaired under the Plan. A class of claims accepts a plan if the

holders of at least two-thirds in dollar amount and more than one-half in the number of claims in

the class vote to accept the plan, counting only those claims whose holders actually vote to

accept or reject the plan. 11 U.S.C. § 1126(c). A class of interests accepts a plan if the holders

of at least two-thirds in amount of the interests in the class vote to accept the plan, counting only

those claims whose holders actually vote to accept or reject the plan. 11 U.S.C. § 1126(d). As

noted above, Classes A1, B1, B2, B3, B4 and B5 are unimpaired under the Plan and therefore are

deemed to have accepted the Plan. 11 U.S.C. § 1126(f). Class A2, multiple subclasses of Class

A3, Class A4 and Class A5 have overwhelmingly voted to accept the Plan. *See* Voting

Declaration.

The Deemed Rejecting Classes will receive no distributions under the Plan, so those

classes are deemed to have rejected the Plan. 11 U.S.C. § 1126(g); *In re PWS Holding Corp.*,

228 F.3d at 231-232. Moreover, three subclasses of Class A3 and one subclass of Class A7 have

voted to reject the Plan. Since the Plan does not satisfy the acceptance requirements of section

1129(a)(8), it must be confirmed under the "cram down" provisions of section 1129(b) of the

Bankruptcy Code. The Plan satisfies the "cram down" requirements, as demonstrated herein.

**9.      The Plan Provides for the Payment in Full
         of All Allowed Priority Claims (Section 1129(a)(9)).**

As required by section 1129(a)(9) of the Bankruptcy Code, the Plan provides for the

payment in full on the Effective Date (or as soon as practicable thereafter) of all claims entitled

to priority under section 507(a) of the Bankruptcy Code. Under section 1129(a)(9) of the

Bankruptcy Code, unless otherwise agreed by the applicable claimholder, a plan must provide

that:

A. the holder of a claim entitled to priority under section 507(a)(2) or (3) will receive cash for the allowed amount of the claims on the effective date of the plan;

B. the holder of a claim entitled to priority under section 507(a)(1), (4), (5), (6) or (7) will receive either deferred cash payments for the allowed amount, or cash for the allowed amount of the claim on the effective date of the plan;

C. the holder of a tax claim entitled to priority under section 507(a)(8) will receive regular installment payments in cash (i) of the total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

D. the holder of a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, will receive cash payments on account of that claim in the same manner and over the same period as described above in subparagraph (C).

Section 3.1(a) of the Plan provides that each Holder of an Allowed Administrative Claim

shall receive from the Debtors (a) Cash equal to the unpaid portion of such Allowed

Administrative Claim or (b) such different, less favorable treatment as to which the applicable

Debtor and such holder have agreed upon in writing; *provided* that Allowed Administrative

Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during

the chapter 11 cases shall be paid in ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

With respect to Other Priority Claims in Classes A1 and B1, sections 3.2(a) and 3.3(a) of the Plan provide that each holder of an Allowed Other Priority Claim would receive either (a) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (b) such different, less favorable treatment as to which the applicable Debtor and such holder have agreed upon in writing.

Section 3.1(b) of the Plan provides that each holder of an Allowed Priority Tax Claim would receive (a) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Allowed Priority Tax Claim becomes Allowed, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different, less favorable treatment as to which the applicable Debtor and such holder of an Allowed Priority Tax Claim shall have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under section 511(a) of the Bankruptcy Code), equal to such Allowed Priority Tax Claim, over a period ending not later than five years after the Petition Date.

Moreover, to the extent an Allowed Other Secured Claim would otherwise be an Allowed Priority Tax Claim, but for the secured status of that claim, such holder would receive cash payments on account of that claim in the same manner and over the same period as Allowed Priority Tax Claims. As set forth in the *Notice of Treatment Option Applicable to Holders of Class A3 Other Secured Claims Pursuant to Section 3.2(c) of Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., et al., Debtors* that the Debtors filed with this Court on February 26, 2010 [Docket No. 1092] (the

"Other Secured Claim Notice"), to the extent a holder of a tax claim has an Allowed Other Secured Claim against the Encumbered Debtors, the legal, equitable, and contractual rights of the holder of such Allowed Other Secured Claim against an Encumbered Debtor will be Reinstated as of the Effective Date in accordance with the provisions of section 1124(2) of the Bankruptcy Code. Moreover, pursuant to section 3.3(b) of the Plan, the legal, equitable and contractual rights of each holder of an Allowed Other Secured Claim against an Unencumbered Debtor will be Reinstated as of the Effective date in accordance with the provisions of section 1124(2) of het Bankruptcy Code.

It should be noted that in accordance with the Other Secured Claim Notice, the Allowed Other Secured Claims of *all* of the parties that filed the Taxing Authority Objections will be Reinstated as of the Effective Date in accordance with the provisions of section 1124(2) of the Bankruptcy Code, and that the Allowed Priority Tax Claims of *all* of the parties that filed the Taxing Authority Objections will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. Moreover, Administrative Claims arising out of post-petition taxes will be satisfied by Administrative Claim treatment that comports with the Bankruptcy Code's requirements. Accordingly, the Plan's treatment of the Allowed tax Claims of the parties that filed the Taxing Authority Objections fully complies with the Bankruptcy Code.

### 10. At Least One Class of Impaired Claims Has Accepted the Plan (Section 1129(a)(10)).

Section 1129(a)(10) of the Bankruptcy Code requires at least one class of impaired claims to accept the Plan, not counting the votes of any insiders. Class A2, multiple subclasses of Class A3, Class A4 and Class A5 have voted to accept the Plan within the meaning of section 1126 of the Bankruptcy Code, without the need to include any acceptance of any insider. *See*

Voting Declaration. The Plan therefore satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

### 11. The Plan Meets the Feasibility Requirement of Section 1129(a)(11) of the Bankruptcy Code.

Section 1129(a)(11) of the Bankruptcy Code requires as a condition to confirming a plan of reorganization that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). In interpreting the requirements of section 1129(a)(11), courts have found the language of the statute to be "sufficiently broad so as to have provided a great deal of latitude to Courts interpreting its provisions." *In re Eddington Thread Mfg., Co., Inc.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995). The courts have also universally interpreted the statute to mean that a debtor need only demonstrate a reasonable assurance of commercial viability, and the court need not require a guarantee of success in order to find that a plan satisfies the feasibility requirement. *See e.g., In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1165-66 (5th Cir. 1993); *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D. N.J. 2000); *Corestates Bank, N.A. v. United Chem. Tech., Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996).

While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence – proof that a given fact is "more likely than not." *In re Briscoe Enters., Ltd.*, 994 F.2d at 1164; *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 802; *Corestates Bank, N.A.*, 202 B.R. at 45. Further, a number of courts have held that this constitutes "a relatively low threshold of proof." *In re Eddington Thread Mfg. Co.*, 181 B.R. at 833; *In re Mayer Pollack Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the

debtors "have established that they meet the requisite low threshold of support for the Plan as a viable undertaking …"); *see also In re Briscoe Enters. Ltd.*, 944 F.2d at 1116 (upholding the bankruptcy court's ruling that a reorganization that had only "a marginal prospect of success" was feasible because only "a reasonable assurance of commercial viability" was required). The courts have also made clear that "speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds." *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, at *170 (Bankr. S.D.N.Y. 2003).

Courts have fashioned a series of factors to be considered in the determination of whether a debtor's plan is feasible. These factors, while varying from case to case, traditionally include: the adequacy of the debtor's capital structure, the earning power of its business, economic conditions, the ability of the debtor's management, the probability of the continuation of the same management, and other related matters affecting successful performance under the provisions of the plan. *See, e.g., In re Prussia Assocs.*, 322 B.R. at 584; *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. at 226-27; *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 801 (discussing the factors that the bankruptcy court examined in its decision that the debtor's plan was feasible). As the evidence will show, the Plan satisfies each of the factors courts consider in determining whether a plan of reorganization is feasible.

As stated in the McEachen Declaration, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further chapter 11 filing of the Reorganized Debtors, because the post-Effective Date capital structure was designed to enable the Debtors to meet their debts as such debts mature in the ordinary course. Upon emergence from chapter 11 under the Plan, the Reorganized Debtors will have reduced their indebtedness by over $400 million and will have eliminated tens of millions of dollars per year of interest expense. The

Debtors also intend to document and consummate a $25 million first lien exit facility that will provide adequate liquidity for the Reorganized Debtors' working capital needs at emergence, and have maintained normal trade credit terms with the majority of their principal suppliers. All of the foregoing should materially improve the Reorganized Debtors' overall financial health and performance.

Exhibit 9 to the Disclosure Statement details the financial projections of the Reorganized Debtors' annual performance for fiscal years 2010 through 2014. The five-year financial projections support the Reorganized Debtors' ability to meet their obligations while at the same time maintaining sufficient liquidity and capital resources. Subject to the risks described in the Disclosure Statement, the Debtors believe that the financial projections indicate that the Reorganized Debtors should have sufficient cash flow to (a) make payments and other distributions required under the Plan, (b) service debt obligations contemplated under the Plan, and (c) maintain their business operations on and after the Effective Date on a going concern basis.

Additionally, the evidence at the Confirmation Hearing will demonstrate that the projections underlying the Reorganized Debtors' business plan were based on a thorough analysis of the Reorganized Debtors' operations when considering historical and recent operational performance, opportunities for improving operational efficiency and reducing waste and costs, and published market research regarding forecast growth rates for the primary markets in which the Debtors participate. The Debtors submit that the assumptions underlying their financial projections are reasonable, and that the Reorganized Debtors are more likely than not to meet the results reflected in the projections. In sum, the Debtors will establish that the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

12. **All Court and United States Trustee Fees Have Been or Will be Paid (Section 1129(a)(12)).**

Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan only if "[a]ll fees payable under section 1930 of Title 28, as determined by the court at the hearing on confirmation of the Plan have been paid or the plan provides for the payment of all such fees on the effective date of the plan." Section 11.3 of the Plan provides for the payment by the Reorganized Debtors of all quarterly fees due to the Clerk of the Court and the Office of the United States Trustee. The Plan therefore satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

13. **The Plan Adequately and Properly Treats Retiree Benefits (Section 1129(a)(13)).**

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continued payment of certain retiree benefits "for the duration of the period that the debtor has obligated itself to provide such benefits." Section 6.5(a) of the Plan provides as follows:

> Except to the extent (i) otherwise provided for in the Plan (including, without limitation, otherwise provided in subparagraphs (d) and (f) of this Section 6.5 and in Section 6.6 of the Plan), (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation, benefit, and expense reimbursement programs, plans, policies, and agreements of the Debtors in effect during the pendency of the Chapter 11 Cases, including all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all benefits subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Cases, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan; *provided, however,* that the foregoing provision shall not apply to unpaid compensation and severance Claims that were not authorized to be paid under the First Day Employee Order, which unpaid Claims shall be treated as Other Priority Claims or General Unsecured Claims, as may be applicable. Except as expressly provided in the Plan, nothing contained herein shall be deemed to modify the existing terms of any such employee compensation, benefit, and expense

reimbursement program, plan, policy, or agreement, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

Additionally, section 6.5(g) of the Plan, which was heavily negotiated with the Creditors' Committee, clarifies the obligations of the Debtors to provide health benefits to retired employees and spouses or surviving spouses of retired employees under pre-petition arrangements. Therefore, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

### 14. Section 1129(a)(14) Does Not Apply to the Debtors.

Section 1129(a)(14) of the Bankruptcy Code provides that "[i]f the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition." 11 U.S.C. 1129(a)(14). Such provision is inapplicable to the Debtors.

### 15. Section 1129(a)(15) Does Not Apply to the Debtors.

Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan. Since the Debtors are not individuals, section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Debtors.

### 16. Transfers of Property of the Plan Will be Made in Accordance With any Applicable Provisions of Non-Bankruptcy Law that Govern the Transfer of Property by a Corporation or a Trust that is Not a Moneyed, Business, or Commercial Corporation or Trust (Section 1129(a)(16)).

Transfers of property of the Plan will be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or a trust

that is not a moneyed, business, or commercial corporation or trust. The Plan specifies how transfers of property to creditors and transfers of the Litigation Trust Assets to the Litigation Trust will be made. Accordingly, the Plan satisfies the requirements of section 1129(a)(16) of the Bankruptcy Code.

### B. Section 1129(b) Cramdown Requirements

Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims and equity interests. Section 1129(b)(1) of the Bankruptcy Code provides, in pertinent part:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirements contained in section 1129(a)(8) of the Bankruptcy Code] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims and interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

As stated in the Other Secured Claim Notice, the Debtors will Reinstate the Allowed Other Secured Claims of the claimants in Class A3 that voted to reject the Plan: the City of Kalamazoo and the County of Washington. Thus, these claimants are deemed unimpaired by the Plan and should be deemed to accept the Plan, and the Plan can be confirmed without resort to cram down on those subclasses.

Thus, under section 1129(b) of the Bankruptcy Code, this Court may cram down the Plan over the dissenting votes of the Deemed Rejecting Classes and the dissenting subclass of Class A7, as long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to those Classes. The Plan satisfies those requirements, and thus can be crammed down on those rejecting Classes.

1. **The Plan Complies with Section 1129(b)(1) of the Bankruptcy Code Because It Does Not Discriminate Unfairly Against Holders of Claims and Equity Interests in Rejecting Classes.**

The requirement in section 1129(b)(1) of the Bankruptcy Code that a plan not discriminate unfairly against impaired, dissenting classes focuses on the treatment of the dissenting class relative to other classes consisting of similar legal rights. *See* H.R. Rep. No. 95-595, at 416-417 (1977) ("The plan may be confirmed ... if the class is not unfairly discriminated against with respect to equal classes if junior classes will receive nothing under the plan."); *see also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 62 (Bankr. S.D.N.Y 1990) (same). Moreover, section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination among classes; it prohibits only discrimination that is "unfair" with respect to the class or classes that do not accept the plan. *In re 11,111, Inc.*, 117 B.R. 471,478 (Bankr. D. Minn. 1990). As such, a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if classes comprising similarly situated claims or interests receive treatment under the plan that is not equivalent, and there is no reasonable basis for the disparate treatment. *See, e.g., In re Kennedy*, 158 B.R. 589, 599 (Bankr. D. N.J. 1993); *In re Resorts Int'l*, 145 B.R. 412, 481 (Bankr. D. N.J. 1990).

Here, the "unfair discrimination" requirement does not apply to the Deemed Rejecting Classes, or the subclass of Class A7 that voted to reject the Plan, because there are no other classes of claims or interests that have similar legal rights to the rights of those Classes. Class A7 consists of tort claimants against the Encumbered Debtors who may have access to a pool of assets to which general unsecured creditors of the Encumbered Debtors certainly do not have access; namely, the proceeds of the Debtors' existing liability insurance policies. Class A8 consists of Claims against the Encumbered Debtors that are subordinated to the claims of the

Encumbered Debtors' general unsecured creditors, as set forth in the Plan's definition of the term "Subordinated Claim." *See* Plan § 1.138. Class A10 consists of all preferred and common stock equity interests in Freedom Holdings issued and outstanding prior to the Effective Date, while Class A11 consists of stock options or other rights to purchase the stock of Freedom Holdings. *Cf. In re Kennedy*, 158 B.R. at 599 (Bankr. D. N.J. 1993); *In re America West Airlines, Inc.*, 179 B.R. 893, 897 (Bankr. D. Ariz. 1995) (stating that stock options are junior interests to common stock, preferred stock and all creditors). Hence, there is no basis for any of these Classes to assert that their treatment under the Plan is the result of unfair discrimination compared to similarly situated Classes.

The Plan also does not discriminate unfairly against Class A7 (Tort Claims against the Encumbered Debtors), even though Class A4 (General Unsecured Claims against the Encumbered Debtors) are receiving a specified recovery from the Encumbered Debtors' estates and the holders of Class A7 may only pursue recoveries from the proceeds of the Debtors' existing insurance policies. As noted above, the Existing Lenders have asserted liens on substantially all of the Encumbered Debtors' assets. As part of the global settlement and compromise embodied in the Plan, the Existing Lenders have agreed to provide a significant portion of the recovery to which they are legally entitled to the holders of Allowed General Unsecured Claims against the Encumbered Debtors. This compromise was the result of several months of hard-fought negotiations.

Under established precedent in this jurisdiction, senior secured creditors may (a) share a portion of their proceeds under a reorganization plan with holders of unsecured claims, without including holders of tort claims. *See, e.g., Genesis Health Ventures*, 266 B.R. at 602, 617-18; *In re MCorp Financial, Inc.*, 160 B.R. 941 (S.D. Tex. 1993) (where a junior creditor

received a distribution by agreement from a distribution otherwise due to a senior creditor, the senior creditor may share its proceeds with the junior creditor, even if other junior creditors are left out, as long as the juniors who do not receive a distribution from the senior receive at least as much as they would without the sharing). Like the plan in *Genesis Health*, under the Debtors' Plan, the Existing Lenders have agreed to "carve out" property that is subject to their liens and provide it to junior claimants. The Debtors' Plan is distinguishable from the plan at issue in *In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005) (lower court's judgment denying confirmation of plan affirmed, where the plan at issue provided for the distribution of warrants to the debtors' sole equity holder over the objection of the debtors' unsecured creditors (who were to receive less than 100% recovery) violated the absolute priority rule). Unlike the Plan in this case, *Armstrong* did not involve a carve-out of property from a secured lender's lien, and a class that was junior to the rejecting class was receive warrants. Thus, nothing prohibits the Existing Lenders from sharing a portion of their recovery with holders of Allowed General Unsecured Claims against the Encumbered Debtors, while not sharing any of their recovery with Class A7.

### 2. The Plan Complies with Section 1129(b) of the Bankruptcy Code Because It Is Fair and Equitable with Respect to Holders of Claims and Equity Interests in Rejecting Classes.

Under section 1129(b)(2)(B)(ii) of the Bankruptcy Code, a plan is fair and equitable with respect to a dissenting class of claims if the holders of any claim or interest that is junior to the claims of such class will not receive or retain any property on account of such junior claim or interest. Moreover, under section 1129(b)(2)(C)(ii) of the Bankruptcy Code, a plan is fair and equitable with respect to a dissenting class of interests if no class junior to such class receives or retains any property under the plan. 11 U.S.C. § 1129(b)(2)(C)(ii); *see In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 352 (Bankr. D. Del. 1998) ("[W]here an estate is solvent ... unsecured and

undersecured creditors' claims must be paid in full … before equity holders may participate in any recovery."); *In re Union Meeting Partners*, 165 B.R. 553, 569 (Bankr. E.D. Pa. 1994) (a plan is not fair and equitable if it violates the "absolute priority rule").

Even though one subclass of Class A7 has voted to reject the Plan, the Plan is fair and equitable as to Class A7 because holders of claims or interests that are junior to that Class will not receive or retain any property under the Plan on account of such junior claim or interest. Similarly, Class A8 is deemed to reject the Plan because holders in that Class would receive no recoveries on account of their Claims under the Plan. *See* 11 U.S.C. § 1126(g). Holders of Allowed General Unsecured Claims against the Encumbered Debtors (a Class that is senior to Class A8) are not being paid in full under the Plan. However, no holders of any Classes of Claims or Interests junior to Class A8 will receive or retain any property under the Plan on account of such junior claim or interest. Accordingly, the Plan is fair and equitable with respect to the rejecting subclass of Class A7 and to Class A8.

Moreover, Classes A10 and A11 are deemed to have rejected the Plan because the holders of Interests in such class are not entitled to any distributions under the Plan. *See* 11 U.S.C. § 1126(g). However, because there are no classes junior to Classes A10 and A11 that will receive any distributions under the Plan, the Plan is fair and equitable with respect to Classes A10 and A11. Therefore, in accordance with section 1129(b) of the Bankruptcy Code, this Court may cram down the Plan on the rejecting Classes.

## C. Section 1129(d) of the Bankruptcy Code

The Plan does not have as one of its principal purposes the avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933. Thus, section 1129(d) of the Bankruptcy Code does not bar confirmation of the Plan.

## III.   THE UNRESOLVED OBJECTIONS SHOULD BE OVERRULED

### A.   To the Extent the Taxing Authority Objections
###      Have Not Been Resolved, They Should be Overruled

The Plan's treatment of the Allowed tax Claims of the holders of the Taxing Authority

Objections complies fully with the Bankruptcy Code.  Specifically, the Allowed Other Secured

Claims of all of the parties that filed the Taxing Authority Objections will be Reinstated as of the

Effective Date in accordance with the provisions of section 1124(2) of the Bankruptcy Code, and

the Allowed Priority Tax Claims of all of the parties that filed the Taxing Authority Objections

will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.  Moreover,

Administrative Claims arising out of post-petition tax Claims will be treated in accordance with

section 1129(a)(9)(A) of the Bankruptcy Code.  Thus, there is no valid basis upon which to

object to the Plan's treatment of the Allowed Priority Tax Claims and the Allowed Other

Secured Claims of the holders of the Taxing Authority Objections, and the Taxing Authority

Objections relating to the Plan's treatment of such Allowed Claims must be overruled.

To address one of the Taxing Authority Objections, that of the United States, the Debtors

have agreed to insert language substantially similar to the following in the proposed order

confirming the Plan:

> Any Allowed Priority Tax Claim held by the Internal Revenue Service shall be paid in
> full pursuant to Section 3.1(b)(iii) of the Plan, in quarterly installments over a period
> ending five (5) years after the Petition Date, with the first payment to be made on the last
> day of the calendar quarter that is at least ten (10) days after the Distribution Date and
> subsequent payments to be made on the last day of each calendar quarter thereafter
> through the five (5)-year period; provided, however, that the Debtors reserve the right to pay
> pay such Allowed Priority Tax Claim on an accelerated schedule, including in a lump
> sum.  Notwithstanding any provision to the contrary in the Plan, the Plan Supplement, or
> this Order, nothing shall affect the rights of the Internal Revenue Service to assert setoff
> (subject to 11 U.S.C. § 553) and recoupment and such rights are expressly preserved;
> provided, however, that the Debtors reserve the right to challenge the assertion of setoff
> and recoupment on any basis.

The Debtors understand that the Taxing Authority Objections filed by Maricopa County and the United States have been consensually resolved and that those Taxing Authority Objections will be withdrawn. To the extent it is not resolved prior to the Confirmation Hearing, the objection of the Texas Tax Jurisdictions should be overruled for the reasons set forth above.

**B.    The U.S. Trustee's Objection Must be Overruled**

        **1.    The Provisions of the Plan Relating to an Administrative Claims Bar Date are Fair and Reasonable, and Are Consistent With the Bankruptcy Code, Established Caselaw and Constitutional Due Process**

The U.S. Trustee objects to the Plan's requirement (in section 11.2) that holders of certain types of asserted Administrative Claims file requests for payment of such Administrative Claims within 45 days after the Effective Date. The U.S. Trustee argues that this requirement would "improperly exclude certain administrative claims from payment, and would alter substantive rights under nonbankruptcy law by, among other things, depriving potential claimants of local statutes of limitation." U.S. Trustee Objection at 3. The U.S. Trustee also asserts that the Debtors seek to deny due process to administrative claimants. The U.S. Trustee's position is contrary to the explicit provisions of the Bankruptcy Code and established caselaw in the Third Circuit. In fact, section 1141(d)(1)(A) of the Bankruptcy Code provides that the confirmation of a plan discharges the debtor from any debt that arose before the date of confirmation. Accordingly, the U.S. Trustee's objection should be overruled.

Section 11.2 of the Plan provides, in relevant part, as follows:

> All Requests for Payment of an Administrative Claim (other than as set forth in Sections 3.1(a) and 11.1 and this Section 11.2 of the Plan) must be filed with the Bankruptcy Court and served on counsel for the Debtors or Reorganized Debtors no later than forty-five (45) days after the Effective Date. *The Debtors shall provide supplemental notice of such filing deadline by mail with respect to known claimants and by publication with respect to unknown claimants.* Unless the Debtors or Reorganized Debtors object to an Administrative Claim by

the applicable Claims Objection Deadline, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, (a) no Request for Payment need be filed with respect to an undisputed postpetition obligation which was paid or is payable by any of the Debtors in the ordinary course of business; *provided, however,* that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; ...

Plan § 11.2 (emphasis added). The Debtors propose to establish an bar date for parties to assert certain non-ordinary course Administrative Claims, and the Debtors will provide notice of such bar date by mail to all known claimants and by publication with respect to unknown claimants. The Debtors submit that administrative claim bar dates are consistent with the discharge of administrative claims provided for under section 1141(d)(1) of the Bankruptcy Code and have been established in numerous other bankruptcy cases. Furthermore, the notice that the Debtors would provide of any administrative claim bar date meets Constitutional due process requirements. Additionally, to the extent that any party wishes to assert an Administrative Claim after the bar date that this Court establishes, such party is free to move for leave to file a late Administrative Claim or for other appropriate relief.

The Plan's proposed treatment of Administrative Claims (including the establishment of an Administrative Claims bar date) is consistent with the Bankruptcy Code's discharge provisions. Section 1141(d)(1)(A) of the Bankruptcy Code provides, in relevant part, as follows:

Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—
(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;
(ii) such claim is allowed under section 502 of this title; or
(iii) the holder of such claim has accepted the plan;

11 U.S.C. § 1141(d)(1). Since section 1141(d)(1)(A) of the Bankruptcy Code defines the scope of the chapter 11 debtor's discharge upon confirmation to include "any debt that arose before the date of such confirmation," courts have concluded that this statutory provision should be interpreted as written. *See, e.g.*, *In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir. 1992) (explaining that "[w]hen the chapter 11 plan of [the debtor] was confirmed, [the claimant] simply no longer had an 'administrative claim' - he then had only the contractual claim upon the debtor"); *In re Polysat, Inc.*, 152 B.R. 886 (Bankr. E.D. Pa. 1993). In accordance with the Third Circuit's ruling in *Benjamin Coal*, upon the Effective Date of the Plan in these cases, holders of Administrative Claims would only have contract claims against the Debtors (*i.e.*, their contractual entitlements under the confirmed Plan).[12]

---

[12] Section 11.10(a) of the Plan provides that upon the Effective Date, the Debtors would receive a discharge from all claims (including Administrative Claims) that arose before the date of entry of an order confirming the Plan:

"Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Interests of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims; *and upon the Effective Date, except as otherwise provided herein or in the Confirmation Order, (i) the Debtors, and each of them, shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (C) the holder of a Claim based upon such debt accepted the Plan,* and (ii) all Interests shall be terminated."

Plan § 11.10. (emphasis added). This provision, to which the U.S. Trustee did not object, is a standard discharge provision that is consistent with section 1141(d)(1)(A) of the Bankruptcy Code and established Third Circuit caselaw.

It is well-established that once confirmed, a debtor's reorganization plan binds the debtor and all creditors, regardless of whether the creditor has accepted the plan, provided that the creditor has been given notice sufficient to satisfy due process. See, e.g., *DePippo v. Kmart Corp.*, 335 B.R. 290, 295 (S.D.N.Y. 2005), citing *Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*, No. 02 Civ. 9629, 2003 WL 21355214, at *3 (S.D.N.Y. June 11, 2003) (citing 11 U.S.C. § 1141(a)). Where notice satisfies due process, "an order confirming a reorganization plan operates too discharge all unsecured debts and liabilities, even those of tort victims who were unaware of the debtor's bankruptcy." *In re U.S.H. Corp.*, 223 B.R. 654, 657 (Bankr. S.D.N.Y. 1998). Due process is met if notice is reasonably calculated to reach all interested parties, reasonably conveys all of the required information, and permits a reasonable amount of time for response. *See, e.g., Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252 (3d Cir. 2000); citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

What constitutes "reasonable notice" principally depends on the status of the parties and whether the creditor is a "known" creditor or an "unknown" creditor.[13] While actual notice is required if the creditor is a "known" creditor, constructive notice is sufficient where a creditor is "unknown." *See id.* at 295-96, *citing City of New York v. New York N.H. & H.R. Co.*, 344 U.S. 293, 296, 73 S.Ct. 299, 97 L.Ed. 333 (1953). When a creditor is unknown to the debtor,

---

[13] The Supreme Court has explained that a "known" creditor is one whose identity is either known or "reasonably ascertainable by the debtor." *Tulsa Prof'l Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988). "A creditor's identity is 'reasonably ascertainable' if that creditor can be identified through 'reasonably diligent efforts.' " *In re U.S.H. Corp.*, 223 B.R. at 659 (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983)). However, "[r]easonable diligence does not require 'impracticable and extended searches ... in the name of due process.' " *In re U.S.H. Corp.*, 223 B.R. at 659 (quoting *Mullane*, 339 U.S. at 317, 70 S.Ct. 652). Rather, "[t]he requisite search instead focuses on the debtor's own books and records"; a debtor is not required to go beyond "a careful examination of these documents." *Id.* Conversely, a creditor is "unknown" if their "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Mullane*, 339 U.S. at 317, 70 S.Ct. 652.

publication notice of a bar date is adequate constructive notice sufficient to satisfy due process requirements because, "in the case of persons missing or unknown, employment of an indirect and even probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." *Mullane*, 339 U.S. at 317, 70 S.Ct. 652; *see also New York N.H.*, 344 U.S. at 296, 73 S.Ct. 299 (concluding publication of the claims bar date satisfies requirements of due process with respect to providing notice to unknown creditors); *In re XO Comms., Inc.*, 301 B.R. 782, 792-93 (Bankr. S.D.N.Y. 2003). Debtors are not required to provide actual notice to anyone who potentially could have been affected by their actions, because such a requirement would completely vitiate the important goal of prompt and effectual administration and settlement of debtors' estates. *In re U.S.H. Corp.*, 223 B.R. at 659.

This is exactly what the Debtors will do pursuant to section 11.2 of the Plan; *i.e.*, provide notice of the administrative claim bar date by mail with respect to known claimants and by publication with respect to unknown claimants. Accordingly, the Debtors respectfully submit that section 11.2 of the Plan complies with the Bankruptcy Code, established caselaw and Constitutional due process.

*In re UAL Corp.*, 398 B.R. 243, 247-48 (N.D. Ill. 2008), a case cited by the U.S. Trustee in its objection, does not bolster the U.S. Trustee's argument. In that case, the district court ruled that once the debtor's chapter 11 plan was confirmed, under the plain language of section 1141(d)(1) of the Bankruptcy Code, the debtor was discharged from all claims based on conduct occurring prior to confirmation, except as otherwise provided in the Plan or in the order confirming the Plan. Accordingly, the district court reversed the bankruptcy court's judgment that the claimant was authorized by 28 U.S.C. § 959(a) to file a lawsuit against the debtor in state court for employment discrimination allegedly occurring prior to the date of confirmation.

However, the district court also held that the debtor failed to provide Constitutionally adequate notice of the administrative claim bar date, because the claimant was a "known" creditor and the debtor had failed to provide actual notice to him. The facts of *UAL Corp.* are readily distinguishable from the facts here, as there has been no allegation that the Debtors have provided inadequate notice to a particular claimant. Indeed, these cases have not progressed to the point where the adequacy of notice of an administrative claims bar date to a particular creditor is at issue. If this issue ever arises, this Court can address it at the appropriate time (which would be after the expiration of the Administrative Claim bar date).

### 2.     The U.S. Trustee's Remaining Objections Should be Overruled

In its objection, the U.S. Trustee states that the Plan cannot be confirmed because section 1129(a)(3) (the good faith requirement) has been violated. However, the only basis the U.S. Trustee asserts in support of that position is the Administrative Claim bar date issue described above. For the reasons described above, however, there is nothing inappropriate about the Plan provisions relating to the Administrative Claim bar date. Accordingly, the U.S. Trustee's objection with respect to the section 1129(a)(3) good faith requirement should be overruled.

In its objection, the U.S. Trustee stated that the Debtors bear the burden at the Confirmation Hearing to demonstrate how any proposed person or entity to be released under the satisfies the *Master Mortgage* requirements. As stated above, based on the circumstances and the record of the Debtors' chapter 11 cases and the record that will be adduced at the Confirmation Hearing (including the Declaration of Mark McEachen in support of confirmation of the Plan, which will be filed with this Court prior to the Confirmation Hearing), the paramount interest of creditors and other parties-in-interest supports the inclusion of the release, exculpation, injunction and limitation of liability provisions as permissible elements of the Plan,

are reasonable and appropriate, and, therefore, should be approved. Accordingly, any objection the U.S. Trustee may raise to these Plan provisions should be overruled.

## IV. CONCLUSION

For all of the reasons set forth in this Memorandum, the Debtors respectfully request that this Court overrule all unresolved objections and confirm the Plan.

Dated: Wilmington, Delaware
March 5, 2010

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: 302-571-6600
Fax: 302-571-1253
Email: mnestor@ycst.com
           kcoyle@ycst.com

- and -

Robert A. Klyman
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: 213-485-1234
Fax: 213-891-8763
Email: robert.klyman@lw.com

- and –

Rosalie Walker Gray
Michael J. Riela
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: 212-906-1200
Fax: 212-751-4864
Email: rosalie.gray@lw.com
           michael.riela@lw.com

Counsel for Debtors and Debtors in
Possession